UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MENDES and DORIS MENDES,<br><br>   Plaintiffs,<br><br>v.<br><br>CENDANT MORTGAGE,<br><br>   Defendant. | )<br>)<br>)  Civil Action No. 05CV11765DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

Pursuant to Federal Rule of Civil Procedure 56, Defendant, PHH Mortgage Corporation f/k/a Cendant Mortgage ("Cendant"), has moved for summary judgment on all claims of the Plaintiffs, Anthony Mendes and Doris Mendes (collectively, "Mendes"). The gist of Mendes' claim is that Cendant breached a commitment to make Mendes a loan in connection with Mendes' proposed purchase of property located at 1-3 Chilson Avenue, Mansfield, Massachusetts (the "Property"). But Mendes has admitted in discovery that they were unable to fulfill certain agreed-upon conditions of a loan agreement between the parties. For this reason, and for the additional reasons discussed below, the Court should grant Cendant summary judgment on all of the Mendes' claims.

### Undisputed Facts

1. In 2001, Mendes began searching for a home to purchase in Mansfield, Massachusetts. See Deposition of Anthony Mendes ("A. Mendes Dep."), p. 23.

2.  At all relevant times, Mendes was represented by counsel in connection with their search for property to purchase. See A. Mendes Dep., pp. 54-55.

3.  In connection with this search, Anthony Mendes was referred to Richard Luongo of Cendant concerning mortgage financing. Id. at 45-46. In the spring of 2001, Luongo sent Anthony Mendes a series of Pre-Qualification letters for a loan, dated March 21, 2001, May 3, 2001, and June 12, 2001. Id. at pp. 92-105, Ex. 3-5. All of these letters had conditions attached to them. Id. at pp. 92-105, Ex. 3-5; see also Deposition of Richard Luongo ("Luongo Dep."), pp. 38-41.

4.  On June 12, 2001, Mendes saw the property located at 1-3 Chilson Avenue, Mansfield, Massachusetts (the "Property") for the first time. See Anthony Mendes Dep., p. 31. The Property is a 3 family dwelling, with a three bedroom unit, a two bedroom unit, and a one bedroom unit. Id. at p. 38. Mendes intended to live at the Property with the younger of their two sons. Id. at pp. 39-40.

5.  On June 12, 2001, Mendes made an offer to purchase the Property for $305,000, which the owner accepted. See Anthony Mendes Dep., p. 31, Ex. 2. Mendes made a deposit of $1,000 with the offer, which Mendes paid with a check drawn on Doris Mendes' account at Citizens Bank. See Anthony Mendes Dep., p. 31, Ex. 2; see also, Deposition of Doris Mendes ("D. Mendes Dep."), p. 44, Ex. 1.

6.  On June 14, 2001, Mendes submitted a Residential Loan Application to Cendant for the purchase of the Property. See Complaint, Ex. A. By the application, Mendes applied to Cendant for a Federal Housing Administration ("FHA") loan. Id. Anthony Mendes made the application with Mr. Luongo by telephone. See A. Mendes Dep., p. 68; Luongo Dep., pp. 43-49.

7. In the Application, Mendes represented to Cendant that they had $14,100 in the bank. Id., Ex. A at p. 3. By the Application, Mendes also represented to Cendant that Anthony Mendes' base employment income was $3,500 per month; and that the Mendes' total income was over $9,000 per month, including $1,575 of anticipated rental income from the Property. Id. These representations, as it turned out, were not true, as set forth immediately below.

8. Mendes submitted documentation to Cendant in support of the Application. See Affidavit of Clair Taylor ("Taylor Aff."), ¶¶ 6-7, Ex. B-C. This documentation included the following:

- Bank statements from Fleet Bank, Citizens Bank, and Metropolitan Credit Union that showed a total account balance of $6,976.49, as opposed to the $14,100 that the Mendes represented they had in the Application.[1]

- Income and employment documentation for Anthony Mendes that showed the following earnings history:

    1999:  Total earnings of $34,454.33, or $2,871.19 per month;

    2000:  Total earnings of $35,609.24, or $2,967.44

    2001:  Base pay in 2001 at the rate of $34,320 per year, or $2,860 per month, *i.e.,* well under the $3,500 per month that Mendes represented in the Application.

9. On July 6, 2001, Mendes entered into a purchase and sale agreement with the owner of the Property (the "P&S"). Defendants' Second Set of Requests For Admissions To Plaintiff Anthony Mendes and Doris Mendes, number 20; Exhibit C, Response of Anthony Mendes and Doris Mendes to Second Set of Requests for Admissions, number 20. Mendes made an additional deposit of $8,000 with the P&S, for a total deposit of $9,000. Id.

---

[1] Notably, the Citizens Bank statement was dated June 19, 2001, and did not include the $1,000 deposit that Mendes made with the Offer, which was paid for by a check that did not clear Citizens Bank until June 20, 2001. See D. Mendes Dep., Exs. 1, 7.

10. Pursuant to paragraph 8 of the P&S, a closing was scheduled for August 31, 2001. See Response to Requests for Admissions, Ex. C. Paragraph 26 of the P&S was a Mortgage Contingency Clause, which conditioned Mendes' purchase of the Property on their obtaining a mortgage loan commitment of $297,000 on or before July 31, 2001. Id.

11. Pursuant to a July 11, 2006, appraisal of the Property done on behalf of Cendant by John G. Pacheco of High Point Real Property Appraisers, Inc. (the "Appraiser"), the fair market rental value of the Property's three units, including the unit that Mendes proposed to occupy, was $2,075. See Taylor Aff., ¶ 8, Ex. C.

12. In order to qualify for an FHA loan, the Mendes were required to meet the following debt to income ratios:

- The Mendes' total monthly mortgage payment could not exceed 29 percent of the Mendes' gross effective income (the "Mortgage Payment Expense Ratio").

- The Mendes' total of their monthly mortgage payment and all recurring charges could not exceed 41 percent of the Mendes' gross effective income (the "Total Fixed Payment Ratio").

See Taylor Aff., ¶ 8, Ex. A, Chapter 2, Section 5.[2]

13. Pursuant to an underwriting analysis that Cendant Mortgage performed on August 1, 2001, Mendes' Mortgage Payment Expense Ratio was 36.84% and their Total Fixed Payment Ratio was 52.74%, well above acceptable ratios, according to FHA guidelines. See Taylor Aff., ¶ 10, Ex. F. This issue was addressed in Cendant's final commitment letter to Mendes.

14. On August 10, 2001, Cendant sent to Mendes a Final Commitment letter for the Property. See A. Mendes Dep. p. 120, Ex. 7. The first sentence of the Final Commitment provided that:

---

[2] Under FHA guidelines, a lender has some discretion in regard to these ratios. Id.

4

BOST_199042.3

> Cendant Mortgage Corporation is pleased to issue a mortgage loan commitment to you which reflects the final terms of your loan.

15.     Paragraph "A" of the Final Commitment entitled, "Conditions to commitment," provided that the terms of the loan included:

- Base Loan Amount:  $297,765

- MIP/funding fee . . . :  $4,466.48

- Total loan amount:  $302,231.00

- Approved Interest Rate:  7.250

- Loan Type:  FHA

Id.[3]

16.     Paragraph "C" of the Final Commitment, entitled, "Conditions to commitment," provided:

> *Please read the conditions listed below carefully.*  They are a part of this commitment and are needed to meet your August 31st, 2001 closing date.

See A. Mendes Dep. p. 120, Ex. 7 (emphasis in original).

17.     Among the conditions listed in paragraph C of the Final Commitment are the following:

- Customer to provide bank statement to show where that $9,000 deposit on sales Contract came from and an escrow letter from attorney.

- Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental *(also to obtain additional income to lower ratios)*

See A. Mendes Dep. p. 120, Ex. 7 (emphasis added).

---

[3] MIP refers to a mortgage insurance premium required for FHA loans.  See Taylor Aff., ¶ 11.

5

18.     The reference to "escrow letter from attorney" in the Final Commitment referred to a requirement of an FHA loan for a multi-family home that the borrow have three months reserves, or in this case, $6,225 in liquid assets.  See Taylor Aff., ¶ 13, Ex. A, Chapter 1, Section 2, paragraph 1-8(C)(3).

19.     The condition concerning the net market rental value of the Property was based on FHA guidelines for three family homes that provides:

> Regardless of occupancy status, the property must be self-sufficient (i.e., the maximum mortgage is limited so that the ratio of the monthly mortgage payment, divided by the monthly net rental income, does not exceed 100 percent).

See Taylor Aff., ¶ 3, Ex. A, Chapter 1, Section 2, paragraph 1-8(C).

20.     "PITI" referred to in the Final Commitment is the amount that the Mendes would have to pay monthly toward Principal, Interest, Taxes, and Insurance in connection with their proposed purchase of the Property.  See Taylor Aff., ¶ 15.  The PITI on Mendes' proposed loan from Cendant was $2,490.34.  See Taylor Aff., ¶ 15, Ex. G.

21.     The last paragraph of the Final Commitment, entitled "Acceptance of Offer," and located directly above where Mendes signed the Final Commitment, provided:

> The terms and conditions offered by this Final Commitment letter and Attachments are accepted by the undersigned.  I/we have received a duplicate original of this document.

See A. Mendes Dep. p. 120, Ex. 7.

22.     Mendes accepted the Final Commitment on August 14, 2001.  Id.

23.     On August 22, 2001, the Appraiser submitted an addendum to his appraisal that reflected an increase in the monthly fair market rental value of the Property from $2,075 to $2,325.  See Taylor Aff., ¶ 9, Ex. E.

BOST_199042.3

24.     Since the PITI on the Mendes' proposed loan from Cendant was $2,490.34, notwithstanding this addendum, PITI exceeded 75% of the Property's monthly fair market rental value. Taylor Aff., ¶¶ 9, 15.

25.     On August 29, 2001, Mendes and the Property's seller agreed to extend the closing date on a sale of the Property to September 13, 2001. See A. Mendes Dep., pp. 138, 139, Ex. 10.

26.     After August 22, 2001 and even beyond the re-scheduled closing date, Cendant attempted to have the Appraiser increase his estimate of the fair market rental value of the Property. See Taylor Aff., ¶ 18, Exs. H and I. The Appraiser, however, would not raise his opinion of the fair market rental value of the Property. Id. at 16.

27.     Mendes never provided to Cendant an appraisal that evidenced that PITI didn't exceed 75% of the net market rental value for all 3 units of the Property. See Taylor Aff., ¶ 16.

28.     Mendes never provided to Cendant any bank statements showing the source of the $9,000 deposit. Taylor Aff., ¶ 7.

29.     Mendes never provided to Cendant an escrow letter from his attorney that he had three months reserves, as required by FHA Guidelines, in order to close on their purchase of the Property. Id. at ¶ 14.

30.     Notably, as of August 2001, Mendes had only $2,768.16 in cash. See D. Mendes Dep., Exs. 5-7.

31.     Thereafter, Cendant informed Mendes that they would not be able to close on Mendes' proposed loan because the Property did not meet FHA Guidelines. See A. Mendes Dep., p. 206, Ex. 28.

BOST_199042.3

32. Even though Mendes' mortgage contingency deadline had expired on July 31, 2001, the seller of the Property returned the Mendes' $9,000 deposit to them. See A. Mendes Dep., p. 174, Ex. 13.

33. In addition, Cendant refunded to Mendes a $350 application fee that Mendes had paid in June 2001. See Taylor Aff., ¶ 17.

34. On November 16, 2001, Mendes purchased a three bedroom home located at 895 School Street, in Mansfield, Massachusetts for $269,900. See A. Mendes Dep., pp. 26-27.

## Argument

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). On an issue where the plaintiff has the burden of proof, the defendant may meet this initial burden by merely pointing out the absence of facts to support the plaintiff's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986)  If the moving party is successful in carrying this initial burden, summary judgment should be granted unless the opponent establishes the existence of a genuine issue of fact by credible evidence in the record that would be admissible at trial. Id. at 325.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

For the reasons discussed below, the Court should grant summary judgment on all of Mendes' claims against Cendant.

**I.   The Court Should Grant Cendant Summary Judgment On Count I Of The Complaint For Breach Of Contract Because  Cendant Did Not Breach The Terms Of Its Contract With Mendes**

8

In Count I of the Complaint, Mendes alleges as follows:

Cendant agreed to provide Mr. and Mrs. Mendes with $307,545 in financing to purchase a home.

Cendant breached that agreement by refusing to provide the insurance [sic].

See Complaint, ¶¶ 27-28.

These breach of contract allegations are without merit because Cendant did not breach the Final Commitment. This contract governed under what circumstances Cendant would be contractually obligated to provide financing to Mendes for their purchase of the Property. The Final Commitment was subject to the following condition that Mendes was never able to satisfy:

Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental (also to obtain additional income to lower ratios)

Cendant never received an appraisal that evidenced that PITI did not exceed 75% of the Property's fair market rental value, a pre-requisite to Cendant's obligation to provide a loan to Mendes. Given Mendes' failure to meet this condition, Cendant was under no obligation to provide Mendes with the financing under the Final Commitment. Therefore, Cendant could not have breached the Final Commitment by refusing to provide financing to Mendes to purchase the Property.

Although the condition concerning the Property's rental value was the stated reason that Cendant provided to Mendes for not closing on the loan, Mendes also did not meet other conditions in the Final Commitment. Specifically, Mendes (1) never provided to Cendant any bank statements showing the source of the $9,000 deposit, or (2) an escrow letter from their attorney that he had three months reserves, as required by FHA Guidelines, in order to close on their purchase of the Property. See Taylor Aff., ¶¶ 7, 14. For these additional reasons, Cendant

did not breach the Final Commitment because Cendant had no obligation to close on the proposed loan to Mendes with these conditions outstanding.

Notably, in their answers to discovery, Mendes admitted that they do not have any facts to support a claim that Cendant breached the Final Commitment. See Mendes' Answers to Interrogatories, numbers 8, 9, 18. Given that Mendes has the burden of proof on their breach of contract claim, this admission, which establishes an absence of facts to support any claim that Cendant breached the Final Commitment, entitles Cendant to summary judgment on Count I of the Complaint. Celotex, 477 U.S. at 323, 325.

In fact, Mendes does not even allege in the Complaint that Cendant breached the terms of the Final Commitment. See Complaint, passim; see also Mendes' Responses to Requests For Admissions, number 21 (Mendes deny that the Final Commitment is the contract between the parties). Rather, Mendes does allege in the Complaint that Cendant breached the terms of the June 12, 2001, letter, which Mendes alleges was a binding contract by which Cendant was obligated to provide financing to Mendes. See Complaint, ¶¶ 6, 7, 27, 28, Ex. A. This claim fails for a variety of reasons. As an initial matter, even assuming the June 12, 2001, letter created contractual obligations, by agreeing to the terms of the August 10, 2001, Final Commitment, Mendes agreed to a modification of the terms under which Cendant would be obligated to make a loan to Mendes. Cochran v. Quest Software, 328 F.3d 1, 9 (1st Cir. 2003); Roddy & McNulty Ins. Agency v. A.A. Proctor & Co., 16 Mass. App. Ct. 525, (536) (1983); see also Puretest Ice Cream v. Kraft, 806 F.2d 323, 325 (1st Cir. 1986) (under doctrine of merger, "earlier contract disappears. It does not remain to exert some wraith-like influence on what otherwise would be clear, unambiguous meaning"). Having agreed to the terms of the

BOST_199042.3

Final Commitment, Mendes cannot go back to an alleged earlier agreement and argue that this agreement sets forth the parties' contractual rights.

In any event, the June 12, 2001, letter, especially in the context of the earlier pre-qualification letters and Mendes' subsequent loan application to Cendant, cannot be construed to be a binding contract between the parties. Indeed, the following provisions of the June 12, 2001, letter alone make clear that it is not intended to be a binding contract between the parties:

> Once we arrange and receive a satisfactory appraisal on the home you intend to buy, and we verify your income and assets, you will be ready to go to closing.

As set forth above, Cendant was unable to verify the income and the assets that Mendes represented that they had, as set forth in the Application. In addition, Cendant did not receive a satisfactory appraisal for the Property, *i.e.,* one that evidenced that PITI did not exceed 75% of the Property's fair market rental value.[4]

Given the foregoing, Mendes cannot prevail on their breach of contract claim, and, therefore, this Court should enter summary judgment on Count I of the Mendes' complaint.

## II. The Court Should Grant Mendes Summary Judgment On Count II Of The Complaint For Breach Of Implied Contract Since No Implied Contract Existed

In Count II of the Complaint, for "Breach of Implied Contract," Mendes alleges as follows:

> Cendant represented that it would provide home financing in the amount of $307,545.
>
> As a result of this representation, Mr. and Mrs. Mendes did not look for alternative financing, executed an agreement to purchase 1-3 Chilson Street, and paid a $9,000 deposit.

---

[4] Mendes have also never produced the entire June 12, 2001 letter. Therefore, they cannot sustain any claim based on this letter because they will be unable to introduce this letter into evidence at trial.

> Cendant indicated after execution of the purchase and sale agreement as to 1-3 Chilson Street that it would not provide financing.
>
> As a result of Cendant's refusal to provide financing, Mr. and Mrs. Mendes suffered damages in excess of $120,000.

Mendes' allegations in Count II of the Complaint that Cendant "represented" that it would make a loan to Mendes, as opposed to the allegation in Count I of the Complaint that Cendant "agreed" to make a loan to Mendes, cannot alter the reality of the parties' contractual relationship. Specifically, the Final Commitment defined when Cendant would be contractually obligated to make a loan to Mendes in regard to their proposed purchase of the Property. As set forth above, Cendant was under no obligation to close a loan to Mendes because of Mendes' failure to satisfy the conditions of the Final Commitment.

Given the contract between the parties, the Final Commitment, Mendes cannot bring a claim for breach of an implied contract. E.g., Micromuse, Inc. v. Micromuse, PLC, 304 F. Supp. 2d 202, 209 n. 8 (D. Mass. 2004) (where a contract governs the parties' relationship, the contract provides the measure of the plaintiff's right and no action for an implied contract lies) citing McKesson v. New York State Common Retirement Fund, 339 F.3d 1087, 1091 (9th Cir 2003); In Re Harbour House Operating, 26 B.R. 324, 330 (Bkrtcy. D. Mass. 1982) (express contract between the parties bars implied contract claim); In Re D. Federico Co., 8 B.R. 888, 897 (Bkrtcy. D. Mass. 1981) (recovery on a theory of contract implied in law is not permitted where an express contract covers the same subject) citing Randolph v. New England Mutual Life Ins., 526 F. 2d 1383 (6th Cir. 1975); Zarum v Brass Mill Materials, 334 Mass. 81, 84 (1956) ("the law will not imply a contract where there is an existing express contract covering the same subject matter").

12

Accordingly, the Court should grant Cendant summary judgment on Count II of the Complaint.

### III. The Court Should Grant Mendes Summary Judgment On Count III Of The Complaint For Violation Of Chapter 93A

Mendes makes the following allegations in support of their Chapter 93A claim.

Mr. and Mrs. Mendes later claimed that Cendant's [sic] acted wrongfully in refusing to provide financing as to the purchase of 1-3 Chilson Street.

In response, Cendant claimed that it had proposed that Mr. and Mrs. Mendes utilize conventional financing at or about Cendant refused to provide financing guaranteed by the FHA. [sic]

Cendant never made any such proposal.

\* \* \*

Cendant committed unfair and deceptive acts in violation of Section 2 of Mass Gen. Laws Chapter 93A.

Such actions include, but are not limited to, Cendant's refusal to provide financing to Mr. and Mrs. Mendes and its misrepresentation that it offered to provide conventional financing to them.

See Complaint, ¶¶23-25, 37, 38.

These allegations fail to state a claim for violations of Chapter 93A. Massachusetts General Laws, chapter 93A, section 2(a) provides that, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The claim that Cendant refused to provide Mendes financing is no more than a restatement of Mendes' breach of contract claim. As a matter of law, a breach of contract claim does not rise to the level of a Chapter 93A claim, *i.e.,* an unfair or deceptive act or practice in the conduct of any trade or commerce. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-101 (1979).

13

As to Mendes' misrepresentation claim, they have admitted that this alleged misrepresentation claim occurred in response to their October 7, 2002, demand letter purportedly sent pursuant to Chapter 93A.  See A. Mendes Dep., pp. 194-195, passim.  Given the timing of this alleged representation, it could not have caused Mendes any damages.  Damages, however, is an essential element of a Chapter 93A claim.  Hershenow et al. v. Enterprise Rent-A-Car Company of Boston, Inc., et al., 445 Mass. 790, 797-800 (2006).  Mendes, therefore, cannot sustain their alleged Chapter 93A claim based on Cendant's alleged misrepresentation.

In their answers to discovery, Mendes has admitted that their Chapter 93A claim is not based on any alleged unfair and deceptive conduct beyond what is set forth in the Complaint.  See, Plaintiffs' Answers To Interrogatories, numbers 19.  Because these alleged claims fail to state a Chapter 93A claim, the Court should grant Cendant summary judgment on the Mendes' Chapter 93A claim.

## Conclusion

For all of the foregoing reasons, PHH Mortgage Corporation f/k/a Cendant Mortgage requests that the Court grant it summary judgment on all of the Plaintiffs' claims.

>PHH MORTGAGE CORPORATION,
>f/k/a Cendant Mortgage,
>
>By its attorneys,
>
>/s/Andrew Keith Goldstein
>Thomas I. Elkind, BBO Number 153080
>Andrew Keith Goldstein, BBO Number 552239
>Foley & Lardner LLP
>111 Huntington Avenue
>Boston, Massachusetts  02199
>(617) 342-4000
>agoldstein@foley.com
>telkind@foley.com

Dated:  September 22, 2006

## CERTIFICATE OF SERVICE

  I, Andrew Keith Goldstein, hereby certify that on September 22, 2006, I caused the foregoing document to be served by first class mail, postage prepaid, and by e-mail upon the Plaintiffs' attorney, Christopher J. Trombetta, Law Office of Christopher J. Trombetta, 310 North Main Street, Mansfield, MA 02048.

              /s/Andrew Keith Goldstein
              Andrew Keith Goldstein