UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MENDES and DORIS MENDES, | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 05CV11765DPW |
| | ) |
| v. | ) |
| | ) |
| CENDANT MORTGAGE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **AFFIDAVIT OF ANDREW K. GOLDSTEIN AUTHENTICATING DOCUMENTS**

I, Andrew Keith Goldstein, depose and state as follows:

1.      I am an attorney associated with the law firm of Foley & Lardner LLP, counsel to Defendant, Cedant Mortgage in the above-captioned matter.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of Defendant's Second Set of Requests For Admissions to Plaintiffs Anthony Mendes and Doris Mendes.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Response of Anthony Mendes and Response of Doris Mendes to Second Set of Requests for Admissions.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the deposition transcript of Anthony Mendes taken on June 1, 2006 in this action.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the deposition transcript of Doris Mendes taken on September 8, 2006 in this action.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of the deposition transcript of Richard Luongo taken on July 12, 2006.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of exhibits 2 -5, 7, 10, 12-13, and 28 to the deposition of Anthony Mendes taken on June 1, 2006 in this action.

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of exhibits 1, 5-7 to the deposition of Doris Mendes taken on September 8, 2006 in this action.

9.      Attached hereto as <u>Exhibit H</u> is a true and correct copy of Anthony Mendes and Doris Mendes' Responses to Defendant's First Set of Interrogatories.

EXECUTED UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA THIS 22nd DAY OF SEPTEMBER, 2006.


                                    /s/ Andrew K. Goldstein
                                    Andrew K. Goldstein

- 2 -

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew Keith Goldstein, hereby certify that on September 22, 2006, I caused the foregoing document to be served by first class mail, postage prepaid, and by e-mail upon the Plaintiffs' attorney, Christopher J. Trombetta, Law Office of Christopher J. Trombetta, 310 North Main Street, Mansfield, MA 02048.

/s/ Andrew K. Goldstein
Andrew Keith Goldstein

- 3 -

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MENDES<br>And DORIS MENDES,<br><br>Plaintiffs,<br><br>v.<br><br>CENDANT MORTGAGE,<br><br>Defendant. | )<br>)<br>)   Civil Action No. 05CV11765DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S SECOND SET OF REQUESTS FOR
## ADMISSIONS TO PLAINTIFF ANTHONY MENDES

Pursuant to Federal Rule of Civil Procedure 36, Defendant Cendant Mortgage, now known as PHH Mortgage Corporation, hereby requests that Plaintiff Anthony Mendes make the following admissions for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at trial:

### I.    That each of the following statements is true:

1 7 .    By a letter dated January 9, 2006, a copy of which is attached hereto as Exhibit A, Plaintiffs produced to Defendant documents identified in Plaintiffs' Initial Disclosures.

1 8 .    Among the documents that Plaintiffs produced was the document attached hereto as Exhibit B.

1 9 .    Exhibit B is a true copy of five pages of a six page fax that Richard Luongo of Cendant Mortgage sent to Anthony Mendes on May 3, 2001.

2 0 .    In May 2001, Anthony Mendes worked for Riverbend Convalescent Home.

2 1 .    Riverbend Convalescent Home's fax number in May 2001 was 508-653-8385.

2 2 .   <u>Exhibit C</u> attached hereto is a true copy of a July 6, 2001, Standard Form

Purchase and Sale agreement between Doris H. Mendes and Anthony P. Mendes, as buyers, and

the One Chilson Avenue Realty Trust, Helen Jackson, Trustee.

2 3 .   <u>Exhibit D</u> attached hereto is a true copy of a Final Commitment between Cendant

Mortgage, on the one hand, and Anthony Mendes and Doris Mendes, on the other hand.

2 4 .   Your signature appears at the bottom of pages 2 and 3 of <u>Exhibit E</u>.

PHH MORTGAGE CORPORATION,
f/k/a Cendant Mortgage,

By its attorneys,

Thomas I. Elkind, BBO# 153080
Andrew K. Goldstein, BBO #552239
Foley & Lardner LLP
111 Huntington Avenue
Boston, Massachusetts  02199
(617) 342-4000

Dated: February 3, 2006

## CERTIFICATE OF SERVICE

I, Andrew Keith Goldstein, hereby certify that on February 3, 2006, I caused the
foregoing document to be served by first class mail, postage prepaid, and by e-mail, upon the
Plaintiffs' attorney, Christopher J. Trombetta, Law Office of Christopher J. Trombetta, 310
North Main Street, Mansfield, MA 02048.

Andrew Keith Goldstein

2

LAW OFFICE OF

# CHRISTOPHER J. TROMBETTA

310 NORTH MAIN STREET

MANSFIELD, MASSACHUSETTS 02048

TELEPHONE (508) 339-5900 • FAX (508) 339-3111

www.trombettalaw.com

January 9, 2006

Andrew K. Goldstein
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA  02199

   Re:  <u>Anthony and Doris Mendes v. Cendant Mortgage;</u>
     <u>C.A. No. 05CV11765DPW</u>

Dear Andrew:

   Enclosed please find documents identified in Plaintiffs' Initial Disclosures.

   Please call with any questions.

       Very truly yours,

       Christopher J. Trombetta

cc:  Anthony and Doris Mendes

Enclosure

Case 1:06-cv-11765-DPW   Document 14-2   Filed 09/22/2006   Page 5 of 19



# Mortgage Services

## Facsimile Transmission

**From:**    **Name:**    Richard Luongo
             **Fax Number:**    856-917-2966
             **Voice Phone:**    800-236-3268 Ext. 84853

**To:**    **Name:**    Anthony P Mendes
           **Company:**
           **Fax Number:**    (9)1-508-653-8385
           **Voice Phone:**

**Fax Notes:**

**Date and time of transmission:** Thursday, May 03, 2001 6:04:02 PM
**Number of pages including this cover sheet:** 06



Cendant Mortgage
3000 Leadenhall Road
Mt. Laurel, NJ 08054

**CENDANT**
*Mortgage*

May 3, 2001

ANTHONY P MENDES

171 BRIDGE ST
DEDHAM, MA 02026

Sales Price: $340,000.00

Loan Amount: $337,335.25

Interest Rate: 7.250%

Type / Term of Loan:
FHA, 360 months

# YOU'RE APPROVED!

Dear ANTHONY P MENDES, DORIS MENDES,

We're pleased to tell you that you've been approved for a mortgage loan in the amount of $337,335.25. From here on, getting the home you want will be as easy as 1-2-3. We'll be with you all the way, from the application process right through closing.

Now that your application is already completed and on file with us, all you need to do is find your dream home. As soon as you do, simply call us at 1-800-236-3268, Ext. 84853, to give us the property address, and we'll make sure your loan closes right on time – guaranteed. You can use it to call us 7 days a week with any questions about your mortgage process.

*As part of the Cendant Mortgage Family, you now have these unique advantages:*

- ◆ HOUSE-HUNTING WITH CONFIDENCE. Knowing that your mortgage loan is already approved, you can look for your new home – confident that the closing process will be smooth and easy.

- ◆ SERVICE EXCELLENCE. Our service is so outstanding that 95% of our customers would recommend us to their family and friends. We will answer all of your mortgage questions promptly and thoroughly.

- ◆ **NEGOTIATING POWER.** With your financing secured and a closing date guaranteed, sellers know that your offer is solid.

- ◆ **GUARANTEED SERVICE.** We guarantee that we'll meet your closing date, or we'll give you 1/8th of one percent off your interest rate for the life of your loan.*

- ◆ **FLEXIBILITY.** Although you've been approved for a specific loan amount, we realize that your loan requirements may change. Simply call us if you need to change your loan amount, or the term or type of loan.

*While you continue to search for your new home, here are some important reminders:*

- ◆ Your interest rate is floating; however, you may call us at any time to discuss our available Rate Protection options. Based on your rate now, the maximum total monthly payment you qualify for is $2,716.26. This would be principal and interest of $2,301.22 and estimated taxes and insurance of $415.04 (includes private mortgage insurance, if applicable).

- ◆ Remember to call us at 1-800-236-3268, Ext. 84853, with the property address as soon as you have selected a home.

Please note: The following page is a checklist of items needed for your final approval before we go to closing. Please take a moment to review it.

We're here to make your home buying experience a fast, simple, and pleasant one. We look forward to helping you purchase your dream home, and we welcome your questions, now, or any time.

Sincerely,


Richard Luongo
Mortgage Consultant
1-800-236-3268, Ext. 84853

*P.S. Good luck househunting! As soon as you call us at 1-800-236-3268, Ext. 84853, with the property address, it'll take only a few minutes to get you moving toward a fast and easy mortgage closing.*

*Conventional purchase loans only. Customers must use a Cendant Mortgage - approved closing agent.



# NEXT STEPS IN THE HOME-BUYING PROCESS.

Now that your mortgage loan is approved, there are only three more steps to go in the homebuying process. We're here to guide you along the way. If you have any questions, simply call us at 1-800-236-3268, Ext. 84853.

**STEP ONE:**

Look for your dream home.

**STEP TWO:**

Once you've selected your home and signed the sales contract, call us at 1-800-236-3268, Ext. 84853, right away. We already have all of your loan information on file, so it will only take a few moments for us to fill in the remaining items. Then we can send your updated application which reflects your purchase price.

**STEP THREE:**

After you have found your home, these are the items that we need to complete your loan package:

❑  Fully executed agreement of sale on the property being purchased to show a sales price of $340,000.00

❑  Subject to receipt and review of a satisfactory appraisal on the property being purchased that supports the sales price, to be ordered by Mortgage Services.

❑  If any information has changed from your original application, including property type, additional documentation may be required.

❑  Fully executed FHA Amendatory Clause.

❑  Evidence any outstanding Collection Account, Charge-off, Tax Lien, or Judgement has been satisfied.

❑  Please provide the policy date and declaration page for the homeowner's insurance policy 5 days prior to closing.

❑  If the property you select is located in a flood zone, a flood insurance policy will be required.

❑  All pages of the past two months bank statements for all accounts to show $16,000.00.

❑  Loan approval is not subject to the sale of any property.

# NEXT STEPS IN THE HOME-BUYING PROCESS.

- ❑ Last 2 years W-2s for Doris Mendes.
- ❑ Last 2 years W-2s for Anthony Mendes.
- ❑ Mortgage services will obtain verbal or written verification of employment.
- ❑ Fully executed Real Estate Certification.
- ❑ Satisfactory wood destroying insect infestation report (NPCA 1 or state specific) must be obtained within 30 days of closing.
- ❑ Any large deposits that appear on the bank/investment account statements will need to be explained and documented.
- ❑ All pages of the most recent quarterly statement for 401K account to show $2,000.00 and evidence sufficient funds are liquidated.
- ❑ All pages of the most recent quarterly statement for 401K account and evidence of liquidation in the amount of $2,000.00.
- ❑ Copy of Anthony Mendes' most recent pay statements for the past 30 days to verify gross monthly income of $3,200.00 and year-to-date earnings.
- ❑ Copy of Doris Mendes' most recent pay statements for the past 30 days to verify gross monthly income of $3,933.00 and year-to-date earnings.
- ❑ Satisfactory explanation for delinquencies on credit report.
- ❑ If delinquencies were the result of extenuating circumstances, please provide evidence supported by 3rd party documentation.
- ❑ Mortgage Services to order a credit supplement in order to delete erroneous accounts and verify previously paid accounts have a zero balance. If we are unable to verify the accounts are inaccurate, you must qualify with the monthly payment.
- ❑ In order to obtain a satisfactory 12 month rental reference, we will need the name and phone number of your landlord.
- ❑ Mortgage Services to obtain evidence of clear CAIVRS prior to closing, verifying no delinquent outstanding debts owed to the government.
- ❑ Verification the account with lord taylor has a minimum payment of $30.00.
- ❑ Verification the account with wm filene has a minimum payment of $50.00.
- ❑ Return the Home Inspection Disclosure (HUD-92564-CN) that was provided to you, signed and dated prior to the date on the contract of sale.

EXHIBIT
C

**STANDARD FORM**
**PURCHASE AND SALE AGREEMENT**

From the Office of:
GERRY ABBOTT INC., RLTRS.
43 North Main Street
Mansfield, MA 02048
508-339-6336/261-1218-fax

**1. PARTIES AND MAILING ADDRESSES**
(fill in)

This ___6th___ day of ___July___ ___2001___

One Chilson Avenue Realty Trust, Helen Jackson, Trustee of
1-3 Chilson Avenue, Mansfield, MA 02048

hereinafter called the SELLER, agrees to SELL and
Doris H. and Anthony P. Mendes of
171 Bridge Street, Dedham, MA 02048

hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set forth, the following described premises:

**2. DESCRIPTION**
(fill in and include title reference)

Land and buildings known and numbered as 1-3 Chilson Avenue, Mansfield, MA 02048, situated on approximately 9416 square feet of land, and as more accurately described in Book 5166, Page 161, of the North Bristol County Registry of Deeds.

**3. BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**
(fill in or delete)

Included in the sale as a part of said premises are the buildings, structures, and improvements now thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall carpeting, drapery rods, automatic garage door openers, venetian blinds, window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating equipment, stoves, ranges, oil and gas burners and fixtures appurtenant thereto, hot water heaters, plumbing and bathroom fixtures, garbage disposers, electric and other lighting fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, and, ONLY IF BUILT IN, refrigerators, air conditioning equipment, ventilators, dishwashers, washing machines and dryers; and

but excluding chandelier in Unit #1 - Helen's House

**4. TITLE DEED**
(fill in)
* Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER's breach of SELLER's covenants in leases, where necessary.

Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven 7 calendar days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

(a) Provisions of existing building and zoning laws;
(b) Existing rights and obligations in party walls which are not the subject of written agreement;
(c) Such taxes for the then current year as are not due and payable on the date of the delivery of such deed;
(d) Any liens for municipal betterments assessed after the date of this agreement;
(e) Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises; *
*(f)    substantially    residential

* or prevent the mortgagability thereof.

**5. PLANS**

If said deed refers to a plan necessary to be recorded therewith the SELLER shall deliver such plan with the deed in form adequate for recording or registration.

**6. REGISTERED TITLE**

In addition to the foregoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

**7. PURCHASE PRICE**
(fill in); space is allowed to write out the amounts if desired

The agreed purchase price for said premises is ($ 305,000.00)
Three Hundred Five Thousand ----------------- dollars, of which

| $ | 1,000.00 | have been paid as a deposit this day and |
| $ | 8,000.00 | at signing of Purchase & Sale Agreement |
| $ | 296,000.00 | are to be paid at the time of delivery of the deed in cash, or by certified, cashier's, treasurer's or bank check(s). |
| $ | | |
| $ | 305,000.00 | TOTAL |

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991
GREATER BOSTON REAL ESTATE BOARD
Rev. 1999    Form No. RA151



All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.    CWV 5.0

**8. TIME FOR PERFORMANCE; DELIVERY OF DEED (fill in)**

Such deed is to be delivered at **1:00** o'clock **P.** M. on the **31st** day of **August** **2001**, at the **North Bristol County** Registry of Deeds, unless otherwise agreed upon in writing. It is agreed that time is of the essence of this agreement. **or at the office of the Counsel for Lending Institution.**

**9. POSSESSION AND CONDITION OF PREMISE.**

*(attach a list of exceptions, if any)*

Full possession of said premises **free of all tenants and occupants**, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and zoning laws, in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to personally enter said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause **\*substantially     \*\* when inspected by Buyer's home inspector**

**10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM**

*(Change period of time if desired).*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto, unless the SELLER **shall** use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty **30 calendar** days. **and above shall be at the Buyer's option or unless the Buyer's mortgage commitment expires.**

**11. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.**

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on or said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

**12. BUYER's ELECTION TO ACCEPT TITLE**

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

**13. ACCEPTANCE OF DEED**

**\*\*\*\* without recourse,**

The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

**14. USE OF MONEY TO CLEAR TITLE**

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed.

**15. INSURANCE**

*\*insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| Type of Insurance | Amount of Coverage |
| --- | --- |
| (a) Fire and Extended Coverage | **\*** Sufficient to Cover This Agreement |
| (b) | |

**16. ADJUSTMENTS**

*(list operating expenses, if any, or attach schedule)*

Collected rents, mortgage interest, water and sewer use charges, operating expenses (if any) according to the schedule attached hereto or set forth below, and taxes for the then current fiscal year, shall be apportioned and fuel value shall be adjusted, as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed. Uncollected rents for the current rental period shall be apportioned if and when collected by either party.

**\*\*\*within 48 hours prior to close.**

Copyright © 1979, 1984, 1986, 1987, 1988, 1991 Greater Boston Real Estate Board. All rights reserved.

**17. ADJUSTMENT OF UNASSESSED AND ABATED TAXES**

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding fiscal year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

**18. BROKER's FEE**
*(fill in fee with dollar amount or percentage; also name of Brokerage firm(s))*

A Broker's fee for professional services of 2.5% of the Purchase Price is due from the SELLER to Jack Conway Realtors of 311 Washington St. Westwood, MA  02090, only if and when the Title passes and the Deed is recorded.

~~the Broker(s) herein, but if the SELLER pursuant to the terms of clause 21 hereof retains the deposits made hereunder by the BUYER, said Broker(s) shall be entitled to receive from the SELLER an amount equal to one-half the amount so retained or an amount equal to the Broker's fee for professional services according to this contract, whichever is the lesser.~~

**19. BROKER(S) WARRANTY**
*(fill in name)*

The Broker(s) named herein Gerry Abbott Inc., Realtors & Jack Conway warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts. Realtors

**20. DEPOSIT**
*(fill in name)*

All deposits made hereunder shall be held in escrow by Gerry Abbott Inc., Realtors as escrow agent subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement. In the event of any disagreement between the parties, the escrow agent may retain all deposits made under this agreement pending instructions mutually given in writing by the SELLER and the BUYER. Deposit shall be kkept in an interest bearing account in a federally insured bank with the interest split equally between the Buyer and Seller at closing.

**21. BUYER's DEFAULT: DAMAGES**

If the BUYER shall fail to fulfill the BUYER's agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages ~~unless within thirty days after the time for performance of this agreement or any extension hereof, the SELLER otherwise notifies the BUYER in writing~~ and this shall be the Seller's Sole and Exclusive Remedy at Law and in Equity.

**22. RELEASE BY HUSBAND OR WIFE**

The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

**23. BROKER AS PARTY**

The Broker(s) named herein join(s) in this agreement and become(s) a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

**24. LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.**

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

**25. WARRANTIES AND REPRESENTATIONS**
*(fill in); if none, state "none"; if any listed, indicate by whom each warranty or representation was made*

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): The Buyer has had the option of having a home inspection prior to the signing of the Purchase & Sale Agreement and the Buyer accepts the premises in their present condition without representation or warranty by the Seller or their Broker as to the condition thereof.

**26. MORTGAGE CONTINGENCY CLAUSE**
*(omit if not provided for in Offer to Purchase)*

In order to help finance the acquisition of said premises, the BUYER shall apply for a \*FHA conventional bank or other institutional mortgage loan of $ 297,000.00  at prevailing rates, terms and conditions. If despite the BUYER's diligent efforts a commitment for such loan cannot be obtained on or before  July 31  , 2001 the BUYER may terminate this agreement by written notice to the SELLER and/or the Broker(s), as agent(s) for the SELLER, prior to the expiration of such time, whereupon any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto. In no event will the BUYER be deemed to have used diligent efforts to obtain such commitment unless the BUYER submits a complete mortgage loan application conforming to the foregoing provisions on or before  July 13  , 2001.

Copyright © 1979, 1984, 1986, 1987, 1988, 1991 Greater Boston Real Estate Board. All rights reserved.        Page 3

27. **CONSTRUCTION OF AGREEMENT**
This instrument, executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. **LEAD PAINT LAW**
The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. **SMOKE DETECTORS**
The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law.

30. **ADDITIONAL PROVISIONS**
The initialed riders, if any, attached hereto, are incorporated herein by reference.
- – Home is connected to public sewer system in Mansfield.
- – Home to be free and clear of all tenants prior to closing.
- – See Attached Rider

**FOR RESIDENTIAL PROPERTY CONSTRUCTED PRIOR TO 1978, BUYER MUST ALSO HAVE SIGNED LEAD PAINT "PROPERTY TRANSFER NOTIFICATION CERTIFICATION"**

NOTICE. This is a legal document that creates binding obligations. If not understood, consult an attorney.

_Helen E. Jackson_
SELLER (or spouse)    1 Chilson Ave Rlty Trst
                       Helen Jackson, Trustee
Taxpayer ID/Social Security No. _____

SELLER _____
Taxpayer ID/Social Security No. _____

_Doris H. Mendes_
BUYER    Doris H. Mendes
Taxpayer ID/Social Security No. _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_

_Anthony Mendes_
BUYER    Anthony P. Mendes
Taxpayer ID/Social Security No. _034 44 0265_

_____
Broker(s)

Copyright © 1979, 1984, 1986, 1987, 1988, 1991 Greater Boston Real Estate Board. All rights reserved.

RIDER to the Purchase and Sale Agreement dated July        , 2001 by and between One Chilson Avenue Realty Trust, Seller, and Doris H. and Anthony P. Mendes, Buyers

RE:    1-3 Chilson Avenue, Mansfield, MA 02048
       Property Address

1     The Seller hereby agrees that the Buyer or the Buyers' representative shall have the right of access to the premises with reasonable notice, to inspect, to take measurements and to show to contractors, architects, insurers, banks and other lenders, at reasonable times, form the date of this Agreement, up to and including the date for the delivery of the deed

2     Seller hereby states that on the day of the closing the premises shall be in broom-clean condition and free from all personal property and debris

3.    The Seller acknowledges and understands that in order for a financial institution to process the Buyers' mortgage application it will require access to the subject premises. The Seller expressly agrees to cooperate to the fullest extent with the financial institution in providing said access. The Seller further understands that at the closing the financial institution will require the Seller to execute certain documents. These documents include but are not limited to the following: federal loan disclosure and adjustment sheets; affidavit relative to purchase price; affidavits relative to the existence of lead paint and urea formaldehyde in the premises; affidavits relative to materialmen's liens, sufficient in form and substance to enable the title insurance company to delete its standard ALTA exception for such lien; affidavit that there are no parties in possession of or entitled to possession of the premises except for those currently in possession. The Seller agrees to sign all such required documents containing true information. The Seller further agrees that the inability of the Buyer to perform pursuant to the terms of this Agreement insofar as it is a result of the Sellers' failure to sign said documents or cooperate with the financial institution, shall not be a breach of this Agreement by the Buyer and shall give rise to the Buyers' option to extend this Agreement for a period of seven (7) days or to terminate this Agreement and receive back all deposits, with interest, paid hereunder.

4.    Any matter or practice arising under or relating to this Agreement which is the subject of a practice standard or title standard of the Massachusetts Conveyancers Association shall be governed by such standard to the extent applicable

5.    All notices required or permitted to be given hereunder shall be in writing and delivered by hand or mailed postage prepaid, by registered or certified mail, addressed in the case of the Seller to:
Helen Jackson, Trustee
One Chilson Avenue Realty Trust
1-3 Chilson Avenue
Mansfield, MA 02048
with a copy to:

Page - 1

and in the case of the Buyer to:
Doris H. and Anthony P. Mendes
171 Bridge Street
Dedham, MA 02048
with a copy to:
Lyn E. Erickson, Esq.
101 Tremont St., Suite 412
Boston, MA 02108
Hand delivery shall be in hand only   Mailed notice shall be deemed given upon postage cancellation date by the U.S. Post Office.

6.   The Seller hereby represents, warrants and covenants to Buyer as follows:
   (a)   That the premises are not the subject of any outstanding agreements with any party pursuant to which any such party may acquire any interest in the premises;
   (b)   The Seller is presently not a party to any lawsuit in reference to the premises, nor is the Seller aware of any threatened or contemplated lawsuits against the Seller in reference to the premises; and,
   (c)   The Seller is not obligated to offer any other person any right of first refusals to buy the within described premises.

7   Seller shall also deliver an insurable title to the premises sufficient to allow the Buyer to obtain an ALTA Owner's Policy with the standard exceptions and subject to specific encumbrances from a company licensed to do business in Massachusetts

8.   The Seller hereby represents and covenants that no notice or communication has been received by Seller from any public authority that there exists with respect to the premises any condition which violates any municipal, state or federal law, rule or regulation which has not heretofore been rectified.

9.   No closing funds are to be released from the closing except in escrow until the deed and mortgage have been recorded at the appropriate registry of deeds   This paragraph is intended to modify Paragraph 7 of the printed Agreement.

10.   Not withstanding the provisions of Paragraph 8 of the printed Agreement to the contrary. in the event the attorney for the Buyers lender is unable to close the Buyer's loan transaction at the time for the performance hereof, the Seller agrees that the time for the performance may be extended to a time and date designed by the Buyer, as directed by the lender's attorney, but in no event later than the fifth (5) business day after the time for performance and such attorney may change the place for delivery to his or her office. Buyer shall give the parties reasonable notice of any such change(s).   Time shall be of the essence for this new date if this clause is exercised.

JUL-06-2001 10:08 AM    CA    GAN AND ERICKSON    617 3    9544    P.05

11.    Reasonable efforts as required by any extension under Paragraph 10 of the printed Agreement shall require the Seller to expend no more than five percent (5%) of the selling price in costs, expenses and fees in order to attempt to make the premises conform therewith.

12    To Paragraph 10 of the printed Agreement is added the following language .   so long as Buyer can obtain corresponding extensions to his or her financing commitment without incurring any material additional bank charges or fees and or a materially higher interest rate.   Material or materially shall mean that the Buyer shall spend no more than an additional $1,500.00 over the life of the loan in bank fees, costs or interest.

13.    Notwithstanding the provisions of Paragraph 12 or any other provision of this Agreement, if prior to the delivery of the deed, the building comprising the premises or any portion of the same are damaged by fire or other casualty so that the same cannot reasonably be restored for the intended use by the time of the delivery of the deed, then at Buyer's option, any payments made under this Agreement shall be forthwith refunded and all of the obligations of the parties hereto shall cease and this Agreement shall be null and void and without recourse.

14.    If the sales price is over Three Hundred Thousand and xx/100 Dollars ($300,000.00) and the Seller (transferor) is a foreign person, the Seller agrees to execute the forms required by Section 1445 of the Internal Revenue Code.

15    The Seller hereby states that to the best of their knowledge, there is no Urea Formaldehyde Foam Insulation (UFFI) present in the premises.

Signed this     6 th.     day of July, 2001.


Helen Jackson, Trustee,
One Chilson Avenue Realty Trust, Seller


Doris H. Mendes, Buyer                    Anthony P. Mendes, Buyer



Cendant Mortgage
3000 Leadenhall Road
Mount Laurel, NJ 08054

 **CENDANT**
*Mortgage*

## FINAL COMMITMENT

Date:                     August 10th, 2001
Loan Number:      0015775950
Customer:             Anthony P Mendes

Doris Mendes

Property Address:  1-3 CHILSON AVE MANSFIELD, MA 02048

Dear  Anthony P Mendes

Doris Mendes

Congratulations!  Cendant Mortgage Corporation is pleased to issue a mortgage loan commitment to you which reflects the final terms of your loan.

### A. Your Approved Loan terms

Base loan amount: $ 297,765.00
MIP/ funding fee (if applicable): $ 4,466.48
Total loan amount: $ 302,231.00
Approved Interest Rate: 7.250
Rate Lock Expiration Date: 08/31/2001
Initial Monthly Principal and Interest: $ 2,061.75
Private Mortgage Insurance required:  NO
Assumable: (Y or N)   Y
Premium Pricing:
Balloon Payment Required: (Y or N)   N
Product:  30 yr FHA Fixed (880)

Loan term:  360
Loan to Value Ratio: 97.63
Loan Type: (FHA/VA/Conv)  FHA
Commitment Expiration Date:  08/31/2001
Escrow account required:  YES

MIP required (FHA loans):  YES
Prepayment Penalty applicable: (Y or N)   Y
Rate Lock Option  [X] Lock     [ ] Rate Protect

[ ] Float     [ ] 1X Float Down

If your loan is an Adjustable Rate Mortgage, the following additional terms apply:
Index:
Rate change cap:
Rate change frequency: (weeks, months, years)
First Adjustment:
Subsequent Adjustment:
If your loan is a Balloon payment loan, please refer to your program description.

Margin:  0.0000
Lifetime Cap:

### B. Points you pay in connection with your loan

**Total points:**    0.000
Origination fee:   0.000
Discount points:  0.000
Commitment fee: 0.000

### C. Conditions to commitment: *Please read the conditions listed below carefully.* They are a part of this commitment and are needed to meet your August 31st, 2001 closing date.
PLEASE SIGN AND RETURN THIS FINAL COMMITMENT.

* Any changes in your application may affect, but is not limited to, rate, points, maximum loan amount, and additional documentation requirements.
* Fully executed FHA Amendatory Clause.
* Please provide the declaration page for the homeowner's insurance policy to equal or exceed mortgage amount or replacement value (5 days prior to closing).
* Mortgage services will obtain verbal or written verification of employment.
* Fully executed Real Estate Certification.
* Return the Home Inspection Disclosure (HUD-92564-CN) that was provided to you, signed and dated prior to the date on the contract of sale.
* Borrower to sign Homebuyer Summary.

* Customer to provide bank statement to show where that $9,000 deposit on sales contract came from and an escrow letter from attorney.
* Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental. (also to obtain additional income to lower ratios)
* Corrected final application and addendum (1003 and 92900a (pgs. 1-4))

### D. Inspections - Well, Septic, Radon, Termite: Inspections are required only if requested by the appraiser and noted in the *Conditions.*

### E. Assumability:
[ ] This loan is not assumable.
[X] Your rights and obligations under the note and mortgage are assumable under certain conditions described in your loan documents.

F. **Prepayment Penalty:**
☐ This loan may be prepaid in part or in full at any time without penalty.
☒ This loan has a prepayment penalty. Refer to your loan documents for when the penalty will be collected.

G. **Expiration of Commitment:** This commitment will expire on 08/31/2001 unless an extension is granted by Cendant Mortgage Corporation. We may cancel this commitment if something occurs which we feel may effect the security or your ability to repay this loan.

H. **Title to Property and Title Insurance:** Cendant Mortgage Corporation must have first lien position on the property. The title to the property must be acceptable to us. The property must comply with zoning regulations. The Title Search/Abstract, Tax Search and Certificates, Instrument Survey and Title Commitment must be forwarded at least 10 days prior to closing, if possible.

A policy of title acceptable to us at your expense, is required. If your proposed mortgage loan is an Adjustable Rate Mortgage, the title policy must include affirmative coverage of an ARM and take no exception to the adjustable feature. Title insurance is also available to protect your interest as owner of the property at an extra charge to you but is not required by us. If you desire such insurance protecting your interest as an owner, please advise your attorney or closing agent.

I. **Survey:** Lender's title insurance policy to be issued pursuant to Paragraph H above shall not contain a survey exception. Should an instrument survey or plot plan be required by the title insurer in order to remove such exception, you must supply us, at your expense, a currently dated survey/plot plan, acceptable to us, noting the location of all boundaries, improvements, set back lines, easements and encroachments on or off of the property. The instrument must be certified to:
Cendant Mortgage Corporation/Secretary of Housing and Urban Development, its Successors and/or Assigns, as their interests may appear, 3000 Leadenhall Road Mount Laurel, NJ 08054

J. **Fire and Flood Insurance:** The following insurance must be provided by you at or prior to closing. Policies must be in effect on the closing date. The Endorsement on the policy should read for First Mortgagee:
Cendant Mortgage Corporation/Secretary of Housing and Urban Development, its Successors and/or Assigns, as their interests may appear, P.O. Box 5954 Springfield, OH 45501-5954 , Attn: Insurance Department

Fire and extended coverage in the amount of full replacement cost or the loan amount, whichever is less, must be fully paid for 1 year with receipt. We will not require you to obtain a policy in excess of the replacement cost of the improvements on the property securing your loan

If flood insurance is required in connection with your loan, it will be listed under your *Conditions*. Flood insurance will be required if your property is in flood zone "A" or "V". We do not require you to obtain a flood insurance policy in excess of the replacement costs of the improvements on the property securing your loan. A binder with a one year paid receipt is acceptable evidence of coverage unless prohibited by state law.

K. **Appraisal:** If an appraisal was obtained in connection with your loan transaction, a copy of it will be provided to you prior to or at closing.

L. **Closing:** At closing, you must sign all of the customary mortgage documents.

M. **Interest Rate:** Your interest rate and terms are governed by your rate lock/ confirmation agreement.

N. **Contacts:** PLEASE DIRECT ALL CALLS AND DOCUMENTATION TO
Kevin Cogan
(800) 236-3268 ext. 87806

O. **State Specific Supplement:** Florida and the New York Department of Banking require us to provide you with additional information contained in the Final Commitment Supplement. Please refer to that supplement for further information about your Final Commitment.

P. **Acceptance:** To accept this commitment, you must sign below and return this letter to us within 15 days from the date of this letter. This agreement cannot be changed orally.

Very truly yours;
Cendant Mortgage Corporation

*Claire Taylor*

Claire Taylor
Production Manager

**ACCEPTANCE OF OFFER:** The terms and conditions offered by this Final Commitment letter and Attachments are accepted by the undersigned. I/we have received a duplicate original of this document.

| _Anthony Mendes_ 8/14/01 | _Doris H. Mender_ 8-14-01 |
|---|---|
| Applicant Name Anthony P Mendes   Date | Applicant Name Doris Mendes   Date |
| _Anthony Mendes_ 8-14-01 | DORIS H. MENDES 8-14-01 |
| Applicant Name   Date | Applicant Name   Date |

0641361 [011501] 02

ADDENDUM TO FINAL COMMITMENT

## C. Conditions to commitment, continued.

* Credit documents expire 07/10/01. Updates will be required if loan is not closed by that date. (Credit report -90 days, other docs - 120 days) (credit report expired)
* Subject to re-qualification if: Buyer's investment into the transaction (allowable closing costs & downpayment) is less than 3% of the sales price
* Sign final application and addendum (1003 and 92900a)
* Subject to re-qualification if: rate or points change from 7.125% with 1% origination fee and 0% discount points
* Subject to requalification if: buyer paid "Closing Costs" are less than $1883.51
* Fully-executed hotel and transient use certification

Applicant Name Anthony P Mendes     Date     Applicant Name Doris Mendes     8-14-01     Date

Applicant Name     Date     Applicant Name DORIS H. MENDES     8-14-01     Date

0041301 (103)DQ 03

Addendum to Final Commitment

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MENDES<br>And DORIS MENDES,<br><br>               Plaintiffs,<br><br>      v.<br><br>CENDANT MORTGAGE,<br><br>               Defendant. | )<br>)<br>)  Civil Action No. 05CV11765DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S SECOND SET OF REQUESTS FOR
## ADMISSIONS TO PLAINTIFF DORIS MENDES

Pursuant to Federal Rule of Civil Procedure 36, Defendant Cendant Mortgage, now known as PHH Mortgage Corporation, hereby requests that Plaintiff Doris Mendes make the following admissions for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at trial:

**I.     That each of the following statements is true:**

1 7 .   By a letter dated January 9, 2006, a copy of which is attached hereto as <u>Exhibit A</u>, Plaintiffs produced to Defendant documents identified in Plaintiffs' Initial Disclosures.

1 8 .   Among the documents that Plaintiffs produced was the document attached hereto as <u>Exhibit B</u>.

1 9 .   <u>Exhibit B</u> is a true copy of five pages of a six page fax that Richard Luongo of Cendant Mortgage sent to Anthony Mendes on May 3, 2001.

2 0 .   <u>Exhibit C</u> attached hereto is a true copy of a July 6, 2001, Standard Form Purchase and Sale agreement between Doris H. Mendes and Anthony P. Mendes, as buyers, and the One Chilson Avenue Realty Trust, Helen Jackson, Trustee.

2 1 .    Exhibit D attached hereto is a true copy of a Final Commitment between Cendant

Mortgage, on the one hand, and Anthony Mendes and Doris Mendes, on the other hand.

2 2 .    Your signature appears at the bottom of pages 2 and 3 of Exhibit D.

PHH MORTGAGE CORPORATION,
f/k/a Cendant Mortgage,

By its attorneys,

Thomas I. Elkind, BBO# 153080
Andrew K. Goldstein, BBO #552239
Foley & Lardner LLP
111 Huntington Avenue
Boston, Massachusetts  02199
(617) 342-4000

Dated: February 3, 2006

## CERTIFICATE OF SERVICE

I, Andrew Keith Goldstein, hereby certify that on February 3, 2006, I caused the foregoing document to be served by first class mail, postage prepaid, and by e-mail, upon the Plaintiffs' attorney, Christopher J. Trombetta, Law Office of Christopher J. Trombetta, 310 North Main Street, Mansfield, MA 02048.

Andrew Keith Goldstein

LAW OFFICE OF

# CHRISTOPHER J. TROMBETTA

310 NORTH MAIN STREET

MANSFIELD, MASSACHUSETTS 02048

TELEPHONE (508) 339-5900 • FAX (508) 339-3111

www.trombettalaw.com

January 9, 2006

Andrew K. Goldstein
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199

      Re: <u>Anthony and Doris Mendes v. Cendant Mortgage;</u>
           <u>C.A. No. 05CV11765DPW</u>

Dear Andrew:

      Enclosed please find documents identified in Plaintiffs' Initial Disclosures.

      Please call with any questions.

                  Very truly yours,

                  Christopher J. Trombetta

cc: Anthony and Doris Mendes

Enclosure



# Mortgage Services

## Facsimile Transmission

**From:**    Name:          Richard Luongo
              Fax Number:    856-917-2966
              Voice Phone:    800-236-3268 Ext. 84853

**To:**    Name:          Anthony P Mendes
              Company:
              Fax Number:    (9)1-508-653-8385
              Voice Phone:

**Fax Notes:**

Date and time of transmission: Thursday, May 03, 2001 6:04:02 PM
Number of pages including this cover sheet: 06

Cendant Mortgage
3000 Leadenhall Road
Mt. Laurel, NJ 08054

# CENDANT
## *Mortgage*

May 3, 2001

ANTHONY P MENDES

17 1 BRIDGE ST
DEDHAM, MA 02026

Sales Price: $340,000.00

Loan Amount: $337,335.25

Interest Rate: 7.250%

Type / Term of Loan:
FHA, 360 months

# YOU'RE APPROVED!

Dear ANTHONY P MENDES, DORIS MENDES,

We're pleased to tell you that you've been approved for a mortgage loan in the amount of $337,335.25. From here on, getting the home you want will be as easy as 1-2-3. We'll be with you all the way, from the application process right through closing.

Now that your application is already completed and on file with us, all you need to do is find your dream home. As soon as you do, simply call us at 1-800-236-3268, Ext. 84853, to give us the property address, and we'll make sure your loan closes right on time – guaranteed. You can use it to call us 7 days a week with any questions about your mortgage process.

*As part of the Cendant Mortgage Family, you now have these unique advantages:*

- ◆ HOUSE-HUNTING WITH CONFIDENCE. Knowing that your mortgage loan is already approved, you can look for your new home – confident that the closing process will be smooth and easy.

- ◆ SERVICE EXCELLENCE. Our service is so outstanding that 95% of our customers would recommend us to their family and friends. We will answer all of your mortgage questions promptly and thoroughly.

- ♦ **NEGOTIATING POWER.** With your financing secured and a closing date guaranteed, sellers know that your offer is solid.

- ♦ **GUARANTEED SERVICE.** We guarantee that we'll meet your closing date, or we'll give you 1/8th of one percent off your interest rate for the life of your loan.*

- ♦ **FLEXIBILITY.** Although you've been approved for a specific loan amount, we realize that your loan requirements may change. Simply call us if you need to change your loan amount, or the term or type of loan.

*While you continue to search for your new home, here are some important reminders:*

- ♦ Your interest rate is floating; however, you may call us at any time to discuss our available Rate Protection options. Based on your rate now, the maximum total monthly payment you qualify for is $2,716.26. This would be principal and interest of $2,301.22 and estimated taxes and insurance of $415.04 (includes private mortgage insurance, if applicable).

- ♦ Remember to call us at 1-800-236-3268, Ext. 84853, with the property address as soon as you have selected a home.

Please note: The following page is a checklist of items needed for your final approval before we go to closing. Please take a moment to review it.

We're here to make your home buying experience a fast, simple, and pleasant one. We look forward to helping you purchase your dream home, and we welcome your questions, now, or any time.

Sincerely,

Richard Luongo
Mortgage Consultant
1-800-236-3268, Ext. 84853

*P.S.  Good luck househunting!  As soon as you call us at 1-800-236-3268, Ext. 84853, with the property address, it'll take only a few minutes to get you moving toward a fast and easy mortgage closing.*

*Conventional purchase loans only.  Customers must use a Cendant Mortgage - approved closing agent.



# NEXT STEPS IN THE HOME-BUYING PROCESS.

Now that your mortgage loan is approved, there are only three more steps to go in the homebuying process. We're here to guide you along the way. If you have any questions, simply call us at 1-800-236-3268, Ext. 84853.

**STEP ONE:**

Look for your dream home.

**STEP TWO:**

Once you've selected your home and signed the sales contract, call us at 1-800-236-3268, Ext. 84853, right away. We already have all of your loan information on file, so it will only take a few moments for us to fill in the remaining items. Then we can send your updated application which reflects your purchase price.

**STEP THREE:**

After you have found your home, these are the items that we need to complete your loan package:

❑ Fully executed agreement of sale on the property being purchased to show a sales price of $340,000.00

❑ Subject to receipt and review of a satisfactory appraisal on the property being purchased that supports the sales price, to be ordered by Mortgage Services.

❑ If any information has changed from your original application, including property type, additional documentation may be required.

❑ Fully executed FHA Amendatory Clause.

❑ Evidence any outstanding Collection Account, Charge-off, Tax Lien, or Judgement has been satisfied.

❑ Please provide the policy date and declaration page for the homeowner's insurance policy 5 days prior to closing.

❑ If the property you select is located in a flood zone, a flood insurance policy will be required.

❑ All pages of the past two months bank statements for all accounts to show $16,000.00.

❑ Loan approval is not subject to the sale of any property.

Case 1:05-cv-11765-DPW Document 14-3 Filed 09/22/2006 Page 9 of 18

MORTGAGE SERVICES    1/01 6:16 PAGE 5/6 Right. X

# NEXT STEPS IN THE HOME-BUYING PROCESS.

- ❑ Last 2 years W-2s for Doris Mendes.
- ❑ Last 2 years W-2s for Anthony Mendes.
- ❑ Mortgage services will obtain verbal or written verification of employment.
- ❑ Fully executed Real Estate Certification.
- ❑ Satisfactory wood destroying insect infestation report (NPCA 1 or state specific) must be obtained within 30 days of closing.
- ❑ Any large deposits that appear on the bank/investment account statements will need to be explained and documented.
- ❑ All pages of the most recent quarterly statement for 401K account to show $2,000.00 and evidence sufficient funds are liquidated.
- ❑ All pages of the most recent quarterly statement for 401K account and evidence of liquidation in the amount of $2,000.00.
- ❑ Copy of Anthony Mendes' most recent pay statements for the past 30 days to verify gross monthly income of $3,200.00 and year-to-date earnings.
- ❑ Copy of Doris Mendes' most recent pay statements for the past 30 days to verify gross monthly income of $3,933.00 and year-to-date earnings.
- ❑ Satisfactory explanation for delinquencies on credit report.
- ❑ If delinquencies were the result of extenuating circumstances, please provide evidence supported by 3rd party documentation.
- ❑ Mortgage Services to order a credit supplement in order to delete erroneous accounts and verify previously paid accounts have a zero balance. If we are unable to verify the accounts are inaccurate, you must qualify with the monthly payment.
- ❑ In order to obtain a satisfactory 12 month rental reference, we will need the name and phone number of your landlord.
- ❑ Mortgage Services to obtain evidence of clear CAIVRS prior to closing, verifying no delinquent outstanding debts owed to the government.
- ❑ Verification the account with lord taylor has a minimum payment of $30.00.
- ❑ Verification the account with wm filene has a minimum payment of $50.00.
- ❑ Return the Home Inspection Disclosure (HUD-92564-CN) that was provided to you, signed and dated prior to the date on the contract of sale.



**EXHIBIT C**

<table>
<tr><td></td><td colspan="2" align="center">STANDARD FORM<br>PURCHASE AND SALE AGREEMENT</td><td>From the Office of:<br>GERRY ABBOTT INC., RLTRS.<br>43 North Main Street<br>Mansfield, MA 02048<br>508-339-6336/261-1218-fax</td></tr>
</table>

This ___6th___ day of ___July___ 2001

| 1. | PARTIES<br>AND MAILING<br>ADDRESSES<br><br>(fill in) | One Chilson Avenue Realty Trust, Helen Jackson, Trustee of<br>1-3 Chilson Avenue, Mansfield, MA 02048<br><br>hereinafter called the SELLER, agrees to SELL and<br><br>Doris H. and Anthony P. Mendes of<br>171 Bridge Street, Dedham, MA 02048<br><br>hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set forth, |
|---|---|---|
| 2. | DESCRIPTION<br><br>(fill in and include<br>title reference) | the following described premises: Land and buildings known and numbered<br>as 1-3 Chilson Avenue, Mansfield, MA 02048, situated on<br>approximately 9416 square feet of land, and as more<br>accurately described in Book 5166, Page 161, of the North<br>Bristol County Registry of Deeds. |
| 3 | BUILDINGS,<br>STRUCTURES,<br>IMPROVEMENTS,<br>FIXTURES<br><br>(fill in or delete) | Included in the sale as a part of said premises are the buildings, structures, and improvements now<br>thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if<br>any, all wall-to-wall carpeting, drapery rods, automatic garage door openers, venetian blinds,<br>window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces,<br>heaters, heating equipment, stoves, ranges, oil and gas burners and fixtures appurtenant thereto,<br>hot water heaters, plumbing and bathroom fixtures, garbage disposers, electric and other lighting<br>fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, and, ONLY IF<br>BUILT IN, refrigerators, air conditioning equipment, ventilators, dishwashers, washing machines<br>and dryers; and<br><br>but excluding chandelier in Unit #1 - Helen's House |
| 4 | TITLE DEED<br><br>(fill in)<br><br>* Include here by specific<br>reference any restric-<br>tions, easements, rights<br>and obligations in party<br>walls not included in (b),<br>leases, municipal and<br>other liens, other encum-<br>brances, and make pro-<br>vision to protect<br>SELLER against BUYER's<br>breach of SELLER's<br>covenants in leases,<br>where necessary. | Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER,<br>or to the nominee designated by the BUYER by written notice to the SELLER at least seven<br>_7 calendar_ days before the deed is to be delivered as herein provided, and said deed shall<br>convey a good and clear record and marketable title thereto, free from encumbrances, except<br>(a) Provisions of existing building and zoning laws;<br>(b) Existing rights and obligations in party walls which are not the subject of written agreement;<br>(c) Such taxes for the then current year as are not due and payable on the date of the delivery of<br>such deed;<br>(d) Any liens for municipal betterments assessed after the date of this agreement;<br>(e) Easements, restrictions and reservations of record, if any, so long as the same do not pro-<br>hibit or materially interfere with the current use of said premises: *<br>*(f)    substantially    residential<br><br>   * or prevent the mortgagability thereof. |
| 5. | PLANS | If said deed refers to a plan necessary to be recorded therewith the SELLER shall deliver such plan<br>with the deed in form adequate for recording or registration. |
| 6. | REGISTERED<br>TITLE | In addition to the foregoing, if the title to said premises is registered, said deed shall be in form<br>sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall<br>deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such<br>Certificate of Title. |
| 7. | PURCHASE PRICE<br><br>(fill in); space is<br>allowed to write out<br>the amounts if<br>desired | The agreed purchase price for said premises is ($ 305,000.00)<br>Three Hundred Five Thousand --------------------- dollars, of which |

|   |   |   |
|---|---|---|
| $ | 1,000.00 | have been paid as a deposit this day and |
| $ | 8,000.00 | at signing of Purchase & Sale Agreement |
| $ | 296,000.00 | are to be paid at the time of delivery of the deed in cash, or by<br>certified, cashier's, treasurer's or bank check(s). |
| $ | | |
| $ | 305,000.00 | TOTAL |

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991<br>GREATER BOSTON REAL ESTATE BOARD<br>Rev. 1999      Form No. RA151



All rights reserved. This form may not be copied or<br>reproduced in whole or in part in any manner whatsoever<br>without the prior express written consent of the Greater<br>Boston Real Estate Board.     CWV 5.0

**8  TIME FOR PERFORMANCE; DELIVERY OF DEED (fill in)**

Such deed is to be delivered at   1:00   o'clock   P. M. on the   31st   day of   August   2001 , at the   North Bristol County   Registry of Deeds, unless otherwise agreed upon in writing.  It is agreed that time is of the essence of this agreement.  or at the office of the Counsel for Lending Institution.

**9  POSSESSION AND CONDITION OF PREMISE.**

*(attach a list of exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof.  The BUYER shall be entitled to personally enter said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.  ** *substantially    ** when inspected by Buyer's home inspector

**10.  EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM**

*(Change period of time if desired).*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto; unless the SELLER    shall    use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty   30 calendar   days.

**11.  FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.**

and above shall be at the Buyer's option or unless the Buyer's mortgage commitment expires.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension hereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

**12.  BUYER's ELECTION TO ACCEPT TITLE**

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured  against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a)  pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b)  If a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts so reasonably expended by the SELLER for any partial restoration.

**13.  ACCEPTANCE OF DEED**

**** without recourse.

The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

**14.  USE OF MONEY TO CLEAR TITLE**

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed.

**15.  INSURANCE**

*insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| Type of Insurance | Amount of Coverage |
| --- | --- |
| (a) Fire and Extended Coverage | |
| (b) | *3 Sufficient to Cover This Agreement |

**16.  ADJUSTMENTS**

*(list operating expenses, if any, or attach schedule)*

Collected rents, mortgage interest, water and sewer use charges, operating expenses (if any) according to the schedule attached hereto or set forth below, and taxes for the then current fiscal year, shall be apportioned and fuel value shall be adjusted, as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.  Uncollected rents for the current rental period shall be apportioned if and when collected by either party.

***within 48 hours prior to close.

Copyright © 1979, 1984, 1986, 1987, 1988, 1991 Greater Boston Real Estate Board.  All rights reserved.

17. **ADJUSTMENT OF UNASSESSED AND ABATED TAXES**

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding fiscal year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

18. **BROKER's FEE** *(fill in fee with dollar amount or percentage; also name of Brokerage firm(s))*

A Broker's fee for professional services of 2.5% of the Purchase Price is due from the SELLER to Jack Conway Realtors of 311 Washington St. Westwood, MA 02090, only if and when the Title passes and the Deed is recorded.

~~the Broker(s) herein, but if the SELLER pursuant to the terms of clause 21 hereof retains the deposits made hereunder by the BUYER, said Broker(s) shall be entitled to receive from the SELLER an amount equal to one-half the amount so retained or an amount equal to the Broker's fee for professional services according to this contract, whichever is the lesser.~~

19. **BROKER(S) WARRANTY** *(fill in name)*

The Broker(s) named herein Gerry Abbott Inc., Realtors & Jack Conway Realtors warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts.

20. **DEPOSIT** *(fill in name)*

All deposits made hereunder shall be held in escrow by Gerry Abbott Inc., Realtors as escrow agent subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement. In the event of any disagreement between the parties, the escrow agent may retain all deposits made under this agreement pending instructions mutually given in writing by the SELLER and the BUYER. Deposit shall be hkept in an interest bearing account in a federally insured bank with the interest split equally between the Buyer and Seller at closing.

21. **BUYER's DEFAULT; DAMAGES**

If the BUYER shall fail to fulfill the BUYER's agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages ~~unless within thirty days after the time for performance of this agreement or any extension hereof, the SELLER otherwise notifies the BUYER in writing~~ and this shall be the Seller's Sole and Exclusive Remedy at Law and in Equity.

22. **RELEASE BY HUSBAND OR WIFE**

The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

23. **BROKER AS PARTY**

The Broker(s) named herein join(s) in this agreement and become(s) a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

24. **LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.**

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

25. **WARRANTIES AND REPRESENTA- TIONS** *(fill in); if none, state "none"; if any listed, indicate by whom each warranty or representation was made*

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): The Buyer has had the option of having a home inspection prior to the signing of the Purchase & Sale Agreement and the Buyer accepts the premises in their present condition without representation or warranty by the Seller or their Broker as to the condition thereof.

26. **MORTGAGE CONTINGENCY CLAUSE** *(omit if not provided for in Offer to Purchase)*

In order to help finance the acquisition of said premises, the BUYER shall apply for a *FHA ~~conventional~~ bank or other institutional mortgage loan of $ 297,000.00 at prevailing rates, terms and conditions. If despite the BUYER's diligent efforts a commitment for such loan cannot be obtained on or before July 31 , 2001 the BUYER may terminate this agreement by written notice to the SELLER and/or the Broker(s), as agent(s) for the SELLER, prior to the expiration of such time, whereupon any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto. In no event will the BUYER be deemed to have used diligent efforts to obtain such commitment unless the BUYER submits a complete mortgage loan application conforming to the foregoing provisions on or before July 13 , 2001

Copyright © 1979, 1984, 1986, 1987, 1988, 1991 Greater Boston Real Estate Board. All rights reserved.

27. **CONSTRUCTION OF AGREEMENT**

This instrument, executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. **LEAD PAINT LAW**

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. **SMOKE DETECTORS**

The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law.

30. **ADDITIONAL PROVISIONS**

The initialed riders, if any, attached hereto, are incorporated herein by reference.
- Home is connected to public sewer system in Mansfield.
- Home to be free and clear of all tenants prior to closing.
- See Attached Rider

**FOR RESIDENTIAL PROPERTY CONSTRUCTED PRIOR TO 1978, BUYER MUST ALSO HAVE SIGNED LEAD PAINT "PROPERTY TRANSFER NOTIFICATION CERTIFICATION"**

NOTICE. This is a legal document that creates binding obligations. If not understood, consult an attorney.

_Helen E. Jackson_
SELLER (or spouse) 1 Chilson Ave Rlty Trst
Helen Jackson, Trustee
Taxpayer ID/Social Security No. _____

SELLER _____
Taxpayer ID/Social Security No. _____

_Doris H. Mendes_
BUYER        Doris H. Mendes
Taxpayer ID/Social Security No. _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_

_Anthony Mendes_
BUYER        Anthony P. Mendes
Taxpayer ID/Social Security No. _134 44 0265_

_____
Broker(s)

Copyright © 1979, 1984, 1986, 1987, 1988, 1991 Greater Boston Real Estate Board. All rights reserved.

RIDER to the Purchase and Sale Agreement dated July     , 2001 by and between One Chilson Avenue Realty Trust, Seller, and Doris H. and Anthony P. Mendes, Buyers

RE:    1-3 Chilson Avenue, Mansfield, MA 02048
       Property Address

1    The Seller hereby agrees that the Buyer or the Buyers' representative shall have the right of access to the premises with reasonable notice, to inspect, to take measurements and to show to contractors, architects, insurers, banks and other lenders, at reasonable times, form the date of this Agreement, up to and including the date for the delivery of the deed

2    Seller hereby states that on the day of the closing the premises shall be in broom-clean condition and free from all personal property and debris

3.   The Seller acknowledges and understands that in order for a financial institution to process the Buyers' mortgage application it will require access to the subject premises. The Seller expressly agrees to cooperate to the fullest extent with the financial institution in providing said access. The Seller further understands that at the closing the financial institution will require the Seller to execute certain documents. These documents include but are not limited to the following: federal loan disclosure and adjustment sheets; affidavit relative to purchase price; affidavits relative to the existence of lead paint and urea formaldehyde in the premises; affidavits relative to materialmen's liens, sufficient in form and substance to enable the title insurance company to delete its standard ALTA exception for such lien; affidavit that there are no parties in possession of or entitled to possession of the premises except for those currently in possession. The Seller agrees to sign all such required documents containing true information. The Seller further agrees that the inability of the Buyer to perform pursuant to the terms of this Agreement insofar as it is a result of the Sellers' failure to sign said documents or cooperate with the financial institution, shall not be a breach of this Agreement by the Buyer and shall give rise to the Buyers' option to extend this Agreement for a period of seven (7) days or to terminate this Agreement and receive back all deposits, with interest, paid hereunder.

4.   Any matter or practice arising under or relating to this Agreement which is the subject of a practice standard or title standard of the Massachusetts Conveyancers Association shall be governed by such standard to the extent applicable

5.   All notices required or permitted to be given hereunder shall be in writing and delivered by hand or mailed postage prepaid, by registered or certified mail, addressed in the case of the Seller to:
Helen Jackson, Trustee
One Chilson Avenue Realty Trust
1.3 Chilson Avenue
Mansfield, MA 02048
with a copy to:

Page - 1

and in the case of the Buyer to:
Doris H. and Anthony P. Mendes
171 Bridge Street
Dedham, MA 02048
with a copy to:
Lyn E. Erickson, Esq.
101 Tremont St., Suite 412
Boston, MA 02108
Hand delivery shall be in hand only. Mailed notice shall be deemed given upon postage cancellation date by the U.S. Post Office.

6.    The Seller hereby represents, warrants and covenants to Buyer as follows:

    (a)    That the premises are not the subject of any outstanding agreements with any party pursuant to which any such party may acquire any interest in the premises;

    (b)    The Seller is presently not a party to any lawsuit in reference to the premises, nor is the Seller aware of any threatened or contemplated lawsuits against the Seller in reference to the premises; and,

    (c)    The Seller is not obligated to offer any other person any right of first refusals to buy the within described premises.

7    Seller shall also deliver an insurable title to the premises sufficient to allow the Buyer to obtain an ALTA Owner's Policy with the standard exceptions and subject to specific encumbrances from a company licensed to do business in Massachusetts

8.    The Seller hereby represents and covenants that no notice or communication has been received by Seller from any public authority that there exists with respect to the premises any condition which violates any municipal, state or federal law, rule or regulation which has not heretofore been rectified.

9.    No closing funds are to be released from the closing except in escrow until the deed and mortgage have been recorded at the appropriate registry of deeds   This paragraph is intended to modify Paragraph 7 of the printed Agreement.

10.    Not withstanding the provisions of Paragraph 8 of the printed Agreement to the contrary, in the event the attorney for the Buyers lender is unable to close the Buyer's loan transaction at the time for the performance hereof, the Seller agrees that the time for the performance may be extended to a time and date designed by the Buyer, as directed by the lender's attorney, but in no event later than the fifth (5) business day after the time for performance and such attorney may change the place for delivery to his or her office. Buyer shall give the parties reasonable notice of any such change(s). Time shall be of the essence for this new date if this clause is exercised.

11. Reasonable efforts as required by any extension under Paragraph 10 of the printed Agreement shall require the Seller to expend no more than five percent (5%) of the selling price in costs, expenses and fees in order to attempt to make the premises conform therewith.

12 To Paragraph 10 of the printed Agreement is added the following language . so long as Buyer can obtain corresponding extensions to his or her financing commitment without incurring any material additional bank charges or fees and or a materially higher interest rate. Material or materially shall mean that the Buyer shall spend no more than an additional $1,500.00 over the life of the loan in bank fees, costs or interest.

13. Notwithstanding the provisions of Paragraph 12 or any other provision of this Agreement, if prior to the delivery of the deed, the building comprising the premises or any portion of the same are damaged by fire or other casualty so that the same cannot reasonably be restored for the intended use by the time of the delivery of the deed, then at Buyer's option, any payments made under this Agreement shall be forthwith refunded and all of the obligations of the parties hereto shall cease and this Agreement shall be null and void and without recourse.

14. If the sales price is over Three Hundred Thousand and xx/100 Dollars ($300,000.00) and the Seller (transferor) is a foreign person, the Seller agrees to execute the forms required by Section 1445 of the Internal Revenue Code.

15 The Seller hereby states that to the best of their knowledge, there is no Urea Formaldehyde Foam Insulation (UFFI) present in the premises.

Signed this    6 +h.    day of July, 2001.


_Helen E. Jackson_
Helen Jackson, Trustee,
One Chilson Avenue Realty Trust, Seller


_Doris H. Mendes_                    _Anthony P. Mendes_
Doris H. Mendes, Buyer              Anthony P. Mendes, Buyer




**EXHIBIT**
**D**

Cendant Mortgage
3000 Leadenhall Road
Mount Laurel, NJ 08054



**CENDANT**
*Mortgage*

## FINAL COMMITMENT

Date:                August 10th, 2001
Loan Number:        0015775950
Customer:           Anthony P Mendes                     Doris Mendes

Property Address:   1-3 CHILSON AVE MANSFIELD, MA 02048

Dear  Anthony P Mendes                                   Doris Mendes

Congratulations!  Cendant Mortgage Corporation is pleased to issue a mortgage loan commitment to you which reflects the final terms of your loan.

### A. Your Approved Loan terms

Base loan amount: $ 297,765.00
MIP/ funding fee (if applicable): $ 4,466.48
Total loan amount: $ 302,231.00
Approved Interest Rate: 7.250
Rate Lock Expiration Date: 08/31/2001
Initial Monthly Principal and Interest: $ 2,061.75
Private Mortgage Insurance required:  NO
Assumable: (Y or N)  Y
Premium Pricing:
Balloon Payment Required: (Y or N)  N
Product:  30 yr FHA Fixed (880)

Loan term: 360
Loan to Value Ratio: 97.63
Loan Type: (FHA/VA/Conv)  FHA
Commitment Expiration Date:  08/31/2001
Escrow account required:  YES

MIP required (FHA loans):  YES
Prepayment Penalty applicable: (Y or N)  Y
Rate Lock Option  [X] Lock     [ ] Rate Protect
                  [ ] Float    [ ] 1X Float Down

If your loan is an Adjustable Rate Mortgage, the following additional terms apply:
Index:
Rate change cap:
Rate change frequency: (weeks, months, years)
First Adjustment:
Subsequent Adjustment:
Margin: 0.0000
Lifetime Cap:

If your loan is a Balloon payment loan, please refer to your program description.

### B. Points you pay in connection with your loan

Total points:     0.000
Origination fee:  0.000
Discount points:  0.000
Commitment fee: 0.000

### C. Conditions to commitment: *Please read the conditions listed below carefully.* They are a part of this commitment and are needed to meet your August 31st, 2001 closing date.
PLEASE SIGN AND RETURN THIS FINAL COMMITMENT.
* Any changes in your application may affect, but is not limited to, rate, points, maximum loan amount, and additional documentation requirements.
* Fully executed FHA Amendatory Clause.
* Please provide the declaration page for the homeowner's insurance policy to equal or exceed mortgage amount or replacement value(5 days prior to closing).
* Mortgage services will obtain verbal or written verification of employment.
* Fully executed Real Estate Certification.
* Return the Home Inspection Disclosure (HUD-92564-CN) that was provided to you, signed and dated prior to the date on the contract of sale.
* Borrower to sign Homebuyer Summary.

* Customer to provide bank statement to show where that $9,000 deposit on sales contract came from and an escrow letter from attorney.
* Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental. (also to obtain additional income to lower ratios)
* Corrected final application and addendum (1003 and 92900a (pgs. 1-4))

### D. Inspections - Well, Septic, Radon, Termite: Inspections are required only if requested by the appraiser and noted in the *Conditions*.

### E. Assumability:
[ ] This loan is not assumable.
[X] Your rights and obligations under the note and mortgage are assumable under certain conditions described in your loan documents.

0841301 (02/01) 01                          Page 1 of 2

**F. Prepayment Penalty:**
☐ This loan may be prepaid in part or in full at any time without penalty.
☒ This loan has a prepayment penalty. Refer to your loan documents for when the penalty will be collected.

**G. Expiration of Commitment:** This commitment will expire on 08/31/2001 unless an extension is granted by Cendant Mortgage Corporation. We may cancel this commitment if something occurs which we feel may effect the security or your ability to repay this loan.

**H. Title to Property and Title Insurance:** Cendant Mortgage Corporation must have first lien position on the property. The title to the property must be acceptable to us. The property must comply with zoning regulations. The Title Search/Abstract, Tax Search and Certificates, Instrument Survey and Title Commitment must be forwarded at least 10 days prior to closing, if possible.

A policy of title acceptable to us at your expense, is required. If your proposed mortgage loan is an Adjustable Rate Mortgage, the title policy must include affirmative coverage of an ARM and take no exception to the adjustable feature. Title insurance is also available to protect your interest as owner of the property at an extra charge to you but is not required by us. If you desire such insurance protecting your interest as an owner, please advise your attorney or closing agent.

**I. Survey:** Lender's title insurance policy to be issued pursuant to Paragraph H above shall not contain a survey exception. Should an instrument survey or plot plan be required by the title insurer in order to remove such exception, you must supply us, at your expense, a currently dated survey/plot plan, acceptable to us, noting the location of all boundaries, improvements, set back lines, easements and encroachments on or off of the property. The instrument must be certified to
Cendant Mortgage Corporation/Secretary of Housing and Urban Development, its Successors and/or Assigns, as their interests
may appear, 3000 Leadenhall Road Mount Laurel, NJ 08054

**J. Fire and Flood Insurance:** The following insurance must be provided by you at or prior to closing. Policies must be in effect on the closing date. The Endorsement on the policy should read for First Mortgagee:
Cendant Mortgage Corporation/Secretary of Housing and Urban Development, its Successors and/or Assigns, as their interests
may appear, P.O. Box 5954 Springfield, OH 45501-5954, Attn: Insurance Department

Fire and extended coverage in the amount of full replacement cost or the loan amount, whichever is less, must be fully paid for 1 year with receipt. We will not require you to obtain a policy in excess of the replacement cost of the improvements on the property securing your loan.

If flood insurance is required in connection with your loan, it will be listed under your *Conditions*. Flood insurance will be required if your property is in flood zone "A" or "V". We do not require you to obtain a flood insurance policy in excess of the replacement costs of the improvements on the property securing your loan.
A binder with a one year paid receipt is acceptable evidence of coverage unless prohibited by state law.

**K. Appraisal:** If an appraisal was obtained in connection with your loan transaction, a copy of it will be provided to you prior to or at closing.

**L. Closing:** At closing, you must sign all of the customary mortgage documents.

**M. Interest Rate:** Your interest rate and terms are governed by your rate lock/ confirmation agreement.

**N. Contacts:** PLEASE DIRECT ALL CALLS AND DOCUMENTATION TO
Kevin Cogan
(800) 236-3268 ext. 87806

**O. State Specific Supplement:** Florida and the New York Department of Banking require us to provide you with additional information contained in the Final Commitment Supplement. Please refer to that supplement for further information about your Final Commitment.

**P. Acceptance:** To accept this commitment, you must sign below and return this letter to us within 15 days from the date of this letter. This agreement cannot be changed orally.

Very truly yours:
Cendant Mortgage Corporation

*Claire Taylor*

Claire Taylor
Production Manager

ACCEPTANCE OF OFFER: The terms and conditions offered by this Final Commitment letter and Attachments are accepted by the undersigned. I/we have received a duplicate original of this document.

| *[signature]* | 8-14-01 | *Doris H. Mendes* | 8-14-01 |
|---|---|---|---|
| Applicant Name Anthony P Mendes | Date | Applicant Name Doris Mendes | Date |

| *Anthony Mendes* | 8-14-01 | DORIS H. MENDES | 8-14-01 |
|---|---|---|---|
| Applicant Name | Date | Applicant Name | Date |

0641301 (01/301) 02

Page 2 of 2

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MENDES<br>AND DORIS MENDES,<br><br>Plaintiffs,<br><br>v.<br><br>CENDANT MORTGAGE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 05CV11765DPW

## RESPONSES TO REQUESTS FOR ADMISSIONS

Plaintiff, Anthony Mendes, hereby responds to Defendant's Requests for Admissions.

REQUEST NO. 17. By a letter dated January 9, 2006, a copy of which is attached as

Exhibit A, Plaintiffs produced to Defendant documents identified in Plaintiffs' Initial Dislosure.

RESPONSE TO REQUEST NO. 17.

Admitted.

REQUEST NO. 18. Among the documents that Plaintiffs produced was the document

attached hereto as Exhibit B.

RESPONSE TO REQUEST NO. 18.

Admitted.

REQUEST NO. 19. Exhibit B is a true copy of five pages of a six page fax that Richard

Luongo of Cendant Mortgage sent to Anthony Mendes on May 3, 2001.

RESPONSE TO REQUEST NO. 19.

Plaintiff admits that Exhibit B is a true and accurate copy of a document faxed from Mr. Luongo to Mr. Mendes. Mr. Mendes denies that Exhibit B comprised part of a six paged fax in that he does not possess a page six.

REQUEST NO. 20. Exhibit C attached hereto is a true copy of a July 6, 2001, Standard Form Purchase and Sale agreement between Doris H. Mendes and Anthony P. Mendes, as buyers, and the One Chilson Avenue Realty Trust, Helen Jackson, Trustee.

RESPONSE TO REQUEST NO. 20.

Admitted.

REQUEST NO. 21. Exhibit D attached hereto is a true copy of a Final Commitment between Cendant Mortgage, on the one hand, and Anthony Mendes and Doris Mendes, on the other hand.

RESPONSE TO REQUEST NO. 21.

Mrs. Mendes admits that Exhibit D is a true and accurate copy of a document entitled Final Commitment but denies that he is bound by any of the terms set forth therein.

REQUEST NO. 22. Your signature appears at the bottom of pages 2 and 3 of Exhibit D.

RESPONSE TO REQUEST NO. 22.

Admitted.

Anthony Mendes

As to objections:

DORIS AND ANTHONY MENDES,

By their attorney,

_____
Christopher J. Trombetta, BBO# 556923
Law Office of Christopher J. Trombetta
310 North Main Street, Suite 6
Mansfield, Massachusetts  02048
(508) 339-5900

Dated:  March 6, 2006

## CERTIFICATE OF SERVICE

I, Christopher J. Trombetta, do hereby certify that on March 6, 2006 a copy of the foregoing document has been served via ~~first class mail~~ fax and overnight delivery on opposing counsel in this action.

_____
Christopher J. Trombetta

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY MENDES
AND DORIS MENDES,                    )   Civil Action No. 05CV11765DPW
                                     )
            Plaintiffs,              )
                                     )
      v.                             )
                                     )
CENDANT MORTGAGE,                    )
                                     )
            Defendant.               )

## RESPONSES TO REQUESTS FOR ADMISSIONS

Plaintiff, Doris Mendes, hereby responds to Defendant's Requests for Admissions.

REQUEST NO. 17.  By a letter dated January 9, 2006, a copy of which is attached as

Exhibit A, Plaintiffs produced to Defendant documents identified in Plaintiffs' Initial Dislosure.

RESPONSE TO REQUEST NO. 17.

Admitted.

REQUEST NO. 18.  Among the documents that Plaintiffs produced was the document

attached hereto as Exhibit B.

RESPONSE TO REQUEST NO. 18.

Admitted.

REQUEST NO. 19.  Exhibit B is a true copy of five pages of a six page fax that Richard

Luongo of Cendant Mortgage sent to Anthony Mendes on May 3, 2001.

RESPONSE TO REQUEST NO. 19.

Plaintiff admits that Exhibit B is a true and accurate copy of a document faxed from Mr. Luongo to Mr. Mendes. Mr. Mendes denies that Exhibit B comprised part of a six paged fax in that he does not possess a page six.

REQUEST NO. 20. Exhibit C attached hereto is a true copy of a July 6, 2001, Standard Form Purchase and Sale agreement between Doris H. Mendes and Anthony P. Mendes, as buyers, and the One Chilson Avenue Realty Trust, Helen Jackson, Trustee.

RESPONSE TO REQUEST NO. 20.

Admitted.

REQUEST NO. 21. Exhibit D attached hereto is a true copy of a Final Commitment between Cendant Mortgage, on the one hand, and Anthony Mendes and Doris Mendes, on the other hand.

RESPONSE TO REQUEST NO. 21.

Mrs. Mendes admits that Exhibit D is a true and accurate copy of a document entitled Final Commitment but denies that she is bound by any of the terms set forth therein.

REQUEST NO. 22. Your signature appears at the bottom of pages 2 and 3 of Exhibit D.

RESPONSE TO REQUEST NO. 22.

Admitted.

_____
Doris Mendes

2

As to objections:

DORIS AND ANTHONY MENDES,

By their attorney,

Christopher J. Trombetta, BBO# 556923
Law Office of Christopher J. Trombetta
310 North Main Street, Suite 6
Mansfield, Massachusetts  02048
(508) 339-5900

Dated:  March 6, 2006

## CERTIFICATE OF SERVICE

I, Christopher J. Trombetta, do hereby certify that on March 6, 2006 a copy of the foregoing document has been served via ~~first class mail~~ fax and overnight delivery on opposing counsel in this action.

Christopher J. Trombetta

**Exhibit C**

Page 1

 1                          Volume:   I

 2                          Pages:  1 - 222

 3                          Exhibits:  1 - 36

 4

 5          COMMONWEALTH OF MASSACHUSETTS

 6

 7   Bristol, ss.                Superior Court Dept.

 8                          Civil Action No.  B05-809

 9   - - - - - - - - - - - - - - - - - - - - - - -

10   ANTHONY MENDES AND DORIS MENDES,

11                   Plaintiffs,

12

13   vs.

14

15   CENDANT MORTGAGE CORPORATION,

16                   Defendant.

17   - - - - - - - - - - - - - - - - - - - - - - -

18          DEPOSITION OF ANTHONY MENDES

19          JUNE 1, 2006 - 10:35 A.M.

20

21               FOLEY & LARDNER

22            111 HUNTINGTON AVENUE

23           BOSTON, MASSACHUSETTS

24      Reporter:  Donna J. Whitcomb, CSR/RPR/RMR

Anthony Mendes                                                                                      06/01/2006

Page 2

1
2  A P P E A R A N C E S :
3
4     FOLEY & LARDNER
5     By Andrew Goldstein, Esquire
6     111 Huntington Avenue
7     Boston, Massachusetts 02199
8     (617) 342-4000
9     On behalf of the Defendant.
10
11    LAW OFFICE OF CHRISTOPHER J. TROMBETTA
12    By Christopher J. Trombetta, Esquire
13    310 North Main Street
14    Mansfield, Massachusetts  02048
15    (508) 339-5900
16    On behalf of the Plaintiffs.
17
18
19
20
21
22
23
24

Page 4

1                  E X H I B I T S
2   NO.                              PAGE
3   11   Document, Application Fee          148
4        Re: Visa Payment, 6/14/01
5   12   Appraisal, Chilson Avenue          150
6   13   Copies of Checks, Re:  Deposit Refund   174
7   14   Document, Re:  Chilson Purchase    195
8   15   Document, Re:  Chilson Purchase    196
9   16   Document, Re:  HUD and FHA         196
10       Insured Mortgages
11  17   Document, Re:  Home Energy Audit   197
12       StatementAddendum FHA
13  18   Document, Re:  Mortgage Application   197
14  19   FHA Amendatory Clause          198
15  20   FHA Purchase Agreement Addendum     198
16  21   Document, Re:  Tax Release         199
17       Authorization
18  22   Document, Re:  Tax Release         200
19       Authorization
20  23   Document, Re:  Income Verification   200
21       Anthony Mendes
22  24   Document, Re:  Income Verification   201
23       Doris Mendes
24

Page 3

1                  I N D E X
2   EXAMINATION OF:             PAGE
3   ANTHONY MENDES
4   By Mr. Goldstein               7
5
6
7
8
9              E X H I B I T S
10  NO.                        PAGE
11   1   Complaint               28
12   2   Document, 4 pages, Duzan to Trombetta   32
13       Re:  Offer to purchase, 6/12/01
14   3   Letter, Luongo to Mendes        92
15       Re:  Two-Family, 3/21/01
16   4   Letter, Luongo to Mendes       102
17       Re:  Four-Family, 5/1/01
18   5   Letter, Re:  Guaranteed Financing   110
19   6   P&S Chilson Avenue          115
20   7   Final Commitment Letter       120
21   8   Citizens Account Staements      131
22   9   Fleet Account Statements      131
23  10   Extension of Closing         138
24

Page 5

1                  E X H I B I T S
2   NO.                              PAGE
3   25   Document, Re:  Housing Act         202
4   26   Loan Application               203
5   27   Document                   203
6   28   Letter, Cogan to Mendes, 10/2/01    206
7   29   Income Verfication, Re:  Pay Stubs   207
8   30   W-2 Form                   209
9   31   Letter, Re:  Loan Denial 9/21/01    210
10  32   Demand Letter, Erickson to Cendant    211
11  33   Document, Re:  Capitol One        213
12  34   Letter, Re:  Bank of America       213
13  35   Letter, Re:  CrossCountry Bank      214
14  36   Loan Application, Re:  School Street   218
15
16
17
18
19
20
21  *Original exhibits retained by the reporter.
22
23
24

2 (Pages 2 to 5)

Anthony Mendes                                                    06/01/2006

Page 6

1        PROCEEDINGS
2            ANTHONY P. MENDES, having been
3    satisfactorily identified by production of a
4    Massachusetts Driver's License was duly sworn by the
5    Notary Public that his testimony would be the truth,
6    the whole truth, and nothing but the truth,
7    testified as follows in answer to direct
8    interrogatories by Mr. Goldstein:
9        Q.  Good morning, Mr. Mendes.
10       A.  Good morning.
11       Q.  Will you please state your name for the
12   record?
13       A.  Sure.  Anthony Mendes, 895 School Street,
14   Mansfield, Mass., 02048.
15       Q.  My name is Andy Goldstein.  I represent
16   Cendant Mortgage Corporation now known as PHH
17   Mortgage Corporation, a defendant in a lawsuit that
18   you brought.  I'm going to ask you some questions
19   about the facts that give rise to the lawsuit.
20       A.  Okay.
21       Q.  If you don't understand a question just
22   tell me and I'll try to rephrase it so that you
23   hopefully will understand it.  If you can't hear a
24   question just tell me and I'll repeat it.

Page 7

1        A.  Okay.
2        Q.  Hopefully you'll hear it.  If you don't
3    know the answer to a question or if you don't know
4    the information necessary to give an answer, that's
5    fine; just tell me you don't know or you don't
6    remember the answer; that's acceptable.
7            At any time you need a break for
8    whatever reasons just let me know and you will be
9    allowed to take a break unless there's a question
10   pending or a series of questions pending then I'll
11   want to finish up that subject matter then you'll be
12   able to take a break.  If for some reason you feel
13   ill or you need to end the deposition, just let me
14   know and we can continue this another day.
15       A.  Okay.
16       Q.  Have you ever been deposed before?
17       A.  Yes, I have.
18       Q.  How many times?
19       A.  I believe a couple of times.
20       Q.  Okay, so you're familiar with the process
21   somewhat?
22       A.  Yes.
23       Q.  All right, so often -- I will tell you
24   anyway -- often you're going to anticipate the

Page 8

1    answer to my question.
2        A.  Okay.
3        Q.  But even if you do let me finish the
4    question before you answer because the court
5    reporter is trying to type down everything we say
6    and if we speak at the same time it's hard for her
7    to do that.  Now, I ask this question to all
8    witnesses, don't take it personally.
9        A.  No.
10       Q.  Some people have said, yes.  Is there
11   anything that impairs your ability to give accurate
12   testimony today?
13       A.  No problem.
14       Q.  Are you on any medication that would
15   impair your ability to give accurate testimony
16   today?
17       A.  To be honest with you, I'm on a -- I'm on
18   amoxicillin.  I had an infection.  I had surgery.
19            MR. TROMBETTA:  What are you on?
20       Q.  You're pointing to your mouth?
21       A.  Yeah, I had some stitches.  I had some
22   work done last week, bone grafting.
23       Q.  Okay, so what are you taking now?
24       A.  Just amoxicillin.

Page 9

1        Q.  Amoxicillin.  Do you feel it impairs your
2    ability to answer questions accurately today?
3        A.  No.
4        Q.  I just want to get some brief background
5    information.  Let's start at how old are you?
6        A.  49 and a half.
7        Q.  And a half, right?
8        A.  Yeah.
9        Q.  You'll soon be joining the 50 club?
10       A.  Right.
11       Q.  As I did this year or last year.  And did
12   you graduate from high school?
13       A.  Yes, I did.
14       Q.  Where?
15       A.  Boston High.
16       Q.  Are you from Boston?
17       A.  Yes, I am.
18       Q.  So was that in 1974?
19       A.  '76.
20       Q.  '76.  What did you do after high school?
21       A.  Basically I worked -- worked for a while,
22   as a young man growing up, basically worked as a
23   diet aide.
24       Q.  Did you go on to get any further formal

Legalink Boston, A Merrill Company
(617) 542-0039

Anthony Mendes                                                                06/01/2006

Page 10

1  education after high school?
2      A. Yes, I got a certificate program. I was
3  in a certificate program. Basically six to eight
4  week course.
5      Q. What was the certificate in?
6      A. Food service supervisor.
7      Q. Any other formal education?
8      A. That's it basically.
9      Q. Where are you employed now?
10     A. I'm at the Sherill -- I'm sorry, I'm at
11  the Ellis Nursing Home in Norwood.
12     Q. Ellis?
13     A. Yeah.
14     Q. With an "E"?
15     A. Yes.
16     Q. When did you start there?
17     A. 2004.
18     Q. What's your position there?
19     A. I'm a full-time cook.
20     Q. Before you were working at Ellis Nursing
21  Home where were you working?
22     A. 2004 at the River Bend Nursing Home in
23  Natick, Mass.
24     Q. What was your position there?

Page 11

1      A. I was the food service director there.
2      Q. Why did you leave the River Bend Nursing
3  Home?
4      A. Basically left because there was changes
5  in management so my boss moved on and then I decided
6  to move on.
7      Q. Was it voluntary on your part?
8      A. Yeah.
9      Q. Before you were at River Bend Nursing Home
10  where were you?
11     A. Hancock Manner in Dorchester.
12     Q. And doing what?
13     A. Hancock Manner, nursing home in
14  Dorchester.
15     Q. For what period of time?
16     A. I was there from '98 to 2000.
17     Q. What was your position?
18     A. Food service director.
19     Q. What was your reason for leaving there?
20     A. I basically left that to move on to
21  another position that was, you know, more money and
22  benefits involved so I accepted it.
23     Q. And that was at River Bend?
24     A. Right.

Page 12

1      Q. I'm working backwards. We can go the
2  other way if you get confused. Where were you
3  before Hancock Manner Nursing Home?
4      A. I was at the Wingate at Brighton.
5      Q. Wingate in Brighton?
6      A. Yeah.
7      Q. That's a nursing home?
8      A. Yes.
9      Q. Run by the Schusters?
10     A. Yes.
11     Q. How long were you there for?
12     A. I believe a couple of years.
13     Q. What was your position there?
14     A. Food service director.
15     Q. What was your reason for leaving there?
16     A. Basically got another position and moved
17  on to Hancock.
18     Q. Okay. And before Wingate where were you?
19     A. I was at -- before Wingate I was with
20  Meadow Brook.
21     Q. Meadow Brook Nursing Home?
22     A. Yeah, yes.
23     Q. For what period of time?
24     A. I was there for a year.

Page 13

1      Q. So about '97 to '98 -- or, I'm sorry, '95
2  to '96?
3      A. Right.
4      Q. What was your position there?
5      A. I was a cook there.
6      Q. Have you been a cook since you graduated
7  high school?
8      A. Basically, yes.
9      Q. Okay.
10     A. Basically worked my way into the position.
11     Q. Okay.
12     A. Yeah. That's basically job of a food
13  service director.
14     Q. Let's go back a little bit more. Where
15  were you before Meadow Brook Nursing Home?
16     A. I was at the Neponset Hall Nursing Home.
17     Q. For what period of time?
18     A. I was there about a year.
19     Q. What was your position there?
20     A. I was a cook there.
21     Q. And before Neponset Hall Nursing Home
22  where were you employed?
23     A. I was at the Sherill House Nursing Home in
24  Jamaica Plain.

Legalink Boston, A Merrill Company
(617) 542-0039

Anthony Mendes                                                    06/01/2006

Page 14

1    Q.   How do you spell that?
2    A.   S-h-e-r-i-l-l, House Health Care.
3    Q.   For what period of time?
4    A.   I was there for two years.
5    Q.   From 1992 to 1994?
6    A.   I believe -- '90 to '92, I believe.
7    Q.   I thought you told me you were at Neponset
8    Hall Nursing Home from '94 to '95; is that right?
9    A.   I think it was '93 to '94 if I could be
10   correct.
11   Q.   Well, you went from Neponset to Meadow
12   Brook, right?
13   A.   Right.
14   Q.   Before Neponset you were at Sherill House?
15   A.   Exactly.
16   Q.   When were you at Sherill House, '90?
17   A.   I believe it was from '90 to '92 if I can
18   remember.
19   Q.   Was there something in between Sherill
20   House and Neponset?
21   A.   No, not that I could remember.
22   Q.   Was there a period of unemployment?
23   A.   There could have been, yeah.
24   Q.   I know there could have been but was

Page 15

1    there?
2    A.   I believe so.
3    Q.   Well, let's go back just little bit
4    further. Before Sherill House where were you?
5    A.   Oh, I'm trying to think. Whew -- Laurie
6    Ridge Nursing Home.
7    Q.   Do you know what period of time you were
8    there?
9    A.   That was a corporation I was with. I was
10   basically, if I can remember, I was with them for
11   four years; they owned several facilities.
12   Q.   Was that immediately preceding Sherill
13   House Health Care?
14   A.   Yes.
15   Q.   So from about 1986 to 1990?
16   A.   Right.
17   Q.   Were you in the service?
18   A.   No.
19   Q.   All right, well, from graduating high
20   school up until you went to Laurie Ridge Nurse Home,
21   were there any other jobs that you had that were
22   other than food service jobs?
23   A.   As I was young growing up I worked in
24   Filene's in high school, Mass. General Hospital.

Page 16

1    Q.   Right, but after the hospital --
2    A.   That was it; basically stayed in health
3    care.
4    Q.   And Laurie Ridge Nursing Home, what was
5    your position there?
6    A.   I was the -- I started off as a cook and
7    then they moved me on. I was a food service
8    supervisor after that.
9    Q.   And at Sherill House Health Care what was
10   your position?
11   A.   I was a cook.
12   Q.   Other than what you've testified to, I
13   haven't gone back before '86 in detail, I'm not
14   going to, but did you have any jobs in real estate?
15   A.   No, never.
16   Q.   Had you been involved in any other
17   litigation other than the case we're here for today?
18   A.   I slipped at the bank in '88.
19   Q.   Okay.
20   A.   Broke my elbow.
21   Q.   Anything else?
22   A.   Basically I had a case -- I was in a car
23   accident, serious car accident, when I was at the
24   Sherill House.

Page 17

1    Q.   All right, and did you file a lawsuit
2    because of that accident?
3    A.   There was -- there was a claim and they
4    paid the claim. I was seriously injured.
5    Q.   Any other lawsuits or claims that you've
6    been involved with?
7    A.   I had a -- I had a claim at Wingate
8    Nursing Home but I never settled. It was dismissed.
9    Q.   What was that claim for?
10   A.   Basically I was injured in -- it was
11   basically didn't offer me family medical leave.
12   Q.   Did you actually file a lawsuit or
13   administrative action?
14   A.   Administrative action.
15   Q.   Was that with the EEOC --
16   A.   I don't think so.
17   Q.   -- or with MCAD or do you know?
18   A.   If I -- I'm not sure but I know that was
19   dismissed.
20   Q.   Okay, any other disputes with any of your
21   former employers other than what you've mentioned?
22   A.   No, basically just a -- health care there
23   is basically a turnover. It always has been.
24   Q.   All right, are you married?

Page 18

1    A.  Yes, I am.
2    Q.  To Doris?
3    A.  Yes.
4         MR. TROMBETTA:  Excuse me, I just
5    want to talk to him about something, responses of
6    the questions you just had.  Do you mind if we just
7    take a two-minute break?  It will only take a
8    minute.
9         MR. GOLDSTEIN:  That's fine.
10        (Attorney-client conversation)
11        MR. GOLDSTEIN:  All right, Mr. Mendes
12   and his attorney just left the room to consult and
13   we're back on the record.
14   Q.  After consulting with your attorney is
15   there anything you want to change in your prior
16   answers?
17   A.  No.
18   Q.  Do you recall any other claims that you've
19   been involved with?
20   A.  No, no.
21   Q.  Were you in court this morning?
22   A.  I was with him.  It had nothing to do with
23   me.  Nothing to do with me.
24   Q.  You are living at 895 School Street in

Page 19

1    Mansfield, correct?
2    A.  Yes.
3    Q.  And before that you were living on Bridge
4    Street in Dedham?
5    A.  171 Bridge Street, yes.
6    Q.  And that was rental property?
7    A.  Actually, I was living with my in-laws.
8    Q.  Okay.
9    A.  Living with my in-laws.
10   Q.  So they didn't charge you rent?
11   A.  Oh, yes, they did.
12   Q.  They did?
13   A.  Yes.
14   Q.  Was that a single-family home?
15   A.  Yes, yes.
16   Q.  Actually, before you took the break I
17   asked you if you were married and you're married to
18   Doris, correct?
19   A.  Have you ever been married before?
20   A.  No, first time married.
21   Q.  And it's her first time?
22   A.  Doris Mendes, yes.  That's her name.
23   Q.  When were you married?
24   A.  Married her in 1983.

Page 20

1    Q.  Do you have any kids?
2    A.  Yes, I do.
3    Q.  What are their names and ages?
4    A.  Anthony P. Mendes, Jr., and he's 22.
5    Q.  Okay, anyone else?
6    A.  And Sean Mendes.
7    Q.  How old is he?
8    A.  Sean's 17.
9    Q.  I don't mean to insult you in any way when
10   I ask this, but I've seen a reference to your son
11   only and then you -- your son and Doris' son?
12   A.  I'm sorry, I improperly worded it, I
13   think.  These are my kids.
14   Q.  Are they Doris' kids?
15   A.  Yes.
16   Q.  Because I've seen them referenced as just
17   being your kids so I'm confused.
18   A.  Yes, they're our kids.
19   Q.  All right, does Sean Mendes live with you?
20   A.  Yes.
21   Q.  And he's lived with you all his life?
22   A.  Yes.
23   Q.  And Anthony Mendes lived with you until
24   when, Anthony P. Mendes, Jr.?

Page 21

1    A.  Anthony has been with me right along up
2    until he went into the service and he's in the
3    service presently.
4    Q.  When did he go in the service?
5    A.  I believe -- 2002.
6    Q.  He's been in the service since 2002?
7    A.  Yes.
8    Q.  What branch?
9    A.  United States Air Force.
10   Q.  Is he an officer?
11   A.  Yes, he is.
12   Q.  What's his rank?
13   A.  He's E4.
14   Q.  Oh, he's not -- I asked if he's an
15   officer.  He enlisted?
16   A.  He's a police officer, security police in
17   the Air Force.
18   Q.  Security police?
19   A.  Right.
20   Q.  And his rank is E4?
21   A.  Yes.
22   Q.  Did Anthony Mendes graduate from college?
23   A.  No, but from high school.
24   Q.  Okay.  You own 895 School Street, correct?

Anthony Mendes                                                                    06/01/2006

Page 22

1     A.   That is correct.
2     Q.   Have you ever owned another house?
3     A.   Not at all.
4     Q.   Have you ever before the events that gave
5   rise to this lawsuit occurred, had you attempted to
6   buy any other houses?
7          MR. TROMBETTA:  You mean any house
8   other than the School Street house?
9          MR. GOLDSTEIN:  Right.
10    A.   Yes.
11    Q.   And the Chilson Avenue house?
12    A.   Chilson, yes.
13    Q.   Okay, anything else that you've --
14    A.   But when I was -- when they approved me
15  basically we were looking at a two-family.  You
16  know, that didn't work out for us -- suitable for me
17  and my wife.  We looked at a couple of two-families
18  and then after that we were -- we went on to a
19  three-family.
20    Q.   When were you looking at these two,
21  two-family houses?
22    A.   Right around when they approved me.
23    Q.   Who is "they"?
24    A.   Cendant Mortgage.

Page 23

1     Q.   Okay, so is the first time you started
2   looking for a house was in or about 2001?
3     A.   Right.
4     Q.   Had you ever made an offer to purchase
5   real estate before that?
6     A.   No, no.
7     Q.   So you had rented before that or --
8     A.   Basically rented for a long time.  I was
9   with my mother-in-law for about seven and a half
10  years.  Jesus, it's a long time, I'll tell you that.
11  That basically drove me to buy some real estate.
12    Q.   You mentioned a couple of two-family homes
13  you looked at.  Who showed you those homes?
14    A.   If I could remember I had a -- when I was
15  approved Century 21, if I can remember, down in
16  Dedham.
17    Q.   All right, well, who showed you the
18  property that's the subject matter of this case at
19  1-3 Chilson Avenue?  When I say who showed you, were
20  you working with a broker?
21    A.   Yes, I was.
22    Q.   Who was that?
23    A.   It was Paula Duzan.
24    Q.   Is it Duzan?

Page 24

1     A.   Duzan.
2     Q.   D-u-z-a-n?
3     A.   That's correct.
4     Q.   Did she show you the other houses?
5     A.   I can't remember.  I don't remember that.
6     Q.   You don't think she was with Century 21?
7     A.   That's correct, right.
8     Q.   She was with Jack Conway, right?
9     A.   That's correct.
10    Q.   So it was another broker?
11    A.   Yes.
12    Q.   Do you remember the other broker's name?
13    A.   No, I don't to be honest with you.
14    Q.   Would you describe 895 School Street; is
15  it a -- the house, it's a one-family?
16    A.   It's a one-family.  It's got -- let me
17  see, it's a one-family.  It's got, let me see,
18  one -- one --
19    Q.   Is it a ranch?
20    A.   It's a raised ranch.
21    Q.   Raised ranch?
22    A.   Yes.
23    Q.   It has two floors?
24    A.   Exactly.

Page 25

1     Q.   Does it have a basement?
2     A.   Yes, it does.
3          MR. TROMBETTA:  Just so I'm clear,
4   what did you ask him about the basement?
5     Q.   Does it have one or two floors and a
6   basement or --
7     A.   Yeah, raised ranch has a basement -- mine
8   does.
9     Q.   There's a basement.  Are there two floors
10  above the basement?
11    A.   No, it's a lower level and an upstairs.
12    Q.   Okay, so is the lower level what you
13  referred to as the basement?
14    A.   Yes, I did.
15    Q.   Is it above ground?
16    A.   Yes, it is.
17    Q.   Have you made any improvements to that
18  house since you bought it?
19    A.   Yes, I have.
20    Q.   What improvements have you made?
21    A.   (Pause)
22    Q.   Well, I don't want to go into the details.
23  Have you made any structural changes like -- did you
24  raise the ranch or did you --

7 (Pages 22 to 25)

Page 26

1    A.  No, the house was the way it was when I
2  bought it. Basically I redid the kitchen. I redid
3  the basement.
4    Q.  What are the rooms on the lower level?
5    A.  Two.
6    Q.  What are those?
7    A.  Two plus a bath.
8    Q.  Okay, what are the rooms?
9    A.  So counting the bath, three rooms
10 downstairs.
11   Q.  What are they?
12   A.  (Pause)
13   Q.  Kitchen, living room, bedroom?
14   A.  A kitchen, an office room.
15   Q.  Okay?
16   A.  And what do you want to call it -- a den.
17   Q.  So there are four rooms with a bath?
18   A.  Right.
19   Q.  Any other rooms on the lower level?
20   A.  And a garage.
21   Q.  Two car?
22   A.  One car.
23   Q.  What's on the second level?
24   A.  Living room, kitchen -- living room,

Page 27

1  kitchen, den and three bedrooms and a bath.
2    Q.  Have you rented any of this property since
3  you've occupied it?
4    A.  No, this is not income rental. I live
5  there myself with my family.
6    Q.  As I said earlier I'm asking questions
7  about this case so I don't know the answers
8  sometimes. So you've never rented any portion of
9  this property?
10   A.  No, no.
11   Q.  And how big is the lot?
12   A.  It's an acre.
13   Q.  What's that?
14   A.  One acre.
15   Q.  One acre? And what kind of street is it
16 on, side street, busy street?
17   A.  Busy street, pretty fair.
18   Q.  How does it compare to Chilson Ave.?
19   A.  Chilson Ave. was a little quieter.
20   Q.  Yes?
21   A.  Yeah. Main drag, people come in from
22 Attleboro up and down School Street, people living
23 in the community.
24          MR. TROMBETTA:  What address is that?

Page 28

1          THE WITNESS:  895 School Street.
2    Q.  Has anyone else lived with you at School
3  Street since you purchased it?
4    A.  Has anyone else lived with me?
5    Q.  Yes, like your mother-in-law?
6    A.  No. To be honest with you my wife -- my
7  wife had her relative just recently come over from
8  South America trying to get themselves established.
9  She asked me if they could stay for a few months.
10 They were with me for Christmastime, about three
11 months, and then they got their own apartment down
12 in Mansfield.
13   Q.  All right, let's turn to your complaint.
14          MR. GOLDSTEIN:  Let's mark that as
15 Exhibit 1.
16          (Document marked as Exhibit No. 1
17 for identification.)
18   Q.  By the way, you said you had been deposed
19 a couple of times; what cases were those?
20   A.  That was on the -- when I fractured my
21 elbow at the bank.
22   Q.  Okay, and the other one, was there another
23 deposition?
24   A.  There was the -- what do you call it, I

Page 29

1  can't pronounce the word -- Dram Shop.
2    Q.  Dram Shop?
3    A.  Yeah, I -- it was -- I was in an accident
4  basically, the passenger. Me and my brother-in-law
5  was at a night club and they basically over served
6  us and that's how the accident happened.
7    Q.  Were you hurt?
8    A.  Oh, pretty bad.
9    Q.  I'm sorry. All right, and so there was a
10 lawsuit regarding that, too?
11   A.  Yeah, that was -- how do you want to say
12 it? I'm trying to say it for you -- that was
13 dismissed.
14   Q.  When was that lawsuit brought?
15   A.  I believe in '90.
16   Q.  And you were a plaintiff?
17   A.  Yes, I was.
18   Q.  Do you know what court that was in?
19   A.  I cannot remember.
20   Q.  Let me show you what's been marked as
21 Exhibit 1.
22   A.  Okay.
23          MR. TROMBETTA:  You don't have a copy
24 for me, do you?

Anthony Mendes                                                                              06/01/2006

Page 30

1        MR. GOLDSTEIN: I do. There you are.
2        MR. TROMBETTA: Thank you.
3    Q.   I'll tell you this is the complaint that
4  you filed in the Bristol Superior Court against
5  Cendant Mortgage Corporation. Do you recognize this
6  as your complaint?
7    A.   Yes, I do.
8    Q.   And you've looked at the first page. Why
9  don't you flip through it and make sure this is your
10 complaint and your wife's? Unless your counsel
11 wants to stipulate to it.
12       (Witness perusing document)
13   A.   Yes.
14   Q.   All right, so this is the complaint that
15 you filed in Bristol Superior Court against Cendant
16 Mortgage Corporation, correct?
17   A.   Yes, that's correct.
18   Q.   Have you flipped through -- you've flipped
19 through the complaint, correct?
20   A.   Excuse me?
21   Q.   You've flipped through the complaint?
22   A.   No, I was just looking at it.
23   Q.   Yes, you've looked at it, okay. If you
24 turn to -- before we go into this, you can hold

Page 31

1  that, but when did you first see the property at 1-3
2  Chilson Street in Mansfield, Massachusetts?
3    A.   When did I see the property? I seen the
4  property in June.
5    Q.   Of 2001?
6    A.   2001.
7    Q.   Okay. Well, I'll tell you there's an
8  offer that you and your wife made that stated June
9  12th, 2001. Do you know how long I assume before
10 the offer you saw the property?
11   A.   Excuse me, come again?
12   Q.   How many days before the offer had you
13 seen the property?
14   A.   Basically when we were to go see it and
15 look at it we both liked it and we put a deposit on
16 it same day. If I could remember it was the same
17 day because we really liked it.
18   Q.   So you made an offer the same day you
19 first saw it?
20   A.   Right.
21   Q.   Who showed you the house at 1-3 Chilson?
22   A.   Paula.
23   Q.   Was anyone else there?
24   A.   Greg Abbot.

Page 32

1    Q.   Anybody else? Your wife, I guess?
2    A.   Yeah, my wife.
3    Q.   And anybody else?
4    A.   No.
5    Q.   Do you recall what you did after you saw
6  the house?
7    A.   Yes, I do remember.
8    Q.   What did you do?
9    A.   Put a deposit on it.
10   Q.   Did you go back to Paula's office and
11 write up an offer?
12   A.   Oh, they did it right there. She had all
13 her papers and stuff.
14   Q.   Okay.
15       MR. GOLDSTEIN: Let's mark this as
16 Exhibit 2.
17       (Document marked as Exhibit No. 2
18 for identification.)
19       MR. GOLDSTEIN: I give that to your
20 counsel and you to look at the exhibit.
21   Q.   All right, now, Exhibit 2 is a four-page
22 document and the first page appears to be a fax
23 cover sheet from Paula Duzan to Chris; have you seen
24 this first page before?

Page 33

1    A.   No, not this one.
2    Q.   I want you to focus, however, on the
3  second, third, and fourth pages of this document.
4  Is the second -- are those pages the offer that you
5  made?
6    A.   Yes.
7    Q.   And -- well, you looked at the second
8  page, how about the third and fourth? Why don't you
9  look at all three?
10   A.   Yes, yeah.
11   Q.   And did you look at the last page?
12       All right, now, you've looked at
13 pages 2 through 3 of Exhibit 2 and again I ask you
14 is this the offer that you made on June 12th, 2001?
15   A.   Yes.
16   Q.   And this was filled out at the property at
17 1-3 Chilson?
18   A.   I believe it's -- it was either at the --
19 at the house or at her office but I know I made a
20 deposit.
21   Q.   On June 12th, 2001?
22   A.   Yes.
23   Q.   And it looks like your initial offer was
24 300,000, correct?

9 (Pages 30 to 33)

Anthony Mendes                                                                    06/01/2006

Page 34

1   A.   Yes.
2        Q.   And was there a counteroffer?
3        A.   Yes, if I could remember -- 2001 it was
4   going for either 307 or 310, I believe.  We did a
5   counteroffer for 305.
6        Q.   Who did a counteroffer?
7        A.   We negotiated.
8        Q.   And you eventually agreed on a price of
9   305, correct?
10       A.   Yes.
11       Q.   Does your handwriting appear on pages 2
12  through 4 of this document?
13       A.   On which one?
14       Q.   On the pages 2 through 4 of Exhibit 2, on
15  any of it besides your signature which --
16       A.   Here's my handwriting.  My -- my signature
17  appears right there (indicating).
18       Q.   So you signed the second page of Exhibit
19  2?
20       A.   Yes.
21       Q.   Do you recognize your wife's signature?
22       A.   Right there, yes (indicating).
23       Q.   That's below your signature?
24       A.   Yes.

Page 35

1        Q.   And on the last page of this document does
2   your signature appear at the bottom?
3        A.   That is correct.  Right here (indicating).
4        Q.   You're pointing to the buyer line on the
5   left-hand side of the document, the first buyer
6   line?
7        A.   Yes, that's mine.
8        Q.   Is your wife's signature opposite yours?
9        A.   That's true.
10       Q.   All right, actually, why don't you hold on
11  to this.  Again, look at the second page of Exhibit
12  2; do you see paragraph 7?
13       A.   Yes.
14       Q.   And do you see there's some handwriting,
15  contingent upon same one bedroom unit, correct?
16       A.   Yes.
17       Q.   And then it continues, correct, and
18  there's a handwritten reference to prequalification
19  letter; do you see that?
20       A.   Where's that at?
21       Q.   In paragraph 7 (indicating).
22       A.   Yes.
23       Q.   What was that reference to?
24       A.   Basically I didn't understand that.

Page 36

1        Q.   Was the handwritten language of paragraph
2   7 of the June 12th, 2001 offer to purchase there
3   when you signed it?
4        A.   Yes, yes.
5        Q.   This document was complete when you signed
6   it, correct?
7        A.   That's correct.
8        Q.   Well, in that same paragraph 7, this is
9   the second page of Exhibit 2 we're looking at,
10  handwritten in is also the following language,
11  quote:  All units being vacated upon delivery,
12  period, close quote.  Did you see that before you
13  signed this?
14       A.   Yes, I remember that, yes.
15       Q.   Do you know why that was included in your
16  offer?
17       A.   Basically we had some ideas of fixing up
18  the property and renting it out.
19       Q.   Okay, so you wanted it to be vacant,
20  correct?
21       A.   Yes.
22       Q.   And then in that same paragraph 7, it
23  says:  Contingent upon seeing one bedroom unit.  You
24  hadn't seen that when you made this offer?

Page 37

1        A.   Basically I seen them all.
2        Q.   Do you know why this was contingent upon
3   seeing one bedroom unit then?
4        A.   No, I don't remember that.
5        Q.   Do you know what unit is referred to by
6   "one bedroom unit" in paragraph 7?
7        A.   No.
8        Q.   Do you know if it's the top floor or
9   the --
10       A.   I believe that was on the other side;
11  there was three units.
12       Q.   Well, all right, let's go over this piece
13  now.  There was an unfinished basement at 1-3
14  Chilson, correct?
15       A.   No there were -- when I was there there
16  was occupants.
17       Q.   Was the basement unfinished or finished,
18  the basement?
19       A.   It was finished.
20       Q.   How many levels were there at 1-3 Chilson
21  when you saw it on June 12th?
22       A.   There was a basement, there was -- let me
23  see, a basement, I'm trying to count, let me see --
24  I think the largest unit was six rooms, if I can

Page 38

1    remember, six units. The largest unit right from
2    the basement.
3        Q.   Well, I'm asking you first how many levels
4    there were. So there was a basement?
5        A.   The basement.
6        Q.   What other levels were there?
7        A.   And three other separate levels.
8        Q.   Three other separate levels?
9        A.   Yes.
10       Q.   What were those?
11       A.   Coming up from the basement there was the
12   large unit.
13       Q.   Okay?
14       A.   And as you come in or go outside of the
15   house connected there are two other units that
16   connect right onto the house. You have to go in
17   from a separate entrance.
18       Q.   So there were three dwelling units in the
19   house?
20       A.   Yes, yeah.
21       Q.   Did they all have separate entrances?
22       A.   Two floors -- two floors had a separate
23   entrance and the main other large unit had one
24   entrance.

Page 39

1        Q.   When you say the main other unit, what are
2    you talking about?
3        A.   The six -- the six rooms.
4        Q.   Did that have a separate entrance?
5        A.   Yes.
6        Q.   Was that the top floor?
7        A.   That was the first floor.
8        Q.   That was the first floor, okay. What unit
9    were you planning on living in?
10       A.   Well, basically with my son -- with my son
11   going into the Air Force, because he was going --
12   because he wasn't living with me and even when I
13   moved into Mansfield he wasn't living with me, he
14   stayed with my grandmother -- his grandmother
15   because he was going to school in Dedham. So
16   basically me and my wife was going to go into the
17   two bedroom.
18       Q.   Okay.
19       A.   And we were going to rent out the other
20   units.
21       Q.   Where was your son going to live, your
22   other son?
23       A.   My son? My son stayed at 171 Bridge
24   Street.

Page 40

1        Q.   I'm talking about Sean Mendes. He moved
2    in with you, correct, into School Street?
3        A.   (Pause)
4        Q.   Right?
5        A.   Right.
6        Q.   Was he going to move in with you to 1-3
7    Chilson?
8        A.   Yes.
9        Q.   Where was he going to stay in the two
10   bedroom?
11       A.   He was going to stay in the two bedroom.
12   He was going to have his room and we were going to
13   have our room.
14       Q.   Did Anthony, Jr., ever move to the School
15   Street address?
16       A.   No, no.
17       Q.   I thought you told me he went into the
18   service in 2002?
19       A.   Yes. He had to reside in Dedham because
20   he had to finish out high school in Dedham.
21       Q.   He was going to Dedham High School?
22       A.   He was going to Dedham High. He had to
23   finish out and he went in the service three to four
24   months after.

Page 41

1        Q.   When did he graduate from high school?
2        A.   2002.
3        Q.   Okay, so a year after you made this offer
4    that's Exhibit 2, correct?
5        A.   Exactly.
6        Q.   How does the house you're living in now
7    compare to the two-bedroom unit you were going to
8    live in at 1 to 3 Chilson?
9            MR. TROMBETTA:  Well, I'll object to
10   the form of that question but you can answer.
11       A.   Excuse me?
12       Q.   How do you believe the house you're living
13   in now compares to the two-bedroom unit you were
14   going to live in at 1-3 Chilson?
15           MR. TROMBETTA:  Same objection but
16   you can answer.
17       A.   Basically the house that I lost was
18   basically going to generate income.
19       Q.   I didn't ask you about the house that you
20   allegedly lost.
21       A.   I'm sorry, can you repeat the question
22   again? I'm a little confused.
23       Q.   You were going to live in a two-bedroom
24   unit at 1 to 3 Chilson, correct?

Page 42

1    A.  Right.
2         MR. TROMBETTA:  Well, I sort of
3    object to what you're telling him.  You're asking
4    for a comparison in general terms.
5         MR. GOLDSTEIN:  I haven't asked that
6    question again yet.
7         MR. TROMBETTA:  Well, I think you
8    did.
9         MR. GOLDSTEIN:  Well, I might have
10   before not yet.
11        MR. TROMBETTA:  I objected, I let him
12   answer, but if you're asking for a -- you asked for
13   a comparison.  I think he's trying to give that to
14   you.
15        Q.  Let me put this in context again.  If you
16   had purchased 1-3 Chilson --
17        A.  Right.
18        Q.  -- you were going to live in a two-bedroom
19   unit, correct?
20        A.  That's correct.
21        Q.  What other rooms were in the two-bedroom
22   unit?
23        A.  There was two bedrooms, a kitchen, a
24   bathroom, and a living room.

Page 43

1    Q.  Do you know the square footage of that
2    unit?
3    A.  No, not offhand.
4    Q.  And the Chilson lot, the area of the lot
5    on Chilson Avenue was a lot smaller than the lot you
6    have now, correct?
7    A.  Much smaller.
8    Q.  And you have more living space at your
9    School Street property than you would have had in
10   the two-bedroom unit on Chilson Ave., correct?
11   A.  That's correct.
12   Q.  Do you know how much more?
13   A.  Mathematically, no.
14   Q.  Twice as much?
15        MR. TROMBETTA:  Well --
16   Q.  If you know?
17        MR. TROMBETTA:  I'll object.  You can
18   answer.
19   A.  Oh, naturally Mansfield's got more room.
20   Q.  I'm talking about the house on School
21   Street, not Mansfield.
22   A.  (Pause)
23   Q.  Do you understand the question?
24   A.  No, I don't.  I'm a little confused, I'm

Page 44

1    sorry.
2    Q.  Okay, how much more living space do you
3    have at the School Street property compared to the
4    living space you would have had in the two-bedroom
5    unit at 1-3 Chilson Street?
6    A.  Basically couple of extra rooms.  Couple
7    of extra rooms.
8    Q.  Can you quantify it?  Is it twice as much
9    room or --
10   A.  I would say.  Yeah, I would say so.
11   Q.  All right, if you turn to the third page
12   of Exhibit 2?
13   A.  Third page?
14   Q.  Actually, why don't you turn to the last
15   page.  Paragraph 6 on the last page of Exhibit 2 is
16   is a mortgage contingency clause, correct?
17   A.  Yes.
18   Q.  And that was filled out when you signed
19   this last page of Exhibit 2?
20   A.  Yes.
21   Q.  All right.  All right, let's go back to
22   Exhibit 1, your complaint.  Could you turn to page 2
23   of your complaint?  In paragraph 4 there's an
24   allegation that states, quote, Mr. and Mrs. Mendes

Page 45

1    -- well, let me read the whole thing from the
2    beginning.  Paragraph 4 of your complaint reads:
3    Cendant directed Mr. and Mrs. Mendes to apply for an
4    FHA loan.  Mr. and Mrs. Mendes did so only because
5    Cendant directed them to do so, close quote; do you
6    see that?
7    A.  Yes, I see it.
8    Q.  Is that a true statement?
9    A.  That's a true statement.
10   Q.  Who at Cendant allegedly directed you to
11   apply for an FHA loan?
12   A.  The person who took the application.  His
13   name is Richard.
14   Q.  Is that Richard Luongo?
15   A.  That's correct.
16   Q.  How did you get hooked up with Cendant
17   Mortgage?
18   A.  Good question.  Good question.  Very good
19   question.
20   Q.  Do you know the answer?
21   A.  Oh, I'll have it for you.  I jsat got to
22   think because it's so far back.
23   Q.  Take your time.
24   A.  Let me see.  Can you present the question

Page 46

1  again, please?
2      Q.  How did you first come to work with
3  Cendant Mortgage in 2001?
4      A.  Century 21.  I had to think.
5      Q.  That's okay.  Century 21 referred you to
6  Cendant Mortgage?
7      A.  Yes.
8      Q.  And that's the brokers whose name you
9  don't remember, correct?
10     A.  I don't remember and -- what's your first
11 name, again, "Andrew"?
12     Q.  Yes.
13     A.  Andrew, we had her -- I can't think of her
14 name -- we had her and I wasn't really happy with
15 her.  I wasn't.  Because she was -- she was showing
16 me -- she was trying to push me to buy.
17     Q.  Okay?
18     A.  And I -- you know, when she showed me the
19 two-family and was trying to push me to buy, I
20 didn't really like it, my wife didn't care for it.
21 So I took that information when I was approved and I
22 got another broker and just went forward with it.
23     Q.  How did you --
24     A.  I got Paula.

Page 47

1      Q.  Right, okay.  So -- but the broker at
2  Century 21, what did she say to you about Cendant;
3  do you recall?
4      A.  No, I basically got tired of living at
5  Bridge Street, decided I wanted to buy a house.  Me
6  and her were saving to buy the house.
7      Q.  You and Doris?
8      A.  Yeah, we were saving.  Took us a long time
9  to do it, I'll tell you.  Just got tired of living
10 at Bridge Street and called Century 21, Elizabeth
11 Graylon (phonetic) Realtors down in Dedham.  And
12 offhand I can't -- I can't think of the person's
13 name but...
14     Q.  Is it a woman?
15     A.  It was a woman, yes.
16     Q.  Okay.
17     A.  I can't think of her name offhand.
18     Q.  Is it Shamikah Solomon?
19     A.  No.
20     Q.  All right, okay, and that person in any
21 event --
22     A.  Evidently said to me -- I says, how do I
23 start the process of -- I want to buy a piece of
24 property.  She says you can get approved through

Page 48

1  Cendant.  So she gave me the number and I called
2  them and they took an application.
3      Q.  Do you remember the first person you spoke
4  to at Cendant?
5      A.  Richard Luongo.
6      Q.  Was that in regard to the two-family?
7      A.  It was in regard to the two-family to
8  be -- to get approved, qualified.
9      Q.  Did you ever meet Richard Luongo?
10     A.  No, never.
11     Q.  Did you ever meet anyone from Cendant?
12     A.  No.
13     Q.  This was all by -- on the phone, correct?
14     A.  Everything was done by phone.
15     Q.  When you made your offer to purchase 1 to
16 3 Chilson -- is it Chilson Avenue or Street?  I've
17 seen both.
18     A.  I always thought it was Chilson Ave.
19     Q.  Why don't you refer to it as the Chilson
20 Avenue property; is that okay?
21     A.  No problem.
22     Q.  That will be 1 to 3 Chilson Avenue in
23 Mansfield.
24     A.  Okay, that's good.

Page 49

1      Q.  It will save my mouth and some work.  The
2  offer you made on June 12th, 2001 for the Chilson
3  Avenue property -- let me just get that back out for
4  a second.  That's Exhibit 2.  It has a purchase
5  price that was agreed to of $305,000, correct?
6      A.  That is correct.
7      Q.  Could you have put 20 percent down toward
8  that purchase?
9      A.  No.
10     Q.  In 2001?
11     A.  No.
12     Q.  Could you have put 10 percent down, 30,500
13 in 2001?
14     A.  No, first-time buyer.
15     Q.  What does first-time buyer have to do with
16 your answer?
17     A.  (Pause)
18     Q.  I'm asking you whether you had sufficient
19 funds, whether you were a first-time buyer or
20 tenth-time buyer, in the summer of 2001 to put 10
21 percent down?
22     A.  No.
23     Q.  Toward the purchase of Chilson Avenue?
24     A.  No, no.

13 (Pages 46 to 49)

Anthony Mendes                                                                      06/01/2006

1    Q.   And your wife didn't have it either,
2    correct?
3    A.   No.
4    Q.   Do you know if you had sufficient funds in
5    the summer of 2001 to put 5 percent down toward the
6    purchase?
7    A.   Yes, I did.
8    Q.   And that would be about $15,000?
9    A.   Yes.
10   Q.   And where were those funds to come from?
11   A.   A 401K. Assets of a 401K.
12   Q.   Okay, is that your 401K?
13   A.   My wife's 401K.
14   Q.   Okay.
15   A.   I had funds in the bank. I had
16   approximately in checking and savings altogether, if
17   I can remember, there was about 9 to 10,000 there.
18   Q.   Okay, what bank account was that; do you
19   know?
20   A.   At that time, Citizens.
21   Q.   All right, and --
22   A.   Also we had a refund coming in that was
23   owed to us.
24   Q.   From the IRS?

1    A.   Yeah.
2    Q.   Do you know how much that was?
3    A.   I believe it was about 3,000.
4    Q.   Do you know how much Doris' 401K was in
5    June of 2001?
6    A.   Between 6 and 7,000.
7    Q.   So she was going to cash that in?
8    A.   Oh, yes.
9    Q.   And pay a penalty?
10   A.   We were trying to get a house. And also
11   my mother-in-law was going to give us some money as
12   a gift.
13   Q.   How much?
14   A.   5,000.
15   Q.   What's your mother-in-law's name?
16   A.   Isabelle Loredo.
17   Q.   Does she still live on Bridge Street in
18   Dedham?
19   A.   Yes, yes.
20   Q.   Is she married?
21   A.   Yes, she is.
22   Q.   Is does her husband live there, too,
23   still?
24   A.   Yes.

1    Q.   Does Isabelle work?
2    A.   Yes, Isabelle works.
3    Q.   Did you ever tell anyone at Cendant about
4    the $5,000 gift?
5    A.   Yeah, I told them.
6    Q.   Who did you tell?
7    A.   Kevin Cogan.
8    Q.   What was Kevin Cogan's role?
9         MR. TROMBETTA: What was his what?
10        MR. GOLDSTEIN: Kevin Cogan's role.
11   A.   I believe I took him as loan officer.
12   Q.   Did you have any other funds to apply
13   toward the purchase of the Chilson Avenue property
14   other than what you've told me?
15   A.   That's it.
16   Q.   Do you know if your wife had any other
17   funds other than what you've told me?
18   A.   I don't think so.
19   Q.   Did you eventually apply for an FHA loan?
20   A.   Not really because I didn't know anything
21   about it. This is what they presented to me.
22   Q.   Well, when you say not really, do you know
23   whether you did or did not apply for an FHA loan?
24   A.   I just applied for a loan. They didn't

1    tell me any specifics. I applied for a loan, me and
2    my spouse.
3    Q.   Did you ever come to learn it was an FHA
4    loan?
5    A.   Don't have any knowledge of real estate.
6    Q.   I didn't ask you if you have knowledge of
7    real estate. Did you ever find out that you had
8    applied for an FHA loan --
9    A.   No.
10   Q.   -- through Cendant for the purchase of the
11   Chilson Avenue property?
12   A.   No.
13   Q.   When did you first meet Lynn Erickson?
14   A.   I knew Lynn Erickson through my
15   brother-in-law.
16   Q.   Through the Dram Shop action?
17   A.   No, no, nothing to do with that.
18   Q.   Okay.
19   A.   My brother-in-law owns a lot of real
20   estate himself and he introduced me to her.
21   Q.   When?
22   A.   I would say probably in 2001.
23   Q.   Was it before you made your June 12th,
24   2001 offer on the Chilson Avenue property?

Page 54

1   A.  Yes, yes.
2   Q.  Was she involved in your potential
3   purchase of the two-family house, Lynn Erickson?
4       A.  She was involved in the whole aspect of
5   the real estate.
6   Q.  Does that include the Chilson Avenue
7   property?
8       A.  Chilson Avenue?  Yes.
9   Q.  She was involved before you made an offer
10  to purchase Chilson Avenue, correct?
11      A.  I believe so.
12  Q.  All right, did you consult with Lynn
13  Erickson about your June 12th, 2001 offer?
14          MR. TROMBETTA:  Well, I'll object.  I
15  mean, I think you're getting into attorney-client --
16          MR. GOLDSTEIN:  I'm asking if he
17  consulted, not what was said.
18          MR. TROMBETTA:  Well, you're asking
19  what he consulted about.
20          MR. GOLDSTEIN:  That's right, I think
21  I'm allowed to do that.
22  Q.  Did Lynn Erickson represent you in regard
23  to the June 12, 2001 offer to purchase the Chilson
24  Avenue property?

Page 55

1           MR. TROMBETTA:  You can answer that.
2       A.  I believe she was aware.
3   Q.  And you eventually executed a purchase and
4   sale agreement for the Chilson Avenue property,
5   correct?
6       A.  That is correct.
7   Q.  And Lynn Erickson represented you in your
8   negotiation of that purchase and sale agreement,
9   correct?
10      A.  That's correct.
11  Q.  Prior to June 12, 2001 did you have any
12  discussions with anyone at Cendant Mortgage about an
13  FHA loan program?
14      A.  No, no.
15  Q.  Now, if you go to paragraph 5 of your
16  complaint, Exhibit 1, it states:  Cendant completed
17  a loan application for Mr. and Mrs. Mendes.  A true
18  and accurate copy of the application completed by
19  them is attached as Exhibit A.  Do you see that?
20      A.  Yes.
21  Q.  Okay, and turn to Exhibit A of Exhibit 1.
22      A.  Okay.
23  Q.  What is Exhibit A?
24      A.  You're referring to the application?

Page 56

1           MR. GOLDSTEIN:  Excuse me?
2           MR. TROMBETTA:  I'm going to object.
3   I don't know there's any foundation for that
4   question but...
5   Q.  Well, turn back to paragraph 5 in light of
6   your counsel's objection.  It states in paragraph 5
7   of the complaint that a true and accurate copy of
8   the application completed by them is attached as
9   Exhibit A; is that a true statement?
10          MR. TROMBETTA:  Well, I'm going to
11  object to -- I mean, clearly he didn't verify the
12  complaint.  I wrote the complaint.
13          MR. GOLDSTEIN:  Are you objecting to
14  "Is that a true statement"?
15          MR. TROMBETTA:  Objecting to what?  I
16  think you're asking him questions about something I
17  wrote.  If you want to ask him about facts then
18  you're welcome to do that.
19          MR. GOLDSTEIN:  I think under the
20  federal rules that you're limited to stating an
21  objection on the record without any narrative and
22  then --
23          MR. TROMBETTA:  Well, you're asking
24  me why and I'm just telling you why.

Page 57

1           MR. GOLDSTEIN:  I didn't ask you, I'm
2   just clarifying.
3           MR. TROMBETTA:  I haven't interfered
4   at all.  I'm just saying if you want to ask him
5   about the application then go right ahead.
6           MR. GOLDSTEIN:  All right, just from
7   this point on -- and you're right I did ask you what
8   -- I just want you to state your objection and then
9   subject to the rules Mr. Mendes will answer, agreed?
10          MR. TROMBETTA:  I didn't tell him he
11  couldn't answer.
12          MR. GOLDSTEIN:  Okay.
13  Q.  Now, again paragraph 5 states that a true
14  and accurate copy of the application completed by
15  them is attached as Exhibit A.  Do you know what
16  Exhibit A is to this complaint?
17      A.  Well, this is the application.
18  Q.  Well, let's do it this way.  There is a
19  document, the last page of the written complaint is
20  a signature page?
21      A.  Yes.
22  Q.  Signed by your attorney, Chris Trombetta,
23  correct?
24      A.  Right.

15 (Pages 54 to 57)

Page 58

1      MR. TROMBETTA: You mean of the
2  complaint?
3           MR. GOLDSTEIN: Of the complaint.
4      Q. Of that exhibit. I was talking about page
5  7, right?
6      A. Okay, yes, yes.
7      Q. And is Exhibit A the document that follows
8  page 7?
9      A. Yes.
10     Q. How many pages is Exhibit A?
11     A. Application -- I would say I got four.
12     Q. Okay. And the first page it states at the
13  top, Cendant Mortgage Residential Loan Application,
14  correct?
15     A. Correct.
16     Q. So that page and the next three pages are
17  Exhibit A to the complaint as referred to in
18  paragraph 5?
19     A. Yes. Yes.
20     Q. Did you review this complaint before it
21  was filed?
22          MR. TROMBETTA: Well, I'm going to
23  object to that. I mean, I think you're impeding on
24  attorney-client communication so I'm going to

Page 59

1  instruct him not to answer that question. You can
2  ask him if he reviewed it after it was filed.
3      Q. Did you read this complaint before it was
4  filed?
5      A. No, I don't remember reading this.
6      Q. Did you read it after it was filed?
7      A. I did look after, after it was filed.
8      Q. How soon after it was filed?
9      A. I would say -- I would say probably a
10  month or two later.
11     Q. The complaint is dated, on page 7, July
12  25th, 2005?
13     A. Wait a minute. I'm sorry, come again?
14  I'm sorry.
15     Q. Go to page 7 of the complaint. The last
16  page before what you've identified as Exhibit A,
17  it's dated July 25th, 2005?
18     A. Right.
19     Q. When did you receive this complaint in
20  relation to the date, July 25th, 2005?
21     A. I received this, I believe, some time in
22  August.
23     Q. Did you read it when you received it?
24     A. I read some of it.

Page 60

1      Q. But within a couple of months you read the
2  whole thing?
3      A. Yeah, took me a little time to try to read
4  it and understand it.
5      Q. Now, turning to Exhibit A of the
6  complaint, the four-page residential loan
7  application?
8      A. Yes.
9      Q. Could you turn to the fourth page which is
10  labeled page 4 of 4; did you ever sign this
11  application?
12     A. This is the page you're talking about?
13     Q. Yes.
14     A. No, no.
15     Q. Were you asked to sign it?
16     A. Not at all.
17     Q. Do you know when this application was
18  submitted by you?
19          MR. TROMBETTA: Well, I object.
20     Q. Well, let me ask you this way. Do you
21  know when Cendant completed the loan application
22  that's attached as Exhibit A?
23     A. Me, right?
24     Q. Yes.

Page 61

1      A. I remember speaking to them.
2      Q. To whom?
3      A. Richard Luongo.
4      Q. About the application?
5      A. About the application.
6      Q. That's attached as Exhibit A?
7      A. Yes.
8           MR. GOLDSTEIN: I just note for the
9  record it's not labeled as "A," at least on the copy
10  of the complaint I have. I'm not -- I just don't
11  want any confusion on the record.
12     Q. Was that after June 12th, 2001?
13     A. No, it was before. It was before.
14     Q. Well, do you know when this document was
15  created, Exhibit A?
16     A. If I could remember I -- if I could
17  remember, it's a while ago, some time between May
18  and June of 2001 I spoke to him.
19     Q. I know you first saw the Chilson Avenue
20  property on June 12th, 2001?
21     A. Right.
22     Q. When did you first learn of its existence;
23  that same day?
24     A. Excuse me, come again?

Page 62

1    Q.   When did you first learn that this even
2    existed?
3        A.   The property?
4        Q.   Yes.
5        A.   Good question again.  Let me see, well,
6    when I got approved from Cendant I was dealing out
7    of the realtor out of Dedham.  She was showing me
8    around and she was showing me around in Mansfield
9    because I seen a couple of houses in Mansfield.
10            After she showed me around, I wasn't
11    satisfied with the home and whatever so I decided to
12    get another realtor and I got Paula and we started
13    looking at some real estate and here came up Chilson
14    Avenue.
15        Q.   Did you look at other real estate with
16    Paula?
17        A.   Not much.  It wasn't much.
18        Q.   Did you make any other offers other than
19    on the Chilson Avenue property?
20        A.   No, no.
21        Q.   Did you make an offer on the two-family?
22        A.   No, no.
23        Q.   Do you know where Century 21 Elizabeth
24    Realtors is located?

Page 63

1        A.   Providence Highway in Dedham.
2        Q.   All right, let's go to paragraph 6 of the
3    complaint.
4        A.   Okay.
5        Q.   It states in paragraph 6:  Thereafter,
6    Cendant preapproved a mortgage in the amount of
7    $307,545.  This mortgage contemplated an interest
8    rate of 7.125 percent.  A true and accurate copy of
9    the proposal is allocated as Exhibit B.  Do you know
10    what Exhibit B is to the complaint?
11        A.   I would say it would be this right here
12    (indicating).
13        Q.   So you're referring to a June 12th, 2001
14    letter to you at Bridge Street, correct?
15        A.   That's correct.
16        Q.   How many pages is Exhibit B?
17        A.   Two.
18        Q.   Now, you see at the top of what you've
19    identified as Exhibit B there is some fax
20    information, correct?
21        A.   Yes.
22        Q.   And, for example, on the bottom fax
23    information line, if you will, it says page 2 of 4;
24    do you see that?

Page 64

1        A.   Yes, I do
2        Q.   All right, and the next page it says page
3    3 of 4?
4        A.   Right.
5        Q.   Do you know where page 4 of 4 is?
6        A.   No, I don't.
7        Q.   Was there a page 4?
8        A.   Not that I'm aware of.
9        Q.   Was there a page 1?
10        A.   Not that I'm aware of.
11        Q.   Do you know how you came to receive this
12    document?
13        A.   If I could remember he either mailed it to
14    me or he faxed it to me.
15        Q.   Well, there's a top fax line on this
16    Exhibit B --
17        A.   Right.
18        Q.   -- that reads received 6/12/01, 10:32 a.m.
19        A.   Right.  He either could have faxed it or
20    mailed it but --
21        Q.   Let me --
22        A.   I'm sorry.
23        Q.   That line continues:  Mortgage Services
24    River Bend; do you see that?

Page 65

1        A.   Yes.
2        Q.   Is this a document that was faxed to you
3    at River Bend?
4        A.   Yes, yes.  I agree.
5        Q.   And the date on this document is June
6    12th, 2001, correct?
7        A.   That's correct.
8        Q.   What time of the day did you see the
9    Chilson Avenue property on June 12th?
10        A.   I believe it was in the afternoon some
11    time.  I don't know the approximate time, Andrew.
12        Q.   Did you have this Exhibit B with you, the
13    June 12th, 2001 letter from Cendant?
14        A.   I needed it.
15        Q.   Did you have it with you?
16        A.   Yes, yes.  They wanted it.
17        Q.   Who wanted it?
18        A.   Paula and Greg Abbot.
19        Q.   Did you submit it with your offer; do you
20    know?
21        A.   Yes.
22        Q.   In terms of chronology of this event,
23    which came first, Exhibit A or B to the complaint?
24        A.   Come again, I'm sorry?

Page 66

1    Q.  Which document comes first in the
2    chronology, Exhibit A or Exhibit B?
3        A.  Exhibit B.
4                MR. TROMBETTA:  Again, I object.
5                MR. GOLDSTEIN:  Okay.
6                MR. TROMBETTA:  And I don't think
7    there's any foundation.  I'm just telling you.
8        Q.  Exhibit B, I'm sorry?
9        A.  Is this declared as Exhibit B?
10       Q.  That's, I believe, your testimony.
11       A.  Yeah, yeah, this came.
12       Q.  And then the application followed Exhibit
13   B?
14       A.  No, never received the application.  Never
15   received the application.
16       Q.  Well, how do you know that the application
17   then followed Exhibit B?  What's the basis of your
18   statement that --
19       A.  Related to what?
20       Q.  -- that Exhibit B to the complaint, the
21   June 12th, 2001 letter preceded Exhibit A, the
22   residential loan application?
23       A.  I never seen the residential loan
24   application.  The application was done over the

Page 67

1    telephone.
2        Q.  Okay.  And is it your testimony that you
3    applied for a loan from Cendant Mortgage over the
4    telephone?
5        A.  That is correct.
6        Q.  When did you do that in relation to your
7    June 12th, 2001 offer?
8        A.  Before.
9        Q.  How many days before?
10       A.  I don't know.
11       Q.  If you know?
12       A.  Like I said some time in May; some time in
13   June early.  But I believe it took place in May.  I
14   really do.
15       Q.  I know you saw the Chilson Avenue property
16   on June 12th, 2001 for the first time?
17       A.  Right.
18       Q.  Was that the first time you became aware
19   that that property was for sale?
20       A.  I do believe so.
21       Q.  If you look at page 4 of the residential
22   loan application which is Exhibit A to the
23   complaint, at the bottom you'll see Richard Luongo's
24   name with a date 6/14/01?

Page 68

1        A.  Yes.
2        Q.  Do you have any reason to dispute that
3    date?
4                MR. TROMBETTA:  Well, I object.
5        A.  No, I don't but like I said I remember
6    speaking to him some time in May/June; that's all I
7    remember.
8        Q.  Speaking about making an application?
9        A.  An application.
10       Q.  An application for what?
11       A.  To get a loan.
12       Q.  On what?
13       A.  To buy a piece of property.
14       Q.  Any particular property?
15       A.  We started at a two-family.  We wasn't
16   happy with a two-family so we went for a three.
17       Q.  Did you at some point make an application
18   to Cendant Mortgage for a loan to buy the Chilson
19   Avenue property?
20       A.  Over the telephone.
21       Q.  When did you do that?
22       A.  I believe some time in May or the early
23   part of June, if I could remember.
24                MR. TROMBETTA:  Excuse me, do you

Page 69

1    mind if we just take a short break?
2                MR. GOLDSTEIN:  I'd like to go on for
3    this line of questioning then we can take a break.
4                MR. TROMBETTA:  I was actually going
5    to do it to help you but...
6        Q.  Do you know if you applied for a loan from
7    Cendant Mortgage to buy the Chilson Avenue property
8    on or after June 12th, 2001?
9        A.  Before.
10       Q.  How did you come to apply for a loan from
11   Cendant Mortgage to buy the Chilson Avenue
12   property before you had seen it?
13       A.  Well, I was looking -- I was looking at
14   real estate.  I looked at a few houses, they weren't
15   suitable for me and my family, and that's when I
16   looked at Chilson Avenue.  We had an interest in
17   that.
18       Q.  But my question to you, which you didn't
19   answer with all due respect --
20       A.  Okay.
21       Q.  -- is how did you come to apply for a loan
22   to buy the Chilson Avenue property before you even
23   knew it existed?
24                MR. TROMBETTA:  Well, I mean, I'll

18 (Pages 66 to 69)

Anthony Mendes                                                    06/01/2006

Page 70

1    object to that but you can answer.
2        A.  Basically I knew through Paula.  Paula,
3    she was looking on the internet for me for real
4    estate.
5        Q.  Well, you testified earlier today that you
6    first learned about Chilson Avenue, the Chilson
7    Avenue property on June 12th, 2001, correct?
8        A.  Yes.
9        Q.  And if we look at the residential loan
10   application?
11       A.  Okay.
12       Q.  Page 1?
13       A.  Right.
14       Q.  You see where it says:  Subject property
15   address?
16       A.  Right.  Where's that Andrew, please?
17       Q.  I'm referring to page 1 of Exhibit A to
18   the complaint.
19       A.  Okay.
20       Q.  Do you see where it says:  Subject
21   property address?
22       A.  Where is that Andrew, I'm sorry?
23       Q.  Do you see the line:  Subject property
24   address?

Page 71

1        A.  Yes.
2        Q.  Toward the top on the left-hand corner,
3    correct?
4        A.  Yes, yes, Andrew.
5        Q.  What property is referenced there?
6        A.  Chilson Avenue in Mansfield.
7        Q.  So isn't it true that this application was
8    submitted after you saw the property on June 12th,
9    2001?
10       MR. TROMBETTA:  Well, I object.  He
11   said he didn't see it; how could he have submitted
12   it?
13       A.  Like I said, I got approved some time in
14   May, June; that's all I have to say.
15       Q.  I know you got approved but I'm asking you
16   having looked at this residential loan application
17   now and the subject property address, do you have
18   any better recollection as to when you applied
19   specifically for a mortgage loan to buy the Chilson
20   Avenue property?
21       A.  No, I can't remember.
22       Q.  Was it on or after June 12th, 2001 or are
23   you going to stay with your answer that it was some
24   time in May or early June?

Page 72

1        A.  Yeah, that's when it was.
2        MR. TROMBETTA:  Can I take a break
3    with him now?
4        MR. GOLDSTEIN:  Sure.
5        (A brief recess was taken.)
6        MR. GOLDSTEIN:  Back on the record.
7    Just let the record reflect that we're coming back
8    from a break after Mr. Mendes consulted with his
9    attorney, Mr. Trombetta, for several minutes.
10       Q.  Did you discuss the substance of your
11   testimony with your attorney, Mr. Mendes?
12       MR. TROMBETTA:  You can answer, yes,
13   or no.
14       A.  No.
15       Q.  Did your attorney tell you how to testify
16   in any respect?
17       MR. TROMBETTA:  Well, don't answer
18   any of those questions.
19       A.  No, no.
20       Q.  Did your attorney tell you that he needed
21   you to clarify some of your past testimony?
22       MR. TROMBETTA:  You can answer that,
23   yes, or no.
24       A.  Yeah, a little confused because I was

Page 73

1    confused with your question.
2        *Q.  All right, how did he tell you to
3    clarify your past answers?
4        MR. TROMBETTA:  Well, I object to the
5    way you phrased that question.  If you want to ask
6    him to clarify, that's fine.
7        MR. GOLDSTEIN:  Well, would you read
8    my question back, please?
9        (*Record read as requested)
10       A.  No, he just didn't know that I applied for
11   a two-family with Cendant, too.
12       Q.  Did he tell you anything else about --
13       A.  No.
14       Q.  -- your testimony?
15       A.  No, no.
16       Q.  Is there anything else you want to
17   clarify?
18       A.  No, no, I'm fine.
19       Q.  So the only thing you want to clarify is
20   that you applied for a two-family through
21   Cendant Mortgage also?
22       A.  I applied for a two-family and that didn't
23   go through, so then I looked for a three-family and
24   then that's when they approved me, too.

19 (Pages 70 to 73)

Anthony Mendes                                                                06/01/2006

Page 74

1    Q.  So we have a -- the first time you saw the
2  Chilson Avenue property was June 12th, 2001,
3  correct?
4    A.  Yes.
5    Q.  And then Exhibit A to your complaint is a
6  residential loan application for the purchase of the
7  Chilson Avenue property, correct?
8    A.  That's true.
9    Q.  But it's your testimony that the loan
10  application was filled out some time in May or early
11  June even before you saw the Chilson Avenue
12  property?
13    A.  That's correct.
14    Q.  Could you explain to me how you could
15  possibly apply for a loan to buy the Chilson Avenue
16  property before you had even learned of its
17  existence?
18              MR. TROMBETTA:  Well, I'll object as
19  to the form of that question but you can answer.
20    A.  Basically did a loan application over the
21  phone with Richard Luongo.
22    Q.  Well, did you do a loan application over
23  the phone with Mr. Luongo about a property you
24  didn't know existed?

Page 75

1    A.  I was trying to get approved.
2    Q.  That wasn't my question. Did you submit a
3  loan application over the phone with Mr. Luongo
4  regarding a property that you did not know existed?
5    A.  True.
6    Q.  You did?
7    A.  I believe so. It's...
8    Q.  And, again, if you turn to page 4 of the
9  residential loan application, which is Exhibit A to
10  the complaint, which the Richard Luongo appears at
11  the bottom typed on June 14th, 2001; do you have any
12  reason to dispute this date?
13              MR. TROMBETTA:  Well, same objection.
14    A.  No, I don't know anything about that date.
15    Q.  All right, if you turn back to your
16  complaint against Cendant Mortgage Corporation, turn
17  to paragraph 8 on page 2?
18    A.  Okay.
19    Q.  Let me read some of that into the record.
20  Paragraph 8 reads, quote:  After receiving this
21  letter, Mr. and Mrs. Mendes then located the home
22  which they desired to purchase. The home was
23  located at 1-3 Chilson Street, Mansfield,
24  Massachusetts. Do you see that?

Page 76

1    A.  Yes, I see that.
2    Q.  Now, what was this letter that's referred
3  to in the first sentence of paragraph 8?
4    A.  I've got to read this one.
5              (Witness reading)
6    A.  Let me read that again.
7    Q.  Okay.
8              (Witness reading)
9    A.  One second please.
10              (Witness reading)
11    A.  That's true, yeah.
12    Q.  I didn't ask you --
13    A.  Okay, what's the question?
14    Q.  -- whether it's true but it's been a
15  while.
16    A.  I'm sorry, I'm just getting a little --
17    Q.  I asked you in paragraph 8 what this
18  letter refers to when it says, "after receiving this
19  letter"; do you know what letter is being referred
20  to?
21    A.  The letter that says that they guaranteed
22  financing for me.
23    Q.  Is it Exhibit B?
24    A.  Yes.

Page 77

1    Q.  And Exhibit B is the June 12, 2001 letter
2  from Cendant to you, correct?
3    A.  Correct.
4    Q.  So paragraph 8 says after you received
5  this letter, which you've now stated is Exhibit B,
6  you then located a home which you desired to
7  purchase, correct?
8    A.  Correct.
9    Q.  What home was that?
10    A.  1-3 Chilson Ave.
11    Q.  How soon after receiving the letter did
12  you locate the Chilson Ave. property?
13    A.  Excuse me?
14    Q.  How soon after receiving the June 12th,
15  2001 letter did you locate the Chilson Avenue
16  property?
17    A.  Right on June 12th when I put a deposit.
18    Q.  Did you have any discussions with Richard
19  Luongo at Cendant Mortgage that resulted in this
20  June 12th, 2001 letter being generated?
21    A.  He said he would fax it to me.
22    Q.  Okay. Well, do you recall anything else
23  that was said?
24    A.  No, no.

20 (Pages 74 to 77)

Page 78

1    Q.   Did you have discussions with Richard
2  Luongo about the Chilson Avenue property that
3  resulted in this June 12, 2001 letter being
4  generated?
5    A.   Not that I could remember.
6    Q.   Do you know if the June 12, 2001 letter as
7  attached to Exhibit B to the complaint was sent to
8  you in connection with the Chilson Avenue property?
9    A.   I do believe so.
10   Q.   And what's the basis of that belief?
11   A.   The loan amount.
12   Q.   Was that the loan amount that you were
13 looking for to buy the Chilson Avenue property?
14   A.   Yes.
15   Q.   Was that the interest rate that you were
16 hoping to get when you purchased the Chilson Avenue
17 property?
18   A.   Yes.
19   Q.   Now, you see the little seal on the first
20 page of Exhibit B?
21   A.   Yes.
22   Q.   Do you know what that stated?
23   A.   No.
24   Q.   Did you read this letter when you got it?

Page 79

1    A.   Some of it.
2    Q.   Do you know what parts of it?
3    A.   That I was approved.
4    Q.   Did you read parts of it and not read
5  other parts of it?
6    A.   Let me see.
7        (Witness perusing document)
8    A.   Yeah, I read it.
9    Q.   You read the whole thing?
10   A.   I read it.  I remember reading it when he
11 sent it to me.
12   Q.   Can you read on the first page opposite
13 your address: Type, slash, term of loan, colon,
14 FHA; did you read that?
15   A.   No, I didn't see that too clear, no, no.
16   Q.   Did you know after you had this letter
17 that you were applying for an FHA loan?
18   A.   No, no, I didn't know.
19   Q.   Were you aware on June 12th, 2001 of any
20 advantages of applying for an FHA loan?
21   A.   No, no.
22   Q.   Let's go back to paragraph 8 of the
23 complaint.
24   A.   Okay, all right.

Page 80

1    Q.   The last sentence reads:  The rental
2  amounts that they would have received amounted to
3  more than $1500 per month; do you see that?
4    A.   Yes.
5    Q.   Do you know how much more than $1500 per
6  month you allege you would have received?
7    A.   Well, I figured with the -- with myself
8  living in one and the two vacancies I could have
9  probably generated 1500 to 22 - 2300, I would think.
10   Q.   What was that based on?
11   A.   The number of rooms, the location, the
12 area.
13   Q.   Did you have any experience in renting
14 real estate before you made an offer to purchase
15 Chilson Avenue?
16   A.   No, no.
17   Q.   And you were living in Dedham before?
18   A.   Yeah, for a while, long while.
19   Q.   Did you have any knowledge of the rental
20 market in the Mansfield area in June of 2001?
21   A.   Not really, no.
22   Q.   Now, let's go to paragraph 9.
23   A.   Okay.
24   Q.   And paragraph 9 references a purchase and

Page 81

1  sale agreement?
2    A.   Okay.
3    Q.   And then it states: A true and accurate
4  copy of the purchase and sale agreement is attached
5  as Exhibit C; do you see that?
6    A.   Yes.
7    Q.   And then if you turn to the document
8  that's after the June 12, 2001 letter as a document
9  entitled, Standard Form Purchase and Sale Agreement;
10 do you see that?
11   A.   Yes.
12   Q.   Is that Exhibit C?
13   A.   Let me see.
14       MR. GOLDSTEIN: Just for the record
15 it's not marked.
16   A.   Yes it's not marked. I believe so.
17   Q.   Now, in paragraph 9 there's an allegation
18 that, quote: They -- which "they" is you and your
19 wife -- they then executed a purchase and sale
20 agreement knowing that they had been preapproved for
21 a mortgage in an amount sufficient to purchase the
22 property, period, close quote.  Do you see that?
23   A.   Where's that at, I'm sorry?
24   Q.   Paragraph 9.

21 (Pages 78 to 81)

Page 82

1    A.  Okay.
2    Q.  I'll read it. It reads, quote: They then
3    executed a purchase and sale agreement?
4    A.  Oh, I'm sorry, I'm sorry, Andrew.
5    Q.  We're back in the main body, not the
6    exhibits.
7    A.  Oh, okay, what page, Andrew?
8    Q.  Page 2.
9    A.  Okay, go ahead, Andrew.
10   Q.  The first line in paragraph 9 reads,
11   quote: They then executed a purchase and sale
12   agreement knowing that they had been preapproved for
13   a mortgage in an amount sufficient to purchase the
14   property, period, close quote. Do you see that?
15   A.  Yes.
16   Q.  How do you know that you had been
17   preapproved?
18   A.  They sent me -- they faxed me the letter.
19   Q.  Which letter?
20   A.  This letter right here (indicating); right
21   here.
22   Q.  The June 12th, 2001 letter that's
23   referenced as Exhibit B to the complaint?
24   A.  Yes, yes, Andrew.

Page 83

1    Q.  Okay, anything else that forms the basis
2    of the allegation that you knew you had been
3    preapproved?
4    A.  Basically guaranteed financing.
5    Q.  What do you mean by basically guaranteed
6    financing?
7    A.  Because that's what it says in the -- let
8    me see one second, please, Andrew --
9        (Witness perusing document)
10   A.  Right here, "guaranteed" (indicating).
11   Q.  All right, you've already told me the June
12   12, 2001 letter is a basis for the allegation of
13   paragraph 9 that you knew you had been preapproved;
14   is there any other basis for that allegation?
15   A.  No.
16   Q.  Did you know when you got the June 12,
17   2001 letter that that was a prequalification letter?
18   A.  No.
19   Q.  Did anyone refer to it as a
20   prequalification letter prior to your receipt?
21   A.  No.
22   Q.  The seller of the Chilson Avenue property
23   wanted a prequalification letter?
24   A.  Yeah, yeah.

Page 84

1    Q.  With the offer, correct?
2    A.  Correct.
3    Q.  What letter was that?
4        MR. TROMBETTA: Well, I object.
5    Q.  If you know.
6    A.  This (indicating).
7    Q.  Is that the prequalification letter that
8    the seller wanted?
9        MR. TROMBETTA: And I object.
10   A.  This is -- yeah.
11   Q.  I'm sorry, I didn't get your answer; what
12   is your answer?
13   A.  What was your question again?
14   Q.  Let's go back to Exhibit 2 which is your
15   offer, okay? And at least the second through fourth
16   pages of Exhibit 2 are your offer?
17   A.  Okay.
18   Q.  And, again, paragraph 7 references a
19   prequalification letter, correct?
20   A.  Preapproval letter, right.
21   Q.  Well, do you see the words "preapproval"
22   in paragraph 7?
23   A.  No.
24   Q.  Then why did you just say "preapproved"?

Page 85

1    A.  Well, because they said they were going to
2    guarantee me the loan.
3    Q.  Okay, but my question is does paragraph 7
4    refer to a prequalification letter or a preapproval
5    letter?
6    A.  Prequalified letter.
7    Q.  Okay, and now having looked at different
8    documents in the case and testified for almost two
9    hours now, do you know what the prequal letter was
10   that's referred to in your offer?
11       MR. TROMBETTA: Well, I'm objecting,
12   no foundation.
13   A.  No.
14   Q.  No? Okay, why don't you turn to page 4 in
15   the main body of the complaint.
16   A.  Okay.
17   Q.  And on page 4 at the bottom there's Count
18   1 for breach of contract; do you see that?
19       (Witness perusing document)
20   Q.  Do you see Count 1 for breach of contract
21   at the bottom?
22   A.  Of this page?
23   Q.  Yes.
24   A.  Of page 4?

22 (Pages 82 to 85)

Anthony Mendes                                                                06/01/2006

Page 86

1    Q.   Yes.
2         MR. TROMBETTA:  Do you see what he's
3    referring to?  Do you see that (indicating)?
4         THE WITNESS:  Yes, I see it.
5    Q.   Then if you turn to the next page now,
6    page 5 of the complaint, paragraphs 27 and 28 read:
7    That Cendant agreed to provide Mrs. and Mrs. Mendes
8    with a $307,545 refinancing to purchase a home.
9    Cendant breached that agreement by refusing to
10   provide the insurance; do you see that?
11   A.   Yes.
12   Q.   Now, I assume "insurance" is a typo?
13        MR. TROMBETTA:  I think it is.
14   Q.   But we don't have to focus on that right
15   now.  What is the -- what agreement did you enter
16   into with Cendant Mortgage by which Cendant agreed
17   to provide you and your wife with $307,545 in
18   financing?
19        MR. TROMBETTA:  And I'll object.  I
20   think it's a legal conclusion but you can answer the
21   question.
22   A.   Basically the application.  They took the
23   information and they guaranteed me financing.
24   Q.   How did Cendant guarantee you financing?

Page 87

1    A.   When they took the information of me, they
2    pulled my credit and they said we were approved.
3    Q.   Well, are you relying on a written
4    document?
5    A.   Relying on the document and I'm relying on
6    that they -- that we was accepted.
7    Q.   Well, I'm trying to get at the basis of
8    your allegation that Cendant breached that
9    agreement; is that agreement in writing?
10        MR. TROMBETTA:  Well, I'm just going
11   to object again because I think this is a legal
12   conclusion but you can answer.
13   A.   Basically because the deal fell through.
14   It didn't go through.
15   Q.   Well, in light of counsel's objection
16   let's do it this way.  Do you have an agreement in
17   writing with Cendant Mortgage stating they agreed to
18   provide you and your wife with $307,545 in
19   financing?
20        MR. TROMBETTA:  Same objection.  You
21   can answer.
22   A.   Yeah, they said we were guaranteed.
23   Q.   You understand the word "agreement,"
24   correct?

Page 88

1    A.   Yes.
2    Q.   And this is your complaint, correct?
3    A.   That's correct.
4    Q.   You sued Cendant Mortgage, correct?
5    A.   Correct.
6    Q.   And one of your counts is breach of
7    contract, correct?
8    A.   Correct.
9    Q.   All right, I want to know what the
10   contract is?  Is the contract in writing?
11        MR. TROMBETTA:  Same objection.  You
12   can answer.
13        MR. GOLDSTEIN:  I'll withdraw that
14   question.
15   Q.   In your breach of contract count you
16   allege that you had an agreement with Cendant
17   Mortgage, correct?
18   A.   Yes.
19   Q.   Okay, you already told me you know what an
20   agreement is so was the agreement in writing?
21        MR. TROMBETTA:  Same objection.
22   Q.   Is it orally or is it both?
23        MR. TROMBETTA:  Same objection.  You
24   can answer.

Page 89

1    A.   We signed the purchase and sales
2    agreement.
3    Q.   You didn't sign a purchase and sale
4    agreement with Cendant Mortgage Corporation,
5    correct?
6    A.   No, but they knew about it.
7    Q.   What was your agreement with Cendant
8    Mortgage Corporation as referred to in Count 1 of
9    your complaint?
10        MR. TROMBETTA:  Same objection.  You
11   can answer.
12   A.   Guaranteed financing; that's all --
13   Q.   Okay, and how did Cendant Mortgage
14   guarantee financing to you?
15        MR. TROMBETTA:  Well, I'm going to
16   object, asked and answered, but...
17   A.   Well, they -- like I said they took an
18   application, they pulled our credit, they took our
19   income and they said we were on a --
20   Q.   They said what?
21   A.   They took an application, they -- they
22   took an application, took our history of income and
23   they pulled our credit report.
24   Q.   Anything else that forms the basis of your

23 (Pages 86 to 89)

Page 90

1  allegation that you had an agreement with Cendant
2  Mortgage as alleged in Count 1 of your complaint?
3          MR. TROMBETTA: Same objection. You
4  can answer.
5      A.  No.
6      Q.  So the bases are that they took an
7  application, took history, and pulled credit?
8      A.  Yeah.
9      Q.  Well, didn't you understand when you
10 applied for a loan that your application could be
11 rejected?
12         MR. TROMBETTA: Same objection.
13     A.  Never, never knew that, no.  Never knew
14 that.
15     Q.  Did anyone at Cendant Mortgage tell you
16 that your application could not be rejected?
17     A.  No.
18     Q.  And you understand that when you apply for
19 something the person or entity that you applied to
20 can not accept the application, correct?
21     A.  No, I didn't know that.
22     Q.  You didn't know that?
23     A.  No.
24     Q.  Now, you've mentioned during this

Page 91

1  deposition that Cendant guaranteed financing; is
2  that correct?
3      A.  Yeah, I did.
4      Q.  What's the basis of that assertion that
5  there is a guarantee of financing?
6          MR. TROMBETTA: Same objection -- not
7  same objection, different objection. Asked and
8  answered. You can answer the question.
9      A.  I took it right here (indicating),
10 "guaranteed."
11     Q.  The June 12th, 2001 letter that's attached
12 to the complaint?
13     A.  Well, that's when they approved me.
14 That's what they sent me, faxed me.
15     Q.  Anything else that forms the basis of your
16 assertion that there was a guarantee of financing?
17     A.  That's it.
18         MR. TROMBETTA: Just one question.  I
19 assume you've got a number of additional questions?
20         MR. GOLDSTEIN: Yes.
21         MR. TROMBETTA: Because what I'd like
22 to do is just break for lunch.
23         MR. GOLDSTEIN: Now?
24         MR. TROMBETTA: Now, so we can try

Page 92

1  and come back in 40 minutes.  Is there a place
2  across the street we can go?
3          MR. GOLDSTEIN: We can go off the
4  record.
5          (Discussion off the record)
6          (Luncheon recess, 12:25 p.m. - 1:15 p.m.)
7          MR. GOLDSTEIN: Let's mark this as
8  Exhibit 3.
9          (Document marked as Exhibit No. 3
10 for identification.)
11     Q.  Good afternoon, Mr. Mendes.
12     A.  Good afternoon, Andrew.
13     Q.  I've put before you what's been marked as
14 Exhibit 3. Can you identify that document?
15     A.  Yes, I can.  If I could remember this was
16 the document for the two-family house that we first
17 approached.
18     Q.  Was that to the broker for Elizabeth
19 Realtors?
20     A.  That is correct, yes.
21     Q.  Is that the name of the company,
22 "Elizabeth Realtors" or did I miss a name in there?
23     A.  You got it right, Andrew.  I just don't
24 know her name.

Page 93

1      Q.  No, no, I just want to know the name of
2  the company.
3      A.  Yeah.
4      Q.  And when you say this was the document for
5  the two-family home, what do you mean by that?
6      A.  This is what they sent me when I was
7  looking at the two-family house and I was looking at
8  that in Mansfield also.
9      Q.  Was Exhibit 3 sent to you after you saw
10 that two-family house?
11     A.  No, I seen this one first.
12     Q.  The document?
13     A.  Yes.
14     Q.  So is it your testimony that Exhibit 3 was
15 not sent to you in connection with any particular
16 property or --
17     A.  Exhibit -- this one here in particular?
18     Q.  Yes, yes.
19     A.  This one here was sent to me.  If I could
20 remember, this one was sent to me.
21     Q.  Right, what were the circumstances that
22 led up to this document being sent to you?
23     A.  Basically I was looking at a two-family
24 home.

Page 94

1  Q. Did you talk to someone at Cendant
2  Mortgage about that two-family home?
3  A. Yes.
4  Q. Who was that?
5  A. Richard Luongo.
6  Q. Was this document, Exhibit 3, sent to you
7  after you talked with Mr. Luongo about the
8  two-family home?
9  A. One second.
10        (Witness perusing document)
11  A. One second, please.
12        MR. TROMBETTA: Pardon me, I wasn't
13  turning the page with respect to the question. I
14  was looking at something else.
15  A. Come again, I'm sorry, Andrew?
16  Q. I'm trying to get the background as to why
17  this document was sent to you. Was it sent to you
18  because you had a conversation with Richard Luongo
19  about the two-family home?
20  A. Right.
21  Q. So this document is specifically related
22  to the two-family home you were interested in
23  purchasing, correct?
24  A. Yes.

Page 95

1  Q. What do you remember about your
2  conversation with Mr. Luongo in regard to this
3  document?
4  A. Basically, as I had said, application was
5  approved and at that time I was looking at a
6  two-family. It didn't work out so from there on we
7  went into a three-family.
8  Q. So when you say that do you mean the
9  application was approved; did you make an
10  application?
11  A. The one on the telephone.
12  Q. For the two-family?
13  A. Same application, one application.
14  Q. Did you have any other discussions that
15  you can remember with Mr. Luongo concerning the
16  two-family home in relation to -- well, before this
17  letter was sent that's Exhibit 3?
18  A. No, no.
19  Q. Did you submit any written application in
20  regard to the two-family home?
21  A. No.
22  Q. When you say "application," do you
23  remember what you said to Mr. Luongo?
24  A. Over the telephone?

Page 96

1  Q. Yes.
2  A. He asked me a few questions, I answered
3  'em. He asked me where was I working, position,
4  salary. He asked me how much I made. Then he asked
5  me about my wife, I gave him the information. He
6  took the information and then after that put me on
7  hold and he pulled a credit report on both of us and
8  he approved us.
9  Q. What did he say when he said you were
10  approved?
11  A. He said we was approved guaranteed
12  financing and he said he'll send me a letter out and
13  this is what he sent.
14  Q. Did he say that any financing would be
15  subject to an application and approval of the
16  application?
17  A. No, no.
18  Q. Did he say there are any conditions on --
19  A. No.
20  Q. -- the approval of the loan?
21  A. No.
22  Q. Did you tell him about the two-family
23  house?
24  A. Yeah, he knew about it.

Page 97

1  Q. How did he know about it?
2  A. Because I communicated with him.
3  Q. Okay, what did you say to him about it?
4  A. I just said me and my wife's looking at a
5  two-family home and at this point I went out to look
6  at it with the realtor, Elizabeth Realtor, and I
7  just said we had no interest in it.
8  Q. Well, you didn't tell him you had no
9  interest in it before you read this letter, did you?
10  A. Excuse me, come again?
11  Q. I'm talking about a conversation that
12  predates Exhibit 3?
13  A. Okay.
14  Q. You didn't tell him you were not
15  interested in it before you got Exhibit 3; did you?
16  A. No, no.
17  Q. That was a letter communication?
18  A. Correct, correct, Andrew.
19  Q. I'm sorry if I'm repeating myself. Had
20  you made an offer to purchase that two-family house?
21  A. No, no.
22  Q. Do you know where the sale price of
23  $275,000 on Exhibit 3 came from?
24  A. If I could remember, Andrew, that was the

Page 98

1  sale of the home; that was the price of the home.
2      Q.  Okay, and did you tell that to Mr. Luongo
3  before he sent this March 21st, 2001 letter to you?
4      A.  Yes.
5      Q.  Okay, and do you recall the origin for the
6  loan amount on Exhibit 3, 272,008.32?
7      A.  Yes.
8      Q.  What was the origin of that number?
9      A.  I have no idea.  This is what they sent
10 me, okay?
11     Q.  Well, did you tell him that that was the
12 only amount that you were looking for?
13     A.  Not that I could remember.
14     Q.  Did you discuss with Mr. Luongo prior to
15 getting the March 21st, 2001 letter what kind of
16 mortgage you were looking for?
17         MR. TROMBETTA:  Well, I'll just
18 object to the form but you can answer the question.
19     A.  We started off looking for a two-family.
20     Q.  Okay, the type of mortgage loan, for
21 example, conventional, FHA, balloon?
22     A.  No, no.
23     Q.  No?
24     A.  No.

Page 99

1      Q.  If you look at Exhibit 3 do you see the
2  seal that says, "FHA Approved"?
3      A.  Right.
4      Q.  Above that, it says, Type/Term of loan
5  FHA?
6      A.  I see it here.
7      Q.  Do you know how that language came to be
8  in this letter?
9      A.  No idea.
10     Q.  Did you have any conversations with Mr.
11 Luongo about an FHA approved loan?
12     A.  No, no.
13     Q.  How about after you got this letter, did
14 you ask Mr. Luongo why it said FHA?
15     A.  No, no.
16     Q.  Well, if you look at the sales price and
17 the loan amount on Exhibit 3, there's about a little
18 under $4,000 -- actually, a little over $2,000
19 difference between the loan amount and the sales
20 price; is that the type of loan you were looking for
21 on the two-family for almost a full amount of the
22 purchase price?
23         MR. TROMBETTA:  Well, I object.
24     A.  No, not that I'm aware of.

Page 100

1      Q.  Did Mr. Luongo tell you that in regard to
2  the March 21st, 2001 letter that it was a
3  prequalification letter that was subject to final
4  approval after you submitted an application?
5      A.  No, no.
6      Q.  Did you consider this letter a guarantee
7  of financing?
8      A.  Yes, I did.
9      Q.  Did you read it when you got it?
10     A.  I read it.
11     Q.  What documentation did you provide to Mr.
12 Luongo prior to receiving the March 21st, 2001
13 letter?
14     A.  What do you mean, what documentation?
15     Q.  Did you send him any documentation
16 whatsoever?
17     A.  If I could remember -- if I could
18 remember, sent out my taxes.
19     Q.  Anything else?
20     A.  No.
21     Q.  Did you send him a W-2?
22     A.  Yeah, basically the taxes.
23     Q.  For this March 21st, 2001 letter?
24     A.  Right.

Page 101

1      Q.  Did you send out any other documents that
2  you can remember?
3      A.  No.
4      Q.  How did you send these documents to him?
5      A.  By mail.
6      Q.  Do you have a record of that?
7      A.  Not that I could remember.
8      Q.  With regard to Exhibit 3 do you know if
9  there are any more pages to this letter than what's
10 here?
11     A.  Not that I'm aware of.
12     Q.  Did you submit any loan application in
13 regard to your interest in the two-family house?
14         MR. TROMBETTA:  I'm just going to
15 object as to the form of the question but you can
16 answer.
17     A.  No, application over the phone.
18     Q.  By the way, between you and your wife were
19 one of you more involved in the communications with
20 Cendant Mortgage?
21     A.  Come again, Andrew?
22     Q.  You or your wife, did one of you take a
23 lead over the other?
24     A.  I was responsible for it all.

26 (Pages 98 to 101)

Page 102

1   Q.  So as far as you know your wife didn't
2   talk to Cendant Mortgage at all?
3       A.  No, no.
4           MR. TROMBETTA:  Can I see that
5   exhibit, please?
6           THE WITNESS:  Yes.
7           MR. GOLDSTEIN:  Let's have this
8   marked as 4.
9           (Document marked as Exhibit No. 4
10  for identification.)
11      Q.  Do you know what Exhibit 4 is?
12      A.  Kind'a and I do remember it, too.
13      Q.  Well, what is Exhibit 4?
14      A.  Exhibit 4.  Okay, I'm trying to think,
15  Andrew, because it's way back.  If I could remember,
16  Andrew, same application we looked at -- I think it
17  was a four -- I think it was a four- or a six-family
18  home in Mansfield, too, in Mansfield, too.
19      Q.  So Exhibit 4 is a May 1st, 2001 letter
20  that you received from Cendant Mortgage, correct?
21      A.  Correct.
22      Q.  Was this issued in regard to a third
23  property that you were interested in purchasing
24  other than the Chilson Avenue property and the

Page 103

1   two-family you mentioned?
2       A.  If I could remember, Andrew, this came
3   before the Chilson, if I could remember.
4       Q.  My question is you've mentioned a
5   two-family house --
6       A.  Right.
7       Q.  -- that you were interested in and the
8   Chilson Avenue property --
9       A.  Right.
10      Q.  -- which you were obviously interested in
11  and this May 3rd, 2001, letter marked as Exhibit 4
12  is in connection with a third property that you were
13  interested in?
14      A.  Yes, Andrew.
15      Q.  I'm sorry, you said this but I forgot
16  already, what was that type of property, this third
17  property?
18      A.  If I could remember, Andrew, it was --
19  whew, Jesus, I think it -- if I could remember it
20  was either -- I think it was -- if I could remember,
21  Andrew, it was four units, if I could remember.
22  Four or five units, if I could remember.
23      Q.  Do you know where that was?
24      A.  Mansfield.

Page 104

1   Q.  Do you know who showed you that property?
2           MR. TROMBETTA:  If anyone.
3       A.  I'm not -- wait a minute.  I'm not
4   actual -- I can't hardly remember but I know one of
5   the agents came out with me.  I'm not sure, Andrew,
6   if it was the party in Dedham or Paula but one of
7   'em came out when I looked at it.
8       Q.  Okay.  Well, tell me what conversations
9   did you have with Richard Luongo about the four- to
10  five-family home in Mansfield that led to this May
11  3rd, 2001, letter as far as you know?
12      A.  Basically when we didn't accept -- we
13  didn't have interest in the two-family, we heard
14  about the four-family -- four- or five-family unit
15  and I talked to Mr. Luongo about it and I was
16  approved for this.  I went to go look at it and that
17  didn't interest us.
18      Q.  Did you get this letter before you went to
19  look at the four- to five-family house?
20      A.  Yes, I did.  Yes, I did.
21      Q.  Do you recall what information did you
22  give to Mr. Luongo?
23      A.  Only that I was looking at a four- or
24  five-family, did I qualify?  And he said I did so he

Page 105

1   sent it out.
2       Q.  Did he put any conditions on that
3   qualification?
4       A.  No, no.
5       Q.  Did he use the word "qualify"?
6       A.  Excuse me?
7       Q.  Did he say you were qualified?  Did he
8   actually say that?
9       A.  He said I qualified, yeah.
10      Q.  Did you tell him what the sale price of
11  that property was?
12      A.  If I could remember, yes.
13      Q.  And what was that?
14      A.  I believe it was 340,000.
15      Q.  So is it true that the information that is
16  in this Exhibit 4 and is actually in Exhibit 3 --
17      A.  Correct.
18      Q.  -- regarding the sale price and loan
19  amount is based on information that you gave to Mr.
20  Luongo?
21          MR. TROMBETTA:  Well, I'll object to
22  the form of that question plus it's compound, I
23  believe.
24      A.  Well, he knew the sale price because I

Page 106

1 told him.
2    Q.   Did you tell him what amount you were
3 interested in before you got this May 3rd, 2001
4 letter?
5    A.   I believe it was 340.
6    Q.   The loan amount?
7    A.   Yes, sale price amount.
8    Q.   That's the sale price. I asked you about
9 the loan amount?
10    A.   I'm not sure. I can't remember. I can't
11 remember.
12    Q.   Did you tell him a loan amount that's on
13 page 1 of Exhibit 4?
14    A.   I'm not sure. I don't remember.
15    Q.   Well, were you interested in purchasing a
16 house in this time period with putting little money
17 down?
18    A.   Well, they guaranteed me.
19    Q.   That's not what I asked you, if they
20 guaranteed you. Were you interested in purchasing a
21 house and putting as little money down as possible?
22    A.   Yes.
23    Q.   Did you tell that to Mr. Luongo?
24    A.   Yes.

Page 107

1    Q.   Did Mr. Luongo say anything else to you
2 about this May 3rd, 2001 letter?
3    A.   No.
4    Q.   Did he ever tell you that this May 3rd,
5 2001 letter was a prequalification letter and that
6 you would need to formally apply for a mortgage?
7    A.   No.
8    Q.   Now, on Exhibit 4 do you see where it says
9 FHA approved?
10    A.   Yes.
11    Q.   Did you tell Mr. Luongo you wanted to get
12 an FHA approved loan?
13    A.   No, no.
14    Q.   Did you ask him about the FHA approved
15 language on here when you got this letter?
16    A.   No.
17    Q.   Did you ask anybody?
18    A.   No.
19    Q.   Did you believe that this May 3rd, 2001
20 letter was a guarantee of financing?
21    A.   Yes, yes.
22    Q.   What is that based on?
23    A.   It's right here (indicating). It's on all
24 of 'em.

Page 108

1    Q.   When you say "right here," read into the
2 record what you're relying on?
3    A.   It says, guaranteed, as you can see it,
4 call seven days a week with any questions about your
5 mortgage process. Give us the property and address.
6    Q.   Did you understand after you got this
7 letter that any loan that Cendant made to you would
8 be subject to a formal application process?
9    A.   Excuse me again?
10    Q.   Did you understand after you got this
11 letter that any loans Cendant made to you would be
12 subject to a formal application process?
13    A.   No, I've already completed it.
14    Q.   And, again, what did you do to complete it
15 other than speaking with Mr. Luongo on the phone?
16    A.   The application that I processed.
17    Q.   And tell me as of May 3rd, 2001 all the
18 information, other than what you've testified to,
19 that you gave to Mr. Luongo in support of your
20 application?
21    A.   Excuse me, again, I'm sorry, Andrew?
22    Q.   Let's take it from the top. As of May
23 3rd, 2001 --
24    A.   Right.

Page 109

1    Q.   -- what information had you given to Mr.
2 Luongo about your application?
3         MR. TROMBETTA:  Well, I'm going to
4 just object to that based on the prior questions but
5 you can answer.
6    A.   Basically the application. He asked me my
7 income, me and my spouse's income, where I was
8 working, and put me on hold and he pulled the
9 credit.
10    Q.   Did he tell you he pulled the credit?
11    A.   Oh, yeah, he had me on hold for about five
12 minutes.
13    Q.   And after he had you on hold what
14 happened?
15    A.   He said I was approved.
16    Q.   Did he say anything else?
17    A.   No.
18    Q.   Well, did he say he was going to send you
19 a letter?
20    A.   Oh, he did say he was going to send me a
21 letter.
22    Q.   What did he say about that?
23    A.   He just said I'm sending you out a letter.
24 You've been approved, guaranteed, and he sent it.

Anthony Mendes

06/01/2006

Page 110

1    Q.   Did he use the word "guaranteed"?
2    A.   Yeah.
3    Q.   So you thought at that point there was a
4  guaranteed loan from Cendant to you?
5    A.   Yes.
6    Q.   Did you read this whole document that's
7  marked as Exhibit 4 when you got it?
8    A.   Most of it -- some of it.  I was just so
9  anxious to purchase.
10   Q.   Did you read -- go to page 3 of Exhibit 4.
11   A.   Page 3, this one?
12   Q.   Yes, did you read this page?
13   A.   If I could remember.
14   Q.   Well, can you remember?
15   A.   I really can't.
16   Q.   Did you read through Step 3?
17   A.   Not really.
18   Q.   You had a chance to, though, right?
19   A.   Yeah, I did.
20       MR. GOLDSTEIN:  Let's just mark this
21  separately as Exhibit 5.
22       (Document marked as Exhibit No. 5
23  for identification.)
24   Q.   I'm just going to want you to identify

Page 111

1  that.  I'm not going to ask you any more questions
2  about it at this time.  Do you know what Exhibit 5
3  is?
4    A.   Yes.
5    Q.   What is Exhibit 5?
6    A.   They say again guaranteed financing.
7    Q.   Is that the same letter that was marked as
8  Exhibit B to the complaint?
9    A.   Yes.
10   Q.   All right, let's go back to the complaint
11  for the moment and go into the body of the
12  complaint.  On page 4 to 5 we're talking about one
13  count of the complaint for breach of contract?
14   A.   On page 4?
15   Q.   Yes, at the bottom is Count 1, breach of
16  contract?
17   A.   One second, Andrew, please.  Where is that
18  at, Andrew, please?
19   Q.   That's right here, Count 1?
20   A.   Oh, okay, I missed it.
21   Q.   And then flip it over to the next page.
22  We went over the allegations about Cendant agreeing
23  to provide you and your wife with financing and
24  there was a breach of that agreement.  Other than

Page 112

1  what you've testified to did you have any other
2  agreements with Cendant Mortgage?
3    A.   No, no.
4    Q.   Do you contend that you had any oral
5  agreements with Cendant Mortgage?
6    A.   No.
7        MR. TROMBETTA:  I'll just -- never
8  mind.
9    A.   No.
10   Q.   After your offer was accepted what
11  happened next in regard to your proposed purchase of
12  the Chilson Avenue property?
13   A.   Excuse me, come again, Andrew, please?
14   Q.   Well, after your offer to purchase Chilson
15  Avenue was accepted --
16   A.   Yes.
17   Q.   -- and I'll tell you it says June 14th on
18  the document it was accepted, what steps did you
19  then take to further your purchase of that property?
20   A.   Signed a purchase and sale agreement.
21   Q.   Did you take any other steps to get a
22  loan?
23   A.   No.
24   Q.   Did you sign any applications?

Page 113

1    A.   Signed a purchase and sales agreement and
2  also gave them, if I could remember, Andrew, a large
3  deposit that was required.
4    Q.   Where did that deposit come from, by the
5  way?
6    A.   You're funny, Andrew.  I don't mean to --
7  you're funny.  Me and my wife's savings.
8    Q.   What account; do you know?
9    A.   Citizens Bank.
10   Q.   Citizens Bank, okay.
11   A.   Yeah, she had money in Citizens and if I
12  can remember, Andrew, also Metropolitan Credit
13  Union, if I could remember.
14   Q.   Did anyone provide you with any funds so
15  you could make the down payment toward the Chilson
16  Avenue property?
17   A.   No, no, Andrew.
18   Q.   Where is the Metropolitan Credit Union, by
19  the way?
20   A.   In Framingham.
21   Q.   Does it still exist?
22   A.   Yes, they do, Andrew.
23   Q.   Was that your wife's account there?
24   A.   Yes, yes.

29 (Pages 110 to 113)

Page 114

1    Q.   Do you have statements from 2001 for that
2    account?
3       A.   I believe they're in the documents,
4    Andrew.
5       Q.   Well, I don't think I have that but I'll
6    take a look.  I have Citizens and Fleet.
7       A.   Okay, she had money there, too.
8       Q.   Those are the three accounts?
9       A.   If I could remember, Andrew.
10      Q.   Any other accounts?
11      A.   As far as I know it's Citizens, Fleet,
12   Metro, the 401K, refund that was coming with the
13   Internal Revenue, and the gift that was going to be
14   given to us.
15      Q.   Were any of these bank accounts in your
16   name?
17      A.   Not that I'm aware of, Andrew.
18      Q.   Are you aware of any other bank accounts
19   you or your wife had?
20      A.   Not that I'm aware of, Andrew.
21            MR. GOLDSTEIN:  I think we requested
22   the bank account statements.  I don't have them.
23            MR. TROMBETTA:  Which ones are you
24   missing?

Page 115

1            MR. GOLDSTEIN:  Metropolitan, I
2    believe.
3            MR. TROMBETTA:  We can get those to
4    the extent he has them.
5            MR. GOLDSTEIN:  Mark this as the next
6    exhibit.  Again, I only have two, I apologize.
7            (Document marked as Exhibit No. 6
8    for identification.)
9       Q.   Do you recognize Exhibit 6?
10      A.   Yes, I do, Andrew.
11      Q.   What is Exhibit 6?
12      A.   It's the purchase and sale agreement.
13      Q.   For the Chilson Avenue property?
14      A.   That's correct, Andrew.
15      Q.   Now, if you turn to the third page of
16   Exhibit 6, do you see paragraph 26 at the bottom?
17      A.   What number, Andrew?
18      Q.   26, entitled Mortgage Contingency Clause?
19      A.   I don't see -- oh, that's 26, okay, it
20   looks like an "8," okay.
21      Q.   Right.
22      A.   Go ahead, Andrew.
23      Q.   Did you have any discussions with anyone
24   regarding the mortgage contingency clause?

Page 116

1       A.   No.
2       Q.   Well, do you know how the blanks in the
3    contingency clause came to be filled out?
4       A.   If I could remember it was through the
5    brokers.
6       Q.   Well, do you know how the brokers -- did
7    you tell the brokers you wanted a $297,000 mortgage
8    contingency clause?
9       A.   I'm not sure.  I'm not sure.
10      Q.   Is your memory of what happened in the
11   summer of 2001 foggy?
12      A.   No, no.
13      Q.   All right, well, this is a P&S that you
14   signed?
15      A.   Right, go ahead.
16      Q.   To purchase a house for $305,000, correct?
17      A.   Correct.
18      Q.   This is your first house ever, right?
19      A.   Correct.
20      Q.   And do you know how a mortgage contingency
21   clause in the amount of $297,000 came to be in this
22   agreement?
23      A.   No, I don't.
24      Q.   Do you see in that mortgage contingency

Page 117

1    clause where it says, FHA?
2       A.   I see it here.
3       Q.   Do you know how that came to be in there?
4       A.   No.
5       Q.   Did you see that before you signed this
6    document?
7       A.   No.
8       Q.   Do you know what that refers to, FHA?
9       A.   No.
10      Q.   Do you know how the mortgage contingency
11   deadline of July 31st, 2001 came to be in this
12   document?
13      A.   No.
14      Q.   And if you look at the last sentence of
15   paragraph 26, it references submitting a mortgage
16   loan application on or before July 13th, 2001; do
17   you see that?
18      A.   I see it here.
19      Q.   And this document I'll tell you is dated
20   July 6, 2001.  Do you know how the date of July
21   13th, 2001 came to be in there?
22      A.   No.
23      Q.   Did you submit a mortgage loan application
24   by July 13th, 2001?

Page 118

1    A.  No.  Application was processed in June --
2    between May and June.
3        Q.  When was the application process over?
4        A.  Excuse me?
5        Q.  When was the end of the application
6    process?
7        A.  Between May and June.
8        Q.  What date in June did the application
9    process end?
10       A.  I cannot recollect.  I don't remember.
11       Q.  Well, was the application process over as
12   of June 12th, 2001, the date that you got the letter
13   from Mr. Luongo?
14       A.  What's your question here?
15       Q.  The date that you got -- was the
16   application process over by June 12th, 2001 when you
17   received Exhibit 5 from Mr. Luongo?
18       A.  No, before.
19       Q.  Before, okay.  Turn to the next page; is
20   that your signature on the bottom of the fourth page
21   of Exhibit 6?
22       A.  Yes, it is.
23       Q.  Is that your wife's?
24       A.  That is correct.

Page 119

1        Q.  Do you recall if there were any prior
2    drafts of this purchase and sale agreement?
3        A.  Excuse me, Andrew?
4        Q.  Do you recall if there were any prior
5    drafts of this purchase and sale agreement?
6        A.  Meaning copies?
7        Q.  No, drafts like did it go through some
8    revisions?
9        A.  No.
10       Q.  Now, between the date of the offer which
11   is June 12th, 2001 as shown on the second page of
12   Exhibit 2 and the date that you signed the purchase
13   and sale agreement, July 6th, 2001, did you take any
14   other steps towards securing a loan from Cendant
15   Mortgage?
16            MR. TROMBETTA:  Well, I'll object to
17   the form of that question.
18       A.  Basically signed the purchase and sales.
19       Q.  Okay, did you take any other steps toward
20   receiving a loan from Cendant Mortgage between the
21   date of the offer and the date of the purchase and
22   sale agreement?
23       A.  Not that I'm aware of.
24            MR. GOLDSTEIN:  Let's mark this as

Page 120

1    the next exhibit.
2            (Document marked as Exhibit No. 7
3    for identification.)
4        Q.  Do you recognize Exhibit 7?
5        A.  Yes, I do, Andrew.
6        Q.  What is Exhibit 7?
7        A.  It's a final commitment letter -- I mean,
8    final commitment.
9        Q.  Well, you're looking at the first page;
10   why don't you look through all three pages of
11   Exhibit 7 and tell me if you still recognize it as a
12   final commitment letter?
13       A.  Excuse me, Andrew?
14       Q.  Do you still recognize this as a final
15   commitment letter?
16       A.  Yes, I do, Andrew.
17       Q.  Okay.  Now, in terms of Count 1 of your
18   complaint which is for breach of contract, I'm going
19   to show that to you at the same time as Exhibit 7,
20   in paragraph 27 of the complaint you allege that
21   Cendant agreed to provide Mr. and Mrs. Mendes with
22   $307,445 in financing to purchase a home; do you see
23   that?
24       A.  Let me see, Andrew.

Page 121

1            (Witness perusing document)
2        A.  Correct.
3        Q.  Okay, is this the agreement you're
4    referring to in paragraph 27?
5            MR. TROMBETTA:  Well, I'll object to
6    that question.
7        A.  One second, please, Andrew.
8            (Witness reading)
9        A.  That is correct Andrew.
10       Q.  Is this an agreement that you entered into
11   with Cendant Mortgage Corporation?
12            MR. TROMBETTA:  I object to that
13   question.
14       A.  Final commitment.
15       Q.  My question is, is this an agreement that
16   you entered into with Cendant Mortgage?
17            MR. TROMBETTA:  I object.
18       A.  Yeah.
19       Q.  In fact, on the second page of Exhibit 7
20   your signature appears, correct?
21       A.  That is correct, Andrew.
22       Q.  And on the third page of Exhibit 7 your
23   signature appears, correct?
24       A.  Excuse me, Andrew?

Page 122

1    Q.  And in the third page of Exhibit 7 your
2  signature appears, correct?
3    A.  That's correct, Andrew.
4    Q.  Now, if you look on the first page of
5  Exhibit 7 under the heading, A, Your Approved Loan
6  Terms?
7    A.  Go ahead.
8    Q.  This says under their basic loan amount
9  $297,776; do you see that?
10    A.  I see it.
11    Q.  So -- and on the June 12th, 2001 letter,
12  which we marked separately, the loan amount was
13  different.  It was $307,545; do you see that?
14    A.  Uh-huh.
15    Q.  Do you know why the loan amount changed?
16    A.  I don't remember but I do remember when
17  the properties declined, they sent me different
18  preapprovals.
19    Q.  What do you mean by the properties
20  declined?
21    A.  I mean, when I didn't take the two-family
22  and the four-family that I didn't accept.
23    Q.  And you said they sent you different
24  preapprovals?

Page 123

1    A.  If I could remember.  I don't know -- I
2  don't know the difference in the numbers but I
3  remember receiving this (indicating).
4    Q.  I don't mean to mislead you but on Exhibit
5  7 it does have a total loan amount of $302,231.  Was
6  there a fee added to the amount?
7    A.  Where is that, Andrew?  Oh, yeah.
8    Q.  Now, do you see where it says loan type,
9  FHA?
10    A.  I see it here.
11    Q.  Did you read this before you signed it?
12    A.  Not really.
13    Q.  Did you provide a copy of this document to
14  your attorney, Lynn Erickson, before signing this?
15    A.  I'm not sure but I'm pretty sure that
16  Cendant did.
17    Q.  That's something --
18    A.  That I'm not sure of.
19    Q.  Well, did your attorney represent you in
20  negotiation of Exhibit 7?
21    A.  Not that I could remember.
22    Q.  Well, you had an attorney when you
23  executed Exhibit 7, correct?
24    A.  Correct.

Page 124

1    Q.  In paragraph 28 of your complaint you
2  claim that Cendant breached that agreement by
3  refusing to provide the insurance, which your
4  counsel has agreed is a typo.  It's probably
5  supposed to read "loan"; do you contend that Cendant
6  breached the terms of Exhibit 7?
7    A.  I think so, yeah.
8    Q.  How did Cendant breach the terms of
9  Exhibit 7 as far as you know?
10    A.  Well, it was guaranteed financing and as
11  the property was scheduled for closing basically
12  they backed off.
13    Q.  What is the basis for the contention that
14  Exhibit 7 represents guaranteed financing?
15        MR. TROMBETTA:  Well, I'll object to
16  that.
17    A.  Say that again?
18    Q.  What is the basis of your contention that
19  Exhibit 7 is guaranteed financing as you just
20  testified?
21        MR. TROMBETTA:  Same objection.
22    A.  Well, we signed a purchase and sales and
23  final commitment came and it was scheduled to close.
24  We were scheduled to close on the house.

Page 125

1    Q.  Well, I know you were scheduled to close.
2  When the purchase and sale agreement was signed how
3  does that make this guaranteed, Exhibit 7?
4        MR. TROMBETTA:  I object to the form.
5    A.  To qualify for the loan.
6    Q.  This is a loan commitment --
7    A.  Okay.
8    Q.  -- from Cendant to you, correct?
9    A.  Correct.
10    Q.  And isn't it true that the loan commitment
11  was based on certain conditions that you had to
12  meet?
13    A.  I was not aware of it.
14    Q.  Well, did you read this before you signed
15  it?
16    A.  I skimmed it but I was not aware of it.  I
17  was not aware of it.
18    Q.  Did you skim the Section C on the first
19  page where it says, Conditions to Commitment?
20    A.  No, no.
21    Q.  Did anyone at Cendant communicate anything
22  to you regarding any commitments that were part of
23  Exhibit 7?
24    A.  No, no.

32 (Pages 122 to 125)

Page 126

1    Q.  Did anyone at Cendant tell you that there
2    were no commitments in Exhibit 7?
3    A.  No.
4    Q.  If you would you look at the third page of
5    Exhibit 7, you signed this page, correct?
6    A.  Yes.
7    Q.  There's not much writing on this page, is
8    there, correct?
9    A.  No.
10   Q.  And there's one heading on the page that
11   says, C, Conditions to Commitment Continued; do you
12   see that?
13   A.  Where is that at?
14        (Mr. Goldstein indicating)
15   A.  Go ahead.
16   Q.  Did you read that before you signed this
17   document?
18   A.  No.
19   Q.  Did anyone force you to sign this
20   document?
21   A.  The -- Kevin Cogan said sign it and send
22   it back.
23   Q.  He didn't force you to sign it?
24   A.  He --

Page 127

1        MR. TROMBETTA:  I object.
2    A.  He didn't force me but he said sign it and
3    get it back immediately.
4    Q.  Did you sign it of your own free will?
5        MR. TROMBETTA:  I object.
6    A.  I signed it, yeah.
7    Q.  No one was holding a gun to your head,
8    right?
9    A.  No.
10   Q.  Kevin Cogan wasn't in the room when you
11   signed it, right?
12   A.  No.
13   Q.  You never met Kevin Cogan?
14   A.  No.
15   Q.  Did he say anything else to you besides
16   sign it and send it back in regard to the execution
17   of Exhibit 7?
18   A.  No.
19   Q.  Did he threaten you in any way?
20   A.  No.
21   Q.  Did he do anything to coerce you to sign
22   Exhibit 7?
23   A.  No, he just said sign it and send it
24   back.

Page 128

1    *Q.  Now, between the date of the purchase and
2    sale agreement, which is July 6th, 2001 and the date
3    of the final commitment, August 17th, 2001 as shown
4    on Exhibit 7, what additional steps did you take, if
5    any, to secure a mortgage to buy the Chilson Avenue
6    property?
7    A.  Please, Andrew, come again?  I don't mean
8    to have you repeat.  I just want to be able to
9    answer it.
10       MR. GOLDSTEIN:  I'm not going to
11   repeat it.  Would you read it back?
12        (*Record read as requested)
13   Q.  Let me just clarify that.  The final
14   commitment is August 14th.  If I said August 17th I
15   misspoke.
16   A.  August 14th.
17   Q.  What additional steps did you take toward,
18   if any, toward obtaining a mortgage to buy the
19   Chilson Avenue property between the date of the P&S
20   and the date of the final commitment?
21   A.  Basically the P&S was signed.  Kevin was
22   aware and he said he would work on getting the
23   commitment letter out and he would get closing
24   scheduled and that was it.

Page 129

1    Q.  Were you providing any information to
2    Cendant Mortgage to get the commitment letter out?
3    A.  I was -- I was and also the brokers.
4    Q.  What kind of information were you
5    providing?
6    A.  We needed a commitment letter.
7    Q.  And Cendant Mortgage told you you needed a
8    commitment letter, correct?
9    A.  My brokers did, yeah.
10   Q.  What else -- when you say your brokers --
11   A.  I mean, Paula and Greg Abbot.
12   Q.  What did they say to you in regard to
13   needing a commitment letter?
14   A.  You have to get your commitment letter.
15   Q.  Did they tell you why?
16   A.  Just it's needed.
17   Q.  Did they say anything else as to why it
18   was needed?
19   A.  No.
20   Q.  Did you understand that you needed a
21   commitment letter before you could get a loan from
22   Cendant Mortgage Corporation?
23   A.  Not really, no.
24   Q.  Did you ever tell anyone at Cendant

Page 130

1  Mortgage Corporation that you did not feel bound by
2  the terms of this final commitment?
3      A.  No.
4      Q.  Did you ever tell anyone at Cendant
5  Mortgage Corporation that you -- let me limit that
6  question.  In 2001 did you ever tell anyone at
7  Cendant Mortgage Corporation that you disagreed with
8  any conditions in this commitment letter?
9      A.  Can I have the question again, I'm sorry?
10     Q.  Did you tell anyone at Cendant Mortgage
11 Corporation in 2001 that you disagreed with any of
12 the conditions that are set forth in this commitment
13 letter?
14         MR. TROMBETTA:  Well, I'll object to
15 the form of that question.
16     A.  No.
17     Q.  You didn't read them, you didn't know they
18 were there, right?
19     A.  Right.
20         MR. TROMBETTA:  Can we take a quick
21 break?
22         MR. GOLDSTEIN:  Absolutely.
23         (A brief recess was taken, 2:05 p.m.
24 - 2:10 p.m.)

Page 131

1          (Documents marked as Exhibit Nos. 8
2  and 9 for identification.)
3          MR. GOLDSTEIN:  Do you want to
4  stipulate as to the authenticity, to move this
5  along, that's Exhibit 8 and 9?
6          MR. TROMBETTA:  I mean, I don't know
7  if they're authentic or not.  I assume that they
8  are.  If you can just ask him questions?
9          MR. GOLDSTEIN:  They're not his
10 anyway.
11         MR. TROMBETTA:  Well, then I'm not
12 going to stipulate.
13     Q.  Do you know what Exhibits 8 and 9 are?
14     A.  Yeah, statements.
15     Q.  Statements for what?
16     A.  Bank accounts.
17     Q.  For any particular bank accounts?
18     A.  Fleet and Citizens.
19     Q.  Are those statements for your wife's bank
20 accounts at Fleet and Citizens?
21     A.  Yes.
22     Q.  Do you have in your possession statements
23 that postdate those two statements?
24     A.  Excuse me?

Page 132

1      Q.  These statements are dated June 19th, 2001
2  and it looks like one's dated May 31st, 2001; do you
3  have any other statements?
4      A.  That's about it right now from what I can
5  see other than --
6      Q.  I mean, not with you?
7      A.  Not with me.  Not with me.
8      Q.  I mean, at home do you keep your bank
9  statements?
10     A.  I don't know, Andrew.
11     Q.  Do you recognize those as bank statements
12 from your wife's bank accounts?
13     A.  Oh, yes, yes.
14     Q.  Okay.  When was the first time that you
15 learned that there was a problem with Cendant
16 Mortgage making a loan to you to buy the Chilson
17 Avenue property?
18     A.  You're funny.  I don't mean to -- come
19 again, Andrew?  I'm sorry, because I want to try to
20 answer you.
21     Q.  When was the first time that you learned
22 that there was a problem, if any, with Cendant
23 Mortgage Corporation making you a loan on the
24 Chilson Avenue property?

Page 133

1      A.  The last -- the last week of August 2001.
2      Q.  And when did you learn about it?
3      A.  It was like three to seven -- I don't
4  know, three to four, five days before closing.
5      Q.  Three to four, five days before closing.
6  Okay, and what happened then?
7      A.  Kevin Cogan said it's not going to go to
8  closing.
9      Q.  What else did he say?
10     A.  And I asked him why and he said it was
11 related to rents.
12     Q.  Did he say anything else about that?
13     A.  He said something about 75 percent of --
14 something to do with market value or something like
15 that.
16     Q.  Did he say anything else in regard to that
17 issue that you recall?
18     A.  No.
19     Q.  And prior to that were there any other
20 problems with your potential purchase of the Chilson
21 Avenue property?
22     A.  Not that I was aware of.
23     Q.  Well, how long did this conversation with
24 Mr. Cogan last?

Anthony Mendes                                                           06/01/2006

Page 134

1    A.  I was very disgusted and upset.  It didn't
2  last long.  I would say anywhere from five to eight
3  minutes.
4    Q.  Did you talk to anyone else about the rent
5  issue after you got this call from Mr. Cogan?
6    A.  No.
7    Q.  Did you talk to Paula Duzan?
8    A.  Basically I think he had told them, too,
9  because she had mentioned it to me.
10   Q.  But did you talk to Paula Duzan about the
11 issue with the rents?
12   A.  No, no.
13   Q.  Did you talk to Greg Abbot about the issue
14 with the rents?
15   A.  I did.
16   Q.  What do you recall he said and you said?
17   A.  He just said it isn't going to go to
18 closing.  Something to do with rents; that's what he
19 said.
20   Q.  Did you respond?
21   A.  I didn't respond to him.  I responded to
22 Kevin Cogan.
23   Q.  Well, how did you respond other than what
24 you've already testified to?

Page 135

1    A.  How come it doesn't qualify to go to
2  closing?  I mean, how do you back off the deal just
3  when we're all scheduled to close?
4    Q.  Did you say anything else to Mr. Cogan?
5    A.  No, that was about it.
6    Q.  Did you understand at some point that the
7  rent issue that you described was a condition in the
8  final commitment letter?
9    A.  Not that I was aware of.
10   Q.  Did you ever become aware of that?
11   A.  Not until about the last week of August of
12 2001.
13   Q.  Okay, so you became aware that there was a
14 condition in the commitment letter in the last week
15 of August 2001 regarding rents, correct?
16   A.  When it was scheduled to close, yeah.
17   Q.  How did you become aware of that condition
18 in the final commitment letter?
19   A.  I spoke to Kevin.
20   Q.  Okay, I know you told us there was an
21 issue with the rents; did he specifically discuss
22 with you the condition that was in the final
23 commitment letter regarding rents?
24   A.  In the end he mentioned it.

Page 136

1    Q.  Well, when you say in the end, when is
2  that?
3    A.  The week before.  The last week before
4  closing after he said it wasn't going to -- we
5  weren't going to closing.
6    Q.  Well -- and that's the first time the
7  issue with the rents came up?
8    A.  First time, Andrew.
9    Q.  And what happened after that with regard
10 to your proposed purchase of the property?
11   A.  The deal fell through.
12   Q.  Well, were there any efforts made to
13 address this rent issue?
14   A.  No not that I remember.
15   Q.  Did you have any other further discussions
16 with Cendant Mortgage regarding the rent issue?
17   A.  Not that I could remember.
18   Q.  Were there any efforts made to salvage
19 your proposed purchase of the property?
20   A.  No.
21   Q.  When did you start dealing with Kevin
22 Cogan as opposed to Richard Luongo, was there some
23 sort of break; do you recall?
24   A.  Right after it was guaranteed.

Page 137

1    Q.  Well, when you say guaranteed, when was
2  that, is that the June 12, 2001 letter?
3    A.  And prior.
4    Q.  How much prior?
5    A.  I mean, on the letters that he had sent
6  when I looked at the two-family and the four-family.
7    Q.  So you thought those were all guaranties
8  of financing, correct?
9    A.  Yes.
10   Q.  Did you deal with anyone else at Cendant
11 other than Kevin Cogan?
12   A.  That was it.
13   Q.  So it's Kevin and Richard?
14   A.  Those were the only two.
15   Q.  Did you speak to a Shamikah Solomon?
16   A.  I don't remember.
17   Q.  Isn't it true that after June 12th, 2001
18 you went through a whole application process with
19 Cendant Mortgage to get a loan?
20       MR. TROMBETTA:  I'm sorry, when was
21 that?
22   Q.  Isn't it true that after June 12th, 2001
23 you went through a whole application process --
24   A.  No.

35 (Pages 134 to 137)

Anthony Mendes                                                                                    06/01/2006

<table>
<tr><td colspan="2" align="right">Page 138</td></tr>
<tr><td>1</td><td>Q. -- to obtain a loan through Cendant</td></tr>
<tr><td>2</td><td>Mortgage?</td></tr>
<tr><td>3</td><td>A. No.</td></tr>
<tr><td>4</td><td>Q. And at some point other than this rent</td></tr>
<tr><td>5</td><td>issue were there any other problems with your</td></tr>
<tr><td>6</td><td>proposed purchase of the property?</td></tr>
<tr><td>7</td><td>A. No.</td></tr>
<tr><td>8</td><td>Q. Was there any extension of the closing</td></tr>
<tr><td>9</td><td>date?</td></tr>
<tr><td>10</td><td>A. As far as I remember it there was.</td></tr>
<tr><td>11</td><td>Q. What was the reason for the extension of</td></tr>
<tr><td>12</td><td>the closing date?</td></tr>
<tr><td>13</td><td>A. I have no idea. That was between Kevin</td></tr>
<tr><td>14</td><td>and the brokers. I have no idea, Andrew.</td></tr>
<tr><td>15</td><td>Q. Were you involved in any way in the</td></tr>
<tr><td>16</td><td>extension of the closing date?</td></tr>
<tr><td>17</td><td>A. Well, they just told me it has been</td></tr>
<tr><td>18</td><td>extended but, you know, not any actual real facts or</td></tr>
<tr><td>19</td><td>anything.</td></tr>
<tr><td>20</td><td>MR. GOLDSTEIN: Let's mark this as</td></tr>
<tr><td>21</td><td>the next exhibit.</td></tr>
<tr><td>22</td><td>(Document marked as Exhibit No. 10</td></tr>
<tr><td>23</td><td>for identification.).</td></tr>
<tr><td>24</td><td>Q. Do you recognize Exhibit 10?</td></tr>
</table>

<table>
<tr><td colspan="2" align="right">Page 139</td></tr>
<tr><td>1</td><td>A. Yes.</td></tr>
<tr><td>2</td><td>Q. And what is Exhibit 10?</td></tr>
<tr><td>3</td><td>A. This is the extension of closing and they</td></tr>
<tr><td>4</td><td>presented to me related to the buyer I guess Cendant</td></tr>
<tr><td>5</td><td>needed a little more time and then asked me to agree</td></tr>
<tr><td>6</td><td>upon it and I signed it and my wife signed on it.</td></tr>
<tr><td>7</td><td>Q. So your signature appears on this</td></tr>
<tr><td>8</td><td>document?</td></tr>
<tr><td>9</td><td>A. Yes, Andrew.</td></tr>
<tr><td>10</td><td>Q. Do you know why this extension was entered</td></tr>
<tr><td>11</td><td>into?</td></tr>
<tr><td>12</td><td>A. I have no idea.</td></tr>
<tr><td>13</td><td>Q. Well, was there some effort made between</td></tr>
<tr><td>14</td><td>the date of this extension, August 29th, 2001, and</td></tr>
<tr><td>15</td><td>the extended closing date to address the rent issue?</td></tr>
<tr><td>16</td><td>A. No, no, after -- if I could remember,</td></tr>
<tr><td>17</td><td>Andrew, after they sent me the letter from the</td></tr>
<tr><td>18</td><td>attorney that was closing, I guess they had to move</td></tr>
<tr><td>19</td><td>it up a couple of days and that was Kevin and the</td></tr>
<tr><td>20</td><td>brokers.</td></tr>
<tr><td>21</td><td>Q. From the time that you executed the offer</td></tr>
<tr><td>22</td><td>did you send any financial information to Cendant</td></tr>
<tr><td>23</td><td>Mortgage Corporation?</td></tr>
<tr><td>24</td><td>A. Excuse me again, Andrew?</td></tr>
</table>

<table>
<tr><td colspan="2" align="right">Page 140</td></tr>
<tr><td>1</td><td>Q. Did you send any financial information to</td></tr>
<tr><td>2</td><td>Cendant Mortgage Corporation?</td></tr>
<tr><td>3</td><td>A. I do believe I sent out -- they wanted</td></tr>
<tr><td>4</td><td>copies of accounts.</td></tr>
<tr><td>5</td><td>Q. Bank accounts?</td></tr>
<tr><td>6</td><td>A. Yeah.</td></tr>
<tr><td>7</td><td>Q. Anything else?</td></tr>
<tr><td>8</td><td>A. Invoices, and if I could remember it was</td></tr>
<tr><td>9</td><td>taxes.</td></tr>
<tr><td>10</td><td>Q. Anything else?</td></tr>
<tr><td>11</td><td>A. That was it.</td></tr>
<tr><td>12</td><td>Q. Do you recall when you locked in the</td></tr>
<tr><td>13</td><td>interest rate for your loan if at all?</td></tr>
<tr><td>14</td><td>A. You're funny. I don't mean -- yes, when</td></tr>
<tr><td>15</td><td>they guaranteed me.</td></tr>
<tr><td>16</td><td>Q. Did you ever have any conversations with</td></tr>
<tr><td>17</td><td>anyone about the electrical system at the property?</td></tr>
<tr><td>18</td><td>A. Kevin mentioned it.</td></tr>
<tr><td>19</td><td>Q. Well, what did he mention?</td></tr>
<tr><td>20</td><td>A. He just said electrical needed to be</td></tr>
<tr><td>21</td><td>looked at and I told him I would take care of it.</td></tr>
<tr><td>22</td><td>Q. Did Kevin Cogan ever tell you the</td></tr>
<tr><td>23</td><td>appraisal was on hold because of the electrical</td></tr>
<tr><td>24</td><td>problems at the house?</td></tr>
</table>

<table>
<tr><td colspan="2" align="right">Page 141</td></tr>
<tr><td>1</td><td>A. No.</td></tr>
<tr><td>2</td><td>Q. Did Kevin Cogan ever tell you that you</td></tr>
<tr><td>3</td><td>needed to make electrical repairs in the amount of</td></tr>
<tr><td>4</td><td>$4,000 to switch to a conventional loan and put 5</td></tr>
<tr><td>5</td><td>percent down?</td></tr>
<tr><td>6</td><td>A. No, never mentioned that to me.</td></tr>
<tr><td>7</td><td>Q. Did you ever tell Kevin Cogan that you</td></tr>
<tr><td>8</td><td>were going to take a few days to think about the</td></tr>
<tr><td>9</td><td>electrical system and get back to him?</td></tr>
<tr><td>10</td><td>A. Well, I told him up front that I would</td></tr>
<tr><td>11</td><td>have an electrician look at it and as far as I know</td></tr>
<tr><td>12</td><td>you should have a copy of it.</td></tr>
<tr><td>13</td><td>Q. Well, were there any repairs made to the</td></tr>
<tr><td>14</td><td>electrical system at the house during the time you</td></tr>
<tr><td>15</td><td>were pursuing a purchase of it?</td></tr>
<tr><td>16</td><td>A. Not that I was aware of, no.</td></tr>
<tr><td>17</td><td>Q. Did anyone at Cendant Mortgage ever talk</td></tr>
<tr><td>18</td><td>to you about switching to a conventional mortgage</td></tr>
<tr><td>19</td><td>loan?</td></tr>
<tr><td>20</td><td>A. In -- when we lost -- lost it in the end,</td></tr>
<tr><td>21</td><td>I mean, when they backed off the deal, then he</td></tr>
<tr><td>22</td><td>had -- the only time he had mentioned to me and that</td></tr>
<tr><td>23</td><td>was the last week of August of 2001 when we were</td></tr>
<tr><td>24</td><td>closing, you can go conventional, 20 percent, and I</td></tr>
</table>

36 (Pages 138 to 141)

Page 142

1  said I didn't have 20 percent.
2     Q.  Okay, there was no discussion prior to
3  that about a conventional --
4     A.  No.
5     Q.  Did your attorney, Lynn Erickson, ever
6  tell you that Cendant had told her in early July
7  that she had a discussion about applying for a
8  conventional loan?
9     A.  No.
10    Q.  Was there ever an issue about you paying
11 off some sort of a judgment as a condition for the
12 loan closing?
13    A.  Come again, I'm sorry, Andrew?
14    Q.  Was there ever an issue about your paying
15 off a judgment as a condition of the loan closing?
16    A.  I think I owed a small, little debt with
17 Com. Gas and that was paid up and it was all over;
18 that was cleared.
19    Q.  Do you know when that came up?
20    A.  Oh, that was -- that came like later, way
21 later.
22    Q.  Do you know what month?
23    A.  No.
24    Q.  Was it after the P&S was signed?

Page 143

1     A.  Yes.
2     Q.  Do you know what the passport savings
3  account is?
4     A.  Yes.
5     Q.  What is that?
6     A.  Passbook, it's --
7     Q.  Passport?
8     A.  Port -- is it passbook?
9     Q.  Well, I'm asking you "passport"?
10    A.  I would say it's another terminology that
11 they use at the bank where you have so much money in
12 checking and savings.
13    Q.  Well, I understand that.  Perhaps I'm
14 using the wrong term but let me ask the question.
15 Do you or your wife have a passport savings account?
16    A.  It could have been possible but I'm not
17 sure.
18    Q.  Did you have a passbook savings account?
19    A.  I'm not sure.  I'm not sure, Andrew.
20    Q.  Were you ever asked by Kevin Cogan what
21 the source of the funds were for the down payment?
22    A.  Well, he knew because --
23    Q.  No, I didn't ask you that.  I asked you if
24 he asked you?

Page 144

1     A.  No, no.
2     Q.  How did he know?
3     A.  Excuse me?
4     Q.  How did he know?
5     A.  I processed an application over the phone.
6  I mean, I'm sure he had records of that.
7     Q.  Well, when did you make the downpayment?
8  You made a thousand dollar downpayment with the
9  offer, correct?
10    A.  That's correct.
11    Q.  Where did that come from; do you know?
12    A.  As far as I know from the bank.
13    Q.  What bank?
14    A.  I'm not sure.  It could have been
15 Citizens.  I'm not sure.
16    Q.  Was it a check?
17    A.  It was a check if I could remember.
18    Q.  Did you write it?
19    A.  No, I had my wife write it.
20    Q.  Do you know what account it was from?
21    A.  I can't remember but it was from one of
22 them, Andrew.
23    Q.  And then on July 6th, 2001 the P&S
24 required an $8,000 additional deposit?

Page 145

1     A.  She took care of that.
2     Q.  Did you see her write a check for that?
3     A.  If I could remember, Andrew, it was either
4  a check or a money order but it was disbursed if I
5  could remember.
6     Q.  Did you ever tell Kevin Cogan what the
7  source of the down payment was?
8     A.  No.
9     Q.  Was there ever any effort by anyone to
10 support higher rental values for the Chilson Avenue
11 property so you could solve the rental condition?
12       MR. TROMBETTA:  Well, I'll object to
13 that question.  Same objection.
14    Q.  To meet the rent condition?
15    A.  Come again, Andrew, I'm sorry?
16    Q.  Was there ever an effort by anyone to
17 increase the rental value of the property to meet
18 the rental condition in the final commitment letter?
19       MR. TROMBETTA:  And I object to the
20 form of that question.
21    A.  Not that I'm aware.
22    Q.  Did you ever speak to a Mr. Gerner from
23 Cendant Mortgage Corporation?
24    A.  Not that I could remember.

37 (Pages 142 to 145)

Anthony Mendes

06/01/2006

Page 146

1    Q.   Did Kevin Cogan ever explain to you the
2    situation about rental value and FHA guidelines?
3        A.   He mentioned it the last week of closing
4    when it didn't go to closing.
5        Q.   Well, did you have a discussion with Kevin
6    Cogan about whether the rental values the appraisal
7    had established for the property were too low?
8        A.   Not that I could remember.
9        Q.   You can't remember.  Do you deny having
10   any such conversation?
11       A.   Yeah.
12       Q.   Now, the closing pursuant to the extension
13   was rescheduled to September 13th, on or before
14   September 13th, 2001.  Did you ever have any plans
15   to go to another closing?
16       A.   No, no.
17       Q.   Did anything happen on or before September
18   13th, 2001?
19       A.   Excuse me?
20       Q.   Did anything happen on or before September
21   13th, 2001 concerning potential closing?
22       A.   No.
23       Q.   Did you at some point learn that the
24   seller was putting the house back on the market?

Page 147

1        A.   Yeah, Greg Abbot said it.
2        Q.   You got your downpayment back on the
3    Chilson Avenue property, correct?
4        A.   Yes, I did.
5        Q.   Did you lose any monies?
6        A.   What do you mean?
7        Q.   As a result of your pursuit of the Chilson
8    Avenue property?  I'm talking about out-of-pocket.
9            MR. TROMBETTA:  Well, I'll object to
10   that but you can answer.
11       A.   I'm trying to think.  Losing money related
12   to the deposit?
13       Q.   Well, you said you got the deposit back,
14   right?
15       A.   Yes, I did.
16       Q.   You paid an application fee to Cendant
17   Mortgage, correct?
18       A.   As far as I know.
19       Q.   Did you get that back?
20       A.   I don't think so.
21       Q.   Do you know how much the application fee
22   was?
23       A.   If I could remember, $350.
24       Q.   Do you know when that was paid, the

Page 148

1    application fee?
2        A.   I don't.  I don't.  I don't know if it was
3    added on with the application or what but I don't
4    remember.
5        Q.   Do you know who paid it, you or your wife?
6        A.   I have no idea.
7        Q.   Do you know how it was paid?
8        A.   No.
9        Q.   Do you know if your wife paid for it with
10   a Visa card?
11       A.   Andrew, could have -- since you mention
12   that, it could have.
13           MR. GOLDSTEIN:  Let's mark this as
14   the next exhibit.
15           (Document marked as Exhibit No. 11
16   for identification.)
17       Q.   This is a document -- I believe it was in
18   Cendant Mortgage's files so you may not have seen it
19   but it reflects a Visa payment of $350 from your
20   wife's account?
21       A.   Right.
22       Q.   On June 14th, 2001?
23       A.   Right.
24       Q.   And it's for an application fee according

Page 149

1    to this document?
2        A.   Correct.
3        Q.   Does this refresh your memory as to
4    whether there was an application fee paid on June
5    14th, 2001 to Cendant?
6        A.   It's possible, Andrew, it's possible.
7        Q.   Do you know if you or your wife keep your
8    Visa accounts from 2001?
9        A.   No.  I can tell you, no.
10       Q.   And looking at this does this refresh your
11   memory as to whether you got the application fee
12   back?
13       A.   If I do remember, I'm not sure, Andrew, I
14   think they -- and now that I remember that, I
15   remember a little bit, I think they refunded that
16   back on the Visa if I could remember.  I'm not sure.
17       Q.   Do you know why your wife may be paying an
18   application fee of $350 on June 14th, 2001 when
19   according to you already had a guaranteed loan
20   two days even before that?
21       A.   I have no idea.  I think that's -- I have
22   no idea.
23           MR. GOLDSTEIN:  Let's mark this as
24   the next exhibit.

38 (Pages 146 to 149)

Anthony Mendes                                                                                      06/01/2006

Page 150

1          (Document marked as Exhibit No. 12
2    for identification.).
3        Q.   Do you recognize Exhibit 12?
4        A.   No, I don't.
5        Q.   Well, it appears to be an appraisal for
6    the Chilson Avenue property by John Pacheco. Did
7    you ever meet with him about the property?
8        A.   No.
9        Q.   Did you understand that at any time that
10   your loan from Cendant Mortgage was conditioned upon
11   a satisfactory appraisal?
12       A.   No.
13       Q.   Now, if you look at the third page of this
14   document, I'm not going to ask you about it, I know
15   you didn't create it, but it indicates that the
16   basement of the Chilson Avenue property is
17   unfinished and I think you said it was finished. Do
18   you know why this appraisal would indicate the
19   basement was unfinished?
20       A.   As you heard me mention, Kevin had said
21   there was some electrical that needed to be looked
22   at.
23       Q.   Well, and the electrical needed to be
24   looked at doesn't really indicate whether the

Page 151

1    basement is finished or unfinished?
2        A.   Right.
3        Q.   So I just want to clarify, is it your
4    testimony that the basement was finished?
5        A.   I thought it was.
6        Q.   Have you ever seen this document before?
7        A.   No, not this.
8        Q.   Did you ask to get the appraisal from
9    Cendant Mortgage Corporation at some point?
10       A.   No, no.
11       Q.   Never?
12       A.   Never seen it.
13       Q.   Do you know why this document was included
14   in documents that you produced in this action?
15       A.   I would say the house -- it has to be
16   appraised.
17       Q.   Did you understand in 2001 that the
18   Chilson Avenue property was constructed in 1900?
19       A.   I'm not sure. I'm not sure.
20       Q.   When was the house you're living in now
21   constructed?
22       A.   1978.
23       Q.   So it's a much newer house than the
24   Chilson Avenue house?

Page 152

1        A.   Oh, it is.
2        Q.   What kind of mortgage did you get for your
3    School Street property; it was conventional,
4    correct?
5        A.   It was conventional, yes.
6        Q.   How did you decide to get an conventional
7    as opposed to an FHA loan?
8             MR. TROMBETTA:  Well, I'll object to
9    that.
10       A.   Well, basically -- I didn't know much
11   about it. I filled out an application at Jack
12   Conway and took history -- took history, employment
13   income, pulled a credit report, was approved and
14   went right to closing and bought the house right
15   after I lost this one.
16       Q.   Did you go through Paula Duzan for the
17   School Street property?
18       A.   That is correct. That is correct.
19       Q.   So Paula and Jack Conway, he was involved,
20   too, again?
21       A.   Jack Conway.
22       Q.   Or Greg Abbot, I'm sorry, I'm confused.
23       A.   Not with Mansfield.
24       Q.   Now, if you turn to the

Page 153

1    third-from-the-last page of that appraisal?
2        A.   The third?
3        Q.   Right.
4        A.   Okay.
5        Q.   Do you see the floor plan?
6        A.   Yes.
7        Q.   Does this floor plan accurately reflect
8    the floor plan for the Chilson Avenue property in
9    the June through August 2001 time frame?
10       A.   Yeah.
11       Q.   "Yes"?
12       A.   Yeah -- I'm sorry, yes, Andrew.
13       Q.   Okay, just want to make sure we got your
14   answer right. Is the top drawing -- what level of
15   the house is that that's on page Bate Stamped PHH
16   293; do you know what the top floor plan is?  Is
17   that the first floor or the second floor or the
18   basement?
19       A.   The top one? The diagram up top?
20       Q.   Yes.
21       A.   One second, Andrew, please.
22            (Witness perusing document)
23       A.   That's the large unit.
24       Q.   Now, I know you told me this but I've

Anthony Mendes                                                                    06/01/2006

Page 154

1   already forgotten, was this on the top level or
2   the --
3       A.  Lower level.
4       Q.  Lower level?
5       A.  Yeah, on the right-hand side from the
6   building.
7       Q.  Okay.  Was that portion of the house
8   occupied when you saw it?
9       A.  If I could remember, yes.
10      Q.  Was it by Helen Johnson?
11      A.  Yes, the owner.
12      Q.  What was on -- was there something else on
13  the lower level on the left-hand side?
14      A.  On that particular drawing?
15      Q.  What's that?
16      A.  In that particular drawing?
17      Q.  No, just in general.  I mean, you
18  mentioned that the top drawing is on the lower
19  level, right-hand side?
20      A.  Of the house.
21      Q.  So is there something lower level
22  left-hand side?
23      A.  Well, there was upstairs and downstairs.
24      Q.  Okay, this was the downstairs then,

Page 155

1   correct?
2       A.  Right.
3       Q.  Is this the entire downstairs?
4       A.  To me right here, Andrew, this looked like
5   on the large unit, this area looks like it was
6   downstairs and this and this area here (indicating)
7   looks like it was upstairs because the bedrooms were
8   upstairs.
9       Q.  Was the large unit on two floors?
10      A.  Yes, yes.
11      Q.  Oh, I see.  I've never been there so you
12  have -- okay, so which rooms are on the second floor
13  of the large unit?
14      A.  Right to the right, one, two, three, four,
15  and the bathroom.
16      Q.  When you say right to the right?
17      A.  Right here (indicating), on this side.
18      Q.  And the right-hand side as you're looking
19  at this?
20      A.  One, two, three, four and there's a
21  bathroom upstairs.
22      Q.  Okay.
23      A.  And this is the kitchen, the bath, the
24  hall and living room and another room.

Page 156

1       Q.  I see.  So the kitchen was on the
2   upstairs?
3       A.  No, the kitchen was downstairs.
4       Q.  I'm sorry, why don't you highlight with
5   this highlighter which room's on the upper level, on
6   the top floor?
7       A.  Right there.
8       Q.  Why don't you highlight the name of the
9   room that's on the top level?
10      A.  This is a bedroom.
11      Q.  Right, so highlight through the word
12  "bedroom," if you would?
13      A.  (Witness complies)
14      Q.  Is that on the top level?
15      A.  Top level.
16      Q.  Okay.
17      A.  There's another bedroom up there.
18      Q.  Okay.
19      A.  There was another bedroom up there.
20      Q.  Okay.
21      A.  There was a bathroom up there.
22      Q.  Okay, three bedrooms and a bath.
23      A.  (Pause)
24      Q.  All right?

Page 157

1       A.  Oh, yeah, okay, all right, Andrew.
2       Q.  Anything else on the upper level for the
3   large unit?
4       A.  (Pause)
5       Q.  As far as you recall?
6       A.  All this was downstairs, Andrew.
7       Q.  Anything not highlighted on the top
8   drawing was downstairs?
9       A.  No, no.
10      Q.  Okay, thank you.  Now, going to the
11  drawing on the bottom, does this show two different
12  units?
13      A.  This one here (indicating)?
14      Q.  Yes.
15      A.  That's the one bedroom.
16      Q.  Well, I thought there were three dwelling
17  units in this house?
18      A.  Yeah, here's one, here's two, and here's
19  three, (indicating).
20      Q.  I'm sorry, why don't you take -- let me
21  get you a pen.
22          All right, I want you to write the
23  No. 2 in every room which was part of the second
24  dwelling unit.  We'll call the top drawing the first

40 (Pages 154 to 157)

Anthony Mendes                                                        06/01/2006

Page 158

1  dwelling unit.
2      A.  This is the large unit (indicating).  And
3  this here is the one bedroom unit which was the
4  living room, the bedroom, the small hall, the small
5  kitchen and the bathroom.
6      Q.  Okay, so if you would write in each of
7  those rooms, one bedroom, 1BR?  Could you write
8  "1BR"?
9      A.  "1BR"?
10     Q.  Well, you said one bedroom unit.
11     A.  Okay, this is it right here (indicating).
12     Q.  It's not going to be clear when we walk
13  out of this room.
14     A.  Okay.
15     Q.  Just for the record the witness did not do
16  as I asked, not through any ill-will, but just for
17  the record, if you could circle each of those ones
18  that you just wrote?
19         (Witness complies)
20     Q.  I'm just trying to preserve the record.
21  So each of the rooms with the "1" circled was part
22  of a one-bedroom unit at the Chilson Avenue
23  property, correct?
24     A.  Yes.

Page 159

1      Q.  Okay, and that's in the lower drawing,
2  correct?
3      A.  Correct.
4      Q.  Okay.  Now, to the right in that lower
5  drawing is what -- don't write anything until I ask
6  you.
7      A.  Okay.
8      Q.  What's to the right in this lower drawing
9  on page Bate Stamped PHH 293?
10     A.  One second.  One second, Andrew.  Looks
11  like here some -- some parts are missing, Andrew.
12     Q.  Yes?
13     A.  Yeah.
14     Q.  Well --
15     A.  Bedrooms.
16     Q.  Bedrooms?
17     A.  Unless I'm on the wrong one but I know one
18  thing there was three rooms on the second floor,
19  kitchen and bath and hall.
20     Q.  As far as you can tell which unit were you
21  going to live in?
22     A.  I was going to live in the two bedroom.
23  It looks like rooms are missing.
24     Q.  You don't seem to have a two-bedroom, do

Page 160

1  we?
2         MR. TROMBETTA:  I'll object.
3      A.  Not on that diagram.  Not on that diagram.
4  I don't see it.
5      Q.  Well, there was a one bedroom, two bedroom
6  and then a five bedroom; is that right?
7      A.  Exactly.
8      Q.  You were going to live in the two bedroom,
9  rent out the one bedroom and the five bedroom?
10     A.  Right.
11     Q.  Have you been in the house since the deal
12  fell through?
13     A.  Excuse me?
14     Q.  Have you been in the house since the deal
15  fell through?
16     A.  No.
17     Q.  I'm going to take a short break.
18         (A brief recess was taken, 2:50 p.m.
19  - 2:55 p.m.)
20     Q.  Mr. Mendes, do you assert in this lawsuit
21  that Cendant Mortgage Corporation made any false
22  statements to you?
23     A.  Excuse me, come again, Andrew?
24     Q.  Do you assert in this lawsuit that Cendant

Page 161

1  Mortgage made any false statements to you?
2      A.  Well, they didn't deliver to the
3  agreements.
4      Q.  Well, you didn't really answer my
5  question.
6         MR. TROMBETTA:  Well, I don't know
7  about that.
8      Q.  It's, yes, or no.  Well, not delivering,
9  someone breaching a contract is not making a false
10  statement.
11     A.  Come again?
12         MR. TROMBETTA:  Well, I disagree.
13     Q.  Did any agent of Cendant Mortgage
14  Corporation make a statement to you orally that you
15  believe was false?
16     A.  No.
17     Q.  Do you believe that Cendant falsely told
18  you they would make a loan to you?
19     A.  They guaranteed that they were going to
20  provide a loan to me.
21     Q.  Who at Cendant guaranteed the loan?
22         MR. TROMBETTA:  Well, I object to
23  that but --
24     A.  Richard and also Kevin.

Legalink Boston, A Merrill Company
(617) 542-0039

Page 162

1    Q.  Anybody else?
2    A.  That was it.
3    Q.  Do you believe that when Richard allegedly
4  guaranteed a loan to you that he knew that Cendant
5  Mortgage would not make a loan?
6         MR. TROMBETTA:  Well, I object to
7  that question.
8    A.  Come again?
9         MR. TROMBETTA:  There's no
10  foundation.
11    Q.  Do you believe that when Richard Luongo
12  allegedly guaranteed a loan to you that he was
13  making a false statement?
14    A.  No.
15    Q.  Do you believe that when Kevin Cogan
16  allegedly guaranteed the loan to you that he was
17  making a false statement?
18    A.  No.
19    Q.  Do you understand why Cendant Mortgage did
20  not make a loan to you in regards to the Chilson
21  Avenue property?
22         MR. TROMBETTA:  Well, I object but
23  you can go ahead.
24    A.  Come again, I'm sorry?

Page 163

1    Q.  Do you understand why Cendant Mortgage
2  Corporation did not make a loan to you regarding the
3  Chilson Avenue property?
4    A.  Well, they talked about the rents the last
5  week of closing and that was about it.
6    Q.  Do you contend in this lawsuit that the
7  June 12th, 2001 letter, which is marked as Exhibit
8  5, is a separate agreement from the final commitment
9  which is marked as Exhibit 7?
10         MR. TROMBETTA:  Well, I'll object to
11  that.
12    A.  Say that again, I'm sorry, Andrew.
13    Q.  Do you contend that Exhibits 5 and 7
14  represent two different agreements that you had with
15  Cendant Mortgage?
16         MR. TROMBETTA:  Same objection.
17    A.  No, no.
18    Q.  Well, let me show you Interrogatory No. 9
19  and your answer.
20    A.  Okay.
21    Q.  Interrogatory No. 9 reads:  If you contend
22  that all conditions of any final commitment that
23  Cendant Mortgage made to you were fulfilled state
24  the basis for this contention.  And your answer is

Page 164

1  Anthony Mendes objects to this interrogatory on the
2  ground that it is without foundation.  Cendant
3  agreed to provide him and his wife a mortgage loan.
4  None of the information allegedly requested in the
5  final commitment altered that agreement.
6    Q.  What agreement is referred to here when
7  you say none of the information allegedly requested
8  in the final commitment altered that agreement; what
9  is that agreement?
10    A.  Number what?
11    Q.  No. 9.
12         (Witness perusing document)
13    A.  They guaranteed me a loan and basically
14  they backed off.  They presented rents and I made
15  enough money to qualify, I mean...
16    Q.  Well, your answer to Interrogatory No. 9
17  indicates that there was an agreement in addition to
18  the final commitment; is that what your contention
19  is in this lawsuit?
20         MR. TROMBETTA:  Well, I'm going to
21  object to that.
22         MR. GOLDSTEIN:  It's his answer.
23         MR. TROMBETTA:  Well, I don't think
24  that's what you're asking him.  You just asked him

Page 165

1  and he answered it and you're asking the same
2  question again.
3    Q.  Do you have an agreement with Cendant
4  Mortgage other than the final commitment for a
5  mortgage loan?
6         MR. TROMBETTA:  Well, I object to
7  that.
8    A.  I got the guaranteed financing.  I got the
9  commitment letter, and I was preapproved on the
10  application.  I was approved when they took the
11  application.
12    Q.  I appreciate your answer.  I'm not sure
13  we're getting into the nub of the question, though.
14         My question is do you have a separate
15  agreement for financing in addition to the final
16  commitment with Cendant Mortgage, Exhibit 7?
17    A.  Not that I'm aware of.
18    Q.  Other than what you've testified to today,
19  do you recall any other communications which you had
20  with Cendant Mortgage Corporation regarding the
21  rental issue?
22    A.  No.
23    Q.  You're claiming lost rental amounts of
24  more than $200,000 in this action; do you know what

Anthony Mendes                                                    06/01/2006

Page 166

1   that's based on?
2       A.  You're funny.  I'm sorry, come again,
3   Andrew?
4       Q.  Well, you're claiming lost rental income
5   of more than $200,000 in this action; do you know
6   what that's based on?
7       A.  Loss of rental income, equity,
8   appreciation and taxes.
9       Q.  Do you know what the costs were for the
10  rental of the Chilson Avenue property?
11      A.  What do you mean, I'm sorry?
12      Q.  Well, you would rent the Chilson Avenue
13  property, you would charge a certain amount of rent,
14  but then you would have certain costs; do you have
15  any idea what those costs were for rental?
16      A.  For those units?
17      Q.  Yes.
18      A.  I have no idea.
19      Q.  I'll tell you your -- look at your
20  interrogatory answer and it says you're requesting a
21  lost rental amount of over $200,000; do you know how
22  you calculated that?
23      A.  That would need an expert.  I don't know.
24      Q.  Well, this is your interrogatory answer.

Page 167

1   How did you come up with $200,000?
2           MR. TROMBETTA:  Well, I'm going to
3   object to that.  Now you ask a question.
4           MR. GOLDSTEIN:  Okay, I'll withdraw
5   that question.
6       Q.  How did you come up with the number
7   $200,000 as lost rental amounts?
8           MR. TROMBETTA:  Same objection.
9       A.  I said loss of income rental from the time
10  I lost it at the time of closing up until now and
11  equity and appreciation and taxes.
12      Q.  Okay, but did you do some sort of
13  calculation to come up with the number 200,000?
14      A.  I basically looked at rents, loss of rent.
15      Q.  Let me show you a document that is labeled
16  Anthony Mendes Response to Defendant's First Set of
17  Interrogatories which you signed on page 11 --
18      A.  Right.
19      Q.  -- under the penalties of perjury.  Take a
20  look at that document and make sure it's what I say
21  it is and then I'm going to ask you a question.
22          (Witness perusing document)
23      A.  Okay.
24          (Witness perusing document)

Page 168

1       A.  Okay.
2       Q.  Did you read this document before you
3   signed it?
4       A.  I did.
5       Q.  Did you agree with everything in there
6   before you signed it?
7       A.  Yes.
8       Q.  All right, I'm going to refer you to your
9   answer to Interrogatory No. 8?
10      A.  Okay.
11      Q.  It's right here (indicating).
12          Interrogatory No. 8 reads:  If you
13  contend that PHH Mortgage breached any contract or
14  commitment identified in your answer to
15  Interrogatories No. 6 or 7 state the basis for this
16  contention.  And your response was:  Cendant
17  breached its agreement by failing to provide a
18  mortgage loan.
19          Now, I know I've asked you about
20  agreements but I'm going to have to ask you again.
21  What agreement are you referring to in your answer
22  to Interrogatory No. 8, either oral or written?
23      A.  It was written.  They sent me guaranteed
24  financing commitment letter and they said they were

Page 169

1   going to honor this loan.
2       Q.  What is that, do you have that written
3   agreement before you?
4       A.  It's here.  It's guaranteed financing here
5   (indicating), guaranteed, and also the commitment
6   letter.
7       Q.  And the commitment letter provides that
8   it's subject to appraisal to provide a net market
9   rental for all three units for the area to evidence
10  that PITI doesn't exceed 75 percent of the market
11  rental.  You can read that if you like.
12      A.  What number is that, Andrew?  Read that to
13  me again, Andrew, please?
14      Q.  On the bottom of Exhibit 7 the commitment
15  letter, final commitment, states that, quote:
16  Appraiser to provide the net market rental for all
17  three units for the area to evidence that PITI
18  doesn't exceed 75 percent of the market rental.
19      A.  I still qualified because also to obtain
20  additional income to lower ratio which me and my
21  spouse made that income.
22      Q.  Putting that parenthetical aside that you
23  just referred to, do you know if the appraiser ever
24  provided any documentation to Cendant Mortgage

43 (Pages 166 to 169)

Anthony Mendes                                                           06/01/2006

Page 170

1  Corporation that the net market rental for all three
2  units for the area to evidence a PITI doesn't exceed
3  75 percent of the market rental?
4      A.  No.
5      Q.  Was that, "no"?
6      A.  No.
7      Q.  Okay.  Do you contend that you met this
8  condition because you also had additional income to
9  lower ratios?
10     A.  Yes, yes, I do.
11     Q.  When was the first time you communicated
12 that to Cendant Mortgage Corporation?
13     A.  When did I?
14     Q.  Yes.
15     A.  When the application was given.
16     Q.  Well, how did you communicate it?
17     A.  Well, when he took the information over
18 the phone, asked me how much was I making, I told
19 him I do work overtime from time to time.  My wife
20 works overtime so -- and she was working a second
21 job.
22     Q.  So you're saying you provided evidence of
23 your income to Cendant Mortgage Corporation,
24 correct?

Page 171

1      A.  Verbally over the phone on the
2  application.
3      Q.  You say verbally on the phone and the
4  application?
5      A.  Over -- related to the application.
6      Q.  Okay, but as of June 12, 2001 you hadn't
7  provided any documentation to Cendant Mortgage
8  regarding your income?
9          MR. TROMBETTA:  I object to that.
10     A.  Excuse me?
11     Q.  As of June 12th, 2001 had you provided any
12 information, any documentation to Cendant Mortgage
13 Corporation, to support what you were telling
14 Cendant what your income was?
15     A.  Well, they took it over the phone and they
16 asked me for my taxes.  I sent it in, sent my taxes
17 in.
18     Q.  For what years?
19     A.  2001.
20     Q.  When did you send your taxes in; do you
21 know?
22     A.  Some time in May, June.
23     Q.  Did you ever provide to Cendant a bank
24 statement to show where the $9,000 deposit on the

Page 172

1  sales contract came from?
2      A.  I believe that was met.
3      Q.  Do you have that document?
4      A.  I don't.  It should be in the files.
5      Q.  Well, I haven't seen it.
6      A.  Well, that was all presented.
7      Q.  How was it presented?
8      A.  It had to be presented because they sent
9  me the commitment letter.
10     Q.  Well, I don't have -- I'll tell you I
11 don't have any bank statements to show where the
12 $9,000 deposit in the sales contract came from.
13     A.  Well --
14         MR. TROMBETTA:  Well, there's no
15 question.
16     Q.  So I'm telling you that.  Do you have
17 those bank statements that will show where the
18 $9,000 deposit in the sales contract --
19     A.  Well, you got copies from Citizens Bank.
20     Q.  That's not what I'm asking you.  Do you
21 have --
22     A.  Not in my possession.
23     Q.  Who has them?
24     A.  Cendant has them.

Page 173

1      Q.  Did you provide them to Cendant?
2      A.  As far as I know, yes.
3      Q.  How did you provide them?
4      A.  I sent them to them.
5      Q.  Now, I understand you testified that you
6  provided income information to Cendant Mortgage?
7      A.  Right.
8      Q.  But in regard to the conditions in the
9  commitment letter and the rental issue, did you ever
10 communicate to Cendant Mortgage in any way that you
11 felt that Cendant Mortgage had wrongfully denied the
12 mortgage?
13         MR. TROMBETTA:  And I object to the
14 form of that question but you can answer.
15     A.  The only time that they ever mentioned
16 anything was the last week of closing; that was it.
17 Nothing else was ever mentioned.
18     Q.  And did you tell Cendant Mortgage
19 Corporation, anyone at Cendant Mortgage Corporation,
20 that you felt that Cendant Mortgage was wrongfully
21 denying you a loan based on that condition?
22         MR. TROMBETTA:  Again, I object but
23 you can answer.
24     A.  I don't remember.  I don't remember.

44 (Pages 170 to 173)

Anthony Mendes                                                                  06/01/2006

Page 174

1    Q.   After the deal fell through?
2         MR. GOLDSTEIN:  Off the record for a
3    second.
4         (Off the record, 3:13 p.m. - 3:14
5    p.m.)
6         MR. GOLDSTEIN:  Let's mark this as
7    the next exhibit.
8         (Document marked as Exhibit No. 13
9    for identification.)
10        MR. GOLDSTEIN:  I apologize, I only
11   have one again but it's not a big document.
12        MR. TROMBETTA:  Can we put all these
13   exhibits somewhere?
14        MR. GOLDSTEIN:  Yes, let's clean this
15   up.
16   Q.   Now, do you know what Exhibit 13 is?
17   A.   Yeah, it's the refund of the deposit.
18   Q.   All right, and these checks are dated
19   September 26, 2001; is that when you got these
20   checks about?
21   A.   Yes.
22   Q.   What's the bottom check by the way?
23   A.   I have no idea.
24   Q.   Okay, the top check, No. 21, is the refund

Page 175

1    of deposit, right?
2    A.   Correct.
3    Q.   Now, after you got these checks when was
4    the next communication you had with Cendant Mortgage
5    Corporation?
6    A.   In September.
7    Q.   After September 26th, 2001 did you have
8    another communication with Cendant Mortgage
9    Corporation about this?
10   A.   No, no.
11   Q.   Have you had any communications with
12   Cendant Mortgage since September 26, 2001?
13   A.   September 26?
14   Q.   2001?
15   A.   (Pause)
16   Q.   That you recall?
17   A.   No.
18   Q.   All right, I need to go through something.
19   I avoided asking this before but I'm going to ask it
20   now. From August 1st, 2001 to September 26, 2001, I
21   want you to tell me every communication you recall
22   having with Cendant Mortgage regarding the loan?
23   A.   From what time now?
24   Q.   August 1st, 2001, to September 26, 2001 --

Page 176

1    let's make it August 1st, 2001 to September 30th,
2    2001. I want you to tell me every communication
3    that you recall having with Cendant Mortgage
4    Corporation regarding the Chilson Avenue property.
5    A.   The only thing I could remember that I
6    spoke to Kevin Cogan a few times on finding out when
7    the house was going to close and he says it's
8    getting set up through a law firm; that we'll close
9    at the end of August and he said don't worry, you're
10   going to close, guaranteed financing.
11   Q.   Anything else?
12   A.   This was in August.
13   Q.   I'm saying August 1st, 2001, to September
14   30th, 2001?
15   A.   I don't recollect any other communication
16   other than in August. I don't remember.
17   Q.   Well, you already testified about a
18   communication regarding the rental issue; that was
19   in this time frame, August 1st, 2001 to September
20   30th, 2001?
21   A.   Yeah, it was August rental and that was
22   like the last week of August.
23   Q.   And tell me what was that communication,
24   was that a phone call that you had or --

Page 177

1    A.   If I could remember -- if I could remember
2    I called him.
3    Q.   Why did you call him?
4    A.   Because I was concerned about closing.
5    Q.   Well, what were you concerned about?
6    A.   Because me and my wife was -- been waiting
7    quite some time.
8    Q.   All right, and you called Kevin Cogan?
9    A.   Yes.
10   Q.   Tell me everything that he said to you and
11   you said to him during the conversation.
12   A.   He said the house is not going to closing.
13   Q.   Okay?
14   A.   Because it was related to rents and I said
15   I did not know anything about it.
16   Q.   Anything else that was said?
17   A.   That was it if I could remember.
18   Q.   You said you knew nothing about it?
19   A.   No, I knew nothing about it.
20   Q.   Is that because you hadn't read the
21   commitment letter?
22        MR. TROMBETTA:  Well, I object to
23   that.
24   A.   I read some of it. I didn't read all of

45 (Pages 174 to 177)

Page 178

1  it.
2      Q.  Did you have any other communication with
3  anyone at Cendant Mortgage after that regarding the
4  Chilson Avenue property?
5      A.  I don't think so.
6      Q.  Let me show you another one of your
7  interrogatory answers.
8      A.  Okay.
9      Q.  Interrogatory No. 13 asked you to state
10 the basis for the allegations in paragraph 8 of the
11 complaint that the rental amounts for the property
12 that you would have received amounted to more than
13 $1500 per month and in your response you first state
14 that Mr. and Mrs. Mendes did not need to satisfy
15 this requirement based on Cendant's representations.
16 What representations were those?
17     A.  Excuse me?
18     Q.  What representations were those?
19     A.  Come again?  I mean --
20     Q.  Did someone at Cendant represent to you
21 that you did not need to satisfy a rental
22 requirement?
23          MR. TROMBETTA:  Well, I'll object to
24 that but you can answer.

Page 179

1      A.  Basically they didn't tell me anything
2  until the last week of closing.
3      Q.  Well, this says here that Mr. and Mrs.
4  Mendes did not need to satisfy this requirement
5  based on Cendant's representations.  What
6  representations are you referring to in this
7  interrogatory answer?
8      A.  Basically they breached it.  They didn't
9  deliver what they guaranteed.
10     Q.  Do you recall any representations that you
11 are referring to in the first sentence of your
12 answer to Interrogatory No. 13?
13     A.  On that particular question basically I
14 had enough income to qualify.
15     Q.  Well, you haven't told me about any
16 representation that Cendant made to you that you're
17 referring to in the first sentence of Response No.
18 13; is that the way you want to leave it?
19     A.  Yeah.
20     Q.  And then in the second sentence of
21 Response No. 13 you state that:  Even if applicable,
22 however, Mr. and Mrs. Mendes could have received
23 rents in excess of $2300; what is that based on?
24     A.  Based on the income of the units that we

Page 180

1  lost the house that we could have received.
2      Q.  Well, you said you could have received
3  rents in excess of 2300; how do you know that?
4      A.  Basically, I mean, I would say that's the
5  area.  I mean, you know, based on the rents in the
6  community, in the area.
7      Q.  What rents in the community?
8      A.  In the units.
9      Q.  Well, one of the units was empty, right?
10     A.  Right.
11     Q.  Okay, so what rent were you aware of that
12 you could get for the vacant unit?
13     A.  Well, all the other two units at the time
14 of purchase was going to be vacated so they were
15 going to be emptied.
16     Q.  You're really not answering my question,
17 Mr. Mendes.  You say under oath here that you could
18 have received rents in excess of 2300; what is the
19 basis of that assertion?
20     A.  Based on the loss of the house and the
21 loss of receiving rental income.
22     Q.  Okay, do you have any basis for your
23 statement other than what you've said, that you
24 could have received in excess of $2300 for rent for

Page 181

1  the Chilson Avenue property?
2      A.  If I would have owned it and rented it
3  out.
4      Q.  Anything else?
5      A.  No.
6      Q.  Now, you further state in your answer to
7  Interrogatory No. 13 that Cendant had previously
8  approved you and your wife for an FHA loan based on
9  the receipt of such rents; do you know what that
10 refers to?
11     A.  Say that again?
12     Q.  You also state in your answer to
13 Interrogatory No. 13 that Cendant, quote, had
14 previously approved Mr. and Mrs. Mendes for an FHA
15 loan based on the receipt of such rents, period,
16 close quote.  Do you see where it says that, the
17 last two lines on page 6?
18     A.  Yeah, they approved us.
19     Q.  Well, "based on the receipt of such
20 rents"; how did Cendant Mortgage approve you
21 regarding upon receipt of any rents?
22          MR. TROMBETTA:  Well, I object to
23 that question.
24          MR. GOLDSTEIN:  It's his answer.

46 (Pages 178 to 181)

Anthony Mendes                                                                06/01/2006

Page 182

1     MR. TROMBETTA: Well, I object to the
2  form, the way you've asked it.
3     A.  Basically on the application.
4     Q.  Did you read this interrogatory response
5  before you signed this?
6     A.  I do remember reading it.
7     Q.  Now, if you look at Interrogatory 15, the
8  response, you're free to read the interrogatory but
9  I don't think my question requires it.  First it
10  says, "Mrs." Mendes?
11    A.  Go ahead.
12    Q.  Is that a typo?  Is that supposed to be
13  "Mr." Mendes?
14    A.  Mr. and Mrs.
15    Q.  Okay.
16       MR. TROMBETTA: I think it says
17  "Mrs." No, I think it's supposed to be "Mr."  See
18  the first word?  That's a mistake.
19    A.  Yeah, it's from --
20    Q.  Fair enough.  Mr. Mendes directed Cendant
21  for a loan application and Cendant's agreement that
22  Mr. and Mrs. Mendes would receive a mortgage loan.
23  What mortgage loan application is referred to there?
24    A.  I have no idea.  The only thing I know

Page 183

1  that I called them and they asked me questions and I
2  answered it.  Like I said they pulled a credit
3  report and they approved me.
4     Q.  Now, if you take a look on page 8.
5     A.  Okay.
6     Q.  And do you see Interrogatory No. 19?
7     A.  Yes, go ahead.
8     Q.  Okay, Interrogatory No. 19 I asked you to
9  provide the basis for your allegation that Cendant
10  committed unfair and deceptive acts in violation of
11  Section 2 of the Mass. General Laws Chapter 93A.
12  And the first two lines of your response states that
13  Cendant agreed to provide Mr. and Mrs. Mendes with a
14  mortgage loan.  Cendant knew that Mr. and Mrs.
15  Mendes would not therefore seek mortgage approval
16  from another loan company.  How did Cendant know
17  that?
18    A.  I have no idea but I know one thing, I was
19  approved, and it was guaranteed financing.
20  Guaranteed financing.
21    Q.  The answer continues: Cendant also told
22  Mr. and Mrs. Mendes to execute a purchase and sale
23  agreement.  Cendant then understood that it would
24  not provide the loan.

Page 184

1     A.  Well, Michael told me to go forward -- I
2  mean, Kevin told me to go forward and get the
3  purchase and sales agreement moving.
4     Q.  I'm going to put the commitment letter
5  before you again.  Let me just get my copy.  All
6  right, now, again, turning to the first page of the
7  commitment letter there's the condition about the
8  appraiser to provide a net market rental for all
9  three units, et cetera; do you see that?
10    A.  Where is that at?
11    Q.  Right here (indicating), appraiser to
12  provide?
13    A.  Yes.
14    Q.  All right, this is a crucial issue so I
15  just want to make sure I've exhausted your memory
16  and I did ask you about all communications from
17  August 1st to September 30th regarding the Chilson
18  Avenue property but I want to specifically ask you
19  other than what you've testified in regard to that
20  rental condition, do you recall any other
21  communications with Cendant Mortgage from August 1st
22  to September 30th, 2001?
23       MR. TROMBETTA: I object.  You can
24  answer.

Page 185

1     A.  The -- Kevin the last week of August of
2  2001 as I told you earlier --
3     Q.  I said other than what you testified to.
4     A.  No.
5     Q.  Do you recall any other communications?
6     A.  No.
7     Q.  How about from June 1st to July 31st,
8  2001; do you recall any communications regarding a
9  rental condition?
10    A.  No, no.
11    Q.  Your lawyer sent a demand letter dated
12  October 7th, 2002 more than a year after this deal
13  fell through.  What happened between September 26,
14  2001, the date of the check, and the date of that
15  demand letter in regard to this property?
16       MR. TROMBETTA: I object to the form
17  of that question.  What do you mean?
18    A.  Yeah, can you expand a little more?
19    Q.  Why did it take over a year to make a
20  demand; do you know why?
21    A.  Number one, Andrew, I have no idea but I
22  told her we need to do something about it and I
23  guess she acted and went forward.  I'm pretty sure
24  she was busy with other cases and clients but that's

47 (Pages 182 to 185)

Page 186

1   the best knowledge that I know, Andrew.
2       Q.  Let me show you your responses to Request
3   for Admissions From Cendant Mortgage Corporation.
4       A.  Okay.
5       Q.  And I can show you the requests also to
6   put it in context if necessary.  Hopefully we can
7   avoid that to move this along.  Now, I sent some
8   requests for admissions to you and Request No. 21 --
9       A.  Go ahead.
10      Q.  Read Exhibit D, attached hereto is a true
11  copy of a final commitment between Cendant Mortgage
12  on the one hand and Anthony Mendes and Doris Mendes
13  on the other hand.  I'll tell you Exhibit D to the
14  request was Exhibit 7 to this deposition.
15      A.  Right.
16      Q.  And your answer is:  Mr. Mendes admits
17  that Exhibit D is a true and accurate copy of a
18  document entitled, Final Commitment, but denies that
19  he is bound by any of the terms set forth therein
20  so -- do you see that?
21      A.  Go ahead.
22      Q.  What's the basis for your denial that you
23  are not bound by the --
24          MR. TROMBETTA:  Let him finish.

Page 187

1       Q.  I have no question yet.
2       A.  Go ahead, Andrew.
3       Q.  What's the basis for your statement in
4   which you deny that you were bound by any of the
5   terms of the final commitment?
6           MR. TROMBETTA:  And I object.  I
7   think it's a legal conclusion but you can answer the
8   question.
9       Q.  I'm asking for the basis for your answer.
10          MR. TROMBETTA:  And same objection.
11  You can answer.
12      A.  Basically they didn't go over it with me.
13  They didn't go over it with me.  I had no knowledge
14  of it.
15      Q.  Is there anything else that forms the
16  basis of your answer that you admit that Exhibit D
17  is a true and accurate copy of a document entitled,
18  Final Commitment but denies that you are bound by
19  any of the terms set forth therein; anything else?
20          MR. TROMBETTA:  Same objection.  You
21  can answer.
22      A.  No.
23      Q.  Did you ever ask to go over the final
24  commitment letter with anyone from Cendant?

Page 188

1       A.  No, I'm telling you, no.
2       Q.  Do you contend that you actually qualified
3   for an FHA mortgage to purchase the Chilson Avenue
4   property?
5       A.  Yes.
6       Q.  What's that based on?
7       A.  Generated income.
8       Q.  Anything else?
9       A.  We were approved.  We were qualified.
10      Q.  Did you ever communicate that to Cendant
11  Mortgage Corporation before September 26th, 2001 you
12  felt you were qualified for an FHA approved loan to
13  purchase the Chilson Avenue property?
14          MR. TROMBETTA:  Well, I object.
15      A.  No, no.
16          MR. TROMBETTA:  Excuse me, when I go
17  like this (gesturing), give me a chance to object
18  first.
19          THE WITNESS:  Oh, I'm sorry.
20      Q.  Now, if you look at page 4 of this
21  complaint.
22      A.  Okay.
23      Q.  Paragraph 24, it states that Cendant
24  claimed that it had proposed that Mr. and Mrs.

Page 189

1   Mendes utilize conventional financing at or about
2   Cendant refused to provide financing guaranteed by
3   the FHA.  And then paragraph 25 says Cendant never
4   made any such proposal.  Now, I understand from your
5   testimony earlier today that, in fact, such a
6   proposal was made by Cendant, correct?
7       A.  They had mentioned conventional mortgage
8   but I wasn't offered conventional mortgage.
9       Q.  You testified that Cendant Mortgage
10  suggested you go with a conventional mortgage route
11  but you couldn't come up with the 20 percent
12  downpayment; is that right?
13          MR. TROMBETTA:  I object to that.
14  You can answer the question.
15      A.  I didn't have 20 percent.
16      Q.  Well, is it a true statement, is paragraph
17  25 of the complaint a true statement Cendant never
18  made any such proposal?
19          MR. TROMBETTA:  Concerning?
20      Q.  And that proposal being as described in
21  the paragraph before that Mr. and Mrs. Mendes
22  utilize conventional financing; is that true that
23  Cendant never made any such proposal?
24      A.  They haven't, no.

Page 190

1    Q.   So is your earlier testimony inaccurate?
2            MR. TROMBETTA: Well, I object.
3    Q.   Did Cendant ever propose to you that you
4    utilize conventional financing, yes, or no?
5    A.   No.
6    Q.   Turn to the next page, please, page 5.
7    A.   Okay.
8    Q.   There's a Count 2 heading, Breach of
9    Implied Contract?
10   A.   Right.
11   Q.   And why don't you read paragraph 31 into
12   the record?
13   A.   Cendant represented that it would provide
14   home financing in the amount of $307,545.
15   Q.   Okay, and what representation was that?
16   A.   And when they provided me guaranteed
17   financing.
18   Q.   And that was by the June 12th, 2001
19   letter?
20   A.   Yes.
21   Q.   How was this breach of implied contract
22   claim different from the breach of contract claim?
23            MR. TROMBETTA: I'm going to object.
24   You know, these are legal issues. I'll object. I

Page 191

1    don't believe it's -- I think these questions are
2    inappropriate. You can answer the questions but I
3    object.
4    A.   Basically the house never went to closing.
5    Q.   Okay, let's go back to paragraph 31; that
6    Cendant represented that it would provide home
7    financing in the amount of $307,545; other than what
8    you've testified did Cendant make any other
9    representations in this regard?
10   A.   The question again, Andrew?
11   Q.   Well, you testified -- well, other than
12   what you've testified to just a few moments ago, are
13   there any other representations that are referenced
14   in paragraph 31 of the complaint by which you allege
15   Cendant represented that it would provide home
16   financing in the amount of $307,545?
17   A.   Well, that's what they provided for me.
18   Q.   I'm asking you about the representations?
19   A.   Well, it was never delivered.
20   Q.   You know, we're just going to have to
21   start again. What representations did Cendant make
22   to you that it would provide home financing in the
23   amount of $307,545?
24   A.   Guaranteed financing.

Page 192

1    Q.   How was that representation made?
2    A.   Through the application.
3    Q.   Well, how did Cendant communicate to you
4    that it was going to provide you a guaranteed
5    financing?
6            MR. TROMBETTA: I'm going to object,
7    asked and answered.
8    A.   Like I said, the application.
9    Q.   Anything else?
10   A.   No.
11   Q.   Did any other oral communications make up
12   the representation that you've just testified to?
13   A.   No.
14   Q.   Any documents that make up the
15   representation that you just testified to?
16   A.   The letter they sent me.
17   Q.   Which letter?
18   A.   The commitment letter and the letter that
19   they sent me to guaranteed financing. Right here
20   (indicating).
21   Q.   So Exhibits 4, 5 and 7?
22   A.   Right.
23   Q.   Do any other documents make up part of the
24   representation that's referenced in paragraph 31?

Page 193

1    A.   No.
2    Q.   How were you harmed by -- well, strike
3    that. Go to paragraph 38.
4    A.   Okay.
5    Q.   In that paragraph you state that Cendant
6    misrepresented that an offer to provide conventional
7    financing to you; how were you harmed by that
8    misrepresentation?
9    A.   How was I harmed by that?
10   Q.   Right.
11   A.   I mean, knowing the fact somebody submits
12   an application we're approved, first time buyer,
13   they take the income, they pull the credit report,
14   they guaranteed us financing. How would somebody
15   come up with 20 percent to buy their home, first
16   time buyer? I never heard of it.
17   Q.   You couldn't come up with 20 percent?
18   A.   Right.
19   Q.   But you couldn't come up with 10 percent?
20   A.   But I could have come up with 5 percent.
21   Q.   In this paragraph 38 you represent
22   Cendant's refusal to provide financing to Mr. and
23   Mrs. Mendes and its misrepresentation that it
24   offered to provide conventional financing to them;

49 (Pages 190 to 193)

Page 194

1  what conventional financing is referred to there?
2      A.  Well, they didn't offer me at 5 percent.
3      Q.  Do you know what the terms of a
4  conventional financing loan would have been at 5
5  percent downpayment?
6      A.  I have no idea presently.
7      Q.  So you don't know if you would have
8  qualified for a 5 percent downpayment?
9      A.  I'm pretty sure that I would have
10  qualified, pretty sure.
11      Q.  What do you base that statement on?
12      A.  Huh?
13      Q.  What do you base that statement on?
14      A.  When I lost this transaction, same
15  information went right into the other house and I
16  was approved.
17      Q.  Well, that was a much lower mortgage,
18  correct?
19      A.  No, it was about the same.  About the
20  same.
21      Q.  Did you ever ask Cendant Mortgage if you
22  could apply for conventional financing?
23      A.  No.
24      Q.  Did you have any communication with

Page 195

1  Cendant mortgage about the type of loan you wanted
2  to apply for?
3      A.  No, because I had no knowledge.
4      Q.  Is it your testimony that Cendant just
5  picked FHA financing on its own?
6      A.  That is correct.
7      Q.  And you got a series of documents
8  representing FHA financing and you said nothing
9  about it, right?
10      A.  Exactly.
11      Q.  I'm going to go through a series of
12  documents that I want to authenticate so hopefully
13  that will go quickly.
14          MR. GOLDSTEIN:  Let's mark this as
15  the next one.
16          (Document marked as Exhibit No. 14
17  for identification.)
18      Q.  All right, do you recognize Exhibit 14?
19      A.  Yes.
20          MR. TROMBETTA:  Why don't you keep
21  this marked one.  I'll take this one.
22      A.  Okay, yes, I do.
23      Q.  Is that a document you signed in
24  connection with your proposed purchase of the

Page 196

1  Chilson Avenue property?
2      A.  Yes.
3      Q.  Okay.  Did you read this before you signed
4  it?
5      A.  Yes, I did.
6          MR. GOLDSTEIN:  The next document.
7          (Document marked as Exhibit No. 15
8  for identification.)
9      Q.  Do you recognize Exhibit 15?
10      A.  Somewhat.
11      Q.  Well, does your signature appear on the
12  second page?
13      A.  Yes, it does.
14          (Document marked as Exhibit No. 16
15  for identification.)
16      Q.  Do you recognize Exhibit 16?
17      A.  Yes, I do.
18      Q.  Is that your signature on Exhibit 16?
19      A.  Yes.
20      Q.  Did you read this before you signed it?
21      A.  I read some of it but didn't understand
22  too much of it.
23      Q.  Well, did you read the references to HUD
24  and FHA insured mortgages?

Page 197

1      A.  Not really.
2      Q.  Until after you signed this document you
3  didn't know you were getting an FHA insured
4  mortgage?
5      A.  Not really.
6          (Document marked as Exhibit No. 17
7  for identification.)
8      Q.  Do you recognize Exhibit 17?
9      A.  Yes, I do.
10      Q.  Is that your signature on the bottom?
11      A.  Yes, it is.
12      Q.  Do you see where it says under Home Energy
13  Audit Statement Addendum FHA; did you see that
14  before you signed this?
15      A.  Not really, no.
16          (Document marked as Exhibit No. 18
17  for identification.)
18      Q.  Do you recall Exhibit 18?
19      A.  Okay, I remember.
20      Q.  Is this a document you signed in
21  connection with your application to obtain a
22  mortgage from Cendant?
23      A.  Yes.
24      Q.  Is that your signature on this document?

Anthony Mendes                                                                    06/01/2006

Page 198

1    A.  Yes.
2         (Document marked as Exhibit No. 19
3    for identification.)
4    Q.  Do you recognize Exhibit 19?
5    A.  Yes.
6    Q.  What's the title on the top of this
7    document?
8    A.  It says FHA Amendatory Clause.
9    Q.  Is this a document you signed in
10   connection with your application to obtain a loan
11   from Cendant Mortgage?
12        MR. TROMBETTA:  Well, I object to
13   that.  You can answer the question.
14   A.  Yes, I remember signing it.
15        (Document marked as Exhibit No. 20
16   for identification.)
17   Q.  Do you recognize Exhibit 20?
18   A.  Excuse me?
19   Q.  Do you recognize Exhibit 20?
20   A.  Yeah, my signature's here.
21   Q.  Okay, do you recognize the document
22   separate from your signature?
23   A.  I didn't understand it much but I -- told
24   me to sign it and send it in.

Page 199

1    Q.  Okay, is that what you did?
2    A.  Yeah.
3    Q.  Did you read the title before you signed
4    this FHA Purchase Agreement Addendum?
5    A.  No, not really.
6    Q.  Are you always in the habit of not reading
7    documents that you sign?
8    A.  I was just so excited and wanted to buy a
9    house and move on.  Didn't know much about anything.
10   Q.  You did buy a house, correct?
11   A.  I own one now.
12        (Document marked as Exhibit No. 21
13   for identification.)
14   Q.  Do you recognize Exhibit 21?
15   A.  Yes, my signature's on it.
16   Q.  Is this a document you executed in regard
17   to your proposed purchase of the Chilson Avenue
18   property?
19   A.  Yes.
20   Q.  Did you know what this was for when you
21   signed it?
22   A.  Not really.  Not really.
23   Q.  Now, was this to get a copy of your tax
24   returns?

Page 200

1    A.  I think so.
2         (Document marked as Exhibit No. 22
3    for identification.)
4    Q.  Do you recognize Exhibit 22 which is
5    similar to 21 except it has two signatures?
6    A.  Basically it's the tax returns.
7    Q.  Is your signature on it?
8    A.  Yes.
9    Q.  Is it a document you signed in connection
10   with your proposed purchase of the Chilson Avenue
11   property?
12   A.  Yes.
13        (Document marked as Exhibit No. 23
14   for identification.)
15   Q.  Do you recognize Exhibit 23?
16   A.  Yes, I do, Andrew.
17   Q.  What is this?
18   A.  Basically where I was working, position.
19   Q.  Was this a letter that you obtained for
20   your proposed purchase of the Chilson Avenue
21   property?
22   A.  Yes, Andrew.
23   Q.  What was this letter for, do you know?
24   A.  To send to Cendant of the income that I'm

Page 201

1    making and the overtime that I work because they
2    wanted it.
3    Q.  So this was to substantiate the income
4    that you had orally informed Richard Luongo of?
5    A.  Exactly.  Exactly.
6         (Document marked as Exhibit No. 24
7    for identification.)
8    Q.  This is a letter I put before you that's
9    marked as Exhibit 24 concerning Doris Mendes but
10   did you have any involvement in securing this
11   letter?
12   A.  Yes, well, I gave this information to the
13   applicant.
14   Q.  To the applicant?
15   A.  I mean, the person at Cendant, Richard
16   Luongo.
17   Q.  Did he ask you to get this information?
18   A.  Yes.
19   Q.  Did he ask you to get the information in
20   Exhibit 23?
21   A.  Yes.
22   Q.  And that was to substantiate in Exhibit 24
23   your wife's income?
24   A.  Right, and this is her part-time job.

51 (Pages 198 to 201)

06/01/2006

Page 202

1          (Document marked as Exhibit No. 25
2   for identification.)
3       Q.   Do you recognize Exhibit 25?
4       A.   My signature's on it, yeah.
5       Q.   Well, do you know what it is?
6       A.   Not really.
7       Q.   If you look halfway down there's something
8   that is referred to as a Mortgagor's Oath; do you
9   see that?
10      A.   Yes.
11      Q.   Underneath, it says: I, Anthony P.
12  Mendes, being first duly sworn, do hereby certify
13  and say that I am the mortgagor who executed the
14  foregoing contract and I am familiar with the
15  provisions of Section 513(a) of the National Housing
16  Act, as amended, as set forth in part of the reverse
17  hereof. I do further certify that so long as any
18  part of the housing identified in the caption of
19  said contract is subject to a mortgage insured under
20  said National Housing Act, as amended, I will not
21  rent or offer for rent, or permit such housing to be
22  rented or offered for rent for hotel or transient
23  purposes; was that statement true when you signed
24  it?

Page 203

1       A.   Basically. I didn't understand much of
2   it.
3       Q.   So you didn't understand the provision of
4   Section 513(a), the Housing Act, when you signed it?
5       A.   No.
6       Q.   Did you read the top of this document when
7   you signed this document?
8       A.   I don't remember, no. But that's my
9   signature.
10          MR. TROMBETTA: Can we take a break?
11          (A brief recess was taken, 3:55 p.m.
12  - 4:03 p.m.)
13          (Documents marked as Exhibit Nos. 26
14  and 27 for identification.)
15          MR. GOLDSTEIN: I do have a stack of
16  documents that were brought down to me that I don't
17  think I need to go over. I assume you will be
18  reasonable regarding authentication of documents
19  like his purchase of his house and things like that.
20          MR. TROMBETTA: Assuming you will be,
21  too.
22          THE WITNESS: I'm pretty sure that
23  they're the same thing, Andrew.
24          MR. TROMBETTA: If you'll be

Page 204

1   reasonable I'll be reasonable.
2       Q.   All right, let me show you Exhibit 26; is
3   that a document you recognize?
4       A.   Excuse me, Andrew?
5       Q.   Do you recognize that document, Exhibit
6   26?
7          MR. TROMBETTA: Do you have a copy
8   for me?
9          MR. GOLDSTEIN: I'm sorry, do I? No,
10  but you can have this.
11          (Document presented)
12      A.   Yes, I do, Andrew.
13      Q.   What is it?
14      A.   It's a loan application.
15      Q.   Is that something you received from
16  Cendant Mortgage Corporation?
17      A.   No, no, I didn't receive this.
18      Q.   Do you recall ever signing any loan
19  application?
20      A.   No, Andrew.
21      Q.   None?
22      A.   Look it, there's -- Andrew, there's not
23  even a signature on here.
24          MR. TROMBETTA: This is what, 26?

Page 205

1          MR. GOLDSTEIN: Correct.
2       Q.   I asked you if you recognize this, you
3   said, yes. Are you just reading what the document
4   is?
5       A.   Just reading it as you presented it to
6   me.
7       Q.   Right, but when I ask you if you can
8   identify a document, I want you to tell me if you
9   know what it is as opposed to some prior familiarity
10  with the document as opposed to just reading what it
11  is?
12          MR. TROMBETTA: What are you asking
13  him?
14      Q.   Did you get that document from Cendant
15  Mortgage Corporation at some point?
16      A.   No, no.
17      Q.   All right. I'm going to show you 27. Is
18  your signature on the second page of 27?
19      A.   Yes, it is, Andrew.
20      Q.   Do you know what you signed this document
21  in connection with?
22      A.   One second, please, Andrew.
23          (Witness perusing document)
24      A.   No, not really.

Anthony Mendes                                                          06/01/2006

<table>
<tr><td>

Page 206

1    Q.   Okay.
2         (Document marked as Exhibit No. 28
3    for identification.)
4    Q.   Can you identify Exhibit 28?
5    A.   Yeah, I remember seeing it in the mail.
6    Came in the mail.
7    Q.   Okay.  Well, it's a letter from Kevin
8    Cogan?
9    A.   Yes.
10   Q.   To you and your wife, correct?
11   A.   Yes.
12   Q.   This is a -- you received this in the mail
13   from Cendant Mortgage Corporation?
14   A.   Right, dated in October 2001.
15   Q.   Okay.  And you got it about October 2nd,
16   2001; is that correct?
17   A.   Maybe a little bit after.
18   Q.   Okay, but it was mailed to you around the
19   date of October 2nd, 2001?
20   A.   Yes.
21   Q.   Came in the mail.  Did you have any
22   communication with Cendant Mortgage concerning this
23   letter?
24   A.   No.

</td><td>

Page 208

1    A.   I'm sorry, I'm sorry, go ahead, come
2    again?
3    Q.   Well, you're looking at the first
4    document; let's do that.
5    A.   Okay.
6    Q.   It says period ending 6/23/01, correct?
7    A.   Correct.
8    Q.   What is this document, a pay stub?
9    A.   Pay stub of a week's pay.
10   Q.   All right, so you didn't have this before
11   June 12th, correct?
12   A.   No, no, Andrew.
13   Q.   Second page of this document, Exhibit 29,
14   is a pay stub for the period ending 6/16/01 with a
15   pay date of 6/22/01, correct?
16   A.   Correct.
17   Q.   So you didn't have this before June 12th,
18   correct?
19   A.   Correct.
20   Q.   Third document is for the period ending
21   6/9/01 with a pay date of 6/15/01.  When I say third
22   document it's third page of Exhibit 29?
23   A.   Correct.
24   Q.   You didn't have this before June 15th,

</td></tr>
<tr><td>

Page 207

1         (Document marked as Exhibit No. 29
2    for identification.)
3    Q.   Do you recognize Exhibit 29?
4    A.   Yes, I do.
5    Q.   What is Exhibit 29?
6    A.   Basically income of where I was working at
7    the time of the application.
8    Q.   Which application?
9    A.   Application that I applied for a loan with
10   Cendant.
11   Q.   On the phone?
12   A.   Yes.
13   Q.   Why did you send these documents in
14   support -- these documents were sent in support of
15   the application?
16   A.   Yes, they wanted to see my income and
17   stuff.
18   Q.   Fair to say you sent these documents some
19   time after June 12th, 2001, correct?
20   A.   Before.
21   Q.   Before?
22   A.   Before.
23   Q.   Okay.  Well, let's look at the last
24   document.

</td><td>

Page 209

1    2001, correct?
2    A.   Correct.
3    Q.   So your earlier answer that you provided
4    this before June 12th was incorrect, correct?
5    A.   Correct.
6         (Document marked as Exhibit No. 30
7    for identification.)
8    Q.   Do you recognize Exhibit 30?
9    A.   Yes, I do, Andrew.
10   Q.   What is Exhibit 30?
11   A.   Excuse me, Andrew?
12   Q.   What is Exhibit 30?
13   A.   It's a W-2 form.
14   Q.   Okay.  Are these documents that you sent
15   to Cendent Mortgage?
16   A.   Yes.
17   Q.   Do you know when?
18   A.   I don't know when but I know I sent them.
19   Q.   Was it after June 12th, 2001?
20   A.   No, I believe it was before.
21   Q.   Do you recall sending a package to Cendent
22   Mortgage Corporation of documents?
23   A.   I don't remember but I know I sent this to
24   them.  I don't know if it was a package or an

</td></tr>
</table>

Legalink Boston, A Merrill Company
(617) 542-0039

Page 210

1  envelope, I don't know, but I remember sending them.
2      Q.  Well, do you recall calling Kevin Cogan
3  about July 2nd, 2001 and asking him if he received a
4  package of documents concerning a loan application?
5      A.  I believe so.
6      Q.  Do you know what documents you sent
7  Cendant Mortgage Corporation on or about July 2nd,
8  2001?
9      A.  I'm not sure.
10     Q.  Did you tell him some documents were
11  missing?
12     A.  Excuse me?
13     Q.  Did you tell him some documents that
14  Cendent Mortgage Corporation had requested were
15  missing and you would fax them over?
16     A.  I never said that, no, not me.
17     Q.  Did Kevin Cogan ever inform you of
18  electrical damage to the house?
19     A.  He had -- he had mentioned it.
20     Q.  Did he tell you the appraisal was on hold?
21     A.  No, he never told me that.
22         (Document marked as Exhibit No. 31
23  for identification.)
24     Q.  31 is similar to a previous document I

Page 211

1  showed you.  It's a denial of your loan.  It's dated
2  September 21st, 2001, at least that's what it
3  purports to be; do you recall getting this letter
4  also?
5      A.  I don't remember getting this one.
6      Q.  Okay.
7          (Document marked as Exhibit No. 32
8  for identification.)
9      Q.  Do you recognize this letter that's been
10  marked as Exhibit 32?
11     A.  I think I do.
12     Q.  And what is it, if you know?
13     A.  It's a letter sent out to Cendant from the
14  office of Lynn Erickson.
15     Q.  Is this the first demand letter to Cendent
16  Mortgage Corporation concerning your proposed purchase of the
17  Chilson Avenue property that you're aware of?
18     A.  I'm not aware of that but I do remember
19  that she sent this out.
20     Q.  If you look in the first paragraph of
21  Exhibit 32 there's a reference to an aborted loan
22  agreement between Cendant and the Mendeses dated --
23     A.  One second, please.
24     Q.  Okay.

Page 212

1      A.  Where at, Andrew?
2      Q.  "Due to" (indicating).
3      A.  Okay, go ahead.
4      Q.  Mention of a, quote, breach of contract
5  due to an aborted loan agreement between Cendant and
6  the Mendeses dated August 10th, 2001, period, close
7  quote; do you see that?
8      A.  Yes.
9      Q.  And in the next paragraph two lines down
10  it mentions that Cendant provided a final commitment
11  letter, references Exhibit A to the Mendeses on
12  August 10th, 2001 which the Mendeses signed on
13  August 14th, 2001; do you see that?
14     A.  Yes.
15     Q.  It continues on, quote: When the Mendeses
16  signed the document on August 14th, 2001 a binding
17  contract was formed between the Mendeses and Cendant
18  to provide a mortgage loan to fund the Mendeses'
19  purchase of the home; do you see that?
20     A.  Yes.
21     Q.  Do you know where in this letter is any
22  mention of another contract other than the August
23  10th, 2001 final commitment?
24         MR. TROMBETTA:  No question.

Page 213

1      Q.  Did Lynn Erickson represent you when she
2  sent this letter?
3      A.  Yes, she did.
4          (Document marked as Exhibit No. 33
5  for identification.)
6      Q.  Do you recognize Exhibit 33?
7      A.  Yes, I do.
8      Q.  What is Exhibit 33?
9      A.  Just a credit card from Capital One.
10     Q.  Well, was this something that you got in
11  connection with your proposed purchase of the
12  Chilson Avenue property?
13     A.  I believe so.
14     Q.  Did you have to close your account at
15  Capital One in regard to the purchase of Chilson
16  Avenue?
17     A.  Not that I'm aware of, Andrew.
18         (Document marked as Exhibit No. 34
19  for identification.)
20     Q.  Do you know is Exhibit 34 a letter you
21  received from the Bank of America?
22     A.  Yes.
23         MR. GOLDSTEIN:  I guess, actually,
24  there's a second page that doesn't belong so let's

Anthony Mendes                                                                06/01/2006

Page 214

1  just take that off.
2      Q.  Is this letter connected with your
3  proposed purchase of the Chilson Avenue property?
4      A.  I'm not sure, Andrew.
5      Q.  I'll tell you this document and the last
6  document were in the PHH Mortgage or Cendant
7  Mortgage files. Do you know why you may have sent
8  these documents to Cendant Mortgage?
9      A.  I have no idea, Andrew.
10     Q.  Do you have an account at the CrossCountry
11  Bank?
12     A.  There was a credit card, Andrew.
13     Q.  Okay.
14          (Document marked as Exhibit No. 35
15  for identification.)
16     Q.  Is this a letter that you received from
17  CrossCountry bank?
18     A.  Yes.
19     Q.  Again, this was in the files of Cendant
20  Mortgage now PHH Mortgage. Do you know what this
21  has to do with your proposed purchase of the Chilson
22  Avenue property?
23     A.  No, I have no idea.
24     Q.  Were you ever working to get any repairs

Page 215

1  done at the Chilson Avenue property?
2      A.  Was I?
3      Q.  Yes.
4      A.  No, no.
5      Q.  Any repairs regarding any electrical work
6  or the --
7      A.  No, he mentioned it and -- and I had an
8  electrician come and he wrote a letter and I thought
9  it was in the documents. I sent it to him and I
10  don't know where it is.
11     Q.  I just want to make clear, is it your
12  testimony that you don't recall any real estate
13  agent --
14     A.  Real estate agent?
15     Q.  -- helping to find comparables to adjust
16  up the market rental values of the Chilson Avenue
17  property?
18     A.  Come again, I'm sorry, Andrew?
19     Q.  Do you recall any real estate agent in any
20  way helping to find comparables to adjust up the
21  rental value of the Chilson Avenue property?
22     A.  The only one I ever heard was Greg Abbot.
23     Q.  Well, what did you hear about that?
24    *A.  He just said that he was looking at market

Page 216

1  value for Kevin and he was taking care of it and
2  that was it. I didn't hear no more about it.
3          MR. GOLDSTEIN: Could you read that
4  answer back?
5          (*Record read as requested)
6      Q.  Were you ever told that you needed three
7  months reserves to purchase the property?
8      A.  No.
9      Q.  Did Cendant Mortgage ever tell you that
10  you had met all the conditions in the final
11  commitment letter?
12         MR. TROMBETTA: Well, I'll object but
13  you can answer.
14     A.  I'm sorry, come again, please, Andrew?
15     Q.  Did anyone at Cendant Mortgage ever tell
16  you that you had met all of the conditions in the
17  final commitment letter?
18         MR. TROMBETTA: Same objection. You
19  can answer.
20     A.  No.
21     Q.  Have you refinanced your School Street
22  property lately?
23     A.  I have.
24     Q.  When was the last time you refinanced it?

Page 217

1      A.  Couple of years ago.
2      Q.  Did you get an appraisal with the property
3  in connection with the refinancing?
4      A.  If I could remember, yes, Andrew.
5      Q.  You say if you could remember, yes; is
6  that, yes, or --
7      A.  Yes, yes.
8      Q.  Do you have that appraisal at home?
9      A.  I don't think so.
10     Q.  Do you know who did the appraisal?
11     A.  Excuse me?
12     Q.  Do you know who did the appraisal?
13     A.  I can't remember the name of the company
14  but there was an appraisal done.
15         MR. TROMBETTA: Didn't we give you an
16  appraisal of that property?
17         MR. GOLDSTEIN: Maybe you did, I
18  don't remember.
19     A.  I think so.
20         MR. TROMBETTA: I thought we did.
21         MR. GOLDSTEIN: Well, I know you did
22  but I think it's the original. I'm talking about
23  refinance.
24     Q.  Has that property appreciated in value in

55 (Pages 214 to 217)

Anthony Mendes                                                              06/01/2006

Page 218

1  your opinion?
2      A.  You're funny, Andrew.  I don't mean to
3  laugh.  Come again, Andrew?
4      Q.  Has your property appreciated in value?
5      A.  What do you mean when you say that,
6  Andrew, so I can answer your question.
7      Q.  Has the market value of your property gone
8  up since you purchased it?
9      A.  Absolutely, Andrew.
10     Q.  Do you know how much?
11     A.  That house is worth over -- probably close
12  to 385 to 400,000.
13     Q.  Which house, to be clear, School Street?
14     A.  I'm sorry?
15     Q.  The School Street property?
16     A.  The appraisal, if I could remember,
17  Andrew, that was done on the home when I refinanced
18  it two years ago, if I could remember, 368.
19     Q.  What was the bank you went through to
20  refinance?
21     A.  I forget the bank but it was an outside
22  lender.
23         (Document marked as Exhibit No. 36
24  for identification.)

Page 219

1      Q.  Do you recognize Exhibit 36?
2      A.  Not really.
3      Q.  Is this a loan application that you
4  submitted for the School Street property?
5      A.  I'm sorry?  Yes, yes, I'm sorry, yes,
6  Andrew.
7      Q.  Did you get a prequalification letter also
8  in regard to the School Street property?
9          MR. TROMBETTA:  I object.
10     A.  Excuse me, Andrew?
11     Q.  Did you get any letter similar to Exhibits
12  3, 4 and 5 regarding the School Street property?
13         MR. TROMBETTA:  I'll object to that
14  as well.
15     A.  I got a letter stating that it was
16  guaranteed.
17     Q.  Regarding School Street?
18     A.  Yes.
19     Q.  Who was that from?
20     A.  Jack Conway if I could remember.  And see,
21  Andrew, there's the gift right there (indicating).
22         MR. GOLDSTEIN:  Well, I'm going to
23  state for the record that there is no assertion in
24  the interrogatory answers of any emotional distress

Page 220

1  damages so I'm not going to ask about that.  If
2  there's going to be an allegation made that the
3  Mendeses have suffered emotional distress damages,
4  then I'll have to reopen the deposition.  I can go
5  through it right now but you haven't asserted that.
6          THE WITNESS:  I don't know.  What do
7  you mean when you say that, Andrew?
8          MR. GOLDSTEIN:  I mean will you bring
9  Mr. Mendes back if you amend your interrogatory
10  answers to assert emotional distress?
11         MR. TROMBETTA:  Just to answer
12  questions on that topic, I will.
13         MR. GOLDSTEIN:  All right, with that
14  representation I'll complete the deposition.
15         MR. TROMBETTA:  Thank you very much.
16         (Whereupon the deposition concluded
17  at 4:30 p.m.)
18
19
20
21
22
23
24

Page 221

1          C E R T I F I C A T E
2          I, ANTHONY P. MENDES, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that said transcript
5  is a true and accurate record of said testimony
6  (with the exception of the following corrections
7  listed below):
8  Page  Line          Correction
9   ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20
21     _____
22          ANTHONY P. MENDES
23  Signed under the pains and penalties of perjury this
24  _____ day of _____, 2006.

56 (Pages 218 to 221)



Page 222

1           CERTIFICATE
2    Commonwealth of Massachusetts
3    Suffolk, ss
4           I, Donna J. Whitcomb, Certified Shorthand
5    Reporter, CSR #135593, and Notary Public in and
6    for the Commonwealth of Massachusetts, do hereby
7    certify that ANTHONY P. MENDES, the witness whose
8    deposition is hereinbefore set forth, was duly
9    sworn by me and that such deposition is a true
10   record of the testimony given by the witness
11   to the best of my skill and ability.
12          I further certify that I am neither related
13   to or employed by any of the parties in or
14   counsel to this action, nor am I financially
15   interested in the outcome of this action.
16          In witness whereof, I have hereunto set my hand
17   and notarial seal this 23rd day of June, 2006.
18
19
20   _____
21          DONNA J. WHITCOMB, CSR/RPR/RMR
22
23   My commission expires:  12/15/06
24

57 (Page 222)