**Exhibit D**

1

Volume: I

Pages: 1-57

Exhibits: 1-7


COMMONWEALTH OF MASSACHUSETTS

Bristol, ss          Superior Court

CA No. B05-809

- - - - - - - - - - - - - - - - - - -x

ANTHONY MENDES and DORIS MENDES,

          Plaintiffs,

vs.

CENDANT MORTGAGE,

          Defendant.

- - - - - - - - - - - - - - - - - - - x


DEPOSITION OF DORIS MENDES

September 8, 2006

10:18 a.m.

Foley & Lardner

111 Huntington Street

Boston, Massachusetts




Reporter:  Nancy L. LaCivita

**2**

```
1    APPEARANCES:
2
3        LAW OFFICE OF CHRISTOPHER J. TROMBETTA
4        310 North Main Street
5        Suite Six
6        Mansfield, Massachusetts  02048
7        (508) 339-5900
8        On Behalf of the Plaintiffs
9
10       FOLEY & LARDNER
11       By Andrew K. Goldstein, Esquire
12       111 Huntington Avenue
13       Boston, Massachusetts 02199
14       (617) 342-4000
15       On Behalf of the Defendant
16
17
18
19
20
21
22
23
24
```

**3**

```
1                  I N D E X
2    EXAMINATION OF:              PAGE
3    DORIS MENDES
4    By Mr. Goldstein               4
5
6
7
8
9
10
11              E X H I B I T S
12   NO.              PAGE
13   1 Copy of Check           44
14   2 Copy of Check           44
15   3 Copy of Check           45
16   4 Copy of Income Tax Return    46
17   5 Bank Statements          46
18   6 Bank Statements          50
19   7 Bank Statements          51
20
21
22
23
24   *Original exhibits retained by Andrew K. Goldstein.
```

**4**

```
1                  PROCEEDINGS
2                      * * *
3        DORIS MENDES, having been satisfactorily
4    identified and duly sworn by the Notary Public, was
5    examined and testified as follows:
6                      * * *
7              DIRECT EXAMINATION
8    BY MR. GOLDSTEIN:
9        Q.  Would you please state your name.
10       A.  Doris Mendes.
11       Q.  Ms. Mendes, my name is Andy Goldstein.  I
12   represent PHH Mortgage which used to be known as
13   Cendant Mortgage and you have filed a lawsuit against
14   Cendant Mortgage.  Do you understand that?
15       A.  Yes.
16       Q.  I'm going to ask you some questions today
17   about the facts that give rise to the lawsuit.
18       A.  Okay.
19       Q.  If you don't hear a question, please tell me
20   and I will repeat it.  And if you don't understand a
21   question, please tell me you don't understand and I
22   will try to rephrase the question so that you do
23   understand it.
24       A.  Okay.
```

**5**

```
1        Q.  If you don't remember the information
2    necessary to answer a question, you can say I don't
3    remember.  That's an acceptable answer.  If you don't
4    know the answer to a question, say I don't know.  That
5    is an acceptable answer, too.
6        A.  Okay.
7        Q.  I'm only trying to find out what you remember
8    today.
9        A.  Okay.
10       Q.  If I talk too fast, not only will the court
11   reporter tell me to slow down, but you can tell me to
12   slow down, too.  One of my many faults is sometimes I
13   speed up.  I always ask witnesses this one question, so
14   don't take it personally.  Once in a while someone says
15   yes. Is there anything that impairs your ability to
16   accurately answer questions today?
17       A.  Depends.  Some words if I don't understand, I
18   will ask you that.
19       Q.  Anything else?
20       A.  No.
21       Q.  Are you on any medication that impairs your
22   ability?
23       A.  No.
24           MR. TROMBETTA:  The only thing I do
```

2 (Pages 2 to 5)

Doris Mendes

09/08/2006



6

1  want to point out is her primary language is Spanish
2  just so you know that with respect to understanding.
3  I'm not saying it's going to be the easiest thing for
4  her, but if she says she doesn't understand certain
5  words, that is one of the reasons.
6       MR. GOLDSTEIN:  I will keep that in
7  mind.
8       Q.  If you don't understand a word or a sentence
9  or a question, just tell me.  I will try to rephrase
10  it.  My Spanish is rusty, so I won't try that.  Also,
11  you're going to anticipate the answer to questions that
12  I'm asking, but please try to let me finish the
13  question because the court reporter has a difficult
14  time taking down both of us talking at the same time.
15  She is typing everything we are saying.  And also,
16  we're trying to create a record where there is a
17  question and an answer.  Now, you understand this
18  lawsuit deals with property on Chilson Avenue in
19  Mansfield?
20       A.  Can you repeat the question?
21       Q.  This lawsuit you filed against Cendant
22  Mortgage involves a property on Chilson Avenue in
23  Mansfield, correct?
24       A.  Yes.

7

1       Q.  Have you ever spoken with anyone at Cendant
2  Mortgage about this lawsuit?
3       A.  Yes.
4       Q.  Let me rephrase that.  That's not what I was
5  expecting.
6       MR. TROMBETTA:  I don't think that's
7  what she meant, but anyway.
8       Q.  In the summer of 2001, you were attempting to
9  get a loan?
10       A.  Yes.
11       Q.  To purchase Chilson Avenue, correct?
12       A.  Yes.
13       Q.  Did you ever speak to anyone at Cendant
14  Mortgage about that loan?
15       A.  No.  My husband spoke to them.
16       Q.  When you said yes a minute ago, what did you
17  mean?  I asked you if you had ever spoken to anyone at
18  Cendant Mortgage about the lawsuit and you said yes.
19       A.  I didn't understand.
20       MR. TROMBETTA:  I think when you say
21  about the lawsuit, I think if you take that out, she
22  may be able to answer the question.
23       MR. GOLDSTEIN:  That's what I did.
24       MR. TROMBETTA:  But you said it again.

8

1  I'm not telling you what to do.
2       MR. GOLDSTEIN:  Well, she said yes to
3  that.  So I was curious about that.
4       MR. TROMBETTA:  Well, you can ask her,
5  but I don't think she did.
6       Q.  Have you ever you, yourself, spoken to anyone
7  at Cendant Mortgage about the lawsuit?
8       A.  No.
9       Q.  Have you ever spoken to anyone at Cendant
10  Mortgage, as far as you know?
11       A.  No.
12       Q.  Have you ever spoken with Richard Luongo?
13       A.  I don't know.  I don't remember.
14       Q.  So it's true that your husband Anthony Mendes
15  dealt with Cendant Mortgage in the summer of 2001,
16  correct?
17       A.  Yes.
18       Q.  And you didn't have any telephone calls with
19  anyone at Cendant Mortgage about trying to obtain a
20  loan to buy the Chilson Avenue property?
21       MR. TROMBETTA:  I will object.  You can
22  answer.
23       THE WITNESS:  Excuse me?
24       MR. TROMBETTA:  You can answer the

9

1  question.
2       A.  Can you repeat the question?
3       Q.  Sure.  Your attorney will object from time to
4  time if he thinks that I did not properly ask the
5  question, but you still answer the question unless your
6  attorney instructs you otherwise, of course.  Let's
7  move on.  Let me get your background.  Where were you
8  born?
9       A.  South America.
10       Q.  What country?
11       A.  Lima, Peru.
12       Q.  At some point you moved to the United States
13  obviously.  When was that?
14       A.  When what?
15       Q.  When did you move to the United States?
16       A.  1977.
17       Q.  When were you born?
18       A.  1959.
19       Q.  Spanish is your first language?
20       A.  Yes.
21       Q.  So you moved to the United States when you
22  were eight years old?
23       A.  No, 1977.
24       Q.  How old were you when you moved to the United

3 (Pages 6 to 9)

Doris Mendes

09/08/2006

---

10

1  States?
2      A.  16, 17.
3      Q.  When were you born?
4      A.  1959.
5      Q.  Okay.  Did you learn English in Peru at all?
6      A.  No.
7      Q.  Did you graduate from high school?
8      A.  In my country, yes.
9      Q.  Did you get any additional formal education
10  beyond high school?
11      A.  Here?
12      Q.  Anywhere.
13      A.  No.  I came here and I went to school for
14  English classes -- English course.
15      Q.  Did you go to college?
16      A.  No.
17      Q.  Do you have any degrees beyond high school?
18          MR. TROMBETTA:  Well, I object to that.
19  She didn't go to college so –
20          MR. GOLDSTEIN:  Well, she could have
21  some other type of degree.  I won't spend a lot of time
22  on this.
23          MR. TROMBETTA:  I don't know if it
24  would be a degree, but you can answer the question

---

11

1  anyway.
2      A.  I don't have a degree.  I'm a certified
3  nursing assistant.
4      Q.  Did you go to school for that?
5      A.  Yes.
6      Q.  Where?
7      A.  My job.  They gave the class on the job.
8      Q.  In 2001 what was your employment status?
9  Where were you working in 2001?
10      A.  I was working at the Arbor Hospital and
11  Deutsches Altenheim.
12      Q.  Can you spell that?
13      A.  D-E-U-T-S-C-H-E-S, A-L-T-E-N-H-E-I-M.
14      Q.  You were working at Deutsches Altenheim and
15  the Arbor Hospital?
16      A.  Arbor Hospital.
17      Q.  Are you still working at those two places?
18      A.  No.  I work at Deutsches Altenheim and I am
19  working somewhere else.
20      Q.  For what period of time did you work at the
21  Arbor Hospital?
22      A.  I work almost four years, five years.  From
23  1998 to almost 2003.
24      Q.  You're still at Deutsches Altenheim?

---

12

1      A.  Yes.
2      Q.  Did you have any other employment in 2001
3  besides those two jobs?
4      A.  After I left the Arbor Hospital, I went to
5  another job.  It was close to my house.
6      Q.  What job was that?
7      A.  I went to Avery Manor in Needham.
8          MR. TROMBETTA:  I don't mean to object,
9  but did you hear what he said about the time period?
10          MR. GOLDSTEIN:  I was going to go back
11  to that.
12      Q.  In 2001 you were working at Deutsches
13  Altenheim and Arbor Hospital?
14      A.  Yes.
15      Q.  During 2001 did you have any other
16  employment?
17          MR. TROMBETTA:  Do you understand?
18      A.  No.  I don't understand.
19      Q.  In 2001 – beginning from January 2001
20  through December 2001 other than these two jobs, did
21  you have any other jobs?
22      A.  The Arbor Hospital.
23      Q.  I have those two.  Was there a third job?
24      A.  No.

---

13

1      Q.  All right.  Are you able to read English?
2      A.  I can read, but my husband does the most
3  reading for me.  Sometimes he will try to explain to
4  me.
5      Q.  I want to focus you on 2001 regarding my next
6  series of questions.  I'm only asking about 2001.  What
7  bank accounts did you have in 2001?
8      A.  There was – I had Metropolitan Credit Union.
9  There was Bank of Boston at that time and Fleet.
10      Q.  That's the same, Fleet and Bank of Boston?
11      A.  Yes.  Boston Five, I think.
12      Q.  Boston Five?
13      A.  Yes.  Now it is Citizen's Bank.
14      Q.  Anything else?
15      A.  I don't remember.
16      Q.  So I'm not sure I understand.  You said Bank
17  of Boston Fleet, is that one account?
18      A.  No.  That was different account.
19      Q.  You had an account at Bank of Boston and
20  Fleet?
21      A.  And Fleet.
22      Q.  Is Boston Five and Citizen's a different
23  account?
24      A.  No.  At that time Boston Five, but now it's

---

4 (Pages 10 to 13)

14

1    Citizen's Bank.
2        Q.  In 2001 had it already become Citizen's, do
3    you know?
4        A.  No.
5        Q.  In 2001, did your husband have any bank
6    accounts?
7        A.  I don't remember.
8        Q.  Does he have any bank accounts now?
9        A.  No.  Right now?
10       Q.  Yes.
11       A.  Yes, he have one.
12       Q.  Where is that account?
13           MR. TROMBETTA:  I'm just going to
14   object to the form based on the way you're asking it
15   and it's the way I think she's understanding it.  You
16   mean an individual account, a joint account?
17       Q.  You can answer.  Where is the account your
18   husband currently has?
19       A.  It's somewhere in Mansfield.
20       Q.  Do you know what bank?
21       A.  No, I don't.
22       Q.  Are you on the account?
23       A.  No.
24       Q.  This is his separate account?

15

1        A.  Yes.
2        Q.  The accounts you mentioned for 2001, were
3    those your separate accounts?
4        A.  Yes.
5        Q.  Do you know if your --
6        A.  I don't remember -- this is just 16 years,
7    15 years ago I think.
8        Q.  Five years ago.
9        A.  Sorry?
10       Q.  2001.
11       A.  I have so many accounts and I don't remember.
12       Q.  I'm just asking what you remember today.  I
13   have some documents we will go over in a moment.
14       A.  Okay.
15       Q.  Just tell me your best recollection.
16           MR. GOLDSTEIN:  Chris, I didn't bring
17   copies of the marked exhibits for you.  I thought you
18   would bring them.
19           MR. TROMBETTA:  From Anthony's
20   deposition?
21           MR. GOLDSTEIN:  Yes.
22           MR. TROMBETTA:  I have them.
23       Q.  Ms. Mendes, let me show you what was marked
24   as Exhibit 2 in Anthony Mendes' deposition.  Just so

16

1    you know what we do in depositions is we mark documents
2    exhibit numbers and this one was already marked at your
3    husband's deposition on June 1st as Exhibit 2.  I want
4    you to take a look at that document and specifically
5    the second page, do you know what this document is, the
6    second page of Exhibit 2?
7        A.  This was for the deposit for the house at
8    Chilson.
9        Q.  Let me point out a signature line to you next
10   to the word signed about two thirds of the way down.
11   Does your signature appear on this document?
12       A.  Yes.
13       Q.  Is it below Anthony Mendes' signature?
14       A.  Yes.
15       Q.  Did you actually sign your own name to this
16   document?
17       A.  Yes.
18       Q.  Do you see where it says receipt for deposit?
19           MR. TROMBETTA:  Where is that?
20           MR. GOLDSTEIN:  Toward the bottom.
21       A.  Yes.
22       Q.  And it says -- it has a date 6/12/01 under
23   receipt for deposit.  Can you see that?
24       A.  Yes.

17

1        Q.  Can you read to me the line below that?
2        A.  "Received from Anthony and Doris Mendes."
3        Q.  Can you start from the beginning?  I'm not
4    sure she heard you.
5        A.  Which part?  Where it says "received from?"
6        Q.  Yes.
7        A.  "Received from Anthony and Doris Mendes of
8    $1000."
9        Q.  Just for the record, the document says
10   "Received from Anthony and Doris Mendes buyer the sum
11   of $1000."  Do you recall making an offer to purchase
12   1-3 Chilson Avenue in Mansfield, Massachusetts?
13       A.  I don't understand the question.
14       Q.  Did you make an offer to buy -- strike that.
15           In the summer of 2001, you were
16   attempting to purchase property with an address
17   1-3 Chilson Avenue in Mansfield, Massachusetts,
18   correct?
19       A.  Yes.
20       Q.  Let's just refer to that as the Chilson
21   Avenue property.  That might make it easier.
22       A.  Okay.
23       Q.  You made an offer to purchase the Chilson
24   Avenue property in June of 2001, correct?

5 (Pages 14 to 17)

Doris Mendes

09/08/2006

18

1   A. Yes.
2   Q. When you made that offer to purchase, you
3   made a deposit of $1000, correct?
4   A. Yes.
5   Q. Do you know where the $1000 deposit came
6   from?
7   A. From my checking account.
8   Q. At what bank?
9   A. I don't remember. I know it's from one
10  checking. I don't remember.
11  Q. Do you remember writing the check?
12  A. Yes.
13  Q. Do you know where you were when you wrote the
14  check?
15  A. We were in the house.
16  Q. Now, is the second page of Exhibit 2 your
17  offer to purchase the Chilson Avenue property? This
18  document, is that your offer to purchase the Chilson
19  Avenue property?
20  A. Yes.
21  Q. Was this offer also filled out in the house?
22  A. Yes, because we had to prove I was getting
23  the loan.
24  Q. That's not what I asked you. I asked you if

19

1   this offer was completed while you were in the house.
2   A. Yes.
3   Q. The date if you look at this offer is
4   June 12, 2001, do you see that?
5   A. Yes.
6   Q. Was that the first day you saw the Chilson
7   Avenue property June 12, 2001?
8   A. We saw the house twice I think. I remember
9   twice.
10  Q. Twice including June 12, 2001?
11  A. I don't remember.
12  Q. When did you first see the house, do you
13  remember?
14  A. No, I don't remember.
15  Q. Do you remember the month?
16  A. It was in June, but I don't remember the day.
17  Q. Do you know if you saw the house on a day
18  before you made this offer to purchase?
19  A. Yes.
20  Q. How many times before the offer to purchase
21  was made had you seen the house?
22  A. I don't remember.
23  Q. Was it more than once you think?
24  A. I don't remember.

20

1   Q. Do you remember who first showed you the
2   Chilson Avenue property?
3       MR. TROMBETTA: I will object, but you
4   can answer.
5   A. I can answer?
6       MR. TROMBETTA: Yes.
7   A. The lady Paula, my real estate --
8   Q. Do you recall a woman named Paula Duzan?
9   A. Yes.
10  Q. At some point you saw the Chilson Avenue
11  property for the first time, correct?
12  A. Yes.
13  Q. Did Paula Duzan show you the house the first
14  time you saw it?
15  A. Yes.
16  Q. So having answered these questions, do you
17  recall the first time Paula Duzan showed you the
18  property at Chilson Avenue?
19  A. Yes.
20  Q. Do you recall when it was in connection with
21  this offer? In other words, the day before the offer?
22  A. I don't remember.
23  Q. But you do remember that it was in June 2001,
24  correct?

21

1   A. Yes.
2   Q. Had you looked at houses prior to that time?
3   A. Yes.
4   Q. How many, do you recall?
5   A. A few houses. I don't remember how many.
6   Q. Did you make any offers on those houses?
7   A. No.
8   Q. Let me show you what's been marked as
9   Exhibit 3 at Anthony Mendes' deposition. Do you know
10  what Exhibit 3 is?
11  A. No, I don't know.
12  Q. Do you recall ever seeing that before?
13  A. Yes, I saw that.
14  Q. When was the first time you saw that, do you
15  know?
16  A. No, I don't remember.
17  Q. Was it after the lawsuit in this case was
18  filed?
19  A. Can you repeat the question?
20  Q. Was the first time you saw this document
21  after the lawsuit in this case was filed?
22  A. I don't understand.
23  Q. You don't know when you first saw this
24  document, correct?

6 (Pages 18 to 21)

Doris Mendes

09/08/2006

22

1 　　　　MR. TROMBETTA:  Well, I object.
2 　　A.  I saw this letter before we purchased the
3 house. We were approved for the loan for the house.
4 　　Q.  Before you purchased which house?
5 　　A.  No.  This is not it.  It was to buy the
6 house. We got a loan to buy the house.
7 　　Q.  Do you recall what the date of that letter
8 was?
9 　　A.  I don't remember.
10 　　Q.  By the way, as of June 2001, had you ever
11 purchased any real estate before?
12 　　A.  Before, no.
13 　　Q.  Let me show you what is marked as Exhibit 6
14 from Anthony Mendes' deposition.  Take a look at that
15 document.
16 　　A.  (Witness complies.)
17 　　Q.  Do you know what this document is?
18 　　A.  This is about the house on Chilson.
19 　　Q.  Why don't you turn to the fourth page of the
20 document that was marked as Exhibit 6.  Is your
21 signature on this page?
22 　　A.  Yes.
23 　　Q.  Is it next to Anthony Mendes' signature?
24 　　A.  Yes.

23

1 　　Q.  Did you sign this document yourself?
2 　　A.  Yes.
3 　　Q.  Turn back to the first page now.
4 　　A.  (Witness complies.)
5 　　Q.  Do you see at the top of the page where it
6 says "Standard Form Purchase and Sale Agreement?"
7 　　A.  Yes.
8 　　Q.  Is this a purchase and sale agreement that
9 you signed for the Chilson Avenue property?
10 　　A.  Yes.
11 　　Q.  Now, I'm going to direct your attention to
12 paragraph seven on page one of what was marked as
13 Exhibit 6 at Anthony Mendes' deposition.  Do you see
14 paragraph seven?
15 　　A.  Yes.
16 　　Q.  Do you see where it says "purchase price?"
17 　　A.  Yes.
18 　　Q.  Do you see in that same section there is a
19 $1000 figure?
20 　　A.  Yes.
21 　　Q.  Would you please read the line below that
22 $1000 figure?
23 　　A.  "8,000."
24 　　Q.  Keep going.

24

1 　　A.  Two thousand --
2 　　Q.  No.  Read right across.
3 　　A.  "Sign of purchase and sales agreement."
4 　　Q.  Did you make a deposit of $8000 with this
5 purchase and sale agreement?
6 　　A.  Yes.
7 　　Q.  How did you make that deposit?
8 　　　　MR. TROMBETTA:  I will object to the
9 form.  Do you mean where did the money come?
10 　　Q.  How did you make the $8000 deposit?
11 　　A.  My mother gave me a gift.
12 　　Q.  How much was the gift?
13 　　A.  $5000.
14 　　Q.  What is your mother's name?
15 　　A.  Julia Laredo.
16 　　Q.  Where did the other $3000 come from?
17 　　A.  I had my savings from my work. I had some
18 money put away.  I don't remember.  This is -- I'm not
19 going to track all that, you know.
20 　　Q.  I just want you to tell me what you remember.
21 So we have the $8000 deposit was -- strike that - the
22 $8000 deposit included a $5000 gift from your mother?
23 　　A.  Yes.
24 　　Q.  But you don't recall where the other $3000

25

1 came from other than it came from one of your bank
2 accounts?
3 　　A.  Yes. I don't remember.
4 　　　　MR. TROMBETTA:  Can we just take a
5 short break for a minute because I think she is mixed
6 up?
7 　　　　MR. GOLDSTEIN:  I don't want to go off
8 the record at this point.
9 　　　　MR. TROMBETTA:  I do.
10 　　　　MR. GOLDSTEIN:  I am not agreeing to go
11 off the record.
12 　　　　MR. TROMBETTA:  You don't have to
13 agree.
14 　　　　MR. GOLDSTEIN:  We are going to stay on
15 the record. I want the court reporter to note the time
16 of this break and that I have not agreed to go off the
17 record at this point. We're on the record and
18 Mr. Trombetta and Ms. Mendes have left the room.
19 　　　　(Attorney and witness step out at
20 10:50 a.m.)
21 　　　　MR. GOLDSTEIN:  Ms. Mendes and her
22 attorney have returned to the room. The court reporter
23 please note the time they return.
24 　　　　(Attorney and witness return at

7 (Pages 22 to 25)

Doris Mendes

09/08/2006

---

**26**

1   10:53 a.m.)

2        Q. Ms. Mendes, did you just have a discussion

3   with your attorney?

4        A. Yes.

5        Q. Did you discuss your testimony?

6        A. No.

7        Q. Did you discuss what you had just said in

8   response to my questions?

9        A. I was asking about when I don't understand to

10  ask, you know, like make sure if I don't understand to

11  ask you again.

12       Q. Did you discuss anything else?

13       A. No.

14       Q. There was nothing else said other than what

15  you just told me outside in the hallway with your

16  attorney?

17       A. No.

18       Q. Did you discuss Exhibit 6 which is in front

19  of you?

20       A. What is this six?

21       Q. Did you discuss that document that is before

22  you which is Exhibit 6 from Anthony Mendes' deposition?

23  Did you discuss that document with your attorney in the

24  hallway?

---

**27**

1        A. If we talked about this?

2        Q. Yes.

3        A. I was asking if I don't understand the

4   question, to make sure to ask if you don't understand.

5        Q. That I understand, but did you discuss any

6   further during the time you left the room with

7   Mr. Trombetta anything about the document in front of

8   you?

9        A. No.

10       Q. Did you discuss the $8000 deposit with

11  Mr. Trombetta?

12       A. No.

13       Q. Did you discuss the $5000 gift from your

14  mother with Mr. Trombetta during the time you left the

15  room?

16       A. No.

17       Q. So you left the room for several minutes.

18  Did you have a discussion with your attorney the entire

19  time you left the room?

20       A. Yes. I asked when I don't understand, to ask

21  him.

22       Q. Well, it was your attorney who wanted you to

23  leave the room.

24       A. He said make sure you understand when you

---

**28**

1   answer. If you don't understand, ask to repeat.

2        Q. Is there any question that you didn't

3   understand to this point?

4        A. The question you asked me about the money.

5   He said make sure you understand. If you don't

6   understand, to ask to repeat.

7        Q. Did you understand all my questions about the

8   money?

9        A. Yes, I understand.

10       Q. Is there anything you want to add to your

11  testimony regarding the line on the purchase and sale

12  agreement concerning $8000 at the signing of the

13  purchase and sale agreement?

14       A. No.

15       Q. And it's your testimony that your mother gave

16  you $5000 so that you could make the $8000 deposit,

17  correct?

18       A. She gave me money, the gift $5000.

19       Q. And that was put toward this $8000 deposit

20  you testified, correct?

21       A. Correct. I think so. I don't remember

22  really, but she gave me a gift of $5000.

23       Q. When? Before this? As of the time this

24  purchase and agreement was signed?

---

**29**

1        A. I don't remember.

2        Q. Well, you didn't have $8000 in your bank

3   accounts to make a deposit, correct?

4        MR. TROMBETTA: Well, I will object to

5   that, but you can answer the question.

6        A. I don't remember.

7        Q. How did your mother give you this gift of

8   $5000? Was it a check?

9        A. I don't remember.

10       Q. Was it cash?

11       A. No. It was a check.

12       Q. Well, you just said you didn't remember if it

13  was a check; do you remember?

14       A. No. I don't remember.

15       Q. Do you remember if it was cash?

16       A. No, I don't remember.

17       Q. Well, Ms. Mendes, I'm going to go back over

18  some questions because after the break you have given

19  some, in my view, answers that are contradictory.

20       MR. TROMBETTA: I don't think her

21  testimony has changed, to tell you the truth.

22       MR. GOLDSTEIN: Well, do you want to

23  stipulate she made the $8000 deposit by getting a gift

24  of $5000 from her mother?

---

8 (Pages 26 to 29)

Doris Mendes

09/08/2006

30

1    MR. TROMBETTA: I won't stipulate to
2    anything. She hasn't changed her testimony at all. I
3    even let her answer those privileged questions.
4        MR. GOLDSTEIN: I asked a question and
5    you answered it.
6    Q. Ms. Mendes, where did the $8000 for the
7    deposit under the purchase and sale agreement come
8    from?
9    A. From the bank.
10   Q. And where did you get the funds from the
11   bank?
12   A. I got some money and my mother gave me a gift
13   for $5000.
14   Q. Okay. Do you recall how you paid the $8000?
15   Was it a money order, treasurer's check, cash, gold
16   bullion?
17   A. I don't remember.
18   Q. At some point you weren't able to purchase
19   the Chilson Avenue property, correct?
20       MR. TROMBETTA: Well, I will object to
21   the form of that question.
22   Q. You didn't purchase Chilson Avenue, correct?
23       MR. TROMBETTA: Same objection, but you
24   can answer.

31

1    A. I don't understand that.
2    Q. You didn't purchase the Chilson Avenue
3    property, correct?
4    A. I don't understand.
5    Q. You understand what the Chilson Avenue
6    property is?
7    A. Yes, it's the house.
8    Q. You didn't buy it?
9    A. No.
10   Q. Did you give your mother back the $5000?
11   A. No.
12   Q. Let me show you what was marked as Exhibit 7
13   at your husband's deposition. Do you know what this
14   document is?
15   A. Yes.
16   Q. What is it?
17   A. It's the proof for the loan.
18   Q. If you turn to the second page, is your
19   signature at the bottom of the second page?
20   A. Yes.
21   Q. Did you sign this document yourself?
22   A. Yes.
23   Q. Did you read it before you signed it?
24   A. I read some, but my husband read all and he

32

1    told me to sign.
2    Q. I'm not sure I heard your answer. Did you
3    read it?
4    A. Yes, but I didn't understand it.
5    Q. Did you ask anyone to explain it to you?
6    A. Yes, my husband.
7    Q. Did you ask anyone else?
8    A. No.
9    Q. Did your husband explain it to you?
10   A. My husband said we got approved for the loan
11   for the house.
12   Q. If you look at the second page, please.
13   A. (Witness complies.)
14   Q. There is a date next to your signature
15   8/14/01, do you see that?
16   A. Yes.
17   Q. Did you write that yourself?
18   A. Yes.
19   Q. Please turn back to the first page.
20   A. (Witness complies.)
21   Q. There is a sentence toward the bottom that
22   begins with the words "customer to provide," do you see
23   that?
24   A. Yes.

33

1    Q. Would you please read that sentence?
2    A. "Customer to provide bank statement. Show
3    what $9000 deposit of sales" -- I can't see that --
4    Q. Is that difficult to read?
5    A. The light. "Contract name of escrow letter
6    from attorney."
7    Q. So let me read that into the record. It says
8    "Customer to provide bank statement to show where that
9    $9000 deposit on sales contract came from and an escrow
10   letter from attorney." Did you understand that as I
11   read it?
12   A. Yes.
13   Q. Did you ever provide to Cendant Mortgage a
14   bank statement showing where the $9000 deposit on the
15   sales contract came from?
16   A. I don't remember.
17   Q. Did you ever provide Cendant Mortgage with an
18   escrow letter from your attorney?
19   A. I don't remember.
20   Q. Do you know what an escrow letter is?
21   A. No.
22   Q. Did you understand when you signed this
23   document that you had to have escrowed two months of
24   payments for the mortgage?

9 (Pages 30 to 33)

34

1    A. My husband took care of it. I don't
2    remember.
3    Q. I'm just trying to find out what you know.
4    Did you ever sign a loan application for Cendant
5    Mortgage?
6    A. Yes. No. No, I don't remember.
7    Q. Is your answer no or that you don't remember?
8    A. I don't remember.
9    Q. When you signed this Exhibit 7 from your
10   husband's deposition, did you understand that there
11   were conditions to this final commitment?
12   A. No. I only understood I would get the loan.
13   Q. Did you understand you had to fulfill certain
14   conditions before you got the loan?
15   A. No. I only understood I was getting the
16   loan.
17   Q. Let's go over the next line item below what
18   you just attempted to read where it says "Customer to
19   provide" -- where it says "Customer to provide bank
20   statements," et cetera.
21   A. Yes.
22   Q. Did you have difficulty reading that?
23   A. The bottom one?
24   Q. Let's stick with the first line. Did you

35

1    have difficult reading the line that begins with the
2    words "Customer to provide bank statement." Do you
3    understand the question?
4    A. No, I don't.
5    Q. I'm asking if this is difficult for you to
6    read.
7    A. If I can read this letter?
8    Q. Yes, can you read this?
9    A. Yes. I can read this.
10   Q. Is it difficult?
11   A. Sometimes I don't understand some parts.
12   Q. Let me read the next line beginning with the
13   word "appraiser," do you see that?
14   A. Yes.
15   Q. It says "Appraiser to provide the net market
16   rental for all three units for the area to evidence
17   that PITI does not exceed 75 percent of the market
18   rental, open paren. Also to obtain additional income
19   to lower ratios, close paren."
20   A. I don't understand that.
21   Q. So do you know if that condition was
22   fulfilled?
23        MR. TROMBETTA: I object.
24        MR. GOLDSTEIN: I just have to ask the

36

1    question.
2    A. I don't understand what PITI is. I know I
3    was getting the loan.
4    Q. Do you know where you were when you signed
5    this document?
6    A. I don't remember.
7    Q. All right. I'm going to show you what was
8    marked as Exhibit 10 at your husband's deposition. Do
9    you recognize Exhibit 10 -- strike that.
10        Do you know what Exhibit 10 is?
11   A. No.
12   Q. Is your signature on Exhibit 10?
13   A. Yes.
14   Q. At some point was the closing on the Chilson
15   Avenue property delayed?
16   A. Excuse me?
17   Q. Do you see at the top of Exhibit 10 where it
18   says "extension for time of closing?"
19   A. Yes.
20   Q. And this document concerns the Chilson Avenue
21   property, correct?
22   A. Yes.
23   Q. Was there an extension for the closing date
24   of the Chilson Avenue property?

37

1    A. I don't remember.
2    Q. Do you know why Exhibit 10 was signed by
3    you -- strike that.
4        Do you know why you signed Exhibit 10?
5    A. My husband told me to sign.
6    Q. Did he tell you what it was for?
7    A. No, he told me to sign.
8    Q. Let me show you what was marked as
9    Exhibit 11 at your husband's deposition. Actually, let
10   me have that back. Did you pay an application fee for
11   Cendant Mortgage for your loan?
12   A. I don't remember.
13   Q. Do you remember paying a $350 fee for the
14   loan?
15   A. I don't remember. My husband took care of
16   that.
17   Q. Did you have a Visa account in June of 2001?
18   A. Yes, I had a Visa.
19   Q. Do you recall a charge of $350 to that
20   account for a loan application to Cendant Mortgage?
21   A. Yes. I don't remember. I used my card, yes.
22   Q. Let me show you what was marked as Exhibit 26
23   to your deposition.
24        MR. TROMBETTA: Anthony's deposition.

10 (Pages 34 to 37)

Doris Mendes                                                                09/08/2006

38

1      MR. GOLDSTEIN: I'm sorry. To Anthony
2  Mendes' deposition. Thank you.
3      Q. Do you know what this document is?
4      A. It's an application.
5      Q. Is that your loan application?
6      A. Yes.
7      Q. Now, on the last page of Exhibit 26 from your
8  husband's deposition is an area labeled "borrower's
9  signature and co-borrower's signature" which is not
10  signed. Did you ever sign this application or form of
11  it?
12      MR. TROMBETTA: I will object.
13      A. I don't remember.
14      Q. Did you have any retirement savings in the
15  June, August, 2001 time frame?
16      A. I had my 401K.
17      Q. Who was that with?
18      A. My job I had at Deutsches Altenheim.
19      Q. How much was in the 401K?
20      A. Around $7000.
21      MR. GOLDSTEIN: Has documentation
22  regarding that been produced; do you know?
23      MR. TROMBETTA: Concerning?
24      MR. GOLDSTEIN: The $7000 in the 401K.

39

1      MR. TROMBETTA: I don't know. I
2  thought we produced all the documents. Didn't you get
3  bank documents, too?
4      MR. GOLDSTEIN: I think I have those.
5  Let's continue.
6      Q. You had $7000 in a 401K approximately,
7  correct?
8      A. Yes.
9      Q. Did you have any other retirement savings?
10      A. No.
11      Q. Other than your bank accounts -- so putting
12  bank accounts aside and the approximately $7000 in a
13  401K, did you have any other assets in the June,
14  August 2001 time period?
15      A. No.
16      Q. Do you know if your husband did?
17      A. I don't remember.
18      Q. Do you still have a 401K?
19      A. Yes.
20      Q. Have you ever cashed it in?
21      A. Have I ever cashed it in? Yes.
22      Q. When did you cash it in?
23      A. I didn't cash it in. I just borrowed money.
24      Q. How much do you have in your 401K now?

40

1      A. Right now maybe $23,000.
2      Q. How much have you borrowed?
3      A. $3000.
4      Q. What was that for?
5      A. To fix my house.
6      Q. At some point you found out you weren't going
7  to buy Chilson Avenue, correct?
8      A. I always thought I was going to get the
9  house.
10      Q. Excuse me?
11      A. I always thought I was going to get the
12  house.
13      Q. At some point you weren't able to buy it,
14  correct?
15      A. I always thought I was getting the house.
16      Q. Maybe you're not understanding my question.
17  At some point you started to look for another house --
18  strike that.
19      You didn't buy Chilson Avenue, correct?
20      A. No.
21      Q. And you went to look for another house?
22      A. Yes.
23      Q. And you ended up buying a property on School
24  Street in Mansfield?

41

1      A. Yes.
2      Q. Did you look at any other houses other than
3  the School Street property?
4      MR. TROMBETTA: You meaning after
5  Chilson Street?
6      MR. GOLDSTEIN: Yes.
7      A. Yes. I saw a couple of houses. I remember a
8  couple.
9      Q. Do you know what kind of houses they were?
10  Were they two family, three family, single family?
11      A. I don't remember.
12      Q. Chilson Avenue, was that a one family or two
13  family or three family?
14      A. Which one, Chilson Avenue?
15      Q. Yes.
16      A. It was three family.
17      Q. What is the School Street property?
18      A. One family.
19      Q. Did you want to buy a multi-family house
20  after the Chilson Avenue property fell through?
21      A. Can you repeat the question?
22      Q. Why didn't you buy a multi-family house?
23      A. Because I didn't like some houses that I saw.
24  That's why I didn't get a two family.

11 (Pages 38 to 41)

Doris Mendes                                                                                      09/08/2006

**42**

1    Q.   When you were looking to buy the Chilson
2  Avenue property, that was a multi-family house,
3  correct?
4    A.   Yes.
5    Q.   And you were willing to buy that house,
6  correct?
7    A.   Yes.
8    Q.   And then after that, why didn't you just keep
9  looking for a multi-family house that you liked?
10       MR. TROMBETTA:   Well, I object.   I
11  think she may have answered that question.
12       MR. GOLDSTEIN:   I'm not sure.
13    Q.   Why didn't you just keep on looking for
14  another multi-family house that you liked?
15    A.   Because I didn't like the way they looked
16  inside, the houses.
17    Q.   Isn't it true you could have kept on looking
18  for another multi-family house instead of buying School
19  Street?
20    A.   No, because I was ready to move out.   That is
21  why I was looking fast.
22    Q.   Move out of where?
23    A.   Where I was living on Bridge Street.
24    Q.   In Dedham?

**43**

1    A.   Yes.
2    Q.   You didn't have to move out, did you?
3    A.   Yes.
4    Q.   You had to move out of that property?
5    A.   Yes.
6    Q.   Why?
7    A.   Because my kids wanted their own bedrooms.   I
8  was living with my parents.
9    Q.   Your parents would have let you keep living
10  there, correct?
11    A.   Right, but I didn't want to live in there
12  anymore.
13       MR. GOLDSTEIN:   Chris, I just got some
14  documents the other day.   So I will have to make copies
15  of them, but you may not he even want them all.   They
16  are additional bank documents.
17       MR. TROMBETTA:   If you can send them
18  along, that would be helpful.
19       MR. GOLDSTEIN:   I may use some today.
20  So if you want to look through them before I discuss
21  them with the witness, that is fine.
22       MR. TROMBETTA:   Do you have copies for
23  me?
24       MR. GOLDSTEIN:   I do.   Just let me

**44**

1  know.   Let's mark this as the first exhibit today.
2       (Exhibit No. 1 marked for
3  identification.)
4    Q.   Ms. Mendes, do you recognize the document
5  marked as Exhibit 1?
6    A.   Yes.
7    Q.   What is that?
8    A.   A check.
9    Q.   Is that from your account?
10    A.   Yes.
11    Q.   At Citizen's Bank?
12    A.   Yes.
13       MR. GOLDSTEIN:   Let's mark this as
14  Exhibit 2.
15       (Exhibit No. 2 marked for
16  identification.)
17    Q.   Do you recognize what Exhibit 2 is?
18    A.   Yes.
19    Q.   Is that a check you wrote for an inspection
20  of the Chilson Avenue property?
21    A.   Yes.
22    Q.   Now, earlier today you mentioned that you had
23  a Boston Five account that changed to a Citizen's Bank
24  account?

**45**

1    A.   Yes.
2    Q.   Looking at these documents, does that refresh
3  your recollection as of June 2001 you had accounts at
4  Citizen's Bank?
5    A.   Yes.
6    Q.   At the time you had accounts at Citizen's
7  Bank, you didn't have additional accounts at Boston
8  Five, correct?
9    A.   They changed.
10    Q.   Anything you had at Boston Five became
11  Citizen's?
12    A.   Yes.
13       MR. GOLDSTEIN:   Let's have this marked
14  as Exhibit 3.
15       (Exhibit No. 3 marked for
16  identification.)
17    Q.   Do you recognize Exhibit 3?
18    A.   Yes.
19    Q.   What is Exhibit 3?
20    A.   It's a checkbook -- checking.
21    Q.   Exhibit 3, is that a check from Pedro Laredo
22  and Marguerite Laredo?
23    A.   Yes.
24    Q.   To you for $1500?

12 (Pages 42 to 45)

Doris Mendes                                                          09/08/2006

46

1    A.  Yes.
2    Q.  Do you know what that was for?
3    A.  I lent them money and he paid me the money.
4    Q.  All right.
5        (Exhibit No. 4 marked for
6    identification.)
7    Q.  I'm showing you what has been marked
8    Exhibit 4.  Do you know what that document is?
9    A.  Income tax.
10   Q.  Is that your income tax refund for 2000 --
11   strike that.
12       Is that the income tax return you
13   received in 2001?
14   A.  $500.
15   Q.  I understand the amount.  Is that the check
16   you received as a refund in 2001?
17   A.  Yes.
18   Q.  Okay.
19       MR. GOLDSTEIN:  Can I have this marked
20   as the next exhibit.
21       (Exhibit No. 5 marked for
22   identification.)
23   Q.  Let me show you what's been marked as
24   Exhibit 5.  Do you know what these documents are?  And

47

1    you should feel free to look through the whole
2    document.
3        MR. GOLDSTEIN:  While the witness is
4    looking through the document, if you want to stipulate
5    to any of this, let me know to move things along.
6    A.  Yes.
7    Q.  Do you know what these documents are?
8    A.  This is Metropolitan Credit Union.  This is a
9    savings and a Christmas Club and a loan I have with
10   them.
11   Q.  These are bank statements for your accounts
12   at the Metropolitan Credit Union?
13   A.  Yes.
14   Q.  Why don't you turn to the statement for
15   June 30 -- actually June 1st to June 30, 2001.  Let me
16   know when you are there.
17   A.  June what?
18   Q.  June 1st to June 30th, 2001.  So I just want
19   to have you go through this statement.  There is a line
20   that says "2001 dividends earned." Do you see that?
21   $8.91.
22   A.  Okay.
23   Q.  And then below that, it has "share account
24   previous balance."  Do you see that?

48

1    A.  Where is that?  Okay.
2    Q.  I'm just trying to understand how you read
3    the statement.  Do you know what that refers to shared
4    account previous balance?
5    A.  The balance of the account.
6    Q.  Is that some sort of gift account?
7    A.  What?
8    Q.  What is that account?
9    A.  Christmas club.
10   Q.  That's the Christmas club?
11   A.  Yes.
12   Q.  Let me make sure we're on the same thing.  It
13   says one share account --
14   A.  The savings and this is Christmas club.
15   Q.  I'm just trying to figure out the statement.
16   So where it says "one share account previous balance"
17   and then it has a balance of $273.70, do you see that?
18   A.  Yes.
19   Q.  What is that for?  Is that for a savings
20   account?
21   A.  Yes.
22   Q.  Below that it has "payroll deduction?"
23   A.  Which one?
24   Q.  Let's do it this way:  Do you see underneath

49

1    the $8.91 there is an entry for $35?
2    A.  Yes.  It was doing direct deposit.
3    Q.  These are direct deposits of $35 into a
4    savings account?
5    A.  Yes.
6    Q.  Is the number on the far right-hand column in
7    the top portion of the statement where it says $273.70,
8    $308.70, $343.70, is that the balance?
9    A.  Yes.  There was a balance.
10   Q.  That is for a savings account, correct?
11   A.  Yes.
12   Q.  Look below that, there is a number five and
13   it says "Christmas club."
14   A.  Yes.
15   Q.  Then there is a series of $15 deposits?
16   A.  Yes.
17   Q.  That is for a Christmas club?
18   A.  Yes.
19   Q.  Then, again, the far right-hand column under
20   that section there is a series of numbers, $544.18,
21   $559.18, $574.18, $589.18 and $590.30.  That's the
22   balance of your Christmas Club?
23   A.  Yes.
24   Q.  Then there is a -- looks like a separate

13 (Pages 46 to 49)

Doris Mendes

**50**

1  account?

2      A.  That was a loan.

3      Q.  That was a loan?

4      A.  Yes.

5      Q.  Do you see the figure in the far right-hand

6  corner?

7      A.  They were taking $100 from my checking to pay

8  this loan.

9      Q.  What is the loan balance on this statement?

10      A.  Now?

11      Q.  Well, as of this statement.  What was the

12  loan balance as of this statement?

13      A.  $2,961.

14      Q.  Dollars?

15      A.  Yes, and 79 cents.

16      MR. GOLDSTEIN:  Let's mark this as the

17  next document.

18      (Exhibit No. 6 marked for

19  identification.)

20      Q.  Ms. Mendes, I'm going to show you what has

21  been marked as Exhibit 6, and it's a multi-page

22  document, and I'm going to ask you what these documents

23  are.  We can take a break so I can take care of some

24  business.  I will be back in two minutes.

**51**

1      MR. GOLDSTEIN:  If you want to

2  stipulate as to what these are, I believe that would

3  save some time, but let me know when I get back.

4      (Recess taken.)

5  BY MR. GOLDSTEIN:

6      Q.  Let's go back on the record.  Ms. Mendes, do

7  you know what Exhibit 6 is?

8      A.  It's my account.

9      Q.  Where?

10      A.  This is Fleet, I think.

11      Q.  These are statements from your Fleet bank

12  account?

13      A.  Yes.

14      MR. GOLDSTEIN:  Let's mark these as the

15  next exhibit which will be 7.

16      (Exhibit No. 7 marked for

17  identification.)

18      MR. GOLDSTEIN:  I will represent at

19  Mr. Trombetta's request that I got all of the bank

20  statements marked as Exhibits 5, 6 and 7 from the banks

21  directly pursuant to a subpoena.  Will you represent

22  that Exhibit 7 -- will you stipulate that Exhibit 7 is

23  bank statements from Ms. Mendes' Citizen's bank

24  accounts?

**52**

1      MR. TROMBETTA:  Based on your

2  representation I will.

3      MR. GOLDSTEIN:  I will try to get you

4  out of here in the next few minutes as you requested.

5      Q.  Ms. Mendes, looking at Exhibit 7 --

6      A.  Yes.

7      Q.  Look at the first page.

8      A.  Yes.

9      Q.  There is a reference to a checking account

10  and savings account.  Do you see that?

11      A.  Yes.

12      Q.  Then there is a loan balance account?

13      A.  Yes.

14      Q.  In the summer of 2001, did you have any other

15  accounts at Citizen's Bank?

16      A.  Fleet.

17      Q.  Just at Citizen's Bank.

18      A.  Checking and saving.

19      Q.  Those are the only two accounts you had at

20  Citizen's Bank?

21      A.  I don't remember.

22      Q.  Well, we have before us and I will represent

23  that I subpoenaed from Citizen's Bank, Metropolitan

24  Credit Union and Fleet or its successor Bank of America

**53**

1  all of your accounts for 2001 statements and what's

2  been produced by those banks are Exhibits 5 through 7.

3  So we have an account at the Metropolitan Credit Union?

4      A.  Yes.

5      Q.  We have accounts at --

6      A.  Fleet.

7      Q.  And we have accounts at Citizen's Bank --

8      A.  Yes.

9      Q.  -- in 2001.  Do you recall any other bank

10  accounts you had in 2001?

11      A.  I don't remember.

12      Q.  Is it true that your main checking account

13  was at Citizen's Bank in 2001?

14      A.  Yes.

15      Q.  And that is generally where you wrote checks

16  from to pay bills, correct?

17      A.  Yes.

18      Q.  Do you remember if your husband had any bank

19  accounts -- strike that.  I will withdraw that.

20      Other than the bank accounts reflected

21  in Exhibits 5 through 7 and your 401K and the $5000

22  gift from your mother, did you have any other assets in

23  2001.  Do you understand the question?

24      A.  Yes.  I don't remember.

**14** (Pages 50 to 53)

54

1    Q.  Did you have a car in 2001?
2    A.  Yes.  I had a car.
3    Q.  Did you have a loan for that car?
4    A.  Yes.
5    Q.  Who was the loan to in 2002?
6    A.  I don't remember.  I know I had a loan.
7    Q.  Is it the same car you have now?
8    A.  No.
9    Q.  What was the car back then?
10   A.  Mitsubishi Montero.
11   Q.  What year was it?
12   A.  1995.
13   Q.  Who did you buy it from -- strike that.  Who
14   was the loan from?
15   A.  I don't remember.
16   Q.  Do you know what the loan payments were?
17   A.  The loan payment was 334, I think.  I don't
18   remember.  300 and something.
19   Q.  Do you know what payments in 2001 to Cross
20   Country Bank were for?
21   A.  I don't remember.
22   Q.  Do you know what the payments to the
23   Metropolitan Credit Union in 2001 may have been for?
24   A.  That was for my loan $100.

55

1    Q.  How about payments to FCNB processing center?
2    A.  I don't know.  What is that?  I don't
3    remember.
4    Q.  Do you recall making payments in 2001 to
5    Fleet Credit Card Services?
6    A.  Yes.  That's a credit card.
7    Q.  Do you know what a payment in 2001 to Premier
8    Insurance Company would have been for?
9    A.  That's for the car insurance.
10   Q.  Was your car loan with Metropolitan Credit
11   Corporation?
12   A.  My car loan?
13   Q.  Yes.
14   A.  No.
15       MR. GOLDSTEIN:  I don't have any other
16   questions.
17       (Whereupon the deposition was concluded
18   at 11:51 a.m.)
19
20
21
22
23
24

56

1            C E R T I F I C A T E
2            I, DORIS MENDES, do hereby certify that
3    I have read the foregoing transcript of my testimony,
4    and further certify that said transcript is a true and
5    accurate record of said testimony (with the exception
6    of the following corrections listed below:)
7    Page    Line        Correction
8
9
10
11
12
13
14
15
16
17
18   Signed under the pains and penalties of perjury this
19       day of            , 2006.
20
21
22            DORIS MENDES
23
24

57

1    COMMONWEALTH OF MASSACHUSETTS)
2                )
3    SUFFOLK, SS.            )
4
5            I, Nancy L. Lacivita, Professional
6    Shorthand Reporter and Notary Public in and for the
7    Commonwealth of Massachusetts, do hereby certify that
8    DORIS MENDES, the witness whose deposition is
9    hereinbefore set forth, was duly sworn by me, and that
10   such deposition is a true record of the testimony given
11   by such witness.
12            I further certify that I am neither
13   related to or employed by any of the parties in or
14   counsel to this action, nor am I financially interested
15   in the outcome of this action.
16            IN WITNESS WHEREOF, I have hereunto set
17   my hand and Notarial Seal this 14th day of September,
18   2006.
19
20
21            Nancy L. LaCivita
22            Notary Public
23   My commission expires:
24   February 9, 2012

15 (Pages 54 to 57)

**Exhibit E**

Page 1

COMMONWEALTH OF MASSACHUSETTS
BRISTOL, SS.          SUPERIOR COURT DEPT.
_____ CIVIL ACTION NO. B05-809
Anthony Mendes and Doris Mendes,
     Plaintiffs,      Oral Deposition of
     vs.              Richard J. Luongo, Jr.
Cendant Mortgage Corporation,
     Defendant.
_____

* * * * *
Wednesday, July 12, 2006
* * * * *

Transcript in the above matter taken at the
offices of Mastroianni & Formaroli, Certified
Shorthand Reporters, 251 White Horse Pike, Audubon,
New Jersey, commencing at 11:20 a.m.
A P P E A R A N C E S:
     CHRISTOPHER J. TROMBETTA, ESQUIRE
     310 NORTH MAIN STREET
     MANSFIELD, MASSACHUSETTS 02048
     (508) 339-5900
     Attorney for Plaintiffs
     (VIA TELEPHONE)

     FOLEY & LARDNER, ESQUIRES
     BY: ANDREW GOLDSTEIN, ESQUIRE
     111 HUNTINGTON AVENUE
     BOSTON, MASSACHUSETTS 02199
     (617) 342-4000
     Attorney for Defendant

     SOUND DEPOSITION SERVICES
     400 Oceangate Plaza, #400
     Long Beach, California 90802
     888-29-SOUND

Page 2

1
2          WITNESS INDEX
3
Examination of Mr. Luongo by Mr. Goldstein:
4     Page 4, 118
   Examination of Mr. Luongo by Mr. Trombetta:
      Page 66
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          E X H I B I T S
2     EXHIBITS RETAINED BY COUNSEL - NOT ATTACHED
3          EXHIBIT INDEX
4     Appears at the conclusion of the transcript
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1     (RICHARD J. LUONGO, JR., having been duly sworn, was
2     examined and testified as follows:)
3     (EXAMINATION OF MR. LUONGO BY MR. GOLDSTEIN:)
4          Q.  Would you, please, state your name for
5     the record?
6          A.  Richard J. Luongo, Jr.
7          Q.  What is your home address?
8          A.  1318 Stonehenge Drive, Williamstown,
9     New Jersey 08094.
10          Q.  Mr. Luongo, we're here here in an action
11     brought by Anthony Mendes and Doris Mendes versus
12     Cendant Mortgage Corporation, which is now PHH
13     Mortgage Corporation, and the action is currently
14     pending in the Federal Court in Massachusetts,
15     although, it was initiated in the State Court of
16     Massachusetts.
17          So today I'm here to ask you questions
18     about facts that you know about the lawsuit, and I
19     always give witnesses some preliminary instructions
20     before I start asking question and that's what I'm
21     going to do now.
22          If you don't understand a question,
23     please, tell me that you don't understand it and I'll
24     try and rephrase it so that hopefully you do
25     understand it.

2 (Pages 5 to 8)

Page 5

1    If you don't hear a question, tell me
2  that you didn't hear the question and I'll try to
3  speak louder.
4    One of my faults is that a speak too
5  quickly sometimes, so if I speak too quickly you can
6  tell me to slow down, I won't take it personally.
7    If you don't remember the information
8  necessary to answer a question, that's a perfectly
9  fine answer. If you don't remember or you don't
10  recall or if you don't know an answer saying I don't
11  know is an acceptable answer.
12    Now, often you're going to anticipate
13  the answer to a question, and if you do just, please,
14  let me know finish the question because the court
15  reporter, as you can see, is taking down everything
16  that you say and she will have a difficult time
17  typing the conversations of two people at one time.
18    Now, there is a question I ask every
19  witness and, in fact, some witnesses have answered
20  yes to the question, so I just like to get it on
21  record, so don't take this personally, but is there
22  anything that impairs your ability to give accurate
23  testimony today?
24    A.    No.
25    Q.    Is there any -- are you on any

Page 6

1  medication that impairs your ability to give accurate
2  testimony today?
3    A.    No.
4    Q.    All right.
5    I just want to briefly go over your
6  educational background and your employment history,
7  so -- I like to get a starting point.
8    When did you graduate from high school?
9    A.    1989.
10    Q.    Okay.
11    And after graduating from high school
12  did you go on to get any further formal education?
13    A.    I was in the military, United States
14  Army.
15    Q.    For what period of time?
16    A.    From 1988 to 1994.
17    Q.    Okay.
18    So you graduated from high school while
19  in the Army?
20    A.    My junior year of high school I went to
21  basic training right for the summer and I came back,
22  finished my senior year and my AIT training and that
23  was it.
24    Q.    Okay.
25    What did you do in the Army?

Page 7

1    A.    How would you put it -- I worked with
2  self-propelled Howitzers, actually, became an ammo
3  team chief.
4    Q.    Nothing to do with real estate?
5    A.    Nothing to do with real estate.
6    Q.    Okay.
7    A.    Unless you wanted a house demolished.
8    Q.    And were you honorably discharged?
9    A.    Yes.
10    Q.    And after you were discharged in 1994
11  what did you do?
12    A.    I worked for the Burns Cole Corporation,
13  I was a sales rep, sales and leasing representative
14  for Pontiac GMC division.
15    Q.    For what period of time?
16    A.    I believe until November 1997 --
17    Q.    And --
18    A.    -- when I had the opportunity to go to
19  Cendant Mortgage?
20    Q.    And for what period of time were you
21  with Cendant Mortgage?
22    A.    I was with them from 1997 until 2002.
23    Q.    Did you have any formal -- well, strike
24  that.
25    What was your position at Cendant

Page 8

1  Mortgage?
2    A.    I was a loan consultant originator and
3  became a senior loan consultant.
4    Q.    When did you become a senior loan
5  consultant?
6    A.    Around the 2000 -- '99, 2000 area.
7    Q.    Okay.
8    Certainly by January 1, 2001?
9    A.    Yes.
10    Q.    And as a senior loan consultant would
11  you supervise other loan consultants or originators?
12    A.    I helped out other consultants, helped
13  train them, there would be times where a lot of new
14  consultants would come and they use the word or
15  terminology shadow where they were connected into my
16  headset and they could listen to actual conversations
17  with myself and the customer and see how I worked the
18  computer, the questions I asked, there were times I
19  would actually sit with them and direct them how to
20  give information to a customer and was also to -- it
21  was nothing about the types of -- how many deals you
22  get in or so to make senior loan consultant, it was
23  about customer satisfaction, being thorough and
24  having the right information, explaining things to
25  customers, and there was a lot of -- there weren't

Page 9

1   very many senior loan consultants, it was a very hard
2   task to get.
3           MR. TROMBETTA: I'm sorry, I didn't get
4   the end of that response.
5           THE WITNESS: It was very hard to
6   become a senior loan consultant, it wasn't something
7   that was just handed out, there was just a handful of
8   people who were senior loan consultants, and to me it
9   was an honor to achieve that.
10  BY MR. GOLDSTEIN:
11      Q.    You mentioned training, so when you
12  initially started at Cendant were you trained as a
13  loan consultant or originator?
14      A.    Yes, when I first got to Cendant we went
15  through training for seven months, it was nice, it
16  was pretty much school, books, everything, 9:00 to
17  5:00, Monday through Friday, and it was the Cendant
18  school where they trained you on everything, they
19  even had times where if you didn't make the cut, you
20  were out, so the training wasn't, you know,
21  everyone's going to be hired and you stay hired, you
22  had to maintain a certain grade point average or you
23  were pretty much dismissed.
24      Q.    Okay.
25           And what did the training deal with in

Page 10

1   general?
2       A.    We went through -- as far as debt to
3   income ratios, how that works, loan to value, how
4   that works, pretty much A through Z of -- about
5   mortgages, appraisals, documentation, if a customer's
6   self-employed you need self-employed tax returns and
7   how to go over that and decipher what their adjusted
8   gross income is, they can say they're claiming this,
9   but what is their actual income, we went through
10  magic training, how to spoke on the phone, then we
11  had a whole period where how do we use the actual
12  computer system with -- when a customer calls in, we
13  did a lot of role playing --
14      Q.    Okay.
15      A.    -- it was -- it was very good training,
16  very good.
17      Q.    Now -- All right.
18           Did you -- when you worked for Cendant
19  did you deal exclusively with residential real
20  estate?
21      A.    Residential -- I don't understand.
22      Q.    Residential as opposed to commercial
23  real estate.
24      A.    No commercial, just residential, I guess
25  you would say FHA, VA and conventional, conforming

Page 11

1   and nonconforming loans.
2           MR. TROMBETTA: And again, I'm sorry,
3   you said FHA, conventional and what was the third.
4           THE WITNESS: We did VA, FHA,
5   conventional, conventional that's two types of loans
6   on that branch, which would be conforming and
7   nonconforming.
8           MR. TROMBETTA: Okay.
9           Thank you.
10  BY MR. GOLDSTEIN:
11      Q.    And do you know how many loans you would
12  originate on a yearly basis?
13      A.    I can go pretty much on a monthly basis
14  where --
15      Q.    Okay.
16      A.    -- each consultant in different in that
17  approach, as far as many variables, on average I
18  could close anywhere between thirty to forty to fifty
19  or sixty loans per month, it depends upon the month,
20  if I took an average of forty -- four hundred and
21  eighty per year.
22      Q.    Okay.
23           So it's fair to say by the -- early 2001
24  you had originated over a thousand loans?
25      A.    Oh, easy. And the one thing we used to

Page 12

1   say a lot as far as -- the education I get compared
2   to someone who worked for a broker that deals with
3   maybe five clients, seven clients a month, I'm
4   dealing with probably seventy to ninety new clients a
5   week to where my experience -- I mean, five years in
6   this industry probably gave me twenty-five years
7   experience because of the amount of customers and
8   situations that I have to deal with as far as -- I've
9   hit every situation possible known to man as far as
10  in the industry.
11      Q.    And did Cendant also train you on these
12  different types of loan programs, FHA, VA and
13  conventional?
14      A.    Absolutely. Absolutely.
15      Q.    Okay.
16           Do you -- do you recall Anthony Mendes?
17      A.    Not particularly, but I can go through
18  documents and see and --
19      Q.    Okay.
20           Well, let me show you a document that
21  was marked as --
22           MR. GOLDSTEIN: Hold on, Chris.
23           MR. TROMBETTA: No problem.
24           MR. GOLDSTEIN: Okay.
25           It was marked as Exhibit-3 in Anthony

4 (Pages 13 to 16)

Page 13

1  Mendes' deposition, let's remark it as Exhibit-1
2  here.
3          And, Chris, it's the March 21, 2001
4  letter.
5          MR. TROMBETTA: Gotcha.
6          (Exhibit RL-1, Letter dated March 21, 2001,
7  is marked for identification.)
8  BY MR. GOLDSTEIN:
9      Q.    Mr. Luongo, I did not tell you, but
10 throughout the deposition I'll probably put some
11 documents in front you --
12     A.    Okay.
13     Q.    -- which will be marked exhibits and I'd
14 like to ask you about each one and ask you if you can
15 identify the document.
16          Sir, I put before you what has been
17 marked as Exhibit-1 at this deposition, can you
18 identify what this document is?
19     A.    It's a preapproval letter --
20     Q.    Okay.
21     A.    -- it looks like for a sales price of
22 two hundred and seventy-five thousand and the loan
23 amount of two seven two eight three two.
24     Q.    Okay.
25          And there's an interest rate there,

Page 14

1  also?
2      A.    Interest rate -- the type of loan is an
3  FHA for a thirty years, for three hundred and sixty
4  months.
5      Q.    Now, can you tell us what is the process
6  that you would follow while working for Cendant in
7  terms of issuing an -- or sending a customer, such as
8  Anthony P. Mendes, a preapproval letter?
9  (Objection) MR. TROMBETTA: I would just object as
10 to whether there was a process.
11 BY MR. GOLDSTEIN:
12     Q.    Well, did you -- did you generally
13 follow the same, you know, process when you -- in
14 sending out the preapproval letters?
15     A.    Yes.
16     Q.    And -- Okay.
17          And what was that process?
18     A.    Taking it from the initial call do you
19 mean --
20     Q.    Sure.
21     A.    -- when the customer first calls in?
22     Q.    Yes.
23     A.    When a customer does call in it's mostly
24 at the request of the real estate agent, pretty much,
25 because they like the fact to see if the customer

Page 15

1  gets preapproved for a home, meaning that their
2  credit is checked, that -- that's the primary.  When
3  a customer does call in we go over and see what type
4  of home they're looking at, and usually when they're
5  in the home buying process they're looking at some
6  homes or sometimes they're not even looking at any
7  homes at all and they just want to get the dollar
8  amount how much money would it take to get
9  out-of-pocket, what are closing costs and ultimately
10 what is going to be a monthly payment and can we
11 afford that, and the customer can basically call in
12 as many times as they want and try and get approved
13 for higher amounts, because usually -- for
14 hypothetically can sit there and say, yes, the
15 Mendeses called in and they have a sales price of two
16 seventy-five, I can have -- they could call me back a
17 week later and say, hey, we saw a house for two
18 ninety, can we get approved for that much, and then
19 we would go through the process where we look at
20 their debt to income, which the computer helps out
21 emencely with that.  And looking here with the FHA
22 the computer's in with the requirements as far as for
23 government programs, go over the monthly payment,
24 total amount down and see if they could be approved.
25 The one thing is this is all verbal, the customer's

Page 16

1  explain to me -- and I explain to many customers,
2  hey, if you tell me you make thirty dollars a year,
3  you need to have the paystubs to back that up --
4  (Objection) MR. TROMBETTA: Well, I'm going to just
5  object to --
6          THE WITNESS: Yes.
7          MR. TROMBETTA: -- the extent of what
8  he said.
9          But, anyway, you can continue.
10 BY MR. GOLDSTEIN:
11     Q.    Okay.
12          Go ahead.
13     A.    This is, again, all done verbally,
14 everything is over the phone, I have not seen any
15 documents that the customer has given me as far as --
16 if I asked you how much you make a year, if he tells
17 me fifty-two thousand dollars a year, I need someone
18 to tell me, okay, you need -- when it goes to the
19 underwriting process they need to verify all of that
20 by sending actual bank stubs -- or bank statements or
21 assets, what their income level is with paychecks or
22 W-2s.  This approval letter is pretty much done
23 basically to see if they're preapproved.  I've only
24 had two customers in the time I've been there that
25 lied about their income or lied about different

## Page 17

1  things that just called in, I don't understand why
2  because in the end it's going to get them.
3         The process goes through as far as -- I
4  explain to them the different types of programs, I
5  understand what -- this program that this customer
6  wanted to go with a three-unit property, if he wanted
7  to go with a conventional mortgage he would have to
8  put five percent down, and looking at notes here
9  looks like he just couldn't afford that, so I
10 explained to him about the FHA program, saying that
11 you could put three percent down with the FHA --
12 (Objection)  MR. TROMBETTA: I'm just going to
13 object as to the -- we're talking about a process, I
14 don't know if --
15        MR. GOLDSTEIN: All right.
16        THE WITNESS: Okay. I'll go through
17 the process as far as -- you're correct.
18        Customer calls in, we go over debt to
19 income, I explain a lot of things -- depends upon the
20 customer of what knowledge they have in the home
21 buying process. I can't recall what the Mendeses'
22 level of education was with the home buying process,
23 and, again, that's how each call differs. Personally
24 as a consultant I will go over everything from A to
25 Z, what an appraisal is, what closing costs stand

## Page 18

1  for, why they need a certain amount, I let them know
2  that -- title insurance and whatnot, that it's
3  different from -- that's going to be a standard cost
4  across the board, that they're all estimates and that
5  the actual cost comes in at the end and you'll know
6  at the closing table, so I always give them a high
7  end number what they need to come up with, and that's
8  what a good faith estimate's for, it's a high end
9  number, explain -- a lot of customers don't
10 understand what loan to value is, I'll explain that
11 to them, kind of explain to them how the mortgage
12 process works and let them know that once they have
13 their preapproval letter they can go out and look for
14 a house, once they find a house they give me the
15 address of the property, we can either lock into an
16 interest rate or they can float the interest rate, I
17 would then collect -- I believe it was three hundred
18 and twenty-five dollars at the time, that's when they
19 have an actual address to a property, their mortgage
20 application will be sent out to them in a loan
21 package with an underwriter assigned to that actual
22 deal, now with that there will be a list of
23 contingencies that the customer needs to meet, and
24 this is part of the process of when they actually
25 find a home, that loan package will go out to the

## Page 19

1  customer, they will then sign where -- everything is
2  pretty much highlighted and they would have to send
3  back in a prepaid envelope all the information that
4  the underwriter's requesting and then pretty much
5  it's out of my hands from there. I can deal with a
6  customer for a week, a day, I can deal with a
7  customer for five or six months, really depends on
8  their home buying process and how quick they want to
9  buy a home.
10 BY MR. GOLDSTEIN:
11     Q.   So one -- strike that.
12          Once the loan goes to origination it's
13 out of your hands, is that essentially --
14     A.   I originate the loan, once the actual
15 property -- they find a property and we lock into a
16 rate or if they want to float -- once we find a house
17 and they want to buy the house we start the mortgage
18 process, which is --
19     Q.   All right.
20          I misspoke. Let me ask a different
21 question.
22          Once it goes to underwriting it's out of
23 your --
24     A.   Yes. Yes.
25     Q.   Okay.

## Page 20

1          All right.
2          Now, the preapproval letter, such as
3  Exhibit-1 you have in front of you --
4     A.   Yes.
5     Q.   -- are those sent out both in regard to
6  a specific property at times or in a hypothetical
7  situation?
8  (Objection)  MR. TROMBETTA: Well, I'll object.
9          You can answer
10 BY MR. GOLDSTEIN:
11     Q.   Okay.
12          In other words, can a customer ask that
13 a preapproval letter be sent in reference to a
14 specific property?
15     A.   No.
16     Q.   Okay.
17          Well, take a look at Exhibit-1, the
18 sales price, two hundred and seventy-five thousand
19 dollars, would a -- could that actually be a sales
20 price for a specific property?
21     A.   No.
22     Q.   No.
23          Okay.
24          All right. Throughout this process
25 would you have generally told customers whether a

Page 21

1 preapproval letter was a guarantee of a mortgage loan
2 from Cendant Mortgage or not?
3 (Objection) MR. TROMBETTA: And I'll object.
4   But you can answer.
5   THE WITNESS: Could you repeat the
6 question?
7 BY MR. GOLDSTEIN:
8   Q.   Would you have any discussions with
9 customers about whether the sending of a preapproval
10 letter was a guarantee that a loan would be made to
11 that customer?
12 (Objection) MR. TROMBETTA: Same objection.
13   THE WITNESS: It would not be a
14 guarantee. It's a preapproval letter. Nothing's
15 been verified, everything's been done verbally, so I
16 need to verify the documents that -- that whatever
17 the customer tells me I need to back that up with
18 their information. So this is basically just a
19 preapproval letter.
20 BY MR. GOLDSTEIN:
21   Q.   Okay.
22   And is that -- would it be your custom
23 to tell customers that the preapproval letter was not
24 a guarantee of a loan?
25 (Objection) MR. TROMBETTA: Same objection

Page 22

1   THE WITNESS: It's not a commitment
2 letter, it's just a preapproval letter. I mean,
3 thousands of these go out every single day.
4 BY MR. GOLDSTEIN:
5   Q.   Okay.
6   Well, in --
7   A.   I mean, I worked for three other
8 mortgage companies, as well, and it's just a
9 preapproval letter. Even when I bought my home I had
10 a preapproval letter, I wasn't approved yet.
11   Q.   Did you say you worked for three other
12 mortgage companies?
13   A.   Yes.
14   Q.   What -- was that after Cendant?
15   A.   Yes.
16   Q.   Okay.
17   Well, did you receive any training at
18 Cendant as to what to a customer regarding a
19 preapproval letter in terms of whether it was a
20 guarantee of financing?
21   A.   I explained to them it's not a
22 guarantee, you know, this is a preapproval letter,
23 once you find a house your loan will then go to
24 underwriting, and, again, if everything you told me
25 is correct you will -- you should have no problem.

Page 23

1   MR. TROMBETTA: And, again, I'll just
2 move to strike.
3   But continue.
4 BY MR. GOLDSTEIN:
5   Q.   Okay.
6   Do you recall having any discussions
7 with Anthony Mendes specifically about a preapproval
8 letter?
9   A.   I don't recall any conversation with
10 him.
11   Q.   Okay.
12   Well, would you have ever -- given your
13 knowledge and experience as of March 21, 2001 would
14 you have told Mr. Mendes that this March 21, 2001
15 letter meant that he was guaranteed to get a loan
16 from Cendant Mortgage?
17 (Objection) MR. TROMBETTA: Objection.
18   THE WITNESS: I would not state that
19 because all of our calls are recorded and something
20 like that would have me fired.
21   MR. TROMBETTA: I'm sorry, could you
22 repeat that, please?
23   THE WITNESS: All of our phone calls
24 are recorded and if I had lied to a customer in any
25 which way I would be fired. Every call at any given

Page 24

1 time is recorded with every single customer, this --
2 this helps that I don't lie to any customer saying
3 yeah, you can have this, you can have that, oh, your
4 rate can be this, your rate can be that, no, I can't
5 do that, all of the calls are recorded, I cannot tell
6 a customer anything which is not true.
7 BY MR. GOLDSTEIN:
8   Q.   Okay.
9   And, again, when you send out a
10 preapproval letter -- well, strike that. Let's back
11 up again.
12   You mentioned that you generally get
13 customers calling you as a referral from real estate
14 brokers?
15   A.   That's correct.
16   Q.   Okay.
17   And how do these customers come to any
18 particular originator?
19   A.   We had it broken down -- at first it was
20 pretty much I covered all fifty states, I was one of
21 the few that were actually licensed in Wisconsin,
22 some people couldn't even take Wisconsin calls, so, I
23 mean -- but then they broke it down to where we have
24 the whole Northeast region, Southeast, Midwest, and
25 so on, and I remember I was in the Northeast section,

Page 25

1  so basically it was just called down to where anyone
2  who called in from a certain number from the
3  Northeast came to either, say, three hundred
4  consultants and whoever was available, you know, you
5  just pick up the phone. Cendant Mortgage did have a
6  relationship with ERA, Caldwell Banker and Century
7  21, so basically it was their job to refer them to
8  Cendant and that was it, they can't make them use
9  Cendant, just to refer them for an approval letter.
10    Q.    Okay.
11        Now, I just want to go over one piece of
12  your testimony, break it down.
13        After a customer found a particular
14  house you would send out an application to the
15  customer?
16    A.    Yes.
17  (Objection)  MR. TROMBETTA: I'll object to that.
18        I don't think there's any foundation.
19  BY MR. GOLDSTEIN:
20    Q.    Well, would it be the practice of
21  Cendant Mortgage and you to send out an application
22  to a customer?
23  (Objection)  MR. TROMBETTA: Same objection.
24        THE WITNESS: Yes, once a house is
25  found, the customer wants to proceed with purchasing

Page 26

1  the house, they need a mortgage for the house, they
2  call me, they proceed, give me the property address,
3  I cannot start a mortgage process without having an
4  actual physical street address --
5  BY MR. GOLDSTEIN:
6    Q.    Okay.
7    A.    -- and then once that is all entered in
8  the computer, everything is there, the computer
9  automatically generates the loan package where their
10  application -- everything is filled out for them,
11  they need to review it -- sent out to them, they have
12  to review everything and make sure it's all correct.
13    Q.    Okay.
14        And -- Okay.
15        Let me show you the next exhibit, which
16  we're going to mark as Exhibit-2.
17        (Exhibit RL-2, Letter dated May 3, 2001, is
18  marked for identification.)
19  BY MR. GOLDSTEIN:
20    Q.    Before we go on to Exhibit-2, is your
21  signature on the last page of Exhibit-1?
22    A.    Yes.
23    Q.    Now, do you recognize Exhibit-2?
24        MR. TROMBETTA: And, I'm sorry, what is
25  Exhibit-2?

Page 27

1        MR. GOLDSTEIN: I'm sorry, Exhibit-2 is
2  the May 3, 2001 letter --
3        THE WITNESS:  Yeah, May 3rd.
4        MR. GOLDSTEIN: -- marked as Exhibit-4
5  at Anthony Mendes' deposition.
6        THE WITNESS:  Okay. I'm reviewing
7  this.
8  BY MR. GOLDSTEIN:
9    Q.    And does your signature -- well, I guess
10  this doesn't appear to be signed in its current form.
11    A.    No.
12    Q.    In any event, do you recognize this
13  document as a preapproval letter?
14        MR. TROMBETTA: I'm sorry, could you
15  repeat that question, please?
16  BY MR. GOLDSTEIN:
17    Q.    Do you recognize this document as a
18  preapproval letter?
19  (Objection)  MR. TROMBETTA: I'll object.
20        You can answer.
21        MR. GOLDSTEIN:  Okay.
22        I'll ask the question a different way.
23  BY MR. GOLDSTEIN:
24    Q.    Can you identify this document?
25    A.    It's says you're approved, looks like a

Page 28

1  preapproval letter to me, yeah, FHA, it's a
2  preapproval letter, going through it, you know, goes
3  to the next steps in the home buying process, step
4  one, look for your dream home, step two, once you've
5  selected your home and signed sales agreement, again,
6  because you can't start a mortgage process without a
7  signed sales agreement, which makes sense and, step
8  three, after you have found your home, these are the
9  items we need to complete the loan package, again,
10  goes over a list of items that the customer needs to
11  start getting together to show us.
12    Q.    You're referring to the third page --
13        MR. TROMBETTA: Move to strike as not
14  responsive.
15        But you can proceed.
16  BY MR. GOLDSTEIN:
17    Q.    Well, let's go back to Exhibit-1.
18        MR. TROMBETTA:  You can ask him
19  questions about Exhibit-2, I'm not trying to be
20  difficult.
21        MR. GOLDSTEIN: I'm not saying you are.
22  BY MR. GOLDSTEIN:
23    Q.    Exhibit-1 on the second page has next
24  steps in the home buying process?
25    A.    Yes.

Page 29

1    Q.    And was it your practice to explain to
2  people on the phone what the steps were in the home
3  buying process?
4    A.    Yes.
5    Q.    Okay.
6  (Objection) MR. TROMBETTA: Object.
7  BY MR. GOLDSTEIN:
8    Q.    If your look now at Exhibit-2 it has
9  also -- starting at the third page has a list
10  entitled next steps in the home buying process, do
11  you see that?
12    A.    Yes.
13    Q.    All right.
14        And if you look at the top of Exhibit-2
15  there's some fax information, do you see that?
16    A.    I'm sorry?
17    Q.    Do you see the fax information at the
18  top of Exhibit-2?
19    A.    Yes.
20    Q.    It says Mortgage Services?
21    A.    Yes. 5/3/01.
22    Q.    Right.
23        Is that the fax inscription that would
24  come out when Cendant fax'd a document to someone,
25  Mortgage Services, if you recall?

Page 30

1  (Objection) MR. TROMBETTA: Well, I'll object.
2        But you can answer.
3        THE WITNESS: I believe so, I -- I
4  don't recall.
5  BY MR. GOLDSTEIN:
6    Q.    Okay.
7        Well, this document -- the fax
8  information at the top of the document indicates it
9  would be six pages to this document, there were six
10  pages --
11        MR. TROMBETTA: Is that a question?
12        MR. GOLDSTEIN: No, I'm setting it up.
13  BY MR. GOLDSTEIN:
14    Q.    Based on your knowledge of what the
15  contents of the preapproval letters would be and just
16  assuming that page one was a cover sheet do you know
17  what the six pages of this document in general would
18  be?
19  (Objection) MR. TROMBETTA: Well, I'll object.
20        There isn't any foundation for that.
21        THE WITNESS: Well, considering it is
22  produced from a computer and fax'd from a computer it
23  could be a page with a date on it, I mean, it could
24  be anything, I mean --
25  BY MR. GOLDSTEIN:

Page 31

1    Q.    Okay.
2        If you don't know, that's fine.
3    A.    -- I couldn't answer that really --
4    Q.    Okay.
5    A.    -- I mean --
6    Q.    All right.
7        The preapproval letters are generated by
8  a computer?
9    A.    Yes.
10    Q.    Okay.
11        And so looking at -- let's focus on
12  Exhibit-1, which does have your signature, would the
13  entire letter be generated by a computer except for
14  the particular information about the loan?
15  (Objection) MR. TROMBETTA: Well, I'll object to
16  that, too.
17        MR. GOLDSTEIN: Do you want me to go
18  through it page by page, Chris?
19        MR. TROMBETTA: Well, I didn't
20  understand what you meant.
21  BY MR. GOLDSTEIN:
22    Q.    Well, for example, let's look at page --
23        MR. TROMBETTA: Did you say except for
24  the amount of the loan?
25        MR. GOLDSTEIN: No, except for the

Page 32

1  specifics about the loan.
2        MR. TROMBETTA: Well, wouldn't that be
3  in the computer when he generated -- that's the only
4  reason I'm saying that.
5  BY MR. GOLDSTEIN:
6    Q.    Let me ask a different question.
7        Look at page one of Exhibit-1, if you
8  would, please --
9    A.    Um-hum.
10    Q.    -- would that page be computer generated
11  except for the specific information about the
12  specific loan?
13    A.    It is all setup from the computer based
14  on the information that I put in it.
15    Q.    Okay.
16        Each page of Exhibit-1; correct?
17    A.    That's correct.
18    Q.    Okay.
19        And the same for Exhibit-2?
20    A.    Correct.
21    Q.    Okay.
22        Now, on Exhibit-1 and Exhibit-2 there's
23  a -- looks like a seal that says FHA approval?
24    A.    Um-hum. Yes.
25    Q.    How is that generated?

**Page 33**

1    A.   We're using an FHA program so that is
2  why that is there.
3  (Objection)  MR. TROMBETTA: Well, I'll just object.
4        I mean, I don't think that's responsive
5  to the question, but --
6  BY MR. GOLDSTEIN:
7    Q.   Well --
8  (Objection)  MR. TROMBETTA: If you want to
9  continue, that's fine, but note my objection.
10 BY MR. GOLDSTEIN:
11   Q.   -- you said it was an FHA program, how
12 would -- would that be coded into the computer?
13   A.   Absolutely.  There's a difference
14 between FHA, conventional and VA.
15   Q.   And did you have a practice as to
16 discussing different loan programs with customers?
17   A.   Yes --
18 (Objection)  MR. TROMBETTA: Objection.
19       THE WITNESS: -- I would discuss many
20 different programs depending upon their needs.
21 BY MR. GOLDSTEIN:
22   Q.   Okay.
23       And would you ever put a customer in a
24 loan program without discussing that program --
25 strike that.

**Page 34**

1        Did you ever put a customer in a loan
2  program without first discussing that program with
3  the customer?
4  (Objection)  MR. TROMBETTA: And I'll object to
5  that, too.
6        THE WITNESS: I would not put a
7  customer in a program without discussing it with
8  them.  Again, all our conversations are recorded and
9  I cannot force the customer to do anything, I can
10 only go over what I have to offer to them, and if
11 it's to their liking and they like it, we would use
12 that certain program.
13 BY MR. GOLDSTEIN:
14   Q.   And in your experience while working at
15 Cendant who -- who selected what loan program to
16 pursue?
17       MR. TROMBETTA: I'm sorry, could you
18 repeat that question?  I couldn't hear it.
19       MR. GOLDSTEIN: Yeah.
20 BY MR. GOLDSTEIN:
21   Q.   In your experience at Cendant who
22 selected which loan program to pursue as between the
23 customer and you as a loan originator?
24 (Objection)  MR. TROMBETTA: Well, I'll object to
25 that.

**Page 35**

1        THE WITNESS: I can give my
2  professional advice to a customer and the customer
3  makes that ultimate decision.
4  BY MR. GOLDSTEIN:
5    Q.   Okay,
6        And in your practice while you were
7  working at Cendant does the customer always make the
8  decision as to what loan program to pursue?
9  (Objection)  MR. TROMBETTA: Same objection.
10       THE WITNESS: I don't understand the
11 question.
12 BY MR. GOLDSTEIN:
13   Q.   Well, let me ask you, did you ever put a
14 customer in a loan program without the customer's
15 consent?
16 (Objection)  MR. TROMBETTA: Objection.
17       THE WITNESS: No.
18       MR. GOLDSTEIN: What's the basis of the
19 objection, Chris?
20       MR. TROMBETTA: There's no foundation
21 for it.  A customer, I mean, what are we talking
22 about?
23       MR. GOLDSTEIN: Did he ever put a
24 customer into a loan program without the customer's
25 consent.

**Page 36**

1  (Objection)  MR. TROMBETTA: Same objection.
2  BY MR. GOLDSTEIN:
3    Q.   You already answered, I'm just repeating
4  it.
5        Okay.
6        MR. GOLDSTEIN: Exhibit-3 will be the
7  June 12, 2001 letter.
8        (Exhibit RL-3, Letter dated June 12, 2001,
9  is marked for identification.)
10 BY MR. GOLDSTEIN:
11   Q.   All right.
12       I put before you what's been marked as
13 Exhibit-3 to this deposition.
14       MR. GOLDSTEIN: And, Chris, this is a
15 document with a Bates stamp LE0010, so it's from Lynn
16 Erickson's file.
17       MR. TROMBETTA: This is, what; 6/12/01
18 letter?
19       MR. GOLDSTEIN: Yes.
20       MR. TROMBETTA: Okay.
21 BY MR. GOLDSTEIN:
22   Q.   Can you identify what this document is?
23   A.   It appears to be another preapproval
24 letter based on a higher loan amount, so it looks
25 like the customer's been -- looks like from

10 (Pages 37 to 40)

Page 37

1  Exhibit-1, 2 and 3 he's been shopping for homes and
2  it looks like we've gone up and down in prices and it
3  looks like, you know, he could be making offers on
4  homes, and, again, I don't recall the conversations,
5  but it looks like it's another approval letter -- or
6  preapproval letter which helps basically -- these are
7  just pretty much documents here to help a customer
8  when he's making an offer, because you could be
9  making offers against three or four other buyers for
10 the same house, so this is basically -- this just
11 helps the real estate agent and the customer obtain
12 the ability to purchase a home.
13     Q.    All right.
14           So you testified these documents, such
15 as Exhibits 1 through 3, are not sent regarding a
16 specific property?
17     A.    They're not commitment letters, they're
18 basic approval letters for any kind of amount of
19 basically just a sale price.
20     Q.    Okay.
21           But the customer couldn't be asking for
22 a letter with regard to a specific property; correct?
23     A.    No.  They can ask for it, but I can't
24 give it to them for a specific property, because,
25 again, there's no signed contract for that actual

Page 38

1  specific property, so I can't put that address on the
2  actual thing.
3     Q.    All right.
4           Now, Exhibit-3, would that also be a
5  computer generated letter --
6     A.    Yes.
7     Q.    -- except for the specific information?
8     A.    Yes.
9     Q.    Okay.
10          Do you recall what would be included in
11 this computer generated letter in June of 2001?
12          MR. TROMBETTA: I'm sorry, could you
13 say that question again, please?
14 BY MR. GOLDSTEIN:
15    Q.    Do you recall what the contents of each
16 of these computer generated letters would be in June
17 of 2001?
18    A.    The same as every other, it goes over
19 the next steps in the home buying process, again,
20 what items they need to get prepared for when they do
21 find a home, what they need to send to the
22 underwriting department to verify that they can
23 actually get approved for the mortgage.
24    Q.    Okay.
25          Were these documents -- would you sign

Page 39

1  each of these documents?
2     A.    Not personally.
3     Q.    Well, your signature is on Exhibit-1,
4  would that be a computer generated signature?
5     A.    I believe it is.
6     Q.    So if you -- again, looking at
7  Exhibit-1 --
8     A.    Yes.
9     Q.    -- you have -- the second and third
10 pages appear to be -- well, the second page, at
11 least, is next steps in the home buying process?
12    A.    Yes.
13    Q.    Okay.
14          And that's a computer generated
15 document; correct?
16    A.    Yes.
17    Q.    That's part of -- and so when you were
18 working at Cendant in June of 2001 that would be part
19 of every preapproval letter?
20    A.    Yes.
21 (Objection) MR. TROMBETTA: And I'm going to object
22 again.
23          I think you're leading him.
24 BY MR. GOLDSTEIN:
25    Q.    All right.

Page 40

1           Well, let me rephrase that.
2           On page two of Exhibit-1 --
3     A.    Yes.
4     Q.    -- was the -- was the portion of this
5  letter that's entitled next steps in the home buying
6  process computer generated with every preapproval
7  letter that was sent out?
8     A.    Yes.  And looking at this in Exhibit-1,
9  I mean, even in step two we already have, you know --
10 (Objection) MR. TROMBETTA: I'll just object.
11          There's no question, but --
12          MR. GOLDSTEIN: Well --
13          THE WITNESS: -- we can then send you
14 an update -- you know, once they've -- step two, once
15 you find and select your home and have a signed sales
16 contract, then it goes to the last sentence, then we
17 can send your updated application which reflects your
18 purchase price, which means knowing that the approval
19 letter is stating -- that if they're using it to put
20 a bid in for a home and they can put it into the
21 seller by saying, hey, look, they've been preapproved
22 for a mortgage, and the sale price could be -- I have
23 it done for, say, two seventy-five on Exhibit-1 and
24 they can negotiate and the price could be two
25 seventy-eight for someone who is biding higher on the

Page 41

1  home or if we go down to two seventy, two sixty-eight
2  or whatever is the negotiated price. Again, it's
3  just a preapproval letter, it's not a commitment
4  letter, it's not for a specific property, I mean, the
5  customers hasn't given me W-2s, hasn't given me
6  anything yet. I mean, especially with FHA, they have
7  to have an FHA inspector come out to the house, I've
8  had many loans fall through because the house doesn't
9  meet FHA expectations. You know, I'm just looking at
10  preapproval letters here.
11  BY MR. GOLDSTEIN:
12      Q.    So in June of 2001 you understood that a
13  preapproval letter was not a guarantee -- strike
14  that.
15          In June of 2001 did you understand that
16  a preapproval letter was not a guarantee that Cendant
17  would finance a particular mortgage for a particular
18  home?
19      A.    That's correct.
20  (Objection)  MR. TROMBETTA: I'll object.
21  BY MR. GOLDSTEIN:
22      Q.    Okay.
23          And you understood that before June of
24  2001; correct?
25      A.    Yes.

Page 42

1      Q.    Okay.
2          And, in fact, as you just indicated,
3  sometimes mortgages would be declined following --
4  well, strike that.
5          After a preapproval letter was sent at
6  times a customer would formally apply for a mortgage
7  and Cendant would decline the mortgage; correct?
8      A.    That's correct. And there are many
9  variables why it could be declined.
10          MR. TROMBETTA: I'm sorry, I didn't
11  hear that.
12          THE WITNESS: There could be many
13  variables of why it could be declined.
14  BY MR. GOLDSTEIN:
15      Q.    And as of June 2001 -- well, strike
16  that.
17          As of January 1, 2001, after you had
18  been working at Cendant for two years, do you recall
19  if it was your practice to tell people that the
20  preapproval letter was not a guarantee of financing?
21  (Objection)  MR. TROMBETTA: I'll object.
22          THE WITNESS: Yes.
23  BY MR. GOLDSTEIN:
24      Q.    Okay.
25          MR. GOLDSTEIN: There's a document that

Page 43

1  I'm going to mark, Chris, I just have to have it
2  redacted real quick, so -- we'll take a two-minute
3  break?
4          MR. TROMBETTA: Sure.
5          What document is that?
6          MR. GOLDSTEIN: It's the residential
7  loan application.
8          MR. TROMBETTA: Okay.
9          Two minutes?
10          MR. GOLDSTEIN: Yeah.
11          Just hang on.
12          MR. TROMBETTA: Yep.
13          (Brief Recess.)
14          MR. GOLDSTEIN: Mark this as Exhibit-4.
15          (Exhibit RL-4, Residential loan
16  application, is marked for identification.)
17  BY MR. GOLDSTEIN:
18      Q.    Mr. Luongo, I put before you what's been
19  marked as Exhibit-4, can you identify what this
20  document is?
21      A.    A residential loan application.
22      Q.    And if you look at the last page does
23  your signature appear on the bottom?
24      A.    Yes.
25      Q.    And is that in the box entitled

Page 44

1  interviewer's signature?
2      A.    Yes.
3      Q.    Okay.
4          And is that a computer generated
5  signature?
6      A.    Yes.
7      Q.    And that above your computer generated
8  signature is your typed name, do you see that?
9      A.    Yes.
10      Q.    And then there's a date?
11      A.    Yes.
12      Q.    What date is that?
13      A.    6/14/2001.
14      Q.    All right.
15          How was this document generated or how
16  was it generated when you were at Cendant?
17  (Objection)  MR. TROMBETTA: Well, I'll object.
18          But you can answer.
19          MR. GOLDSTEIN: What's the basis of the
20  objection?
21          MR. TROMBETTA: Well, does he even
22  remember preparing the document?
23          MR. GOLDSTEIN: He identified the
24  document.
25          MR. TROMBETTA: I know, I'm just -- do

Page 45

1  you want to know the nature of my objection?
2          MR. GOLDSTEIN: All right.
3  BY MR. GOLDSTEIN:
4      Q.   Was there a method in June 2001 at
5  Cendant as to how residential loan applications, such
6  as Exhibit-4, were generated?
7      A.   It was generated by collecting all of
8  the information that the customer gave to me by
9  telephone, I mean, it even states in the bottom
10 left-hand corner to be completed by interviewer, the
11 application was taken by phone, by mail or face to
12 face, it's by telephone, it's a standard 1003 form
13 which has to be completed by any mortgage company to
14 proceed with the purchasing -- or the mortgage for a
15 home.
16     Q.   So you would input information into a
17 computer based on what the customer was telling you
18 by telephone; correct?
19     A.   Yes.
20     Q.   And then this document would be
21 generated?
22     A.   This document would be generated, we
23 would review it, and it's only sent out to the
24 customer when they actually have a signed sales
25 agreement for a specific property, the customer is

Page 46

1  then told -- this is one of the documents that goes
2  out to the customer, for them to review it, because
3  they, also, need to sign this, as well, this is one
4  of the documents that need to be signed for final
5  approval, because right now the customer's been
6  preapproved and we need to take it to the final
7  approval process, which has not been done.
8      Q.   And the date on the document, June 14,
9  2001, would be -- is that the date that you would
10 have generated this letter?
11     A.   Yes. I'm sorry, what -- what date?
12     Q.   June 14, 2001.
13     A.   That's on the front?
14     Q.   That's on page four of four.
15     A.   Yes, that's the day it was completed.
16     Q.   Okay.
17          And you would only complete this
18 document once the customer had a signed agreement to
19 purchase a property?
20     A.   Yes.
21 (Objection) MR. TROMBETTA: I'll object.
22          I don't think that's what he said.
23 BY MR. GOLDSTEIN:
24     Q.   When -- just to clarify this in light of
25 the objection, when in the home buying process would

Page 47

1  you -- would Cendant -- strike that.
2          When in the home buying process would
3  you generate a loan -- a residential loan
4  application?
5  (Objection) MR. TROMBETTA: Again, I'll just object
6  as to this document.
7          But you can answer.
8          THE WITNESS: Doing the process on my
9  computer it's all preliminary, I am actually
10 collecting their current home address, whether it's
11 rented or they own it, their debts, their assets, I
12 am collecting all of the information that is
13 basically on a 1003, the only way I can actually
14 produce this document and send it out to the customer
15 for them to review is when they have a subject .
16 property address, which is on page one of Exhibit-4,
17 where subject property address -- the Chilson Avenue
18 in Mansfield, Massachusetts, even lets me know that's
19 the number of units, three units, the type of
20 purchase, the type of program, which -- FHA, what the
21 interest rate is the customer decided on --
22          MR. TROMBETTA: I'm sorry, I'm having a
23 little trouble hearing you.
24          THE WITNESS: It goes over as far as
25 the actual subject property --

Page 48

1          MR. TROMBETTA: Yeah.
2          THE WITNESS: -- looks like the house
3  is on Chilson Avenue, even states the number of
4  units, which is three, the county, the type of
5  program, which is a FHA program for a fixed rate of
6  seven point one two five for three hundred and sixty
7  months and the amount to be financed.
8  BY MR. GOLDSTEIN:
9      Q.   And this document, as you pointed out,
10 was -- proviso was based on a telephone interview.
11          In your time at Cendant did you ever
12 request documentation to substantiate a loan from a
13 customer?
14 (Objection) MR. TROMBETTA: And I'll just object to
15 the form.
16          THE WITNESS: The only times I would
17 ask for documentation would be if the customer is
18 self-employed and did not want to use a program which
19 is stated income or no employment verification,
20 interest rates on those types of programs are a lot
21 higher than if I do verify, I have a lot of
22 self-employed borrowers, a lot of bartenders, say,
23 where they think they're -- you know, they're
24 probably making eighty, ninety, a hundred thousand,
25 hypothetically, but when you actually review their

Page 49

1   taxes I need to look at their taxes, and there's a
2   process that I go through and an underwriter goes
3   through to come up with their total adjusted gross
4   income, where they literally can't claim to the
5   government, where I mean, hey, this person
6   hypothetically is making eighty thousand a year but
7   he's claiming thirteen thousand dollars to the
8   government, I can't do a loan for him because he's
9   not making enough money to -- they're the one --
10  they're pretty much the only time I would request
11  documentation or if they had certain credit issues
12  and I need to move on -- I need to get a letter to
13  show an underwriter before it goes to processing.
14  BY MR. GOLDSTEIN:
15      Q.   Okay.
16          And other than those occasions, the --
17  initial prequalification or preapproval letter you
18  would not be collecting documentation from a
19  customer?
20      A.   That's correct --
21  (Objection)  MR. TROMBETTA: I object.
22          THE WITNESS: -- I would not request
23  any documentation. Everything basically I did was
24  paperless, that was for the processor and the
25  underwriter to deal with.

Page 50

1   BY MR. GOLDSTEIN:
2       Q.   I apologize. In light of the objection
3   let me just put it another way.
4           What was your practice in terms of
5   collecting documentation in regard to a preapproval
6   letter?
7   (Objection)  MR. TROMBETTA: Same objection.
8           THE WITNESS: I would let them know
9   that when the process starts they will receive their
10  full loan application in the mail, they'll receive it
11  within twenty-four to forty-eight hours, and they'll
12  have their underwriter that they would deal with,
13  they can certainly call me if they have questions,
14  but their underwriter will be helping them through
15  the transition, speaking with the real estate agent
16  on the one-on-one basis pretty much daily, and that
17  the -- there will be a preapproved letter or envelope
18  that they can send all of the information back, as
19  far as which states and the approval letters, you
20  know, their W-2s, in this case looks like evidence of
21  an outstanding collection account and so on and so
22  on, bank statements, copy of the signed sales
23  agreements, I mean, whatever is needed for that final
24  approval we need to have it and we request it.
25  BY MR. GOLDSTEIN:

Page 51

1       Q.   You requested that from the customer --
2   strike that.
3           And you would send, you said, a loan
4   package or loan application package to the customer?
5       A.   Yes, with the actual specific property
6   in mind and for that specific property what
7   requirements that customer needs for a final
8   approval.
9       Q.   And what would be -- and correct me if
10  I'm wrong, but you stated there would be an envelope
11  included in that package to send back to Cendant?
12      A.   To send everything back.
13      Q.   Who would that go to?
14      A.   That would go to the actual underwriter
15  it's assigned to.
16      Q.   You wouldn't see that?
17      A.   I would not see it, no.
18      Q.   And you're not directly involved in the
19  underwriting process --
20      A.   That is correct.
21      Q.   -- strike that.
22          While you were at Cendant you weren't
23  directly involved in the underwriting process?
24      A.   I was not --
25      Q.   Okay.

Page 52

1       A.   -- with the actual final approval. And
2   looking at the actual Exhibits, 1, 2 and 3, it looks
3   like --
4   (Objection)  MR. TROMBETTA: And I'll just object
5   to -- there's no question.
6   BY MR. GOLDSTEIN:
7       Q.   All right.
8           Let me put a question to you.
9       A.   Even with that final package that goes
10  to the customer --
11      Q.   Yes.
12      A.   -- with every preapproval letter it does
13  state the following page is a checklist of items
14  needed for your final approval before we go to
15  closing --
16      Q.   Okay.
17      A.   -- and the customer realizes he doesn't
18  have final approval yet, I mean, he knows that,
19  that's discussed.
20      Q.   So it was your practice while working at
21  Cendant to discuss with customers that they -- well,
22  did you have a practice while working at Cendant to
23  discuss whether a preapproval letter was a guarantee
24  of financing?
25  (Objection)  MR. TROMBETTA: I'll object.

14 (Pages 53 to 56)

Page 53

1  BY MR. GOLDSTEIN:
2      Q.    Just yes or no, did you have a practice
3  while you were at Cendant --
4      A.    Yes.
5      Q.    And what was your practice while you
6  were at Cendant?
7  (Objection)  MR. TROMBETTA: Objection.
8          THE WITNESS: To never mislead the
9  customer.
10 BY MR. GOLDSTEIN:
11     Q.    Okay.
12         And did you have a practice as to
13 whether or not you would tell customers that their
14 preapproval letter was binding?
15 (Objection)  MR. TROMBETTA: I'll object.
16         THE WITNESS: Yes.
17 BY MR. GOLDSTEIN:
18     Q.    What was your practice?
19 (Objection)  MR. TROMBETTA: Object again.
20         THE WITNESS: I would explain to them
21 again that they do need to verify the information --
22 BY MR. GOLDSTEIN:
23     Q.    Okay.
24     A.    -- that we've gone over verbally.
25     Q.    And did you have -- while employed at

Page 54

1  Cendant did you tell customers -- strike that.
2          While employed at Cendant did you have a
3  practice as to what you would discuss with customers
4  as to the application process that would take place
5  once a property was found?
6  (Objection)  MR. TROMBETTA: Objection
7          THE WITNESS: Yes, I would.
8  BY MR. GOLDSTEIN:
9      Q.    What was that practice?
10 (Objection)  MR. TROMBETTA: Same objection.
11         THE WITNESS: I would explain again the
12 things they needed to prepare and get ready for when
13 they received that final loan package with the
14 prepaid postage envelope to come back, you know, we
15 would go through again everything, we would go over
16 the interest rate, we would then go over the
17 application again just to make sure before everything
18 was generated that it was correct.
19 BY MR. GOLDSTEIN:
20     Q.    Who at Cendant -- well, you've seen now
21 three prequalification letters and a loan
22 application -- residential loan application, Exhibits
23 1 through 4, who -- in connection with the Mendes
24 application for a mortgage for the property, 1-3
25 Chilson Avenue, Mansfield, Massachusetts, who would

Page 55

1  have sent out the loan application package?
2  (Objection)  MR. TROMBETTA: Well, I'll object.
3          MR. GOLDSTEIN: What's your objection
4  now?
5          MR. TROMBETTA: He said he didn't
6  remember the Mendes, how is he going to know who sent
7  it out?
8          THE WITNESS: There's a specific team
9  that does that, everything is generated, I review
10 everything, I hit a button, I know it goes down to a
11 team that pretty much puts together the loan package,
12 it is then reviewed, an underwriter's assigned and
13 it's sent out.
14 BY MR. GOLDSTEIN:
15     Q.    So as the loan originator at Cendant --
16 strike that.
17         As a loan originator at Cendant you were
18 involved in putting together the loan application
19 package and sending it out to the customer; correct?
20     A.    Everything that's on my screen is then
21 computer generated onto a specific form, so in a way
22 I am responsible for putting this together --
23     Q.    Okay.
24     A.    -- the actual loan package is not put
25 together in my physical hands and sent out, someone

Page 56

1  sends it out for me.
2      Q.    Okay.
3          MR. TROMBETTA: I'm sorry, what was the
4  last sentence you said?
5          THE WITNESS: A team member would send
6  that out for me.
7          I mean, the process that we followed is
8  pretty much what GMAC does --
9  (Objection)  MR. TROMBETTA: I'll object.
10         There's no question
11 BY MR. GOLDSTEIN:
12     Q.    Well, is there a practice that was
13 followed by your -- Cendant in regard to the loan
14 application packages?
15 (Objection)  MR. TROMBETTA: And, again -- I mean,
16 I'll object, I mean --
17         MR. GOLDSTEIN: Okay.
18 BY MR. GOLDSTEIN:
19     Q.    You can answer.
20     A.    This process that we followed is pretty
21 much a standard process that Wells Fargo, Country
22 Wide, GMAC follows the same exact process. At this
23 time Cendant Mortgage was probably the third largest
24 mortgage company in America, right up there with
25 Wells Fargo and Country Wide, I mean, having

Page 57

1  friends -- I mean, this is a standard process with
2  preapproval letters going out and -- and the way the
3  process is done is pretty much the same at any
4  mortgage company.
5  Q.  All right.
6      Now, I've shown you the loan application
7  as Exhibit-4, do you have it there?
8  A.  Yes.
9  Q.  And Exhibit-3 is a June 12, 2001
10  prequalification letter?
11  A.  Yes.
12  Q.  Okay.
13      I'm just going to read to you part of
14  the Mendes' complaint starting at paragraph five --
15  A.  And this deals with Exhibit-3?
16  Q.  3 and 4?
17  A.  Okay.
18  Q.  I'm going to ask you questions about 3
19  and 4 in light of the allegations in the Mendes'
20  complaint.
21      Now, Exhibit-5 -- I'm sorry, paragraph
22  five of the Mendes' complaint reads that Cendant
23  completed a loan application for Mr. and Mrs. Mendes,
24  a true and accurate copy of the application completed
25  by them is attached as Exhibit-A, and Exhibit-A of

Page 58

1  the complaint is Exhibit-4 here of the loan
2  application, and then paragraph six of the complaint
3  then reads, thereafter, Cendant preapproved a
4  mortgage in the amount of three hundred seven
5  thousand five hundred forty-five dollars, this
6  mortgage contemplated an interest rate of seven point
7  one two five percent, and I can show you those
8  allegations if you want, however, would -- the
9  Mendeses, therefore, have alleged that the June 12,
10  2001 preapproval letter followed the residential loan
11  application, was that ever the process that was
12  followed at Cendant?
13  (Objection)  MR. TROMBETTA:  Well, I'll object.
14      You can answer.
15      MR. GOLDSTEIN:  What's your objection
16  to this question?
17      MR. TROMBETTA:  Well, reading from the
18  complaint.
19      If you want to just ask him the
20  question, you can ask him the question.
21      MR. GOLDSTEIN:  Okay.
22      It's your complaint, Mr. Trombetta,
23  your clients' complaint.
24  BY MR. GOLDSTEIN:
25  Q.  So the Mendeses have alleged that they

Page 59

1  first applied pursuant to the residential loan
2  application, marked as Exhibit-4 to this deposition,
3  for a mortgage and then after that application
4  Cendant issued the June 12, 2001 preapproval letter,
5  was that every the --
6  A.  Well, it looks like they could have
7  called in on the 12th and -- it could get mailed to
8  them, I know it automatically gets fax'd over to the
9  real estate agent, it could be in the mail to them
10  and they could have called me up on the 13th and
11  said, hey, I have a property, and then this
12  automatically gets overnighted to them, I mean, that
13  loan package is overnighted to them, it's there.
14  Q.  Would Cendant ever -- was there ever an
15  occasion while you were originating a loan at Cendant
16  where the loan application would be completed first
17  and then a preapproval letter would be sent out
18  second?
19  (Objection)  MR. TROMBETTA:  Well, I'll object
20      THE WITNESS:  It could be a pass in the
21  mail as far as for two different types of properties
22  because of the fact, I mean, one is for one amount
23  and one is for another amount.
24  BY MR. GOLDSTEIN:
25  Q.  Mr. Mendes has testified -- well, the

Page 60

1  Mendeses -- strike that.
2      Anthony Mendes has testified that he
3  made an offer to purchase Chilson Avenue in Mansfield
4  on June 12, 2001, so my question is this -- let me
5  reask the question -- you know what, I'll strike
6  that.
7      On Exhibit-4, the date of June 14, 2001
8  on the last page, that's a date that was generated
9  based on what you input into the computer; correct?
10  A.  That's right.  And it's for a specific
11  property.
12  (Objection)  MR. TROMBETTA:  And I'll object.
13      There's no question.
14      MR. GOLDSTEIN:  You're objecting to
15  that's for a specific property?
16      MR. TROMBETTA:  What's that?
17      MR. GOLDSTEIN:  What are you objecting
18  to?
19      MR. TROMBETTA:  I thought he continued
20  to answer to something else after he had responded to
21  the question.
22      MR. GOLDSTEIN:  Okay.
23      That's fine.
24      Let me look at my notes and see if I
25  have anything else.

Page 61

1  BY MR. GOLDSTEIN:
2      Q.   Did you have any conversations with
3  Chris Trombetta regarding this case, the attorney for
4  the Plaintiffs?
5      A.   Before today?
6      Q.   Before today.
7      A.   Yes.
8      Q.   And what -- how many times?
9      A.   I believe once.
10     Q.   What was discussed?
11          Do you recall the conversation?
12     A.   I received a phone call that the
13  Mendeses were pursuing, I guess, a case against
14  Cendant and pretty much were going over what approval
15  letters were and, you know, what the situation pretty
16  much was, you know, I remember I did discuss that
17  there are many different variables that -- looks like
18  they were looking at a three-unit property and that
19  when a customer purchases a three-unit property
20  there's two ways, they can go with a conventional
21  mortgage with five percent down or they go FHA with
22  as little as three percent and that gives them the
23  benefit of using the two other units to help qualify
24  for a mortgage and that they have to have a one year
25  signed contract for a specific amount for the

Page 62

1  approval and also went over that, yeah, many times
2  somebody could have a preapproval but once we receive
3  the documents they could be declined, you know, I
4  remember the remark Chris said was, that actually
5  happens, I said, yes, it happens every day in the
6  mortgage business, that, you know, a preapproval
7  letter is just a preapproval letter, that I need to
8  verify documents and -- whether it's Cendant
9  Mortgage, whether it's XYZ Mortgage, it's -- you
10  know, we need to verify all of the information for
11  the actual property and specific as far as the
12  subject property address, that's when you really get
13  down to it.
14          MR. TROMBETTA: I'm sorry, are you
15  testifying as to what I said or as to what you said?
16          THE WITNESS: Our conversation.
17          MR. TROMBETTA: Right.
18          But I'm just saying -- I was trying to
19  follow, were you testifying as to what you told me?
20          THE WITNESS: Yeah, and I pretty much
21  went over as far as that someone -- in the
22  conversation you had pretty much asked me the
23  question, you know, people can get declined after
24  they have a preapproval letter, and I had mentioned
25  to you, yes, it happens, a preapproval letter is

Page 63

1  nothing -- nonetheless but just a preapproval letter
2  and that it happens in the business all the time.
3          I just took a verbal application with
4  Mr. Mendes and that -- basically there's -- you know,
5  no one reviewed his information, you know, do I have
6  a signed contract for the other two units for someone
7  to rent it out, do I have this, do I have that, I
8  don't have any of that because there's no specific
9  property address at the time with the preapproval
10  letter. Now, he has a property that is specific --
11  and then getting off, that was pretty much our
12  conversation, I mean, that's pretty much it.
13  BY MR. GOLDSTEIN:
14     Q.   Now, do you play any role in approving a
15  formal residential loan application at Cendant?
16     A.   Yes.
17     Q.   And what's your role?
18  (Objection)  MR. TROMBETTA: Well -- I'll object.
19          You can go ahead.
20          THE WITNESS: Once all of the
21  information is gathered on the computer there is a
22  submit button you can submit which then goes to
23  Fannie Mae, Freddie Mac guidelines, sometimes it can
24  come up as declined, I can sit there and say as a
25  consultant, you know, this doesn't make sense, I can

Page 64

1  then take it to a team leader and say, hey, look,
2  this is my finding with this loan, do you agree with
3  me, hey, they have strong assets, yeah, the back
4  ratio might be high, you know, what do you think, and
5  they could say, yeah, you know, it looks pretty good
6  to me, I think we can go for it, and they'll give me
7  a control number and we actually approve it, I -- I
8  don't actually have final say, I go to a team leader
9  and bring up my findings, hey, this should be
10  approved, not all the time as it were or -- or it's
11  approved, but the computer plays a big role because
12  it goes through all of the requirements with Freddie
13  Mac, Fannie Mae guidelines.
14  BY MR. GOLDSTEIN:
15     Q.   This is my question, you might have
16  answered it earlier --
17     A.   Yeah.
18     Q.   -- after the residential loan
19  application package was --
20     A.   Oh, after --
21     Q.   -- do you play a role in approving loan
22  applications at that point?
23     A.   No.
24     Q.   Okay.
25          In connection with the preapproval

Page 65

1    letter do you pull individual's credit reports?
2        A.    Yes.
3        Q.    Now, let me read you from Mr. Mendes'
4    deposition, page one O nine starting on line
5    twenty-two, referencing a conversation that Anthony
6    Mendes had, he alleges, with you, and I asked him,
7    question, what did he say that, answer -- I
8    might have to back up -- hold on, let me strike that.
9        All right.
10        In asking Mr. Mendes about his May --
11    the conversation regarding the May 3, 2001
12    preapproval letter Mr. Mendes testified as follows,
13    question, did he tell you he pulled the credit,
14    answer, oh, yeah, he had me on hold for about five
15    minutes, question, after he had you on hold what
16    happened, answer, he said I was approved, question,
17    did he say anything else, answer, no, question, well,
18    did he say he was going to send you a letter, answer,
19    oh, he did say he was going to send me a letter,
20    question, what did he say about that, answer, he just
21    said I'm sending you out a letter, you've been
22    approved guaranteed and he said it -- and he sent it,
23    question, did he use the word guaranteed, answer,
24    yeah.
25        Now, at -- while you worked as a loan

Page 66

1    originator at Cendant would you ever tell a customer
2    based -- during the preapproval process that they
3    were guaranteed -- strike that.
4        While working at Cendant as a loan
5    originator did you ever tell a customer during the
6    preapproval process that that customer was guaranteed
7    to get a loan?
8    (Objection) MR. TROMBETTA: And I'll object.
9        But you can answer.
10        THE WITNESS: No.
11        MR. GOLDSTEIN: No further questions.
12        MR. TROMBETTA: All right.
13        (Off-the-record discussion.)
14        (Lunch Recess.)
15    (EXAMINATION OF MR. LUONGO BY MR. TROMBETTA:)
16        Q.    Mr. Luongo, my name is Chris Trombetta,
17    I represent Anthony and Doris Mendes.
18        I'm going to ask you just a few
19    questions here this afternoon. If you don't
20    understand any question or any part of any question,
21    let me know, I'll explain it and we'll clarify the
22    misunderstanding.
23        Do you understand that?
24        A.    Yes.
25        Q.    Okay.

Page 67

1        Now, Mr. Luongo, I believe you indicated
2    that you worked as a senior loan officer; is that
3    right?
4        A.    Senior loan consultant.
5        Q.    I'm sorry, senior loan consultant.
6        Before that what was your position with
7    Cendant?
8        A.    A loan consultant.
9        Q.    Loan consultant.
10        Okay.
11        And Cendant essentially made loans as
12    its business; correct?
13        A.    Correct.
14        Q.    Okay.
15        And you handled calls concerning
16    applications for such loans; isn't that right?
17        A.    Yes.
18        Q.    And it was in Cendant's best interest to
19    make loans in terms of earning revenues; is that
20    correct?
21        A.    Yes, as I'm aware of.
22        Q.    Now, one of the questions I do have go
23    to the letters marked as Exhibits 1, 2 and 3 and I'd
24    like to just ask you a couple of questions.
25        First of all, if you go to Exhibit-2 --

Page 68

1        A.    Yes.
2        Q.    -- how many pages comprise that marked
3    exhibit?
4        A.    It looks like there's four pages total
5    that I have.
6        Q.    This is Exhibit-2?
7        A.    Yes.
8        Q.    And this is the one -- strike that.
9        This is the letter that's dated May
10    2001?
11        A.    Yes, May 3, 2001.
12        Q.    Is there a fax cover sheet?
13        A.    No.
14        Q.    Okay.
15        I believe you have a black binder there
16    with some potential exhibits in it, could you please
17    go to Exhibit P and you'll see there -- there should
18    be a document with a fax cover sheet that says
19    Mortgage Services on the front?
20        A.    P as in Paul? Yeah, it says Mortgage
21    Services fax transmission.
22        Q.    I'm sorry?
23        A.    Looks like a cover sheet.
24        Q.    Right.
25        A.    Yes.

Page 69

1    Q.    It says Mortgage Services on it?
2    A.    Yes. I'm looking at the cover sheet.
3    Q.    Okay.
4          MR. TROMBETTA: What I was going to ask
5    the court reporter to do, please, is to mark that
6    entire document at Exhibit P as Exhibit-5, please.
7          MR. GOLDSTEIN: Do you have multiple
8    copies at that tab?
9          MR. TROMBETTA: I don't know how many
10   are in there. I think there were several.
11         MR. GOLDSTEIN: Okay.
12         THE WITNESS: Yeah, there are several.
13         MR. GOLDSTEIN: Thank you.
14         (Exhibit RL-5, Mortgage Services facsimile
15   transmission with attachment, is marked for
16   identification.)
17         MR. TROMBETTA: Thank you.
18   BY MR. TROMBETTA:
19   Q.    Mr. Luongo, if you look at the top of
20   the cover sheet do you see an indication where it
21   says Mortgage Services, next to that there's a date
22   5/3/01, do you see that?
23   A.    Yes.
24   Q.    And then you go over a little bit more
25   it says page one, slash, six, do you see that?

Page 70

1    A.    Yes.
2    Q.    And if you look at the pages that
3    comprise the exhibit the pages go from one, slash,
4    six through five, slash, six; correct?
5    A.    Mine actually goes four of six and then
6    four of six --
7    Q.    It might be an extra four of six, if
8    it's an extra you can just pull that out.
9    A.    Five of six twice, five of six the third
10   time, so I have three five of sixes --
11   Q.    All right.
12         That's a copying mistake.
13         If you could pull the multiple four of
14   sixes and the multiple five of sixes, could you just
15   go ahead and pull those out of the exhibit --
16   A.    No problem.
17   Q.    -- so the exhibit just has one page four
18   of six and one page five of six?
19         If you can just let me know when you've
20   done that.
21   A.    It's ready.
22   Q.    Okay.
23         So in connection with Exhibit-5 there
24   are five pages that comprise the exhibit; correct?
25   A.    That's correct.

Page 71

1    Q.    And those pages are numbered
2    consecutively from one, slash, six to five, slash,
3    six; correct?
4    A.    Yes.
5    Q.    And this is a fax that you sent to
6    Anthony Mendes on -- well, strike that.
7          The cover sheet indicates that Exhibit-5
8    is a fax that you sent to Anthony Mendes on May 3,
9    2001; is that right?
10   A.    Correct.
11   Q.    Okay.
12         Now, you indicated this fax was sent
13   through your computer?
14   A.    Correct.
15   Q.    Okay.
16         Now, when you do that what happens; you
17   just have the document on your screen, you hit a
18   button and it's fax'd?
19   A.    Correct.
20   Q.    Okay.
21         Now, if you could, please, could you go
22   to Exhibit-3 --
23   A.    Can I also elaborate on that previous
24   question, there are times I can actually print the
25   document up and physically fax it to the customer, as

Page 72

1    well.
2    Q.    Oh, okay.
3          Hard copy, put it on the fax machine and
4    send it?
5    A.    I have two ways of doing it.
6    Q.    Okay.
7          And when you look at Exhibit-5 can you
8    tell me how you fax'd that document?
9    A.    I could not recall that.
10   Q.    Okay.
11         You fax'd it either through the computer
12   or physically; is that right?
13   A.    As I recall, yes.
14   Q.    Okay.
15         Would you, please, go to Exhibit-3?
16   A.    Exhibit-3, yes.
17   Q.    Okay.
18         Now, with respect to Exhibit-3 that's
19   been marked how many pages comprise the exhibit?
20   A.    Four.
21   Q.    Four?
22         What is the first page?
23   A.    I mean -- oh, total pages in the
24   actual -- I have two pages for Exhibit-3.
25   Q.    Oh, okay.

Page 73

1    And the first page, if you to go the top
2  where there's a fax footprint the first page is two,
3  slash, four; is that right?
4    A.    That's correct.
5    Q.    And the second page is three, slash,
6  four; is that right?
7    A.    Correct.
8    Q.    And the date of the letter is June 12,
9  2001; is that correct?
10   A.    Correct.
11   Q.    And this is a document you fax'd to Mr.
12  Mendes; correct?
13   A.    Correct.
14   Q.    Okay.
15        Now, there are only four pages to this
16  fax; correct?
17   A.    As much as I can recall, yes.
18   Q.    Okay.
19        Just based on the indication two out of
20  four; is that right?
21   A.    I believe so.
22   Q.    Okay.
23        That's assuming there even was a page
24  four because we don't have it?
25   A.    Correct.

Page 74

1    Q.    Okay.
2        So there was a difference between this
3  fax and Exhibit-5 in terms of number of pages;
4  correct?
5  (Objection)  MR. GOLDSTEIN: Objection.
6  BY MR. TROMBETTA:
7    Q.    I think you can answer it.
8    A.    It looks like at this point -- I mean,
9  there is a difference in the amount of pages based on
10  what the computer's generating.
11   Q.    Right.
12        And based on the fax footprint it seems
13  that certain pages weren't included with Exhibit-3
14  when it was sent; correct?
15   A.    I'm sorry? Can you repeat the question?
16   Q.    Sure.
17        Based on a comparison of Exhibit-3 to
18  Exhibit-5 it seems that certain pages were not
19  included with Exhibit-3 when it was forwarded to Mr.
20  Mendes on June 12, 2001; correct?
21  (Objection)  MR. GOLDSTEIN: Objection.
22        THE WITNESS: You mean certain pages
23  weren't sent to him?
24  BY MR. TROMBETTA:
25   Q.    Yes.

Page 75

1    A.    Everything is sent to him, what he does
2  with it is what he does with it.
3    Q.    Well, respectfully, if you look at the
4  fax footprint --
5    A.    Um-hum.
6    Q.    -- it says two, slash, four, three,
7  slash, four; correct?
8    A.    Yes.
9    Q.    Is it your understanding that no more
10  than four pages were fax'd on June 12, 2001?
11   A.    To my understanding, if there were four
12  pages, four pages were sent to him.
13   Q.    Right.
14        With respect to Exhibit-5 there were six
15  pages that were sent based on the fax footprint;
16  correct?
17   A.    Correct.
18   Q.    Okay.
19        Now, if we could just focus on
20  Exhibit-3, I believe that you termed this letter a
21  preapproval letter; is that right?
22   A.    I turned the preapproval.
23   Q.    I'm sorry, termed it.
24   A.    Termed it?
25   Q.    Yeah.

Page 76

1    A.    Yes.
2    Q.    Did you say this was a preapproval
3  letter?
4    A.    Yes.
5    Q.    Okay.
6        Now, I just want to ask you a couple
7  questions.
8        If you look in the middle of the
9  document you see the word you're?
10   A.    Yes.
11   Q.    What word follows you're?
12   A.    You're approved.
13   Q.    It doesn't say preapproved; correct?
14   A.    No.
15   Q.    Okay.
16        Next to that do you see that red --
17  strike that.
18        Do you see the stamp on the document?
19   A.    Yes.
20   Q.    What does it say inside that stamp?
21   A.    FHA approved.
22   Q.    It doesn't say preapproved; correct?
23   A.    Correct.
24   Q.    Okay.
25        Now, if you go to the first paragraph,

Page 77

1   would you just read the first line -- let me read it,
2   quote, we're pleased to tell you that you've been
3   approved for a mortgage loan in the amount of three
4   hundred seven thousand five hundred forty-five
5   dollars, close quote.
6        Did I read that correctly?
7   A.   Yes.
8   Q.   And, again, it says approved; correct?
9   A.   Correct.
10  Q.   It does not say preapproved?
11  A.   Correct.
12  Q.   Okay.
13       Now, you indicated that the financing --
14  strike that.
15       If you look at the second paragraph, if
16  you look at the third line down it says, quote, we'll
17  make sure your loan closes right on time, guaranteed,
18  close quote.
19       Did I read that correctly?
20  A.   Correct.
21  Q.   And these were all in a letter that you
22  sent to Anthony Mendes; correct?
23  A.   Correct.
24  Q.   Now, if you look to the next page where
25  it says flexibility, do you see that?

Page 78

1   A.   Yes.
2   Q.   It says, quote, although you've been
3   approved for a specific loan amount, quote close.
4        Did I read that correctly?
5   A.   Yes.
6   Q.   And, again, it says approved; correct?
7   A.   Yes.
8   Q.   Doesn't say preapproved; correct?
9   A.   Correct.
10       MR. GOLDSTEIN:  Are you asking him what
11  the document says?
12       You're just wasting time here.
13  BY MR. TROMBETTA:
14  Q.   Now, Mr. Luongo, did you ever receive
15  any documents -- strike that.
16       Do you remember ever receiving any
17  documents from Mr. Mendes concerning his income?
18  A.   No.
19  Q.   Okay.
20       Do you remember any issues with respect
21  to his purported income being incorrect?
22  A.   I only went off what he told me.
23  Q.   Right.
24       But you have no knowledge as to whether
25  any of that information was correct or incorrect; is

Page 79

1   that right?
2   A.   That's correct.
3   Q.   Now, Mr. Luongo, if you could go to
4   Exhibit-4, which is the residential loan application?
5   A.   I have that.
6   Q.   Okay.
7        In your residential loan application is
8   it comprised of four pages?
9   A.   Total of four, yes.
10  Q.   Okay.
11       And at the bottom right-hand corner is
12  there a Bates stamp number?
13  A.   Bottom right-hand corner?
14  Q.   Yes.
15  A.   I'm sorry, a what?
16  Q.   Is there a number -- does it say
17  PHH0105?
18       MR. GOLDSTEIN:  It doesn't, Chris.
19       MR. TROMBETTA:  It doesn't?
20       MR. GOLDSTEIN:  No.  It was pulled off
21  the complaint.
22       MR. TROMBETTA:  Okay.
23  BY MR. TROMBETTA:
24  Q.   Just to make sure we have the same
25  document, would you mind going to Exhibit-A in my

Page 80

1   binder and there's a residential loan application
2   there --
3   A.   Exhibit A.
4        MR. TROMBETTA:  Mark that, please, as
5   Exhibit-6.
6        (Exhibit RL-6, Residential loan
7   application, is marked for identification.)
8   BY MR. TROMBETTA:
9   Q.   Mr. Luongo, with respect to Exhibit-6,
10  at the top is it labeled residential loan
11  application?
12  A.   Yes.
13  Q.   And if you look at the bottom right-hand
14  corner you see the Bates Number PHH0105?
15  A.   Correct.
16  Q.   If you look at the remaining three pages
17  do they run consecutively from 0105 through 0108?
18  A.   Yes.
19  Q.   And could you, please, compare Exhibit-4
20  to Exhibit-6 and let me know if they're the same
21  document?
22  A.   The first page is exactly the same, the
23  second page is the same -- it appears it's the same
24  exact document.
25  Q.   Okay.

Page 81

1         Thank you.
2         If you could, please, let's just --
3    let's keep working with Exhibit-6.
4         If we could just go -- strike that.
5         If we look at page one where it says
6    subject property, do you see that?
7    A.   Yes.
8    Q.   There's an address listed there; is that
9    right?
10   A.   Yes.
11   Q.   And the address is 1-3 Chilson Avenue,
12   Mansfield, Mass.; is that right?
13   A.   Yes.
14   Q.   Okay.
15        Did you have an understanding as to why
16   that property was listed down?
17   A.   That was the property that the Mendeses
18   were purchasing.
19   Q.   Now, if we go to the next page -- well,
20   let me strike that.
21        Okay.
22        I'm sorry, if we go to the next page,
23   please --
24   A.   Yes.
25   Q.   -- do you see the middle of the page

Page 82

1    where it says Roman Numeral V, monthly income and
2    combined housing expenses -- or expense information?
3    A.   Yes.
4    Q.   Okay.
5         To the left there's something that says
6    gross monthly income, do you see that?
7    A.   Yes.
8    Q.   And below that you see a list of items;
9    is that right?
10   A.   Yes.
11   Q.   And are those the items that would be
12   considered in determining whether or not a borrower
13   and co-borrower would qualify for a mortgage?
14   A.   The incomes listed?
15   Q.   Yes.
16   A.   It's one of the items.
17   Q.   One of the items.
18        But those are the items -- strike that.
19        Those are at least some of the items
20   that are considered; correct?
21   A.   Correct.
22   Q.   Now, I see that there -- with respect to
23   the co-borrower I see that there is overtime listed
24   there, do you see that?
25   A.   Yes.

Page 83

1    Q.   Okay.
2         And next to that under the borrower
3    there's no listing for overtime; is that right?
4    A.   Yes.
5    Q.   Did you ever -- strike that.
6         Do you remember ever discussing with Mr.
7    Mendes whether he earned any overtime?
8    A.   I do not recall.
9    Q.   Let's go down to the next line where it
10   says dividends, slash, interest, do you see that?
11   A.   Yes.
12   Q.   If you look under co-borrower there's a
13   number seven hundred forty-eight; is that right?
14   A.   Correct.
15   Q.   Now, if you look at the top half of the
16   document to the right side, second box down on the
17   right do you see where it says employer Arbor
18   Hospital?
19   A.   Yes.
20   Q.   And do you see the box it says monthly
21   income?
22   A.   Yes.
23   Q.   What's the amount in that box?
24   A.   Seven four eight.
25   Q.   Okay.

Page 84

1         So if we go back to dividends/interest
2    what's the number in that box?
3    A.   Seven four eight.
4    Q.   Does that figure -- strike that.
5         Does that figure constitute the amount
6    of income earned by the second job of Mrs. Mendes?
7    A.   Yes.
8    Q.   Now, if you go to the left of that
9    number do you see a figure one thousand five hundred
10   seventy-five dollars, do you know what that figure
11   represents?
12   A.   I'm sorry, where -- where is the one
13   thousand five hundred?
14   Q.   Do you see in the middle of the
15   document --
16   A.   Okay.
17   Q.   -- there's a section Roman Numeral V --
18   A.   Yes.
19   Q.   -- go down to where it says seven
20   forty-eight --
21   A.   Yes.
22   Q.   -- and to the left of that under
23   borrower there's a number that says one thousand five
24   hundred seventy-five, do you see that?
25   A.   Yes.

Page 85

1    Q.   Do you know what that number represents?
2    A.   Looks like it's under dividend/interest
3  line.
4    Q.   And to the right of that there's the
5  number seven hundred and forty-eight; is that right?
6    A.   Yes.
7    Q.   Is seven hundred forty-eight a dividend?
8  (Objection) MR. GOLDSTEIN: Objection.
9        THE WITNESS: It could be a dividend or
10  interest, I -- I don't recall.
11  BY MR. TROMBETTA:
12    Q.   Well, if you look up above where it says
13  monthly income, seven hundred forty-eight dollars, do
14  you see that?
15    A.   Yes.
16    Q.   Okay.
17        And it's your testimony that that figure
18  is listed on the dividend/interest line; correct?
19    A.   Yes.
20  (Objection) MR. GOLDSTEIN: Objection.
21  BY MR. TROMBETTA:
22    Q.   So is it your belief that the seven
23  forty-eight listed on the dividend/interest line
24  relates to the amount earned by Doris Mendes in her
25  second job?

Page 86

1    A.   I can't say that for sure, it could be a
2  mistake or a clerical error based on the computer,
3  that's why the customer needs to go over the
4  application and make any changes that they need to
5  before they -- the documents are sent out to the
6  customer, they have to review it, if there's anything
7  that's mistaken, they have to correct it.
8    Q.   Okay.
9        Well, let me ask you this question then,
10  with respect to that monthly income -- strike that.
11        The monthly income from the second job
12  should be listed on the -- strike that.
13        The monthly income from the second job
14  should be listed in the blocks appearing underneath
15  Roman Numeral V which says monthly income; correct?
16    A.   I'm sorry, what was the question?
17    Q.   Okay.
18        Go to the top right-hand corner --
19    A.   Yes.
20    Q.   -- look at the box that says employer,
21  Arbor Hospital, do you see that?
22    A.   Yes.
23    Q.   And in the right lower box next to that
24  it says monthly income, do you see that?
25    A.   Seven forty-eight.

Page 87

1    Q.   Right.
2        That amount should appear in one of the
3  blocks under Roman Numeral V that says monthly
4  income; correct?
5    A.   Yes.
6    Q.   Do you see that there is seven
7  forty-eight next to dividend, slash, interest;
8  correct?
9    A.   Yes.
10    Q.   Now, Mr. Luongo, could you go to the
11  next page, please?
12    A.   0107?
13    Q.   That's right.
14        I believe you indicated that you
15  consulted the borrower's credit history when
16  completing an application; is that right?
17    A.   That's correct.
18    Q.   Okay.
19        And where did you input -- strike that.
20        When you conducted that credit check did
21  you input any information from that check on the
22  application?
23    A.   During the application process --
24    Q.   Yes.
25    A.   -- the computer system does not look as

Page 88

1  it does on the actual 1003, which is the actual
2  application, whereas, it's listed on the residential
3  loan application, also known as a 1003, that is done
4  in the computer system with the actual tri-merge from
5  Equifax, TransUnion or TRW.
6    Q.   You're using a lot of acronyms I'm not
7  familiar with.
8    A.   Those are the three credit reports to be
9  run from the three major companies, again, which is
10  TRW, TransUnion and Equifax --
11    Q.   Right.
12    A.   -- so anything that's listed on the 1003
13  form here and the residential loan application is in
14  a different form as opposed to when I do it on the
15  computer.
16    Q.   Right.
17        Which is fine, I'm just asking you if
18  any information from those credit reports is inserted
19  into this residential loan application?
20    A.   Everything from the credit report that,
21  I believe, is being paid on is going to be listed on
22  the actual application.
23    Q.   I'm sorry, that is being what?
24    A.   That is actually has a balance or if
25  money is owed on that would be listed on the actual

## Page 89

1  application --
2     Q.  Okay.
3     A.  -- as listed as liabilities.
4     Q.  Okay.
5        I understand that.
6        Now, with respect to the left where it
7  says assets --
8     A.  Yes.
9     Q.  -- those numbers, are those taken from
10 the credit report?
11    A.  No, that's taken from the customer,
12 that's what the customer is telling me.
13    Q.  Okay.
14       Now, if you go to the last page --
15    A.  .0108?
16    Q.  That's right.
17       And at the bottom I believe you
18 indicated that it's a computer generated copy of your
19 signature; correct?
20    A.  Yes.
21    Q.  And that's in Roman Numeral X?
22    A.  Yes.
23    Q.  And above that under Roman Numeral IX
24 there are two blanks, do you see those?
25    A.  Yes, for borrower's signature and

## Page 90

1  co-borrower's signature?
2     Q.  Right.
3        And there's no signature in those
4  blocks; correct?
5     A.  That's correct.
6     Q.  Now, you indicated that a member of your
7  team should fax this application to Mr. and Mrs.
8  Mendes; correct?
9     A.  It does not get fax'd.  The original
10 gets sent to them in the mail -- or, actually, it's
11 overnighted to the customers.
12    Q.  Okay.
13       I'm sorry, you indicated that a member
14 of your team should send via FedEx or mail a copy of
15 this residential loan allocation to Mr. and Mrs.
16 Mendes; correct?
17    A.  This is the one of many pieces of the
18 mortgage application that gets sent.
19    Q.  Right.
20       But I'm just asking you a member of your
21 team, you understood, would do that; correct?
22    A.  Would send it out, yes, correct.
23    Q.  And you don't know if members of your
24 team sent every piece of information; correct?
25    A.  Not that I'm aware of.

## Page 91

1     Q.  You don't know if Mr. and Mrs. Mendes
2  ever received a copy of this application; correct?
3     A.  If they did not receive it I would
4  receive a phone call.
5     Q.  Well, my question is do you know if they
6  received the residential loan application, you don't;
7  correct?
8     A.  I don't recall if they received it or
9  not.
10    Q.  Now, you haven't seen an executed loan
11 application during the deposition; is that correct?
12    A.  No, I haven't.  I haven't seen one with
13 their signature.
14    Q.  Excuse me?
15    A.  I haven't seen a residential loan
16 application with the Mendeses' signature.
17    Q.  Right.
18       Just give me a minute here.
19       MR. TROMBETTA:  Go to Exhibit B,
20 there's a document there, it says government
21 underwriting worksheet, could you please mark that as
22 Exhibit-7?
23       (Exhibit RL-7, Government underwriting
24 worksheet, is marked for identification.)
25 BY MR. TROMBETTA:

## Page 92

1     Q.  Mr. Luongo, are you looking at
2  Exhibit-7?
3     A.  Yes, I am.
4     Q.  Can you identify Exhibit-7?
5     A.  States at the top government
6  underwriting worksheet.
7     Q.  Have you ever seen -- well, strike that.
8        Had you ever seen a completed government
9  underwriting worksheet during the time you worked for
10 Cendant?
11    A.  It's not my department.
12    Q.  My question, though, is did you ever see
13 one?
14    A.  No.
15    Q.  Let me just ask you a quick question
16 though -- now, I understand you haven't seen this
17 document, but do you see in the middle where it says
18 stable monthly income?
19    A.  I'm sorry, where?
20    Q.  In the middle on the left-hand side it
21 says stable monthly income, do you see that?
22    A.  Stable --
23    Q.  Let me strike the question.
24       Do you see where it says Section 2,
25 underwriting information?

Page 93

1    A.    Yes.
2    Q.    Underneath that it says sales price, do
3  you see that?
4    A.    Yes.
5    Q.    Underneath that it says lock status?
6    A.    Yes.
7    Q.    And underneath that line it says stable
8  monthly income, do you see that?
9    A.    Yes.
10    Q.    Okay.
11        Now, the first line says base income;
12  correct?
13    A.    Yes.
14    Q.    Now, the next line says second income,
15  do you see that?
16    A.    Yes.
17    Q.    And under the co-borrower it says zero;
18  correct?
19    A.    I have base income for borrower three
20  six seven one point nine one and co-borrower it says
21  three thousand eighty-seven point eighty-four.
22    Q.    Right.
23        And that's the base income?
24    A.    That's the base. Second income is zero
25  for everybody.

Page 94

1    Q.    Now, if you could, please, if you could
2  go back to -- I think it's Exhibit-6 is the loan
3  application; correct?
4    A.    Yes.
5    Q.    And if you go up to the top right-hand
6  corner of page two --
7    A.    Yes.
8    Q.    -- where it says employer, Arbor
9  Hospital; correct?
10    A.    Yes.
11    Q.    And to the right it says monthly income,
12  seven hundred forty-eight dollars; correct?
13    A.    Yes.
14    Q.    That would be the amount of income
15  received from Mrs. Mendes as to her second job;
16  correct?
17    A.    Yes.
18    Q.    And that information is not listed in
19  Exhibit-7; correct?
20        MR. GOLDSTEIN: Chris, you keep saying
21  second job, is the section of the loan application
22  previous employer if less than two years?
23        There's no foundation for this
24  question.
25        MR. TROMBETTA: No, I don't think

Page 95

1  that's true.
2        MR. GOLDSTEIN: Previous employer of
3  less than two years, Arbor Hospital, 6/1/97 to
4  5/3/01.
5        MR. TROMBETTA: Okay.
6        Well, let me ask a different question.
7  BY MR. TROMBETTA:
8    Q.    If we go back to Exhibit-6, please --
9    A.    Um-hum.
10    Q.    -- if there was a second employer where
11  would that be listed on the application?
12    A.    For page 0106?
13    Q.    If you're looking at Exhibit-6 --
14    A.    Yes.
15    Q.    -- I'm asking if there's a second job
16  where would that be listed on the application?
17    A.    It would say second job or second
18  employer.
19    Q.    Well, that's what I'm asking --
20    A.    It would be listed on the page.
21    Q.    Which page?
22    A.    I believe it would be on page 0106.
23    Q.    Where would it be listed?
24    A.    If they had a second job looks like
25  there would be a space for it, if they had a

Page 96

1  secondary income for a second employer looks like
2  there would be a space provided.
3    Q.    Okay.
4        So where it says employer, Arbor
5  Hospital --
6    A.    Um-hum.
7    Q.    -- when you completed this application
8  your understanding -- well, strike that.
9        When you placed the name Arbor Hospital
10  you did that under the heading previous employer;
11  correct?
12    A.    I didn't place any information on the
13  form.
14    Q.    Excuse me?
15    A.    I didn't place any of the information on
16  the form.
17    Q.    On the application?
18    A.    I don't do that, that's not my job.
19    Q.    Okay.
20        Well, let me ask you a question.
21        We're talking about Exhibit-6; correct?
22    A.    Yes.
23    Q.    And that's your signature on page four?
24    A.    Yes.
25    Q.    And you didn't take down any of this

Page 97

1  information and put it on the sheet?
2      A.    All the information was taken down and
3  in the computer, the computer designs the sheet and
4  sends it out.
5      Q.    Well, who put the information in the
6  computer?
7      A.    I do.
8      Q.    Okay.
9          So with respect to what's printed out
10 you inputted the information in the computer; is that
11 correct?
12     A.    That is correct.
13     Q.    So you had to put in information which
14 would have caused -- Arbor Hospital would be printed
15 out under previous employer; correct?
16     A.    If it was a previous employer, then it
17 was a previous employer. If it was a secondary job
18 that she's currently still working, then it would be
19 a secondary job. I cannot recall the conversation.
20 As things are told to me, that's how I entered it
21 into the computer.
22     Q.    And, then again, if we go to Roman
23 Numeral V, do you see the figure seven hundred
24 forty-eight dollars; correct?
25     A.    Yes.

Page 98

1      Q.    Again, you don't recall whether Mr. --
2  strike that.
3          You don't recall whether Mrs. Mendes had
4  a second job or didn't have a second job; is that
5  right?
6      A.    No, if she had a second job it would
7  appear on the application, if there was a secondary
8  income.
9      Q.    And the secondary income would be
10 listed; correct?
11     A.    Correct.
12     Q.    If we could just go to item seven --
13 strike that.
14         If we could go to Exhibit-7, please --
15     A.    Yes.
16     Q.    -- and, again, if we're looking in the
17 middle do you know where the figures are obtained --
18 strike that.
19         With respect to the figures that appear
20 in the stable monthly income on Exhibit-7 do you know
21 from where those figures are obtained?
22     A.    No. I take that it that they would be
23 obtained by the information I provided, but, then
24 again, if -- I don't know what process that this form
25 is in, so I don't know whether the customer actually

Page 99

1  sent back his information and the underwriter is
2  actually taking actual information the customer sent,
3  like paystubs, bank statements, to arrive to that
4  number or not, so I don't -- I really can't answer
5  that.
6      Q.    Okay.
7          All right. On Exhibit-7 under stable
8  monthly income there's another block that says ratio,
9  do you see that?
10     A.    Yes.
11     Q.    And the first ratio is primary housing
12 expense, slash, income --
13     A.    Correct.
14     Q.    -- is that correct?
15         What ratio needed to exist to qualify
16 for an FHA loan?
17     A.    It could be anywhere from twenty-eight
18 to thirty-five percent.
19     Q.    Okay.
20     A.    The government preferred twenty-eight
21 percent.
22     Q.    Is it twenty-nine percent?
23     A.    Or twenty-nine.
24 (Objection)  MR. GOLDSTEIN: I'm going to object.
25         There's no foundation.

Page 100

1          THE WITNESS: I mean, there are plenty
2  of variables to have for that -- for the ratio, it's
3  just a guideline.
4  BY MR. TROMBETTA:
5      Q.    Okay.
6          Now, if you look -- the next line it
7  says total obligation, slash, income, do you see
8  that?
9      A.    Yes.
10     Q.    And then there's a percentage there, do
11 you see that?
12     A.    Yes.
13     Q.    What percentage needed -- strike that.
14         What's the highest percentage that could
15 appear there to qualify for an FHA loan --
16 (Objection)  MR. GOLDSTEIN: Objection.
17 BY MR. TROMBETTA:
18     Q.    -- if you remember?
19     A.    There's really no answer to that
20 question.
21     Q.    Why is that?
22     A.    Because every loan, whether it's an FHA
23 loan, there are many different variables for that and
24 the bank or the mortgage company is going to look at
25 that as a way of saying, okay, hey, I've got a guy

Page 101

1  coming in, he's going to put fifty percent down, but
2  his ratio -- he has a fifty percent debt ratio, also
3  do you think makes sense to the bank, I'll do the
4  loan because of the fact if he forecloses I'm way
5  ahead because I got a house that he already gave me
6  fifty percent worth of the value --
7      Q.    Okay.
8            With respect to --
9      A.    -- I mean --
10     Q.    -- primary housing --
11     A.    -- looking at the ratios, I mean, it
12  depends on the customer basis, I mean, what the
13  actual risk the customer poses, and credit is part of
14  that, assets.
15     Q.    Okay.
16           And I'm not trying to --
17     A.    Oh, no, I'm just explaining to you --
18     Q.    -- I'm not trying to be difficult,
19  primary housing expense, slash, income you gave me a
20  percentage range --
21     A.    I mean, there's really -- I can sit
22  there and say they're used as a guideline in the
23  industry, but really -- there's really no answer to
24  the question as far as, you know, what range, you
25  know, can someone be approved or declined on, there

Page 102

1  really is, you know -- in a perfect world it would be
2  standard twenty-nine, forty-two.
3      Q.    A twenty-nine, forty-two, you believe
4  that was enough to go ahead and qualify for the loan?
5  (Objection)  MR. GOLDSTEIN:  Objection.
6            THE WITNESS:  I would not say that, I
7  mean, I -- a twenty-nine, forty-two is pretty much a
8  standard thing for the government.
9  BY MR. TROMBETTA:
10     Q.    Okay.
11           Now, the other thing is you did send out
12  a letter saying that the Mendeses -- strike that.
13           If you go to Exhibit-3, you did send
14  that letter to Mr. and Mrs. Mendes; correct -- strike
15  that.
16           You did send that letter to Anthony
17  Mendes; correct?
18     A.    Yes, correct.
19     Q.    And that letter does state that he's
20  approved for an FHA loan; correct?
21  (Objection)  MR. GOLDSTEIN:  Objection.
22           THE WITNESS:  Correct.
23  BY MR. TROMBETTA:
24     Q.    And before you sent that letter there
25  were financial perimeters that were reviewed in the

Page 103

1  computer; correct?
2      A.    Yes.
3      Q.    And that computer had data which
4  analyzed requirements for FHA loans; correct?
5      A.    I'm sorry?  I didn't get the last part.
6      Q.    You indicated that the computer
7  contained software which enabled it to consider
8  government requirements for FHA loans; correct?
9      A.    Correct.
10     Q.    And before you sent this letter you ran
11  the financial information through the computer;
12  correct?
13     A.    Correct.
14     Q.    And that computer uses software as --
15  strike that.
16           And the software in the computer that
17  related to government requirement was accessed in
18  connection to review the financial information
19  provided; correct?
20  (Objection)  MR. GOLDSTEIN:  Objection.
21           THE WITNESS:  One of the variables.
22  BY MR. TROMBETTA:
23     Q.    And after that review you were able to
24  obtain this letter, which has been marked as
25  Exhibit-3; correct?

Page 104

1      A.    As an approval letter.
2      Q.    Which is Exhibit-3; correct?
3      A.    Yeah.  You're calling it approval
4  letter, I'm calling it preapproval letter.
5      Q.    Okay.
6            Now, Mr. Luongo, do you have any reason
7  to believe that Exhibit-3 is not a true and accurate
8  copy of the letter that was fax'd to Mr. Mendes?
9      A.    It appears as a true letter to me.
10     Q.    I'm sorry, I couldn't hear your answer.
11     A.    It appears as a letter that would be
12  sent, it looks like the original, I, you know --
13     Q.    You believe it's a true and accurate
14  copy?
15  (Objection)  MR. GOLDSTEIN:  Objection.
16  BY MR. TROMBETTA:
17     Q.    I'm just asking you, Mr. Luongo, do you
18  believe that Exhibit-3 is a true and accurate copy of
19  the letter that you sent to Mr. Mendes?
20  (Objection)  MR. GOLDSTEIN:  Objection.
21           THE WITNESS:  I -- I guess, I mean,
22  we're talking something here from 2001.
23  BY MR. TROMBETTA:
24     Q.    Do you have any reason to believe it's
25  not a true and accurate copy?

Page 105

1  (Objection)  MR. GOLDSTEIN: Objection.
2          THE WITNESS:  No.
3  BY MR. TROMBETTA:
4      Q.    Now --
5          MR. GOLDSTEIN:  Are you asking about
6  the two pages that we have or --
7          MR. TROMBETTA:  Well, that's all there
8  is to Exhibit-3; correct?
9          MR. GOLDSTEIN:  Well, you know, your
10  question's vague as to whether you're asking about
11  the two pages we have or whether you're asking if
12  it's complete.
13          MR. TROMBETTA:  I asked about
14  Exhibit-3, so --
15          MR. GOLDSTEIN:  Well --
16  BY MR. TROMBETTA:
17      Q.    Now --
18  (Objection)  MR. GOLDSTEIN:  That's my objection,
19  just so you know.
20          MR. TROMBETTA:  That's fine.
21          I believe the residential loan
22  application we marked a second copy as Exhibit-6;
23  correct.
24          MR. GOLDSTEIN:  Yes.
25          MR. TROMBETTA:  Okay.

Page 106

1  BY MR. TROMBETTA:
2      Q.    Now, other than the designations in the
3  bottom right-hand corner, PHH0105 through 0108, do
4  you have any reason to believe that the application
5  is anything other than a true and accurate copy of
6  the application that was prepared in June of 2001?
7      A.    No.
8          MR. TROMBETTA:  Go to Exhibit C in my
9  binder, please, and there's a document that says
10  final commitment, if you could, please, mark that as
11  Exhibit-8.
12          (Exhibit RL-8, Final commitment, is marked
13  for identification.)
14  BY MR. TROMBETTA:
15      Q.    Mr. Luongo, have you ever seen a copy of
16  Exhibit-8 before?
17      A.    Not for the Mendeses.
18      Q.    Okay.
19          Have you seen -- well, strike that.
20          Have you seen copies of Exhibit-8 while
21  you worked at Cendant?
22      A.    No.
23      Q.    Have you ever seen copies of Exhibit-8
24  that applied to other individuals while you worked at
25  Cendant?

Page 107

1      A.    No.
2      Q.    Do you have -- strike that.
3          So you never sent a copy of Exhibit-8 to
4  borrowers during the time you worked at Cendant;
5  correct?
6      A.    Correct.  This is a completely different
7  department.  The only way to get to that thing is
8  when we have an actual subject property and I start a
9  mortgage process.  I can never send a file commitment
10  letter to a customer.  No originator or senior loan
11  consultant has the power or authority to do that.
12      Q.    Okay.
13          I understand what you're saying, but my
14  question is you never sent a copy of Exhibit-8 to any
15  borrower during the time you worked at Cendant;
16  correct?
17      A.    That's correct.
18      Q.    I'm sorry, I'm just going through my
19  notes, so --
20          Now, Mr. Luongo, I see from the
21  application -- well, strike that.
22          I see from Exhibit-3 that you issued a
23  letter indicating on it terms which say FHA approval;
24  correct?
25      A.    Correct.

Page 108

1      Q.    Did you ever conduct an analysis to see
2  if Mr. and Mrs. Mendes qualified for a conventional
3  mortgage?
4      A.    That would be in the computer file if I
5  did that, every program that I run for them would be
6  on there.
7      Q.    So you don't know if you did or you
8  didn't?
9      A.    I can't recall.  I know the type of
10  property he wanted would require a lot more money
11  down and that's why I would go with an FHA with what
12  he looked to do.
13      Q.    Okay.
14          And with respect to a conventional
15  mortgage I think you indicated that the minimum down
16  payment would be five percent; is that correct?
17      A.    That's correct.
18      Q.    And as to a five percent down payment do
19  you recall what the -- well, strike that.
20          If a five percent down payment was put
21  down as to a conventional mortgage do you know what
22  the minimum percentage would be with respect to
23  primary housing expense to income?
24      A.    With five percent down?
25      Q.    Yes.

Page 109

1        If you remember.
2        A.    I don't recall. Like the debt to income
3    ratios.
4        Q.    I suppose -- to tell you the truth, if
5    you go to Exhibit-7 --
6        A.    The ratio, primary housing expense,
7    total obligation --
8        Q.    Right.
9              And I understand that, you know, you
10    haven't seen Exhibit-7 and this applies to a
11    different type of loan, but I'm just saying with a
12    conventional mortgage the percentage as to primary
13    housing expense, slash, income what would be an
14    acceptable percentage if five percent was put down as
15    to a conventional mortgage?
16    (Objection) MR. GOLDSTEIN: Objection.
17            THE WITNESS: Again, I really can't
18    answer that because there's no -- no question on
19    that.
20    BY MR. TROMBETTA:
21        Q.    I'm sorry, there's no question on that?
22        A.    And there's really no answer, I mean,
23    you can have a standard for the debt to income
24    ratios, conventional like thirty-three, thirty-eight
25    or twenty-eight, thirty-six, you know, based on the

Page 110

1    percent that's down.
2        Q.    Okay.
3              And what about total obligation, slash,
4    income what would have been acceptable percentages
5    for five percent down conventional mortgage purchase?
6        A.    I'm sorry, could you repeat the
7    question?
8        Q.    Sure.
9              If you look at Exhibit-7 the second
10    ratio says total obligation, slash, income, do you
11    see that?
12        A.    Um-hum.
13        Q.    In connection with a conventional
14    mortgage where five percent was placed down as a down
15    payment what would have been an acceptable percentage
16    with respect to total obligation, slash, income?
17    (Objection) MR. GOLDSTEIN: Objection.
18            THE WITNESS: If you're looking at the
19    industry standard of the guideline it would be like
20    thirty-eight percent from what I remember back then,
21    and, again, that's just a guide, again, there are
22    many variables to go above a ratio or of an
23    acceptable ratio.
24    BY MR. TROMBETTA:
25        Q.    So you don't remember what the

Page 111

1    percentage might have been?
2        A.    Correct.
3              MR. GOLDSTEIN: Do you have much more,
4    Chris?
5              MR. TROMBETTA: A little bit more.
6              MR. GOLDSTEIN: Just so you know,
7    Claire Taylor is here, and I'll need a break.
8              MR. TROMBETTA: We can take a short
9    break and then start doing her, as well.
10    BY MR. TROMBETTA:
11        Q.    And, Mr. Luongo, you don't recall ever
12    sending anything to Mr. and Mrs. Mendes indicating
13    that they didn't qualify for a loan; is that right?
14        A.    I don't recall. From -- based on doing
15    applications as originator if something was declined
16    we pretty much just tell them, hey, that sale price
17    is too high, we need to bring it down. I would never
18    send anything saying you were not approved because
19    it's just a preapproval, I'm just in the preapproval
20    stage, so I really don't have the authority to send
21    something, no, I just can go to what they are
22    approved on based on what they tell me.
23              You can -- actually, looking at
24    Exhibit-7 --
25        Q.    Well, I'm just going to move to strike

Page 112

1    the last part of the response because I don't think
2    it --
3        A.    I'm just looking at the incomes and --
4        Q.    Respectfully, I'll just ask you some
5    questions.
6        A.    No problem.
7              I was going into one of the variables
8    looking for a preapproval --
9        Q.    Right.
10        A.    -- to answer -- to help you out with
11    your scenario.
12              You had mentioned -- at Section 2 on
13    Exhibit-7 you had mentioned the different types of
14    incomes, one of the variables here I see would be the
15    positive cash flow from the subject property, that to
16    me is one of the variables for an approval, as well.
17        Q.    Okay.
18              With respect to Exhibit-7 where it says
19    nine hundred fifty-five dollars and fifty cents, do
20    you know what that refers to?
21        A.    I would take it --
22    (Objection) MR. GOLDSTEIN: Objection.
23            THE WITNESS: -- I would take it since
24    the customer's purchasing a three-unit property that
25    he's expecting rental income from the two other

## Page 113

1  units, which he had -- looks like he has to submit
2  information for that that it is going to produce that
3  amount of money.
4  BY MR. TROMBETTA:
5      Q.    And what is the figure nine
6  fifty-five -- well, strike that.
7          The nine -- strike that.
8          You don't know what the nine fifty-five
9  fifty refers to; is that correct?
10     A.    Right now it looks -- like based on this
11  government underwriting worksheet it shows positive
12  cash flow subject property, to me I believe it would
13  be income the customer is using to qualify for the
14  property, that he's getting income from the actual
15  other two units in the property.
16     Q.    All right.
17         Let me ask you a different question --
18         MR. GOLDSTEIN: Hey, Chris?
19         MR. TROMBETTA: Yeah.
20         MR. GOLDSTEIN: May I make a
21  suggestion?
22         MR. TROMBETTA: What is it?
23         MR. GOLDSTEIN: You're asking a loan
24  originator underwriting questions for which there's
25  no foundation of which he has no basis to answer.

## Page 114

1          MR. TROMBETTA: Right.
2          MR. GOLDSTEIN: You know who the
3  underwriter was.
4          MR. TROMBETTA: I'm going to ask him a
5  different question.
6          MR. GOLDSTEIN: Okay.
7  BY MR. TROMBETTA:
8      Q.    Mr. Luongo, if a customer called you
9  asking for a loan as to a multifamily unit would you
10  include as part of the qualifying income a percentage
11  of rent which the borrower would receive?
12  (Objection) MR. GOLDSTEIN: Objection.
13         THE WITNESS: That depends on a
14  case-by-case scenario. I would let the customer know
15  that I could only use that information if he had a
16  signed one-year contract from a tenant for that unit
17  for an exact amount, if he is not sure what the unit
18  can actually go for on a month-to-month basis we ask
19  the real estate agent, sometimes we ask to lowball
20  the amount if the agent's not sure because if it's
21  going to be a determining factor, if they get
22  approved for a property or use it as a preapproval
23  for a property then we like to lowball because
24  whatever the figure is I will take seventy-five
25  percent of that to use in the qualification process,

## Page 115

1  the customer is also told that they need -- we're
2  using this for a preapproval and, then again, if they
3  do decide to purchase a property they have to have an
4  exact amount and, again, a signed letter or an
5  agreement for a lease for one full year.
6  BY MR. TROMBETTA:
7      Q.    Okay.
8          Now, you indicated you use seventy-five
9  percent of the rental amount; is that right?
10     A.    That's correct, if someone was
11  purchasing -- or going to lease an apartment or a
12  unit for, say, one thousand dollars, I would use
13  seven hundred and fifty dollars.
14     Q.    Why would you use only seventy-five
15  percent?
16  (Objection) MR. GOLDSTEIN: Objection.
17         THE WITNESS: We use the other
18  twenty-five percent for maintenance on the property.
19  BY MR. TROMBETTA:
20     Q.    And from where did you get -- strike
21  that.
22         Was there a basis for using the
23  seventy-five percent figure?
24  (Objection) MR. GOLDSTEIN: Objection.
25         THE WITNESS: That's what I was taught.

## Page 116

1  BY MR. TROMBETTA:
2      Q.    By whom?
3      A.    It's pretty much a standard in the
4  industry, that's what the guidelines are for that
5  program.
6      Q.    What guideline?
7      A.    The guidelines for the FHA program.
8      Q.    Now, are those guidelines published --
9  strike that.
10         How are those guidelines brought to your
11  attention?
12     A.    It's written down in a program, they
13  list me down -- if I have a program, Program 880,
14  which is an FHA thirty year mortgage, I think that's
15  the program, if I remember, it's been five years for
16  me, six years, but you go into that program and it
17  will tell me every single detail about that program,
18  what can I use for rental, what can I use for this,
19  that, you know, etcetera --
20     Q.    Okay.
21         Now --
22     A.    -- so they are written down somewhere.
23     Q.    If there were three units could the
24  borrower occupy a unit other than the bigger unit in
25  connection with trying to qualify -- strike that.

Page 117

1      Could the borrower occupy the smaller of
2  a multi-unit facility in connection with presenting
3  qualifying income that he could use to qualify for a
4  loan?
5  (Objection) MR. GOLDSTEIN: Objection.
6          THE WITNESS: I don't know, as far as I
7  know he's buying a house, he's living in one of the
8  units, I don't get in any kind of discussion as far
9  as the size of the house, the size of this unit, that
10 unit, the other unit, he's purchasing a house, I
11 guess he could live in any unit he wants to.
12 BY MR. TROMBETTA:
13     Q.    And the other two units he could use --
14 strike that.
15         As to the other two units he could use
16 that rent as to whether -- strike that.
17         And as to the other two units he could
18 use that income as to whether he qualifies for a
19 loan; correct?
20 (Objection) MR. GOLDSTEIN: Objection.
21         THE WITNESS: I -- I don't know,
22 depends which unit he's renting out --
23 BY MR. TROMBETTA:
24     Q.    Well, that's what I'm asking --
25     A.    -- you know, I mean --

Page 118

1      Q.    -- let's just say, for example, there's
2  a three unit facility and the borrower is going to
3  occupy an apartment that's smaller than at least one
4  of the others, the rent attributable to the other two
5  units would be used by you after your multiplication
6  times point seven five as income which could be
7  considered as to whether he qualifies for a loan;
8  correct?
9  (Objection) MR. GOLDSTEIN: Objection.
10         THE WITNESS: So you're basically
11 asking me could he live in a smaller unit and rent
12 out the other units that are larger?
13 BY MR. TROMBETTA:
14     Q.    Yes.
15     A.    I guess so.
16         MR. TROMBETTA: That's all I have.
17         Thank you, Mr. Luongo.
18         Do you have anything further?
19         MR. GOLDSTEIN: Actually, I do have
20 just a couple minutes.
21 (EXAMINATION OF MR. LUONGO BY MR. GOLDSTEIN:)
22     Q.    Mr. Luongo, you mentioned that you kept
23 a call log while you were working at Cendant
24 Mortgage; is that correct?
25     A.    Yes, it was based on the computer.

Page 119

1      Q.    And what was involved -- was that a
2  policy of Cendant Mortgage?
3      A.    Yes.
4      Q.    And what was the policy?
5      A.    Every time you enter into a file --
6  (Objection) MR. TROMBETTA: I'll object.
7          But go ahead.
8          THE WITNESS: -- every time you went
9  into a customer's file, I would pull it up by their
10 phone number or last name, comes across, I can open
11 it up, any time I get out of the file -- the only way
12 to get out of the actual file and close it would be
13 to write in comments in the bottom screen stating
14 comments, that stays with it, so we pretty much
15 discuss, hey, if I spoke with the real estate agent
16 or what type of conversation I had with the customer
17 or the customer's close to a deal on a home or
18 anything pertaining that's important to the actual
19 deal.
20 BY MR. GOLDSTEIN:
21     Q.    And is that a document that you --
22 strike that.
23         Was that a procedure you were required
24 to follow while at Cendant?
25     A.    It was the only way to get out of a

Page 120

1  file, the only way to close a file, so it's
2  procedure, standard procedure.
3      Q.    Okay.
4          Let me show you document with Bates
5  stamp PHH0211 to 0224, I'm going to ask you is
6  that -- is that a call log for this case that was
7  kept at Cendant Mortgage?
8      A.    It appears to be, yes.
9      Q.    Okay.
10         Is that a document that would be created
11 in the ordinary course of business?
12 (Objection) MR. TROMBETTA: I'll object to that.
13         He's not a keeper of the record.
14         THE WITNESS: For me --
15 BY MR. GOLDSTEIN:
16     Q.    Is that a procedure that you followed
17 while --
18     A.    -- any time I went into --
19 (Objection) MR. TROMBETTA: Well, objection.
20         Getting a little confusing now.
21         THE WITNESS: -- any time I would open
22 up the Mendes' file in the computer I would be able
23 to go back -- anyone because we had a buddy system,
24 another originator could actually open the file up
25 and they could see everything that went on before,

Page 121

1   and that's the reason why we did the notes, you can
2   actually put a customer on hold, hold on, he can go
3   through all of the notes and see, okay, what's been
4   going on with this customer, the originator, and it
5   helps that originator become more familiar with
6   helping me out if I was unavailable, so basically --
7   I mean, all the comments are there, they're going to
8   be there regardless --
9   BY MR. GOLDSTEIN:
10      Q.   Okay.
11      A.   -- if I opened up a file from four years
12  ago, it's going to be there.
13      Q.   Okay.
14          MR. GOLDSTEIN: Can we just have that
15  marked as Exhibit-9?
16          (Exhibit RL-9, Call log, is marked for
17  identification.)
18  BY MR. GOLDSTEIN:
19      Q.   You indicated that the Mendeses would
20  have put down five percent on a conventional loan,
21  is that five percent based on your personal knowledge
22  or do you actually -- just estimating?
23      A.   That's program requirements for a
24  conventional mortgage, five percent.
25      Q.   Is that what it was, as far as you

Page 122

1   recall, back in June 2001?
2   (Objection) MR. TROMBETTA: I'll object.
3          THE WITNESS: For a Program 100, which
4   he looked at, which is a thirty-year standard fixed
5   mortgage, Program 100 would be five percent down.
6   BY MR. GOLDSTEIN:
7       Q.   Program 100?
8       A.   Yes.
9       Q.   Would that be with any points or --
10      A.   You could --
11  (Objection) MR. TROMBETTA: I'll object.
12          I mean, do he even remember the Mendeses?
13          MR. GOLDSTEIN: I didn't ask if he
14  remembered the Mendeses.
15          MR. TROMBETTA: Well, the question
16  assumes that he does.
17          MR. GOLDSTEIN: I don't think so.
18          Your objection is noted.
19          THE WITNESS: We're looking for five
20  percent down, a conventional mortgage, that would be
21  Program 100, to my knowledge, which is standard as a
22  minimum of five percent.
23  BY MR. GOLDSTEIN:
24      Q.   I'm asking because earlier you said it
25  was five or ten percent, do --

Page 123

1       A.   You can put ten percent down.
2       Q.   Okay.
3       A.   Of course, twenty percent eliminates
4   private mortgage insurance. With five percent down
5   you're going to have PMI, private mortgage insurance.
6          MR. GOLDSTEIN: All right.
7          No more questions.
8          MR. TROMBETTA: You know, I did have
9   one more question.
10          If you could just, please, go to
11  Exhibit I, please, that's a residential loan
12  application there.
13          MR. GOLDSTEIN: Isn't that 6?
14          We already marked that, Chris, as 6?
15          MR. TROMBETTA: Yeah, but this is
16  different.
17          MR. GOLDSTEIN: Okay.
18          (Exhibit RL-10, Residential loan
19  application, is marked for identification.)
20  BY MR. TROMBETTA:
21      Q.   Mr. Luongo, are you looking at
22  Exhibit-9?
23          MR. GOLDSTEIN: Isn't it 10?
24          MR. TROMBETTA: I'm sorry.
25  BY MR. TROMBETTA:

Page 124

1       Q.   Mr. Luongo, are you looking at
2   Exhibit-10?
3       A.   Yes. We skipped 9. Yes, we're on 10.
4   That's right, 9 is the call log.
5          I'm looking at Exhibit-10.
6       Q.   Okay.
7          And I think the first four pages are
8   identical to Exhibit-6; is that right?
9          MR. GOLDSTEIN: I'll stipulate that
10  they have the same Bates Numbers, so that they're
11  identical.
12  BY MR. TROMBETTA:
13      Q.   I'd like you to look at the last four
14  pages, PHH0109 to PHH0112 --
15      A.   Yes.
16      Q.   -- and would you, please, look at
17  PHH0112, it's the last page of the exhibits --
18      A.   Yes.
19      Q.   -- do you see at the bottom of the page
20  there's a printing of your name?
21      A.   Yes.
22      Q.   Below that is that a computerized copy
23  of your signature?
24      A.   Yes.
25      Q.   If you would, please, would you go to

Page 125

1    PHH0110 --
2        A.    Okay.
3        Q.    -- and do you see the last two -- well,
4    strike that.
5            In the middle of the page, the last two
6    marked line with a label B and C, do you see that?
7        A.    Yes.
8        Q.    And C says secondary job, do you see
9    that?
10       A.    Yes.
11       Q.    And then there's an amount next it to?
12       A.    Yes.
13       Q.    And what's that amount?
14       A.    Seven four eight.
15       Q.    And if you go to page two of the
16   exhibit, which is 0106, item five you see the figure
17   seven forty-eight; correct?
18       A.    Yes.
19       Q.    So that would be the income from the
20   secondary job; correct?
21       A.    Yes -- I don't know, actually, it just
22   says seven forty-eight, it doesn't state whether it's
23   a secondary job or not.
24       Q.    What's that?
25       A.    It doesn't state if it's a secondary job

Page 126

1    or not.
2        Q.    No, but you look at 0110 it indicates
3    that it is income from the secondary job; is that
4    right?
5        A.    It says secondary job number one, seven
6    four eight.
7        Q.    Okay.
8            If you look -- on page 0110 if you look
9    at Roman Numeral V --
10       A.    Um-hum.
11       Q.    -- there is the indication seven
12   forty-eight in the box in the co-borrower, do you see
13   that?
14       A.    Yes.
15       Q.    So it's your understanding that that
16   seven forty-eight relates to the second job of Doris
17   Mendes?
18       A.    Yes.
19       Q.    Now, if you look at B it says
20   seventy-five percent subject property, do you see
21   that?
22       A.    Yes.
23       Q.    Then it says monthly amount, do you see
24   that?
25       A.    Yes.

Page 127

1        Q.    It's one thousand five hundred
2    seventy-five dollars?
3        A.    Yes.
4        Q.    And, Mr. Luongo, if you would, please,
5    go back to PHH0106, which is the second page of the
6    exhibit --
7        A.    Yes.
8        Q.    -- and if you look under borrower, Roman
9    Numeral V, next to dividend, slash, interest, do you
10   see that figure?
11       A.    Yes.
12       Q.    And that figure is one thousand five
13   hundred seventy-five dollars; is that correct?
14       A.    Yes.
15       Q.    Now, Mr. Luongo, with respect to pages
16   PHH01 -- strike that.
17            With respect to pages PHH0109 through
18   0112 those are pages that you prepared using your
19   computer; correct?
20       A.    Well, I input the information, they're
21   not done at my computer, they're done at someone
22   else's computer.
23       Q.    I'm sorry, what's that?
24       A.    I input the information in, that's done
25   at a different computer.

Page 128

1        Q.    But you put in the information that
2    appears in this form; correct?
3        A.    The information that I put in the
4    computer, and, again, I will state this again, is not
5    in the same format, so when I'm looking at my
6    computer screen -- so, for example, if I'm looking at
7    0106 --
8        Q.    Right.
9        A.    -- that exact page, I don't actually see
10   that on my computer screen --
11       Q.    And I'm not suggesting that you do --
12       A.    -- it is -- it is entirely correct.
13       Q.    -- and I'm not trying to say that it is
14   what appears on your computer screen --
15       A.    Exactly, it's a completely different
16   format, you know, if it's a secondary house or
17   income, they are different screens for that.
18       Q.    Right.
19            What I'm saying, though, is with respect
20   to pages PHH0109 through 0112 those pages -- well,
21   strike that.
22            With respect to pages 0109 through 0112
23   the data in those pages is a result of information
24   you inputted into your computer; correct?
25       A.    Correct.

Page 129

1    Q.    And did you do something to cause those
2    pages to be printed?
3    A.    No.
4    Q.    Did somebody else do something to cause
5    those pages to be printed?
6    A.    Yes.
7    Q.    Who?
8    A.    I couldn't tell you.  There's another
9    team that promotes the mortgage package once we've
10   found the subject property and start the mortgage
11   process.  I could say I start the pages getting done
12   because I collected money from a customer when they
13   have the actual subject property and a signed sales
14   contract, once I collect that it starts the process
15   for another department to get that loan package
16   ready, which looks like Exhibit-10, Exhibit-6,
17   Exhibit-7 -- or part --
18   Q.    Well, I understand that.
19         Have you ever seen the pages PHH0109
20   through 0112 before?
21   A.    No.
22   Q.    Have you ever seen the pages -- well,
23   strike that.
24         You have seen the pages PHH0105 through
25   PHH0108; is that right?

Page 130

1    A.    Today I have.
2    Q.    Did you see them prior to that?
3    A.    No.
4    Q.    So would a member of your team be the
5    first person to see pages 0105 through 0108?
6    A.    I believe the underwriter would be the
7    first person to see that.
8    Q.    Well, didn't you indicate that somebody
9    should have mailed this application?
10        MR. GOLDSTEIN:  Chris, we'll stipulate
11   that someone printed this application and mailed it
12   to the Mendeses.
13        MR. TROMBETTA:  Well, we're not
14   stipulating to that.
15        MR. GOLDSTEIN:  Well, someone obviously
16   printed it.
17        MR. TROMBETTA:  But no one mailed them.
18        MR. GOLDSTEIN:  Well, we're wasting
19   time now.
20        Someone obviously printed them.
21   BY MR. TROMBETTA:
22   Q.    My only question, though, Mr. Luongo, is
23   it was a member of your team, you believe, that first
24   saw pages 0105 through 0108?
25   A.    I believe the underwriter gets the

Page 131

1    information and sends it out to the customer.
2    Q.    But you don't know, that's just what you
3    believe?
4    A.    Well, as I know it's what happens, I
5    mean, it's -- you know, there's a whole department
6    that's designed to get the loan package ready and
7    out, the most important thing is when that customer
8    buys a property we want to close quickly, so we
9    get -- that loan package is overnighted, so it's
10   printed and sent out to the actual customer.
11   Q.    Mr. Luongo, you don't know if this
12   package was sent or not; correct?
13   A.    I can't recall.
14   Q.    You don't know?
15   A.    No.  I could tell from computer if it
16   was sent out, I can't recall back then.
17        MR. TROMBETTA:  That's all I have.
18        MR. GOLDSTEIN:  Nothing further.
19        Thank you.
20        MR. TROMBETTA:  Thank you.
21        (Witness Excused.)
22        (Testimony Concluded.)
23
24
25

Page 132

1        C E R T I F I C A T E.
2    I, Christi A. Argenbright, a Notary Public and
3    Certified Shorthand Reporter of The State of New
4    Jersey and a Commissioner of Deeds of The State of
5    Pennsylvania, do hereby certify that prior to the
6    commencement of the examination,
7        RICHARD J. LUONGO, JR.
8    was duly sworn by me to testify to the truth,
9    the whole truth and nothing but the truth.
10       I do further certify that the foregoing is
11   a true and accurate transcript of the testimony
12   as taken stenographically by and before me at the
13   time, place and on the date hereinbefore set forth.
14       I do further certify that I am neither a
15   relative nor employee nor attorney nor counsel of any
16   of the parties to this action, and that I am neither
17   a relative nor employee of such attorney or counsel
18   and that I am not financially interested in this
19   action.
20
21   _____
     Christi A. Argenbright, C.S.R.
22   Notary Public, State of New Jersey
     My commission expires October 16, 2010
23   Certificate No. XI01789
     Date: July 18, 2006
24
25

Page 133

1
      Exhibit RL-1, Letter dated March 21, 2001    13
2     Exhibit RL-2, Letter dated May 3, 2001    26
      Exhibit RL-3, Letter dated June 12, 2001    36
3     Exhibit RL-4, Residential loan application    43
      Exhibit RL-5, Mortgage Services facsimile    69
4     transmission with attachment
      Exhibit RL-6, Residential loan application    80
5     Exhibit RL-7, Government underwriting    91
      worksheet
6     Exhibit RL-8, Final commitment    106
      Exhibit RL-9, Call log    121
7     Exhibit RL-10, Residential loan application    123
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Exhibit F**



# Jack Conway & Company, Inc. Realtors®

*Servicing the real estate needs of Massachusetts*

## FAX COVER PAGE

DATE: 6-18-01

TO: CHRIS

COMPANY NAME: CENDANT

FAX#: 856-917-2963

FROM: PAULA DUZAN

TOTAL NUMBER OF PAGES: 4
(INCLUDING COVER PAGE)

IF YOU DO NOT RECEIVE ALL PAGES CALL (781)-326-1166.

COMMENTS: RE: SIGNED OFFER OF
ANTHONY & DORIS MENDES ON 1-3 CHILSON
AVE. MANSFIELD, MA.



'CONWAY COUNTRY'™

311 Washington Street • Westwood, Massachusetts 02090
Tel: 781-326-1166 • Fax: 781-326-9138
www.jackconway.com





EXHIBIT
A. Mendes 2
6-1-06   DW

PHH 0130

FOR RESIDENTIAL PROPERTY CONSTRUCTED PRIOR TO 1978,
BUYER(S) MUST ALSO SIGN LEAD PAINT
"PROPERTY TRANSFER NOTIFICATION CERTIFICATION"

**OFFER TO PURCHASE REAL ESTATE**

From the Office of:
PAULA DUZAN
JACK CONWAY & CO
311 WASHINGTON
WESTWOOD MA 02
781-326-1166

TO    OWNER OF RECORD
      1-3 CHILSON AVE
      MANSFIELD, MA 02048        Date  6-12-01

The property herein referred to is identified as follows: LAND AND BUILDING KNOWN AND NUMBERED AS
1-3 CHILSON AVE., MANSFIELD MA, CONSISTING OF WOOD FRAME BUILDING SITUATED
Special provisions (if any) re fixtures, appliances, etc.: ON 9416 SF MORE OR LESS AND RECORDED
AT THE BRISTOL COUNTY REGISTRY OF DEEDS

I hereby offer to buy said property, which has been offered to me by GERRY ABBOTT REALTORS AND JACK
CONWAY INC ST W 02801       $305,000 H.S.       as the Seller's Broker(s) under the following terms and conditions:
1. I will pay therefore $ 300,000.00 of which                                        CHECK ONE:  ☑ Check, subject to collection  ☐ Cash
   (a) $ 1,000.00 .... is paid herewith as a deposit to bind this Offer
   (b) $ .......... is to be paid as an additional deposit upon the execution of the Purchase and Sale Agreement provided for below.
   (c) $ .......... is to be paid at the time of delivery of the Deed in cash, or by certified, cashier's, treasurer's or bank check(s).
H.S. (d) $ 296,000.00
   (e) $ 300,000.00  $ 305,000 H.S.  Total Purchase Price
2. This Offer is good until 11:00 A.M. P.M. on 6-13-01 20___ at or before which time a copy hereof shall be
   signed by you, the Seller and your (husband) (wife), signifying acceptance of this Offer, and returned to me forthwith, otherwise this Offer
   shall be considered as rejected and the money deposited herewith shall be returned to me forthwith.
3. The parties hereto shall, on or before 5:00 A.M. P.M. 6-29-01 20___ execute the applicable Standard
   Form Purchase and Sale Agreement recommended by the Greater Boston Real Estate Board or any form substantially similar thereto,
   which, when executed, shall be the agreement between the parties hereto.
4. A good and sufficient Deed, conveying a good and clear record and marketable title shall be delivered at 12:00 Noon on
   8-31-01 20___ at the appropriate Registry of Deeds, unless some other time and place are mutually agreed upon in
   writing.
5. If I do not fulfill my obligations under this Offer, the above mentioned deposit shall forthwith become your property without recourse to
   either party. Said deposit shall be held by GERRY ABBOTT REALTORS as escrow agent subject to the terms hereof,
   provided however that in the event of any disagreement between the parties, the escrow agent may retain said deposit pending instructions
   mutually given by the parties. A similar provision shall be included in the Purchase and Sale Agreement with respect to any deposits held
   under its terms.
6. Time is of the essence hereof.
7. The initialed riders, if any, attached hereto are incorporated herein by reference. Additional terms and conditions, if any:
   CONTINGENT UPON SEEING 1 BEDROOM UNIT, HOME INSPECTION, ALL UNITS
   BEING VACATED UPON DELIVERY, ADDENDUM A, PROPERTY TRANSFER
   NOTIFICATION, AGENCY DISCLOSURE, PRE-QUAL LETTER

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

WITNESS my hand and seal.              SIGNED X _____
                                       Buyer  Anthony Mendes
                                       X _____
                                       Buyer  Doris H. Mendes

171 BRIDGE ST, DEDHAM MA 02026     781-320-8527 (home)
                                   508-653-8330 (work)
Address                            Phone Numbers
This Offer is hereby accepted upon the foregoing terms and conditions at 5:00 A.M. P.M. on 6/14 2001
WITNESS my (our) hand(s) and seal(s).

_Helen Jackson Grey Cotton_
Seller (or spouse)                     Seller

**RECEIPT FOR DEPOSIT**

6-12-2001

Received from ANTHONY + DORIS MENDES Buyer the sum of $ 1000.00 as deposit under the terms

and conditions of above Offer, to be held by GERRY ABBOTT REALTORS as escrow agent.

Under regulations adopted pursuant to the Massachusetts license law,
"all offers obtained by brokers or salesmen on any properties listed
with them shall be forthwith conveyed to the owner of said real estate".

_Paula Duzan_
Agent for Seller

COPYRIGHT © 1969, 1975, 1988, 1986, 1987, 1989, 1988, 1994 GREATER BOSTON REAL ESTATE BOARD

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.

PHH 0131

# PROPERTY TRANSFER NOTIFICATION CERTIFICATION

This form is to be signed by the prospective purchaser before signing a purchase and sale agreement or a memorandum of agreement, or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property built before 1978, for compliance with federal and Massachusetts lead-based paint disclosure requirements.

**Required Federal Lead Warning Statement:**
Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
   (i)_____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).
   _____
   (ii) **X** Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check (i) or (ii) below):
   (i)_____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (circle documents below).
   Lead Inspection Report; Risk Assessment Report; Letter of Interim Control; Letter of Compliance
   (ii) **X** Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's or Lessee Purchaser's Acknowledgment** (initial)
(c) _____ Purchaser or lessee purchaser has received copies of all documents circled above.
(d) _____ Purchaser or lessee purchaser has received no documents.
(e) _JR._ Purchaser or lessee purchaser has received the Property Transfer Lead Paint Notification.     DM
(f) Purchaser or lessee purchaser has (check (i) or (ii) below):
   (i) _JLL_ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or     DM.
   (II)_____ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
(g) _CJH_ Agent has informed the seller of the seller's obligations under federal and state law for lead-based paint disclosure and notification, and is aware of his/her responsibility to ensure compliance.
(h) _DHID_ Agent has verbally informed purchaser or lessee-purchaser of the possible presence of dangerous levels of lead in paint, plaster, putty or other structural materials and his or her obligation to bring a property into compliance with the Massachusetts Lead Law — either through full deleading or interim control — if it was built before 1978 and a child under six years old resides or will reside in the property.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| _Helen Jackson / gus S Collett_   6/15/01 | | | |
| Seller | Date | Seller | Date |
| X | 6-12-01 | X | 6-12-01 |
| Purchaser | Date | Purchaser | Date |
| _Erica Jizch_ | | _G S Collett_ | 6/15.01 |
| Agent | Date | Agent | Date |

Address of Property / Unit   1-3   CHILSON   AVENUE   MANSFIELD   MA   02048

MASSACHUSETTS ASSOCIATION of REALTORS®   CLPTF Form 94-3, 6/20/94, Rev 11/99   MASSFORMS™

11

**ADDENDUM "A" TO OFFER/PURCHASE and SALE AGREEMENT**

SELLER _OWNER OF RECORD_                    DATE _6-12-01_

BUYER _ANTHONY & DORIS MENDES_

PROPERTY _1-3 CHILSON AVENUE MANSFIELD, MA 02048_

This ADDENDUM TO OFFER/PURCHASE and SALE AGREEMENT is made a part of and incorporated into same.

1) The BUYER may, at the BUYER'S own expense, and within ten (10) days from the date of the acceptance of this Offer, have the property professionally inspected for any or all of the following:

    1)    Home Inspection (Structural, electrical, mechanical, general condition)
    2)    Termite, Wood-boring insect, Pest Inspection,
    3)    On-Site Sewer Disposal Inspection, (Title 5 Certification)
    4)    Lead Paint Inspection
    5)    Radon Gas Inspection
    6)    Asbestos Inspection
    7)    Urea Formaldehyde Foam Insulation (UFFI) Inspection
    8)    Chlordane Inspection
    9)    Hazardous Materials, Groundwater and Soil Test Inspection (may require longer than 10 days to successfully complete)
    10)   Well Tests Inspection (water quality and quantity)
    11)   Other

Should any of the above-listed inspections reveal the existence of unsatisfactory or hazardous conditions in the property, then the BUYER shall send written notice of same to the BROKER and SELLER on or before _6-22-01_ by certified mail, return receipt requested, or by hand delivery to the SELLER and the broker with a copy of the inspection findings to be provided to the SELLER and the Broker within seven (7) days following notification. Upon receipt of written notification and a copy of the inspection findings by the SELLER, this Offer/Purchase and Sale Agreement shall become NULL AND VOID immediately, and upon the issuance of mutually agreeable instructions by BUYERS and SELLERS and upon the signing of a Release by all parties, then all deposits made hereunder shall forthwith be refunded to the BUYER, and all parties to this Offer/Purchase and Sale Agreement shall be released from all liability.

2) FLOOD HAZARD INSURANCE- If the property is determined to be in a flood hazard zone, a lender may require flood hazard insurance before it will grant a mortgage. Providing such insurance is the sole responsibility of the BUYER.

3) AGENCY DISCLOSURE NOTICE-All brokers/salespersons represent the SELLER, *not the BUYER*. In the marketing, negotiating and sale of property, unless otherwise disclosed. However, the broker or salesperson has an ethical and legal obligation to show honesty and fairness to the BUYER in all transactions.

4) LEGAL COUNSEL-BUYER and SELLER acknowledge that they have each been advised of the importance of seeking legal advice prior to signing the Purchase and Sale Agreement, and each acknowledges that they have been afforded the opportunity to confer with legal counsel of their choice prior to signing the Purchase and Sale Agreement.

5) ESCROW FUNDS- In the event of a disagreement relative to the disbursal of escrow funds as referenced in Paragraph 5 of the Offer to Purchase and Paragraph 20 of the Purchase and Sale Agreement all parties agree to submit the disagreement to a mediator associated with the American Arbitration Association or an acceptable company that engages in mediation for binding arbitration. A disagreement shall be defined as the lack of instructions mutually given by all parties.

6) MORTGAGE CONTINGENCY CLAUSE - In order to help finance the acquisition of said premises, the BUYER shall apply for a conventional bank or other institutional mortgage loan of $_291,000.00_ at prevailing rates, terms and conditions. If despite the BUYER's diligent efforts a commitment for such loan cannot be obtained on or before _8-17_ 20_01_, the BUYER may terminate this agreement by written notice to the SELLER and/or the Broker(s), as agent(s) for the SELLER, prior to the expiration of such time, whereupon any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto. In no event will the BUYER be deemed to have used diligent efforts to obtain such commitment unless the BUYER submits a complete mortgage loan application conforming to the foregoing provisions on or before _6-20-01_, 20_____.

WE, the undersigned, have read and understood all of the above provisions.

(Seller) _Helen Johnson Gay Allen_    (Seller) _____
(Buyer) X_____    (Buyer) X_Doris H. Mendes_
(Broker) _Paula Dupre_    (Broker) _Gay Allen_
    Agent for Jack Conway & Co.

Rev. 9/96



**C CENDANT**
*Mortgage*



3000 Leadenhall Road, Mt.Laurel, NJ 08054

1.800.CENDANT
(236.3268)

March 21, 2001

ANTHONY P MENDES

171 BRIDGE ST
DEDHAM,MA 02026

Sales Price: $275,000.00

Loan Amount: $272,832.00

Interest Rate: 6.875%

Type / Term of Loan:
FHA, 360 months

EXHIBIT
A, Mendes 3
6-1-06        o v

# YOU'RE APPROVED!



Dear ANTHONY P MENDES, DORIS MENDES,

We're pleased to tell you that you've been approved for a mortgage loan in the amount of $272,832.00. From here on, getting the home you want will be as easy as 1-2-3. We'll be with you all the way, from the application process right through closing.

Now that your application is already completed and on file with us, all you need to do is find your dream home. As soon as you do, simply call us at 1-800-236-3268, Ext. 84853, to give us the property address, and we'll make sure your loan closes right on time - guaranteed. For your convenience, we've enclosed a wallet card for quick reference to this toll-free number. You can use it to call us 7 days a week with any questions about your mortgage process.

*As part of the Cendant Mortgage Family, you now have these unique advantages:*

- HOUSE-HUNTING WITH CONFIDENCE. Knowing that your mortgage loan is already approved, you can look for your new home - confident that the closing process will be smooth and easy.

- SERVICE EXCELLENCE. Our service is so outstanding that 95% of our customers would recommend us to their family and friends. We will answer all of your mortgage questions promptly and thoroughly.

**LE0012**

- ◆ NEGOTIATING POWER. With your financing secured and a closing date guaranteed, sellers know that your offer is solid.

- ◆ GUARANTEED SERVICE. We guarantee that we'll meet your closing date, or we'll give you 1/8th of one percent off your interest rate for the life of your loan.*

- ◆ FLEXIBILITY. Although you've been approved for a specific loan amount, we realize that your loan requirements may change. Simply call us if you need to change your loan amount, or the term or type of loan.

*While you continue to search for your new home, here are some important reminders:*

- ◆ Your interest rate is floating; however, you may call us at any time to discuss our available Rate Protection options. Based on your rate now, the maximum total monthly payment you qualify for is $2,128.73. This would be principal and interest of $1,792.31 and estimated taxes and insurance of $336.42 (includes private mortgage insurance, if applicable).

- ◆ Remember to call us at 1-800-236-3268, Ext. 84853, with the property address as soon as you have selected a home.

Please note: The following page is a checklist of items needed for your final approval before we go to closing. Please take a moment to review it.

We're here to make your home buying experience a fast, simple, and pleasant one. We look forward to helping you purchase your dream home, and we welcome your questions, now, or any time.

Sincerely,

*Richard Luongo*

Richard Luongo
Mortgage Consultant
1-800-236-3268, Ext. 84853

*P.S.  Good luck househunting! As soon as you call us at 1-800-236-3268, Ext. 84853, with the property address, it'll take only a few minutes to get you moving toward a fast and easy mortgage closing.*

*Conventional purchase loans only. Customers must use a Cendant Mortgage – approved closing agent.

**LE0014**



0687-PHE-060-0148-10-00-350k

WE TREAT CUSTOMERS LIKE FAMILY.

# NEXT STEPS IN THE HOME-BUYING PROCESS.

Now that your mortgage loan is approved, there are only three more steps to go in the homebuying process. We're here to guide you along the way. If you have any questions, simply call us at 1-800-236-3268, Ext. 84853.

**STEP ONE:**

Look for your dream home.

**STEP TWO:**

Once you've selected your home and signed the sales contract, call us at 1-800-236-3268, Ext. 84853, right away. We already have all of your loan information on file, so it will only take a few moments for us to fill in the remaining items. Then we can send your updated application which reflects your purchase price.

**STEP THREE:**

After you have found your home, these are the items that we need to complete your loan package:

- ❑ Fully executed agreement of sale on the property being purchased to show a sales price of $275,000.00
- ❑ Subject to receipt and review of a satisfactory appraisal on the property being purchased that supports the sales price, to be ordered by Mortgage Services.
- ❑ If any information has changed from your original application, including property type, additional documentation may be required.
- ❑ Fully executed FHA Amendatory Clause.
- ❑ Evidence any outstanding Collection Account, Charge-off, Tax Lien, or Judgement has been satisfied.
- ❑ Please provide the policy date and declaration page for the homeowner's insurance policy 5 days prior to closing.
- ❑ If the property you select is located in a flood zone, a flood insurance policy will be required.
- ❑ All pages of the past two months bank statements for all accounts to show $10,000.00.

**LE0013**

WE TREAT CUSTOMERS LIKE FAMILY



Cendant Mortgage
3000 Leadenhall Road
Mt.Laurel, NJ 08054

**CENDANT**
*Mortgage*

May 3, 2001

ANTHONY P MENDES

171 BRIDGE ST
DEDHAM, MA 02026

Sales Price:  $340,000.00

Loan Amount:  $337,335.25

Interest Rate:  7.250%

Type / Term of Loan:
FHA, 360 months

# YOU'RE APPROVED!

Dear ANTHONY P MENDES, DORIS MENDES,

We're pleased to tell you that you've been approved for a mortgage loan in the amount of $337,335.25. From here on, getting the home you want will be as easy as 1-2-3. We'll be with you all the way, from the application process right through closing.

Now that your application is already completed and on file with us, all you need to do is find your dream home. As soon as you do, simply call us at 1-800-236-3268, Ext. 84853, to give us the property address, and we'll make sure your loan closes right on time – guaranteed. You can use it to call us 7 days a week with any questions about your mortgage process.

*As part of the Cendant Mortgage Family, you now have these unique advantages:*

- HOUSE-HUNTING WITH CONFIDENCE. Knowing that your mortgage loan is already approved, you can look for your new home – confident that the closing process will be smooth and easy.

- SERVICE EXCELLENCE. Our service is so outstanding that 95% of our customers would recommend us to their family and friends. We will answer all of your mortgage questions promptly and thoroughly.



**EXHIBIT**
A. Mendes  4
6-1-06

- NEGOTIATING POWER. With your financing secured and a closing date guaranteed, sellers know that your offer is solid.

- GUARANTEED SERVICE. We guarantee that we'll meet your closing date, or we'll give you 1/8th of one percent off your interest rate for the life of your loan.*

- FLEXIBILITY. Although you've been approved for a specific loan amount, we realize that your loan requirements may change. Simply call us if you need to change your loan amount, or the term or type of loan.

*While you continue to search for your new home, here are some important reminders:*

- Your interest rate is floating; however, you may call us at any time to discuss our available Rate Protection options. Based on your rate now, the maximum total monthly payment you qualify for is $2,716.26. This would be principal and interest of $2,301.22 and estimated taxes and insurance of $415.04 (includes private mortgage insurance, if applicable).

- Remember to call us at 1-800-236-3268, Ext. 84853, with the property address as soon as you have selected a home.

Please note: The following page is a checklist of items needed for your final approval before we go to closing. Please take a moment to review it.

We're here to make your home buying experience a fast, simple, and pleasant one. We look forward to helping you purchase your dream home, and we welcome your questions, now, or any time.

Sincerely,

Richard Luongo
Mortgage Consultant
1-800-236-3268, Ext. 84853

*P.S. Good luck househunting! As soon as you call us at 1-800-236-3268, Ext. 84853, with the property address, it'll take only a few minutes to get you moving toward a fast and easy mortgage closing.*

*Conventional purchase loans only. Customers must use a Cendant Mortgage - approved closing agent.



LE0046

# NEXT STEPS IN THE HOME-BUYING PROCESS.

Now that your mortgage loan is approved, there are only three more steps to go in the homebuying process. We're here to guide you along the way. If you have any questions, simply call us at 1-800-236-3268, Ext. 84853.

**STEP ONE:**

Look for your dream home.

**STEP TWO:**

Once you've selected your home and signed the sales contract, call us at 1-800-236-3268, Ext. 84853, right away. We already have all of your loan information on file, so it will only take a few moments for us to fill in the remaining items. Then we can send your updated application which reflects your purchase price.

**STEP THREE:**

After you have found your home, these are the items that we need to complete your loan package:

- ❑ Fully executed agreement of sale on the property being purchased to show a sales price of $340,000.00
- ❑ Subject to receipt and review of a satisfactory appraisal on the property being purchased that supports the sales price, to be ordered by Mortgage Services.
- ❑ If any information has changed from your original application, including property type, additional documentation may be required.
- ❑ Fully executed FHA Amendatory Clause.
- ❑ Evidence any outstanding Collection Account, Charge-off, Tax Lien, or Judgement has been satisfied.
- ❑ Please provide the policy date and declaration page for the homeowner's insurance policy 5 days prior to closing.
- ❑ If the property you select is located in a flood zone, a flood insurance policy will be required.
- ❑ All pages of the past two months bank statements for all accounts to show $16,000.00.
- ❑ Loan approval is not subject to the sale of any property.

# NEXT STEPS IN THE HOME-BUYING PROCESS.

- ☐ Last 2 years W-2s for Doris Mendes.
- ☐ Last 2 years W-2s for Anthony Mendes.
- ☐ Mortgage services will obtain verbal or written verification of employment.
- ☐ Fully executed Real Estate Certification.
- ☐ Satisfactory wood destroying insect infestation report (NPCA 1 or state specific) must be obtained within 30 days of closing.
- ☐ Any large deposits that appear on the bank/investment account statements will need to be explained and documented.
- ☐ All pages of the most recent quarterly statement for 401K account to show $2,000.00 and evidence sufficient funds are liquidated.
- ☐ All pages of the most recent quarterly statement for 401K account and evidence of liquidation in the amount of $2,000.00.
- ☐ Copy of Anthony Mendes' most recent pay statements for the past 30 days to verify gross monthly income of $3,200.00 and year-to-date earnings.
- ☐ Copy of Doris Mendes' most recent pay statements for the past 30 days to verify gross monthly income of $3,933.00 and year-to-date earnings.
- ☐ Satisfactory explanation for delinquencies on credit report.
- ☐ If delinquencies were the result of extenuating circumstances, please provide evidence supported by 3rd party documentation.
- ☐ Mortgage Services to order a credit supplement in order to delete erroneous accounts and verify previously paid accounts have a zero balance. If we are unable to verify the accounts are inaccurate, you must qualify with the monthly payment.
- ☐ In order to obtain a satisfactory 12 month rental reference, we will need the name and phone number of your landlord.
- ☐ Mortgage Services to obtain evidence of clear CAIVRS prior to closing, verifying no delinquent outstanding debts owed to the government.
- ☐ Verification the account with lord taylor has a minimum payment of $30.00.
- ☐ Verification the account with wm filene has a minimum payment of $50.00.
- ☐ Return the Home Inspection Disclosure (HUD-92564-CN) that was provided to you, signed and dated prior to the date on the contract of sale.

LE0048

:MORTGAGE SERVICES    6/12/01 11:14    PAGE  2/4    RightFAX

Cendant Mortgage
3000 Leadenhall Road
Mt.Laurel, NJ 08054

# CENDANT
## *Mortgage*

June 12, 2001

Sales Price:  $310,000.00

Loan Amount:  $307,545.00

ANTHONY P MENDES

Interest Rate: 7.125%

171 BRIDGE ST
DEDHAM,MA 02026

Type / Term of Loan:
FHA, 360 months

# YOU'RE APPROVED!

Dear ANTHONY P MENDES, DORIS MENDES,

We're pleased to tell you that you've been approved for a mortgage loan in the amount of
$307,545.00. From here on, getting the home you want will be as easy as 1-2-3. We'll be
with you all the way, from the application process right through closing.

Now that your application is already completed and on file with us, all you need to do is find
your dream home. As soon as you do, simply call us at 1-800-236-3268, Ext. 84853, to give
us the property address, and we'll make sure your loan closes right on time – guaranteed.
You can use it to call us 7 days a week with any questions about your mortgage process.

*As part of the Cendant Mortgage Family, you now have these unique advantages:*

- ◆ HOUSE-HUNTING WITH CONFIDENCE. Knowing that your mortgage loan is
  already approved, you can look for your new home – confident that the closing
  process will be smooth and easy.

- ◆ SERVICE EXCELLENCE. Our service is so outstanding that 95% of our
  customers would recommend us to their family and friends. We will answer all
  of your mortgage questions promptly and thoroughly.



**EXHIBIT**
A
Mendes 5
6-1-06

ived:  6/12/01 10:33AM;    MORTGAGE SERVICES -> Riverbend C.C.;  Page 3
MORTGAGE SERVICES    6/12/01 11:14  PAGE  3/4    RightFAX

- ◆ **NEGOTIATING POWER.** With your financing secured and a closing date guaranteed, sellers know that your offer is solid.

- ◆ **GUARANTEED SERVICE.** We guarantee that we'll meet your closing date, or we'll give you 1/8th of one percent off your interest rate for the life of your loan.*

- ◆ **FLEXIBILITY.** Although you've been approved for a specific loan amount, we realize that your loan requirements may change. Simply call us if you need to change your loan amount, or the term or type of loan.

*While you continue to search for your new home, here are some important reminders:*

- ◆ Your interest rate is floating; however, you may call us at any time to discuss our available Rate Protection options. Based on your rate now, the maximum total monthly payment you qualify for is $2,503.32. This would be principal and interest of $2,071.99 and estimated taxes and insurance of $431.33 (includes private mortgage insurance, if applicable).

- ◆ Remember to call us at 1-800-236-3268, Ext. 84853, with the property address as soon as you have selected a home. Once we arrange and receive a satisfactory appraisal on the home you intend to buy, and we verify your income and assets, you will be ready to go to closing.

We're here to make your home buying experience a fast, simple, and pleasant one. We look forward to helping you purchase your dream home, and we welcome your questions, now, or any time.

Sincerely,

Richard Luongo
Mortgage Consultant
1-800-236-3268, Ext. 84853

*P.S. Good luck househunting! As soon as you call us at 1-800-236-3268, Ext. 84853, with the property address, it'll take only a few minutes to get you moving toward a fast and easy mortgage closing.*

*Conventional purchase loans only. Customers must use a Cendant Mortgage - approved closing agent.



Exhibit A

Cendant Mortgage
3000 Leadenhall Road
Mount Laurel, NJ 08054



## CENDANT
### Mortgage

### FINAL COMMITMENT

Date:                August 10th, 2001
Loan Number:    0015775950
Customer:         Anthony P Mendes
                                         Doris Mendes

Property Address:  1-3 CHILSON AVE MANSFIELD, MA 02048

Dear  Anthony P Mendes
                                         Doris Mendes

Congratulations!  Cendant Mortgage Corporation is pleased to issue a mortgage loan commitment to you which reflects the final terms of your loan

### A. Your Approved Loan terms

Base loan amount: $ 297,765.00
MIP/ funding fee (if applicable): $ 4,466.48
Total loan amount: $ 302,231.00
Approved Interest Rate: 7.250
Rate Lock Expiration Date: 08/31/2001
Initial Monthly Principal and Interest: $ 2,061.75
Private Mortgage Insurance required:  NO
Assumable: (Y or N)   Y
Premium Pricing:
Balloon Payment Required: (Y or N)   N
Product:  30 yr FHA Fixed (880)

Loan term:  360
Loan to Value Ratio: 97.63
Loan Type: (FHA/VA/Conv)  FHA
Commitment Expiration Date:  08/31/2001
Escrow account required:  YES

MIP required (FHA loans):  YES
Prepayment Penalty applicable: (Y or N)   Y
Rate Lock Option  [X] Lock    [ ] Rate Protect
                              [ ] Float    [ ] 1X Float Down

If your loan is an Adjustable Rate Mortgage, the following additional terms apply:
Index:
Rate change cap:                                    Margin: 0.0000
Rate change frequency: (weeks, months, years)        Lifetime Cap:
First Adjustment:
Subsequent Adjustment:
If your loan is a Balloon payment loan, please refer to your program description

### B. Points you pay in connection with your loan

Total points:    0.000
Origination fee:  0.000
Discount points:  0.000
Commitment fee: 0.000

### C. Conditions to commitment: Please read the conditions listed below carefully.  They are a part of this commitment and are needed to meet your August 31st, 2001 closing date.
PLEASE SIGN AND RETURN THIS FINAL COMMITMENT.
* Any changes in your application may affect, but is not limited to, rate, points, maximum loan amount, and additional documentation requirements
* Fully executed FHA Amendatory Clause.
* Please provide the declaration page for the homeowner's insurance policy to equal or exceed mortgage amount or replacement value(5 days prior to closing).
* Mortgage services will obtain verbal or written verification of employment.
* Fully executed Real Estate Certification.
* Return the Home Inspection Disclosure (HUD-92564-CN) that was provided to you, signed and dated prior to the date on the contract of sale
* Borrower to sign Homebuyer Summary.

* Customer to provide bank statement to show where that $9,000 deposit on sales contract came from and an escrow letter from attorney.
* Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental. (also to obtain additional income to lower ratios)
* Corrected final application and addendum (1003 and 92900a (pgs. 1-4))

### D. Inspections – Well, Septic, Radon, Termite:  Inspections are required only if requested by the appraiser and noted in the Conditions.

### E. Assumability:
[ ] This loan is not assumable.
[X] Your rights and obligations under the note and mortgage are assumable under certain conditions described in your loan documents

0441301 (02/03/100)

anb200-3 (1/04)                              Page 1 of 2



EXHIBIT
S Mendes 7
6-1-06    DM

LF0087

**F. Prepayment Penalty:**

[ ] This loan may be prepaid in part or in full at any time without penalty.

[X] This loan has a prepayment penalty. Refer to your loan documents for when the penalty will be collected.

**G. Expiration of Commitment:** This commitment will expire on 08/11/2001 unless an extension is granted by Cendant Mortgage Corporation. We may cancel this commitment if something occurs which we feel may effect the security or your ability to repay this loan.

**H. Title to Property and Title Insurance:** Cendant Mortgage Corporation must have first lien position on the property. The title to the property must be acceptable to us. The property must comply with zoning regulations. The Title Search/Abstract, Tax Search and Certificates, Instrument Survey and Title Commitment must be forwarded at least 10 days prior to closing, if possible.

A policy of title acceptable to us at your expense, is required. If your proposed mortgage loan is an Adjustable Rate Mortgage, the title policy must include affirmative coverage of an ARM and take no exception to the adjustable feature. Title insurance is also available to protect your interest as owner of the property at an extra charge to you but is not required by us. If you desire such insurance protecting your interest as an owner, please advise your attorney or closing agent.

**I. Survey:** Lender's title insurance policy to be issued pursuant to Paragraph H above shall not contain a survey exception. Should an instrument survey or plot plan be required by the title insurer in order to remove such exception, you must supply us, at your expense, a currently dated survey/plot plan, acceptable to us, noting the location of all boundaries, improvements, set back lines, easements and encroachments on or off of the property. The instrument must be certified to:

Cendant Mortgage Corporation/Secretary of Housing and Urban Development, its Successors and/or Assigns, as their interests may appear, 3000 Leadenhall Road Mount Laurel, NJ 08054

**J. Fire and Flood Insurance:** The following insurance must be provided by you at or prior to closing. Policies must be in effect on the closing date. The Endorsement on the policy should read for First Mortgagee:

Cendant Mortgage Corporation/Secretary of Housing and Urban Development, its Successors and/or Assigns, as their interests may appear, P.O. Box 5954 Springfield, OH 45501-5954, Attn: Insurance Department

Fire and extended coverage in the amount of full replacement cost or the loan amount, whichever is less, must be fully paid for 1 year with receipt. We will not require you to obtain a policy in excess of the replacement cost of the improvements on the property securing your loan.

If flood insurance is required in connection with your loan, it will be listed under your *Conditions*. Flood insurance will be required if your property is in flood zone "A" or "V". We do not require you to obtain a flood insurance policy in excess of the replacement costs of the improvements on the property securing your loan.

A binder with a one year paid receipt is acceptable evidence of coverage unless prohibited by state law.

**K. Appraisal:** If an appraisal was obtained in connection with your loan transaction, a copy of it will be provided to you prior to or at closing.

**L. Closing:** At closing, you must sign all of the customary mortgage documents.

**M. Interest Rate:** Your interest rate and terms are governed by your rate lock/ confirmation agreement.

**N. Contacts:** PLEASE DIRECT ALL CALLS AND DOCUMENTATION TO

Kevin Cogan

(800) 236-3268 ext. 87806

**O. State Specific Supplement:** Florida and the New York Department of Banking require us to provide you with additional information contained in the Final Commitment Supplement. Please refer to that supplement for further information about your Final Commitment.

**P. Acceptance:** To accept this commitment, you must sign below and return this letter to us within 15 days from the date of this letter. This agreement cannot be changed orally.

Very truly yours,

Cendant Mortgage Corporation

*Claire Taylor*

Claire Taylor

Production Manager

**ACCEPTANCE OF OFFER:** The terms and conditions offered by this Final Commitment letter and Attachments are accepted by the undersigned. I/we have received a duplicate original of this document.

| | | | | |
|---|---|---|---|---|
| *signature* 8-14-01 | | | *Doris H. Mendes* 8-14-01 | |
| Applicant Name: Anthony P Mendes | Date | | Applicant Name: Doris Mendes | Date |
| *Anthony Mendes* 8-14-01 | | DORIS H. MENDES | 8-14-01 | |
| Applicant Name | Date | Applicant Name | Date | |

0641301 (01130) 02

## ADDENDUM TO FINAL COMMITMENT

### C. Conditions to commitment, continued.

* Credit documents expire 07/10/01   Updates will be required if loan is not closed by that date.  (Credit report -90 days, other docs - 120 days) (credit report expired)
* Subject to re-qualification if: Buyer's investment into the transaction (allowable closing costs & downpayment) is less than 3% of the sales price
* Sign final application and addendum (1003 and 92900a)
* Subject to re-qualification if: rate or points change from 7.125% with 1% origination fee and 0% discount points
* Subject to requalification if: buyer paid "Closing Costs" are less than $1883.51
* Fully-executed hotel and transient use certification

| | | | |
|---|---|---|---|
| _Anthony P Mendes_ | 8-14-01 | _Doris M. Mendes_ | 8-14-01 |
| Applicant Name  Anthony P Mendes | Date | Applicant Name  Doris Mendes | Date |
| _Anthony Mendes_ | 8/14/01 | DORIS H. MENDES | 8-14-01 |
| Applicant Name | Date | Applicant Name | Date |

0441383 (102100) co

Addendum to Final Commitment



# GERRY ABBOTT INC., REALTORS®

43 North Main Street • Mansfield, MA 02048

TEL – (508) 339-6336
FAX – (508) 261-1218
E-MAIL – ABBOTTRLTR@AOL.COM

# Extension

for

## TIME OF CLOSING

between

**One Chilson Avenue Realty Trust, Helen Jackson, Trustee (SELLER)**

and

**Doris H. and Anthony P. Mendes (BUYERS)**

for

**1-3 Chilson Avenue, Mansfield, MA 02048**

Time for Performance for the Delivery of Deed, has been extended until 1:00 P.M. on or before the 13th day of September, 2001. Time still being of the essence of the Agreement as extended. In all other respects, this Agreement is hereby ratified and confirmed.

This extension, executed in triplicate form is intended to take effect as a sealed instrument.

_Helen Jackson, by Gerry S. Abbott_                    8/29/01.
One Chilson Avenue Realty Trust, Helen Jackson, Trustee   (SELLER)          Date

X _Doris H. Mendes_        8/29/0   X _Anthony Mendes_ –  8/29-0,
Doris H. Mendes  (BUYER)          Date         Anthony P. Mendes  (BUYER)          Date

> **EXHIBIT**
> _A Mahr  10_
> _6-1-06         06_

high point rpa

251-2852439-703
File No. 329134

CENDANT MORTGAGE #15775950
3000 LEADENHALL ROAD
Mt. LAUREL, NJ 08054

File Number:  329134

RRU

NOV 0 1 2001

In accordance with your request, I have personally inspected and appraised the real property at:

1-3 CHILSON AVENUE
MANSFIELD, MA. 02048

The purpose of this appraisal is to estimate the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property, as of June 29, 2001        is:

$305,000
Three Hundred Five Thousand Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

CANCELLED

JOHN G. PACHECO



EXHIBIT

A. Mendes  12
6-1-06      OU

**PHH 0276**

COMPLETE SUMMARY REPORT

## UNIFORM RESIDENTIAL APPRAISAL REPORT

251-2652439-703

File No. 329134

**Property Description**

| Property Address 1-3 CHILSON AVENUE | City MANSFIELD | State MA. | Zip Code 02048 |
|---|---|---|---|

Legal Description BOOK 5166 PAGE 161 — County BRISTOL

Assessor's Parcel No. MAP# 24 LOT# 187 — Tax Year 2001 — R.E. Taxes $ 3,301.88 — Special Assessments $ N/A

Borrower MENDES, Anthony & Doris — Current Owner CHILSON AVE REALTY TRUST — Occupant: ☐ Owner ☒ Tenant ☐ Vacant

Property rights appraised ☒ Fee Simple ☐ Leasehold — Project Type ☐ PUD ☐ Condominium (HUD/VA only) — HOA$ N/A /Mo.

Neighborhood or Project Name MANSFIELD CENTER — Map Reference ASSESSOR — Census Tract 6301

Sale Price $ 305,000 — Date of Sale PENDING — Description and $ amount of loan charges/concessions to be paid by seller NO P&S FOR REVIEW

Lender/Client CENDANT MORTGAGE #15775950 — Address 3000 LEADENHALL ROAD, Mt. LAUREL, NJ 08054

Appraiser JOHN G. PACHECO — Address 3 SOUTH SIXTH STREET, NEW BEDFORD, MA 02740

| | Location | ☐ Urban ☒ Suburban ☐ Rural | Predominant occupancy | Single family housing | Present land use % | Land use change |
|---|---|---|---|---|---|---|
| | Built up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | ☒ Owner | PRICE $(000) / AGE (yrs) | One family 60% | ☒ Not likely |
| | Growth rate | ☐ Rapid ☒ Stable ☐ Slow | ☐ Tenant | 125 Low / 20 | 2-4 family 30% | ☐ Likely |
| | Property values | ☐ Increasing ☒ Stable ☐ Declining | ☒ Vacant(0-5%) | 325 High / 150 | Multi-family 0% | ☐ In process |
| | Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply | ☐ Vacant (over 5%) | Predominant | Commercial 10% | To: |
| | Marketing time | ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. | | 200 / 80 | (VACANT) 0% | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: NORTH; ROUTE 106. SOUTH; EAST STREET. EAST; ROUTE 106. WEST; ROUTE 140.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): See Attached Addendum.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): THE SUBJECT IS LOCATED IN MANSFIELD AND IS IN A MARKET OF 2-4 FAMILY HOMES. PROPERTY VALUES TEND TO BE CONSISTENT IN THIS AREA DEPENDING ON DWELLING CONDITION AND AMENITY. DEMAND AND SUPPLY APPEAR TO BE IN BALANCE IN THIS AREA. MARKETING TIMES TEND TO RUN BETWEEN 3 AND 6 MONTHS BASED ON COMPARABLE DATA. PRICES HAVE BEEN STABLE IN LARGE PART DUE TO ATTRACTIVE INTEREST RATES. CONVENTIONAL FINANCING IS READILY AVAILABLE TO QUALIFIED BUYERS.

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? ☐ YES ☐ NO

Approximate total number of units in the subject project _____ Approximate total number of units for sale in the subject project _____

Describe common elements and recreational facilities: _____

| Dimensions 93 FEET ROAD FRONTAGE  X IRREGULAR | | Topography LEVEL TO ROAD GRADE |
|---|---|---|
| Site area 9418 S.F. | Corner Lot ☒ Yes ☐ No | Size TYPICAL FOR THE AREA |
| Specific zoning classification and description R-3= 10,000 S.F./80' FRONTAGE | | Shape RECTANGULAR |
| Zoning compliance ☐ Legal ☒ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | Drainage APPEARS ADEQUATE |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | | View YARD/NEIGHBORS |
| Utilities | Public / Other | Off-site improvements Type | Public / Private | Landscaping AVERAGE FOR AREA |
| Electricity | ☒ | Street ASPHALT | ☒ / ☐ | Driveway Surface ASPHALT |
| Gas | ☒ | Curb/gutter GRANITE | ☒ / ☐ | Apparent easements NONE NOTED |
| Water | ☒ | Sidewalk CEMENT | ☒ / ☐ | FEMA Special Flood Hazard Area ☐ Yes ☒ No |
| Sanitary sewer | ☒ | Street lights POLE TYPE | ☒ / ☐ | FEMA Zone ZONE C Map Date 4-1-77 |
| Storm sewer | ☒ | Alley NONE | ☐ / ☐ | FEMA Map No. 250057 H&I-02 |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): SEE ATTACHED ADDENDUM.

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | ONE | Foundation | STONE | Slab NO | | Area Sq.Ft. 1540 | | Roof Cncl. ☐ |
| No. of Stories | 2 | Exterior Walls | CLAPBRD. | Crawl Space NO | | % Finished 0% | | Ceiling Cncl. ☐ |
| Type(Det./Att.) | DETACHED | Roof Surface | ASPH.SHNG. | Basement FULL | | Ceiling JOISTS | | Walls Cncl. ☐ |
| Design (Style) | 3 FAMILY | Gutters & Dwnspts. | ALUMINUM | Sump Pump NONE NOTED | | Walls STONE | | Floor Cncl. ☐ |
| Existing/Proposed | EXISTING | Window Type | WOOD DH | Dampness NONE NOTED | | Floor CONCRETE | | None ☐ |
| Age (Yrs.) | 101 +/- | Storm/Screens | ALUM DH | Settlement NONE NOTED | | Outside Entry WALK-UP | | Unknown ☒ |
| Effective Age (Yrs.) | 30 | Manufactured House NO | | Infestation NONE NOTED | | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 1,540 |
| Level 1 | 1 | 2 | 1 | 2 | 1 | | | 1 | 2 | | | 1,540 |
| Level 2 | | 1 | | 1 | | | | 5 | 2 | | | 1,386 |
| | | | | | | | | | | | | 0 |

Finished area above grade contains: 14 Rooms; 6 Bedroom(s); 4 Bath(s); 2,926 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | VNYL/CRPT/HDWD | Type FHW | | Refrigerator ☒ | | None ☐ | | Fireplace(s) # | | None ☐ | |
| Walls | PLASTER | Fuel GAS | | Range/Oven ☒ | | Stairs ☐ | | Patio ☐ | | Garage | # of cars |
| Trim/Finish | WOOD | Condition AVG-GD | | Disposal ☐ | | Drop Stair ☐ | | Deck ☐ | | Attached ☐ | |
| Bath Floor | VINYL & TILE | COOLING | | Dishwasher ☒ | | Scuttle ☒ | | Porch PORCHES ☒ | | Detached ☐ | |
| Bath Wainscot | MARLITE & TILE | Central NONE | | Fan/Hood ☐ | | Floor ☐ | | Fence ☐ | | Built-in ☐ | |
| Doors | WOOD PANEL | Other | | Microwave ☐ | | Heated ☐ | | Pool ☐ | | Carport ☐ | |
| AVERAGE CONDITION | | Condition | | Washer/Dryer ☐ | | Finished ☐ | | | | Driveway ASPHAL | |

Additional features (special energy efficient items, etc.): THE SUBJECT WAS NOTED TO HAVE STANDARD STORM WINDOWS. ADDITIONAL FEATURES INCLUDE PORCHES.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.: SEE ATTACHED ADDENDUM.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: SEE ATTACHED ADDENDUM.

PHH 0277

Freddie Mac Form 70  6-93 — Fannie Mae Form 1004  6-93

COMPLETE SUMMARY REPORT

## UNIFORM RESIDENTIAL APPRAISAL REPORT

251-2652439-703

File No. 329134

**Valuation Section**

| COST APPROACH | | |
|---|---|---|
| ESTIMATED SITE VALUE . . . . . . . . . . . . . . . . . . . . . . . = $ | Comments on Cost Approach (such as, source of cost estimate, | |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | site value, square foot calculation and for HUD, VA and FmHA, the | |
| Dwelling _____ Sq. Ft. @ $ _____ = _____ | estimated remaining economic life of the property): | |
| _____ Sq. Ft. @ $ _____ = _____ | THE COST APPROACH TO VALUE IS NOT | |
| Garage/Carport _____ Sq. Ft. @ $ _____ = _____ | CONSIDERED RELIABLE IN THE INSTANCE OF OLDER | |
| Total Estimated Cost New . . . . . . . = $ _____ | HOMES SUCH AS THE SUBJECT THEREFORE IS NOT | |
| Less 65 Physical \| Functional \| External   Est. Remaining Econ. Life: 35 | USED IN THE REPORT. NO FUNCTIONAL OR | |
| Depreciation . . . . . . . . . . . . . = $ _____ | EXTERNAL OBSOLESCENCE WAS NOTED. | |
| Depreciated Value of Improvements . . . . . . . . . . . . . . = $ _____ | REMAINING ECONOMIC LIFE IS ESTIMATED AT 35 | |
| "As-Is" Value of Site Improvements . . . . . . . . . . . . . = $ _____ | YEARS. | |
| INDICATED VALUE BY COST APPROACH . . . . . . . . . . = $   N/A | | |

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1-3 CHILSON AVENUE MANSFIELD | 39-43 WEST STREET MANSFIELD | | 162 CENTRAL STREET MANSFIELD | | 89 CHURCH STREET NORTH ATTLEBORO | |
| Proximity to Subject | | 1 MILE +/- | | 1 MILE +/- | | 5 MILE +/- | |
| Sales Price | $ 305,000 | $ 281,000 | | $ 260,000 | | $ 286,500 | |
| Price/Gross Liv. Area | $ 104.24 ☑ | $ 99.19 ☑ | | $ 131.18 ☑ | | $ 144.68 ☑ | |
| Data and/or Verification Sources | INSPECTION BROKER | B&T/EXT. INSPECTION ASSESSOR | | B&T/EXT. INSPECTION ASSESSOR | | B&T/EXT. INSPECTION ASSESSOR | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | N/A N/A | CONV. DOM N/A | | CONV. DOM N/A | | CONV. DOM N/A | |
| Date of Sale/Time | PENDING | 4/2/01 CLD | | 11/7/00 CLD | | 1/3/01 CLD | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Leasehold/Fee Simple | FEE | FEE | | FEE | | FEE | |
| Site | 9416 S.F. | 16,000 S.F. | | 23,000 S.F. | -3,000 | 11,780 S.F. | |
| View | NEIGHBORS | NEIGHBORS | | NEIGHBORS | | NEIGHBORS | |
| Design and Appeal | 3 FAMILY | 3 FAMILY | | 2 FAMILY | +26,000 | 2 FAMILY | +26,650 |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Age | 101 Yrs. | 111 YEARS +/- | | 101 YEARS +/- | | 120 YEARS +/- | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade Room Count | Total 14 \| Bdrms 6 \| Baths 4.00   20 | Total 12 \| Bdrms 5 \| Baths 3.00 | +3,000 | Total 7 \| Bdrms 3 \| Baths 2.00 | +7,000 | Total 11 \| Bdrms 5 \| Baths 2.00 | +5,000 |
| Gross Living Area | 2,926 Sq.Ft. | 2,833 Sq.Ft. | +1,900 | 1,982 Sq.Ft. | +18,900 | 1,842 Sq.Ft. | +21,700 |
| Basement & Finished Rooms Below Grade | FULL UNFINISHED | FULL UNFINISHED | | FULL UNFINISHED | | FULL UNFINISHED | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FHW/NONE | FHW/NONE | | FHW/NONE | | FHW/NONE | |
| Energy Efficient Items | STORM WINDOW | STORM WINDOW | | STORM WINDOW | | STORM WINDOW | |
| Garage/Carport | NO GARAGE | NO GARAGE | | GARAGE | -5,000 | NO GARAGE | |
| Porch, Patio, Deck, Fireplace(s), etc. | PORCH NO FIREPLACE | PORCH NONE NOTED | | DECK NONE NOTED | | PORCH NONE NOTED | |
| Fence, Pool, etc. | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Net Adj. (total) | | ☒ + \| ☐ - \| $   4,900 | | ☒ + \| ☐ - \| $   43,900 | | ☒ + \| ☐ - \| $   53,350 | |
| Adjusted Sales Price of Comparable | | Gross: 1.7%   Net: 1.7% $ 285,900 | | Gross: 23.0%   Net: 16.9% $ 303,900 | | Gross: 20.0%   Net: 20.0% $ 319,850 | |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): See Attached Addendum.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | N/A | N/A VERIFIED/MLS & B&T | N/A VERIFIED/MLS & B&T | N/A VERIFIED/MLS & B&T |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal.
COMPARABLES UTILIZED IN THE REPORT HAVE NOT SOLD PRIOR TO ONE YEAR. THE SUBJECT IS CURRENTLY UNDER SALES CONTRACT FOR $305,000, A PURCHASE & SALES AGREEMENT WAS NOT MADE AVAILABLE FOR REVIEW.

INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 305,000
INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ 2,075 /Mo. x Gross Rent Multiplier 140 = $ 290,500

This appraisal is made ☐ "as is" ☒ subject to the repairs, alterations, inspections or conditions listed below.   ☐ subject to completion per plans and specifications.
Conditions of Appraisal: SEE ATTACHED ADDENDUM.

Final Reconciliation: SEE ATTACHED ADDENDUM.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 )
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF JUNE 26, 2001
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 305,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature | Signature | ☐ Did ☒ Did Not |
| Name JOHN G. PACHECO | Name GARY FREITAS | Inspect Property |
| Date Report Signed JULY 11, 2001 | Date Report Signed JULY 11, 2001 | |
| State Certification # | State Certification # 328 | State MA |
| Or State License # 2236   State MA | Or State License # | State |

PAGE 2 OF 2

Freddie Mac Form 70   6-93

Fannie Mae Form 1004   6-93

**ADDENDUM**

| Borrower: MENDES, Anthony & Doris | | File No.: 329134 |
|---|---|---|
| Property Address: 1-3 CHILSON AVENUE | | Case No.: 251-2652439-703 |
| City: MANSFIELD | State: MA. | Zip: 02048 |
| Lender: CENDANT MORTGAGE #16775950 | | |

**Neighborhood Market Factors**
THE SUBJECT PROPERTY IS LOCATED ON CHILSON AVENUE, A ROADWAY WHICH IS SITUATED IN MANSFIELD CENTER. THE SUBJECTS IMMEDIATE AREA IS DEVELOPED WITH A MIXTURE OF COMPATIBLE STYLE SINGLE FAMILY DWELLINGS AND 2-4 FAMILY PROPERTIES RANGING IN SIZE AND AGE. A LIMITED COMMERCIAL INFLUENCE EXISTS IN THE OVERALL AREA HOWEVER NOT APPEARING TO ADVERSELY EFFECT THE SUBJECT. OVERALL PROPERTIES APPEAR IN AVERAGE TO GOOD CONDITION. PROXIMITY FROM THE AREA TO TOWN CENTER, HIGHWAY ACCESS AND ESSENTIAL SERVICES IS A SHORT DRIVE. SCHOOLS ARE LOCATED WITHIN A SHORT DRIVE.

**Site Comments**
THERE IS AN ASPHALT DRIVEWAY TO THE REAR OF THE DWELLING WHICH IS ACCESSED OFF SAMOSET STREET. LANDSCAPE IS CONSIDERED AVERAGE FOR THE AREA CONSISTING MAINLY OF GRASS. NO ADVERSE EASEMENTS, ENCROACHMENTS OR ASSESSMENTS WERE NOTED. THE SUBJECTS LOT IS CONSIDERED LEGAL HOWEVER NON-CONFORMING TO CURRENT ZONING REQUIREMENTS. THIS IS TYPICAL FOR THE AREA AS MOST LOTS WERE APPROVED PRIOR TO CURRENT STANDARDS. IF DESTROYED THE DWELLING MAY BE REBUILT ON THE EXISTING FOOT-PRINT FOR A PERIOD OF 2 YEARS UNDER MASSACHUSETTS LAW. THE SITE IS SERVED BY TOWN WATER & SEWER.

**Condition of Improvements**
THE SUBJECT PROPERTY IS AN ANTIQUE 3 UNIT DWELLING WHICH WAS CONSTRUCTED IN 1900 ACCORDING TO ASSESSORS DATA. THE LAYOUT OF THE DWELLING APPEARS TO BE FUNCTIONAL FOR ITS SIZE & AGE. THE OWNERS OR PRIMARY UNIT OCCUPIES THE MAJORITY OF THE LIVING AREA WITH AN ADDITIONAL UNIT CONTAINING 2 BEDROOMS ON THE 1ST FLOOR AND THE OTHER UNIT CONTAINING 1 BEDROOM ON THE SECOND. OVERALL THE INTERIOR AND EXTERIOR OF THE HOME APPEAR TO BE IN AVERAGE CONDITION. SOME ITEMS OF MAINTENANCE ARE NEEDED INCLUDING 1ST FLOOR NORTH UNIT BATH FLOOR REPAIR AND ELECTRICAL SYSTEM REPLACEMENT. THE HOME IS POWERED BY A KNOB & TUBE SYSTEM WHICH WOULD APPEAR INADEQUATE TO TODAYS STANDARDS. THE HEATING SYSTEM APPEARS TO BE IN GOOD WORKING ORDER AND UPDATED.

**Adverse Environmental Conditions**
NO ADVERSE ENVIRONMENTAL CONDITIONS WERE OBSERVED AT THE TIME OF INSPECTION. THE DWELLING WAS CONSTRUCTED PRIOR TO 1978 THEREFORE THE PRESENCE OF LEAD PAINT COULD EXIST. THE APPRAISER IS NOT QUALIFIED TO ADDRESS HAZARDOUS MATERIALS ISSUES.

**Comments on Sales Comparison**
THE ADJUSTMENTS TO THE SALES ARE 10% FOR DESIGN & APPEAL (TOTAL NUMBER OF UNITS), $3000 FOR LOT SIZE, $1000 PER BEDROOM, $2000 PER BATH, $20 PER SQUARE FOOT OF LIVING AREA AND $5000 FOR GARAGE. THE SALES UTILIZED ARE THE MOST RECENT AVAILABLE AND ARE THE MOST INDICATIVE OF CURRENT MARKET CONDITIONS. A GENERAL LACK OF 2-4 FAMILY HOMES EXISTS IN THE SUBJECTS MARKET AREA WITH EVEN FEWER 3 UNIT PROPERTIES. IT WAS NECESSARY TO USE A 2 UNIT FROM MANSFIELD AND A 2 UNIT FROM NEIGHBORING ATTLEBORO FOR COMPARISON. SALES #2 AND #3 EXCEED NORMAL NET ADJUSTMENT GUIDELINES.

**Conditions of Appraisal**
THE APPRAISAL OF THE SUBJECT PROPERTY IS MADE SUBJECT TO "VC" CONDITIONS. THE SUBJECT COMPETES IN A MARKET OF INCOME PRODUCING PROPERTIES THEREFORE THE INCOME CAPITALIZATION APPROACH TO VALUE IS UTILIZED IN THE REPORT.

THE SUBJECT IS ESTIMATED TO DERIVE A MONTHLY INCOME OF $2075.00 FOR ALL UNITS. THE ESTIMATED GRM OF 140 IS DERIVED FROM SALE #1 WHICH IS A 3 UNIT. THE TOTAL MONTHLY INCOME ESTIMATED FOR SALE #1 IS $2025.00 WITH A GRM OF 138.77 (140.00 ROUNDED).

**Final Reconciliation**
THE SALES COMPARISON APPROACH IS CONSIDERED THE MOST RELIABLE INDICATOR OF MARKET VALUE. THE COST APPROACH TENDS TO BE LESS RELIABLE WHEN ESTIMATING OLDER PROPERTIES SUCH AS THE SUBJECT THEREFORE IT IS NOT USED. THE APPRAISAL REPORT IS CONSIDERED A SUMMARY APPRAISAL AND CONSIDERS THE COST, SALES AND INCOME APPROACHES TO VALUE. IN THIS INSTANCE THE SALES AND INCOME APPROACHES ARE UTILIZED, THE COST APPROACH IS NOT CONSIDERED RELIABLE.

THE ESTIMATED YEARLY HOME OWNERS INSURANCE COST FOR THE SUBJECT IS $550.00

**PHH 0279**

Addendum Page 1 of 1

# Operating Income Statement

One- to Four-Family Investment Property and Two- to Four-Family Owner-Occupied Property

251-2652439-703
329134

Property Address

| 1-3 CHILSON AVENUE | MANSFIELD | MA. | 02048 |
|---|---|---|---|
| Street | City | State | Zip Code |

**General Instructions:** This form is to be prepared jointly by the loan applicant, the appraiser, and the lender's underwriter. The applicant must complete the following schedule indicating each unit's rental status, lease expiration date, current rent, market rent, and the responsibility for utility expenses. Rental figures must be based on the rent for an "unfurnished" unit.

|  | Currently Rented | Expiration Date | Current Rent Per Month | Market Rent Per Month | Utility Expense | Paid By Owner | Paid By Tenant |
|---|---|---|---|---|---|---|---|
| Unit No. 1 | Yes __ No VCNT | | $ _____ | $ _____ 900 | Electricity ......... | ☐ | ☒ |
| Unit No. 2 | Yes X No ___ | TAW | $ _____ 750 | $ _____ 650 | Gas ............. | ☐ | ☒ |
| Unit No. 3 | Yes __ No VCNT | | $ _____ | $ _____ 525 | Fuel Oil ........... | ☐ | ☐ |
| Unit No. 4 | Yes __ No ___ | | $ _____ | $ _____ | Fuel (Other) ....... | ☒ | ☐ |
| Total | | | $ _____ 750 | $ 2,075 | Water/Sewer ....... | ☒ | ☐ |
| | | | | | Trash Removal ..... | ☒ | ☐ |

The applicant should complete all of the income and expense projections and for existing properties provide actual year-end operating statements for the past two years (for new properties the applicant's projected income and expenses must be provided). This Operating Income Statement and previous operating statements the applicant provides must then be sent to the appraiser for review, comment, and/or adjustments next to the applicant's figures (e.g., Applicant/Appraiser 288/300). If the appraiser is retained to complete the form instead of the applicant, the lender must provide to the appraiser the aforementioned operating statements, mortgage insurance premium, HOA dues, leasehold payments, subordinate financing, and/or any other relevant information as to the income and expenses of the subject property received from the applicant to substantiate the projections. The underwriter should carefully review the applicant's/appraiser's projections and the appraiser's comments concerning those projections. The underwriter should make any final adjustments that are necessary to more accurately reflect any income or expense items that appear unreasonable for the market. (Real estate taxes and insurance on these types of properties are included in PITI and not calculated as an annual expense item.) Income should be based on current rents, but should not exceed market rents. When there are no current rents because the property is proposed, new, or currently vacant, market rents should be used.

## Annual Income and Expense Projection for Next 12 months

| Income (Do not include income for owner-occupied units) | By Applicant/Appraiser | Adjustments by Lender's Underwriter |
|---|---|---|
| Gross Annual Rental (from unit(s) to be rented) ................ | $ _____ 9,000 | $ _____ |
| Other Income (include sources) ................................ | + _____ | + _____ |
| Total ......................................................... | $ _____ 9,000 | $ _____ |
| Less Vacancy/Rent Loss ....................................... | − _____ 180.00 ( 2%) | − _____ ( %) |
| Effective Gross Income ....................................... | $ _____ 8,820 | $ _____ |

| Expenses (Do not include expenses for owner-occupied units.) | | |
|---|---|---|
| Electricity ................................................ | _____ | _____ |
| Gas ...................................................... | _____ | _____ |
| Fuel Oil .................................................. | _____ | _____ |
| Fuel ..........................(Type-_____) | _____ | _____ |
| Water/Sewer PUBLIC ....................................... | 750 | _____ |
| Trash Removal ............................................ | _____ | _____ |
| Pest Control .............................................. | _____ | _____ |
| Other Taxes or Licenses TAXES ............................ | 3,302 | _____ |
| Casual Labor ............................................. | 250 | _____ |
| This includes the costs for public area cleaning, snow removal, etc., even though the applicant may not elect to contract for such services. | | |
| Interior Paint/Decorating | 250 | _____ |
| This includes the costs of contract labor and materials that are required to maintain the interiors of the living units. | | |
| General Repairs/Maintenance ............................... | 500 | _____ |
| This includes the costs of contract labor and materials that are required to maintain the public corridors, stairways, roofs, mechanical systems, grounds, etc. | | |
| Management Expenses | | |
| These are the customary expenses that a professional management company would charge to manage the property. | | |
| Supplies .................................................. | 200 | _____ |
| This includes the costs of items like light bulbs, janitorial supplies, etc. | | |
| Total Replacement Reserves - See Schedule on Pg. 2 ........... | 510 | _____ |
| Miscellaneous ............................................. | _____ | _____ |
| ........................................................ | _____ | _____ |
| ........................................................ | _____ | _____ |
| ........................................................ | _____ | _____ |
| ........................................................ | _____ | _____ |
| ........................................................ | _____ | _____ |
| ........................................................ | _____ | _____ |
| ........................................................ | _____ | _____ |
| **Total Operating Expenses** ............................... | $ _____ 5,762 | $ _____ |

251-2652439-703
329134

## Replacement Reserve Schedule

Adequate replacement reserves must be calculate regardless of whether actual reserves are provided for on the owner's operating statements or are customary in the local market. This represents the total average yearly reserves. Generally, all equipment and components that have a remaining life of more than one year-such as refrigerators, stoves, clothes washers/dryers, trash compactors, furnaces, roofs, and carpeting, etc.-should be expensed on a replacement cost basis.

| Equipment | Replacement Cost | Remaining Life | | By Applicant/ Appraiser | Lender Adjustments |
|---|---|---|---|---|---|
| Stoves/Ranges | @$ 500.00 ea.+ | 10 Yrs. x | 3 Units =$ | 150.00 | $ |
| Refrigerators | @$ ea.+ | Yrs. x | Units =$ | | $ |
| Dishwashers | @$ ea.+ | Yrs. x | Units =$ | | $ |
| A/C Units | @$ ea.+ | Yrs. x | Units =$ | | $ |
| C. Washer/Dryers | @$ ea.+ | Yrs. x | Units =$ | | $ |
| HW Heaters | @$ 250.00 ea.+ | 10 Yrs. x | 3 Units =$ | 75.00 | $ |
| Furnace(s) | @$ 2,500.00 ea.+ | 20 Yrs. x | 1 Units =$ | 125.00 | $ |
| (Other) | @$ ea.+ | Yrs. x | Units =$ | | $ |
| Roof | @$ 4,000.00 + | 25 Yrs. x One Bldg. = | $ | 160.00 | $ |

**Carpeting (Wall to Wall)**

Remaining Life

| | | | | | |
|---|---|---|---|---|---|
| (Units) | Total Sq. Yds. @ $ | Per Sq. Yd. + | Yrs. = | $ | $ |
| (Public Areas) | Total Sq. Yds. @ $ | Per Sq. Yd. + | Yrs. = | $ | $ |

**Total Replacement Reserves. (Enter on Pg. 1)**     $ 510.00 $

## Operating Income Reconciliation

$ 8,820.00 - $ 5,762.00 = $ 3,058.00 +12= $ 254.83
Effective gross Income      Total Operating Expenses      Operating Income      Monthly Operating Income

$ 254.83 - $ = $ 254.83
Monthly Operating Income      Monthly Housing Expenses      Net Cash Flow

(Note: Monthly Housing Expense includes principal and interest on the mortgage, hazard insurance premiums, real estate taxes, mortgage insurance premiums, HOA dues, leasehold payments, and subordinate financing payments.)

---

Underwriter's instructions for 2-4 Family Owner-Occupied Properties

* If Monthly Operating Income is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Monthly Operating Income is a negative number, it must be included as a liability for qualification purposes.

* The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total Monthly Housing Expense for the subject property to the borrower's stable monthly income.

---

Underwriter's instructions for 1-4 Family Investment Properties

* If Net Cash Flow is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Net Cash Flow is a negative number, it must be included as a liability for qualification purposes.

* The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total monthly housing expense for the borrower's primary residence to the borrower's stable monthly income.

---

Appraiser's Comments (including sources for data and rationale for the projections)

JOHN G. PACHECO                          JULY 11, 2001
Appraiser Name           Appraiser Signature           Date

---

Underwriter's Comments and Rationale for Adjustments

Underwriter Name           Underwriter Signature           Date

PHH 0281

Freddie Mac
Form 998 Aug 88          PAGE 2 OF 2          Fannie Mae
This form was produced on the ACI Development RapidForms system (800)284-8737          Form 216 Aug 88
high point rpa-

Part 2: Comprehensive Valuation Package
Valuation Conditions

Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0538
(exp. 11/30/99)

Case Number: 251-2862439-703
File Number: 329134

## NOTICE TO THE LENDER

All required repairs must be completed in a professional manner, in compliance with HUD's guidelines and satisfied prior to closing. The lender is responsible for coordinating repairs. A professionally licensed, bonded, registered engineer, licensed home inspector or appropriately registered/licensed trades person, as applicable, must provide documentation that all deficiencies have been acceptably corrected upon completion of repairs.

### SITE CONSIDERATIONS

**VC-1 Site Hazards and Nuisances**
Check the appropriate response for *readily observable* evidence of hazards. Hazards, as defined below, are conditions that endanger the health and safety of the occupants and/or marketability of the property. Use these criteria to determine the extent of the hazard. Please refer to HUD Handbook 4150.2 Section 2-2 for unacceptable locations and the protocol in Appendix D of the Handbook for further guidance. If the required component is not visible during the site visit, provide a detailed comment.

**Provide a description of yes responses on Page 4:**
a. Surface evidence of subsidence/sink holes
☐ yes
b. Operating oil or gas wells within 300 feet of existing construction
☐ yes
c. Operating oil or gas wells within 75 feet of new construction
☐ yes
d. Abandoned oil or gas wells within 10 feet of new/existing
☐ yes
e. Readily observable evidence of slush pits
☐ yes
f. Excessive noise or hazard from heavy traffic area
☐ yes
g. New/proposed construction in airport clear zone
☐ yes
h. High-pressure gas or petroleum lines within 10 feet of property
☐ yes
i. Overhead high voltage transmission lines within engineering (designed) fall distance
☐ yes
j. Excessive hazard from smoke, fumes, offensive noises or odors
☐ yes
k. New/proposed construction in Special Flood Hazard Areas without LOMA or LOMR
☐ yes
l. Stationary storage tanks with more than 1000 gallons of flammable or explosive materials
☐ yes

### PROPERTY CONSIDERATIONS

Mark "Yes" for any *readily observable* deficiency noted below. Each "Yes" constitutes a limiting condition on the appraisal. Each condition requires repair or further inspection. These conditions must be satisfied prior to closing for the mortgage to be eligible for FHA mortgage insurance. Please refer to HUD Handbook 4150.2 Section 3-6 for guidance on HUD's General Acceptability Criteria. Also, refer to the protocol in Appendix D of the Handbook for repair and inspection requirement parameters.

**VC-2 Soil Contamination**
*Check the appropriate response for evidence of environmental contamination*
**Provide a description of yes responses on Page 4:**

a. On-site septic shows observable evidence of system failure
☐ yes ☒ no
b. Surface evidence of an Underground Storage Tank (UST)
☐ yes ☒ no
c. Proximity to dumps, landfills, industrial sites or other locations that could contain hazardous materials
d. Presence of pools of liquid, pits, ponds, lagoons, stressed vegetation, stained soils or pavement, drums or odors
☐ yes ☒ no

**VC-3 Grading and Drainage**
*Check the appropriate response for evidence of topographical problems.*
**Provide a description of yes responses on Page 4:**
a. Grading does not provide positive drainage from structure
☐ yes ☒ no
b. Standing water proximate to structure
☐ yes ☒ no

**VC-4 Well, Individual Water Supply and Septic**
*Check the appropriate response with regard to individual wells and septic system.*
**Provide a description of yes responses on Page 4:**
a. Property lacks connection to public water*
☐ yes ☒ no
b. Property lacks connection to a public/community sewer system
☐ yes ☒ no
*Lender will require water testing for "yes" response.
**NOTE:** Connection should be made to public or community water/sewage disposal system. Estimate distance to sewer or water hook-up and whether hook-up is practical.

**VC-5 Wood Destroying Insects**
*Check the appropriate response for evidence of wood infestation*
**Provide a description of yes responses on Page 4:**
a. Structure and accessory buildings are ground level and/or wood is touching ground
☒ yes ☐ no
b. The house and/or other structures within the legal boundaries of the property show obvious evidence of active termite infestation
☐ yes ☒ no

PHH 0282

This form was produced by the ACI Development RapidForms system (800)204-6727
high point rpa.

Form HUD-92564-VC (8/99)

| Part 2: Comprehensive Valuation Package Valuation Conditions | Department of Housing and Urban Development Office of Housing Federal Housing Commissioner | OMB Approval No. 2502-0538 (exp. 11/30/99) |
|---|---|---|

Case Number: 251-2652439-703
File Number: 329134

**VC-6 Private Road Access and Maintenance**
*Check the appropriate response for evidence of Private Road Access and maintenance problems.*
**Provide a description of yes responses on Page 4:**
a. ~~Property inaccessible by foot or vehicle~~
☐ yes ☒ no
b. Property accessible only by a private road or drive*
☐ yes ☒ no
c. Property is not provided with an all-weather surface (gravel is acceptable).
☐ yes ☒ no

*~~In all cases where a private road exists, submit evidence that~~

_____
(name of road)
is protected by a permanent recorded easement (non-exclusive, non-revocable roadway, driveway easement without trespass from the property to a public street/road) and that there is an acceptable maintenance agreement recorded on the property.

~~Provide a detailed description of the road's condition:~~

_____
_____
_____

**VC-7 Structural Conditions**
*Check the appropriate response for evidence of structural condition problems.*
**Provide a description of yes responses on Page 4:**
Floor Support Systems
a. Significant cracks
☐ yes ☒ no
b. Evidence of water leakage or damage
☒ yes ☐ no
c. Rodent Infestation
☐ yes ☒ no
Framing/Walls/Ceiling
d. Significant cracks
☐ yes ☒ no
e. Visible holes in exposed areas that could effect structure
☐ yes ☒ no
f. Significant water damage
☐ yes ☒ no
Attic
g. Evidence of holes
☐ yes ☒ no
h. Support structure not intact or damaged
☐ yes ☒ no
i. Significant water damage visible from interior
☐ yes ☒ no
j. No ventilation by vent, fan or window
☐ yes ☒ no

**VC-8 Foundation**
(Appraiser must have full access to these areas)
*Check the appropriate response for evidence of foundation/basement or crawl space problems.*
**Provide a description of yes responses on Page 4:**
Foundation/Basement
a. Inadequate access
☐ yes ☒ no
b. Evidence of significant water damage
☐ yes ☒ no
c. Significant cracks or erosion in exposed areas that could effect structural soundness
☐ yes ☒ no

Crawl Space
d. Inadequate Access
☐ yes ☒ no
e. Space inadequate for maintenance and repair (<18 inches)
☐ yes ☒ no
f. Support beams not intact
☐ yes ☒ no
g. Excessive dampness or ponding of water
☐ yes ☒ no

**VC-9 Roofing**
*Check the appropriate response for evidence of all roofing problems*
**Provide a description of yes responses on Page 4:**
a. Does not cover entire house
☐ yes ☒ no
b. Evidence of deterioration of roofing materials
☐ yes ☒ no
c. Roof life less than two years*
☐ yes ☒ no
d. Holes
☐ yes ☒ no
e. Signs of leakage observable from ground (i.e., missing tiles)
☐ yes ☒ no
f. Flat Roof**
☐ yes ☒ no

*HUD/FHA requires that the roof have at least 2 years remaining life. If the roof has less than 2 years remaining life, then the appraiser must call for re-roofing or repair. The condition must clearly state whether the subject is to be repaired or re-roofed. FHA will accept a maximum of 3 layers of existing roofing. If more than 2 layers exist and repair is necessary, then all old roofing must be removed as part of the re-roofing.

**All flat roofs require inspection.

**VC-10 Mechanical Systems**
(All utilities must be turned on at time of appraisal, if possible)
*Check the appropriate response for evidence of mechanical system problems.*
**Provide a description of yes responses on Page 4:**
Furnace/Heating System
a. Unit does not turn 'On'
☐ yes ☒ no
b. Warm air is not emitted
☐ yes ☒ no
c. Unusual or irregular noises are heard
☐ yes ☒ no
d. Smoke or irregular smell is emitted
☐ yes ☒ no
e. Unit shuts down prior to reaching desired temperature
☐ yes ☒ no
f. Significant holes or deterioration on the unit(s)
☐ yes ☒ no
Air Conditioning (central)
g. Unit does not turn 'On'
☐ yes ☒ no
h. Cold air is not emitted
☐ yes ☒ no
i. Irregular noises are heard
☐ yes ☒ no
j. Smoke or irregular smell is emitted
☐ yes ☒ no
k. Unit shuts down prior to reaching desired temperature
☐ yes ☒ no
l. Significant holes or deterioration on the unit(s)
☐ yes ☒ no

This form was produced on the ACI Development RapidForms system (800)234-8727
high point rps

Form HUD-92564-VC (8/99)

**PHH 0283**

Part 2: Comprehensive Valuation Package
Valuation Conditions

Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0538
(exp. 11/30/99)

Case Number: 251-2652439-703
File Number: 329134

**Electrical System**
m. Electrical switches do not turn 'on' or 'off' (check representative sample)
☐ yes  ☒ no
n. Outlets do not function (check representative sample)
☐ yes  ☒ no
o. Presence of sparks or smoke from outlet(s)
☐ yes  ☒ no
p. Exposed wiring visible in living areas
☐ yes  ☒ no
q. Frayed wiring
☒ yes  ☐ no

**Plumbing System**
*Toilet*
r. Toilets do not function
☐ yes  ☒ no
s. Presence of leak(s)
☐ yes  ☒ no
*Leaks*
t. Structural damage under fixtures
☐ yes  ☒ no
u. Puddles present
☐ yes  ☒ no
*Sewer System*
v. Observable surface evidence of malfunction
☐ yes  ☒ no
*Sinks*
w. Basin or pipes leak
☐ yes  ☒ no
x. Water does not run
☐ yes  ☒ no
*Water*
y. Significant drop or limitation in pressure
☐ yes  ☒ no
z. No hot water
☐ yes  ☒ no

**VC-11 Other Health and Safety Deficiencies**
*Check the appropriate response for evidence of health and safety deficiencies.*
Provide a description of yes responses on Page 4:
a. Multiple Broken windows
☐ yes  ☒ no
b. Broken or missing exterior stairs
☐ yes  ☒ no
c. Broken or missing exterior doors
☐ yes  ☒ no
d. Inadequate/blocked entrances or exits
☐ yes  ☒ no
e. Steps without handrails
☐ yes  ☒ no
f. The mechanical garage door does not reverse or stop when meeting reasonable resistance during closing
☐ yes  ☒ no
g. Please identify location of all health and/or safety deficiencies, and note others not included in this or any other VC on the comment page

**VC-12 Lead Based Paint Hazard**
*For any home built prior to 1978, check for evidence of defective paint surfaces, including: peeling, scaling or chipping paint:*

Provide a description of yes responses on Page 4:
a. Evidence on interior
☐ yes  ☒ no
b. Evidence on exterior
☐ yes  ☒ no
Year built  1900

If the home was built before 1978, this may indicate a lead paint hazard. For all FHA insured properties, the seller is required to correct all defective paint in or on dwelling units built before January 1, 1978 in accordance with 24 CFR Part 35.

**VC-13 Condominiums and Planned Unit Developments (PUD)**
Provide a description of yes responses on Page 4:
a. This project is not on FHA's approval list
☐ yes  ☒ no
b. The property does not meet owner-occupancy standards
☐ yes  ☒ no
c. This property does not meet completion standards
☐ yes  ☒ no

**ADDENDA**
**A. Provide the current full/market assessed value:**

$ 176,100

**B. Provide a summary of estimated repair costs:**

$ 10,000 ESTIMATED

Please attach any additional information/reports and give number of attached pages.

**Public reporting burden** for the collection of information is estimated to average 30 minutes to complete the Comprehensive Valuation Package. This includes the time for reviewing the associated Handbook and reporting the data. This does not include the requisite market research or the appraisal process. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** This information is required for the U.S. Department of Housing and Urban Development to endorse a single family mortgage and is used for underwriting purposes. The collection of this information is necessary to comply with HUD's Home Buyer Protection Plan. The information may be made available to a federal agency for review. This information is not confidential and will be made available to the public.

PHH 0284

This form was produced on the ACD Development RapidForms system (800)234-9772
high point.rps

Form HUD-92564-VC (8/99)

Part 2: Comprehensive Valuation Package
Valuation Conditions

Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0538
(exp. 11/30/99)

Case Number:  251-2652439-703
File Number:  329134

## Description of Responses and Related Comments

| VC # | Section (a,b,c..) | Comments |
|------|-------------------|----------|
| 5 | A | SUBJECT TO WOOD DESTROYING INSECT INSPECTION |
| 7 | B | WATER DAMAGE IN BATH FLOOR ON 1ST LEVEL NORTH UNIT |
| 10 | Q | KNOB & TUBE WIRING SYSTEM |

This form was produced on the ACI Development RapidForms system (800)234-8727

Form HUD-92564-VC (6/99)

high point rpa

PHH 0285

Part 3: Comprehensive Valuation Package
**Homebuyer Summary**

Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0538
(exp. 11/30/99)

Case Number: 251-2652439-703
File Number: 329134

Property Address: 1-3 CHILSON AVENUE          City: MANSFIELD          State: MA.     Zip Code: 02048

## Important          NOTICE TO THE HOMEBUYER          Read Carefully

As part of our job insuring the mortgage for the lender, the FHA requires the lender to conduct an appraisal to:

- estimate the value of your potential new home
- make sure it meets *minimal* FHA standards
- ensure that it will be marketable

*Appraisals are different from home inspections.* Home inspections give more detailed information about your potential new home.

This report is a summary of the observations of an appraiser who visited the property. If there was a problem, the appraiser answered "YES" under "Problem".

If any condition is marked (yes), this means that the property you want to buy does not currently meet FHA's Minimum Property Standards. Until this condition is resolved, your lender may not provide you with an FHA insured loan consistent with FHA procedures.

You should speak to your lender about how this situation needs to be handled. You should also make sure that you are confident that the physical condition of this property meets all of your expectations.

For a copy of the full appraisal, contact your lender.

If you have any questions, call us at 1-800-569-4287.

| Physical Condition | Problem (Y) | Comments |
|---|---|---|
| Site Hazards | | |
| Soil Contamination | | |
| Grading and Drainage Problems | | |
| Well, Individual Water Supply and Septic Problems | | |
| Wood Destroying Insects | Y | SUBJECT TO WOOD DESTROYING INSECT INSPECTION |
| Private Road Access and Maintenance Problems | | |
| Structural Deficiencies | Y | WATER DAMAGE IN BATH FLOOR ON 1ST LEVEL NORTH UNIT |
| Foundation Deficiencies | | |
| Roofing Deficiencies | | |
| Mechanical Systems Problems | Y | KNOB & TUBE WIRING SYSTEM |
| General Health and Safety Deficiencies | | |
| Deteriorated Paint | | |

The conditions listed above are reflected on the Valuation Conditions Form (Part 2 of the Comprehensive Valuation Package) of this appraisal. **The lender is required to transmit this Notice to the Homebuyer form to the buyer at least five business days prior to the loan closing.**

X _____          MA2236   6-26-01
FHA Roster Appraiser Signature          ID Number     Valuation Date

Homebuyer acknowledges receipt of Part 3: Summary:

X _____

X _____
Homebuyer(s) Signature(s):          Date Received

PHH 0286

This form was produced on the ACI Development RapidForms system (800)204-9727

Form HUD-92564-HS (8/99)

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

251-2852439-703
329134
OMB Approval No: 2502-0538
(exp. 11/30/99)

# For Your Protection: Get a Home Inspection

Name of Seller    CHILSON AVE REALTY TRUST

Property Address   1-3 CHILSON AVENUE

MANSFIELD, MA. 02048

## What the FHA Does for Buyers... and What We Don't Do

**What we do:** FHA helps people become homeowners by insuring mortgages for lenders. This allows lenders to offer mortgages to first-time buyers and others who may not qualify for conventional loans. Because the FHA insures the loan for the lender, the buyer pays only a very low down-payment.

**What we won't do:** FHA does not guarantee the value or condition of your potential new home. If you find problems with your new home after closing, we can not give or lend you money for repairs, and we can not buy the home back from you.

That's why it's so important for you, the buyer to get an independent home inspection. Ask a qualified home inspector to inspect your potential new home and give you the information you need to make a wise decision.

## Appraisals and Home Inspections are Different



As part of our job insuring the loan, we require that the lender conduct an FHA Appraisal. An appraisal is different from a home inspection. Appraisals are for lenders; home inspections are for buyers. The lender does an appraisal for three reasons:

- to estimate the value of a house
- to make sure that the house meets FHA minimum property standards.
- to make sure that the house is marketable

Appraisals are not home inspections.

## Why a Buyer Needs a Home Inspection

A home inspection gives the buyer more detailed information than an appraisal--information you need to make a wise decision. In a home inspection, a qualified inspector takes an in-depth, unbiased look at your potential new home to:

- evaluate the physical condition: structure, construction, and mechanical systems
- identify items that need to be repaired or replaced
- estimate the remaining useful life of the major systems, equipment, structure, and finishes.

## What Goes into a Home Inspection

A home inspection gives the buyer an impartial, physical evaluation of the overall condition of the home and items that need to be repaired or replaced. The inspection gives a detailed report on the condition of the structural components, exterior, roofing, plumbing, electrical, heating, insulation and ventilation, air conditioning, and interiors.

## Be an Informed Buyer

It is your responsibility to be an informed buyer. Be sure that what you buy is satisfactory in every respect. You have the right to carefully examine your potential new home with a qualified home inspector. You may arrange to do so before signing your contract, or may do so after signing the contract as long as your contract states that the sale of the home depends on the inspection.

I understand the importance of getting an independent home inspection. I have thought about this before I signed a contract with the seller for a home.

X _____
Signature & Date

X _____
Signature & Date

This form was produced on the ACD Development RapidForms system (800)234-6727

Form HUD-92564-CN
(8/99)

high point rpa

PHH 0287

251-2652439-703
File No. 329134

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

### STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**  The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc. ) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc. ) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.



251-2652439-703
File No. 329134

**APPRAISERS CERTIFICATION:**  The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or estimate of market value in the appraisal report  on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report.  I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site in the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them.  I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:**    If a  supervisory  appraiser  signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**   1-3 CHILSON AVENUE, MANSFIELD, MA.  02048

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
|---|---|
| Signature: | Signature: _Gary Freitas_ |
| Name:  JOHN G. PACHECO | Name:  GARY FREITAS |
| Date Signed:  JULY 11, 2001 | Date Signed:  JULY 11, 2001 |
| State Certification #: | State Certification #:  326 |
| or State License #:  2236 | or State License #: |
| State: MA. | State:  MA |
| Expiration Date of Certification or License:  9-2001 | Expiration Date of Certification or License:  2-2002 |
|  | ☐ Did    ☒ Did Not Inspect Property |

**PHH 0289**

Freddie Mac Form 439 6-93       Page 2 of 2       Fannie Mae Form 1004B 6-93

**SUBJECT PROPERTY PHOTO ADDENDUM**

| | | |
|---|---|---|
| Borrower: MENDES, Anthony & Doris | | |
| Property Address: 1-3 CHILSON AVENUE | | File No.: 329134 |
| City: MANSFIELD | | Case No.: 251-2652439-703 |
| Lender: CENDANT MORTGAGE #15775950 | State: MA. | Zip: 02048 |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: June 26, 2001
Appraised Value: $ 305,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

PHH 0290

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: MENDES, Anthony & Doris | File No.: 329134 |
| Property Address: 1-3 CHILSON AVENUE | Case No.: 251-2652439-703 |
| City: MANSFIELD    State: MA | Zip: 02048 |
| Lender: CENDANT MORTGAGE #15776950 | |



**COMPARABLE SALE #1**

39-43 WEST STREET
MANSFIELD
Sale Date: 4/2/01 CLD
Sale Price: $ 281,000



**COMPARABLE SALE #2**

162 CENTRAL STREET
MANSFIELD
Sale Date: 11/7/00 CLD
Sale Price: $ 260,000



**COMPARABLE SALE #3**

89 CHURCH STREET
NORTH ATTLEBORO
Sale Date: 1/3/01 CLD
Sale Price: $ 266,500

**DIMENSION LIST ADDENDUM**

| | |
|---|---|
| Borrower: MENDES, Anthony & Doris | File No.: 329134 |
| Property Address: 1-3 CHILSON AVENUE | Case No.: 251-2652439-703 |
| City: MANSFIELD | State: MA.      Zip: 02048 |
| Lender: CENDANT MORTGAGE #16775950 | |

| GROSS BUILDING AREA (GBA) | 4,468 |
|---|---|
| GROSS LIVING AREA (GLA) | 2,926 |

| Area(s) | Area | % of GBA |
|---|---|---|
| Living | 2,926 | 65.52 |
| Level 1 | 1,540 | 34.48 |
| Level 2 | 1,386 | 31.03 |
| Level 3 | | |
| Other | | |
| Basement | 1,540 | 34.48 |
| Garage | | |

| Area Measurements | | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Measurements | Factor | | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
| 20.00 x 24.00 | x | 1 = | 480.00 | X | ☐ | ☐ | ☐ | X | ☐ |
| 12.00 x 26.00 | x | 1 = | 312.00 | X | ☐ | ☐ | ☐ | X | ☐ |
| 22.00 x 34.00 | x | 1 = | 748.00 | X | ☐ | ☐ | ☐ | X | ☐ |
| 20.00 x 24.00 | x | .9 = | 432.00 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 12.00 x 28.00 | x | .9 = | 280.80 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 22.00 x 34.00 | x | .9 = | 673.20 | ☐ | X | ☐ | ☐ | ☐ | ☐ |

PHH 0292



PHH 0293

**LOCATION MAP**

| | |
|---|---|
| Borrower: MENDES, Anthony & Doris | |
| Property Address: 1-3 CHILSON AVENUE | File No.: 329134 |
| City: MANSFIELD | Case No.: 251-2652439-703 |
| Lender: CENDANT MORTGAGE #15775950 | State: MA. |



© 1998 DeLorme. Street Atlas USA



TOWN OF MANSFIELD,
MASSACHUSETTS
BRISTOL COUNTY

PANEL H&I-02

PAGE 2 OF 3 PRINTED

EFFECTIVE DATE:
APRIL 1, 1977

COMMUNITY NUMBER:
250057A

U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT
FEDERAL INSURANCE ADMINISTRATION

FLOOD HAZARD BOUNDARY MAP
FLOOD INSURANCE RATE MAP

PHH 0295



EXHIBIT

**GERRY ABBOTT INC., REALTORS®**
261 CHAUNCY STREET   MANSFIELD, MA 02048
ESCROW ACCOUNT

2300

53-7146/2113

DATE   _9/26/01_

THE
)ER OF  _Doris and Anthony Mendes_                          $ _9,000. ⁰⁰_

_Nine Thousand_ _____   ⁰⁰/₁₀₀   DOLLARS

**NORTH EASTON**
SAVINGS BANK
"YOUR FAMILY FINANCIAL SERVICE CENTER"

_OFT- 1·3 Chilson Ave, Mansfield._

⑅002300⑅  ⑆211371463⑇  27  300905⑅

---

**GERRY ABBOTT INC., REALTORS®**
261 CHAUNCY STREET   MANSFIELD, MA 02048
ESCROW ACCOUNT

2302

53-7146/2113

DATE   _9/26/01._

THE
ER OF  _Gerry Abbott Inc. Realtors._                         $ _6,125.00_

_Six Thousand One Hundred Twenty Five_ _____   ⁰⁰/₁₀₀   DOLLARS

**NORTH EASTON**
SAVINGS BANK
"YOUR FAMILY FINANCIAL SERVICE CENTER"

_1363 East Street Mansfield._

⑅002302⑅  ⑆211371463⑇  27  300905⑅





# CENDANT
## Mortgage

Cendant Mortgage
3000 Leadenhall Road
Mount Laurel, NJ 08054

**Date:**         October 2nd, 2001
**Customer(s):**  Anthony P Mendes, Doris Mendes

**Address:**      171 BRIDGE ST
                  DEDHAM, MA  02026
**Product:**      30 yr FHA Fixed (880)

> **EXHIBIT**
> A. Mendes JP
> 6.1.06   DW

Dear Anthony P Mendes, Doris Mendes

We have thoroughly reviewed your mortgage application. We are sorry to inform you that we are unable to approve your loan at the time for the following reason(s):

Other *Property does not meet FHA guidelines* (KC)

A credit report was obtained in connection with your credit request from one or more of the following consumer reporting agencies:

| Name: | First American Credco | Equifax Mortgage Services | CBC Companies |
|---|---|---|---|
| Address: | 9444 Balboa Avenue, Suite 500 | 6 E. Clementon Road | 520 E. Main Street |
|  | San Diego, CA 92123 | Gibbsboro, NJ 08026 | Carnegie, PA 15106 |
| Phone Number: | (800) 637-2422 | (800) 333-0037 | (800) 698-1730 |

You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. ***The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you.*** You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

In addition, we may have obtained information from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act you have the right to make a written request no later than 60 days after you receive this notice, for disclosure of the nature of the information.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is:

> Federal Trade Commission
> Equal Credit Opportunity
> Washington, DC 20580

Thank you for the opportunity to serve you. If you have any further questions, please do not hesitate to call either of us.

Sincerely,

Kevin Cogan
Mortgage Counselor
(800) 236-3268 ext. 87806

Michael Marsh
Senior Counselor
(800) 236-3268 ext. 87887

0641279 (062501)