UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MENDES and DORIS MENDES, ) | |
| ) | Civil Action No. 05CV11765DPW |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CENDANT MORTGAGE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **AFFIDAVIT OF CLAIR TAYLOR**

I, Claire Taylor, depose and state as follows:

1.     I have been employed by PHH Mortgage Corporation and its predecessors, including Cendant Mortgage Corporation, for over 20 years.  In 2001, I was employed by Cendant as a Product Manager in its processing department.  The processing department collects and processes all documents for a customer's loan from the time the customer first sends Cendant a loan application package.  In my position as Product Manager in 2001, I managed a group of supervisors who ran teams that processed loans for customers that had submitted application packages to Cendant Mortgage.

2.     After a team had processed a customer's application package, and gathered any other documents necessary to underwrite the loan, such as appraisals and inspection reports, the customer's loan file would typically be sent to Cendant's underwriting department.  In 2001, the underwriting department at Cendant, at the completion of the underwriting process, would return a customer's loan file to the processing department, and, in appropriate cases, the processing department would issue a Final Commitment letter.  Final Commitment letters would commonly have conditions which a customer had to satisfy for the loan to close.

3.      During my time at PHH Mortgage Corporation and its predecessors, I have become familiar with Federal Housing Administration ("FHA") loans.  The FHA provides mortgage insurance for loans made by FHA-approved lenders.  FHA insures mortgages on single family and multifamily homes.  FHA mortgage insurance provides approved lenders with protection against losses as the result of homeowners defaulting on their mortgage loans.  FHA loans, however, must meet certain requirements established by FHA to qualify for an FHA loan. The FHA publishes a handbook that describes the mortgage underwriting requirements for home mortgage loans insured by the FHA.  A copy of the handbook is attached hereto as Exhibit A.  In 2001, Cendant was an FHA approved lender, and, therefore, when making underwriting requirements, followed the rules set forth in this handbook.

4.      I have reviewed the loan file of Anthony and Doris Mendes (collectively, "Mendes") in connection with their proposed purchase of 1-3 Chilson Avenue, Mansfield, Massachusetts (the "Property").  I make this affidavit based on my review of the Mendes' loan file, my personal knowledge of the loan application and underwriting process, documents received from the Appraiser, as that capitalized term is defined below, and my familiarity with FHA loans.

5.      The Mendes applied to Cendant for an FHA loan in connection with their proposed purchase of 1-3 Chilson Avenue, Mansfield, Massachusetts.

6.      In support of this application, Anthony Mendes submitted documentation concerning his earnings from 1999 to 2001.  All the documentation that Anthony Mendes submitted in support of his loan application concerning his earnings is attached hereto as Exhibit B.

2

7.      In support of their loan application, Mendes also submitted the bank statements attached hereto as Exhibit C.  Other than these bank statements, Mendes never submitted any other bank statements to Cendant.

8.      Cendant received a July 11, 2001, appraisal of the Property from John G. Pacheco of High Point Real Property Appraisers, Inc. (the "Appraiser"), a true copy of which is attached hereto as Exhibit D.  This appraisal evidenced an estimate market rental for the property of $2,075 per month.

9.      On August 22, 2001, Cendant received an addendum to this appraisal, attached hereto as Exhibit E.  This addendum evidenced an estimated market rental for the property of $2,325 per month.

10.      An underwriting analysis that Cendant Mortgage performed on August 1, 2001 on the Mendes' loan application is attached hereto as Exhibit F.

11.      On August 10, 2001, Cendant sent to Mendes a Final Commitment letter for the Property, a copy of which is attached hereto as Exhibit G.  The abbreviation in paragraph A of the Final Commitment "MIP" stands for Mortgage Insurance Premium.

12.      Paragraph "C" of the Final Commitment, entitled, "Conditions to commitment," provided:

> Customer to provide bank statement to show where that $9,000 deposit on sales Contract came from and an escrow letter from attorney.
>
> Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental *(also to obtain additional income to lower ratios)*

13.      The reference to "escrow letter from attorney" referred to a requirement of an FHA loan for a multi-family home that the borrow have three months reserves, or in this case,

BOST_213793.1

$6,225 in liquid assets.  This requirement is found in Chapter 1, Section 2, paragraph 1-8(C)(3) of <u>Exhibit A</u>.

14.     Mendes never provided to Cendant a bank statement that showed where the $9,000 deposit on their sales contract for the purchase of the Property came from or an escrow letter from their attorney.

15.     "PITI" referred to in the Final Commitment is the amount that the Mendes would have to pay monthly toward Principal, Interest, Taxes, and Insurance in connection with their proposed purchase of the Property.  The PITI on Mendes' proposed loan from Cendant was $2,490.34.

16.     Mendes never provided to Cendant an appraisal that evidenced that PITI didn't exceed 75% of the net market rental value for all 3 units of the Property.

17.     Cendant refunded to Mendes a $350 application that Mendes had paid in June 2001.

18.     After Cendant received the addendum, Kevin Cogan and Linda Bisthine of Cendant sent the appraiser additional data that might support an increase in the estimated market rental of the Property.  Attached hereto as <u>Exhibit H</u> is an August 28, 2001, fax from Kevin Cogan of Cendant to the appraiser with comparable market rental data.  Attached hereto as <u>Exhibit I</u> is a September 14, 2001 fax  from Linda Bisthine of Cendant to the appraiser.  In her fax cover sheet, Ms. Bisthine asked the appraiser to "look at the attached listings to advise if [the rental income] could be raised further."

Signed under the penalties of perjury on September 21, 2006

<u>/s/ Claire Taylor</u>
Claire Taylor

4

**Exhibit A**

# FOREWORD

This Handbook describes the basic mortgage credit underwriting requirements for single-family (one to four units) mortgage loans insured under the National Housing Act. For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout this Handbook and must be supported by sufficient documentation.

These underwriting guidelines discuss the types of transactions and properties eligible for mortgage insurance, and FHA's requirements for determining the borrower's ability and willingness to repay the debt. Information regarding valuation and architectural requirements can be found in HUD Handbooks 4150.1 REV-1 and 4145.1 REV-2, CHG-1, respectively. These underwriting guidelines apply to mortgages insured under Sections 203(b) and 234(c) of the National Housing Act, and are also generally applicable to other single-family mortgage insurance programs (except where inconsistent with special features of those programs). Other single-family mortgage insurance programs are described in HUD Handbook 4000.2 REV-2.

This Handbook provides direction to lenders and FHA staff and is based on FHA 's experience in insuring single-family mortgages. While it is not FHA's intent to insure mortgages that are likely to result in default, regardless of the borrower's equity, lenders may exercise some discretion in the underwriting of home mortgages where the borrower's financial and other circumstances are not specifically addressed by this Handbook. However, lenders are expected to exercise both sound judgment and due diligence in the underwriting of loans to be insured by FHA. For ease of reading, we have chosen to use "lender" in lieu of "mortgagee" throughout this user guide. However, "lender" is to be interpreted as a FHA-approved mortgagee as described in 24 CFR § 202.10. Similarly, "loan" is to be interpreted as "mortgage" as also described in 24 CFR § 202.10

Questions not addressed in the text should be directed to the appropriate Home Ownership Center (HOC) or the Director, Office of Single Family Program Development, HUD Headquarters, Robert Weaver Building, 451 Seventh St., SW, Washington, DC 20410-8000.

References:

1) 4000.2 REV-2 Mortgagees' Handbook, Application through Insurance
2) 4145.1 REV-2, CHG-1, Architectural Processing and Inspections
3) 4150.1 REV-1 Valuation Analysis for Home Mortgage Insurance
4) 4330.1 REV-5 Administration of Insured Home Mortgages
5) Code of Federal Regulations, Title 24 (24 CFR). Codifies the general and permanent rules of the Department.

# TABLE OF CONTENTS

## CHAPTER 1    INTRODUCTION

1-1  WHAT FHA INSURES ................................................................... 1-1

### SECTION 1:    OCCUPANCY STATUS
1-2  PRINCIPAL RESIDENCES .......................................................... 1-1
1-3  SECONDARY RESIDENCES ....................................................... 1-1
1-4  INVESTMENT PROPERTIES ...................................................... 1-1
1-5  NONPROFIT ORGANIZATIONS AND GOVERNMENT AGENCIES .............. 1-1

### SECTION 2:    MAXIMUM MORTGAGE AMOUNTS
1-6  MAXIMUM MORTGAGE AMOUNT ........................................... 1-1
1-7  MAXIMUM MORTGAGES FOR PURCHASE TRANSACTIONS..................... 1-1
1-8  TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS 1-1

### SECTION 3:    SETTLEMENT REQUIREMENTS
1-9  SETTLEMENT REQUIREMENTS ............................................... 1-1

### SECTION 4:    REFINANCE TRANSACTIONS
1-10  REFINANCING............................................................................... 1-1
1-11  CALCULATING THE MORTGAGE AMOUNT ON REFINANCES.................. 1-1
1-12  STREAMLINE REFINANCES ...................................................... 1-1

### SECTION 5:    SECONDARY FINANCING
1-13  SECONDARY FINANCING .......................................................... 1-1

## CHAPTER 2    MORTGAGE CREDIT ANALYSIS
2-1  OVERVIEW ................................................................................... 2-1
2-2  MORTGAGE ELIGIBILITY (BORROWERS) ............................ 2-1
2-3  ANALYZING THE BORROWER'S CREDIT ........................... 2-1
2-4  CREDIT REPORT REQUIREMENTS ....................................... 2-1
2-5  CREDIT ELIGIBILITY REQUIREMENTS ............................... 2-1

### SECTION 2:    EFFECTIVE INCOME
2-6  STABILITY OF INCOME ............................................................. 2-1
2-7  SALARIES, WAGES, AND OTHER FORMS OF INCOME................ 2-1
2-8  EMPLOYMENT BY FAMILY-OWNED BUSINESS .................. 2-1
2-9  SELF-EMPLOYED BORROWERS................................................ 2-1

### SECTION 3:    BORROWER'S CASH INVESTMENT IN THE PROPERTY
2-10  FUNDS TO CLOSE........................................................................ 2-1

### SECTION 4:    TYPES OF LIABILITIES
2-11  LIABILITIES................................................................................... 2-1

### SECTION 5:    BORROWER QUALIFYING
2-12  DEBT TO INCOME RATIOS ....................................................... 2-1
2-13  COMPENSATING FACTORS........................................................ 2-1

## SECTION 6:    SPECIAL UNDERWRITING INSTRUCTIONS

| | | |
|---|---|---|
| 2-14 | TEMPORARY INTEREST RATE BUYDOWNS | 2-1 |
| 2-15 | ADJUSTABLE RATE MORTGAGES | 2-1 |
| 2-16 | CONDOMINIUM UNITS: UTILITY EXPENSES | 2-1 |
| 2-17 | CONSTRUCTION- PERMANENT MORTGAGE PROGRAM | 2-1 |
| 2-18 | MORTGAGE ASSISTANCE FOR DISASTER VICTIMS [Section 203(h)] | 2-1 |
| 2-19 | ENERGY EFFICIENT HOMES (EEH) | 2-1 |
| 2-20 | ENERGY EFFICIENT MORTGAGE (EEM) PROGRAM | 2-1 |

# CHAPTER 3 DOCUMENTATION AND OTHER PROCESSING REQUIREMENTS

## SECTION 1:    UNDERWRITING DOCUMENTATION

| | | |
|---|---|---|
| 3-1 | APPLICATION PACKAGE | 3-1 |
| 3-2 | DOCUMENTATION STANDARDS | 3-1 |
| 3-3 | REAL ESTATE CERTIFICATION | 3-1 |
| 3-4 | AMENDATORY CLAUSE | 3-1 |

## SECTION 2: PROCESSING REQUIREMENTS

| | | |
|---|---|---|
| 3-5 | POWER OF ATTORNEY | 3-1 |
| 3-6 | LOAN APPLICATION DOCUMENT PROCESSING | 3-1 |
| 3-7 | SEVEN-UNIT DOCUMENTATION | 3-1 |
| 3-8 | HOTEL AND TRANSIENT USE | 3-1 |
| 3-9 | SALES CONTRACT AND LOAN CLOSING | 3-1 |
| 3-10 | LENDER RESPONSIBILITY AT CLOSING | 3-1 |

## SECTION 3: FAIR HOUSING AND OTHER FEDERAL REQUIREMENTS

| | | |
|---|---|---|
| 3-11 | FEDERAL STATUTES AND REGULATIONS | 3-1 |
| 3-12 | FHA-PROCESSED HUD EMPLOYEE LOANS | 3-1 |

# CHAPTER 4 ASSUMPTIONS

| | | |
|---|---|---|
| 4-1 | GENERAL | 4-1 |
| 4-2 | RESTRICTIONS OF THE HUD REFORM ACT OF 1989 | 4-1 |
| 4-3 | RELEASE FROM LIABILITY | 4-1 |
| 4-4 | CREDIT-WORTHINESS REVIEW PROCESSING | 4-1 |
| 4-5 | LTV REDUCTION REQUIREMENTS | 4-1 |

# APPENDICES

| | |
|---|---|
| I. | SINGLE FAMILY HOC JURISDICTIONS |
| II. | CLOSING COSTS AVERAGES FOR STATES |

## FORMS RELEVANT TO HANDBOOK 4155.1

| Form # | Form Name | OMB Approval Number |
|---|---|---|
| HUD 92564-VC | Valuation Condition-Notice to Lender | 2502-0538 |
| HUD 92564-HS | Homebuyers Summary | 2502-0538 |
| HUD 92900-A | Addendum to URLA | 2502-0059 |
| URLA (FNMA 1003 / FHLMC 65) | Uniform Residential Loan Application | N/A |
| HUD 92900-PUR | Mortgage Credit Analysis Worksheet Purchase Money Mortgage | 2502-0059 |
| HUD 92900-WS | Mortgage Credit Analysis Worksheet | 2502-0059 |
| HUD-1 | Settlement Statement | 2502-0265 |
| GFE | Good Faith Estimate | |
| HUD 92300 | Mortgagee Assurance of Completion | 2502-0189 |
| URAR (FNMA 1004 / FHLMC 70) | Uniform Residential Appraisal Report | N/A |
| HUD 92800.5B | Conditional Commitment-DE Statement of Appraised Value | 2502-0494 |
| VA-CRV | VA-Certificate of Reasonable Value | 2900-0045 |
| HUD 92210 | Request for Credit Approval of Substitute Mortgagor | 2502-0036 |
| HUD 92210.1 | Approval of Purchaser and Release of Seller | 2502-0036 |
| HUD 92561 | Borrower's Contract with Respect to Hotel and Transient Use of Property | 2502-0059 |

**4155.1 REV-5**

## CHAPTER 1

## UNDERWRITING THE MORTGAGE

1-1 **WHAT FHA INSURES.** FHA insures mortgages on properties that consist of detached or semi-detached dwellings, townhouses or row houses, and individual units within FHA-approved condominium projects. Except as otherwise stated in this Handbook, FHA's single-family programs are limited to owner-occupied principal residences only. FHA will not insure mortgages on commercial enterprises, boarding houses, hotels and motels, tourist houses, private clubs, bed and breakfast establishments, and fraternity or sorority houses.

### SECTION 1: OCCUPANCY STATUS

1-2 **PRINCIPAL RESIDENCES.** A principal residence is a property that will be occupied by the borrower for the majority of the calendar year. At least one borrower must occupy the property and sign the security instrument and the mortgage note for the property to be considered owner-occupied. Our security instruments require a borrower to establish bona fide occupancy in the home as the borrower's principal residence within 60 days after signing the security instrument with continued occupancy for at least one year.

To prevent circumvention of the restrictions on FHA-insured mortgages to investors, we generally will not insure more than one mortgage for any borrower. Any person individually or jointly owning a home covered by a mortgage insured by FHA in which ownership is maintained may not purchase another principal residence with FHA mortgage insurance except under the situations described below. Properties previously acquired as investment properties are not subject to these restrictions.

We will not insure a mortgage if we conclude that the transaction was designed to use FHA mortgage insurance as a vehicle for obtaining investment properties, even if the property to be encumbered will be the only one owned using FHA mortgage insurance. We do not object to homebuyers using FHA mortgage insurance more than once if compatible with the homebuyer's needs and resources as follows:

A. **Relocations.** If the borrower is relocating and re-establishing residency in another area not within reasonable commuting distance from the current principal residence, the borrower may obtain another mortgage using FHA insured financing and is not required to sell the existing property covered by a FHA-insured mortgage. The relocation need not be employer mandated to qualify for this exception. Further, if the borrower returns to an area where he or she owns a property with an FHA-insured mortgage, it is not required that the borrower re-establish primary residency in that property in order to be eligible for another FHA insured mortgage.

**B.**   **Increase in Family Size.** The borrower may be permitted to obtain another home with an FHA-insured mortgage if the number of legal dependents increases to the point that the present house no longer meets the family's needs. The borrower must provide satisfactory evidence of the increase in dependents and the property's failure to meet the family's needs.

The borrower also must pay down the outstanding mortgage balance on the present property to a 75 percent or lower loan-to-value (LTV) ratio. A current residential appraisal must be used to determine LTV compliance. Tax assessments, market analyses by real estate brokers, etc., are not acceptable as proof of LTV compliance.

**C.**   **Vacating a Jointly Owned Property.** If the borrower is vacating a residence that will remain occupied by a co-borrower, the borrower is permitted to obtain another FHA-insured mortgage. Acceptable situations include instances of divorce, after which the vacating ex-spouse will purchase a new home, or one of the co-borrowers will vacate the existing property.

**D.**   **Non-Occupying Co-Borrower.** A non-occupying co-borrower on property being purchased with an FHA-insured mortgage as a principal residence by other family members may have a joint interest in that property as well as in a principal residence of their own with a FHA-insured mortgage. (See paragraph 1-8 B for additional information).

Under no circumstances may investors use the exceptions described above to circumvent FHA's ban on loans to private investors and acquire rental properties through purportedly purchasing "principal residences." Considerations in determining the eligibility of a borrower for one of these exceptions are the length of time the previous property was owned by the borrower and the circumstances that compel the borrower to purchase another residence with an FHA-insured mortgage. *In all other cases, the purchasing borrower either must pay off the FHA-insured mortgage on the previous residence or terminate ownership of that property before acquiring another FHA-insured mortgage.*

**1-3**   **SECONDARY RESIDENCES.** A secondary residence is a property the borrower occupies in addition to his or her principal residence. Secondary residences are only permitted when the appropriate Home Ownership Center (HOC) agrees that an undue hardship exists, meaning that affordable rental housing that meets the needs of the family is not available for lease in the area or within reasonable commuting distance to work, and the maximum loan amount is 85 percent of the lesser of the appraised value or sales price. Direct Endorsement (DE) lenders are not authorized to grant hardship exceptions. Any request for a hardship exception must be submitted by the lender in writing to the appropriate HOC. HOC jurisdictions are listed in Appendix I. A borrower may have only

**4155.1 REV-5**

one secondary residence at any time. All the following conditions must be met for secondary residences:

**A.** The secondary residence must *not* be a vacation home or otherwise used primarily for recreational purposes; and

**B.** The borrower must obtain the secondary residence because of seasonal employment, employment relocation, or other circumstances not related to recreational use of the residence; and

**C.** There must be a demonstrated lack of affordable rental housing meeting the needs of the borrower in the area or within a reasonable commuting distance of the borrower's employment. Documentation to support this must include:

　　1.　A satisfactory explanation from the borrower of the need for a secondary residence and the lack of available rental housing in the area that meets the need.

　　2.　Written evidence from local real estate professionals who verify a lack of acceptable rental housing in the area.

**1-4    INVESTMENT PROPERTIES.** An investment property is a property that is not occupied by the borrower as a principal residence or as a secondary residence. With permission from the appropriate HOC, private investors, including nonprofit organizations not meeting the criteria described in paragraph 1-5 A, may obtain FHA-insured mortgages for the following reasons:

**A.** Purchasing HUD Real Estate Owned (REO) properties. Owner occupancy is not required when the jurisdictional HOC sells the property and permits the purchaser to obtain FHA-insured financing on the investment property.

**B.** Streamline refinancing without appraisals. See paragraph 1-12 for additional qualifying information.

**C.** Underwriting Considerations:

　　1.　Individual investors who credit qualify may assume mortgages made on investment properties. This applies to the transactions described in paragraphs 1-4 A and B, as well as to investment properties purchased before the 1989 ban on investors that have been subsequently streamline refinanced.

　　2.　Qualifying ratios, the treatment of projected rental income, etc., are described in Chapter 2, paragraph 2-7 M.

3. ARMs and graduated payment mortgages (GPMs) are <u>not</u> permitted on investment properties.

4. Except for streamline refinances in which the mortgage was originally insured in the name of a business, FHA will not insure loans made solely in the name of a business entity (such as a corporation, partnership, or sole proprietorship) or trust. One or more individuals, along with the business entity or trust, must be analyzed for creditworthiness. The individual(s) and the business entity or trust must appear on the mortgage note. The business entity, trust, or individual(s) may appear on the property deed or title. All parties appearing on the property deed or title must also appear on the security instrument (i.e., mortgage, deed of trust, security deed).

1-5    **NONPROFIT ORGANIZATIONS AND STATE AND LOCAL GOVERNMENT AGENCIES.** Nonprofit organizations and state and local government agencies are permitted to purchase properties with FHA-insured mortgages, subject to the conditions listed below. These government and nonprofit organizations are eligible for the same percentage of financing available on owner-occupied principal residences. Nonprofit agencies may only obtain FHA-insured fixed rate mortgages, and only an existing FHA-insured mortgage is eligible for refinancing and may never result in equity withdrawal.

A.    **Nonprofit Organizations.** Nonprofit organizations that intend to sell or lease the property to low- or moderate-income individuals (generally defined as income not exceeding 115 percent of the applicable median income) may obtain FHA-insured financing on rental property. The appropriate HOC is responsible for determining the nonprofit agency's eligibility to participate in FHA programs; the DE lender is responsible for determining the agency's financial capacity for repayment. Lenders also must verify that the agency is approved as a participating nonprofit agency as of the date of underwriting. Lenders can verify nonprofit approval status by visiting the HUD Website at www.hud.gov.

B.    **Nonprofit Approval.** In order to qualify to purchase properties with FHA-insured mortgages and to obtain the same percentage of financing available to owner-occupants, HUD must approve the nonprofit agency. The nonprofit must:

1.    Be of the type described in Section 501(c)(3) as exempt from taxation under Section 501(a) of the Internal Revenue Code of 1986; and

2.    Have a voluntary board, and no part of the net earnings of the organization or funds from the transaction may benefit any board member, founder, contributor, or individual.

**4155.1 REV-5**

3. Have two years' experience as a provider of housing for low- and moderate- income persons.

A nonprofit agency not meeting the above requirements, including religious and charitable organizations, may only purchase properties backed by FHA mortgage insurance under the conditions described for other investors in paragraph 1-4A.

Detailed instructions on qualifying nonprofit organizations as mortgagors, including documentation requirements, are contained in Mortgagee Letter 2002-01. Questions concerning a nonprofit agency's approval should be directed to the appropriate HOC.

C. **State and Local Government Agencies.** State and local government agencies involved in the provision of housing may obtain FHA-insured financing provided the agency meets the criteria described below. Loan applications from these entities may be processed under the DE program without prior approval from the appropriate HOC.

The agency must provide evidence from its legal counsel that the agency has the legal authority and capacity to become the borrower, that the state or local government is not in bankruptcy, and that there is no legal prohibition that would prevent the lender from obtaining a deficiency judgment (if permitted by state law for other types of borrowers) on FHA's behalf in the event of foreclosure or deed-in-lieu of foreclosure. Credit reports, financial statements, bank statements, CAIVRS/LDP/GSA checks are not required.

## SECTION 2: MAXIMUM MORTGAGE AMOUNTS

**1-6     MAXIMUM MORTGAGE AMOUNT.** The maximum insurable mortgage is the lesser of: (1) the statutory loan limit for the area (typically a county or metropolitan statistical area (MSA)) or (2) the applicable loan-to-value (LTV) limit.

Most FHA mortgages require payment of an upfront mortgage insurance premium (UFMIP). The statutory loan amount and loan-to-value limits described in this Handbook do not include the UFMIP. All descriptions of maximum insurable mortgages throughout this Handbook, unless otherwise stated, exclude UFMIP.

**A.     Statutory Loan Amount Limits.** The statutory loan amount limits vary by program and the number of family units within the dwelling, and apply to both purchases and refinances. For most programs, they may be increased when housing costs for the area support higher limits. The National Housing Act specifies the maximum loan amount for each program.

In high-cost areas, the maximum 203(b) mortgage amount (for a one-unit property) can be increased by the appropriate HOC to 95 percent of the median one-family house price in the area or 87 percent of the Federal Home Loan Mortgage Corporation (Freddie Mac) limit, whichever is less. Higher limits are available in Hawaii, Alaska, Guam, and Virgin Islands but must be justified by local house prices.

The current FHA standard and high-cost area mortgage limits can be accessed from the lender Web page on HUD's Web site at www.hud.gov or on FHA Connection at https://entp.hud.gov/clas/. A Mortgagee Letter is also issued each year announcing the new mortgage limits.

The standard area-wide mortgage limits and the maximum high-cost limits are indexed to the Freddie Mac conforming loan limit. Therefore, as the conventional conforming loan limits increase, the FHA loan limits also increase.

**B.     Loan-to-Value Limitations.**

The mortgage insurance program, whether the loan is for the purchase of a property or for the refinance of an existing debt, the age of the property, and several additional criteria (as per paragraph 1-8) are used to determine the maximum LTV percentage available to the borrower. This LTV percentage is then applied to the lesser of the sales price or the appraised value, as described in paragraph 1-7.

**4155.1 REV-5**

**1-7    MAXIMUM MORTGAGES/CASH INVESTMENT REQUIREMENTS FOR PURCHASE TRANSACTIONS.** The property's sales price, subject to certain required adjustments as described in A-C below, or the appraised value, if less, is multiplied by a loan-to-value ratio. The resulting amount is the maximum mortgage that FHA will insure. The borrower must make a cash investment at least equal to the difference between the sales price and the resulting maximum mortgage amount.

Except for certain property and transaction types as described in 1-8 below, the lower of the adjusted sales price or the appraised value is multiplied by the factor shown in the chart below. The resulting amount is the maximum loan that FHA will insure *provided* that the mortgagor has made a cash investment of at least three percent of the contract sales price.

Borrower-paid closing costs may be used to meet the three percent minimum cash investment. If the borrower pays no closing costs at settlement, the loan amount must be reduced sufficiently so that the three percent minimum cash investment is met.

The maximum LTV limits shown below are functions of the property's appraised value or the adjusted sales price (whichever is less) and the State in which the property is located. (A list of states and their closing costs averages may be found in Appendix II.) The maximum LTVs for most purchase transactions are as follows:

---

### Maximum Loan-to-Value Percentages
(Purchase Transactions Only on Proposed and Existing Construction)

**States with Average Closings Costs *At or Below* 2.1 Percent of Sales Price**

- **98.75 percent**: For properties with values/sales prices equal to or less than $50,000.

- **97.65 percent**: For properties with values/sales prices in excess of $50,000 up to $125,000

- **97.15 percent**: For properties with values/sales prices in excess of $125,000.

**States with Average Closings Costs *Above* 2.1 Percent of Sales Price**

- **98.75 percent**: For properties with values/sales prices equal to or less than $50,000.

- **97.75 percent**: For properties with values/sales prices in excess of $50,000.

---

Our definition of closing costs does not include discount points or prepaid items and, thus, these fees and expenses cannot be used in meeting the cash investment requirements; see paragraph 1-9 A for additional information including a description of closing costs eligible for meeting the minimum cash investment requirement.

The borrower may pay for the appraisal and credit report with a credit card. However, when these fees are paid for in this manner, they may not be counted in meeting the minimum investment requirement.

Closing costs paid by the seller or lender may not be used to meet the minimum investment requirement. Subject to the limits described below, we are not concerned with the dollar amount of any particular fee charged to the seller.

A.  **Seller Contributions.**  The seller (or other interested third parties such as real estate agents, builders, developers, etc., or a combination of parties) may contribute up to six percent of the property's sales price toward the buyer's actual closing costs, prepaid expenses, discount points, and other financing concessions. Contributions exceeding six percent of the sales price or exceeding the actual cost of prepaid expenses, discounts points, and other financing concessions will be treated as inducements to purchase, thereby reducing the amount of the mortgage. Closing costs normally paid by the borrower are considered contributions if paid by the seller. Inducements to purchase are described in paragraph B, below.

The six percent limitation also includes seller payment for permanent and temporary interest rate buydowns and other payment supplements, payments of mortgage interest for fixed rate mortgages and GPMs only (but not principal), mortgage payment protection insurance, and payment of UFMIP.

Fees typically paid by the seller under local or state law, or local custom, such as real estate commissions, charges for pest inspections, fees paid for trustees to release a deed of trust, etc., are not considered contributions. The dollar limit for seller contributions is calculated by using Attachment A on the HUD-92900-PUR/HUD-92900WS. Each dollar exceeding FHA's six percent limit must be subtracted from the property's sales price before applying the appropriate LTV ratio.

B.  **Inducements to Purchase.**  Certain expenses (beyond those described above) paid on behalf of the borrower, as well as other inducements to purchase, result in a dollar-for-dollar reduction to the sales price before applying the appropriate LTV ratio. These inducements include decorating allowances, repair allowances, moving costs, and other costs as determined by the appropriate HOC. We also require dollar-for-dollar

**4155.1 REV-5**

reductions to the sales price for excess rent credit (see 2-10 N), as well as for gift funds not meeting the requirements stated in Chapter 2.

Personal property items such as cars, boats, riding lawn mowers, furniture, televisions, etc., given by the seller to consummate the sale result in a reduction to the mortgage. The value of the item(s) must be deducted from the sales price and the appraised value of the property (if not already done so by the appraiser) before applying the LTV ratio. However, certain items, depending upon local custom or law, may be considered as part of the real estate transaction with no adjustment to the sales price or appraised value necessary. These items include ranges, refrigerators, dishwashers, washers, dryers, carpeting, window treatments, and other items as determined by the jurisdictional HOC. That office determines if these items affect value and are considered customary. Replacement of existing equipment or other realty items by the seller before closing, such as carpeting or air conditioners, does not require a value adjustment provided no cash allowance is given to the borrower.

In addition, if the seller or builder of the property agrees to pay any portion of the borrower's sales commission on the sale of the borrower's present residence, the amount paid by the seller or builder is an inducement to purchase and must be subtracted dollar for dollar from the sales price before the LTV ratio is applied. Similarly, a borrower not paying real estate commission on the sale of a present home constitutes a sales concession, if the real estate broker or agent is involved in both transactions and the seller of the property purchased by the borrower pays a real estate commission exceeding that typical for the area. In these situations, the amount paid by the seller above the normal real estate commission is considered an inducement to purchase and must be subtracted from the sales price of the property being purchased before applying the LTV ratio.

C.    **Additions to the Mortgage Amount.** In some cases, the maximum mortgage amount may be increased. Except for solar energy systems discussed below, an increase generally is permitted only when the appraised value exceeds the sales price. Only the amount by which the value exceeds the sales price may be added; any remaining costs become part of the borrower's settlement requirements. The following may result in an increase to the mortgage amount:

1.    **Repairs and Improvements.** Repairs and improvements required by the appraiser as essential for property eligibility and to be paid by the borrower may be added to the sales price before calculating the mortgage amount. (The appraised value will reflect these requirements.) For the cost of repairs and improvements to be eligible for inclusion in the mortgage amount, the sales contract or

addendum must identify the borrower as responsible for paying for or otherwise completing the repairs or improvements.

The amount that may be added to the sales price before calculating the maximum mortgage amount is the lowest of:

a. The amount the value of the property exceeds the sales price; or
b. The appraiser's estimate of repairs and improvements; or
c. The amount of the contractor's bid, if available.

Only repairs and improvements *required* by the appraiser may be included. Any repairs completed by the borrower on the property *before* the appraisal is made are not eligible for inclusion in calculating the maximum mortgage. The amount that cannot be financed into the mortgage will become part of the borrower's required cash investment.

If repairs cannot be completed before loan closing due to weather-related delays, the lender must establish an escrow account to ensure eventual completion of all required repairs. See HUD Handbook 4145.1 REV-2 for details.

2.  **Energy-Related Weatherization Items.** If weatherization items are to be added to the property and paid for by the borrower, the mortgage amount may be increased by the cost of those items as described below. Weatherization items include thermostats, insulation, storm windows and doors, weather stripping and caulking, etc. These items may be added to both the sales price *and* the appraised value before determining the maximum mortgage amount. (A contractor's statement of cost of work completed or a buyer's estimate of the cost of materials must be submitted. See HUD Handbook 4150.1 REV-1 for details.) If the weatherization items cannot be completed before loan closing due to weather-related delays, the lender must establish an escrow account to ensure eventual completion of all items. See HUD Handbook 4145.1 REV-2 for details.

The amount that may be added in calculating the maximum mortgage is:

a.  $2000 without a separate value determination; or
b.  Up to $3500 if supported by a value determination by an approved or FHA roster appraiser or DE underwriter; or
c.  More than $3500 subject to a value determination by an approved or FHA roster appraiser or DE underwriter and a

separate on-site inspection made by a FHA-approved fee inspector or DE staff appraiser.

3. **Solar Energy Systems.** The cost of solar energy systems may be added *directly to the mortgage amount* (before adding the UFMIP) after applying the LTV ratio limits. The *statutory* mortgage limit for the area also may be exceeded by 20 percent to accommodate the cost of the system.

The amount that may be added to the mortgage is limited to the *lesser* of the solar energy system's replacement cost or its effect on the property's market value. Both active and passive solar systems are acceptable, as are wind-driven systems. See HUD Handbooks 4150.1 REV-1 and 4930.2 for details.

**1-8 TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS.** Certain types of loan transactions affect the amount of financing available and the calculation of the maximum mortgage. These transactions include identity-of-interest, properties with non-occupying co-borrowers, three- and four-unit properties, properties for which a house will be constructed by the borrower on his or her own land or as a general contractor, payoffs of land contracts, and transactions involving properties under construction or less than a year old. Unless otherwise stated in this Handbook, the mortgage calculation procedures described in paragraph 1-6 also apply.

**A. Identity-of-Interest Transactions.** Identity-of-interest transactions on principal residences are restricted to a maximum LTV ratio of *85 percent.* Identity-of-interest is defined as a sales transaction between parties with family relationships or business relationships. However, maximum financing above 85 percent LTV is permissible under the following circumstances:

1. A family member purchases another family member's home as a principal residence.

If a property is sold from one family member to another and is the seller's investment property, the maximum mortgage is the lesser of either:

a. 85 percent of the appraised value, or
b. The appropriate LTV ratio percentage applied to the sales price, plus or minus required adjustments.

*The 85 percent limit may be waived if the family member has been a tenant in the property for at least six months*

*immediately predating the sales contract. A lease or other written evidence must be submitted to verify occupancy.*

2.  An employee of a builder purchases one of the builder's new homes or models as a principal residence.

3.  A current tenant purchases the property that he or she has rented for at least six months immediately predating the sales contract. (A lease or other written evidence must be submitted to verify occupancy.)

4.  A corporation transfers an employee to another location, purchases that employee's home, and then sells the home to another employee.

B.  **Non-Occupying Borrowers.** When there are two or more borrowers, but one or more will not occupy the property as a principal residence, the maximum mortgage is limited to a *75 percent* LTV. However, maximum financing, as described in paragraph 1-7, *is* available for borrowers related by blood, marriage or law (spouses, parent-child, siblings, stepchildren, aunts-uncles/nieces-nephews, etc.), or for unrelated individuals that can document evidence of a family-type, longstanding, and substantial relationship *not arising out of the loan transaction.* All borrowers, regardless of occupancy status, must sign the security instrument and mortgage note. If a parent is selling to a child, the parent cannot be the co-borrower with the child on the new mortgage unless the loan-to-value is 75 percent or less.

To reduce risk exposure, mortgages with non-occupying co-borrowers are limited to one-unit properties if the LTV will exceed 75 percent. While we do not object to legitimate transactions in which non-occupant borrowers assist in the financing of the property–such as when parents help their children buy a first home–this arrangement may not be used by non-occupant borrowers to develop a portfolio of rental properties. The degree of financial contribution by the non-occupant borrower, and the number of properties similarly owned, may indicate that an investor loan has become the practical reality and that, in effect, family members are acting as "strawbuyers." FHA does not impose additional underwriting criteria on such transactions, such as specific qualifying ratios the occupying-borrower must meet individually. Lenders must judge each transaction on its merits.

C.  **Three- and Four-Unit Properties.** Regardless of occupancy status, the property must be self-sufficient (i.e., the maximum mortgage is limited so that the ratio of the monthly mortgage payment, divided by the monthly net rental income, does not exceed 100 percent). The mortgage

calculations described below are in addition to the calculations detailed in paragraphs 1-6 and 1-7.

1.  The monthly payment is the principal, interest, taxes, and insurance (PITI), including mortgage insurance, plus any homeowners' association dues, computed at the note rate (no consideration for buydowns may be given).

2.  Net rental income is the appraiser's estimate of fair market rent from *all units*, including the unit chosen by the borrower for occupancy, less the appraiser's estimate for vacancies or the vacancy factor used by the jurisdictional HOC, whichever is greater.

    This calculation is used only to determine the maximum loan amount. Borrowers must still qualify for the mortgage based on income, credit, cash to close, and the projected rents received from the remaining units. The projected rent may only be considered as gross income for qualifying purposes; it may not be used to offset the monthly mortgage payment.

3.  The borrower must have reserves equivalent to three months' PITI after closing on purchase transactions. Reserves cannot be derived from a gift.

D.  **Building on Own Land.** If the borrower acts as a general contractor, and builds a house on land that the borrower already owns, or acquires land separately, maximum financing is available if the borrower receives no cash from the settlement. The appropriate LTV limits are applied to the *lesser of*:

1.  The appraised value; or
2.  The documented acquisition cost of the property, which includes: (a) the builder's price, or the sum of all subcontractor bids, materials, etc.; (b) cost of the land (if the land has been owned more than six months or was received as an acceptable gift, the *value* of the land may be used instead of its cost); (c) interest and other costs associated with any construction loan obtained by the borrower to fund construction of the property; (d) the closing costs to be paid by the borrower; and (e) reasonable discount points.

Equity in the land (value or cost, as appropriate, minus the amount owed) may be used for the borrower's entire cash investment. However, if the borrower receives more than $250 cash at closing, the loan is limited to 85 percent of the sum of the appraised value and allowable closing costs. Replenishment of the borrower's own cash expended during construction

is not considered as "cash back," provided the borrower can substantiate with cancelled checks and paid receipts all out-of-pocket funds used for construction.

E.  **Paying Off Land Contracts.**  If the borrower will use the loan to complete payment on a land contract, contract for deed, or other similar type financing arrangement in which the borrower does not have title to the property, the new mortgage may be processed as either a purchase or a refinance transaction with maximum FHA-insured financing *if the borrower receives no cash at closing.*  If all loan proceeds are used to pay the outstanding balance on the land contract and eligible repairs, renovations, etc., the appropriate LTV ratio is applied to the *lesser of:*

1.  The appraised value; or
2.  The total cost to acquire the property (the original purchase price, plus any documented costs the purchaser incurs for rehabilitation, repairs, renovation, or weatherization), plus allowable closing costs and, if treated as a refinance, reasonable discount points.

Equity in the property (original sales price minus the amount owed) may be used for the borrower's entire cash investment.  However, *if the borrower receives more than $250 cash at closing*, the loan is limited to 85 percent of the sum of the appraised value and allowable closing costs. Replenishment of the borrower's own cash expended for repairs, improvements, renovation, etc., is not considered as "cash back," provided the borrower can substantiate with cancelled checks and paid receipts all out-of-pocket funds spent for those purposes.

F.  **Properties Under Construction or Existing Construction Less than One Year Old**

Properties not meeting the criteria shown below are considered as under construction or existing construction-less than one year old and are limited to 90 percent financing, i.e., 90 percent of the lesser of the appraiser's estimate of value or sales price, plus or minus the adjustments required by paragraph 1-7, A-C.  For a property to be eligible for greater than 90 percent financing, whether or not it has been previously occupied, it must meet one of the criteria described below.  Otherwise, the property is classified as "under construction" or "less than one year old" and is limited to 90 percent financing.

1.  Construction was completed more than one year preceding the borrower's signature on the Addendum to Uniform Residential Loan Application (form HUD-92900-A, page 2); or
2.  The dwelling's site plans and materials were approved by the Department of Veterans Affairs (VA), an eligible DE underwriter,

**4155.1 REV-5**

or a builder under FHA's builder certification procedures, (see HUD Handbook 4145.1 REV-2) before construction began; or

3. The local jurisdiction has issued both a building permit (prior to construction) and a Certificate of Occupancy or equivalent. (NOTE: This paragraph does not apply to condominiums or manufactured housing because of the special circumstances regarding their approval.); or

4. The dwelling is covered by a builder's ten-year insured warranty plan that is acceptable to HUD; or

5. The dwelling will be moved to a new location and the property is eligible for an insured mortgage at the new location by one of the methods described in 2 above.

## SECTION 3: SETTLEMENT REQUIREMENTS

**1-9**   **SETTLEMENT REQUIREMENTS.** For each transaction, the lender must estimate the settlement requirements to determine the cash required to close the mortgage transaction. In addition to the minimum cash investment described in paragraph 1-7, additional borrower expenses, including those described in A-I below, must be included in the total amount of cash the borrower must provide at mortgage settlement. The difference between the amount of the FHA-insured mortgage, excluding any UFMIP, and the total cost to acquire the property, including these expenses, determines the cash needed for closing a loan eligible for FHA mortgage insurance.

    **A.**   **Closing Costs.** These include those FHA-approved non-recurring costs associated with the mortgage transaction, including the appraisal fee, any inspection fees, the actual cost of credit reports, the loan origination fee, settlement fee, deposit verification fees, home inspection service fees up to $300, the cost of title examination and title insurance, document preparation fees (if performed by a third-party not controlled by the lender), property survey fees, attorney's fees, recording fees, transfer stamps, and taxes, as well as test and certification fees, such as flood-zone determination fees, water tests, and other costs as determined by the appropriate HOC.

    **B.**   **Prepaid Items.** Prepaid items are collected at closing to cover accrued and unaccrued hazard insurance and mortgage insurance premiums, taxes and per diem interest, and include other similar fees and charges. The lender must use a minimum of 15 days of per diem interest in its estimate of prepaid items.

    To reduce the burden on borrowers whose loans were scheduled to close at the end of the month but did not due to unforeseen circumstances, lenders and borrowers may agree to credit the per diem interest to the borrower and have the mortgage payments begin the first of the succeeding month. However, the dollar amount of the cash credit is not to be used to reduce the minimum cash investment.

    **C.**   **Discount Points.** Discount points that are being paid by the borrower become part of the total cash investment but are not eligible for meeting the minimum cash investment requirement.

    **D.**   **Non-Realty (Chattel) or Personal Property.** Non-realty or personal property items that the borrower agrees to pay for separately, including the amount subtracted from the sales price in determining the maximum mortgage, are included in the total cash requirements for the loan.

**4155.1 REV-5**

E. **Closing Costs Not Eligible for Meeting the Cash Investment Requirement.** Certain closing costs, such as commitment fees for guaranteeing the rate or points, and fees such as any ineligible real estate broker fees or any portion, or any such allowable fee not previously included in meeting the investment requirement are included in calculating the total cash needed to close the mortgage.

F. **UFMIPs.** Any UFMIP amounts paid in cash are added to the total cash settlement requirements. The UFMIP must be entirely financed into the mortgage (except for any amount less than $1) or paid entirely in cash and all mortgage amounts must be rounded down to a multiple of $1.

G. **Repairs and Improvements.** Repairs and improvements (or any portion) to be paid by the borrower that cannot be financed into the mortgage are part of the borrower's total cash requirements.

H. **Real Estate Broker Fees.** If the borrower is represented by a real estate buyer-broker and must pay a fee directly to the broker, that expense must be included in the total of the borrower's settlement requirements and appear on the HUD-1 Settlement Statement.

If the seller pays the buyer-broker fee as part of the sales commission, this is not to be considered an inducement to purchase or part of the 6 percent seller contributions limitation, *provided* that the seller is paying only the normal sales commission typical of that market. The lender must obtain a copy of the original listing agreement and compare it with the HUD-1 Settlement Statement to determine if the seller paid a buyer-broker fee in addition to the normal sales commission for that market. If the seller paid an additional commission for the buyer-broker fee, then this is considered an inducement to purchase.

I. **Mortgage Broker Fees.** If the borrower must pay a fee directly to a mortgage broker, that expense must be included in the total of the borrower's cash settlement requirements and appear on the HUD-1 Settlement Statement. (This requirement applies to instances in which the borrower independently engages a mortgage broker to seek financing and pays the broker directly. The payment may not come from the lending institution.)

J. **Premium Pricing on FHA Insured Mortgages.** Lenders may pay the borrower's allowable closing costs and/or prepaid items by "premium pricing". Closing costs paid in this manner need not be included as part of the 6 percent seller contribution limit. The funds derived from a premium priced mortgage:

1.    May <u>never</u> be used to pay any portion of the borrower's downpayment.

2.    Must be disclosed on the Good-Faith Estimate (GFE) and the HUD-1 Settlement Statement.  The GFE and HUD-1 must include an itemized statement indicating which items are being paid on the borrower's behalf; disclosing only a lump sum is not acceptable. Also, the amount paid on the borrower's behalf for each item may not exceed the allowable fee permitted by the jurisdictional HOC.

2.    Must be used to reduce the principal balance if the premium pricing agreement establishes a specific dollar amount for closing costs and prepaid expenses with any remaining funds, in excess of actual costs, reverting to the borrower.

3.    May not be used for payment of debts, collection accounts, escrow shortages or missed mortgage payments, or judgments.

K.    <u>**Yield Spread Premiums**</u>.  Yield spread premiums (YSP) are not part of the cash required to close but must be disclosed to borrowers on the Good Faith Estimate (GFE) and HUD-1 Settlement Statement in accordance with the Real Estate Settlement Procedures Act (RESPA) requirements.

4155.1 REV-5

## SECTION 4: REFINANCE TRANSACTIONS

**1-10**  **REFINANCING.**  A refinance transaction involves repaying an existing real estate debt from the proceeds of a new mortgage that has the same borrower(s) and the same property.  As long as the borrower has legal title (even though not originally on the loan), the borrower is eligible to refinance the loan.

The following must be considered when processing a refinance transaction:

A.    **Maximum Percentage of Financing:**  The maximum percentage of financing is governed by the occupancy status of the property, the use of the loan proceeds, and how and when the property was purchased.  FHA will insure several different types of refinance transactions including streamline refinances of existing FHA-insured mortgages made with and without appraisals, "no cash-out" refinances of conventional and FHA-insured mortgages where all proceeds are used to pay existing liens and costs associated with the transaction, and "cash-out" refinances.

B.    **Maximum Term.**  The maximum term of any refinance with an appraisal is 30 years.  A streamline refinance (see Section 1-12) without an appraisal is limited to the remaining term of the existing mortgage plus 12 years (not to exceed 30 years).

C.    **Re-Using an Appraisal.**  FHA appraisals on existing properties remain valid for six months.  However, they cannot be re-used during this period once the mortgage, for which the appraisal was ordered, has closed.  An appraisal used for the purchase of a property cannot be used again for a subsequent refinance, even if six months have not passed.  A new appraisal is required for each refinance transaction requiring an appraisal.

D.    **Refinance Authorization.**  A lender must obtain a Refinance Authorization Number from the FHA Connection or functional equivalent for all FHA-to-FHA refinances. **Error! Hyperlink reference not valid.**

E.    **"Skipped" Payments Not Acceptable**.  Lenders are not permitted to allow borrowers to "skip" payments.  The borrower is either to make the payment when it is due or bring the monthly mortgage payment check to settlement.  When the new mortgage amount is calculated, FHA does not permit the inclusion of any mortgage payments "skipped" by the homeowner in the new mortgage amount.  For example, a borrower whose mortgage payment is due June 1 and expects to close the refinance before the end of June is not permitted to roll the June mortgage payment into the new FHA loan amount.

## 1-11   MORTGAGE AMOUNTS ON REFINANCES.

**A.**   **"No Cash-Out" Refinances with Appraisals (Credit Qualifying).** The maximum mortgage is the *lower* of the loan-to-value or the existing debt calculation described below, and may never exceed the statutory limit except by the amount of any new upfront MIP:

    1.   LTV Ratio Applied to Appraised Value:  Multiply the appraised value of the property by the appropriate factor, as shown in the chart below, for the property's value and the state where it is located.  (A list of states and their closing costs averages may be found in Appendix II.)  Any appraisal requirements, including repairs, must be complied with before the mortgage is eligible for insurance endorsement.

---

### Maximum Loan-to-Value Percentages

**States with Average Closings Costs *At or Below* 2.1 Percent of Sales Price**

- **98.75 percent**: For properties with appraised values equal to or less than $50,000.

- **97.65 percent**: For properties with appraised values in excess of $50,000 up to $125,000

- **97.15 percent**: For properties with appraised values in excess of $125,000.

**States with Average Closings Costs *Above* 2.1 Percent of Sales Price**

- **98.75 percent**: For properties with appraised values equal to or less than $50,000.

- **97.75 percent**: For properties with appraised values in excess of $50,000.

---

    2.   Existing Debt.  Add together the amount of the existing first lien, any purchase money second mortgage, any junior liens over 12 months old, closing costs, prepaid expenses, borrower paid repairs required by the appraisal, discount points, and other fees as determined acceptable by the appropriate HOC and then subtract any refund of UFMIP.  (If any portion of the funds of an equity line of credit in excess of $1000 was advanced within the past twelve months and was for purposes other than repairs and rehabilitation of the property, the line of credit is *not* eligible for inclusion in the new mortgage.)

October 2003

The amount of the existing first mortgage may include the interest charged by the servicing lender when the payoff will not likely be received on the first day of the month (as is typically assessed on FHA-insured mortgages). The amount also may include any prepayment penalties assessed on a conventional mortgage or FHA Title I loan. The amount of the existing first mortgage may not include delinquent interest, late charges, or escrow shortages. Prepaid expenses may include the per diem interest to the end of the month on the new loan, hazard insurance premium deposits, mortgage insurance premium, and any real estate tax deposits needed to establish the escrow account.

Subordinate liens, including credit lines, regardless of when taken, may remain outstanding, provided the FHA-insured mortgage meets our eligibility criteria for mortgages with secondary financing as described in Section 5 of this chapter.

If the purpose of the new loan is to refinance an existing mortgage to buy out an ex-spouse's or other co-borrower's equity, the specified equity to be paid is considered property-related indebtedness and is eligible for inclusion in calculating the new mortgage. The divorce decree, settlement agreement, or other bona fide equity agreement must be provided to document the equity awarded to the ex-spouse or co-borrower.

*If the property was acquired less than one year before the loan application and is not already FHA-insured, in addition to the calculations described above, the original sales price of the property also must be considered in determining the maximum mortgage. With conclusive documentation, expenditures for repairs and rehabilitation incurred after the purchase of the property may be added to the original sales price in calculating the mortgage amount.*

B.    **"Cash-Out" Refinances.** "Cash-out" refinances are only permitted on owner-occupied principal residences and are limited to a combined LTV (FHA-insured first and any subordinate liens) of 85 percent of the appraised value, provided the property has been owned by the borrower for at least one year. If the property was purchased less than one year preceding the loan application, the mortgage amount must be calculated using the lesser of the appraised value or the original sales price of the property multiplied by 85 percent. Properties owned free and clear may be refinanced as cash-out transactions.

"Cash-out" refinances for debt consolidation represent considerable risk, especially if the borrowers have not had an attendant increase in income. Such transactions must be carefully evaluated.

**1-12    STREAMLINE REFINANCES.** Streamline refinances are designed to lower the monthly principal and interest payments on a current FHA-insured mortgage and must involve no cash back to the borrower, except for minor adjustments at closing not to exceed $250. Streamline refinances can be made with or without an appraisal. On streamline refinances with an appraisal, Form HUD 92564-VC is required, but the Homebuyer Summary is not required. FHA does not require repairs to be completed (except for lead-based paint repairs) on streamline refinances with appraisals; however, the lender may require completion of repairs as a condition of the loan.

HUD's Credit Alert Interactive Voice Response System (CAIVRS) need not be checked, but HUD's Limited Denial of Participation (LDP) and General Services Administration (GSA) exclusion lists are still required checks for all borrowers. FHA does not require a credit report (except for the credit-qualifying streamline refinances described below) or a termite inspection on this type of loan, but the lender may require either one or both as part of its credit policy.

Lenders may use an abbreviated version of the Uniform Residential Loan Application (URLA) that omits sections IV, V, VI, and a-k of VIII, provided all other required information is captured. Furthermore, while the lender must assure itself that it is in compliance with Equal Credit Opportunity Act (ECOA) and all other regulations, the loan application need not be signed by the borrower(s) until loan closing.

Streamline refinance processing and underwriting instructions are described below. The mortgage amount limits may never exceed the statutory limits except by the amount of any new upfront MIP.

A.      **Streamline Refinances WITHOUT an Appraisal.** The maximum insurable mortgage is the *lower* of the two calculations shown below:

   1.     Original Loan Amount: The original principal balance on the mortgage (which will include any upfront mortgage insurance premium) plus the new upfront premium that will be charged on the refinance, or

   2.     Existing Debt: Add the sum of the existing FHA insured first lien, closing costs, reasonable discount points and the prepaid expenses necessary to establish the escrow account, and subtract any refund of upfront mortgage insurance premiums (UFMIP). The existing first lien may include the interest charged by the servicing lender when the payoff is not received on the first day of the month as is

**4155.1 REV-5**

typically assessed on FHA mortgages, but may not include delinquent interest, late charges or escrow shortages.

This mortgage calculation process applies only to owner-occupied properties. Investment properties, even if originally acquired as principal residences by the current borrowers, may only be refinanced for the outstanding principal balance. The term of the mortgage is the lesser of 30 years or the remaining term of the mortgage plus 12 years.

Streamline refinances by investors or for secondary residences may only be made without an appraisal and may be made solely in the business entity's name if previously insured in the business entity's name. The new security instruments will contain FHA's standard provision permitting acceleration of the mortgage upon assumption by an investor or as a secondary residence; however, FHA does not intend to authorize the lender to exercise the acceleration provision if the investor assumptor is found to be creditworthy.

Although a property purchased as a principal residence, under certain circumstances as described in the security instruments, may be rented, a streamline refinance without an appraisal does not "convert" the mortgage to one eligible for assumption by an investor.

**B.**    **Streamline Refinance WITH an Appraisal (No Credit Qualifying).**
The maximum insurable mortgage is the *lower* of the appropriate loan-to-value ratio applied to the appraiser's estimate of value or the sum of the existing indebtedness and related closing costs and prepaid expenses for the refinance; both are described below.

   1.    LTV Ratio Applied to Appraised Value:  Multiply the appraised value of the property by the appropriate factor as shown in the chart below for the property's value and the State where it the property is located.  (A list of states and their closing costs averages may be found in Appendix II.)

---

**Maximum Loan-to-Value Percentages**

**States with Average Closings Costs _At or Below_ 2.1 Percent of Sales Price**

- **98.75 percent**:  For properties with appraised values equal to or less than $50,000.

- **97.65 percent**:  For properties with appraised values in excess of $50,000 up to $125,000

- **97.15 percent**:  For properties with appraised values in excess of $125,000.

**States with Average Closings Costs _Above_ 2.1 Percent of Sales Price**

- **98.75 percent**:  For properties with appraised values equal to or less than $50,000.

- **97.75 percent**:  For properties with appraised values in excess of $50,000.

---

2.    Existing Debt:  Add the sum of the existing FHA insured first lien, closing costs, reasonable discount points and the prepaid expenses necessary to establish the escrow account, and subtract any refund of upfront mortgage insurance premiums (UFMIP) as described below. The existing first lien may include the interest charged by the servicing lender when the payoff is not received on the first day of the month as is typically assessed on FHA mortgages, but may not include delinquent interest, late charges or escrow shortages.

C.    **"Credit-Qualifying" Streamline Refinances.**  "Credit-qualifying" streamline refinances contain all the normal features of a streamline refinance, but provide a level of assurance of continued performance on the mortgage.  The lender must provide evidence that the remaining borrowers have an acceptable credit history and ability to make payments.

The following must be considered when processing a credit-qualifying transaction:

1.    **Mortgage Amount.**  The maximum loan amount is the same as in A (without appraisal) or B (with appraisal) above, as appropriate.

2.    **Credit Documentation/Qualifying.**  The lender must provide a verification of income, a credit report, compute the debt-to-income ratios and determine that the borrower will continue to make mortgage payments.

3.    **Purposes.**  Credit-qualifying streamline refinances may be used for the following:

**4155.1 REV-5**

a.    When a change in the mortgage term will result in an increase in the mortgage payment. (This is only permitted for owner-occupied principal residences, secondary residences meeting the requirements of paragraph 1-3, and those investment properties purchased by governmental agencies and eligible nonprofit organizations described in paragraph 1-5.)

b.    When deletion of a borrower or borrowers will trigger the due-on-sale clause.

c.    Following an assumption of a mortgage that does not contain restrictions (e.g., due-on-sale clause) limiting assumptions only to creditworthy borrowers *and* the assumption occurred less than six months previously.

d.    Following an assumption of a mortgage in which the transferability restriction (i.e., due-on-sale clause) was not triggered, such as in a property transfer resulting from a divorce decree or by devise or descent *and* the assumption occurred less than six months previously.

**D.    Additional Information on Streamline Refinances.**

1.    **Appraisal, Termite Inspection, and Credit Report Fees.** We do not require an appraisal, termite inspection, or credit report on streamline refinances (except credit qualifying streamline refinances). However, the associated fees may be paid by the borrower out-of-pocket (i.e., not financed) if law, banking regulations, or its secondary market investors require the lender to obtain these services on a streamline refinance made without a FHA appraisal.

2.    **Cash-to-Close.** Borrowers are not required to provide evidence of cash-to-close.

3.    **Withdrawn Condominium Approvals.** If approval of a condominium project has been withdrawn, FHA will insure only streamline refinances *without* appraisals for that condominium project.

4.    **Underwriting.** Mortgage credit underwriting is not required except for credit qualifying streamline refinance. The loan application and form HUD 92900-WS must be submitted; however, the sections regarding income, assets, and debts and

obligations need not be completed (unless the borrowers are credit qualified).

5. **Shortening the Term of Mortgage.** A mortgage on a principal residence may be refinanced to a shorter-term mortgage, provided the new monthly principal and interest payment increases no more than $50. (The $50 latitude is not available for mortgages on investment properties or secondary residences, unless the borrower qualifies under the provisions described in paragraphs 1-3 and 1-4.) Since streamline refinances are designed to reduce the borrower's *principal and interest payments* on a current FHA-insured mortgage, that portion of the borrower's payment for escrowed items need not be considered.

6. **Delinquent Mortgages.** Delinquent mortgages are not eligible for streamline refinancing until the loan is brought current. However, if the mortgage is delinquent by no more than two monthly payments, the refinancing lender may pay the borrower's mortgage to bring the payments current provided no obligation is placed on the borrower to repay the funds used to bring the mortgage current.

7. **"No-Cost" Refinances.** "No-cost" refinances, in which the lender charges a premium interest rate to defray the borrower's closing costs and/or prepaid items, are permitted. The lender may also offer an interest-free advance of amounts equal to the present escrow balances on the existing mortgage to establish a new escrow account.

8. **Holding Period before Eligibility.** A borrower who assumed or took title subject to an FHA-insured mortgage, without being credit qualified and with the previous mortgagors receiving a release of liability, must have owned the property for at least six months before being eligible for the streamline refinance program without credit qualifying. This rule applies to mortgages that do not contain restrictions limiting the assumption only to creditworthy assumptors. Typically those mortgages were made prior to December 1989.

9. **Adding or Deleting Individuals on Title.** Individuals may be *added* to the title on a streamline refinance without credit worthiness review and without triggering due-on-sale clauses. Individuals can be deleted from the title on a streamline refinance only under the circumstances described in paragraph 1-12 C, above or:

4155.1 REV-5

a.  When an assumption of a mortgage not containing a due-on-sale clause occurred more than six months previously and the assumptor can document that he or she has made the mortgage payments during this interim period; or

b.  Following an assumption of a mortgage in which the transferability restriction (due-on-sale clause) was not triggered, such as in a property transfer resulting from a divorce decree or by devise or descent, and the assumption or quit-claim of interest occurred more than six months previously and the remaining owner-occupant can demonstrate that he or she has made the mortgage payments during this time.

10. **Seven-Unit Exemptions.** An eligible investor that has a financial interest in more than seven rental units, as described in 24 CFR 203.42, may only refinance *without* appraisals.

11. **Subordinate Financing.** Subordinate financing may remain in place, regardless of the total indebtedness against the property on streamline refinances, with or without appraisals. The borrower is not required to satisfy any outstanding subordinate liens, as long as they will clearly be subordinate to the new FHA-insured refinance mortgage.

12. **Proceeding as if No Appraisal was Completed.** If the appraised value is such that the borrower would be better advised to proceed as if no appraisal had been made, the appraisal may be ignored and not used. A notation of this decision must be made in the "remarks" section of form HUD-92900-WS.

13. **Geographic Areas.** Lenders may solicit and process streamline refinances applications from any area of the country, provided the lender is approved for DE by at least one HOC.

14. **ARM to ARM.** An ARM may be refinanced to another ARM, *provided* that an immediate payment reduction occurs and that the maximum interest rate of the new mortgage does not exceed the maximum interest rate of the old mortgage being refinanced. These refinances may be transacted with or without an appraisal.

15. **ARM to Fixed Rate.** An ARM may be refinanced to a fixed rate mortgage, with or without an appraisal, *provided* the interest rate on the new fixed-rate mortgage will be no greater than 2 percentage points above the current rate of the ARM. In addition, all mortgage payments must have been made within the month due

for the past 12 months or the period the mortgage has been in force, if shorter. If the new fixed rate mortgage will be at a rate lower than the existing rate of the ARM thus reducing the homeowner's monthly mortgage payment, the "within the month due," (i.e., not more than 30 days late), rule is not applicable.

16. **Fixed-Rate to ARM.** Fixed-rate mortgages may be refinanced to a one-year ARM, with or without an appraisal, provided the interest rate of the new mortgage is at least 2 percentage points below the interest rate of the current mortgage.

*An ARM may be used for refinancing only on principal residences.*

17. **Graduated Payment Mortgages (GPM) to Fixed-Rate.** Section 245 GPMs may be refinanced, with or without an appraisal, to a fixed-rate mortgage *provided* the new mortgage payment will not exceed the current mortgage payment. (If the streamline refinance is completed without an appraisal, the new mortgage amount may exceed the statutory limit by the accrued negative amortization and the new UFMIP.)

18. **GPM to ARM.** A GPM may be refinanced to an ARM, *provided* the note rate results in a reduction to the current principal and interest payments. (If the streamline refinance is completed without an appraisal, the new mortgage amount may exceed the statutory limit by the accrued negative amortization and the new UFMIP.)

19. **Section 203(k) to Section 203(b).** Section 203(k) Rehabilitation mortgages may be refinanced into a Section 203(b) mortgage after all work is complete. The rehabilitation work is considered complete by a fully executed certificate of completion, the rehabilitation escrow account has been closed with a final release, and the lender has entered the required close out information into the FHA Connection or its functional equivalent. The new mortgage will be subject to the appropriate insurance premium applicable to a new Section 203(b) mortgage.

20. **Section 235 to Section 203(b).** Lenders may refinance Section 235 mortgages to Section 203(b) mortgages using the streamline underwriting procedures described in paragraph 1-12. Any overpaid subsidy that has been paid by the lender to HUD and is part of the borrowers' mortgage account can be included in the Section 203(b) mortgage amount, provided the mortgage amount does not exceed the maximum mortgage permitted under paragraphs 1-12 A or 1-12 B as appropriate.

**4155.1 REV-5**

Furthermore, if HUD has a junior lien that was part of the original Section 235 financing, HUD will subordinate the junior lien to the Section 203(b) mortgage that refinances the Section 235 mortgage.

## SECTION 5: SECONDARY FINANCING

**1-13    SECONDARY FINANCING.**

Any financing (other than the FHA-insured first mortgage) that creates a lien against the property is considered secondary financing and not a gift, even if it is a "soft" or "silent" second (i.e., has no monthly repayment provisions) or has other features forgiving the debt.

Documentation from the provider of the secondary financing must show the amount of funds provided to the borrower in each transaction and copies of the loan instruments are to be included in the endorsement binder. Costs incurred for participating in a downpayment assistance secondary financing program may only be included in the amount of the second lien. FHA reserves the right to reject any secondary financing that does not serve the needs of the intended borrower or where it believes the costs to the participants outweigh the benefits derived by the homebuyer. Permissible secondary financing arrangements include:

A.    **Government Agencies.** Federal, state, and local government agencies, as well as nonprofit agencies considered instrumentalities of government (see B, below), may provide secondary financing *for the borrower's entire cash investment.* The second lien itself must be made or held by the eligible governmental body or instrumentality. Neither governmental units nor their established nonprofit instrumentalities may use "agents," including other nonprofits or for-profit enterprises to make the second lien regardless of the source of those funds. In other words, even if the funds used for the secondary financing were *derived* from an acceptable source such as HUD HOME funds or from a unit of government or the eligible nonprofit instrumentality, the subordinate lien must be in the name of the eligible entity, i.e., the state, county, city or eligible nonprofit instrumentality must be the lien holder. This authority cannot be delegated to another party that is not itself permitted to provide this level of secondary financing. These other entities, however, may be used to *service* the subordinate lien if regularly scheduled payments are to be made by the mortgagor. Loans secured by secondary mortgages are subject to the conditions described below.

1.    The FHA-insured first mortgage, when combined with any second mortgage or other junior liens from government agencies may not result in cash back to the borrower. The sum of all liens cannot exceed 100 percent of the cost to acquire the property. The cost to acquire is the sales price plus allowable borrower-paid closing costs, discount points, repair and rehabilitation expenses, and prepaid expenses. The cost to acquire may exceed the appraised value of the property under these types of government assistance programs. The FHA insured first mortgage cannot exceed the

FHA statutory limit for the area where the property is located. The combined indebtedness, however, may exceed the FHA statutory limit.

2. The required monthly payment under both the insured mortgage and the second mortgage or lien, plus other housing expenses and all recurring charges, cannot exceed the borrower's reasonable ability to pay.

3. The source, amount, and repayment terms must be disclosed in the mortgage application, and the borrower must acknowledge that he or she understands and agrees to the terms.

B. **Nonprofit Agencies.** Nonprofit agencies that meet the criteria described in paragraph 1-5 B *and* are considered instrumentalities of government may provide secondary financing under the terms outlined in A, above. The appropriate HOC is responsible for approving the nonprofit agency, as well as determining if it can be considered an instrumentality of government. To obtain this status the nonprofit must be an entity "established by a governmental body or with governmental approval or under special law to serve a particular public purpose or designated by law (statute or court opinion)." FHA also requires that the unit of government that *established* the nonprofit also must either exercise organizational control, operational control, or financial control of the nonprofit in its entirety or, at minimum, the specific homebuyer assistance program that is using FHA's credit enhancement. The HOCs review applications from nonprofits that purport to be instrumentalities of government and make approval decisions based on information submitted by the nonprofit.

Nonprofit agencies *not* considered instrumentalities of government that otherwise meet the criteria described in paragraph 1-5 B may provide secondary financing under the same conditions as described in A, above, *provided* the borrower makes a cash investment of at least 3 percent of the acquisition cost and the combined amount of the first and second mortgages do not exceed the statutory loan limit for the area where the property is located. The jurisdictional HOC is responsible for approving the nonprofit agency.

C. **Other Organizations and Private Individuals.** Other organizations and private individuals may provide secondary financing under the following conditions:

1. The combined amount of the first and second mortgages do *not* exceed the applicable LTV ratio and the maximum mortgage limit for the area.

2. The repayment terms of the second mortgage must not provide for a balloon payment before ten years (or other such term acceptable to FHA), unless the property is sold or refinanced, and must permit prepayment by the borrower, without penalty, after giving the lender 30 days advance notice.

3. The required monthly payment under both the insured mortgage and the second mortgage or lien, plus other housing expenses and all recurring charges, cannot exceed the borrower's reasonable ability to pay. Any periodic payments due on the second mortgage are due monthly and are essentially the same in dollar amount.

D. **Borrowers 60 Years of Age or Older.** Borrowers 60 years of age or older may borrow the required cash investment for purchasing a principal residence, provided:

1. The donor or lender is a relative of the borrower, a close friend with clearly defined interest in the borrower, the borrower's employer, or an institution established for humanitarian or welfare purposes.

2. The donor or lender's interest is not solely in the sale of the property, such as a builder or seller, or any person or organization associated with builders or sellers.

3. The principal amount of the insured mortgage loan, plus the note or other evidence of indebtedness in connection with the property, may not exceed 100 percent of the value, plus prepaid expenses.

4. The note or other evidence of indebtedness may not bear an interest rate exceeding the interest rate of the insured mortgage.

E. **Family Member Lending.** Family members (defined below) may help with the costs of acquiring a home in the form of a gift or a loan. All such gifts must also meet the requirements of paragraph 2-10(C). FHA permits family member to lend on a secured or unsecured basis, up to 100 percent of the homebuyer's required cash investment. This lending may include the downpayment, closing costs, prepaid expenses and discount points. If the money lent by the family member is secured against the subject property, whether borrowed from an acceptable source or from the family member's own savings, only the family member provider(s) may be the note holder. FHA will not approve any form of securitization of the note that results in any entity other than the family member being the note holder, whether at loan settlement or at any time during the mortgage life cycle.

**4155.1 REV-5**

Further, if the funds that are lent by the family member are borrowed from an acceptable source, the homebuyer may not be a co-obligor on that note (e.g., the son and daughter-in-law may not be co-obligors on the note used to secure money borrowed by the parents that in turn was lent for the down payment).

The following financing terms and conditions also apply:

1.    The maximum insurable mortgage is not affected by gifts or loans from family members.

2.    The combined amount of financing may not exceed 100 percent of the lesser of the property's value or sales price, plus normal closing costs, prepaid expenses, and discount points.  While the family member may lend 100 percent of the cash investment requirements, cash back to the homebuyer (beyond refund of any earnest money deposit) at closing is not acceptable.

3.    If periodic payments of the secondary financing are required, the combined payments may not exceed the borrower's reasonable ability to pay.  The secondary financing payments are to be included in the total debt-payment-to-income ratio (i.e., the "back-end" ratio) for qualifying purposes.

4.    The second lien may not provide for a balloon payment within five years from the date of execution.

5.    If the family member providing the secondary financing borrows those funds, the source may not be any entity with an identity-of-interest in the sale of the property, including the seller, builder, loan officer, real estate agent, etc.  Mortgage companies that have retail banking affiliates may have that entity make a loan to the family member, providing the secondary financing for the home purchase.  However, the lending institution may not make such financing available under terms and conditions more favorable than to other borrowers (i.e., there may not be any special considerations provided in connection between making the mortgage and lending funds to family members to be used as secondary financing for the purchase of the home).

6.    An executed copy of the document outlining the terms of the secondary financing must be maintained in the lender's file.  An executed copy of this agreement also must be provided in the endorsement binder.

For the purposes of this paragraph, a "family member" is defined as a child, parent, or grandparent of the borrower or borrower's spouse. Included in this definition are legally adopted sons or daughters (and a child who is a member of an individual's household, if placed with such individual by an authorized agency for legal adoption by that individual), and foster children. The term "child" means a son, stepson, daughter, or stepdaughter.

## CHAPTER 2

## MORTGAGE CREDIT ANALYSIS

**2-1**    **OVERVIEW.**  The purpose of underwriting is to determine a borrower's ability and willingness to repay the mortgage debt, thus limiting the probability of default and collection difficulties, and to examine the property offered as security for the loan to determine if it is sufficient collateral.  The "Four C's of Credit" (Credit history, Capacity to repay, Cash to close, and the Collateral) are evaluated during the underwriting process.

This chapter on mortgage credit analysis describes procedures for evaluating the credit history, the borrower's capacity to make payments, and whether sufficient cash assets are available to close the mortgage.  It provides the requirements on the types of income that may be considered in qualifying the borrower, the liabilities that must be included in the determining creditworthiness, and the debt-to-income ratios and compensating factors used in the underwriting process. These underwriting instructions are FHA's "base-line" credit policies.  For those lenders using FHA-approved automated underwriting systems (AUS) or those employing FHA's TOTAL mortgage scorecard, there will be a considerable number of revisions to these policies, including documentation requirements, as described in other FHA issuances.

**2-2**    **MORTGAGE ELIGIBILITY (BORROWERS).**  Generally, we will insure mortgages made to individuals only.  Under the conditions described in Chapter 1, we will also insure mortgages made to state and local government agencies and approved nonprofit organizations.

**A.**    **Borrowers, Co-Borrowers and Co-Signers.**  Borrowers and Co-borrowers take title to the property and are obligated on the mortgage note and must also sign the security instrument.  The co-borrower's income, assets, liabilities, and credit history are considered in determining creditworthiness.

Co-signers do not hold ownership interest in a property, but are liable for repaying the obligation and must sign all documents with the exception of the security instruments.  The co-signer's income, assets, liabilities, and credit history are considered in determining creditworthiness for the mortgage and the co-signer must complete and sign the loan application.

We do not permit an individual to take an ownership interest in the property at settlement without signing the mortgage note and all security instruments.

The following conditions also apply to co-borrower and co-signer eligibility:

1.  A co-borrower or a co-signer may not be a party that has a financial interest in the transaction, such as the seller, builder, real estate agent, etc. Exceptions may be granted if the seller and co-borrower/co-signer is related to the owner by blood, marriage or law.

2.  An individual signing the loan application must not be otherwise ineligible for participation. (See paragraph 2-5).

3.  Unless otherwise exempted (e.g., military service with overseas assignments, U.S. citizens living abroad), any non-occupying co-borrowers or co-signers must have a principal residence in the United States.

*All references to co-borrowers – including the 75 percent LTV limits (paragraph 1-8(B)), etc. – apply equally to co-signers (except co-signers do not take title to the property or sign the security instruments).*

**B.**  **Citizenship and Immigration Status.** Citizenship of the United States is not required for eligibility. When a mortgage loan applicant indicates on the loan application that he or she holds something other than U.S. citizenship, the lender must determine residency status from the documentation provided by the borrower.

*Lawful Permanent Resident Alien*s: For those borrowers with *lawful permanent resident alien* status, FHA will insure the mortgage under the same terms and conditions as U.S. citizens. The lender must document the mortgage file with evidence of permanent residency and indicate on the Uniform Residential Loan Application (URLA) that the borrower is a lawful permanent resident alien. Evidence of lawful permanent residency is issued by the Bureau of Citizenship and Immigration Services (BCIS) (formerly the Immigration and Naturalization Service) within the Department of Homeland Security.

*Non-Permanent Resident Aliens*: FHA will also insure a mortgage made to a *non-permanent resident alien* provided that the property will be the borrower's principal residence, the borrower has a valid SSN, and the borrower is eligible to work in the U.S. as evidenced by an Employment Authorization Document (EAD) issued by BCIS. If the authorization for temporary residency status will expire within one year and a prior history of residency status renewals exists, the lender may assume continuation will be granted. If there are no prior renewals, the lender must determine the likelihood of renewal, based on information from the BCIS.

Although social security cards may indicate work status, such as "not valid for work purposes," an individual's work status may change without the

**4155.1 REV-5**

---

change being reflected on the actual social security card. Therefore, the social security card is not to be used as evidence of work status for non-permanent resident aliens; the BCIS employment authorization document is to be used instead.

Non-U.S. Citizens with no lawful residency in the U.S. are not eligible for FHA-insured mortgages.

C.   **Borrower's Age.** There is no *maximum* age limit for a borrower. The minimum age is the age at which the mortgage note can be enforced legally in the state or other jurisdiction in which the property is located.

D.   **Non-Purchasing Spouses.** If required by state law in order to perfect a valid and enforceable first lien, the non-purchasing spouse may be required to sign either the security instrument or documentation evidencing that he or she is relinquishing all rights to the property. If the non-purchasing spouse executes the security instrument for such reasons, he or she is not considered a borrower for our purposes and need not sign the loan application. In all other cases, the non-purchasing spouse is not to appear on the security instrument or otherwise take title to the property at loan settlement.

Where there are non-purchasing spouses who sign security instruments relinquishing their rights to the property pursuant to applicable state laws, these non-purchasing spouses do not have to sign the mortgage note. Signing the security instrument for such purposes does not make the non-purchasing spouse a co-borrower.

Except for the obligations specifically excluded by state law, the debts of the non-purchasing spouse must be included in the borrower's qualifying ratios if the borrower resides in a community property state or the property to be insured is located in a community property state. Although the non-purchasing spouse's credit history is not to be considered a reason for credit denial, a credit report that complies with the requirements of paragraph 2-4 must be obtained for the non-purchasing spouse in order to determine the debt-to-income ratio.

E.   **Military Personnel.** Military personnel are considered occupant-owners and are eligible for maximum financing if a member of the immediate family will occupy the property as a principal residence, even if the service person is stationed elsewhere.

F.   **Living Trusts.** Property held in a *living trust* is eligible for FHA mortgage insurance for owner-occupied property, as long as an individual borrower remains the beneficiary and occupies the property as a principal residence. The lender must be satisfied that the trust provides reasonable

---

means to assure that the lender will be notified of any subsequent change of occupancy (for owner-occupant loans only) or transfer of beneficial interest. The trust must appear on the security instrument (i.e., mortgage, deed of trust, security deed). The individual borrower must appear on the security instrument when required to create a valid lien under state law; otherwise, the individual borrower is not required to appear. The owner-occupant, if any, and other borrower(s), if any, must appear on the note with the trust. The individual borrower(s) is not required to appear on the property deed or title.

| 4155.1 REV-5 |
|---|

## SECTION 1: CREDIT HISTORY

**2-3**  **ANALYZING THE BORROWER'S CREDIT.**  Past credit performance serves as the most useful guide in determining a borrower's attitude toward credit obligations and predicting a borrower's future actions.  A borrower who has made payments on previous and current obligations in a timely manner represents reduced risk.  Conversely, if the credit history, despite adequate income to support obligations, reflects continuous slow payments, judgments, and delinquent accounts, strong compensating factors will be necessary to approve the loan.

When analyzing a borrower's credit history, examine the overall pattern of credit behavior, rather than isolated occurrences of unsatisfactory or slow payments.  A period of financial difficulty in the past does not necessarily make the risk unacceptable if the borrower has maintained a good payment record for a considerable time period since the difficulty.  When delinquent accounts are revealed, the lender must document their analysis as to whether the late payments were based on a disregard for financial obligations, an inability to manage debt, or factors beyond the control of the borrower, including delayed mail delivery or disputes with creditors.

While *minor* derogatory information occurring two or more years in the past does not require explanation, *major* indications of derogatory credit–including judgments, collections, and any other recent credit problems–require sufficient written explanation from the borrower.  The borrower's explanation must make sense and be consistent with other credit information in the file.

Neither the lack of credit history nor the borrower's decision not to use credit may be used as a basis for rejecting the loan application.  We also recognize that some prospective borrowers may not have an established credit history.  For those borrowers, and for those who do not use traditional credit, the lender must develop a credit history from utility payment records, rental payments, automobile insurance payments, or other means of direct access from the credit provider.  The lender must document that the providers of non-traditional credit do, in fact, exist and verify the credit information.  Documents confirming the existence of a non-traditional credit provider may include a public record from the state, county, or city records, or other means providing a similar level of objective confirmation.  To verify the credit information, lenders must use a published address or telephone number for that creditor.

As an alternative, the lender may elect to use a non-traditional mortgage credit report developed by a credit-reporting agency, provided that the credit reporting agency has verified the existence of the credit providers and the lender verifies that the non-traditional credit was extended to the applicant.  The lender must verify the credit using a published address or telephone number to make that verification.

4155.1 REV-5

The basic hierarchy of credit evaluation is the manner of payments made on previous housing expenses, including utilities, followed by the payment history of installment debts, and then revolving accounts. Generally, an individual with no late housing or installment debt payments should be considered as having an acceptable credit history, unless there is major derogatory credit on his or her revolving accounts.

When reviewing the borrower's credit and credit report, the lender must pay particular attention to the following:

A.    **Previous Rental or Mortgage Payment History.** The payment history of the borrower's housing obligations holds significant importance in evaluating credit. The lender must determine the borrower's payment history of housing obligations through either the credit report, verification of rent directly from the landlord (with no identity-of-interest with the borrower) or verification of mortgage directly from the mortgage servicer, or through canceled checks covering the most recent 12-month period.

B.    **Recent and/or Undisclosed Debts.** The lender must ascertain the purpose of any recent debts, as the indebtedness may have been incurred to obtain part of the required cash investment on the property being purchased. Similarly, the borrower must provide a satisfactory explanation for any significant debt that is shown on the credit report but not listed on the loan application. The borrower must explain in writing all inquiries shown on the credit report in the last 90 days.

C.    **Collections and Judgments.** Court-ordered judgments must be paid off before the mortgage loan is eligible for FHA insurance endorsement. (An exception may be made if the borrower has agreed with the creditor to make regular and timely payments on the judgment and documentation is provided that the payments have been made in accordance with the agreement.) FHA does not require that collection accounts be paid off as a condition of mortgage approval. Collections and judgments indicate a borrower's regard for credit obligations and must be considered in the analysis of creditworthiness with the lender documenting its reasons for approving a mortgage where the borrower has collection accounts or judgments. The borrower must explain in writing all collections and judgments.

D.    **Previous Mortgage Foreclosure.** A borrower whose previous principal residence or other real property was foreclosed or has given a deed-in-lieu of foreclosure within the previous three years is generally not eligible for a new FHA-insured mortgage. However, if the foreclosure was the result of documented extenuating circumstances that were beyond the control of the borrower and the borrower has re-established good credit since the foreclosure, the lender may grant an exception to the three-year

**4155.1 REV-5**

requirement. Extenuating circumstances include serious illness or death of a wage earner, but do not include the inability to sell the house because of a job transfer or relocation to another area.

**E.**   **Bankruptcy.** A Chapter 7 bankruptcy (liquidation) does not disqualify a borrower from obtaining an FHA-insured mortgage if at least two years have elapsed since the date of the discharge of the bankruptcy. Additionally, the borrower must have re-established good credit or chosen not to incur new credit obligations. The borrower also must have demonstrated a documented ability to responsibly manage his or her financial affairs. An elapsed period of less than two years, but not less than 12 months, may be acceptable if the borrower can show that the bankruptcy was caused by extenuating circumstances beyond his or her control and has since exhibited a documented ability to manage his or her financial affairs in a responsible manner. Additionally, the lender must document that the borrower's current situation indicates that the events that led to the bankruptcy are not likely to recur.

A Chapter 13 bankruptcy does not disqualify a borrower from obtaining an FHA-insured mortgage provided the lender documents that one year of the payout period under the bankruptcy has elapsed and the borrower's payment performance has been satisfactory (i.e., all required payments made on time). In addition, the borrower must receive permission from the court to enter into the mortgage transaction.

**F.**   **Consumer Credit Counseling Payment Plans.** Participation in a consumer credit counseling payment program does not disqualify a borrower from obtaining an FHA-insured mortgage provided the lender documents that one year of the pay-out period has elapsed under the plan and the borrower's payment performance has been satisfactory (i.e., all required payments made on time). In addition, the borrower must receive written permission from the counseling agency to enter into the mortgage transaction.

**2-4**   **CREDIT REPORT REQUIREMENTS.**

**A.**   **Traditional Credit Reports.** Credit reports submitted with each loan must contain all credit available in the accessed repositories. They also must provide an account of all credit, residence history, and public records information available in the credit repositories of each borrower responsible for the mortgage debt. The minimum credit report required by FHA is a "three repository merged" credit report (TRMCR). A Residential Mortgage Credit Report (RMCR) from an independent consumer-reporting agency also may be used. One report is required for each borrower, or a joint report may be obtained for a married couple.

**4155.1 REV-5**

The following are requirements for traditional credit reports:

1. The TRMCR submitted must be an original received electronically and printed on the lender's printer or delivered by the credit-reporting agency. The report must not have whiteouts, erasures, or alterations. It must indicate the name, address, and telephone number of the consumer-reporting agency; and each account listed must show the primary repository from which the particular information was pulled. The name of the company ordering the report must be shown.

2. The credit report must include all credit and legal information not considered obsolete under the Fair Credit Reporting Act, including bankruptcies, judgments, law suits, foreclosures, and tax liens that have occurred within the last seven years. All inquiries made within the last 90 days must also be included on the report. Credit reports that fail to show bankruptcies, judgments, lawsuits, foreclosures and tax liens must be supplemented with a corrected report. Lenders must retain all copies of all credit reports and document in writing an analysis of the reasons for any discrepancies between the credit reports. If a lender receives any information inconsistent with the information on the credit report, the lender must reconcile the inconsistency.

3. The credit report must identify each borrower's name and social security number. For each debt listed, the report also must show the date the account was opened, the high credit amount, the required payment, the unpaid balance, and the payment history, as contained in the credit repositories. The report must be in an easy-to-read and understandable format, and it should not require code translations.

4. The lender must also develop credit information separately for any open debt that is listed on the loan application but not referenced on the credit report. Accounts listed as "rate by mail only" or "need written authorization" require separate written verification.

5. While the TRMCR should prove sufficient for processing most loan applications, the following circumstances require an RMCR:

   a. The borrower(s) disputes the ownership of accounts on the TRMCR; or
   b. The borrower(s) claims that collections, judgments, or liens listed as open on the TRMCR have been paid and cannot provide separate documentation supporting this claim; or

**4155.1 REV-5**

    c.  The borrower claims that certain debts shown on the TRMCR have different balances and/or payments and cannot provide current statements (less than 30 days old) attesting to this claim; or

    d.  The lender's underwriter determines that it would be prudent to use an RMCR in lieu of a TRMCR to underwrite the loan properly.

6.    RMCRs must access at least two named repositories and meet all the requirements for the TRMCR, plus the following:

    a.    Provide a detailed account of the borrower's employment history.

    b.    Verify each borrower's current employment and income (if obtainable). It also must include a statement attesting to certification of employment and date verified. If this information is not obtained through an interview with the employer, the credit reporting agency must state why this action was not taken.

    c.    Each account with a balance must have been checked with the creditor within 90 days of the credit report.

**B.**    **Credit Report Requirements (Non-Traditional).** A Non-Traditional Mortgage Credit Report (NTMCR) is designed to assess the credit history of a borrower without the types of trade references normally appearing on a traditional credit report. It can be used either as a substitute for a TRMCR or an RMCR for a borrower without a credit history with traditional credit grantors or as a supplement to a traditional credit report having an insufficient number of trade items reported. A NTMCR may not, however, be used to enhance the credit history of a borrower with a poor payment record or to manufacture a credit report for a borrower without a verifiable credit history. It also may not be used to offset derogatory references found in the borrower's traditional credit, such as collections and judgments.

The following conditions apply when using non-traditional credit reporting:

1.    If the information obtained through the standard credit report is not sufficient for the lender to make a prudent underwriting decision, the lenders may use a NTMCR developed by a credit-reporting agency that documents all non-traditional credit references. Otherwise, the lender must develop its own non-traditional credit history that is consistent with the requirements for credit reporting agencies described in paragraph 2-4.

4155.1 REV-5

2. The credit-reporting agency should consider only the types of credit that require the mortgage applicant to make periodic payments on a regular basis. These types of credit include rental housing; utilities (if not included in the rental payment); telephone service; cable television service; insurance payments (excluding those paid through payroll deductions), such as medical, automobile, life, household, and renter's insurance; payments to child care providers; school tuition; payments to local stores; payments for the uninsured portion of any medical bills; etc.

**2-5    ELIGIBILITY FOR FEDERALLY-RELATED CREDIT.** A borrower must be rejected if any of the following conditions apply:

A. **HUD Limited Denial of Participation (LDP) and the U.S. General Services Administration's "List of Parties Excluded from Federal Procurement and Non-Procurement Programs" (GSA List)** A person suspended, debarred, or otherwise excluded from participation in the Department's programs is not eligible to participate in FHA-insured mortgage transactions. The lender must examine HUD's LDP list and the government-wide General Services Administration's (GSA) "List of Parties Excluded from Federal Procurement or Nonprocurement Programs" and document this review on the HUD 92900-WS/92900-PUR. If the name of the borrower, seller, listing or selling real estate agents, or loan officer appears on either list, the application is not eligible for mortgage insurance. A lender may check HUD's LDP list by going to www.hud.gov and the Federal government's list of excluded parties by going to http://epls.arnet.gov. (An exception shall be made for a seller on the GSA list when the property being sold is the seller's principal residence.)

B. **Delinquent Federal Debts.** If the borrower, as revealed by public records, credit information, or HUD's Credit Alert Interactive Voice Response System (CAIVRS), is presently delinquent on any Federal debt (e.g., VA-guaranteed mortgage, Title I loan, Federal student loan, Small Business Administration loan, delinquent Federal taxes) or has a lien, including taxes, placed against his or her property for a debt owed to the U.S., the borrower is *not* eligible until the delinquent account is brought current, paid, otherwise satisfied, or a satisfactory repayment plan is made between the borrower and the Federal agency owed and is verified in writing. Tax liens may remain unpaid provided the lien holder subordinates the tax lien to the FHA-insured mortgage. If any regular payments are to be made, they must be included in the qualifying ratios.

Since the IRS routinely takes a second lien position without the necessity of independent documentation, eligibility for FHA mortgage insurance will not be jeopardized by outstanding IRS tax liens remaining on the

**4155.1 REV-5**

property unless the lender has information that the IRS has demanded a first-lien position.

*Although eligibility for an FHA-insured mortgage may be established by performing the actions described above, the overall analysis of the creditworthiness must include consideration of a borrower's previous failure to make payments to the Federal agency in the agreed-to manner and must document its analysis of how the previous failure does not represent a risk of mortgage default.*

C.    **CAIVRS.** HUD's CAIVRS is a Federal government-wide repository of information on those individuals with delinquent or defaulted Federal debt and on those for whom a payment of an insurance claim has occurred. Lenders must screen all borrowers, including nonprofit agencies acting as a borrower, using CAIVRS (except on streamline refinances). If CAIVRS indicates the borrower is presently delinquent or has had a claim paid within the previous three years on a loan made or insured by HUD on his or her behalf, the borrower is not eligible except as described below. Lenders access CAIVRS either through the FHA Connection or functional equivalent or by calling 301-344-4000 on a touch-tone telephone. Lenders must write the CAIVRS authorization code for each borrower on the HUD-92900-WS/92900-PUR. Exceptions to this rule may be granted under the following situations:

1.    **Assumptions.** If the borrower sold the property, with or without a release of liability, to an individual who subsequently defaulted, the borrower is eligible, provided he or she can prove the loan was not in default at the time of assumption.

2.    **Divorce.** A borrower may be eligible if the divorce decree or legal separation agreement awarded the property and responsibility for payment to the former spouse. However, if a claim was paid on a mortgage in default prior to the divorce, the borrower is not eligible.

3.    **Bankruptcy.** When the property was included in a bankruptcy that was caused by circumstances beyond the borrower's control (such as the death of the principal wage earner or serious long-term uninsured illness), the borrower may be eligible if the borrower meets the requirements in Paragraph 2-3 E.

While FHA may delete erroneous information regarding a borrower falsely indicated as having defaulted on a FHA mortgage, such as incorrect social security number reporting, it will not remove correct CAIVRS information even if the borrower is judged eligible under the conditions described above.

4155.1 REV-5

Lenders may not rely upon a clear CAIVRS approval when in possession
of independent evidence of delinquent federal obligations and must
document the resolution of any conflicting information. If the lender has
reason to believe the CAIVRS message is erroneous or needs to establish
the date of claim payment, the lender must contact the appropriate HOC
for instructions or documentation to support the borrower's eligibility.
The appropriate HOC can provide information when the three-year
waiting period will elapse or if the social security number in CAIVRS is
erroneous. The HOC will also provide instructions to lenders regarding
processing requirements for other HUD-related defaults and claims (e.g.,
Title I loans).

We cannot alter or delete CAIVRS information reported from other
Federal agencies, such as the Department of Education, Veterans Affairs,
etc. The borrower and/or the lender must contact those agencies to correct
or remove erroneous or outdated information. We do not require a "clear"
CAIVRS authorization number as a condition for mortgage endorsement,
but the lender must document and justify its approval based on the
exceptions described above.

4155.1 REV-5

## SECTION 2: EFFECTIVE INCOME

The anticipated amount of income, and the likelihood of its continuance, must be established to determine a borrower's *capacity* to repay mortgage debt. Income may not be used in calculating the borrower's income ratios if it comes from any source that cannot be verified, is not stable, or will not continue. This section describes acceptable types of income, procedures for calculating effective income, and requirements for establishing income stability.

**2-6    STABILITY OF INCOME.** We do not impose a minimum length of time a borrower must have held a position of employment to be eligible. However, the lender must verify the borrower's employment for the most recent two full years. If a borrower indicates he or she was in school or in the military during any of this time, the borrower must provide evidence supporting this claim, such as college transcripts or discharge papers. The borrower also must explain any gaps in employment spanning one month or more. Allowances for seasonal employment, such as is typical in the building trades, etc., may be made if documented by the lender.

To analyze and document the probability of continued employment, lenders must examine the borrower's past employment record, qualifications for the position, previous training and education, and the employer's confirmation of continued employment. A borrower who changes jobs frequently within the same line of work, but continues to advance in income or benefits, should be considered favorably. In this analysis, *income* stability takes precedence over *job* stability.

In some cases, a borrower may have recently returned to the work force after an extended absence. In these circumstances, the borrower's income may be considered effective and stable provided the following conditions apply:

A.    The borrower has been employed in the current job for six months or more, and

B.    The borrower can document a two-year work history prior to the absence from the work force. Acceptable documentation includes traditional employment verifications, copies of W-2's or paystubs.

An example of an acceptable employment situation includes a person that took several years off of work to raise children and then returned to the workforce. Situations not meeting the criteria listed above may be considered as compensating factors only.

**2-7    SALARIES, WAGES, AND OTHER FORMS OF EFFECTIVE INCOME.**
The income of each borrower to be obligated for the mortgage debt must be analyzed to determine whether it can reasonably be expected to continue through at least the *first three years* of the mortgage loan. If the borrower intends to retire

during this period, the effective income must be the amount of documented retirement benefits, social security payments, or other payments expected to be received in retirement. No inquiry may be made regarding possible future maternity leave.

In most cases, the borrower's income will be limited to salaries or wages. Income from other sources can be included as effective income with proper verification by the lender. Procedures for analyzing other acceptable income sources besides salaries and wages are described below:

A.    **Overtime and Bonus Income.** Both overtime and bonus income may be used to qualify if the borrower has received such income for the past two years and it is likely to continue. The lender must develop an average of bonus or overtime income for the past two years, and the employment verification must not state that such income is unlikely to continue. Periods of less than two years may be acceptable provided the lender justifies and documents in writing the reason for using the income for qualifying purposes.

An earnings trend also must be established and documented for overtime and bonus income. If either type shows a continual decline, the lender must provide a sound rationalization in writing for including the income for borrower qualifying. If bonus income varies significantly from year to year, a period of more than two years must be used in calculating the average income.

B.    **Part-Time Income.** Part-time/second job income, including employment in seasonal work, may be used in qualifying if the lender documents that the borrower has worked the part-time job uninterrupted for the past two years and will continue to do so. Seasonal employment (e.g., umpiring baseball games in summer, working at a department store during the holiday shopping season) is considered uninterrupted and may be used in qualifying if the lender documents that the borrower has worked the same type of job for the past two years and expects to be rehired during the next season. Income from a part-time position that has been received for less than two years may be included as effective income, provided the lender justifies and documents that the income's continuance is likely. Income from part-time positions not meeting these requirements may be considered as a compensating factor only.

For qualification purposes, *part-time income refers to jobs taken to supplement the borrower's income from regular employment* (i.e., a second job – not meaning primary jobs of less than 40 hours per week.) If a borrower's regular employment involves less than a typical 40-hour workweek, the stability of that income should be evaluated as any other regular, on-going primary employment. For example, a registered nurse

**4155.1 REV-5**

may have worked 24 hours per week for the last year. Although this job requires less than 40 hours of work per week, it is the borrower's primary employment and is to be considered effective income.

We recognize that many low- and moderate-income families rely on part-time and seasonal income for day-to-day needs. Lenders must not restrict the consideration of such income sources in qualifying these borrowers.

C.    **Military Income.** In addition to base pay, military personnel may be entitled to additional forms of pay. Income from variable housing allowances, clothing allowances, flight or hazard pay, rations, and proficiency pay is acceptable, provided its probability of continuance is verified in writing. An additional consideration may be the tax-exempt nature of some of these payments (see paragraph Q for additional information.)

D.    **Commission Income.** Commission income must be averaged over the previous two years. The borrower must provide copies of signed tax returns for the last two years, along with the most recent pay stub. (Unreimbursed business expenses must be subtracted from gross income.) Individuals whose commission income shows a decrease from one year to the next require significant compensating factors to allow for loan approval. Borrowers with commission income received for more than one but less than two years may be considered favorably provided the underwriter is able to make a sound rationalization for acceptance and can document the likelihood of continuance.

Commissions earned for less than one year are not considered effective income. Exceptions may be made for situations in which the borrower's compensation was changed from a salary to commission within a similar position with the same employer. A borrower also may qualify when the portion of earnings *not* attributed to commissions would be sufficient to qualify the borrower for the mortgage.

E.    **Retirement and Social Security Income.** Retirement and social security income require verification from the source (former employer, Social Security Administration) or federal tax returns. If any benefits expire within the first full three years, the income source may be considered only as a compensating factor.

F.    **Alimony, Child Support, or Maintenance Income.** Income in this category may be considered as effective if such payments are likely to be consistently received for the first three years of the mortgage. The borrower must provide a copy of the final divorce decree, legal separation agreement, or voluntary payment agreement, *as well as* evidence that payments have been received during the last twelve months. Acceptable

4155.1 REV-5

evidence of payment regularity includes cancelled checks, deposit slips, tax returns, and court records. Periods less than twelve months may be acceptable, provided the payer's ability and willingness to make timely payments is adequately documented by the lender.

G.    **Notes Receivable.** A copy of the note must be presented to establish the amount and length of payment. The borrower also must provide evidence that these payments have been received consistently for the last twelve months, which may include deposit slips, cancelled checks, or tax returns. If the borrower is not the original payee on the note, the lender must also establish that the borrower is now a holder in due course and able to enforce the note.

H.    **Interest and Dividends.** Interest and dividend income may be used, provided that documentation (tax returns or account statements) supports a two-year history of receipt. This income must be averaged over the two years. Any funds derived from these sources and required for the cash investment must be subtracted before the projected interest or dividend income is calculated.

I.    **Mortgage Credit Certificates.** If a government entity subsidizes the mortgage payments, either through direct payments or through tax rebates, these payments can be considered as acceptable income if verified in writing. Either type of subsidy may be added to gross income or may be used to directly offset the mortgage payment before calculating the qualifying ratios.

J.    **Employer Differential Payments.** If the employer subsidizes the mortgage payments through direct payments, the amount of the payments is considered gross income; it may not be used to offset the mortgage payment directly, even if the employer pays the servicing lender directly.

K.    **VA Benefits.** Direct compensation, such as for a service-related disability, is acceptable, subject to documentation from the VA. Education benefits, used to offset education expenses, are not acceptable.

L.    **Government Assistance Programs.** Income received from government assistance programs is acceptable, subject to documentation from the paying agency, provided the income is expected to continue at least three years. If the income is not expected to be received for at least three years, such income may be considered as a compensating factor.
(Unemployment income must be documented for two years. Reasonable assurance of its continuance is also required. This requirement may apply to individuals employed on a seasonal basis, such as farm workers, resort employees, etc.)

4155.1 REV-5

M.    **Rental Income.** Rent received for properties owned by the borrower is acceptable if the lender can document that the rental income is stable. Examples of stability may include a current lease, an agreement to lease, or a rental history over the previous 24 months that is free of unexplained gaps greater than three months. (Student, seasonal, or military renters, or property rehabilitation would provide such an explanation). A separate schedule of real estate is not required for rental properties, provided all properties are shown on the URLA.

If the borrower resides in one or more units of a multiple-unit property and charges rent to tenants of other units, that rent may be used for qualifying purposes. However, projected rent of additional units only and not the owner-occupied unit(s) may be considered gross income only after deducting the HOC's vacancy and maintenance factor. They may not be used as a direct offset to the mortgage payments.

Income from roommates in a single-family property to be occupied as the borrower's primary residence is not acceptable. Rental income from boarders is acceptable if the boarders are related by blood, marriage, or law. The rental income may be considered effective income if shown on the borrower's tax returns. Otherwise, the income only may be considered a compensating factor and must be documented adequately by the lender.

The following is required to verify all rental income:

1.    **Schedule E of IRS Form 1040.** Depreciation may be added back to the net income or loss shown on Schedule E. Positive rental income is considered gross income for qualifying purposes; negative rental income must be treated as a recurring liability. The lender must be certain that the borrower still owns each property listed, by comparing the Schedule E with the real estate owned section of the residential loan application. (If the borrower in the same general area owns six or more units, a map disclosing the locations must be submitted evidencing compliance with FHA's seven-unit limitation. See paragraph 4-8 for additional information.)

2.    **Current Leases.** If a property was acquired since the last income tax filing and is not shown on Schedule E, a current signed lease or other rental agreement must be provided. The gross rental amount must be reduced for vacancies and maintenance by 25 percent (or the percentage developed by the jurisdictional HOC), before subtracting PITI and any homeowners' association dues, etc., and applying the remainder to income (or recurring debts, if negative).

**N.** **Eligible Investment Properties.** If the property to be insured is an eligible investment property or sold through FHA's REO program, the following calculations of qualifying ratios apply:

1. Subtract the monthly payment (PITI) from the monthly net rental income of the subject property (gross rents, minus the 25 percent reduction or HOC's percentage reduction for vacancies and repairs). If this calculation yields a positive number, add the number to the borrower's monthly gross income. If the calculation results in a negative number, consider it a recurring monthly obligation; then

2. Calculate the mortgage payment-to-income ratio (top or front-end ratio) by dividing the borrower's current housing expense (principal residence) by the monthly gross income. (The monthly gross income will include any positive cash flow from the subject investment property.); and

3. Calculate the total fixed payment-to-income ratio (bottom or back-end ratio) by dividing the borrower's total monthly obligations, including any net loss from the subject investment property, by the borrower's total monthly gross income.

**O.** **Automobile Allowances and Expense Account Payments.** Only the amount by which the borrower's automobile allowance or expense account payments exceed actual expenditures may be considered income. The borrower must provide IRS Form 2106, Employee Business Expenses, for the previous two years to establish the amount of income that may be added to gross income. The borrower also must provide verification from the employer that these payments will continue. (If these calculations show a loss, that amount must be treated as a recurring debt. If the borrower uses the standard per-mile rate in calculating automobile expenses, as opposed to the actual cost method, the portion that the IRS considers depreciation may be added back to income.) Additionally, the borrower's monthly car payment must be treated as a recurring debt; it may not be offset by the car allowance.

**P.** **Trust Income.** Income from trusts may be used if guaranteed, constant payments will continue for at least the first three years of the mortgage term. Documentation is required and includes a copy of the Trust Agreement, or other trustee's statement, confirming amount, frequency of distribution, and duration of payments. Funds from the trust account also may be used for the required cash investment with adequate documentation.

**Q.** **Non-Taxable Income.** If a particular source of regular income is not subject to federal taxes (e.g., certain types of disability and public assistance payments, military allowances), the amount of continuing tax

<div style="border:1px solid black; display:inline-block">**4155.1 REV-5**</div>

savings attributable to the non-taxable income source may be added to the borrower's gross income. The percentage of income that may be added may not exceed the appropriate tax rate for that income amount, and no additional allowances for dependents are acceptable. The lender must document and support the adjustments (the amount the income is "grossed up") made for any non-taxable income source. Child support income **cannot** be grossed up. The lender should use the tax rate used to calculate last year's income tax for the borrower. If the borrower is not required to file a federal income tax return, the tax rate to use is 25 percent.

R. **Projected Income.** Projected or hypothetical income is not acceptable for qualifying purposes. However, exceptions are permitted to this rule for income from cost-of-living adjustments, performance raises, bonuses, etc., which are both verified by the employer in writing and scheduled to begin within 60 days of loan closing.

If a borrower is about to start a new job and has a guaranteed, non-revocable contract for employment that will begin within 60 days of loan closing, the income is acceptable for qualifying purposes. The lender also *must* verify that the borrower will have sufficient income or cash reserves to support the mortgage payments and any other obligations during the interim between loan closing and the start of employment. (This condition may be appropriate for situations such as teachers whose contracts will begin with the new school year, or physicians who will begin residency after the loan is scheduled to close.) However, if the loan will close more than 60 days before the borrower's employment begins, the loan is *not eligible for endorsement* until the lender provides a pay stub or other acceptable evidence that the borrower has begun the new job.

2-8 **EMPLOYMENT BY FAMILY-OWNED BUSINESSES.** Borrowers employed at businesses owned by their family member(s) are required to provide additional income documentation. These borrowers must provide the normal verification of employment, pay stubs, and evidence that they are not an owner of the business. This evidence may include copies of the borrower's signed personal tax returns or a signed copy of the corporate tax return showing ownership percentages.

2-9 **SELF-EMPLOYED BORROWERS.** A borrower with a 25 percent or greater ownership interest in a business is considered self-employed for FHA mortgage loan underwriting purposes.

The following conditions apply to underwriting self-employed borrowers:

A. **Minimum Length of Self-Employment.** Income from self-employment is considered stable and effective if the borrower has been self-employed for two or more years. The high probability of failure during the first few

**4155.1 REV-5**

years of a business makes the following requirements necessary for individuals who have been self-employed less than two years:

1. **Between One and Two Years.** An individual self-employed between one and two years must have at least two years of documented previous successful employment (or a combination of one year of employment and formal education or training) in the line of work in which the borrower is self-employed or in a related occupation to be eligible.

2. **Less than One Year.** The income from a borrower self-employed less than one year may not be considered effective income.

**B.    Documentation Requirements.** The following documents are required from self-employed borrowers:

1. Signed and dated individual tax returns, plus all applicable schedules, for the most recent two years.

2. Signed copies of federal business income tax returns for the last two years, with all applicable schedules, if the business is a corporation, an "S" corporation, or a partnership.

3. A year-to-date profit-and-loss (P&L) statement and balance sheet.

4. A business credit report on corporations and "S" corporations.

**C.    Analyzing Income.** The lender must establish the borrower's earnings trend over the previous two years but may average the income over three years, if all three years' tax returns are provided. If the borrower provides quarterly tax returns, the analysis can include income through the period covered by the tax filings. If the borrower is not subject to quarterly tax filings or does not file quarterly returns (Form IRS 1040 ES), the income shown on the P&L statement may be included in the analysis, *provided the income stream based on the P&L statement is consistent with the previous years' earnings*. If the P&L statements submitted for the current year show an income stream considerably greater than what is supported by the previous years' tax returns, the analysis of income must be predicated solely on the income verified through the tax returns.

To determine if the business can be expected to continue to generate sufficient income for the borrower's needs, lenders must analyze carefully the business's financial strength, the source of its income, and the general economic outlook for similar businesses in the area. Annual earnings that are stable or increasing are acceptable. Conversely, a borrower whose

**4155.1 REV-5**

business shows a significant decline in income over the period analyzed is not acceptable, even if current income and debt ratios meet our guidelines.

There are four basic types of business structures: sole proprietorships, corporations; limited liability ("S" corporations); and partnerships. Each type requires slightly different forms of analysis.

The following provides additional information on analyzing tax returns:

1.     **<u>Individual Tax Returns (IRS Form 1040)</u>.** The amount shown on the IRS Form 1040 as "adjusted gross income" either must be increased or decreased, based on the lender's analysis of the individual tax returns and any related tax schedules. Particular attention must be paid to the following:

     a.     <u>Wages, Salaries, and Tips.</u> An amount shown under this heading may indicate that the individual is a salaried employee of a corporation or has other sources of income. It also may indicate that the spouse is employed, in which case the income must be subtracted from the adjusted gross income in the analysis.

     b.     <u>Business Income or Loss (from Schedule C).</u> The sole proprietorship income calculated on Schedule C is business income. Depreciation or depletion may be added back to adjusted gross income.

     c.     <u>Rents, Royalties, Partnerships, Etc. (from Schedule E).</u> Any income received from rental properties or royalties may be used as income after adding back any depreciation shown on Schedule E.

     d.     <u>Capital Gain or Loss (from Schedule D).</u> This transaction generally occurs only one time, and it should not be considered in determining effective income. However, if the business has a constant turnover of assets resulting in gains or losses, the capital gain or loss may be considered in determining the income, provided the borrower has at least three years' tax returns evidencing capital gains. An example includes an individual who purchases old houses, remodels them, and sells them for a profit.

     e.     <u>Interest and Dividend Income (from Schedule B).</u> This income, which is taxable and tax-exempt, may be added back to the adjusted gross income only if it has been received for the past two years and is expected to continue.

(If the interest-bearing asset will be liquidated as a source of the cash investment, the lender must adjust accordingly.)

f.   Farm Income or Loss (from Schedule F).  Any depreciation shown on Schedule F may be added back to the adjusted gross income.

g.   IRA Distributions, Pensions, Annuities, and Social Security Benefits.  The non-taxable portion of these items may be added back to the adjusted gross income, if the income is expected to continue for the first three years of the mortgage.

h.   Adjustments to Income.  Certain adjustments to income shown on the IRS Form 1040 may be added back to the adjusted gross income.  Among these adjustments are IRA and Keogh retirement deductions, penalties on early withdrawal of savings, health insurance deductions, and alimony payments.

i.   Employee Business Expenses.  These expenses are actual cash expenses that must be deducted from the borrower's adjusted gross income.

2.   **Corporate Tax Returns (IRS Form 1120).**  Corporations are state-chartered businesses owned by their stockholders.  Compensation to its officers, generally in proportion to the percentage of ownership, is shown on the corporate tax returns and will appear on individual tax returns.  If the borrower's percentage of ownership is not shown, it must be obtained separately from the corporation's accountant, with evidence that the borrower has the right to those funds.  Once the adjusted business income is determined. it should be multiplied by the borrower's percentage of ownership in the business.

In analyzing the corporate tax returns, lenders must adjust for the following:

a.   Depreciation and Depletion.  The corporation's depreciation and depletion must be added back to after-tax income.

b.   Taxable Income.  Taxable income is the corporation's net income before federal taxes.  It must be reduced by the tax liability.

4155.1 REV-5

c. <u>Fiscal Year vs. Calendar Year.</u> If the corporation operates on a fiscal year that is different from the calendar year, an adjustment must be made by the lender to relate corporate income to the individual tax return.

d. <u>Cash Withdrawals.</u> The borrower's withdrawal of cash from the corporation may have a severe negative impact on the corporation's ability to continue operating.

3. **"S" Corporation Tax Returns.** An "S" corporation is generally a small, start-up business, with gains and losses passed on to stockholders in proportion to each stockholder's percentage of business ownership. The income for the owners comes from W-2 wages and is taxed at the individual rate.

The "compensation of officers" line on the IRS Form 1120S is transferred to the borrower's IRS Form 1040. Both depreciation and depletion may be added back to income in proportion to the borrower's share of income. However, income also must be deducted proportionately by the total obligations payable by the corporation in less than one year. The borrower's withdrawal of cash from the corporation may have a severe negative impact on the corporation's ability to continue operating and must be considered in the analysis.

4. **Partnership Tax Returns.** A partnership is formed when two or more individuals form a business and share in profits, losses, and responsibility for running the company. Each partner pays taxes on his or her proportionate share of the partnership's net income.

Both general and limited partnerships report income on the IRS Form 1065; this form must be reviewed by the lender to assess the viability of the business. The partner's share of income is carried over to Schedule E of IRS Form 1040. Both depreciation and depletion may be added back to income in proportion to the borrower's share of income. However, income also must be deducted proportionately by the total obligations payable by the partnership in less than one year. The borrower's withdrawal of cash from the partnership may have a severe negative impact on the partnership's ability to continue operating and must be considered in the analysis.

4155.1 REV-5

## SECTION 3: BORROWER'S CASH INVESTMENT IN THE PROPERTY

**2-10**  **FUNDS TO CLOSE.** The cash investment in the property must equal the difference between the amount of the insured mortgage, excluding any upfront MIP, and the total cost to acquire the property including prepaid expenses and closing costs as described in paragraph 1-9.

*All funds for the borrower's investment in the property must be verified and documented.* Acceptable sources of these funds include the following:

A.    **Earnest Money Deposit.** If the amount of the earnest money deposit exceeds 2 percent of the sales price *or* appears excessive based on the borrower's history of accumulating savings, the lender must verify with documentation the deposit amount and the source of funds. Satisfactory documentation includes a copy of the borrower's cancelled check. A certification from the deposit-holder acknowledging receipt of funds and separate evidence of the source of funds is also acceptable. Evidence of source of funds includes a verification of deposit or bank statement showing that at the time the deposit was made the average balance was sufficient to cover the amount of the earnest money deposit.

B.    **Savings and Checking Accounts.** A verification of deposit (VOD), along with the most recent bank statement, may be used to verify savings and checking accounts. If there is a large increase in an account, or the account was opened recently, the lender must obtain a credible explanation of the source of those funds.

C.    **Gift Funds.** An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower. The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them. Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price. No repayment of the gift may be expected or implied. (As a rule, we are not concerned with how the donor obtains the gift funds provided they are not derived in any manner from a party to the sales transaction. Donors may borrow gift funds from any other acceptable source provided the mortgage borrowers are not obligors to any note to secure money borrowed to give the gift.) This rule also applies to properties of which the seller is a government agency selling foreclosed properties, such as the Veterans Administration or Rural Housing Services. Only family members may provide equity credit as a gift on a property being sold to other family members. These restrictions

**4155.1 REV-5**

on gifts and equity credit may be waived by the jurisdictional HOC provided that the seller is contributing to or operating an acceptable affordable housing program.

FHA deems the payment of consumer debt by third parties to be an inducement to purchase. While FHA permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing. Other expenses paid on behalf of the borrower must result in a dollar-for-dollar reduction to the sales price. The dollar-for-dollar reduction to the sales price also applies to gift funds not meeting the requirement that the gift be for downpayment assistance and is provided by an acceptable source. When someone other than a family member has paid off debts, the funds used to pay off the debt must be treated as an inducement to purchase and the sales price must be reduced by a dollar-for-dollar amount in calculating the maximum insurable mortgage.

**Documentation Requirements.** The lender must document the gift funds by obtaining a gift letter, signed by the donor and borrower, that specifies the dollar amount of the gift, states that no repayment is required, shows the donor's name, address, telephone number and states the nature of the donor's relationship to the borrower. In addition, the lender must document the transfer of funds from the donor to the borrower, as follows:

1. If the gift funds are in the homebuyer's bank account, the lender must document the transfer of the funds from the donor to the homebuyer by obtaining a copy of the canceled check or other withdrawal document showing that the withdrawal is from the donor's account. The homebuyer's deposit slip and bank statement that shows the deposit is also required.

2. If the gift funds are to be provided at closing:

   a. If the transfer of the gift funds is by certified check made on the donor's account, the lender must obtain a bank statement showing the withdrawal from the donor's account, as well as a copy of the certified check.

   b. If the donor purchased a cashier's check, money order, official check, or any other type of bank check as a means of transferring the gift funds, the donor must provide a withdrawal document or canceled check for the amount of the gift, showing that the funds came from the donor's personal account. If the donor borrowed the gift funds and cannot provide documentation from the bank or other

**4155.1 REV-5**

savings account, the donor must provide written evidence that those funds were borrowed from an acceptable source, i.e., not from a party to the transaction, including the lender. "Cash on hand" is not an acceptable source of the donor's gift funds.

Regardless of when the gift funds are made available to the homebuyer, the lender must be able to determine that the gift funds ultimately were not provided from an unacceptable source and were indeed the donor's own funds. When the transfer occurs at closing, the lender remains responsible for obtaining verification that the closing agent received funds from the donor for the amount of the purported gift and that those funds came from an acceptable source.

NOTE: FHA does not "approve" down payment assistance programs in the form of gifts administered by charitable organizations (i.e., nonprofits). Mortgage lenders are responsible for assuring that the gift to the homebuyer from the charitable organization meets the appropriate FHA requirements and the transfer of funds is properly documented. In addition, FHA does not allow nonprofit entities to provide gifts to homebuyers for the purpose of paying off installment loans, credit cards, collections, judgments, and similar debts.

**D.**   **Collateralized Loans.** Funds can be borrowed for the total required investment as long as satisfactory evidence is provided that the funds are fully secured by investment accounts or real property. Such assets may include stocks, bonds, real estate (other than the property being purchased), etc.

In addition, certain types of loans secured against deposited funds, such as signature loans, the cash value of life insurance policies, loans secured by 401(k)s, etc., in which repayment may be obtained through extinguishing the asset; do not require consideration of a repayment for qualifying purposes. However, in such circumstances, the asset securing the loan may not be included as assets to close or otherwise considered as available to the borrower.

An independent third party must provide the borrowed funds. The seller, real estate agent or broker, lender, or other interested third party may not provide such funds. Unacceptable borrowed funds include signature loans, cash advances on credit cards, borrowing against household goods and furniture and other similar unsecured financing.

**4155.1 REV-5**

E.   **Sales Proceeds.** The net proceeds from an arms-length sale of a currently owned property may be used for the cash investment on a new house. A fully executed HUD-1 Settlement Statement must be provided as satisfactory evidence of the cash sales proceeds accruing to the borrower. If the property has not sold by the time of underwriting, loan approval must be conditioned upon verifying the actual proceeds received by the borrower. The lender must document both the actual sale and the sufficiency of the net proceeds required for settlement.

F.   **Trade Equity.** The borrower may agree to trade his or her real property to the seller as part of the cash investment. The amount of the borrower's equity contribution is determined by subtracting all liens against the property being traded (along with any real estate commission) from the lesser of that property's appraised value or sales/trade price.

Value must be determined by a residential appraisal no more than six months old. Evidence of ownership also is required. Additionally, if the property being traded has an FHA-insured mortgage, assumption processing requirements and restrictions apply (see Chapter 4 for additional information).

G.   **Sale of Personal Property.** If the borrower intends to sell personal property items (cars, recreational vehicles, stamps, coins, baseball card collections, etc.) to obtain funds required for closing, the borrower must provide a satisfactory estimate of their worth, in addition to conclusive evidence the items have been sold. The estimated worth of the items being sold may be in the form of published value estimates, such as those issued by automobile dealers, philatelic or numismatic associations, or a separate written appraisal by a qualified appraiser with no financial interest in the loan transaction. Only the lesser of this estimate of value or the actual sales price is considered as assets to close.

H.   **Employer's Guarantee Plans.** If the borrower's employer guarantees to purchase the borrower's previous residence as the result of relocation, the borrower must submit evidence of the agreement and the net proceeds must be guaranteed.

I.   **Employer Assistance Plans.** If the employer, to attract or retain valuable employees, pays the employee's closing costs, mortgage insurance premium, or any portion of the cash investment, this payment is considered employee compensation and no adjustment to the maximum mortgage amount is required. If the employer provides this benefit after loan settlement, the borrower must provide evidence of sufficient cash for closing. *A salary advance, however, cannot be considered as assets to close since it represents an unsecured loan.*

**J.**  **Savings Bonds, Etc.**  Government issued bonds are counted at original purchase price, unless eligibility for redemption and redemption value are confirmed.  Actual receipt of funds at redemption must be verified.

**K.**  **IRAs, Thrift Savings Plans, 401(k)s & Keogh Accounts.**  Assets such as IRAs, thrift savings plans, and 401(k)s, etc., may be included in the underwriting analysis up to only *60 percent* of value unless the borrower provides conclusive evidence that a higher percentage may be withdrawn after subtracting any federal income tax and any withdrawal penalties.  Evidence of redemption is required.

**L.**  **Stocks and Bonds.**  The monthly or quarterly statement provided by the stockbroker or financial institution managing the portfolio may be used to verify the value of these securities.  Actual receipt of funds must be verified and documented.

**M.**  **Cash Saved At Home.**  Borrowers who have saved cash at home and are able to demonstrate adequately the ability to do so are permitted to have this money included as an acceptable source of funds to close the mortgage.  To include such funds in assessing the homebuyer's cash assets for closing, the money must be verified–whether deposited in a financial institution or held by the escrow/title company–and the borrower must provide satisfactory evidence of the ability to accumulate such savings.

The asset verification process requires the borrower to explain in writing how such funds were accumulated and the amount of time taken to do so.  The lender must determine the reasonableness of the accumulation of the funds based on the borrower's income stream, the time period during which the funds were saved, the borrower's spending habits, documented expenses and the borrower's history of using financial institutions.  (All other factors being equal, individuals with checking and/or savings accounts are less likely to save money at home than an individual with no history of such accounts.)

**N.**  **Rent Credit.**  The cumulative amount of the rental payments that exceed the appraiser's estimate of fair market rent may be considered accumulation of the borrower's cash investment.  Both the rent-with-option-to-purchase agreement and the appraiser's estimate of market rent must be included in the endorsement package.

Conversely, if the sales agreement reveals that the renter has been living in the property (or one owned by the seller) rent-free, or that an agreement was made allowing the renter to occupy at a rental amount considerably below fair market value in anticipation of eventual purchase of the property, this situation must be treated as an inducement to purchase with an appropriate reduction to the mortgage.  Exceptions may be granted in

**4155.1 REV-5**

---

situations, such as when a builder fails to deliver a property at an agreed-to time and then permits the borrower to occupy that or another unit for less-than-market rent temporarily until construction is complete.

**O.**    **Sweat Equity.** Labor performed or materials furnished by the borrower before closing, on the property being purchased, may be considered as the equivalent of a cash investment, to the extent of the estimated cost of the work or materials. (Sweat equity may be "gifted" subject to the gift requirements and additional requirements shown below.) Additionally, the following apply to sweat equity:

1.    On existing construction, only the repairs or improvements listed on the appraisal are eligible for sweat equity. Any work completed or materials provided *before* the appraisal is made are not eligible. On proposed construction, the sales contract must indicate the tasks to be performed by the homebuyer during construction.

2.    The borrower's labor may be considered as the equivalent of cash, if the borrower can demonstrate his or her ability to complete the work in a satisfactory manner. The lender must document the contributory value of the labor through either the appraiser's estimate or a cost estimating service.

3.    Delayed work (on-site escrow), clean up, debris removal, and other general maintenance cannot be included as sweat equity.

4.    There can be no cash back to the borrower in these transactions.

5.    Sweat equity on a property other than the property being purchased is not acceptable. Compensation for work performed on other properties must be in cash and be properly documented.

6.    Evidence of the source of funds used to purchase and the market value of the materials must be provided if the borrower furnishes these.

**P.**    **Commission from Sale.** If the borrower is a licensed real estate agent entitled to a real estate commission from the sale of the property being purchased, that amount may be used for the cash investment with no adjustment to the maximum mortgage required. A family member entitled to the commission also may provide gift funds to the homebuyer.

**Q.**    **Disaster Relief Grants and Loans.** Grants or loans from state and federal agencies [e.g., Federal Emergency Management Agency (FEMA)] that provide immediate housing assistance to individuals displaced due to natural disaster may be used for the borrower's cash investment. Secured

---

4155.1 REV-5

or unsecured disaster relief loans administered by the Small Business
Administration (SBA) also may be used. However, if the SBA loan will
be secured against the property being purchased, it must be clearly
subordinate to the FHA-insured mortgage. Any monthly payment arising
from such a loan must be included in the qualifying ratios.

**R.**     **Cash Accumulated with Private Savings Clubs.**  Some borrowers may
choose to use non-traditional methods of saving money by making
deposits into private savings club. Often, these private savings clubs pool
resources for use among the membership.

If a homebuyer claims that the cash to close an FHA-insured mortgage is
from savings held with a private savings club, the borrower must be able
to adequately document the accumulation of those assets with the club.
While such clubs are not supervised banking institutions, the clubs must –
at a minimum– have account ledgers, receipts from the club, verification
from the club treasurer, and identification of the club so that the lender can
reverify the information provided. The underwriter must be able to
determine that it was reasonable for the borrower to have saved the money
claimed and that there is no evidence these funds were borrowed with an
expectation of repayment.

4155.1 REV-5

---

## SECTION 4: LIABILITIES

**2-11**   **TYPES OF LIABILITIES.**  The following are types of liabilities that must be considered in qualifying borrowers:

**A.**   **Recurring Obligations.**  The borrower's liabilities include all installment loans, revolving charge accounts, real estate loans, alimony, child support, and all other continuing obligations.  In computing the debt-to-income ratios, the lender must include the monthly housing expense and all other additional recurring charges *extending ten months or more*, including payments on installment accounts, child support or separate maintenance payments, revolving accounts and alimony, etc.  Debts lasting less than ten months must be counted if the amount of the debt affects the borrower's ability to make the mortgage payment during the months immediately after loan closing; this is especially true if the borrower will have limited or no cash assets after loan closing.

The following additional information deals with revolving accounts and alimony payments:

1.   Revolving Accounts.  If the account shown on the credit report has an outstanding balance, monthly payments for qualifying purposes must be calculated at the greater of 5 percent of the balance or $10 (unless the account shows a specific minimum monthly payment).

2.   Alimony.  Because of the tax consequences of alimony payments, the lender may choose to treat the monthly alimony obligation as a reduction from the borrower's gross income in calculating qualifying ratios, rather than as a monthly obligation.

**B.**   **Contingent Liabilities.**  A contingent liability exists when an individual will be held responsible for payment of a debt, should another party, jointly or severally obligated, default on that payment.  Unless the borrower can provide conclusive evidence from the debt holder that there is no possibility the debt holder will pursue debt collection against him or her should the other party default, the following rules apply to contingent liabilities:

1.   Mortgage Assumptions.  When a borrower remains obligated on an outstanding FHA-insured, VA-guaranteed, or conventional mortgage secured by a property that has been sold or traded within the last twelve months without a release of liability, or is to be sold on assumption *without* a release of liability being obtained, contingent liability must be considered unless:

---

a.   The originating lender of the mortgage being underwritten obtains from the servicer of the assumed loan a payment history showing that mortgage has been current during the previous 12 months; or

b.   An appraisal or closing statement from the sale of the property supports a value that results in a 75 percent LTV ratio [i.e., the outstanding balance on the mortgage loan (minus any UFMIP, if applicable) cannot exceed 75 percent of the appraised value or sales price].

2.   <u>Co-Signed Obligations.</u>  If the individual applying for an FHA-insured mortgage is a co-signer–or is otherwise co-obligated on a car loan, student loan, mortgage, or any other obligation – contingent liability applies unless the lender obtains documented proof that the primary obligor has been making payments during the previous 12 months on a regular basis and does not have a history of delinquent payments on the loan.

C.   **Projected Obligations.**  If a debt payment, such as a student loan, is scheduled to begin within twelve months of the mortgage loan closing, the lender must include the anticipated monthly obligation in the underwriting analysis, unless the borrower provides written evidence that the debt will be deferred to a period outside this timeframe.  Similarly, balloon notes that come due within one year of loan closing must be considered in the underwriting analysis.

D.   **Obligations Not Considered Debt.**  Obligations not to be considered debt (or subtracted from gross income) include federal, state, and local taxes; FICA or other retirement contributions such as 401(k) accounts (including repayment of debt secured by these funds); commuting costs; union dues; open accounts with zero balances; automatic deductions to savings accounts; child care; and voluntary deductions.

4155.1 REV-5

## SECTION 5: BORROWER QUALIFYING

The paragraphs below discuss debt-to-income ratios and the compensating factors that may be used to exceed the qualifying ratios. As evidenced by the description of compensating factors, ratios can be exceeded when significant compensating factors exist. We also do not set an arbitrary percentage that ratios may never exceed; however, the underwriter should judge the overall merits of the loan application and determine what compensating factors apply and the extent to which ratios may be exceeded.

Underwriting requires careful analysis of the many aspects of the mortgage. Each loan is a separate and unique transaction, and there may be other factors that demonstrate the borrowers' ability and willingness to make timely mortgage payments. There is a danger of "layering flexibilities" in assessing mortgage insurance risk, and simply establishing that a loan transaction meets minimal standards does not necessarily constitute prudent underwriting. The lender is responsible for adequately analyzing the probability that the borrower will be able to repay the mortgage obligation in accordance with the terms of the loan.

**2-12 DEBT-TO-INCOME RATIOS.** Ratios are used to determine whether the borrower can reasonably be expected to meet the expenses involved in homeownership, and otherwise provide for the family. The lender must compute two ratios:

    **A.** **Mortgage Payment Expense to Effective Income.** If the total mortgage payment (principal and interest; escrow deposits for real estate taxes, hazard insurance, the mortgage insurance premium, homeowners' association dues, ground rent, special assessments, and payments for any acceptable secondary financing) does not exceed *29 percent of the gross effective income*, the relationship of the mortgage payment to income is considered acceptable. A ratio exceeding 29 percent may be acceptable only if significant compensating factors as discussed in paragraph 2-13 are documented and are recorded on the mortgage credit analysis worksheet. Typically, for borrowers with limited recurring expense, greater latitude is permissible on this ratio than on the total fixed payment ratio described below.

    **B.** **Total Fixed Payment to Effective Income.** If the total of the mortgage payment and all recurring charges does not exceed *41 percent of the gross effective income*, the relationship of total obligations to income is considered acceptable. A ratio exceeding 41 percent may be acceptable only if significant compensating factors as discussed in paragraph 2-13 are documented and are recorded on the mortgage credit analysis worksheet.

**2-13 COMPENSATING FACTORS.** Compensating factors that may be used to justify approval of mortgage loans with ratios exceeding our benchmark guidelines are those listed below. Underwriters must record on the "remarks"

**4155.1 REV-5**

section of the HUD 92900-WS/HUD 92900-PUR the compensating factor(s) used to support loan approval. Any compensating factor used to justify mortgage approval must be supported by documentation.

A. The borrower has successfully demonstrated the ability to pay housing expenses equal to or greater than the proposed monthly housing expense for the new mortgage over the past 12-24 months.

B. The borrower makes a large downpayment (ten percent or more) toward the purchase of the property.

C. The borrower has demonstrated an ability to accumulate savings and a conservative attitude toward the use of credit.

D. Previous credit history shows that the borrower has the ability to devote a greater portion of income to housing expenses.

E. The borrower receives documented compensation or income not reflected in effective income, but directly affecting the ability to pay the mortgage, including food stamps and similar public benefits.

F. There is only a minimal increase in the borrower's housing expense.

G. The borrower has substantial documented cash reserves (at least three months' worth) after closing. In determining if an asset can be included as cash reserves or cash to close, the lender must judge whether or not the asset is liquid or readily convertible to cash and can be done so absent retirement or job termination. Also see paragraph 2-10K.

Funds borrowed against these accounts may be used for loan closing, but are not to be considered as cash reserves. "Assets" such as equity in other properties and the proceeds from a cash-out refinance are not to be considered as cash reserves. Similarly, funds from gifts from any source are not to be included as cash reserves.

H. The borrower has substantial non-taxable income (if no adjustment was made previously in the ratio computations).

I. The borrower has a potential for increased earnings, as indicated by job training or education in the borrower's profession.

J. The home is being purchased as a result of relocation of the primary wage-earner, and the secondary wage-earner has an established history of employment, is expected to return to work, and reasonable prospects exist for securing employment in a similar occupation in the new area. The underwriter must document the availability of such possible employment.

4155.1 REV-5

## MORTGAGE CREDIT ANALYSIS

### SECTION 6: SPECIAL UNDERWRITING INSTRUCTIONS

2-14    **Temporary Interest Rate Buydowns**.  Interest rate buydowns are designed to reduce the borrower's monthly payment during the early years of the mortgage and are permitted only on purchase transactions.  Buydowns may only be used on fixed-rate mortgages.

Buydown funds may come from the seller, lender, borrower or other party.  Funds from the seller or any other interested third party are considered seller contributions and must be included in the six percent limit on seller contributions (see paragraph 1-7A).  Lenders must ensure that the funds described in the escrow agreement have been placed in escrow before or at closing and that the agreement meets the requirements described below.

Buydowns on eligible loans not meeting all the criteria described in paragraph A, below, may be considered only as compensating factors.  However, all buydowns must comply with the escrow agreement requirements in paragraph B, below.

A.    Underwriting Requirements for Qualifying Borrowers at the Buydown Interest Rate.

    1.    The mortgage must be a fixed rate loan on an owner occupied principal residence.

    2.    The buydown must not result in a reduction of more than two percentage points below the interest rate on the note.

    3.    The buydown must not result in more than a one-percentage point annual decrease in the interest rate.  The borrower's payment may change only once a year.

B.    Additional Interest Rate Buydown Instructions.

    1.    Lender-funded buydowns on fixed-rate purchase money mortgages through premium pricing are acceptable provided that the funds generated do not result in a reduction of more than 2 percentage points below the note rate.

    2.    The lender must establish that the eventual increase in mortgage payments will not affect the borrower adversely and likely lead to default.  The underwriter must document that the borrower meets one of the following criteria:

a.   The borrower has a potential for increased income that would offset the scheduled payment increases, as indicated by job training or education in the borrower's profession or by a history of advancement in the borrower's career with attendant increases in earnings.

b.   The borrower has a demonstrated ability to manage financial obligations in such a way that a greater portion of income may be devoted to housing expenses. This criterion also may include borrowers whose long-term debt, if any, will not extend beyond the term of the buydown agreement.

c.   The borrower has substantial assets available to cushion the effect of the increased payments.

d.   The cash investment made by the borrower substantially exceeds the minimum required.

3.   <u>Escrow Agreement Requirements.</u>  A copy of the escrow agreement, signed by the borrower and the provider of funds, must accompany the loan application. (The underwriter may condition the loan approval for an executed buydown agreement at closing.)

The following are requirements for the escrow agreement:

a.   The agreement must provide that any escrow funds not distributed at the time the mortgage loan is prepaid be applied to the outstanding balance due on the mortgage. However, in the event of foreclosure, the claim for mortgage insurance benefits must be reduced by the amount remaining in the buydown escrow account.

b.   The agreement must not permit reversion of undistributed escrow funds to the provider if the property is sold or the mortgage is prepaid in full. The agreement may provide that assistance payments continue to buyers who assume the mortgage. Unless the borrower establishes the escrow account, unexpended escrow funds may not be provided to the borrower in cash.

c.   The escrow funds must be held in an escrow account by a financial institution supervised by a federal or state agency. Payments must be made by the escrow agent to the lender or its servicing agent. However, if the escrow payments are not received for any reason, it is the borrower's responsibility to make the total payment set forth in the

4155.1 REV-5

mortgage note. FHA has no objection to the lender holding and administering the escrow funds for up to 60 days when there is an outstanding forward commitment to sell the mortgage.

**2-15**    **ADJUSTABLE RATE MORTGAGES (ARMs).** Borrowers must qualify for one-year ARMs using the mortgage payments based upon the contract or initial interest rate plus 1 percentage point (i.e., the anticipated maximum second-year interest rate) if the loan-to-value ratio is 95 percent or greater.

**2-16**    **CONDOMINIUM UNITS–UTILITY EXPENSES.** With proper documentation, such as that which is available from the utility company, the portion of a condominium fee that is clearly attributable to utilities may be subtracted from the Homeowners Association (HOA) dues before computing ratios.

**2-17**    **CONSTRUCTION–PERMANENT MORTGAGE PROGRAM.** A construction-permanent mortgage combines the features of a construction loan, a short-term interim loan for financing the cost of construction, and the traditional long-term permanent residential mortgage. For mortgage insurance and LTV purposes, we consider it to be a purchase transaction. The mortgage lender makes the loan directly to an approved borrower/homebuyer. There is one closing that occurs prior to the start of construction. At closing, funds are disbursed to cover purchase of the land, with the balance of the mortgage proceeds placed in an escrow account to be disbursed as construction progresses. *The loan is insured after construction is complete.*

**Program Information.**

A.    **Disbursement of Funds.** It is the lender's responsibility to obtain written approval from the borrower before each draw payment is provided to the builder.

B.    **Construction Period Fees.** Unless a separate agreement has been made specifying responsibility, construction loan interest, commitment fees, inspection fees, title update charges, real estate taxes, hazard insurance, and other financing charges incurred during the construction period are to be paid by the builder.

C.    **Interest Rate.** The permanent mortgage loan interest is established at closing. However, a lender may offer a "ceiling/floor," whereby the borrower may "float" the interest rate during construction. The agreement must provide that, at the point of interest rate lock-in, the permanent mortgage will not exceed a specific maximum interest rate based on market fluctuations, as well as permit the borrower to lock-in at a lower rate depending on the market. The borrower must qualify for the

mortgage at the maximum rate at which the permanent mortgage may be set.

D. **Disclosure.** The lender must provide a disclosure to the borrower explaining that the loan is not eligible for FHA mortgage insurance until after either a final inspection or issuance of a certificate of occupancy by the local governmental jurisdiction (whichever is later), and that FHA has no obligation until the mortgage is endorsed for insurance.

E. **Amortization.** Amortization must begin no later than the first of the month following 60 days from the date of either the final inspection or issuance of certificate of occupancy, whichever is later.

F. **Endorsement.** The lender must submit a request for endorsement after final inspection or issuance of certificate of occupancy (but within 60 days of the date the latter of these events occur). During construction, the loan is not FHA-insured.

G. **Remitting UFMIP.** FHA must receive the UFMIP within 15 days of closing or other time period as may be prescribed by FHA.

H. **Maximum Mortgage Amount.** The maximum mortgage amount is determined by applying LTV limits to the lesser of the appraised value or the acquisition cost. The acquisition cost includes the contractor's price to build, cost of the land, and allowable closing costs. (If the land has been owned more than six months or was received as an acceptable gift, the *value* of the land may be used instead of its cost.)

I. **Equity in the Land.** Equity in the land may be used for the borrower's cash investment. However, if the advancement of the permanent loan results in the borrower receiving cash out in excess of $250, the maximum LTV is limited to 85 percent. *If the contractor of the improvements is also the seller of the land, the total acquisition cost for maximum mortgage purposes is the purchase price to the borrower.*

J. **Other Underwriting Considerations.** The following criteria must be met for a loan to be considered a construction/permanent loan and to be eligible for FHA mortgage insurance:

The borrower must own or be purchasing the lot (or, if owned by the contractor, the lot must be included in the total contract price).

(1) The borrower must have secured or will secure the loan in his or her own name.

**4155.1 REV-5**

---

(2)    The borrower has contracted with a builder to construct the improvement. (This program is not available to a borrower acting as his or her own general contractor, unless the borrower is a licensed builder by profession. In this case, the acquisition cost must be determined by the actual documented cost to construct the improvements.)

(3)    The balance on the loan, when it is fully drawn, must be verified. The construction escrow account, if one was established, must be fully extinguished; any remaining funds must be applied to the outstanding balance of the permanent loan.

(4)    If the borrower purchased the lot within the past 6 months, he or she must provide a copy of the HUD-1 or other settlement statement showing the acquisition cost. If the borrower owns the lot free-and-clear, the borrower must provide a copy of the Warranty Deed showing no vendor's lien, a copy of the release of lien, or a copy of the HUD-1 or other settlement statement showing ownership.

(5)    If the initial draw on the loan was for the purpose of paying off the lot, a statement verifying the amount must be provided.

(6)    The borrower must provide a copy of the fully executed sales agreement, which includes the contractor's price to build. (A Mechanic's and Material man's lien is not sufficient.)

(7)    If the borrower is including extras over and above the contract specification and/or is paying out-of-pocket costs over and above the interim loan, the borrower must provide a breakdown of the extras and the cost of each and canceled checks and paid receipts for all out-of-pocket construction costs.

K.    **Documentation Requirements.** The loan is to be closed using standard FHA documentation, with the addition of a Construction Rider to the Note and a Construction Loan Agreement. These construction documents may be in any form acceptable to the lender, but they must provide that all special construction terms end when the construction loan converts to a permanent loan. After conversion, only the permanent loan terms (using standard documents) continue to be effective, thus making the permanent loan eligible for FHA mortgage insurance.

Prior to endorsement, the DE underwriter must be provided with the following:

---

1.    Certification, signed by the borrower after conversion to the permanent loan, that the mortgaged property is free-and-clear of all liens other than the mortgage.

2.    Verification that the construction loan has been fully drawn down.

3.    Copies of canceled checks and paid receipts for all the borrower's out-of-pocket construction costs.

## 2-18  MORTGAGE INSURANCE FOR DISASTER VICTIMS [Section 203(h)].

FHA provides mortgage insurance to assist victims of Presidentially-declared disasters. Under this program, individuals or families whose residences were destroyed or damaged to such an extent that reconstruction or repair is necessary are eligible for 100 percent financing for the purchase of a home. The Federal Emergency Management Agency (FEMA) provides listings of the specific affected counties and cities and corresponding declaration dates. This information can be found on the Internet at http://www.fema.gov/disasters.

The procedures described are in effect whenever a disaster is declared by the President and remain in effect for one year from the date of the President's declaration.

### A.    Program and Underwriting Requirements.

The borrower's previous residence must have been in the disaster area and must have been destroyed or damaged to such an extent that reconstruction or replacement is necessary. The borrower must provide conclusive evidence of this fact. Documentation showing a permanent residence in the affected area before the disaster includes a valid driver's license, a voter registration card, utility bills, etc. Documentation regarding destruction of the residence includes an insurance report, an inspection report by an independent fee inspector or government agency, or conclusive photographic evidence showing the destruction or damage. The borrower may have been the owner of the property or a renter of the property affected.

The borrower is eligible for 100 percent financing of the sales price and no down payment is required. (However, closing costs and prepaid expenses not paid by the seller must be paid by the borrower in cash or paid through premium pricing.)
Maximum mortgage amounts are the same as for Section 203(b)/203(h). A list can be accessed from the lender Web page on HUD's Website at www.hud.gov or on FHA Connection at https://entp.hud.gov/clas/.

The program is limited to one-unit detached homes or units in an approved condominium project. "Spot units" in condominiums are eligible also.

**4155.1 REV-5**

Two-, three-, and four-unit properties may not be purchased under the Section 203(h) program.

The borrower's mortgage loan application must be submitted to the lender within one year of the President's declaration of the disaster.

ARMS may be used with the Section 203(h) program.

B.   **Using Section 203(k) with 203(h) for Rehabilitation Mortgages.** The requirement for a dwelling to be completed more than one year preceding the date of the application for mortgage insurance under Section 203(k) does not apply to properties in the disaster area. Damaged residences are eligible for Section 203(k) mortgage insurance regardless of the age of the property. The residence needs only to have been completed and ready for occupancy for eligibility under Section 203(k). The percentage of financing is determined by the type of mortgage being made (i.e., normal LTV ratios apply to Section 203(k) mortgages made in these areas).

Homes that have been demolished, or will be razed as part of the rehabilitation work, are eligible provided the existing foundation system is not affected and still will be used. The complete foundation system must remain in place.

2-19  **ENERGY-EFFICIENT HOMES (EEH).** The benchmark qualifying ratios may both be exceeded by up to 2 percentage points when the borrower is purchasing or refinancing an EEH. These higher housing expense- and obligations-to-income ratios are justified due to the anticipated energy costs savings and become 31 percent and 43 percent, respectively. The appropriate HOC determines if a property qualifies for EEH designation. The original documentation attesting to energy efficiency is required on resales.

All properties meeting the Council of American Building Officials (CABO) 1992 Model Energy Code (MEC) are considered energy efficient and eligible for the two percentage points increase in the qualifying ratios.

**2-20    ENERGY EFFICIENT MORTGAGE (EEM) PROGRAM.** The FHA EEM
Program is for *existing* properties. An EEM recognizes the energy savings of a
home that has "cost effective" energy saving improvements, which increase the
energy efficiency of a home. Because the home is energy efficient, the
occupant(s) will save on utility costs and, thus, be able to devote more income to
the monthly mortgage payment. Energy efficiency improvements can include
energy saving equipment and active and passive solar technologies.

Under the FHA EEM Program, a borrower can finance into the mortgage 100
percent of the cost of eligible energy efficient improvements, subject to certain
dollar limitations, without an appraisal of the energy efficient improvements. To
be eligible for inclusion into the mortgage, the energy efficient improvements
must be "cost effective" (i.e., the total cost of the improvements, including
maintenance costs, must be less than the total present value of the energy saved
over the useful life of the improvements). The mortgage includes the cost of the
energy efficient improvements, in addition to the usual mortgage amount
normally permitted.

A.    **Basic Program Requirements.**

1.    Existing *one- and two-unit* properties are eligible. Three- and
four- unit existing properties are not eligible.

2.    The cost of any improvement to the property that will increase the
property's energy efficiency and that is determined to be "cost
effective" is eligible for financing into the mortgage. Its cost may
be added to the mortgage amount up to the greater of:

a.    5 percent of the property's value (not to exceed $8,000); or
b.    $4,000.

"Cost effective" means that the total cost of the improvements,
including any maintenance costs, is less than the total present value
of the energy saved over the useful life of the energy improvement.
The FHA maximum loan limit for the area may be exceeded by the
cost of the energy efficient improvements.

3.    The cost of the energy improvements, including maintenance costs,
and the estimate of the energy savings must be determined based
upon a physical inspection of the property by a home energy
ratings system (HERS) representative or energy consultant.

The HERS representative or energy consultant must be an
independent entity; it cannot be related, directly or indirectly, to
the seller of the property or the prospective borrower. The
contractor selected by the borrower to install the energy efficient

**4155.1 REV-5**

improvements may not be related, directly or indirectly, to the HERS representative or energy consultant. The HERS representative or energy consultant may be a utility company; a local, state, or federal government agent; an entity approved by a local, state, or federal government agency specifically for the purpose of providing home energy ratings on residential properties; or a nonprofit organization experienced in conducting home energy ratings of residential properties.

4.    The home energy rating report prepared by the HERS representative or energy consultant must be in writing and provided to the prospective borrower and lender.  The report must contain the following information:

a.    Address of the property.

b.    Name of the current owner(s) of the property.

c.    Date of the property inspection.

d.    Description of the energy features currently in the property. This description must include, at a minimum, a description of the insulation R values in ceilings, walls and floors; infiltration levels and barriers (caulking, weatherstripping and sealing); a description of the windows (storm windows, double pane, triple pane etc.) and doors; and a description of the heating (including water heating) and cooling systems.

e.    Description of the modifications recommended to improve the energy efficiency of the property.

f.    Estimated costs of the energy improvements, their useful life, and the costs of any maintenance over the useful life.

g.    Present estimated annual utility costs *before* installation of the energy efficient improvements.

h.    Estimated annual utility costs *after* installation of the energy efficient improvements.

i.    Estimated annual savings in utility costs after installation of the energy efficient improvements.

j.    Printed name(s) and signature(s) of the person(s) that inspected the property and prepared the report, as well as the date of preparation of the report.

k.    The following certification statement, signed by the person(s) who inspected the property and prepared the report, must accompany the report:

"I certify, that to the best of my knowledge and belief, the information contained in this report is true and accurate and I understand that the information in this report may be used in connection with an application for an energy efficient

mortgage to be insured by the Federal Housing Administration of the United States Department of Housing and Urban Development."

For streamline refinance transactions, the borrower's monthly payment for principal and interest for the refinance mortgage (which will include the cost for the energy efficient improvements) *must be lower than the monthly principal and interest on the current mortgage.*

**B.** **Escrow Account Specifications.** An escrow account may be established for no more than three months after loan closing to allow for installation of the energy efficient improvements. The lender, a utility company, a nonprofit organization, or a government agency may administer the escrow account. The escrow account must be insured and be established at a financial institution supervised by a federal agency.

**C.** **Processing and Underwriting Requirements.**

1.  The lender will process the mortgage loan application and qualify the borrower using our standard underwriting requirements and qualifying ratios. If the borrower elects to have an EEM and add the cost of the energy efficient improvements to the mortgage, the lender must take the following additional steps:

    a.  Obtain a report prepared by a HERS representative or energy consultant showing the estimated costs of installing the energy efficient improvements, including any maintenance costs, and the estimated annual savings in utility costs that will result from the installation of the energy efficient improvements.

    b.  Using the HERS or energy consultant's report, the lender must determine that the energy efficient improvements are "cost effective" by calculating the *present cost* of the energy improvements, including maintenance costs (if any) over the useful life of the improvements and the *present value of the energy savings* over the useful life of the energy improvements. If the energy efficient improvements meet the "cost effective" test (i.e., present cost of improvements is less than the present value of the energy savings), the lender may add 100 percent of the cost of the energy efficient improvements (subject to the dollar limits described above in B. 4.) to the otherwise allowable maximum mortgage amount. No appraisal of the energy efficient improvements is necessary, and the borrower need not meet any further credit standards. If the energy

4155.1 REV-5

efficient improvements meet the "cost effective" test, the full cost of the improvements can be added to the borrower's base loan amount, *without* a determination of value and *without* further credit qualification.

c.    The lender calculates the UFMIP on the full mortgage amount, which will include the cost of the energy improvements.

D.    **Escrow Account.** We will insure the mortgage before the energy efficient improvements are installed provided the lender establishes an escrow account and deposits into it the funds to pay for the energy efficient improvements. The escrow account shall be for a period of no more than 90 days. If the improvements are not installed within 90 days, the lender must apply the funds held in escrow to a prepayment of the principal balance of the mortgage. The escrow account may be established by the lender and administered by the lender, a utility company, a nonprofit organization, or a government agency. However, the lender is responsible for assuring FHA that the escrow has been cleared. Lenders shall execute Form HUD 92300 Mortgagee Assurance of Completion to indicate that the escrow for the energy efficient improvements has been established. Subsequently, the lender is responsible for notifying FHA that the improvements have been made and that the escrow has been cleared. The installation of the improvements may be inspected by the lender, the HERS, or an FHA fee inspector. The borrower may be charged an inspection fee in accordance with the appropriate HOC fee schedule.

F.    **Home Energy Rating Report.** The lender must include a copy of the home energy rating report, performed by the HERS representative or energy consultant, in the closing package, when requesting insurance endorsement.

2-21    **ADVANCE MORTGAGE PAYMENTS PROHIBITED.** We do not permit, as a condition for making a FHA insured mortgage, a lender to collect from the borrower advance payment(s) of the mortgage. Borrowers are not to be required to write post-dated checks, give cash, or otherwise make mortgage payments to the lender in advance of the borrowers mortgage payment requirements under the security instruments.

4155.1 REV-5

# CHAPTER 3

## DOCUMENTATION AND OTHER PROCESSING REQUIREMENTS

This chapter describes the documentation requirements for each loan submitted for mortgage insurance and the specific requirements lenders must observe in processing and underwriting FHA-insured mortgages. The lender is responsible for asking sufficient questions to elicit a complete picture of the borrower's financial situation, source of funds for the transaction, and the intended use of the property. All information must be verified and docuemtned. <u>The lender must also verify and document the identity of the loan applicant(s).</u>

### SECTION 1: UNDERWRITING DOCUMENTATION

3-1     **APPLICATION PACKAGE.** The application package must contain all documentation supporting the lender's decision to approve the mortgage loan. *When standard documentation does not provide enough information to support this decision, the lender nust provide additional explanatory statements, consistent with other information in the application, to clarify or to supplement the documentation submitted by the borrower.*

All documents may be up to *120 days old* at the time the loan closes (*180 days* for new construction) unless this or other applicable HUD instructions specify a different timeframe, or the nature of the document is such that its validity for underwriting purposes is not affected by being older than the number of prescribed days (e.g., divorce decrees, tax returns). Updated, written verifications must be obtained when the age of the documents exceed these limits. Verification forms or documents used as an alternate to these verifications must pass directly between the lender and the provider without being handled or transmitted by any third party or using any third party's equipment. No document used in the processing or underwriting of a loan may be handled or transmitted by or through an interested third party to the transaction.

The Verification of Deposit (VOD) and Verification of Employment (VOE) may be faxed documents or printed pages from the Internet if they clearly identify their sources (e.g., contain the names of the borrower's employer or depository/investment firm). The lender is accountable for ascertaining the authenticity of the document by examining information included in a document's headers and footers. The lender should verify the authenticity of printed Web pages by examining the pages for similar information. A printed Web page also must show its uniform resource locator (URL) address, as well as the date and time the document was printed.

Lenders may not accept or use documents relating to the credit, employment or income of borrowers that are handled by or transmitted from or through interested third parties (e.g., real estate agents, builders, sellers) or by using their equipment.

**4155.1 REV-5**

---

The following documents are generally required for mortgage credit analysis in all transactions except for certain streamline refinances:

**A.**  **Loan Application.** Uniform Residential Loan Application (URLA), signed and dated by all borrowers and the lender, and the Addendum to the URLA (form HUD-92900-A).

**B.**  **Mortgage Credit Analysis Worksheet.** Form HUD 92900-WS or HUD-92900-PUR, as appropriate.

**C.**  **Social Security Number Evidence.** For all borrowers, including US citizens, the lender is required to document a valid SSN for each borrower, co-borrower, and co-signer on the mortgage. All individuals eligible for legal employment in the US must have a SSN. Each borrower must provide the lender with evidence of his or her own valid SSN as issued by the Social Security Administration (SSA). This applies to purchase money loans and all refinances, including streamline refinances. While the actual social security card is not required, the lender is required to validate the SSN. Lenders may use various means for validating the SSN including examining the borrower's pay stubs, passport, valid tax returns, and may use service providers including those with direct access to the SSA. The lender is also required to resolve any inconsistencies or multiple SSNs for individual borrowers that are revealed during loan processing and underwriting. (Also see paragraph 2-2 B).

**D.**  **Credit Report.** The lender must obtain a credit report on all borrowers who will be obligated on the mortgage note (except for streamline refinance transactions).

**E.**  **Verification of Employment (VOE).** VOE and the borrower's most recent pay stub are to be provided. "Most recent" means at the time the initial loan application is made. If the document is not more than 120 days old when the loan closes (180 days old on new construction), it does not have to be updated.

*Alternative Documentation. As an alternative to obtaining a VOE, the lender may obtain the borrower's original pay stub(s) covering the most recent 30-day period, along with original IRS W-2 Forms from the previous two years. The pay stub(s) must show the borrower's name, social security number, and year-to-date earnings. Any copies of the W-2 Form not submitted with the borrower's income tax returns are considered "original" W-2's. (These original documents may be photocopied and returned to the borrower.) The lender also must verify by telephone all current employers. The loan file must include a certification from the lender that original documents were examined and the name, title, and telephone number of the person with whom employment was verified. For all loans processed in this manner, the lender also must obtain a signed*

---

4155.1 REV-5

*copy of Form IRS 4506 Request for Copy of Tax Form, Form IRS 8821, or a document that is appropriate for obtaining tax returns directly from the IRS. The lender also may use an electronic retrieval service for obtaining W-2 and tax return information.*

*If the employer will not give telephone confirmation of employment or if the W-2 indicates inconsistencies (e.g., FICA payments not reflecting earnings), standard employment documentation must be used.*

F.  **VOD.**  VOD and most recent bank statements are to be provided. "Most recent" means at the time the initial loan application is made. Provided the document is not more than 120 days old when the loan closes (180 days old on new construction), it does not have to be updated.

   ***Alternative Documentation.***  *As an alternative to obtaining a VOD, the lender may obtain from the borrower original bank statement(s) covering the most recent three-month period.  Provided the bank statement shows the previous month's balance, this requirement is met by obtaining the two most recent, consecutive statements.*

G.  **Federal Income Tax Returns.**  Federal income tax returns (both individual returns and business returns) for the past two years, including all applicable schedules, for self-employed borrowers, are required. Commissioned individuals must provide individual federal income tax returns for the past two years.  The lender must obtain signed Forms IRS 4506, IRS 8821, or whatever form or electronic retrieval service is appropriate for obtaining tax returns directly from the IRS for any loan for which the borrower's tax returns are required.

H.  **Sales Contract.**  The sales contract and any amendments or other agreements and certifications are to be included in the case binder.  Either an original or a certified true copy of the sales contract received by the lender is required.

I.  **Real Estate Certification.**  Real estate certification, signed by the buyer, seller, and selling real estate agent or broker (if not contained within the purchase agreement) are required.  Also see paragraph 3-3, below.

J.  **Verification of Rent or Payment History of Present/Previous Mortgages.**  This document must be in the form of a direct verification from the landlord or mortgage servicer or through information shown on the credit report.

K.  **Uniform Residential Appraisal Report (URAR).**  The URAR and Valuation package must be included in the endorsement binder except for streamline refinances made without appraisals.

    **L.**    **Explanatory Statements.** Explanatory statements or additional documentation necessary to make a sound underwriting decision are to be included in the case binder.

## 3-2   DOCUMENTATION STANDARDS.

    **A.**    **Application Forms.** Application forms must be signed and dated by all borrowers applying for the mortgage and assuming responsibility for the mortgage debt.

    **B.**    **Verifications.** Rather than requiring borrowers to sign multiple verification forms, the lender may ask the borrower to sign a general authorization form that gives the lender blanket authority to verify information needed to process the mortgage loan application, such as past and present employment records, bank accounts, stock holdings, etc. If the lender uses such an authorization, he or she must attach a copy of the authorization to each verification sent. Additionally, lenders may use self-adhesive signature labels for laser printed verifications. Each label must completely and clearly indicate its use and must contain the Privacy Act notification.

    **C.**    **Documents Signed in Blank.** Lenders may not have borrowers sign documents in blank, or on blank sheets of paper.

## 3-3   REAL ESTATE CERTIFICATION.

**REAL ESTATE CERTIFICATION.** The borrower, seller, and the selling real estate agent or broker involved in the sales transaction must certify that the terms and conditions of the sales contract are true to the best of their knowledge and belief and that any other agreement entered into by any of the parties in connection with the real estate transaction is part of, or attached to, the sales agreement.

If the sales contract contains a provision that there are no other agreements between parties and that the terms of the sales contract constitute the entire agreement between the parties, the certification specified in the above paragraph is not needed if all parties are signatories to the sales contract submitted at the time of underwriting.

## 3-4   AMENDATORY CLAUSE.

**AMENDATORY CLAUSE.** An amendatory clause must be included in the sales contract when the borrower has not been informed of the appraised value by receiving a copy of Form HUD-92800.5B, Conditional Commitment/DE Statement of Appraised Value or VA-CRV *before* signing the sales contract. The amendatory clause must contain the following language:

"It is expressly agreed that notwithstanding any other provisions of this contract, the purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or

**4155.1 REV-5**

otherwise unless the purchaser has been given in accordance with HUD/FHA or VA requirements a written statement by the Federal Housing Commissioner, Department of Veterans Affairs, or a Direct Endorsement lender setting forth the appraised value of the property of not less than $_____.  The purchaser shall have the privilege and option of proceeding with consummation of the contract without regard to the amount of the appraised valuation.  The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the property. The purchaser should satisfy himself/herself that the price and condition of the property are acceptable."

The actual dollar amount to be inserted in the amendatory clause is the sales price stated in the contract.  If the borrower and seller agree to adjust the sales price in response to an appraised value that is less than the sales price, a new amendatory clause is *not* required.  However, the loan application package must include the original sales contract with the same price as shown on the amendatory clause, along with the revised or amended sales contract.  The Amendatory Clause is not required on HUD REO sales, sales where the seller is Fannie Mae, Freddie Mac, the Department of Veterans Affairs, Rural Housing Services, other Federal, State and local government agencies, mortgagees disposing of REO assets, or sellers at foreclosure sales and those sales where the borrower will not be an owner-occupant (e.g., sales to nonprofit agencies).

## SECTION 2: PROCESSING REQUIREMENTS

**3-5    POWER OF ATTORNEY.** Power of attorney may be used for *closing documents*, including page four of the Addendum to the URLA and the final URLA if it is signed at closing. Any power of attorney, whether specific or general, must comply with state law and allow for the mortgage note to be enforced legally in that jurisdiction. It is the lender's responsibility to assure that clear title can be conveyed in the event of foreclosure.

Except for the conditions described below, the *initial loan application* may not be executed by using a power of attorney (i.e., it must be signed by all borrowers). Either the initial loan application or the final, if one is used, must contain the signatures of all borrowers.

A.    **Military Personnel.** Power of attorney may be used for military personnel on overseas duty or on an unaccompanied tour. The lender should obtain the service person's signature on the application by mail or fax machine.

B.    **Incapacitated Borrowers.** Power of attorney may be used for incapacitated borrowers who are unable to sign the mortgage application. The lender must provide evidence that the signer has authority to purchase the property and to obligate the borrower. Acceptable evidence includes a durable power of attorney specifically designed to survive incapacity and avoid the need for court proceedings. The incapacitated individual must occupy the property to be insured (except on eligible investment property).

**3-6    LOAN APPLICATION DOCUMENT PROCESSING.** Due to various disclosure requirements and our long-standing belief that borrowers are best served when certifications they must make are divulged as early as possible in the loan application process, the application for mortgage insurance must be signed and dated by the borrower(s) before the loan is underwritten. However, we also recognize the burden on lenders and borrowers of having various documents re-signed by the borrower after the loan application has been taken.

To alleviate this burden, lenders are permitted to process and to underwrite the loan after the borrower completes an initial URLA and initial Addendum. If the lender asks the borrower to complete an initial Addendum, based on the preliminary information obtained at loan application, it is not necessary to have a final loan application or *final* Addendum signed before underwriting. The underwriter must condition the loan approval for the final URLA and final Addendum to be signed and dated by the borrower(s) anytime before or at closing.

Page one of the *initial* Addendum must be signed by the interviewer; page one of the *final* Addendum may be signed by anyone authorized to bind the company in

**4155.1 REV-5**

its business dealing with HUD. Page four of the Addendum must be signed by the borrower at closing.

The underwriter must have the final Addendum and URLA before underwriting the loan application, whether or not the borrower signs it. If the lending institution uses only one loan application that serves as both the initial and final, the institution still must obtain a completed final Addendum before underwriting the loan. A copy of any initial and final application must be submitted as part of the endorsement package. A satisfactory letter of explanation from the borrower addressing any significant variances between the initial application and final application is also required.

If the lender chooses not to complete an initial Addendum (i.e., the lender asks the borrower to sign a completed Addendum before the loan is underwritten), simultaneous appraisal and mortgage credit review is permissible, if the lender discloses to the borrower that the lender's DE underwriter may adjust the appraised value. The disclosure statement below becomes part of the official file submitted to FHA for endorsement and must be signed by the borrower(s).

"I (we) understand that my (our) application for an FHA-insured mortgage is being processed under the Direct Endorsement (DE) program. The lender has advised me (us) that the appraiser has assigned a value of $_____ to the property being purchased. I am (we are) aware that the official determination will be made by the DE underwriter when he/she reviews the report. It is understood that I (we) may elect to cancel the application or renegotiate with the seller if the DE underwriter reduces the value below the amount set forth in the sales contract or requires additional repairs for which the seller will not be responsible."

3-7    **SEVEN-UNIT LIMITATION.** Qualified investor entities are limited to a financial interest (i.e., any type of ownership, regardless of type of financing) in seven rental dwelling units, when the subject property is part of, adjacent to or contiguous to a property, subdivision or group of properties owned by the investor. Each dwelling unit in two-, three-, and four-family properties counts toward the seven-unit limitation. The rental units in an owner-occupied two-, three-, or four-unit property also count toward this limitation. The lender is responsible for assuring compliance with this regulation (see 24 CFR 203.42 for additional information). Waivers to the seven-unit limitation can only be initiated by the jurisdictional HOC for good cause.

**3-8    HOTEL AND TRANSIENT USE.** The lender must obtain a hotel and transient use certification (Form HUD-92561), signed by the borrower, for every application on a two-, three-, or four-family dwelling. This certification also is required for a single-family dwelling that is one of a group of five or more dwellings held by the same borrower. Fulfilling this requirement assures FHA that the property will not be used for hotel or transient purposes, or otherwise rented for periods less than 30 days.

**3-9    SALES CONTRACTS AND LOAN CLOSING.** Except for houses sold by FHA under its Real Estate Owned (REO) program, we are not a party to the sales agreement. When a sales contract contains conditions that, if performed, would violate our requirements, the lender must obtain an addendum or modification to the sales agreement that would allow for conformance to those requirements. Nevertheless, failure to perform a condition of the contract will not be grounds for denying loan endorsement, *provided the loan closes in compliance with all regulations and policies.* For example, the sales contract may require the seller to pay an amount in excess of our present limits. Provided the lender closes the loan in accordance with our requirements, endorsement will not be withheld. The sales contract need not refer to FHA financing to be valid.

**3-10    LENDER RESPONSIBILITY AT CLOSING.** The lender is required to resolve all problems regarding title to the real estate and to review all documents to assure compliance with all conditions of the commitment, close the loan before the expiration of the FHA-issued certificate of commitment or DE approval and expiration of the credit documents, and to submit the loan documents for insurance within 60 days of loan closing or disbursement, whichever is later.

The following are required at closing:

**A.    Signatures.** Signatures of all individuals appearing on the loan application must appear on the mortgage note. All owners of the property to be vested in title must sign the security instruments (i.e., mortgage, deed of trust, or security deed). In order to create a valid first lien, to pass clear title, or to waive inchoate rights, any individual whose signature is required by state law must sign the security instruments and/or note. All applicants must sign and date all closing documents where appropriate.

**B.    Closing in Compliance with Loan Approval.** The loan must *close* in the same manner in which it was underwritten and approved. Except for the conditions described in paragraph 2-2 D, additional signatures on the security instruments and/or mortgage note of individuals not reviewed during mortgage credit analysis may be grounds for withholding endorsement.

4155.1 REV-5

---

## SECTION 3: FAIR HOUSING AND OTHER FEDERAL REQUIREMENTS

**3-11    FEDERAL STATUTES AND REGULATIONS.** Federal statutes and regulations concerning fair housing and equal credit opportunities apply to FHA's single-family mortgage insurance programs. Lenders and FHA must abide by these statutes and regulations for new originations and assumption transactions. These regulations include:

**A.    Fair Housing Act (42 USC 3605).** This act prohibits discrimination against individuals based on their race, color, religion, sex, handicap, familial status, or national origin for the availability of residential real estate related transactions, i.e., making or purchasing loans or providing other financial assistance: 1) for purchasing, constructing, improving, repairing, or maintaining a dwelling, or 2) secured by residential real estate. HUD is responsible for enforcing the Fair Housing Act. Information regarding this act may be obtained from the HUD Office of Fair Housing and Equal Opportunity, 451 Seventh Street, S.W., Washington, DC 20410-2000.

The Fair Housing Act prohibits the following:

1.    **Discrimination in Making Loans and Providing Other Financial Assistance.** Prohibited practices include, but are not limited to, failing or refusing to provide information regarding the availability of loans or other financial assistance; application requirements, procedures or standards for the review and approval of loans or financial assistance; or providing information that is inaccurate or different from that provided to others because of race, color, religion, sex, handicap, familial status, or national origin.

2.    **Discrimination in the Terms and Conditions for Making Available Loans or Other Financial Assistance.** Unlawful conduct includes: a) using different policies, practices or procedures in evaluating or in determining creditworthiness of any person in connection with the provision of any loan or other financial assistance secured by residential real estate, or b) determining the type of loan or other financial assistance to be provided, or fixing the amount, interest rate, duration or other terms for a loan or other financial assistance, because of race, color, religion, sex, handicap, familial status, or national origin.

**B.    Equal Credit Opportunity Act (ECOA) (15 USC 1601 et seq.).** ECOA prohibits discrimination in the extension of credit on the basis of race, color, religion, national origin, sex, marital status, or age; because all or part of the borrower's income derives from public assistance; or because

---

4155.1 REV-5

the borrower has in good faith exercised any right under the Consumer Credit Protection Act. The act and Regulation B of the Board of Governors of the Federal Reserve System (12 CFR Part 202) outline rules to be observed in evaluating the creditworthiness of borrowers. Under no circumstances can the source of confidential credit information be disclosed to third parties, except as required by law.

**ECOA prohibits the lender from the following:**

1.    Making any oral or written statement, in advertising or otherwise, to borrowers or prospective borrowers that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

2.    Inquiring whether income stated in an application is derived from alimony, child support, or separate maintenance payments, unless the creditor discloses to the borrower that such income need not be revealed if the borrower does not want the lender to consider it in determining the borrower's creditworthiness.

3.    Inquiring about the sex, race, color, religion, or national origin of an applicant (except as provided in 12 CFR 202.13 regarding information for monitoring purposes).

4.    Inquiring about birth control practices, or intentions concerning the bearing and rearing of children, or capability to bear them.

**Notice of Action Taken on Application.** Regulation B requires that a borrower be notified of action taken by the creditor within 30 days after receiving the completed application. All applications submitted for underwriting are considered completed applications for the purpose of complying with the notification requirements of Regulation B. Actions that are to be taken by HUD or the DE lender include:

1.    Issuing a Firm Commitment or DE approval;
2.    Rejecting the borrower for mortgage credit reasons; and
3.    Notifying the borrower of the lender's inability to process the application because certain items are incomplete or were not submitted.

The maximum time limit for notification is 30 days after the date the DE underwriter receives the application. Under no circumstances is the processing of an application to be delayed in such manner that the required notification to the borrower cannot be provided by the lender within this limit. The notification to the borrower must be provided within 30 days after a loan application is resubmitted or a reconsideration request is

**4155.1 REV-5**

received by the DE lender (or the appropriate HOC for FHA-processed cases). For the purposes of complying with the notification requirements of Regulation B, resubmissions and reconsiderations are considered new applications.

**Rejection/Denial of Loan.** If a loan is rejected, the lender must complete a rejection notice consistent with the requirements of Regulation B. (On FHA-processed loans, FHA issues a rejection notice directly to the lender.) At least one credit aspect must be rejected before an overall rejection can be issued. The rejection notice must provide specific reasons for the rejection. (Delinquent credit accounts need not be listed.) The lender must retain case binders on rejected loans for 26 months from the date the application is received by the DE underwriter or rejected by the appropriate HOC. The rejection notice must contain all the reasons for denial/ineligibility and any counter proposals to effectuate loan approval, such as reduced mortgage amount, etc.

C.    **Fair Credit Reporting Act (FCRA).** This legislation is intended to control collection and dissemination of information about granting credit to the borrower. It is designed primarily to ensure that consumer reporting agencies exercise fairness, confidentiality, and accuracy in preparing and disclosing credit information.

The following conditions apply:

1.    When adverse action is taken based, in whole or in part, on a credit report, the lender must disclose to the borrower the name, address, and, if available, the telephone number of the credit reporting agency issuing the report. The notice must indicate that the borrower is entitled to request from the credit reporting agency information reported to the lender that was used as a reason for rejection.

2.    The notice of adverse action must be given at the time of notice of mortgage rejection, or within a reasonable time thereafter. Any such notice should be retained in the application file.

D.    **Executive Order 11063.** Executive Order 11063, as amended by Executive Order 12259, prohibits discrimination in lending practices involving housing and related facilities financed, insured, or guaranteed by the federal government.

E.    **Section 527 of the National Housing Act.** Section 527 prohibits denial of a federally related mortgage loans on of the basis of sex.

4155.1 REV-5

F. **Minimum Principal Loan Amount.** Section 535 of the National Housing Act prohibits lenders from requiring, as a condition of providing a loan to be insured by FHA, that the loan amount equal or exceed a minimum amount established by the lender. In addition, Section 330(a) of the 1990 National Affordable Housing Act prohibits a variation in mortgage charge rates ("tiered pricing") that exceed 2 percent for FHA-insured mortgages made by a lender on dwellings located within an area. (See 24 CFR Part 202.20 for additional information.)

G. **Home Mortgage Disclosure Act (HMDA).** HMDA and Regulation C of the Federal Reserve Board require lenders to collect and to report information pertaining to applications for mortgage loans, in addition to data regarding originations and purchases of such loans.

1. All institutions making FHA-insured mortgages must report information pertaining to those mortgages or applications for mortgages. Institutions exempt from the reporting requirements discussed below must report their FHA mortgage application activity to HUD.

2. All depository institutions having assets of at least $10 million, including assets of a parent company *and* located in a Metropolitan Statistical Area (MSA), are required to report all types of loan applications (i.e., conventional, HUD, VA, and RECD) to its regulator. Reports from a subsidiary must be sent to the regulator designated for its parent company. Depository institutions need not send an additional report to HUD covering only its HUD mortgage insurance activity.

3. All non-depository institutions having assets of at least $10 million, including assets of a parent company *and* located in an MSA, must report all types of loan applications (i.e., conventional, FHA, VA, or RHS) to HUD, who is the designated regulator for non-depository institutions.

4. Loan correspondents and their sponsors both must report their loan activity. The correspondent must report all loans closed in its name as loan originations, even if the loans are simultaneously transferred to a sponsor at the loan closing. The sponsor reports such loans as loan purchases. For applications that are denied, however, the information required by HMDA must be reported by the entity that made the underwriting decision to deny the loan.

3-12 **FHA-INSURED MORTGAGES FOR HUD EMPLOYEES.** The jurisdictional HOC must process applications made by HUD employees, except for streamline refinance applications. The lender is to process and underwrite the mortgage and

**4155.1 REV-5**

submit to the HOC for final signoff and approval. Such cases are to be sent to the attention of the Processing and Underwriting Division Director.

4155.1 REV-5

# CHAPTER 4

## ASSUMPTIONS

4-1    **GENERAL.**  All FHA insured mortgages are assumable.  However, FHA has placed certain restrictions on the assumability of FHA-insured mortgages originated since 1986.  Depending on the date of loan origination, a creditworthiness review of the assumptor by the lender may be required. Mortgages originated before December 1, 1986 generally contain no restrictions on assumability.  To determine what restrictions to assumability have been placed on the mortgage, the lender must review the legal documents of the mortgage. Additional details regarding assumability are contained in HUD Handbook 4330.1 REV-5, "Administration of Insured Home Mortgages."  Lenders should note that some mortgages executed in years 1986 through 1989 contain language that is not enforced due to later Congressional action.  Mortgages from that period are now freely assumable, despite any restrictions stated in the mortgage.

4-2    **RESTRICTIONS OF THE HUD REFORM ACT OF 1989.**  Mortgages closed on or after December 15, 1989 require credit qualification of those borrowers wishing to assume the mortgage.  This policy applies to borrowers who take title to properties subject to the mortgage, without assuming personal liability for the debt.  It also applies to borrowers who assume and agree to pay the mortgage. The creditworthiness review requirement spans the life of the mortgage. Assumptions without credit approval are grounds for acceleration of the mortgage, if permitted by applicable state law and subject to HUD approval, unless the seller retains an ownership interest in the property or the transfer is by devise or descent.

In addition, private investors are prohibited from assuming insured mortgages that are subject to the restrictions of the 1989 Act.  This restriction applies whether or not there is a release of liability by the lender of the selling mortgagor.

4-3    **RELEASE FROM LIABILITY.**  The lender completes a form HUD-92210, Request for Credit Approval of Substitute Mortgagor, or other similar form used by the lender.  Execution of this form does not formally release the borrower from personal liability on the mortgage note.

The execution of form HUD-92210.1, Approval of Purchaser and Release of Seller, or other similar form used by the lender, constitutes a formal release of liability.  Only the lender can execute the release of liability.  The lender is required to release all parties from liability when the assuming borrower is found creditworthy.

The following requirements apply:

**A.** **Mortgages Subject to the 1989 Act.** Mortgages subject to the 1989 Act require that the lender automatically prepare the release from liability, thereby releasing the original owner when he or she sells by assumption to a creditworthy assumptor who executes an agreement to assume and to pay the mortgage debt, thus becoming the substitute borrower.

The due-on-sale clause generally is triggered when any owner is deleted from title, except when that party's interest is transferred by devise, descent, or in other circumstances in which the transfer cannot legally lead to exercise of the due-on-sale, such as a divorce in which the party remaining on title retains occupancy.

**B.** **Mortgages Not Subject to the 1989 Act.** Mortgages executed before December 15, 1989 require that the lender honor all former owners' written requests to process a formal release from liability. Lenders must grant a release from liability if the assumptor is creditworthy and agrees to execute a statement agreeing to assume and to pay the mortgage debt.

**4-4** **CREDITWORTHINESS REVIEW PROCESSING.** Creditworthiness of the assumptor is determined in accordance with standard mortgage credit analysis requirements by the lender that is the holder or servicer of the mortgage. The DE lender may also use an approved authorized agent to process assumptions. Assumption creditworthiness review processing must be completed within 45 days from the date the lender receives all necessary documents. Allowable fees for assumption processing are described in HUD Handbook 4330.1 REV-5, Chapter 4.

There are a number of servicing lenders that neither originate mortgages nor are approved under the DE program. In these situations, if the servicer is either a supervised or non-supervised financial institution, it may contract with a DE-approved lender to underwrite its credit qualifying assumptions. The DE underwriter must indicate his or her CHUMS identification number on the mortgage credit analysis worksheet. The fee is to be negotiated between servicer and DE lender. In addition, supervised lenders with a HUD-approved authorized agent relationship may have the agent underwrite its credit qualifying assumptions.

The following requirements apply:

**A.** **Credit Review.** The lender reviews the assumptor's credit if the mortgage being assumed is held or serviced by a DE-approved lender.

**B.** **Documentation Requirements.** Same as those described in Chapter 3 of this Handbook.

**4155.1 REV-5**

---

C.  **Secondary Financing.** Secondary financing or other borrowed funds may be used by the assuming borrowers, provided the repayment terms are clearly defined and included in the underwriting analysis.

D.  **Seller Contributions.** Cash contributions from the seller in order to facilitate an assumption are not acceptable. The existing mortgage balance must be reduced by the amount of the contribution. However, the seller may pay the assumptor's normal closing costs (processing fee and credit report) with no reduction to the mortgage.

E.  **Assumptions by Other Legal Entities.** An assumption solely in the name of a corporation, partnership, sole proprietorship, trust, etc., is not acceptable if a creditworthiness review is required.

4-5  **LTV REDUCTION REQUIREMENTS.** Certain mortgages, depending on when originated, may require a reduction to the outstanding principal balance, when assumed by investors or as secondary residences.

A.  **Investors.** When assuming mortgages not subject to the 1989 Act, originated by an owner-occupant pursuant to a VA Certifications of Reasonable Value (CRV) issued, or for which a DE underwriter signed an appraisal report on or after February 5, 1988, investors must pay down the outstanding mortgage balance to a 75 percent LTV ratio, *if* the owner-occupant requests a release of liability. Either the original or the current appraised value of the property may be used to determine compliance with the 75 percent LTV limitation. This requirement continues throughout the life of the mortgage.

B.  **Owner-Occupants.** When assuming a property as a secondary residence, for which a VA CRV was issued, or for which a DE underwriter signed an appraisal report on or after February 5, 1988 (but before January 27, 1991), owner-occupants must pay down the outstanding mortgage balance to an 85 percent LTV ratio. Either the original appraised value or the current appraised value of the property may be used to determine compliance with the 85 percent LTV limitation.

Mortgages pursuant to a VA CRV, or a DE lender appraisal report or master appraisal report issued or signed on or after January 27, 1991, may not be assumed as secondary residences, except under the hardship provisions described in paragraph 1-3. (This does not apply to mortgages exempt from the investor prohibitions.)

---

4155.1 REV-5

# APPENDIX I

## SINGLE FAMILY HOC JURISDICTIONS

### Philadelphia  (800) 440-8647
Connecticut
Delaware
District of Columbia
Maine
Maryland
Massachusetts
Michigan
New Hampshire
New Jersey
New York
Ohio
Pennsylvania
Rhode Island
Vermont
Virginia
West Virginia

### Atlanta (888) 696-4687
Alabama
Florida
Georgia
Illinois
Indiana
Kentucky
Mississippi
North Carolina
Puerto Rico
South Carolina
Tennessee
Virgin Islands

### Denver (800) 543-9378
Arkansas
Colorado
Iowa
Kansas
Louisiana
Minnesota
Missouri
Montana
Nebraska
New Mexico
North Dakota
Oklahoma
South Dakota
Texas
Utah
Wisconsin
Wyoming

### Santa Ana (888) 827-5605
Alaska
Arizona
California
Guam
Hawaii
Idaho
Nevada
Oregon
Washington

| 4155.1 REV-5 |
|---|

# APPENDIX II

## STATES WITH AVERAGE CLOSING COSTS AT or BELOW 2.10 PERCENT and ABOVE 2.10 PERCENT

| Average At or Below 2.10 Percent | Average Above 2.10 Percent | |
|---|---|---|
| **STATE** | **STATE** | **STATE** |
| Arizona | Alabama | Mississippi |
| California | Alaska | Montana |
| Colorado | Arkansas | North Carolina |
| Guam | Connecticut | North Dakota |
| Idaho | District of Columbia | Nebraska |
| Illinois | Delaware | New Hampshire |
| Indiana | Florida | New Jersey |
| New Mexico | Georgia | New York |
| Nevada | Hawaii | Ohio |
| Oregon | Iowa | Oklahoma |
| Utah | Kansas | Pennsylvania |
| Virgin Islands | Kentucky | Puerto Rico |
| Washington | Louisiana | Rhode Island |
| Wisconsin | Massachusetts | South Carolina |
| Wyoming | Maryland | South Dakota |
| | Maine | Tennessee |
| | Michigan | Texas |
| | Missouri | Vermont |
| | Minnesota | Virginia |
| | | West Virginia |

4155.1 REV-5

# INDEX
### (Listed by subject and paragraph)

## A

*Alimony*
　As Liability  2-11(A)
　As Income  2-7(F), 2-9(C)(1)(h)

*Amendatory Clause*  3-4

*Application*  3-1(A)

*Assumptions*  Chap.4

*Attachment A*  1-7

*Auto Allowance*  2-7(O)

## B

*Bank Statements*  3-1(E)

*Bankruptcy*  2-3(E)

*Borrower Identification*  3-2(B)

*Building on Own Land*  1-8(D)

*Buydowns*  2-14

## C

*Cash-on-Hand*  2-10(M)

*Citizenship, not required*  2-2(B)

*Child Care Expenses*  2-11(A)

*Child Support*
　As Liability  2-11(A)
　As Income  2-7(F)

*Closing Costs*  1-6(B)(1),1-7

*Commission Income*  2-7(D)

*Community Property States*  2-2(D)

*Compensating Factors*  2-13

*Concessions*
　Financing  1-7(B)
　Seller  1-7(A)

*Contingent Liabilities*  2-11(B)

*Co-Borrowers*
　Non-Occupants  1-8(B)
　On Title  2-2(A)

*Cosigners*  2-2(A)

*Credit*
　Documents (Age of)  3-1
　History  2-3

*Credit Alert System* (CAIVRS)  2-5(C)
　Streamline Refinances  1-12
　Assumptions  4-4

## D

*Debt-to-Income Ratio*  2-12

*Deposit Verification*  3-1(E)

*Depreciation*  2-9(1)(b), 2-9(1)(c)

*Disclosure Statement*  3-11

*Discount Points*  1-9 (B)

## E

*Earnest Money*  2-10(A)

*Effective Income*  2-5 (C)(3)

*Employer Assistance*  2-10(I)

*Employment*  2-7

*Energy Efficient Homes*  2-19

*Energy Efficient Mortgage*  2-20

*Equal Credit Opportunity Act* (ECOA)  3-11(B)

**4155.1 REV-5**

## F

*Fair Housing Regulations* 3-11 (A)

*Federal Obligations* 2-4(B), 2-5(A)(B)

*Foreclosure* 2-3(D), 2-14(5)(A)

*Funds for Closing* 2-10

## G

*General Contractor* 1-8(D)

*Gift Funds* 2-10(C)

*Gross Income* 2-12

## H

*Hotel and Transient Use* 3-8

*HUD-1 Settlement Statement* 2-10(E)

*HUD-Owned (PD) Properties* 1-4(A)

## I

*Identity-of-Interest* 1-8 (A)

*Income*
    Alimony 2-7(F)
    Commission 2-7(D)
    Interest and Dividend 2-7(H)
    Non-taxable Income 2-7(Q)
    Overtime and Bonus 2-7(A)
    Part-time and Seasonal 2-7(B)
    Projected 2-7(R)
    Ratios 2-12
    Rental 2-7(M)
    Retirement 2-7(E)
    Salary and Wage 2-7
    Self-Employed 2-9
    Social Security 2-7(E)
    Trust 2-7(P)
    Unacceptable 2-6

*Income Tax Returns* 2-9, 4-1(F)
    Corporate (IRS 1120) 2-9(C)(2)
    Partnership (IRS 1065) 2-9(C)(4)
    "S" Corporations (IRS 1120S) 2-9(C)(3)
    Schedules B 2-9(C)(1)(E)

*Income Verification* 4-1(D)

*Investor Mortgages* 1-4, 1-5 (A)

## L

*Land Contracts* 1-8(E)

*Land Equity/Value* 1-8(D)

*LDP List* 2-5(A)

*Legal Documents* 3-11

*Living Trusts* 2-2(F)

*Loan-to-Value (LTV) Ratio*
    Co-borrowers and 1-8(B)
    Identity-of-Interest 1-8(A)
    Financing Concessions and
    Maximum Financing 1-6
    Payoffs of Land Contracts 1-8(E)
    Purchase Transactions 1-7
    Refinances 1-10
    Subordinate Financing and 1-13

## M

*Maximum Mortgage Amount* 1-6
    Built on Own Land 1-8(D)
    Co-Borrowers and 1-8(B)
    Construction Stage of Property 1-6(B)(2)
    Land Contracts 1-8(E)
    Identity-of-Interest 1-8(A)
    Owner-Occupied 1-6(B)(1)
    Refinances 1-11
    Secondary Residences 1-6(3)
    Solar Energy System 1-7(C)(3)
    Statutory Limits 1-6(A)
    Three- and Four-Unit Properties 1-8(C)

*Military Personnel* 2-2(E), 4-5(A)

*Minimum Investment* 1-7

*Mortgage Broker Fee* 1-9(H)

*Mortgage Credit Certificates* 2-7(I)

*Mortgage Limits* 1-6

*Mortgage Payment-to-Income Ratios* 2-12

4155.1 REV-5

## N

*Nonprofit Organizations*
As Borrowers 1-5
Providing Secondary Financing 1-13 (B)

*Non-Purchasing Spouse* 2-2(D)

*Non-Realty Items* 1-7(B), 1-9(C)

*Note (Mortgage)* 2-2(A)

## O

*Obligations*
Not Considered 2-11(D)
Projected 2-11(C)
Recurring 2-11(A)

*Occupancy Status* 1-2

## P

*Payment Record* 2-3(A)

*Personal Property Items*
In Mortgage Amount 1-7(B)
Sales of 2-10(G)

*Power of Attorney* 3-7

*Prepaid Expenses*
Paid by Seller 1-7(A)
As Settlement Costs 1-9(B)

*Principal Residence* 1-2

*Projected Obligations* 2-11(C)

*Proposed Construction* 1-6(2)

## R

*Ratios*
Debt-to-income 2-12
Energy-efficient homes 2-12(C)
Mortgage payment-to-income 2-12
Loan-to-value 1-6(B)
Total fixed payment-to-income 2-12(B)

*Real Estate Broker Fees* 1-7, 1-9(G)

*Real Estate Certification* 3-3

*Real Estate Commissions*
As Assets to Close 2-10(P)
As Sales Concession 1-7(A)

*Inducement to Purchase* 1-7(B)

*Recurring Obligations* 2-11(A)

*Refinance Transactions* 1-10

*Release from Liability* 4-3

*Rent Credit*
As Assets 2-10(N)

*Rental Income* 2-7(M)

*Repairs and Improvements* 1-7(C)(1)

*Residency Requirements* 1-2, 2-2(B)

*Residential Mortgage Credit Report* 3-1(C)

*Room and Board Income* 2-7(M)

## S

*Sales Agreement* 3-1(G), 3-4, 3-9

*Sales Concessions* 1-7(A)

*Sales Proceeds* 2-10(E)

*Second Homes* 1-3

*Secondary Financing* 1-13
On Assumptions 4-4(C)

*Secondary Mortgages*
Refinances of 1-11

*Self-Employed Borrowers* 2-9

*Settlement Requirements* 1-9

*Seven-Unit Limitation* 3-7

*Signature Requirements* 3-10(A)

*Social Security Number* 3-1(B),4-2 (B)

*Solar Energy System* 1-7(3)

*Sources of Funds* 2-10

*Spouse Information* 2-2(D)

*Stability of Income* 2-6

*Statutory Limits* 1-6(A)

**4155.1 REV-5**

*Streamline Refinance* 1-12

*Subordinate Liens*
    On Streamline Refinances 1-12(d)(12)

*Sweat Equity* 2-10(O)

### T

*Tax Returns* 2-9, 4-1(F)
    Corporate (IRS 1120) 2-9(C)(2)
    Partnership (IRS 1065) 2-9(C)(4)
    "S" Corporations (IRS 1120S) 2-9(C)(3)
    Schedules 2-9(C)(1)

*Three- and Four-Family Units* 1-8(C)

*Title to Property*
    Changes to 1-12(C)(3), 5-2

*Trade Equity* 2-10(F)

### U

*URLA* 3-1(A)

*Underwriting*
    Buydowns 2-14
    Debt-to-income ratios 2-12
    Self-employed borrowers 2-9

### V

*Verifications* 3-1

*VA Benefits* 2-7(K)

### W

*Weatherization* 1-7(C)(2)