UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————  *
                                              *
ANTHONY MENDES                   *
AND DORIS MENDES,               *
                                              *
                    Plaintiffs,        *      C. A. No.: 05-11765-DPW
                                              *
        v.                                  *
                                              *
CENDANT MORTGAGE,            *
                                              *
                    Defendant.       *
———————————————————

## AFFIDAVIT OF CHRISTOPHER J. TROMBETTA

I, Christopher J. Trombetta, hereby depose and say:

1.  I am a member in good standing of the bar of the Commonwealth of Massachusetts.  There are no pending disciplinary proceedings against me and I have never been subject to such a proceeding.

2.  Attached as Exhibit A are true and accurate copies of pages from the deposition of Anthony Mendes.

3.  Attached as Exhibit B are true and accurate copies of pages from the deposition of Doris Mendes.

4.  Attached as Exhibit C are true and accurate copies of pages from the deposition of Richard Luongo.

5.  Attached as Exhibit D are true and accurate copies of pages from the deposition of Clair Taylor.

6.  Attached as Exhibit E are true and accurate copies of a government underwriting worksheet produced by Cendant Mortgage.

7. Attached as Exhibit F are true and accurate copies of a government underwriting worksheet produced by Cendant Mortgage.

8. Attached as Exhibit G is a true and accurate copy of a loan application.

9. Attached as Exhibit H is a true and accurate copy of the expert report of Connor Shortsleeve.

Signed under penalties of perjury this 23rd day of October 2006.


s/Christopher J. Trombetta
Christopher J. Trombetta

# EXHIBIT A

Anthony Mendes                                                06/01/2006

```
 1                              Volume:  I

 2                              Pages:  1 - 222

 3                              Exhibits:  1 - 36

 4

 5            COMMONWEALTH OF MASSACHUSETTS

 6

 7    Bristol, ss.              Superior Court Dept.

 8                           Civil Action No.  B05-809

 9    - - - - - - - - - - - - - - - - - - - - - - - -

10    ANTHONY MENDES AND DORIS MENDES,

11                   Plaintiffs,

12

13    vs.

14

15    CENDANT MORTGAGE CORPORATION,

16                   Defendant.

17    - - - - - - - - - - - - - - - - - - - - - - - -

18            DEPOSITION OF ANTHONY MENDES

19            JUNE 1, 2006 - 10:35 A.M.

20

21                FOLEY & LARDNER

22              111 HUNTINGTON AVENUE

23              BOSTON, MASSACHUSETTS

24    Reporter:  Donna J. Whitcomb, CSR/RPR/RMR
```

Anthony Mendes                                                                          06/01/2006

---

Page 2

1
2    A P P E A R A N C E S :
3
4    FOLEY & LARDNER
5    By Andrew Goldstein, Esquire
6    111 Huntington Avenue
7    Boston, Massachusetts 02199
8    (617) 342-4000
9    On behalf of the Defendant.
10
11   LAW OFFICE OF CHRISTOPHER J. TROMBETTA
12   By Christopher J. Trombetta, Esquire
13   310 North Main Street
14   Mansfield, Massachusetts  02048
15   (508) 339-5900
16   On behalf of the Plaintiffs.
17
18
19
20
21
22
23
24

---

Page 4

1                    E X H I B I T S
2    NO.                              PAGE
3    11   Document, Application Fee          148
4         Re:  Visa Payment, 6/14/01
5    12   Appraisal, Chilson Avenue     150
6    13   Copies of Checks, Re:  Deposit Refund   174
7    14   Document, Re:  Chilson Purchase     195
8    15   Document, Re:  Chilson Purchase     196
9    16   Document, Re:  HUD and FHA         196
10        Insured Mortgages
11   17   Document, Re:  Home Energy Audit     197
12        StatementAddendum FHA
13   18   Document, Re:  Mortgage Application     197
14   19   FHA Amendatory Clause          198
15   20   FHA Purchase Agreement Addendum       198
16   21   Document, Re:  Tax Release          199
17        Authorization
18   22   Document, Re:  Tax Release          200
19        Authorization
20   23   Document, Re:  Income Verification     200
21        Anthony Mendes
22   24   Document, Re:  Income Verification     201
23        Doris Mendes
24

---

Page 3

1                    I N D E X
2    EXAMINATION OF:                  PAGE
3    ANTHONY MENDES
4    By Mr. Goldstein                 7
5
6
7
8
9                 E X H I B I T S
10   NO.                           PAGE
11   1    Complaint            28
12   2    Document, 4 pages, Duzan to Trombetta   32
13        Re:  Offer to purchase, 6/12/01
14   3    Letter, Luongo to Mendes          92
15        Re:  Two-Family, 3/21/01
16   4    Letter, Luongo to Mendes          102
17        Re:  Four-Family, 5/1/01
18   5    Letter, Re:  Guaranteed Financing      110
19   6    P&S Chilson Avenue          115
20   7    Final Commitment Letter        120
21   8    Citizens Account Statements       131
22   9    Fleet Account Statements        131
23   10   Extension of Closing          138
24

---

Page 5

1                    E X H I B I T S
2    NO.                              PAGE
3    25   Document, Re:  Housing Act          202
4    26   Loan Application           203
5    27   Document                203
6    28   Letter, Cogan to Mendes, 10/2/01     206
7    29   Income Verfication, Re:  Pay Stubs     207
8    30   W-2 Form             209
9    31   Letter, Re:  Loan Denial 9/21/01      210
10   32   Demand Letter, Erickson to Cendant     211
11   33   Document, Re:  Capitol One        213
12   34   Letter, Re:  Bank of America       213
13   35   Letter, Rc:  CrossCountry Bank       214
14   36   Loan Application, Re:  School Street     218
15
16
17
18
19
20
21   *Original exhibits retained by the reporter.
22
23
24

2 (Pages 2 to 5)

Anthony Mendes                                                                06/01/2006

Page 10

1  education after high school?
2     A. Yes, I got a certificate program. I was
3  in a certificate program. Basically six to eight
4  week course.
5     Q. What was the certificate in?
6     A. Food service supervisor.
7     Q. Any other formal education?
8     A. That's it basically.
9     Q. Where are you employed now?
10    A. I'm at the Sherill -- I'm sorry, I'm at
11 the Ellis Nursing Home in Norwood.
12    Q. Ellis?
13    A. Yeah.
14    Q. With an "E"?
15    A. Yes.
16    Q. When did you start there?
17    A. 2004.
18    Q. What's your position there?
19    A. I'm a full-time cook.
20    Q. Before you were working at Ellis Nursing
21 Home where were you working?
22    A. 2004 at the River Bend Nursing Home in
23 Natick, Mass.
24    Q. What was your position there?

Page 11

1     A. I was the food service director there.
2     Q. Why did you leave the River Bend Nursing
3  Home?
4     A. Basically left because there was changes
5  in management so my boss moved on and then I decided
6  to move on.
7     Q. Was it voluntary on your part?
8     A. Yeah.
9     Q. Before you were at River Bend Nursing Home
10 where were you?
11    A. Hancock Manner in Dorchester.
12    Q. And doing what?
13    A. Hancock Manner, nursing home in
14 Dorchester.
15    Q. For what period of time?
16    A. I was there from '98 to 2000.
17    Q. What was your position?
18    A. Food service director.
19    Q. What was your reason for leaving there?
20    A. I basically left that to move on to
21 another position that was, you know, more money and
22 benefits involved so I accepted it.
23    Q. And that was at River Bend?
24    A. Right.

Page 12

1     Q. I'm working backwards. We can go the
2  other way if you get confused. Where were you
3  before Hancock Manner Nursing Home?
4     A. I was at the Wingate at Brighton.
5     Q. Wingate in Brighton?
6     A. Yeah.
7     Q. That's a nursing home?
8     A. Yes.
9     Q. Run by the Schusters?
10    A. Yes.
11    Q. How long were you there for?
12    A. I believe a couple of years.
13    Q. What was your position there?
14    A. Food service director.
15    Q. What was your reason for leaving there?
16    A. Basically got another position and moved
17 on to Hancock.
18    Q. Okay. And before Wingate where were you?
19    A. I was at -- before Wingate I was with
20 Meadow Brook.
21    Q. Meadow Brook Nursing Home?
22    A. Yeah, yes.
23    Q. For what period of time?
24    A. I was there for a year.

Page 13

1     Q. So about '97 to '98 -- or, I'm sorry, '95
2  to '96?
3     A. Right.
4     Q. What was your position there?
5     A. I was a cook there.
6     Q. Have you been a cook since you graduated
7  high school?
8     A. Basically, yes.
9     Q. Okay.
10    A. Basically worked my way into the position.
11    Q. Okay.
12    A. Yeah. That's basically job of a food
13 service director.
14    Q. Let's go back a little bit more. Where
15 were you before Meadow Brook Nursing Home?
16    A. I was at the Neponset Hall Nursing Home.
17    Q. For what period of time?
18    A. I was there about a year.
19    Q. What was your position there?
20    A. I was a cook there.
21    Q. And before Neponset Hall Nursing Home
22 where were you employed?
23    A. I was at the Sherill House Nursing Home in
24 Jamaica Plain.

4 (Pages 10 to 13)

Anthony Mendes                                                    06/01/2006

Page 42

1     A.  Right.
2          MR. TROMBETTA:  Well, I sort of
3   object to what you're telling him.  You're asking
4   for a comparison in general terms.
5          MR. GOLDSTEIN:  I haven't asked that
6   question again yet.
7          MR. TROMBETTA:  Well, I think you
8   did.
9          MR. GOLDSTEIN:  Well, I might have
10  before not yet.
11         MR. TROMBETTA:  I objected, I let him
12  answer, but if you're asking for a -- you asked for
13  a comparison.  I think he's trying to give that to
14  you.
15    Q.  Let me put this in context again.  If you
16  had purchased 1-3 Chilson --
17    A.  Right.
18    Q.  -- you were going to live in a two-bedroom
19  unit, correct?
20    A.  That's correct.
21    Q.  What other rooms were in the two-bedroom
22  unit?
23    A.  There was two bedrooms, a kitchen, a
24  bathroom, and a living room.

Page 43

1     Q.  Do you know the square footage of that
2   unit?
3     A.  No, not offhand.
4     Q.  And the Chilson lot, the area of the lot
5   on Chilson Avenue was a lot smaller than the lot you
6   have now, correct?
7     A.  Much smaller.
8     Q.  And you have more living space at your
9   School Street property than you would have had in
10  the two-bedroom unit on Chilson Ave., correct?
11    A.  That's correct.
12    Q.  Do you know how much more?
13    A.  Mathematically, no.
14    Q.  Twice as much?
15         MR. TROMBETTA:  Well --
16    Q.  If you know?
17         MR. TROMBETTA:  I'll object.  You can
18  answer.
19    A.  Oh, naturally Mansfield's got more room.
20    Q.  I'm talking about the house on School
21  Street, not Mansfield.
22    A.  (Pause)
23    Q.  Do you understand the question?
24    A.  No, I don't.  I'm a little confused, I'm

Page 44

1   sorry.
2     Q.  Okay, how much more living space do you
3   have at the School Street property compared to the
4   living space you would have had in the two-bedroom
5   unit at 1-3 Chilson Street?
6     A.  Basically couple of extra rooms.  Couple
7   of extra rooms.
8     Q.  Can you quantify it?  Is it twice as much
9   room or --
10    A.  I would say.  Yeah, I would say so.
11    Q.  All right, if you turn to the third page
12  of Exhibit 2?
13    A.  Third page?
14    Q.  Actually, why don't you turn to the last
15  page.  Paragraph 6 on the last page of Exhibit 2 is
16  is a mortgage contingency clause, correct?
17    A.  Yes.
18    Q.  And that was filled out when you signed
19  this last page of Exhibit 2?
20    A.  Yes.
21    Q.  All right.  All right, let's go back to
22  Exhibit 1, your complaint.  Could you turn to page 2
23  of your complaint?  In paragraph 4 there's an
24  allegation that states, quote, Mr. and Mrs. Mendes

Page 45

1   -- well, let me read the whole thing from the
2   beginning.  Paragraph 4 of your complaint reads:
3   Cendant directed Mr. and Mrs. Mendes to apply for an
4   FHA loan.  Mr. and Mrs. Mendes did so only because
5   Cendant directed them to do so, close quote; do you
6   see that?
7     A.  Yes, I see it.
8     Q.  Is that a true statement?
9     A.  That's a true statement.
10    Q.  Who at Cendant allegedly directed you to
11  apply for an FHA loan?
12    A.  The person who took the application.  His
13  name is Richard.
14    Q.  Is that Richard Luongo?
15    A.  That's correct.
16    Q.  How did you get hooked up with Cendant
17  Mortgage?
18    A.  Good question.  Good question.  Very good
19  question.
20    Q.  Do you know the answer?
21    A.  Oh, I'll have it for you.  I just got to
22  think because it's so far back.
23    Q.  Take your time.
24    A.  Let me see.  Can you present the question

12 (Pages 42 to 45)

Anthony Mendes                                                06/01/2006

Page 46

1  again, please?
2     Q.  How did you first come to work with
3  Cendant Mortgage in 2001?
4     A.  Century 21. I had to think.
5     Q.  That's okay. Century 21 referred you to
6  Cendant Mortgage?
7     A.  Yes.
8     Q.  And that's the brokers whose name you
9  don't remember, correct?
10    A.  I don't remember and -- what's your first
11  name, again, "Andrew"?
12    Q.  Yes.
13    A.  Andrew, we had her -- I can't think of her
14  name -- we had her and I wasn't really happy with
15  her. I wasn't. Because she was -- she was showing
16  me -- she was trying to push me to buy.
17    Q.  Okay?
18    A.  And I -- you know, when she showed me the
19  two-family and was trying to push me to buy, I
20  didn't really like it, my wife didn't care for it.
21  So I took that information when I was approved and I
22  got another broker and just went forward with it.
23    Q.  How did you --
24    A.  I got Paula.

Page 47

1     Q.  Right, okay. So -- but the broker at
2  Century 21, what did she say to you about Cendant;
3  do you recall?
4    A.  No, I basically got tired of living at
5  Bridge Street, decided I wanted to buy a house. Me
6  and her were saving to buy the house.
7    Q.  You and Doris?
8    A.  Yeah, we were saving. Took us a long time
9  to do it, I'll tell you. Just got tired of living
10  at Bridge Street and called Century 21, Elizabeth
11  Graylon (phonetic) Realtors down in Dedham. And
12  offhand I can't -- I can't think of the person's
13  name but...
14    Q.  Is it a woman?
15    A.  It was a woman, yes.
16    Q.  Okay.
17    A.  I can't think of her name offhand.
18    Q.  Is it Shamikah Solomon?
19    A.  No.
20    Q.  All right, okay, and that person in any
21  event --
22    A.  Evidently said to me -- I says, how do I
23  start the process of -- I want to buy a piece of
24  property. She says you can get approved through

Page 48

1  Cendant. So she gave me the number and I called
2  them and they took an application.
3    Q.  Do you remember the first person you spoke
4  to at Cendant?
5    A.  Richard Luongo.
6    Q.  Was that in regard to the two-family?
7    A.  It was in regard to the two-family to
8  be -- to get approved, qualified.
9    Q.  Did you ever meet Richard Luongo?
10    A.  No, never.
11    Q.  Did you ever meet anyone from Cendant?
12    A.  No.
13    Q.  This was all by -- on the phone, correct?
14    A.  Everything was done by phone.
15    Q.  When you made your offer to purchase 1 to
16  3 Chilson -- is it Chilson Avenue or Street? I've
17  seen both.
18    A.  I always thought it was Chilson Ave.
19    Q.  Why don't you refer to it as the Chilson
20  Avenue property; is that okay?
21    A.  No problem.
22    Q.  That will be 1 to 3 Chilson Avenue in
23  Mansfield.
24    A.  Okay, that's good.

Page 49

1     Q.  It will save my mouth and some work. The
2  offer you made on June 12th, 2001 for the Chilson
3  Avenue property -- let me just get that back out for
4  a second. That's Exhibit 2. It has a purchase
5  price that was agreed to of $305,000, correct?
6    A.  That is correct.
7    Q.  Could you have put 20 percent down toward
8  that purchase?
9    A.  No.
10    Q.  In 2001?
11    A.  No.
12    Q.  Could you have put 10 percent down, 30,500
13  in 2001?
14    A.  No, first-time buyer.
15    Q.  What does first-time buyer have to do with
16  your answer?
17    A.  (Pause)
18    Q.  I'm asking you whether you had sufficient
19  funds, whether you were a first-time buyer or
20  tenth-time buyer, in the summer of 2001 to put 10
21  percent down?
22    A.  No.
23    Q.  Toward the purchase of Chilson Avenue?
24    A.  No, no.

13 (Pages 46 to 49)

Anthony Mendes                                                                06/01/2006

Page 110

1    Q. Did he use the word "guaranteed"?
2    A. Yeah.
3    Q. So you thought at that point there was a
4  guaranteed loan from Cendant to you?
5    A. Yes.
6    Q. Did you read this whole document that's
7  marked as Exhibit 4 when you got it?
8    A. Most of it -- some of it. I was just so
9  anxious to purchase.
10    Q. Did you read -- go to page 3 of Exhibit 4.
11    A. Page 3, this one?
12    Q. Yes, did you read this page?
13    A. If I could remember.
14    Q. Well, can you remember?
15    A. I really can't.
16    Q. Did you read through Step 3?
17    A. Not really.
18    Q. You had a chance to, though, right?
19    A. Yeah, I did.
20    MR. GOLDSTEIN: Let's just mark this
21  separately as Exhibit 5.
22    (Document marked as Exhibit No. 5
23  for identification.)
24    Q. I'm just going to want you to identify

Page 111

1  that. I'm not going to ask you any more questions
2  about it at this time. Do you know what Exhibit 5
3  is?
4    A. Yes.
5    Q. What is Exhibit 5?
6    A. They say again guaranteed financing.
7    Q. Is that the same letter that was marked as
8  Exhibit B to the complaint?
9    A. Yes.
10    Q. All right, let's go back to the complaint
11  for the moment and go into the body of the
12  complaint. On page 4 to 5 we were talking about one
13  count of the complaint for breach of contract?
14    A. On page 4?
15    Q. Yes, at the bottom is Count 1, breach of
16  contract?
17    A. One second, Andrew, please. Where is that
18  at, Andrew, please?
19    Q. That's right here, Count 1?
20    A. Oh, okay, I missed it.
21    Q. And then flip it over to the next page.
22  We went over the allegations about Cendant agreeing
23  to provide you and your wife with financing and
24  there was a breach of that agreement. Other than

Page 112

1  what you've testified to did you have any other
2  agreements with Cendant Mortgage?
3    A. No, no.
4    Q. Do you contend that you had any oral
5  agreements with Cendant Mortgage?
6    A. No.
7    MR. TROMBETTA: I'll just -- never
8  mind.
9    A. No.
10    Q. After your offer was accepted what
11  happened next in regard to your proposed purchase of
12  the Chilson Avenue property?
13    A. Excuse me, come again, Andrew, please?
14    Q. Well, after your offer to purchase Chilson
15  Avenue was accepted --
16    A. Yes.
17    Q. -- and I'll tell you it says June 14th on
18  the document it was accepted, what steps did you
19  then take to further your purchase of that property?
20    A. Signed a purchase and sale agreement.
21    Q. Did you take any other steps to get a
22  loan?
23    A. No.
24    Q. Did you sign any applications?

Page 113

1    A. Signed a purchase and sales agreement and
2  also gave them, if I could remember, Andrew, a large
3  deposit that was required.
4    Q. Where did that deposit come from, by the
5  way?
6    A. You're funny, Andrew. I don't mean to --
7  you're funny. Me and my wife's savings.
8    Q. What account; do you know?
9    A. Citizens Bank.
10    Q. Citizens Bank, okay.
11    A. Yeah, she had money in Citizens and if I
12  can remember, Andrew, also Metropolitan Credit
13  Union, if I could remember.
14    Q. Did anyone provide you with any funds so
15  you could make the down payment toward the Chilson
16  Avenue property?
17    A. No, no, Andrew.
18    Q. Where is the Metropolitan Credit Union, by
19  the way?
20    A. In Framingham.
21    Q. Does it still exist?
22    A. Yes, they do, Andrew.
23    Q. Was that your wife's account there?
24    A. Yes, yes.

29 (Pages 110 to 113)

Anthony Mendes                                                                06/01/2006

1    Q.   Did anyone at Cendant tell you that there
2    were no commitments in Exhibit 7?
3    A.   No.
4    Q.   If you would you look at the third page of
5    Exhibit 7, you signed this page, correct?
6    A.   Yes.
7    Q.   There's not much writing on this page, is
8    there, correct?
9    A.   No.
10   Q.   And there's one heading on the page that
11   says, C, Conditions to Commitment Continued; do you
12   see that?
13   A.   Where is that at?
14   (Mr. Goldstein indicating)
15   A.   Go ahead.
16   Q.   Did you read that before you signed this
17   document?
18   A.   No.
19   Q.   Did anyone force you to sign this
20   document?
21   A.   The -- Kevin Cogan said sign it and send
22   it back.
23   Q.   He didn't force you to sign it?
24   A.   He --

1    MR. TROMBETTA:  I object.
2    A.   He didn't force me but he said sign it and
3    get it back immediately.
4    Q.   Did you sign it of your own free will?
5    MR. TROMBETTA:  I object.
6    A.   I signed it, yeah.
7    Q.   No one was holding a gun to your head,
8    right?
9    A.   No.
10   Q.   Kevin Cogan wasn't in the room when you
11   signed it, right?
12   A.   No.
13   Q.   You never met Kevin Cogan?
14   A.   No.
15   Q.   Did he say anything else to you besides
16   sign it and send it back in regard to the execution
17   of Exhibit 7?
18   A.   No.
19   Q.   Did he threaten you in any way?
20   A.   No.
21   Q.   Did he do anything to coerce you to sign
22   Exhibit 7?
23   A.   No, he just said sign it and send it
24   back.

1    *Q.   Now, between the date of the purchase and
2    sale agreement, which is July 6th, 2001 and the date
3    of the final commitment, August 17th, 2001 as shown
4    on Exhibit 7, what additional steps did you take, if
5    any, to secure a mortgage to buy the Chilson Avenue
6    property?
7    A.   Please, Andrew, come again?  I don't mean
8    to have you repeat.  I just want to be able to
9    answer it.
10   MR. GOLDSTEIN:  I'm not going to
11   repeat it.  Would you read it back?
12   (*Record read as requested)
13   Q.   Let me just clarify that.  The final
14   commitment is August 14th.  If I said August 17th I
15   misspoke.
16   A.   August 14th.
17   Q.   What additional steps did you take toward,
18   if any, toward obtaining a mortgage to buy the
19   Chilson Avenue property between the date of the P&S
20   and the date of the final commitment?
21   A.   Basically the P&S was signed.  Kevin was
22   aware and he said he would work on getting the
23   commitment letter out and he would get closing
24   scheduled and that was it.

1    Q.   Were you providing any information to
2    Cendant Mortgage to get the commitment letter out?
3    A.   I was -- I was and also the brokers.
4    Q.   What kind of information were you
5    providing?
6    A.   We needed a commitment letter.
7    Q.   And Cendant Mortgage told you you needed a
8    commitment letter, correct?
9    A.   My brokers did, yeah.
10   Q.   What else -- when you say your brokers --
11   A.   I mean, Paula and Greg Abbot.
12   Q.   What did they say to you in regard to
13   needing a commitment letter?
14   A.   You have to get your commitment letter.
15   Q.   Did they tell you why?
16   A.   Just it's needed.
17   Q.   Did they say anything else as to why it
18   was needed?
19   A.   No.
20   Q.   Did you understand that you needed a
21   commitment letter before you could get a loan from
22   Cendant Mortgage Corporation?
23   A.   Not really, no.
24   Q.   Did you ever tell anyone at Cendant

33 (Pages 126 to 129)

Anthony Mendes                                                                      06/01/2006

Page 130

1  Mortgage Corporation that you did not feel bound by
2  the terms of this final commitment?
3      A.  No.
4      Q.  Did you ever tell anyone at Cendant
5  Mortgage Corporation that you -- let me limit that
6  question.  In 2001 did you ever tell anyone at
7  Cendant Mortgage Corporation that you disagreed with
8  any conditions in this commitment letter?
9      A.  Can I have the question again, I'm sorry?
10      Q.  Did you tell anyone at Cendant Mortgage
11  Corporation in 2001 that you disagreed with any of
12  the conditions that are set forth in this commitment
13  letter?
14          MR. TROMBETTA:  Well, I'll object to
15  the form of that question.
16      A.  No.
17      Q.  You didn't read them, you didn't know they
18  were there, right?
19      A.  Right.
20          MR. TROMBETTA:  Can we take a quick
21  break?
22          MR. GOLDSTEIN:  Absolutely.
23          (A brief recess was taken, 2:05 p.m.
24  - 2:10 p.m.)

Page 131

1          (Documents marked as Exhibit Nos. 8
2  and 9 for identification.)
3          MR. GOLDSTEIN:  Do you want to
4  stipulate as to the authenticity, to move this
5  along, that's Exhibit 8 and 9?
6          MR. TROMBETTA:  I mean, I don't know
7  if they're authentic or not.  I assume that they
8  are.  If you can just ask him questions?
9          MR. GOLDSTEIN:  They're not his
10  anyway.
11          MR. TROMBETTA:  Well, then I'm not
12  going to stipulate.
13      Q.  Do you know what Exhibits 8 and 9 are?
14      A.  Yeah, statements.
15      Q.  Statements for what?
16      A.  Bank accounts.
17      Q.  For any particular bank accounts?
18      A.  Fleet and Citizens.
19      Q.  Are those statements for your wife's bank
20  accounts at Fleet and Citizens?
21      A.  Yes.
22      Q.  Do you have in your possession statements
23  that postdate these two statements?
24      A.  Excuse me?

Page 132

1      Q.  These statements are dated June 19th, 2001
2  and it looks like one's dated May 31st, 2001; do you
3  have any other statements?
4      A.  That's about it right now from what I can
5  see other than --
6      Q.  I mean, not with you?
7      A.  Not with me.  Not with me.
8      Q.  I mean, at home do you keep your bank
9  statements?
10      A.  I don't know, Andrew.
11      Q.  Do you recognize those as bank statements
12  from your wife's bank accounts?
13      A.  Oh, yes, yes.
14      Q.  Okay.  When was the first time that you
15  learned that there was a problem with Cendant
16  Mortgage making a loan to you to buy the Chilson
17  Avenue property?
18      A.  You're funny.  I don't mean to -- come
19  again, Andrew?  I'm sorry, because I want to try to
20  answer you.
21      Q.  When was the first time that you learned
22  that there was a problem, if any, with Cendant
23  Mortgage Corporation making you a loan on the
24  Chilson Avenue property?

Page 133

1      A.  The last -- the last week of August 2001.
2      Q.  And when did you learn about it?
3      A.  It was like three to seven -- I don't
4  know, three to four, five days before closing.
5      Q.  Three to four, five days before closing.
6  Okay, and what happened then?
7      A.  Kevin Cogan said it's not going to go to
8  closing.
9      Q.  What else did he say?
10      A.  And I asked him why and he said it was
11  related to rents.
12      Q.  Did he say anything else about that?
13      A.  He said something about 75 percent of --
14  something to do with market value or something like
15  that.
16      Q.  Did he say anything else in regard to that
17  issue that you recall?
18      A.  No.
19      Q.  And prior to that were there any other
20  problems with your potential purchase of the Chilson
21  Avenue property?
22      A.  Not that I was aware of.
23      Q.  Well, how long did this conversation with
24  Mr. Cogan last?

34 (Pages 130 to 133)

Page 134

1    A.   I was very disgusted and upset.  It didn't
2  last long.  I would say anywhere from five to eight
3  minutes.
4    Q.   Did you talk to anyone else about the rent
5  issue after you got this call from Mr. Cogan?
6    A.   No.
7    Q.   Did you talk to Paula Duzan?
8    A.   Basically I think he had told them, too,
9  because she had mentioned it to me.
10    Q.   But did you talk to Paula Duzan about the
11  issue with the rents?
12    A.   No, no.
13    Q.   Did you talk to Greg Abbot about the issue
14  with the rents?
15    A.   I did.
16    Q.   What do you recall he said and you said?
17    A.   He just said it isn't going to go to
18  closing.  Something to do with rents; that's what he
19  said.
20    Q.   Did you respond?
21    A.   I didn't respond to him.  I responded to
22  Kevin Cogan.
23    Q.   Well, how did you respond other than what
24  you've already testified to?

Page 135

1    A.   How come it doesn't qualify to go to
2  closing?  I mean, how do you back off the deal just
3  when we're all scheduled to close?
4    Q.   Did you say anything else to Mr. Cogan?
5    A.   No, that was about it.
6    Q.   Did you understand at some point that the
7  rent issue that you described was a condition in the
8  final commitment letter?
9    A.   Not that I was aware of.
10    Q.   Did you ever become aware of that?
11    A.   Not until about the last week of August of
12  2001.
13    Q.   Okay, so you became aware that there was a
14  condition in the commitment letter in the last week
15  of August 2001 regarding rents, correct?
16    A.   When it was scheduled to close, yeah.
17    Q.   How did you become aware of that condition
18  in the final commitment letter?
19    A.   I spoke to Kevin.
20    Q.   Okay, I know you told us there was an
21  issue with the rents; did he specifically discuss
22  with you the condition that was in the final
23  commitment letter regarding rents?
24    A.   In the end he mentioned it.

Page 136

1    Q.   Well, when you say in the end, when is
2  that?
3    A.   The week before.  The last week before
4  closing after he said it wasn't going to -- we
5  weren't going to closing.
6    Q.   Well -- and that's the first time the
7  issue with the rents came up?
8    A.   First time, Andrew.
9    Q.   And what happened after that with regard
10  to your proposed purchase of the property?
11    A.   The deal fell through.
12    Q.   Well, were there any efforts made to
13  address this rent issue?
14    A.   No not that I remember.
15    Q.   Did you have any other further discussions
16  with Cendant Mortgage regarding the rent issue?
17    A.   Not that I could remember.
18    Q.   Were there any efforts made to salvage
19  your proposed purchase of the property?
20    A.   No.
21    Q.   When did you start dealing with Kevin
22  Cogan as opposed to Richard Luongo, was there some
23  sort of break; do you recall?
24    A.   Right after it was guaranteed.

Page 137

1    Q.   Well, when you say guaranteed, when was
2  that, is that the June 12, 2001 letter?
3    A.   And prior.
4    Q.   How much prior?
5    A.   I mean, on the letters that he had sent
6  when I looked at the two-family and the four-family.
7    Q.   So you thought those were all guaranties
8  of financing, correct?
9    A.   Yes.
10    Q.   Did you deal with anyone else at Cendant
11  other than Kevin Cogan?
12    A.   That was it.
13    Q.   So it's Kevin and Richard?
14    A.   Those were the only two.
15    Q.   Did you speak to a Shamikah Solomon?
16    A.   I don't remember.
17    Q.   Isn't it true that after June 12th, 2001
18  you went through a whole application process with
19  Cendant Mortgage to get a loan?
20        MR. TROMBETTA:  I'm sorry, when was
21  that?
22    Q.   Isn't it true that after June 12th, 2001
23  you went through a whole application process --
24    A.   No.

35 (Pages 134 to 137)

Anthony Mendes                                                                06/01/2006

Page 142

1  said I didn't have 20 percent.
2      Q.  Okay, there was no discussion prior to
3  that about a conventional --
4      A.  No.
5      Q.  Did your attorney, Lynn Erickson, ever
6  tell you that Cendant had told her in early July
7  that she had a discussion about applying for a
8  conventional loan?
9      A.  No.
10     Q.  Was there ever an issue about you paying
11 off some sort of a judgment as a condition for the
12 loan closing?
13     A.  Come again, I'm sorry, Andrew?
14     Q.  Was there ever an issue about your paying
15 off a judgment as a condition of the loan closing?
16     A.  I think I owed a small, little debt with
17 Com. Gas and that was paid up and it was all over;
18 that was cleared.
19     Q.  Do you know when that came up?
20     A.  Oh, that was -- that came like later, way
21 later.
22     Q.  Do you know what month?
23     A.  No.
24     Q.  Was it after the P&S was signed?

Page 143

1      A.  Yes.
2      Q.  Do you know what the passport savings
3  account is?
4      A.  Yes.
5      Q.  What is that?
6      A.  Passbook, it's --
7      Q.  Passport?
8      A.  Port -- is it passbook?
9      Q.  Well, I'm asking you "passport"?
10     A.  I would say it's another terminology that
11 they use at the bank where you have so much money in
12 checking and savings.
13     Q.  Well, I understand that.  Perhaps I'm
14 using the wrong term but let me ask the question.
15 Do you or your wife have a passport savings account?
16     A.  It could have been possible but I'm not
17 sure.
18     Q.  Did you have a passbook savings account?
19     A.  I'm not sure.  I'm not sure, Andrew.
20     Q.  Were you ever asked by Kevin Cogan what
21 the source of the funds were for the down payment?
22     A.  Well, he knew because --
23     Q.  No, I didn't ask you that.  I asked you if
24 he asked you?

Page 144

1      A.  No, no.
2      Q.  How did he know?
3      A.  Excuse me?
4      Q.  How did he know?
5      A.  I processed an application over the phone.
6  I mean, I'm sure he had records of that.
7      Q.  Well, when did you make the downpayment?
8  You made a thousand dollar downpayment with the
9  offer, correct?
10     A.  That's correct.
11     Q.  Where did that come from; do you know?
12     A.  As far as I know from the bank.
13     Q.  What bank?
14     A.  I'm not sure.  It could have been
15 Citizens.  I'm not sure.
16     Q.  Was it a check?
17     A.  It was a check if I could remember.
18     Q.  Did you write it?
19     A.  No, I had my wife write it.
20     Q.  Do you know what account it was from?
21     A.  I can't remember but it was from one of
22 them, Andrew.
23     Q.  And then on July 6th, 2001 the P&S
24 required an $8,000 additional deposit?

Page 145

1      A.  She took care of that.
2      Q.  Did you see her write a check for that?
3      A.  If I could remember, Andrew, it was either
4  a check or a money order but it was disbursed if I
5  could remember.
6      Q.  Did you ever tell Kevin Cogan what the
7  source of the down payment was?
8      A.  No.
9      Q.  Was there ever any effort by anyone to
10 support higher rental values for the Chilson Avenue
11 property so you could solve the rental condition?
12     MR. TROMBETTA:  Well, I'll object to
13 that question.  Same objection.
14     Q.  To meet the rent condition?
15     A.  Come again, Andrew, I'm sorry?
16     Q.  Was there ever an effort by anyone to
17 increase the rental value of the property to meet
18 the rental condition in the final commitment letter?
19     MR. TROMBETTA:  And I object to the
20 form of that question.
21     A.  Not that I'm aware.
22     Q.  Did you ever speak to a Mr. Gerner from
23 Cendant Mortgage Corporation?
24     A.  Not that I could remember.

37 (Pages 142 to 145)

Anthony Mendes                                                    06/01/2006

Page 166

1   that's based on?
2       A.  You're funny.  I'm sorry, come again,
3   Andrew?
4       Q.  Well, you're claiming lost rental income
5   of more than $200,000 in this action; do you know
6   what that's based on?
7       A.  Loss of rental income, equity,
8   appreciation and taxes.
9       Q.  Do you know what the costs were for the
10  rental of the Chilson Avenue property?
11      A.  What do you mean, I'm sorry?
12      Q.  Well, you would rent the Chilson Avenue
13  property, you would charge a certain amount of rent,
14  but then you would have certain costs; do you have
15  any idea what those costs were for rental?
16      A.  For those units?
17      Q.  Yes.
18      A.  I have no idea.
19      Q.  I'll tell you your -- look at your
20  interrogatory answer and it says you're requesting a
21  lost rental amount of over $200,000; do you know how
22  you calculated that?
23      A.  That would need an expert.  I don't know.
24      Q.  Well, this is your interrogatory answer.

Page 167

1   How did you come up with $200,000?
2           MR. TROMBETTA:  Well, I'm going to
3   object to that.  Now you ask a question.
4           MR. GOLDSTEIN:  Okay, I'll withdraw
5   that question.
6       Q.  How did you come up with the number
7   $200,000 as lost rental amounts?
8           MR. TROMBETTA:  Same objection.
9       A.  I said loss of income rental from the time
10  I lost it at the time of closing up until now and
11  equity and appreciation and taxes.
12      Q.  Okay, but did you do some sort of
13  calculation to come up with the number 200,000?
14      A.  I basically looked at rents, loss of rent.
15      Q.  Let me show you a document that is labeled
16  Anthony Mendes Response to Defendant's First Set of
17  Interrogatories which you signed on page 11 --
18      A.  Right.
19      Q.  -- under the penalties of perjury.  Take a
20  look at that document and make sure it's what I say
21  it is and then I'm going to ask you a question.
22          (Witness perusing document)
23      A.  Okay.
24          (Witness perusing document)

Page 168

1       A.  Okay.
2       Q.  Did you read this document before you
3   signed it?
4       A.  I did.
5       Q.  Did you agree with everything in there
6   before you signed it?
7       A.  Yes.
8       Q.  All right, I'm going to refer you to your
9   answer to Interrogatory No. 8?
10      A.  Okay.
11      Q.  It's right here (indicating).
12          Interrogatory No. 8 reads:  If you
13  contend that PHH Mortgage breached any contract or
14  commitment identified in your answer to
15  Interrogatories No. 6 or 7 state the basis for this
16  contention.  And your response was:  Cendant
17  breached its agreement by failing to provide a
18  mortgage loan.
19          Now, I know I've asked you about
20  agreements but I'm going to have to ask you again.
21  What agreement are you referring to in your answer
22  to Interrogatory No. 8, either oral or written?
23      A.  It was written.  They sent me guaranteed
24  financing commitment letter and they said they were

Page 169

1   going to honor this loan.
2       Q.  What is that, do you have that written
3   agreement before you?
4       A.  It's here.  It's guaranteed financing here
5   (indicating), guaranteed, and also the commitment
6   letter.
7       Q.  And the commitment letter provides that
8   it's subject to appraisal to provide a net market
9   rental for all three units for the area to evidence
10  that PITI doesn't exceed 75 percent of the market
11  rental.  You can read that if you like.
12      A.  What number is that, Andrew?  Read that to
13  me again, Andrew, please?
14      Q.  On the bottom of Exhibit 7 the commitment
15  letter, final commitment, states that, quote:
16  Appraiser to provide the net market rental for all
17  three units for the area to evidence that PITI
18  doesn't exceed 75 percent of the market rental.
19      A.  I still qualified because also to obtain
20  additional income to lower ratio which me and my
21  spouse made that income.
22      Q.  Putting that parenthetical aside that you
23  just referred to, do you know if the appraiser ever
24  provided any documentation to Cendant Mortgage

43 (Pages 166 to 169)

Anthony Mendes                                                                    06/01/2006

Page 170

1    Corporation that the net market rental for all three
2    units for the area to evidence a PITI doesn't exceed
3    75 percent of the market rental?
4       A.  No.
5       Q.  Was that, "no"?
6       A.  No.
7       Q.  Okay.  Do you contend that you met this
8    condition because you also had additional income to
9    lower ratios?
10      A.  Yes, yes, I do.
11      Q.  When was the first time you communicated
12   that to Cendant Mortgage Corporation?
13      A.  When did I?
14      Q.  Yes.
15      A.  When the application was given.
16      Q.  Well, how did you communicate it?
17      A.  Well, when he took the information over
18   the phone, asked me how much was I making, I told
19   him I do work overtime from time to time.  My wife
20   works overtime so -- and she was working a second
21   job.
22      Q.  So you're saying you provided evidence of
23   your income to Cendant Mortgage Corporation,
24   correct?

Page 171

1       A.  Verbally over the phone on the
2    application.
3       Q.  You say verbally on the phone and the
4    application?
5       A.  Over -- related to the application.
6       Q.  Okay, but as of June 12, 2001 you hadn't
7    provided any documentation to Cendant Mortgage
8    regarding your income?
9            MR. TROMBETTA:  I object to that.
10      A.  Excuse me?
11      Q.  As of June 12th, 2001 had you provided any
12   information, any documentation to Cendant Mortgage
13   Corporation, to support what you were telling
14   Cendant what your income was?
15      A.  Well, they took it over the phone and they
16   asked me for my taxes.  I sent it in, sent my taxes
17   in.
18      Q.  For what years?
19      A.  2001.
20      Q.  When did you send your taxes in; do you
21   know?
22      A.  Some time in May, June.
23      Q.  Did you ever provide to Cendant a bank
24   statement to show where the $9,000 deposit on the

Page 172

1    sales contract came from?
2       A.  I believe that was met.
3       Q.  Do you have that document?
4       A.  I don't.  It should be in the files.
5       Q.  Well, I haven't seen it.
6       A.  Well, that was all presented.
7       Q.  How was it presented?
8       A.  It had to be presented because they sent
9    me the commitment letter.
10      Q.  Well, I don't have -- I'll tell you I
11   don't have any bank statements to show where the
12   $9,000 deposit in the sales contract came from.
13      A.  Well --
14           MR. TROMBETTA:  Well, there's no
15   question.
16      Q.  So I'm telling you that.  Do you have
17   those bank statements that will show where the
18   $9,000 deposit in the sales contract --
19      A.  Well, you got copies from Citizens Bank.
20      Q.  That's not what I'm asking you.  Do you
21   have --
22      A.  Not in my possession.
23      Q.  Who has them?
24      A.  Cendant has them.

Page 173

1       Q.  Did you provide them to Cendant?
2       A.  As far as I know, yes.
3       Q.  How did you provide them?
4       A.  I sent them to them.
5       Q.  Now, I understand you testified that you
6    provided income information to Cendant Mortgage?
7       A.  Right.
8       Q.  But in regard to the conditions in the
9    commitment letter and the rental issue, did you ever
10   communicate to Cendant Mortgage in any way that you
11   felt that Cendant Mortgage had wrongfully denied the
12   mortgage?
13           MR. TROMBETTA:  And I object to the
14   form of that question but you can answer.
15      A.  The only time that they ever mentioned
16   anything was the last week of closing; that was it.
17   Nothing else was ever mentioned.
18      Q.  And did you tell Cendant Mortgage
19   Corporation, anyone at Cendant Mortgage Corporation,
20   that you felt that Cendant Mortgage was wrongfully
21   denying you a loan based on that condition?
22           MR. TROMBETTA:  Again, I object but
23   you can answer.
24      A.  I don't remember.  I don't remember.

44 (Pages 170 to 173)

Anthony Mendes                                                                                    06/01/2006

1     Q.   After the deal fell through?
2          MR. GOLDSTEIN:  Off the record for a
3    second.
4          (Off the record, 3:13 p.m. - 3:14
5    p.m.)
6          MR. GOLDSTEIN:  Let's mark this as
7    the next exhibit.
8          (Document marked as Exhibit No. 13
9    for identification.)
10         MR. GOLDSTEIN:  I apologize, I only
11   have one again but it's not a big document.
12         MR. TROMBETTA:  Can we put all these
13   exhibits somewhere?
14         MR. GOLDSTEIN:  Yes, let's clean this
15   up.
16   Q.   Now, do you know what Exhibit 13 is?
17   A.   Yeah, it's the refund of the deposit.
18   Q.   All right, and these checks are dated
19   September 26, 2001; is that when you got these
20   checks about?
21   A.   Yes.
22   Q.   What's the bottom check by the way?
23   A.   I have no idea.
24   Q.   Okay, the top check, No. 21, is the refund

1    of deposit, right?
2    A.   Correct.
3    Q.   Now, after you got these checks when was
4    the next communication you had with Cendant Mortgage
5    Corporation?
6    A.   In September.
7    Q.   After September 26th, 2001 did you have
8    another communication with Cendant Mortgage
9    Corporation about this?
10   A.   No, no.
11   Q.   Have you had any communications with
12   Cendant Mortgage since September 26, 2001?
13   A.   September 26?
14   Q.   2001?
15   A.   (Pause)
16   Q.   That you recall?
17   A.   No.
18   Q.   All right, I need to go through something.
19   I avoided asking this before but I'm going to ask it
20   now.  From August 1st, 2001 to September 26, 2001, I
21   want you to tell me every communication you recall
22   having with Cendant Mortgage regarding the loan?
23   A.   From what time now?
24   Q.   August 1st, 2001, to September 26, 2001 --

1    let's make it August 1st, 2001 to September 30th,
2    2001.  I want you to tell me every communication
3    that you recall having with Cendant Mortgage
4    Corporation regarding the Chilson Avenue property.
5    A.   The only thing I could remember that I
6    spoke to Kevin Cogan a few times on finding out when
7    the house was going to close and he says it's
8    getting set up through a law firm; that we'll close
9    at the end of August and he said don't worry, you're
10   going to close, guaranteed financing.
11   Q.   Anything else?
12   A.   This was in August.
13   Q.   I'm saying August 1st, 2001, to September
14   30th, 2001?
15   A.   I don't recollect any other communication
16   other than in August.  I don't remember.
17   Q.   Well, you already testified about a
18   communication regarding the rental issue; that was
19   in this time frame, August 1st, 2001 to September
20   30th, 2001?
21   A.   Yeah, it was August rental and that was
22   like the last week of August.
23   Q.   And tell me what was that communication,
24   was that a phone call that you had or --

1    A.   If I could remember -- if I could remember
2    I called him.
3    Q.   Why did you call him?
4    A.   Because I was concerned about closing.
5    Q.   Well, what were you concerned about?
6    A.   Because me and my wife was -- been waiting
7    quite some time.
8    Q.   All right, and you called Kevin Cogan?
9    A.   Yes.
10   Q.   Tell me everything that he said to you and
11   you said to him during the conversation.
12   A.   He said the house is not going to closing.
13   Q.   Okay?
14   A.   Because it was related to rents and I said
15   I did not know anything about it.
16   Q.   Anything else that was said?
17   A.   That was it if I could remember.
18   Q.   You said you knew nothing about it?
19   A.   No, I knew nothing about it.
20   Q.   Is that because you hadn't read the
21   commitment letter?
22         MR. TROMBETTA:  Well, I object to
23   that.
24   A.   I read some of it.  I didn't read all of

45 (Pages 174 to 177)

Anthony Mendes                                                                    06/01/2006

Page 190

1    Q.   So is your earlier testimony inaccurate?
2         MR. TROMBETTA:  Well, I object.
3    Q.   Did Cendant ever propose to you that you
4    utilize conventional financing, yes, or no?
5    A.   No.
6    Q.   Turn to the next page, please, page 5.
7    A.   Okay.
8    Q.   There's a Count 2 heading, Breach of
9    Implied Contract?
10   A.   Right.
11   Q.   And why don't you read paragraph 31 into
12   the record?
13   A.   Cendant represented that it would provide
14   home financing in the amount of $307,545.
15   Q.   Okay, and what representation was that?
16   A.   And when they provided me guaranteed
17   financing.
18   Q.   And that was by the June 12th, 2001
19   letter?
20   A.   Yes.
21   Q.   How was this breach of implied contract
22   claim different from the breach of contract claim?
23        MR. TROMBETTA:  I'm going to object.
24   You know, these are legal issues.  I'll object.  I

Page 191

1    don't believe it's -- I think these questions are
2    inappropriate.  You can answer the questions but I
3    object.
4    A.   Basically the house never went to closing.
5    Q.   Okay, let's go back to paragraph 31; that
6    Cendant represented that it would provide home
7    financing in the amount of $307,545; other than what
8    you've testified did Cendant make any other
9    representations in this regard?
10   A.   The question again, Andrew?
11   Q.   Well, you testified -- well, other than
12   what you've testified to just a few moments ago, are
13   there any other representations that are referenced
14   in paragraph 31 of the complaint by which you allege
15   Cendant represented that it would provide home
16   financing in the amount of $307,545?
17   A.   Well, that's what they provided for me.
18   Q.   I'm asking you about the representations?
19   A.   Well, it was never delivered.
20   Q.   You know, we're just going to have to
21   start again.  What representations did Cendant make
22   to you that it would provide home financing in the
23   amount of $307,545?
24   A.   Guaranteed financing.

Page 192

1    Q.   How was that representation made?
2    A.   Through the application.
3    Q.   Well, how did Cendant communicate to you
4    that it was going to provide you a guaranteed
5    financing?
6         MR. TROMBETTA:  I'm going to object,
7    asked and answered.
8    A.   Like I said, the application.
9    Q.   Anything else?
10   A.   No.
11   Q.   Did any other oral communications make up
12   the representation that you've just testified to?
13   A.   No.
14   Q.   Any documents that make up the
15   representation that you just testified to?
16   A.   The letter they sent me.
17   Q.   Which letter?
18   A.   The commitment letter and the letter that
19   they sent me to guaranteed financing.  Right here
20   (indicating).
21   Q.   So Exhibits 4, 5 and 7?
22   A.   Right.
23   Q.   Do any other documents make up part of the
24   representation that's referenced in paragraph 31?

Page 193

1    A.   No.
2    Q.   How were you harmed by -- well, strike
3    that.  Go to paragraph 38.
4    A.   Okay.
5    Q.   In that paragraph you state that Cendant
6    misrepresented that an offer to provide conventional
7    financing to you; how were you harmed by that
8    misrepresentation?
9    A.   How was I harmed by that?
10   Q.   Right.
11   A.   I mean, knowing the fact somebody submits
12   an application we're approved, first time buyer,
13   they take the income, they pull the credit report,
14   they guaranteed us financing.  How would somebody
15   come up with 20 percent to buy their home, first
16   time buyer?  I never heard of it.
17   Q.   You couldn't come up with 20 percent?
18   A.   Right.
19   Q.   But you couldn't come up with 10 percent?
20   A.   But I could have come up with 5 percent.
21   Q.   In this paragraph 38 you represent
22   Cendant's refusal to provide financing to Mr. and
23   Mrs. Mendes and its misrepresentation that it
24   offered to provide conventional financing to them;

49 (Pages 190 to 193)

Page 198

1    A.  Yes.
2         (Document marked as Exhibit No. 19
3    for identification.)
4    Q.  Do you recognize Exhibit 19?
5    A.  Yes.
6    Q.  What's the title on the top of this
7    document?
8    A.  It says FHA Amendatory Clause.
9    Q.  Is this a document you signed in
10   connection with your application to obtain a loan
11   from Cendant Mortgage?
12        MR. TROMBETTA:  Well, I object to
13   that.  You can answer the question.
14   A.  Yes, I remember signing it.
15        (Document marked as Exhibit No. 20
16   for identification.)
17   Q.  Do you recognize Exhibit 20?
18   A.  Excuse me?
19   Q.  Do you recognize Exhibit 20?
20   A.  Yeah, my signature's here.
21   Q.  Okay, do you recognize the document
22   separate from your signature?
23   A.  I didn't understand it much but I -- told
24   me to sign it and send it in.

Page 199

1    Q.  Okay, is that what you did?
2    A.  Yeah.
3    Q.  Did you read the title before you signed
4    this FHA Purchase Agreement Addendum?
5    A.  No, not really.
6    Q.  Are you always in the habit of not reading
7    documents that you sign?
8    A.  I was just so excited and wanted to buy a
9    house and move on.  Didn't know much about anything.
10   Q.  You did buy a house, correct?
11   A.  I own one now.
12        (Document marked as Exhibit No. 21
13   for identification.)
14   Q.  Do you recognize Exhibit 21?
15   A.  Yes, my signature's on it.
16   Q.  Is this a document you executed in regard
17   to your proposed purchase of the Chilson Avenue
18   property?
19   A.  Yes.
20   Q.  Did you know what this was for when you
21   signed it?
22   A.  Not really.  Not really.
23   Q.  Now, was this to get a copy of your tax
24   returns?

Page 200

1    A.  I think so.
2         (Document marked as Exhibit No. 22
3    for identification.)
4    Q.  Do you recognize Exhibit 22 which is
5    similar to 21 except it has two signatures?
6    A.  Basically it's the tax returns.
7    Q.  Is your signature on it?
8    A.  Yes.
9    Q.  Is it a document you signed in connection
10   with your proposed purchase of the Chilson Avenue
11   property?
12   A.  Yes.
13        (Document marked as Exhibit No. 23
14   for identification.)
15   Q.  Do you recognize Exhibit 23?
16   A.  Yes, I do, Andrew.
17   Q.  What is this?
18   A.  Basically where I was working, position.
19   Q.  Was this a letter that you obtained for
20   your proposed purchase of the Chilson Avenue
21   property?
22   A.  Yes, Andrew.
23   Q.  What was this letter for, do you know?
24   A.  To send to Cendant of the income that I'm

Page 201

1    making and the overtime that I work because they
2    wanted it.
3    Q.  So this was to substantiate the income
4    that you had orally informed Richard Luongo of?
5    A.  Exactly.  Exactly.
6         (Document marked as Exhibit No. 24
7    for identification.)
8    Q.  This is a letter I put before you that's
9    marked as Exhibit 24 concerning Doris Mendes but
10   did you have any involvement in securing this
11   letter?
12   A.  Yes, well, I gave this information to the
13   applicant.
14   Q.  To the applicant?
15   A.  I mean, the person at Cendant, Richard
16   Luongo.
17   Q.  Did he ask you to get this information?
18   A.  Yes.
19   Q.  Did he ask you to get the information in
20   Exhibit 23?
21   A.  Yes.
22   Q.  And that was to substantiate in Exhibit 24
23   your wife's income?
24   A.  Right, and this is her part-time job.

Anthony Mendes

06/01/2006

Page 202

1        (Document marked as Exhibit No. 25
2    for identification.)
3        Q.  Do you recognize Exhibit 25?
4        A.  My signature's on it, yeah.
5        Q.  Well, do you know what it is?
6        A.  Not really.
7        Q.  If you look halfway down there's something
8    that is referred to as a Mortgagor's Oath; do you
9    see that?
10       A.  Yes.
11       Q.  Underneath, it says: I, Anthony P.
12   Mendes, being first duly sworn, do hereby certify
13   and say that I am the mortgagor who executed the
14   foregoing contract and I am familiar with the
15   provisions of Section 513(a) of the National Housing
16   Act, as amended, as set forth in part of the reverse
17   hereof.  I do further certify that so long as any
18   part of the housing identified in the caption of
19   said contract is subject to a mortgage insured under
20   said National Housing Act, as amended, I will not
21   rent or offer for rent, or permit such housing to be
22   rented or offered for rent for hotel or transient
23   purposes; was that statement true when you signed
24   it?

Page 203

1        A.  Basically.  I didn't understand much of
2    it.
3        Q.  So you didn't understand the provision of
4    Section 513(a), the Housing Act, when you signed it?
5        A.  No.
6        Q.  Did you read the top of this document when
7    you signed this document?
8        A.  I don't remember, no.  But that's my
9    signature.
10       MR. TROMBETTA:  Can we take a break?
11       (A brief recess was taken, 3:55 p.m.
12   - 4:03 p.m.)
13       (Documents marked as Exhibit Nos. 26
14   and 27 for identification.)
15       MR. GOLDSTEIN:  I do have a stack of
16   documents that were brought down to me that I don't
17   think I need to go over.  I assume you will be
18   reasonable regarding authentication of documents
19   like his purchase of his house and things like that.
20       MR. TROMBETTA:  Assuming you will be,
21   too.
22       THE WITNESS:  I'm pretty sure that
23   they're the same thing, Andrew.
24       MR. TROMBETTA:  If you'll be

Page 204

1    reasonable I'll be reasonable.
2        Q.  All right, let me show you Exhibit 26; is
3    that a document you recognize?
4        A.  Excuse me, Andrew?
5        Q.  Do you recognize that document, Exhibit
6    26?
7        MR. TROMBETTA:  Do you have a copy
8    for me?
9        MR. GOLDSTEIN:  I'm sorry, do I?  No,
10   but you can have this.
11       (Document presented)
12       A.  Yes, I do, Andrew.
13       Q.  What is it?
14       A.  It's a loan application.
15       Q.  Is that something you received from
16   Cendant Mortgage Corporation?
17       A.  No, no, I didn't receive this.
18       Q.  Do you recall ever signing any loan
19   application?
20       A.  No, Andrew.
21       Q.  None?
22       A.  Look it, there's -- Andrew, there's not
23   even a signature on here.
24       MR. TROMBETTA:  This is what, 26?

Page 205

1        MR. GOLDSTEIN:  Correct.
2        Q.  I asked you if you recognize this, you
3    said, yes.  Are you just reading what the document
4    is?
5        A.  Just reading it as you presented it to
6    me.
7        Q.  Right, but when I ask you if you can
8    identify a document, I want you to tell me if you
9    know what it is as opposed to some prior familiarity
10   with the document as opposed to just reading what it
11   is?
12       MR. TROMBETTA:  What are you asking
13   him?
14       Q.  Did you get that document from Cendant
15   Mortgage Corporation at some point?
16       A.  No, no.
17       Q.  All right.  I'm going to show you 27.  Is
18   your signature on the second page of 27?
19       A.  Yes, it is, Andrew.
20       Q.  Do you know what you signed this document
21   in connection with?
22       A.  One second, please, Andrew.
23       (Witness perusing document)
24       A.  No, not really.

52 (Pages 202 to 205)

Anthony Mendes                                                    06/01/2006

Page 214

1    just take that off.
2        Q.   Is this letter connected with your
3    proposed purchase of the Chilson Avenue property?
4        A.   I'm not sure, Andrew.
5        Q.   I'll tell you this document and the last
6    document were in the PHH Mortgage or Cendant
7    Mortgage files.  Do you know why you may have sent
8    these documents to Cendent Mortgage?
9        A.   I have no idea, Andrew.
10       Q.   Do you have an account at the CrossCountry
11   Bank?
12       A.   There was a credit card, Andrew.
13       Q.   Okay.
14           (Document marked as Exhibit No. 35
15   for identification.)
16       Q.   Is this a letter that you received from
17   CrossCountry bank?
18       A.   Yes.
19       Q.   Again, this was in the files of Cendant
20   Mortgage now PHH Mortgage.  Do you know what this
21   has to do with your proposed purchase of the Chilson
22   Avenue property?
23       A.   No, I have no idea.
24       Q.   Were you ever working to get any repairs

Page 215

1    done at the Chilson Avenue property?
2        A.   Was I?
3        Q.   Yes.
4        A.   No, no.
5        Q.   Any repairs regarding any electrical work
6    or the --
7        A.   No, he mentioned it and -- and I had an
8    electrician come and he wrote a letter and I thought
9    it was in the documents.  I sent it to him and I
10   don't know where it is.
11       Q.   I just want to make clear, is it your
12   testimony that you don't recall any real estate
13   agent --
14       A.   Real estate agent?
15       Q.   -- helping to find comparables to adjust
16   up the market rental values of the Chilson Avenue
17   property?
18       A.   Come again, I'm sorry, Andrew?
19       Q.   Do you recall any real estate agent in any
20   way helping to find comparables to adjust up the
21   rental value of the Chilson Avenue property?
22       A.   The only one I ever heard was Greg Abbot.
23       Q.   Well, what did you hear about that?
24   *A.   He just said that he was looking at market

Page 216

1    value for Kevin and he was taking care of it and
2    that was it.  I didn't hear no more about it.
3           MR. GOLDSTEIN:  Could you read that
4    answer back?
5           (*Record read as requested)
6        Q.   Were you ever told that you needed three
7    months reserves to purchase the property?
8        A.   No.
9        Q.   Did Cendent Mortgage ever tell you that
10   you had met all the conditions in the final
11   commitment letter?
12           MR. TROMBETTA:  Well, I'll object but
13   you can answer.
14       A.   I'm sorry, come again, please, Andrew?
15       Q.   Did anyone at Cendent Mortgage ever tell
16   you that you had met all of the conditions in the
17   final commitment letter?
18           MR. TROMBETTA:  Same objection.  You
19   can answer.
20       A.   No.
21       Q.   Have you refinanced your School Street
22   property lately?
23       A.   I have.
24       Q.   When was the last time you refinanced it?

Page 217

1        A.   Couple of years ago.
2        Q.   Did you get an appraisal with the property
3    in connection with the refinancing?
4        A.   If I could remember, yes, Andrew.
5        Q.   You say if you could remember, yes; is
6    that, yes, or --
7        A.   Yes, yes.
8        Q.   Do you have that appraisal at home?
9        A.   I don't think so.
10       Q.   Do you know who did the appraisal?
11       A.   Excuse me?
12       Q.   Do you know who did the appraisal?
13       A.   I can't remember the name of the company
14   but there was an appraisal done.
15           MR. TROMBETTA:  Didn't we give you an
16   appraisal of that property?
17           MR. GOLDSTEIN:  Maybe you did, I
18   don't remember.
19       A.   I think so.
20           MR. TROMBETTA:  I thought we did.
21           MR. GOLDSTEIN:  Well, I know you did
22   but I think it's the original.  I'm talking about
23   refinance.
24       Q.   Has that property appreciated in value in

55 (Pages 214 to 217)

# EXHIBIT B

1

Volume: I

Pages: 1-57

Exhibits: 1-7


COMMONWEALTH OF MASSACHUSETTS

Bristol, ss          Superior Court

CA No. B05-809

- - - - - - - - - - - - - - - - - - -x

ANTHONY MENDES and DORIS MENDES,

        Plaintiffs,

vs.

CENDANT MORTGAGE,

        Defendant.

- - - - - - - - - - - - - - - - - - x


DEPOSITION OF DORIS MENDES

September 8, 2006

10:18 a.m.

Foley & Lardner

111 Huntington Street

Boston, Massachusetts


Reporter: Nancy L. LaCivita

2

1  APPEARANCES:
2
3     LAW OFFICE OF CHRISTOPHER J. TROMBETTA
4     310 North Main Street
5     Suite Six
6     Mansfield, Massachusetts 02048
7     (508) 339-5900
8     On Behalf of the Plaintiffs
9
10    FOLEY & LARDNER
11    By Andrew K. Goldstein, Esquire
12    111 Huntington Avenue
13    Boston, Massachusetts 02199
14    (617) 342-4000
15    On Behalf of the Defendant
16
17
18
19
20
21
22
23
24

3

1              I N D E X
2   EXAMINATION OF:              PAGE
3   DORIS MENDES
4   By Mr. Goldstein             4
5
6
7
8
9
10
11            E X H I B I T S
12  NO.                     PAGE
13  1  Copy of Check           44
14  2  Copy of Check           44
15  3  Copy of Check           45
16  4  Copy of Income Tax Return   46
17  5  Bank Statements         46
18  6  Bank Statements         50
19  7  Bank Statements         51
20
21
22
23
24  *Original exhibits retained by Andrew K. Goldstein.

4

1              P R O C E E D I N G S
2                    * * *
3        DORIS MENDES, having been satisfactorily
4   identified and duly sworn by the Notary Public, was
5   examined and testified as follows:
6                    * * *
7           DIRECT EXAMINATION
8   BY MR. GOLDSTEIN:
9      Q.  Would you please state your name.
10     A.  Doris Mendes.
11     Q.  Ms. Mendes, my name is Andy Goldstein.  I
12  represent PHH Mortgage which used to be known as
13  Cendant Mortgage and you have filed a lawsuit against
14  Cendant Mortgage.  Do you understand that?
15     A.  Yes.
16     Q.  I'm going to ask you some questions today
17  about the facts that give rise to the lawsuit.
18     A.  Okay.
19     Q.  If you don't hear a question, please tell me
20  and I will repeat it.  And if you don't understand a
21  question, please tell me you don't understand and I
22  will try to rephrase the question so that you do
23  understand it.
24     A.  Okay.

5

1      Q.  If you don't remember the information
2   necessary to answer a question, you can say I don't
3   remember.  That's an acceptable answer.  If you don't
4   know the answer to a question, say I don't know.  That
5   is an acceptable answer, too.
6      A.  Okay.
7      Q.  I'm only trying to find out what you remember
8   today.
9      A.  Okay.
10     Q.  If I talk too fast, not only will the court
11  reporter tell me to slow down, but you can tell me to
12  slow down, too.  One of my many faults is sometimes I
13  speed up.  I always ask witnesses this one question, so
14  don't take it personally.  Once in a while someone says
15  yes.  Is there anything that impairs your ability to
16  accurately answer questions today?
17     A.  Depends.  Some words if I don't understand, I
18  will ask you that.
19     Q.  Anything else?
20     A.  No.
21     Q.  Are you on any medication that impairs your
22  ability?
23     A.  No.
24        MR. TROMBETTA:  The only thing I do

2 (Pages 2 to 5)

Doris Mendes

09/08/2006

6

1 want to point out is her primary language is Spanish
2 just so you know that with respect to understanding.
3 I'm not saying it's going to be the easiest thing for
4 her, but if she says she doesn't understand certain
5 words, that is one of the reasons.
6        MR. GOLDSTEIN: I will keep that in
7 mind.
8        Q. If you don't understand a word or a sentence
9 or a question, just tell me. I will try to rephrase
10 it. My Spanish is rusty, so I won't try that. Also,
11 you're going to anticipate the answer to questions that
12 I'm asking, but please try to let me finish the
13 question because the court reporter has a difficult
14 time taking down both of us talking at the same time.
15 She is typing everything we are saying. And also,
16 we're trying to create a record where there is a
17 question and an answer. Now, you understand this
18 lawsuit deals with property on Chilson Avenue in
19 Mansfield?
20        A. Can you repeat the question?
21        Q. This lawsuit you filed against Cendant
22 Mortgage involves a property on Chilson Avenue in
23 Mansfield, correct?
24        A. Yes.

7

1        Q. Have you ever spoken with anyone at Cendant
2 Mortgage about this lawsuit?
3        A. Yes.
4        Q. Let me rephrase that. That's not what I was
5 expecting.
6        MR. TROMBETTA: I don't think that's
7 what she meant, but anyway.
8        Q. In the summer of 2001, you were attempting to
9 get a loan?
10        A. Yes.
11        Q. To purchase Chilson Avenue, correct?
12        A. Yes.
13        Q. Did you ever speak to anyone at Cendant
14 Mortgage about that loan?
15        A. No. My husband spoke to them.
16        Q. When you said yes a minute ago, what did you
17 mean? I asked you if you had ever spoken to anyone at
18 Cendant Mortgage about the lawsuit and you said yes.
19        A. I didn't understand.
20        MR. TROMBETTA: I think when you say
21 about the lawsuit, I think if you take that out, she
22 may be able to answer the question.
23        MR. GOLDSTEIN: That's what I did.
24        MR. TROMBETTA: But you said it again.

8

1 I'm not telling you what to do.
2        MR. GOLDSTEIN: Well, she said yes to
3 that. So I was curious about that.
4        MR. TROMBETTA: Well, you can ask her,
5 but I don't think she did.
6        Q. Have you ever you, yourself, spoken to anyone
7 at Cendant Mortgage about the lawsuit?
8        A. No.
9        Q. Have you ever spoken to anyone at Cendant
10 Mortgage, as far as you know?
11        A. No.
12        Q. Have you ever spoken with Richard Luongo?
13        A. I don't know. I don't remember.
14        Q. So it's true that your husband Anthony Mendes
15 dealt with Cendant Mortgage in the summer of 2001,
16 correct?
17        A. Yes.
18        Q. And you didn't have any telephone calls with
19 anyone at Cendant Mortgage about trying to obtain a
20 loan to buy the Chilson Avenue property?
21        MR. TROMBETTA: I will object. You can
22 answer.
23        THE WITNESS: Excuse me?
24        MR. TROMBETTA: You can answer the

9

1 question.
2        A. Can you repeat the question?
3        Q. Sure. Your attorney will object from time to
4 time if he thinks that I did not properly ask the
5 question, but you still answer the question unless your
6 attorney instructs you otherwise, of course. Let's
7 move on. Let me get your background. Where were you
8 born?
9        A. South America.
10        Q. What country?
11        A. Lima, Peru.
12        Q. At some point you moved to the United States
13 obviously. When was that?
14        A. When what?
15        Q. When did you move to the United States?
16        A. 1977.
17        Q. When were you born?
18        A. 1959.
19        Q. Spanish is your first language?
20        A. Yes.
21        Q. So you moved to the United States when you
22 were eight years old?
23        A. No, 1977.
24        Q. How old were you when you moved to the United

3 (Pages 6 to 9)

Doris Mendes

09/08/2006

10

1  States?
2    A.  16, 17.
3    Q.  When were you born?
4    A.  1959.
5    Q.  Okay.  Did you learn English in Peru at all?
6    A.  No.
7    Q.  Did you graduate from high school?
8    A.  In my country, yes.
9    Q.  Did you get any additional formal education
10  beyond high school?
11    A.  Here?
12    Q.  Anywhere.
13    A.  No.  I came here and I went to school for
14  English classes -- English course.
15    Q.  Did you go to college?
16    A.  No.
17    Q.  Do you have any degrees beyond high school?
18    MR. TROMBETTA:  Well, I object to that.
19  She didn't go to college so --
20    MR. GOLDSTEIN:  Well, she could have
21  some other type of degree.  I won't spend a lot of time
22  on this.
23    MR. TROMBETTA:  I don't know if it
24  would be a degree, but you can answer the question

11

1  anyway.
2    A.  I don't have a degree.  I'm a certified
3  nursing assistant.
4    Q.  Did you go to school for that?
5    A.  Yes.
6    Q.  Where?
7    A.  My job.  They gave the class on the job.
8    Q.  In 2001 what was your employment status?
9  Where were you working in 2001?
10    A.  I was working at the Arbor Hospital and
11  Deutsches Altenheim.
12    Q.  Can you spell that?
13    A.  D-E-U-T-S-C-H-E-S, A-L-T-E-N-H-E-I-M.
14    Q.  You were working at Deutsches Altenheim and
15  the Arbor Hospital?
16    A.  Arbor Hospital.
17    Q.  Are you still working at those two places?
18    A.  No.  I work at Deutsches Altenheim and I am
19  working somewhere else.
20    Q.  For what period of time did you work at the
21  Arbor Hospital?
22    A.  I work almost four years, five years.  From
23  1998 to almost 2003.
24    Q.  You're still at Deutsches Altenheim?

12

1    A.  Yes.
2    Q.  Did you have any other employment in 2001
3  besides those two jobs?
4    A.  After I left the Arbor Hospital, I went to
5  another job.  It was close to my house.
6    Q.  What job was that?
7    A.  I went to Avery Manor in Needham.
8    MR. TROMBETTA:  I don't mean to object,
9  but did you hear what he said about the time period?
10    MR. GOLDSTEIN:  I was going to go back
11  to that.
12    Q.  In 2001 you were working at Deutsches
13  Altenheim and Arbor Hospital?
14    A.  Yes.
15    Q.  During 2001 did you have any other
16  employment?
17    MR. TROMBETTA:  Do you understand?
18    A.  No, I don't understand.
19    Q.  In 2001 -- beginning from January 2001
20  through December 2001 other than these two jobs, did
21  you have any other jobs?
22    A.  The Arbor Hospital.
23    Q.  I have those two.  Was there a third job?
24    A.  No.

13

1    Q.  All right.  Are you able to read English?
2    A.  I can read, but my husband does the most
3  reading for me.  Sometimes he will try to explain to
4  me.
5    Q.  I want to focus you on 2001 regarding my next
6  series of questions.  I'm only asking about 2001.  What
7  bank accounts did you have in 2001?
8    A.  There was -- I had Metropolitan Credit Union.
9  There was Bank of Boston at that time and Fleet.
10    Q.  That's the same, Fleet and Bank of Boston?
11    A.  Yes.  Boston Five, I think.
12    Q.  Boston Five?
13    A.  Yes.  Now it is Citizen's Bank.
14    Q.  Anything else?
15    A.  I don't remember.
16    Q.  So I'm not sure I understand.  You said Bank
17  of Boston Fleet, is that one account?
18    A.  No.  That was different account.
19    Q.  You had an account at Bank of Boston and
20  Fleet?
21    A.  And Fleet.
22    Q.  Is Boston Five and Citizen's a different
23  account?
24    A.  No.  At that time Boston Five, but now it's

4 (Pages 10 to 13)

Document removed due to personal identifiers.