UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————
                                                  )
ANTHONY MENDES and DORIS MENDES,                  )
                                                  )
                    Plaintiffs,                   )     Civil Action No. 05CV11765DPW
                                                  )
        v.                                        )
                                                  )
CENDANT MORTGAGE,                                 )
                                                  )
                    Defendant.                    )
                                                  )
—————————————————————                            )

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PLAINTIFFS'
EXPERT FROM TESTIFYING AND TO STRIKE EXPERT'S REPORT**

Defendant PHH Mortgage Corporation, f/k/a Cendant Mortgage, ("Cendant") has moved

to preclude Plaintiffs' experts, Susan L. Mitchell, Peter D. Tetreault, and Connor Shortsleeve,

from testifying in this action and to strike Shortsleeve's expert report that was filed in support of

the Opposition of Plaintiffs Anthony and Doris Mendes (collectively, "Mendes") to PHH

Mortgage's Motion for Summary Judgment.  PHH Mortgage submits a memorandum of law in

support of this motion.

**Factual Background**

The gist of Mendes' claim is that Cendant breached a commitment to make Mendes a

loan in connection with Mendes' proposed purchase of property located at 1-3 Chilson Street,

Mansfield, Massachusetts (the "Property").  See Complaint, passim.  The factual background of

this claim is as follows.

In 2001, Mendes began searching for a home to purchase in Mansfield, Massachusetts. See Deposition of Anthony Mendes ("A. Mendes Dep."), p. 23.[1] In connection with this search, Anthony Mendes was referred to Richard Luongo of Cendant concerning mortgage financing. Id. at 45-46. In the spring of 2001, Luongo sent Anthony Mendes a series of Pre-Qualification letters, dated March 21, 2001, May 3, 2001, and June 12, 2001. Id. at pp. 92-105, Ex. 3-5. These letters were all sent in connection with Mendes' interest in buying three different multi-family homes. See Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (the "Opposition"), p. 2.

On June 12, 2001, Mendes saw the Property for the first time. See Anthony Mendes Dep., p. 31. The Property is a 3 family dwelling, with a three bedroom unit, a two bedroom unit, and a one bedroom unit. Id. at p. 38. Mendes intended to live at the Property with their younger son. Id. at pp. 39-40. On June 12, 2001, Mendes made an offer to purchase the Property for $305,000, which the owner accepted. See Anthony Mendes Dep., p. 31, Ex. 2.

On June 14, 2001, Mendes submitted a Residential Loan Application to Cendant for the purchase of the Property. See Complaint, Ex. A. By the application, Mendes applied to Cendant for a Federal Housing Administration ("FHA") loan. Id.

On July 6, 2001, Mendes entered into a purchase and sale agreement with the owner of the Property (the "P&S"). Defendants' Second Set of Requests For Admissions To Plaintiff Anthony Mendes and Doris Mendes, number 20; Exhibit C, Response of Anthony Mendes and Doris Mendes to Second Set of Requests for Admissions, number 20. Mendes made an additional deposit of $8,000 with the P&S, for a total deposit of $9,000. Pursuant to paragraph 8

---

[1] Any depositions or discovery responses referred to in this memorandum have been previously filed with the Court in support of Cendant's Motion for Summary Judgment.

of the P&S, a closing was scheduled for August 31, 2001.  Paragraph 26 of the P&S was a Mortgage Contingency Clause, which conditioned Mendes' purchase of the Property on their obtaining a mortgage loan commitment of $297,000 on or before July 31, 2001.  Id.

On August 10, 2001, Cendant sent to Mendes a Final Commitment letter for the Property. See A. Mendes Dep., Ex. 7.  Mendes accepted the Final Commitment on August 14, 2001.

On August 29, 2001, Mendes and the Property's seller agreed to extend the closing date on a sale of the Property to September 13, 2001.  Thereafter, Cendant informed Mendes that they would not be able to close on Mendes' proposed loan because the Property did not meet FHA Guidelines.  See A. Mendes Dep., p. 206,  Ex. 28.

Even though Mendes' mortgage contingency deadline had expired on July 31, 2001, the seller of the Property returned the Mendes' $9,000 deposit to them.  See A. Mendes Dep., p. 174, Ex. 13.  In addition, Cendant refunded to Mendes a $350 application fee that Mendes had paid in June 2001.  See Affidavit of Claire Taylor, ¶ 17.

On November 16, 2001, Mendes purchased a three bedroom home located at 895 School Street, Mansfield, Massachusetts for $269,900.  See A. Mendes Dep., pp. 26-27.

By their Complaint, Mendes alleges that Cendant breached an agreement to finance their purchase of the Property, and, therefore, they were unable to complete the purchase of it.  See Complaint, passim.  This breach of contract claim is based on the June 12, 2001, pre-qualification letter.

## Plaintiffs' Proposed Expert Testimony

Plaintiffs have designated three expert witnesses, Susan L. Mitchell, Peter D. Tetreault, and Connor Shortsleeve. Susan Mitchell and Peter Tetreault are both real estate appraisers affiliated with P.D. Tetreault & Associates (collectively referred to as "Tetreault"). A copy of Tetreault's expert report is attached hereto as <u>Exhibit A</u>. Mendes has designated Tetreault as a damage expert. Specifically, Mendes claims that their damages include lost profits measured by the amount that the Property would have appreciated during a hypothetical "holding period," from the date of the purchase and sale agreement, July 6, 2001, to July 1, 2016. <u>See</u> Exhibit A, p. 5. In addition, Mendes is claiming lost rental income during this same 16 year period.

Shortsleeve is a mortgage broker. A copy of his report is attached hereto as <u>Exhibit B</u>. Mendes has designated Shortsleeve to testify on three topics, none of which has anything to do with mortgage brokerage. First, Mendes has designated Shortsleeve to testify that the May 3, and June 12, 2001, letters that Luongo sent to Mendes formed a binding contract that Cendant breached when it failed to make a loan to Mendes. Second, Mendes seek to have Shortsleeve testify to an underwriting analysis, that Mendes "Qualified for the FHA Mortgage Loan." Third, Mendes seeks to have Shortsleeve testify that Mendes "Could Have Funded The Loan From Other Sources." Included in this opinion is Shortsleeve's entirely unsubstantiated opinion that, with these additional assets, "Numerous lenders would then have approved a loan to Mr. and Mrs. Mendes."

For the reasons set forth below, the Court should preclude Mendes' expert from offering any of these opinions at trial, and should strike Shortsleeve's opinion from Mendes' summary judgment opposition.

### Argument

I.    **The Court Should Preclude Tetreault From Offering His Purported Expert Opinions**

   A.    **Tetreault Is Not Qualified To Testify About Alleged Appreciation Of The Property**

An expert's qualifications must relate to the subject matter of the proposed testimony. Polaino v. Bayer Corp., 122 F.Supp.2d 63, 68-69 (D.Mass. 2000); see also Levin v. Dalva Brother, 459 F.3d 68, 78 (1st Cir. 2006) ("a district court acts properly by excluding opinions that are beyond the witness's expertise").

Tetreault is an appraiser.  See Exhibit A.  As such, Tetreault may be qualified to "ascertain and state the true value of goods or real estate."  See Black's Law Dictionary Fifth Edition West; see also Levin v. Dalva Brother, 459 F.3d at 78-9 (appraiser allowed to testify to value of item in dispute).  But Tetreault is not an economist who is qualified to testify as to what the value of the Property will be 10 years from now.  Indeed, nothing in the qualifications of Mr. Tetreault or Ms. Mitchell even hint that they are qualified to forecast future economic trends, and, therefore render an opinion of the future value of real estate.

In this regard, Tetreault admits by its own report that the methodology that appraisers use to value real estate cannot be applied to predict the future value of the Property.  In particular, on page 22 of the report, Tetreault states:

> "There are three traditional approaches available to the appraiser in estimating Market Value.  They are:
>
> 1.    The Sales Comparison Approach
> 2.    The Income Approach
> 3.    The Cost Approach
>
> All approaches are based on data extracted from the market, each from a different prospectus."

Tetreault goes on to describe each of these approaches, which, as set forth in the above definition, are all based on available market date.  For example, the sales comparison approach is defined as:

> A set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales price of the comparables based on elements of comparison. . . .  it is the most common and preferred method of land valuation when comparable sales data are available.

See Exhibit A, p. 22,

This definition establishes that a sales comparison approach cannot be used to value the Property in the year 2016, since no comparable sales for 2016 will be available for another 10 years.  Similarly, neither the income nor cost approach can be utilized to determine the value of the Property in 2016, since these two methods also rely on existing data.  See Exhibit A, passim.

Tellingly, Tetreault did not use any of the "three traditional approaches available to the appraiser" to come up with a market value of the Property in 2016.  This highlights the inevitable conclusion that the Court should preclude Tetreault from making an economic forecast that it is not qualified to give.

That Tetreault is not qualified to testify as to economic forecasts is corroborated by his failure to understand even the fundamentals of the data that Tetreault did use as a basis to forecast the future value of the Property, the Consumer Price Index.  Tetreault writes on page 5 of his report that "the Consumer Price Index for the Boston-Brockton-Nashua area rose 31.5 or 6.3% per year."   This is flat-out wrong, as demonstrated by the chart attached hereto as Exhibit C of the Consumer Price Index published by the United Department of Labor, Bureau of Labor Statistics.  The first chart on this page shows that the Consumer Price Index in 2001 was 189.0 and in 2006 it was 220.5, a rise of "31.5"  as Tetreault correctly states in its report.  But this 31.5

6

rise in the Consumer Price Index does not translate to a 6.3% change per year from 2001 to 2006, as anyone even vaguely familiar with the Consumer Price Index would know, let alone an expert.

The Consumer Price Index is a measurement tool to track the changes in the price of a certain basket of consumer goods.  See Exhibits C and D.  Thus the Bureau of Labor Statistics defines a price index as follows:

> Price Index
>
> A price index is a tool that simplifies the measurement of *price movements* in a numerical series.  Movements are measured with respect to the base period, when the index is set to 100.

See Exhibit D (emphasis added).

Price movements, of course, are not percentage changes.  Id.  For example, in 2001 and 2002 the Consumer Price Index rose from 189.0 to 192.9.  This means it costs 3.9 units more in 2002 to purchase the basket of goods than it did in 2001.[2]  But this is not a 3.9% change, as Tetreault suggests.  Rather, the percentage change from 2001 to 2002 was 2.1%, which is exactly what the second chart on Exhibit C shows, which is a chart of the percentage change in the Consumer Price Index from year to year.  This second chart shows that the percentage change in the Consumer Price Index from 2001 to 2006 was in fact 16.66%, or 3.33% per year, not 6.3% as Tetreault states.[3]

To boot, on page 38 of the report, Tetreault states that the Consumer Price Index rose 4.64% instead of 6.3%.  This percentage change is also inaccurate.  See Exhibit C.

---

[2] The Consumer Price Index does not have a unit of measure, like dollars.

[3] Of course, it is common knowledge that consumer prices have not risen 31.5% over the last 5 years.

The foregoing demonstrates that Tetreault is not qualified to offer the expert opinions in its report.  In addition, and as discussed below, Tetreault's opinions should also be excluded as unreliable.

**B.    Tetreault's Opinion About Alleged Appreciation Is Unreliable Because It Is Not Supported By Sufficient Facts Or Reliable Methodology**

Under Fed.R.Evid. 702, a witness may testify as an expert if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  The rule thus imposes a gate-keeping role on the trial court to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  See  Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

Daubert lists five factors that a Court may consider in determining whether expert testimony is admissible:

(1)    whether the expert's technique or theory can be or has been tested-that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;

(2)    whether the technique or theory has been subject to peer review and publications;

(3)    the known or potential rate of error of the technique or theory when applied;

(4)    the existence and maintenance of standards and controls; and

(5)    whether the technique or theory has been generally accepted in the scientific community.

509 U.S. at 592-4.

These factors are applicable in assessing the reliability of non-scientific expert testimony, like an appraiser's. Kumho, 526 U.S. at 147-9. The list of factors in Daubert is not a definitive checklist or test, and which of these factors a Court should consider depends upon the facts of a particular case. Kumho, 526 U.S. at 150. Thus, the Court's inquiry is flexible, and the trial judge has broad latitude to determine whether the expert employs the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

While a Court's Daubert analysis is often rigorous, here the Court need only review Tetreault's report to determine that Tetreault's analysis does not come close to reaching the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." For example, on page 5 of the Report, Tetreault reveals that his method of determining the future value of the Property is based on mere speculation. After observing (mistakenly, as explained above) that the "Consumer Price Index for the Boston-Brockton-Nashua area rose 31.5 or 6.3% per year" from 2001 to 2006, see Exhibit A, page 5, Tetreault writes that:

> In estimating the forecasted future value of the property in 2016 I first completed an analysis of the increase in value of the subject property over the past 5 years. I estimated the market value of the property as of January 1, 2006 at $420,000 to arrive at an appreciation of 37.7% or an annualized appreciation rate of 7.5%. This period includes the time of record low interest rates for the past 35 years and homes appreciated quickly due to affordability of mortgage payments. At the present time the interest rates are rising and the affordability of homes are lessened. Thus I have forecasted stable market conditions for 2006 and 2007. Beginning in 2008 into 2009 I forecasted moderate increases in value of 5%. In 2010 through the end of the holding period [July 1, 2016] I utilized an appreciation rate of 7% reflective of a blend of the recent appreciation and the increase in the CPI for the Boston-Brockton-Nashua area.

See Exhibit A, pp. 5-6.

Tetreault acknowledges on pages 37-38 that his analysis is based on an assumption:

> I have also considered the CPI index and the change during the first 5 years of the holding period (2001-2005). The consumer price index rose 4.64% and I have *assumed* that the real estate market will closely align itself with the CPI."

(Emphasis added.)

At the end of the report, Tetreault confirms that its forecast for the appreciation of the Property is nothing more than an estimate:

> In calculating the appreciation for the property I concluded that the market conditions during 2006 through 2007 will remain stable.  I have *estimated* that the market will then experience a slightly softer appreciation rate of 5% for 2 years and then rise at an annual rate of 7% for the remainder of the holding period.

Tetreault's opinion regarding the appreciation of the property is not based on sufficient facts or data, as required by Fed.R.Evid. 702.  Tetreault gives no basis whatsoever for the assumption that markets will be stable during 2006 and 2007, and then increase 5% during 2008 and 2009.  The data that Tetreault uses to reach his appreciation rate for the Property from 2010 to 2016 is flawed, as discussed in section I.A of this memorandum.  Indeed, Tetreault twice inaccurately calculated the percentage change in the Consumer Price Index.  Notably, Tetreault's assumption that, "the real estate market will closely align itself with the CPI," is belied by Tetreault s own analysis.  In fact, from 2001 to 2006, housing prices rose significantly faster than the Consumer Price Index.  In addition, Exhibit C shows that the Consumer Price Index is rising during 2006, even though Tetreault maintains that housing prices are flat.

Tetreault' s opinion is also unreliable, as it is based on estimates and assumptions. Tetreault's opinion on the future appreciation of the Property, including the assumptions and estimates, fall woefully short of the "level of intellectual rigor that characterizes the practice of an expert in the relevant field."

### C.    Tetreault's Opinions About Alleged Appreciation And Rental Income Are Not Relevant To Mendes' Claim

The ultimate purpose of the <u>Daubert</u> inquiry is to determine whether expert testimony would be helpful to the jury in resolving a fact in issue.  <u>Kumho</u>, 526 U.S. at 147.  Here,

Tetreault's opinion's about the market value of the Property as of 2016 and rent that Mendes would have earned from 2001 to 2016 is not relevant to any fact in issue. This is because the Mendes' damages are measured at the time of the breach, and is the difference between the fair market value of the Property as of the date Mendes would have purchased the Property and the amount that they agreed to pay for the Property, $305,000. Rokowsky v. Gordon, 531 F. Supp. 435, 439 (D.Mass. 1982) (in breach of contract action regarding sale of real estate, measure of damages is difference in value of property at time of breach); see Anzalone v. Strand, 14 Mass. App. Ct. 45, 47-50 (1982). If the Property was worth $305,000, then Mendes has no damages arising out of their inability to purchase the Property. Put another way, if the Mendes contracted to pay $305,000 for an asset worth $305,000, the Mendes have lost nothing as a result of their failure to purchase the Property. They still had the ability to purchase another property for $305,000 in lieu of the Property. In fact, Mendes did purchase another property shortly after the transaction at issue fell through.

On the other hand, calculating the Mendes' damages as of 2016 is arbitrary. For example, it is mere speculation that the Mendes, had they purchased the Property, would have held it until July 1, 2016.

Tetreault's opinions are irrelevant to this matter and should be excluded.

## II.    The Court Should Preclude Shortsleeve From Offering His Expert Opinions

### A.    The Court Should Preclude Shortsleeve From Testifying That Cendant's Pre-Qualification Letters Formed A Binding Contract Between The Parties

By his report, Shortsleeve purports to offer expert testimony on three different topics. His first opinion, entitled, "The Approval Letters," is based on the May 3 and June 12, 2001 letters from Luongo to Mendes. See Exhibit B, pp. 1-2. As an initial matter, Mendes has not made any claim based on the May 3, 2001 letter, see Complaint, passim, and, therefore,

Shortsleeves' opinion on this letter is not relevant to this action.

Mendes seeks to have Shortsleeve opine that (1) these letters formed a binding contract between the parties, and (2) that Cendant "intentionally misled" Mendes by these letters. An expert, however, may not offer an opinion on a legal issue. Levin v. Dalva Brother, 459 F.3d at 79 citing United States v. Mikutowicz, 365 F.3d 65, 73 (1st Cir. 2004). Shortsleeve's purported opinion that the correspondence from Luongo to Mendes formed a binding a contract and was misleading is nothing more than a legal opinion that this Court should preclude Shortsleeve from offering.

On a related matter, Mendes also seeks to have Shortsleeve testify that Mendes satisfied any conditions in the May 3 and June 12, 2001 letters. Expert testimony, however, is not necessary for the finder-of-fact to determine whether Mendes satisfied any conditions in these letters. The same is true of Shortsleeve's opinion that Cendant "denied the loan (wrongly) for a condition that had not been communicated." Expert testimony is not required for the finder-of-fact to determine whether Cendant failed to communicate a loan condition to Mendes and then denied the loan based on this condition.

**B.    The Court Should Preclude Shortsleeve From Testifying That Mendes Qualified For The Loan Because He Is Not Qualified To Render Such An Opinion And Because He Gives No Basis For His Testimony**

The second topic of Shortsleeve's opinion is entitled, "Mr. and Mrs. Mendes Qualified for the FHA Mortgage Loan." See Exhibit B, p. 2. This section of Shortsleeve's opinion is a critique of Cendant's underwriting of Mendes' loan application. Shortsleeve, a mortgage broker, is not qualified to perform an underwriting analysis that Mendes qualified for an FHA loan. Polaino v. Bayer Corp., 122 F.Supp.2d at 68-69; Levin v. Dalva Brother, 459 F.3d at 78. Mendes should have designated a qualified FHA mortgage underwriter to opine on whether

Cendant properly underwrote the Mendes' loan. Having failed to do so, Mendes cannot rely on Shortsleeve's opinion to that effect.

In addition, Mendes have failed to provide a proper report as required by Federal Rule of Civil Procedure 26(a)(2)(B), which requires that an expert report contain:

> . . . a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions.

In support of his underwriting critique, Shortsleeve makes a series of conclusory statements, including that, "In calculating gross income, however, Cendant did not include income from Mrs. Mendes second job." Shortsleeve offers no basis, reason, data, or other information to support this opinion.

Similarly, Shortsleeve states that, "I understand that Mr. and Mrs. Mendes had the ability to borrow funds. Had they borrowed $5,250 they could have paid off and closed 13 accounts which represented $449 in other/back debt." Shortsleeve goes on to state that by incurring this new debt to pay off old debt, Mendes would realize a "reduction" in their debt. Again, Shortsleeve offers no basis, reason, data, or other information to support his understanding or his opinion that incurring new debt to pay old debt would result in a reduction in debt.

Shortsleeve then states that:

> In addition, the borrower may have been able to consolidate and extend two loans he had with the credit union for $10,275 and $2685. I don't know if this consolidation was suggested or considered as an option to reduce the back ratio.

Shortsleeve's speculation that Mendes may have been able to restructure their debts to improve their financial situation is not an expert opinion, and, therefore, the Court should exclude it.

### C.    The Court Should Preclude Shortsleeve From Testifying That Mendes Could Have Funded The Loan From Other Sources

In section 3 of his report, entitled "Mr. and Mrs. Mendes Could Have Funded the Loan From Other Sources," Shortsleeve opines:

> Also if Mrs. Mendes had liquidated her approximately $7,000 401K she would have received $5600 after taxes.  In addition Mr. and Mrs. Mendes show $14,100 in other assets on the application.  If they did a no points, no closing they would have saved the $6,851 Cendant was charging the borrowers to close.  All they then needed was a gift of $4,000 to have a 10% down payment.  Numerous lenders would then have approved a loan to Mr. and Mrs. Mendes.  There were several lenders who then financed owner occupied three family properties and there were B lenders that also would have approved a loan to Mr. and Mrs. Mendes.

This purported opinion should be precluded for a number of reasons.  Once again, this is not a proper report as required by Federal Rule of Civil Procedure 26(a)(2)(B).  Indeed, with all due respect, it is not clear what Shortsleeve is saying by this section 3 of his report.  Shortsleeve is apparently attempting to say that Mendes could have raised enough money to put 10% down on their purchase of the Property.  However, Shortsleeve admits that he has no factual basis for this opinion.  Specifically, the statement that "All [the Mendes] needed was a gift of $4,000 to have a 10% down payment," is mere speculation that cannot form the basis of an expert opinion.  In addition, Shortsleeve is not qualified to testify as to the liquidation value of Ms. Mendes' 401K.  In any event, calculating the amount of money that Mendes could put toward a down payment on a house does not require expert testimony.  Rather, this only requires counting the assets that Mendes disclosed on their loan application and that Cendant was able to verify.

Shortsleeve does not provide any basis for his opinion that, apparently by putting down 10%, "Numerous lenders would then have approved a loan to Mr. and Mrs. Mendes."  Indeed, Shortsleeve does not identify one lender or even one loan program for which Mendes was qualified.

14

Finally, Shortsleeve's opinion about other loan programs that were available, with 10% down, will not be helpful to the jury in resolving a fact in issue. <u>Kumho</u>, 526 U.S. at 147. The only loan at issue in this action is the one that Mendes actually applied for and whether Cendant properly refused to fund this loan. <u>See</u> Complaint, passim. Therefore, Shortsleeve's opinions about what other lenders may have done had Mendes applied to them for a loan is irrelevant to this action.

**III.     The Court Should Strike Shortsleeve's Opinion From Mendes' Summary Judgment Opposition**

For the reasons in section II of this Memorandum, Cendant requests that the Court strike Shortsleeve's report from Mendes' Summary Judgment Opposition.

## Conclusion

For all of the foregoing reasons, PHH Mortgage Corporation f/k/a Cendant Mortgage requests that the Court preclude Mendes' experts from offering their opinions in support of the Mendes' claims, and that Shortsleeve's opinion be stricken from the summary judgment opposition.

PHH MORTGAGE CORPORATION,
f/k/a Cendant Mortgage,

By its attorneys,


/s/Andrew Keith Goldstein
Thomas I. Elkind, BBO Number 153080
Andrew Keith Goldstein, BBO Number 552239
Foley & Lardner LLP
111 Huntington Avenue
Boston, Massachusetts  02199
(617) 342-4000
agoldstein@foley.com
telkind@foley.colm


Dated:  December 1, 2006


## CERTIFICATE OF SERVICE

I, Andrew Keith Goldstein, hereby certify that on December 1, 2006, a true copy of the foregoing document, filed through the ECF system will be sent electronically to Plaintiffs' counsel, Christopher J. Trombetta, Law Office of Christopher J. Trombetta, 310 North Main Street, Mansfield, MA 02048.


/s/ Andrew Keith Goldstein
Andrew Keith Goldstein

# EXHIBIT A



**P. D. TETREAULT & ASSOCIATES**
Real Estate Appraisers, Consultants & Analysts
13 Dean Street • Attleboro, Mass. 02703-2274
1-508-222-1051 • Telephone
1-508-226-6357 - Fax



# INVESTMENT ANALYSIS
# SUMMARY REPORT

### *The Analysis of:*

**1 – 3 Chilson Avenue**
**Mansfield, Massachusetts**

### *Requested by:*

**Attorney Christopher J. Trombetta**
**Mansfield, Massachusetts**

### *Prepared by:*

**Susan L. Mitchell, RA**
**Real Estate Appraiser**
***And***
**Peter D. Tetreault, SRPA/MRA**
**Supervisory Appraiser**

**DATE OF REPORT:**        **July 22, 2006**



**P. D. TETREAULT & ASSOCIATES**
Real Estate Appraisers, Consultants & Analysts
13 Dean Street • Attleboro, Mass. 02703-2274
1-508-222-1051 - Telephone
1-508-226-6357 - Fax



July 22, 2006

Attorney Christopher J. Trombetta
310 North Main Street
Mansfield, Massachusetts  02048

Dear Attorney Trombetta:

    RE:  1 – 3 Chilson Avenue, Mansfield

At your request I hereby certify that I have inspected the exterior of the three-unit apartment building located at 1 – 3 Chilson Avenue for the purpose of completing an investment analysis by estimating the potential cash flow for a 15-year holding period beginning in 2001 and the forecasted potential loss of profit at the end of the 15-year holding period based on the historic appreciation within the town of Mansfield relative to the legal action of Anthony J. Mendes vs. Cendant Mortgage.

After analyzing all of the pertinent and available information including the property's location, type of property, size of units, market conditions and other physical characteristics and important data, these are my conclusions:

*Loss of Potential Cash Flow:*

> *NINETY THOUSAND AND TWO HUNDED FIFTY-NINE THOUSAND DOLLARS*
> *($90,259)*

*Loss of Potential Profit (Appreciation):*

> *FOUR HUNDRED SEVENTY SEVEN THOUSAND FIVE HUNDRED AND NINETY-ONE DOLLARS*
> *($477,591)*

Attached is a Summary Appraisal Report that we have written after completing a full appraisal on the subject property.

After reading this report if you have any questions please feel free to contact me at any time.

Respectfully submitted,

Susan L. Mitchell, RA
Real Estate Appraiser
MA Cert. Gen. Lic. #872
Exp. 11/25/08

P.D. TETREAULT & ASSOCIATES

# TABLE OF CONTENTS

FRONT PHOTO OF SUBJECT PROPERTY ........................................................................... 1

SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS ........................................... 2

SCOPE OF THE APPRAISAL ............................................................................................. 4

GENERAL COMMENTS ...................................................................................................... 5

PURPOSE OF APPRAISAL .................................................................................................. 7

THE FUNCTION AND USE OF THE APPRAISAL ............................................................. 7

PROPERTY RIGHTS APPRAISED ..................................................................................... 7

EFFECTIVE DATE OF VALUE ............................................................................................ 7

DATE OF INSPECTION ......................................................................................................... 7

PROPERTY IDENTIFICATION ........................................................................................... 8

TOWN AND MARKET AREA ANALYSIS ......................................................................... 9

LOCATION MAP ................................................................................................................... 11

ASSESSMENT AND TAX DATA ........................................................................................ 12

PROPERTY DESCRIPTION ................................................................................................. 13

PLAT MAP ............................................................................................................................ 15

FLOOR PLAN FROM JUNE 26, 2001 APPRAISAL ......................................................... 16

PHOTOGRAPH IDENTIFICATION .................................................................................... 17

HIGHEST AND BEST USE .................................................................................................. 20

MARKET VALUE ................................................................................................................. 21

APPRAISAL PROCESS ....................................................................................................... 22

THE COST APPROACH ....................................................................................................... 25

GROSS RENT MULTIPLIER APPROACH ........................................................................ 26

CASH FLOW ANALYSIS ..................................................................................................... 33

THE SALES COMPARISON APPROACH .......................................................................... 34

SPREAD SHEET AND ADJUSTMENT GRID ................................................................... 39

COMPARABLE SALES ........................................................................................................ 40

SUMMARY AND CONCLUSION ....................................................................................... 41

CERTIFICATE OF APPRAISAL ......................................................................................... 43

LIMITING CONDITIONS AND ASSUMPTIONS .............................................................. 46

QUALIFICATIONS ............................................................................................................... 51

ADDENDA ............................................................................................................................. 57

24031.706

P.D. TETREAULT & ASSOCIATES

## FRONT PHOTO OF SUBJECT PROPERTY



1- 3 Chilson Avenue
Mansfield, Massachusetts

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

**ADDRESS:** 1-3 Chilson Avenue
Mansfield, Massachusetts

**LOCATION:** Older Suburban Residential district
south of the downtown.

**TYPE OF PROPERTY** 3 Unit apartment building

**PROPERTY DESCRIPTION** The subject is a 105+/- year old 3-family
residence that according to a 2001
appraisal has 2,926 square feet of above
grade living area. The southern half of
the building has a townhouse style 7-
room, 3 bedroom, 2 bath unit. The
northern half has a 3-room, 1 bedroom, 1
bath unit on the 1st floor and a 4 room, 2
bedroom, 1 bath unit on the 2nd floor.

**EFFECTIVE DATE OF VALUE:** January 1, 2006

**INTEREST APPRAISED:** Fee Simple

**FUNCTION OF APPRAISAL:** Legal Action

**NEIGHBORHOOD:** Residential

**ZONING:** R-3

**HIGHEST AND BEST USE:** Existing Use

**LAND FRONTAGE:** 93.5 feet on Chilson Avenue
105.5 feet on Samoset Avenue

**LAND AREA:** 9,416± Square Feet

**MARKETING TIME:** 2 to 6 months

**FLOOD ZONE:** No

**EFFECTIVE AGE:** 25 to 30 years

# SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS (Cont.)

**JANUARY 1, 2006 MARKET RENTS:**       $1350, $625 & $850

**LOSS OF POTENTIAL CASH FLOW:**       $90,259

**LOSS OF POTENTIAL PROFIT:**       $477,591

# SCOPE OF THE APPRAISAL
## COMPLETE APPRAISAL
## SUMMARY APPRAISAL REPORT

This appraisal assignment has been completed pursuant to and in accordance with the Uniform Standards of Professional Practice (USPAP) and Code of Ethics as adopted April 27, 1987 by the Appraisal Foundation, The Massachusetts Board of Real Estate Appraisers and The Appraisal Institute as amended with various effective dates, the latest being updated January 1, 2002.

I/We am/are competent to complete this appraisal assignment in accordance with the Uniform Standards of Professional Practice referenced above.

This assignment has been completed considering all three approaches to value and all the necessary data and material has been verified and analyzed to the best of our ability in arriving at a final value estimate.

It should be recognized that there are assignments that do not lend themselves to the utilization of all three approaches as defined.

**Summary Appraisal Report**

Under the provisions of the Uniform Standards of Professional Practice - Standard 2-2(b), the appraiser is rendering a summary appraisal report in lieu of a self-contained appraisal report.

This is being done based on the specific instructions and with the knowledge of the client requesting this report. All reporting formats were explained to the client. This summary report was chosen by the client to be the most appropriate reporting format for this assignment.

A full appraisal has been performed on the subject property.

The basic difference between a self-contained appraisal report and a summary report is the level of detail in this presentation. It has nothing to do with the appraisal itself, only the reporting format. Under the current provisions of USPAP, the appraiser is allowed to summarize the details and analysis rather than rendering a formal lengthy narrative presentation - "self-contained appraisal report". However, all of the data and analysis not specifically contained in this report have been retained in the appraiser's work file.

This report summarizes all the data and analysis used to perform a full appraisal as required under Standard Rules 1-1 through Standard Rules 1-5.

## GENERAL COMMENTS

The subject property is a three-unit apartment building with approximately 2,926 square feet of above grade area.

The property is the subject of legal action relative to the declination of mortgage approval of Anthony J. and Doris M. Mendes relative to the potential purchase of the property in 2001.

The scope of work relative to this assignment was to analyze the Mansfield market to determine the potential rental income of the property and cash flow over a 15-year holding period beginning with the effective date of value, the date of the purchase and sales agreement in 2001 as well as to estimate a forecasted future value of the property at the end of the 15-year holding period, July 1, 2016. I completed an appraisal of the property as of January 1, 2006 in order to establish a value to apply the extracted appreciation rate from the Mansfield market through 2016.

In estimating the potential rental income of the property from 2001, I researched reported rental data for 1 bedroom, 2 bedroom and 3 bedroom units from 2001 to the present to estimate the potential income stream through 2006. That analysis indicated that over the 5-year period there were periods of stability as well as increases. The appreciation in rents was 17.7% over the 5-year period or 3.5% on an annual basis. During this time period the Consumer Price Index for the Boston-Brockton-Nashua area rose 31.5 or 6.3% per year. For the future income stream I estimated a 5% annual increase in rents.

In estimating the forecasted future value of the property in 2016 I first completed an analysis of the increase in value of the subject property over the past 5 years. I estimated the market value of the property as of January 1, 2006 at $420,000 to arrive at an appreciation of 37.7% or an annualized appreciation rate of 7.5%. This period includes the time of record low interest rates for the past 35 years and homes appreciated quickly due to the affordability of mortgage payments. At the present time the interest rates are rising and the affordability of homes has lessened. Thus I have forecasted stable market conditions for 2006 and 2007. Beginning in 2008 into 2009 I forecasted moderate increases in value of 5%. In 2010 through the end of the

5

## GENERAL COMMENTS (Cont.)

holding period I utilized an appreciation rate of 7% reflective of a blend of the recent appreciation and the increase in the CPI for the Boston-Brockton-Nashua area.

For this analysis I was supplied a copy of the home inspection as well as the appraisal report completed on the Mendes' behalf as of 2001 since an interior inspection of the property was not possible since Mr. & Mrs. Mendes do not own the property.

The property has a townhouse style apartment with 7 rooms and two "flats" on the northern side of the building with a 3-room unit on the first floor and a 4-room unit on the second floor.

I have assumed that our client would have completed similar electrical upgrades as those completed on the property since purchase by Douglas J. Rogowski. In December 2001 the electrical services were upgraded to include an owner's meter and all hall, basement and exterior wiring was changed to that service. In January 2002 another permit for wiring updating for the addition of 8 additional plugs was taken. According to municipal records all work was completed and inspected.

I also assumed that all typical cosmetic repairs would have been completed on the property if Mr. & Mrs. Mendes completed the purchase of the property.

## PURPOSE OF APPRAISAL

The purpose of this appraisal is to estimate the current market value of the subject property, the rental income for the property over a 15-year holding period beginning in 2001 and to estimate a value of the property at the end of the holding period in 2016.

## THE FUNCTION AND USE OF THE APPRAISAL

The function and use of this appraisal is to assist the client and his legal counsel in estimating the market value, the forecasted income stream and potential value of the property in 2016 relative to their legal action.

> This appraisal report is prepared for the sole and exclusive use of the appraiser's client.  No third parties are authorized to rely upon this report without the express written consent of the appraiser.

## PROPERTY RIGHTS APPRAISED

This appraisal is made with the understanding that the present ownership of the subject property includes all of the rights that maybe lawfully owned and is therefore entitled in "Fee Simple"

## EFFECTIVE DATE OF VALUE

The original effective date of value of this analysis was the date of the Purchase & Sales agreement of the property in 2001.  To better analyze the property, I annualized the effective date of the current value to January 1, 2006.

## DATE OF INSPECTION

The appraiser completed an exterior only inspection on July 21, 2006 at the request of the client. The overall condition of the property is assumed to be in similar repair to what it was as of the date of the appraisal for the purchase of the property, June 26, 2001.

7

## PROPERTY IDENTIFICATION

The property being appraised in this appraisal assignment is known as:

## The Rogowski Property

**OWNERSHIP:**     Douglas J. Rogowski

**ADDRESS:**     1 – 3 Chilson Avenue
Mansfield, Massachusetts

## LEGAL/MUNICIPAL REFERENCES:

|  |  |
|---|---|
| PLAT: | 24 |
| LOT: | 187 |
| BOOK: | 9915 |
| PAGE: | 173 |

## SALES HISTORY AND AGREEMENT TO SELL THE SUBJECT PROPERTY

The subject property was transferred into the current title of ownership on November 1, 2001 from "One Chilson Avenue Realty Trust". The noted consideration of this transfer was $309,900. This transfer took place after Mr. and Mrs. Mendes were denied the mortgage relative to the potential purchase of the property.

## TOWN AND MARKET AREA ANALYSIS

### Town Data

The town of Mansfield is located in northern Bristol County on the Norfolk County line in southeastern Massachusetts.

The town is bordered by North Attleboro on the west, Attleboro on the southwest, Norton on the south, Easton on the east, Sharon on the northeast, and Foxboro on the north.

Due to the highway structure intersecting Mansfield, it is easily accessible from all points throughout the state and is only approximately 26 miles from Boston and 19 miles northeast of Providence, Rhode Island.

The town has a board of selectmen and town manager type government with an open town meeting. The population, as of the 2000 census, is slightly over 22,414 with a town land area of 20.46 square miles. According to the officials at the Town of Mansfield the 2000 population has been increasing moderately over the last several years and as of 2004 the population was 22,998. The unemployment rate for 2004 was 4.5 percent, lower than the Massachusetts rate of 5.3 percent, and conditions within the town are favorable to the real estate market.

Mansfield is noted for its good school system, fair assessment of property values, excellent selection of residential properties in all price levels and segments of the market place and a large industrial park to stabilize taxes for all segments of the market. For fiscal year 2006 Mansfield has a single tax rate that is $11.30 per thousand.

There are no conditions within the community that should adversely affect property values or marketability that are known to the appraiser at this time.

The town is currently heading in the right direction. Market conditions are excellent. Interest rates are low and all segments of the real estate market are active. However, the increases in property values are substantially higher in the residential and condominium markets than they are in the industrial and commercial markets.

## TOWN AND MARKET AREA ANALYSIS (Cont.)

### Neighborhood and Area Analysis

The subject property is located in an older residential district of the town east of the downtown district. The immediate market area bounds include North Main Street to the west, East Street to the south, Hope Street to the east and Route 106 to the north.

The immediate area has a mixture of single-family homes of various ages, two to four family homes, condominiums as well as a limited number of multi-family apartment buildings. There are commercial influences along North Main Street and Route 106. The Mansfield Public School Complex is located just east of the immediate market area bounds.

This district offers good access to the downtown district along with its associated amenities. The downtown district is within walking distance. The MBTA rail stop is located at the northern side of the downtown district and is within .9 mile. The immediate area offers generally average access to all major routes as well as town services.

The properties in the area are a mixture of various styles and types but most in the area appear to be in good to average overall repair.

All municipal utilities service the area and I did not note any conditions within the market area bounds that would adversely impact the appeal or marketability of the subject property.

P.D. TETREAULT & ASSOCIATES

## LOCATION MAP



The Subject Property
1-3 Chilson Avenue
Mansfield, MA

## ASSESSMENT AND TAX DATA

The subject property has been assessed as follows:

| | |
|---|---|
| Land: | $ 179,100 |
| Building and Site Improvements: | $ 225,800 |
| Total Assessment: | $ 404,900 |
| The current fiscal year taxes are: | $ 4,575.37 |
| The current fiscal year tax rate is: | $ 11.30/$1,000 |

## ZONING REQUIREMENTS AND RESTRICTIONS

The subject property is located within an R-3 zoning district within the town of Mansfield. This zoning district has the minimum requirements as follows:

| | |
|---|---|
| Minimum Lot Size – Detached SF | 10,000 SF |
| Minimum Lot Size – Two-Family | 7,500 per unit |
| Minimum Lot Frontage: | 80 feet |
| Minimum Front Yard set back: | 30 feet |
| Minimum Side Yard requirement: | 15 feet |
| Minimum Rear Yard requirement: | 30 |
| Maximum Height: | 35 feet |
| Minimum Open Space: | 50% |

The subject lot has 93.5 feet of frontage on Chilson Avenue and 105.5 feet along Samoset Avenue. There is approximately 9,416 square feet of land. The property was subdivided before the current zoning requirements. If vacant today, a variance for its undersized nature would have to be granted for it to be considered a buildable lot. The use is a 3-unit apartment building. The use is assumed to be a grandfathered legal nonconforming use.

12

## PROPERTY DESCRIPTION

### SITE DESCRIPTION

The subject property is made up of a single town numbered lot that is known as Lot 187 on Assessors' Map 24 within the town of Mansfield. The lot is located on the northeastern corner of Chilson Avenue and Samoset Avenue.

The lot is rectangular in shape with the lot dimensions, as shown on the town's assessing map, of 93.5 feet of frontage along the eastern side of Chilson Avenue, 105.5 feet of frontage along the northern side of Samoset Avenue, 103 feet along the northern property line and 93 feet along the rear at the eastern side of the property. The lot is generally level in topography.

It appears that there is adequate on site parking for six cars at this time. There is an open rear yard area. All municipal utilities service the property.

### IMPROVEMENTS DESCRIPTION

The subject property is improved with an older two-story three-unit apartment building. The building has 2,926 square feet of above grade living area according to the client's appraisal records from 2001. There is a full and unfinished basement that houses the utilities. According to the town records the property was constructed in approximately 1900.

According to the appraisal dated June 26, 2001 the southern side of the building contains a townhouse style 7 room, 3 bedroom and 1 bath unit. The northern side of the building contains a 3 room, 1 bedroom and 1 bath unit on the first level and a 4 room, 2 bedroom, 1 bath unit on the second level. According to the appraisal the property was in generally average repair at the time of the appraisal. The units were considered to be semi-modern in nature.

The appraisal stated that the wiring was substandard for the current market and based on town electrical permits the wiring was updated in late 2001 and early 2002. Smoke detectors were updated in 2001 at the time of the sale.

There appears to be two heating systems for the building. The heating systems have been updated according to that appraisal.

13

## PROPERTY DESCRIPTION (Cont.)

The exterior appears to be wood clapboard siding. There is an asphalt shingle roof that as of the current date appears to be in older repair. Based on the home inspection report and appraisal records, the roof was in adequate repair as of the date of the original appraisal, June 2001. I have assumed that if my client owned the property, the roof would be in adequate repair with all repairs completed. There are aluminum gutters and downspouts on the appropriate elevation.

Overall the cosmetic repair of the property is assumed to be average, typical, of the market area.

Four of the units are very small and suffer from limited market appeal due to the size of these units. Due to the overall size of the units, the subject property would not typically appeal to an owner occupant in the market today.

The subject property is estimated to have the market as follows:

| | |
|---|---|
| Townhouse, southern side of building | $1,350/month |
| First Floor north, 3 room, 1 bedroom unit | $625/month |
| Second Floor north, 4 room, 2 bedroom | $850/month |

Please refer to page 29 for more detail.

14

P.D. TETREAULT & ASSOCIATES

## PLAT MAP



15

PETER D. TETREAULT & ASSOCIATES

## FLOOR PLAN FROM JUNE 26, 2001 APPRAISAL



PETER D. TETREAULT & ASSOCIATES

## PHOTOGRAPH IDENTIFICATION



Front and north side view of the subject property.



Front and south side view of the property with parking area in foreground.

17

PETER D. TETREAULT & ASSOCIATES



Rear and southern side view of the subject property.



View of the rear yard area.

PETER D. TETREAULT & ASSOCIATES



#5

View of Chilson Avenue looking south toward Samoset Avenue.



#6

View of Chilson Avenue looking north.

## HIGHEST AND BEST USE

**HIGHEST AND BEST USE** is defined as follows:

The reasonably probably and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the Highest and Best Use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability. [1]

## HIGHEST AND BEST USE OF THE SUBJECT

In analyzing the highest and best use of the subject property, the appraiser has approached the analysis in two steps first, the site as if vacant and second, the entire property as improved. In so doing, the following four tests were applied to each phase of the analysis:

1. Legally permissible
2. Physically possible
3. Financially feasible
4. Maximally productive

to arrive at the following conclusions:

**Site as if Vacant**

If the subject site were vacant today, a variance for its undersized nature would be needed to build upon it.

If a variance was granted, the highest and best use would be a single family house lot.

**Property As Improved**

The property is improved with a 3-unit multi-family residence and this appears to remain the highest and best use.

**Conclusion**

The highest and best use of the property is to continue the existing use, a 3-unit apartment residence.

---

[1]Appraisal Institute, The Dictionary of Real Estate Appraisal, Third Edition, Appraisal Institute, 1993, p171.

## MARKET VALUE

Market Value is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined. A current economic definition agreed upon by agencies that regulate federal financial institutions in the United States of America is:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.   Buyer and seller are typically motivated.

2.   Both parties are well informed or well advised, and acting in what they consider their best interests.

3.   A reasonable time is allowed for exposure in the open market.

4.   Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.   The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Substitution of other currency for United States dollars in the fourth condition is appropriate in other countries or in reports addressed to clients from other countries.

Persons performing appraisal services that may be subject to litigation are cautioned to seek the exact legal definition of market value in the jurisdiction in which the services are being performed.

---

[1] "Appraisal Standards Board USPAP" Publication, as amended March 31, 1999, pg 139.

## APPRAISAL PROCESS

There are three traditional approaches available to the appraiser in estimating Market Value. They are:

1. The Sales Comparison Approach
2. The Income Approach
3. The Cost Approach

All approaches are based on data extracted from the market, each from a different prospectus.

In the Income Approach, there are three methods available to the appraiser. For residential properties, there is the Gross Rent Multiplier; for multi-family and nonresidential commercial and industrial properties, the traditional Income Approach using Direct Capitalization and/or Discounted Cash Flow Analysis.

In estimating market value for undeveloped raw land with the potential of a residential, commercial or industrial subdivision, the appraiser utilizes a combination of all three approaches in what is termed the Developmental Approach or the Anticipated Use Method.

## THE APPROACHES ARE EXPLAINED AND DEFINED AS FOLLOWS:

### The Sales Comparison Approach

The approach in appraisal analysis, which is based on the proposition that an informed purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility. This approach is applicable when an active market provides sufficient quantities of reliable data that can be verified from authoritative sources. The Sales Comparison Approach is relatively unreliable in an inactive market or in estimating the value of properties for which no real comparable sales data are available. It is also questionable when sales data cannot be verified with principals to the transaction. Also referred to as the Market Comparison or Market Data Approach.

*Defined As: A set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sale prices of the comparables based on elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered s though vacant; it is the most common and preferred method of land valuation when comparable sales data are available.* [1]

## APPRAISAL PROCESS (Cont.)

### The Gross Rent Multiplier Analysis

That approach in appraisal analysis which is based upon the proposition that an informed purchaser would pay no more for a property than the cost of obtaining a return (in income or amenities) of the same amount and embodying the same risk as that involved in the subject property. This approach is applicable when sufficient numbers of comparable properties are rented at the time of sale. The Gross Income (rent) Multiplier Approach is not applicable when few or no comparable properties are rented in the competitive market. This approach also is questionable in market situations in which market rentals and sales prices do not bear a constant relationship to each other.

> *Defined As: The relationship or ratio between the sale price or value of a property and its gross rental income.* [2]

### The Income Approach

(Income producing property other than single family residential as mentioned above)

That procedure is appraisal analysis that converts anticipated benefits (dollar income or amenities) to be derived from the ownership of property into a value estimate. The Income Approach is widely applied in appraising income- producing properties. Anticipated future income and/or reversions are discounted to a present worth figure through the capitalization process.

### Discounted Cash Flow Analysis

A means of isolating differences in the timing of cash flows by discounting these cash flows to their present values. The two discounted cash flow methods are the internal rate of return method and the net present value method.

> *Defined As: The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analyst specifies the quantity, variability, timing, and duration of the income streams as well as the quantity and time of the reversion and discounts each to its present value at a specified yield rate. DCF analysis can be applied with any yield capitalization technique and may be performed on either a lease-by-lease or aggregate basis.* [3]

23

## APPRAISAL PROCESS (Cont.)

### The Cost Approach

The approach in appraisal analysis that is based on the proposition that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility as the subject property. It is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land or when relatively unique or specialized improvements are located on the site and for which there exist no comparable properties on the market.

Normally, the three approaches will each indicate a different value. After all the factors in each of the approaches have been carefully weighed, the indications of value derived from each of the approaches are correlated to arrive at a final value estimate.

### The Developmental Approach

A method of estimating the value of vacant land. The usual application is to raw, unsubdivided land by deducting from the estimated gross selling price, the direct expense of development such as cost of streets, utilities, sales, advertising, and overhead (taxes, carrying charges, inspection). Profit and "time lag" (interest on the money invested for the time needed to complete the project) are also deducted, after which the land value is indicated. Also known as development method.

> *Defined As: Development Procedure. A technique for valuing undeveloped acreage which involves discounting the cost of development and the probable proceeds from the sale of developed sites.*[4]

WHEN THE APPRAISER EXCLUDES ONE OF THE APPROACHES, THEY WILL EXPLAIN THE REASON WHY THE APPROACH WAS NOT APPLICABLE IN THE APPROPRIATE REPORT SECTION.

---

[1] Appraisal Institute, The Dictionary of Real Estate Appraisal, Third Edition, Appraisal Institute, 1993, p318.
[2] Ibid., p.165
[3] Ibid., p.102
[4] Ibid., p.99

## THE COST APPROACH

This approach is based upon cost of production. It is especially applicable for the new or proposed construction that represents the highest and best use of the site. It is also frequently, applicable in estimating the market value of unique and special purpose properties, especially when there is little or no sales information in an inactive market. The steps in the Cost Approach are:

1. Estimate the value of the site as if vacant and available to put to its highest and best use. Valuing the site was done through the Direct Sales Comparison Approach.

2. Estimate the reproduction costs new of all major building and improvements on the site.

3. Estimate accrued depreciation or diminished utility experienced by the improvements from all sources.

4. Subtract or deduct the accrued the depreciation or diminished utility from the reproduction costs new in order to obtain a depreciated value of the improvements or their present worth.

5. Estimate depreciated reproduction costs new of any accessory buildings and/or site improvements. Contributory value of any other item will also be added in at this point.

6. Add the estimated, depreciated reproduction cost new of all major buildings to the depreciated reproduction cost new of the accessory buildings and site improvements in order to estimate the present worth or contribution of all improvements to the site.

7. Add estimated reproduction cost new of all improvements to the estimated site value to reach an indication of market value for the subject property via the Cost Approach.

### Cost Approach Exclusion

While the cost approach to value was initially considered in this analysis, it was not considered to be reflective of the actual market. Given the age and varied updates within the property it would be difficult to accurately estimate all forms of depreciation, thus the appraiser did not complete this approach in valuing the subject property. A typical purchaser does not utilize this approach in purchasing such homes within the market area.

25

## GROSS RENT MULTIPLIER APPROACH

The Direct Sales Comparison Analysis measures value in exchange, operating primarily through the principal of substitution or opportunity cost. An alternative approach to the valuation of real property is to measure value from use to a typically informed, prudent purchaser-investor, basically through the principal of substitution and marginal productivity or anticipation of future benefits. In general, this is the Income Approach, more specifically, in residential real estate that includes single-family and small multi-family dwellings; it is called the Gross Rent Multiplier Approach. Because residential properties can be and sometimes are rented, they are capable of producing income. Rental income can be the basis for estimating the value of residential property just as it is used in value estimation for income-producing investments in real estate.

Gross Rent Multiplier Approach Defined

"That approach in the appraisal analysis which is based on the proposition that an informed purchaser-investor would pay no more for a property than the cost of obtaining a return in income or amenities of the same amount and embodying the same risk as that involved in the subject property. This approach is applicable when sufficient numbers of comparable properties are rented at the time of sale. The Gross Rent Multiplier Approach is not applicable when few or no comparable properties are rented in the competitive market.

This approach is also questionable in market situations in which the market rentals and the sales prices do not bear a constant relationship to each other." [1]

Dividing the sales price of a recently sold rental property by its gross monthly rent derives gross Rent Multipliers.

---

(1) Bryl N. Boyce, Real Estate Appraisal Terminology, Revised Edition, Ballinger Publishing Company, Cambridge, Massachusetts, 1984, p. 122.

26

## GROSS RENT MULTIPLIER APPROACH (Cont.)

This approach differs from the Gross Income Multiplier that is part of the Income Approach to value in estimating non-residential properties. This approach is only reliable with sufficient quantities of sales and rentals and if they are not one in the same, they must be similar enough so the appraiser can utilize the paired sales technique comparing a rental with one similar that has sold recently. This approach is actually an extension of the Direct Sales Comparison Approach and is not typically utilized by a purchaser of single-family residential properties purchasing a dwelling for owner-occupancy. An investor of single-family dwellings in their purchasing decisions could utilize this approach.

Typically, this approach is more applicable in multi-family residential properties ranging from two to five units where one of the units may be owner-occupied.

### General Comments, Discussion, and Analysis

In this approach we have estimated market rents for the subject units based on actual rentals within the Mansfield market as of January 1, 2006 to determine the market rents for 2005 and 2006. At this time the market rents have been stable over the past 12 months based on my analysis of the rental comparables. The market rents for the subject units have been based on the following rental comparables.

Rental Comparable #1: 77 Pleasant Street, Mansfield

This property was rented in 2006. The first floor unit is a 5-room, 3 bedroom unit that was rented for $1,450 per month with hot water included. The unit has a modern kitchen and bath. The unit is in good cosmetic repair. The unit has approximately 1,461 square feet of living area.

In comparison with the subject's larger unit this was adjusted $100/mo for the superior updating, $25/mo for the difference in baths and $25/mo for the hot water included in the rent. Once adjusted, the indicated market rent for the subject's largest unit is $1,350 per month.

Rental Comparable #2: 106 – 108 Union Street, Mansfield

This property was rented in 2005. Each of the three units in the main building is a 4 room, 2 bedroom, 1 bath unit. Each unit has 876 square feet. The first floor unit superior repair to the subject's 2 bedroom unit. The second floor unit is similar to the subject's 2 bedroom unit. The

## GROSS RENT MULTIPLIER APPROACH (Cont.)

first floor unit was rented for $995 per month, the second floor unit was rented for $850 per month and the third floor unit was rented for $790 per month.

The second floor unit was compared to the subject's second floor unit in this analysis. This unit was adjusted $75/month for the superior repair as well as $75/month for heat and hot water included in the rent. Once the property was adjusted, the indicated market rent for the subject's 4 room apartment was $850 per month.

Rental Comparable #3:  73 Park Street, Mansfield

This property was rented in September 2005. This is a third floor unit with 4 rooms, 2 bedrooms and 1 bath units. The unit has approximately 926 square feet according to town records. The unit is currently rented for $750 per month with no utilities. The unit has similar updating.

This rental was adjusted $75/mo for heat and hot water. The first floor unit was rented for $850 per month. Once the property was adjusted, the indicated market rent for the subject's 2nd floor 2 bedroom apartment is $825 per month.

Rental Comparable #4:  35 Eddy Street, Mansfield

This property was rented in August 2005. This is a 5 room, 2-bedroom apartment with approximately 1,000 square feet according to the broker's records. This unit did not include any utilities and rented for $850 per month.

This unit was compared to the subject's 2-bedroom unit in this analysis. This rental was adjusted $25/mo for the larger size of the unit, $50/mo for the superior updating and $75 per month for the lack of heat and hot water included. Once the property was adjusted, the indicated market rent for the subject's 2-bedroom apartment is $850 per month.

Rental Comparable #5:  24 Summit Avenue, Mansfield

This property was rented as of December 2004 for $1195 per month. This is a 7 room, 3-bedroom apartment with approximately 1,500 square feet according to the town records. This unit did not include any utilities.

This unit was compared to the subject's 3-bedroom unit in this analysis. This rental was adjusted $25/mo for the lack of a second bath and $50/mo for the difference in location. Once the property was adjusted, the indicated market rent for the subject's 3-bedroom apartment is $1,270 per month.

## GROSS RENT MULTIPLIER APPROACH (Cont.)

Rental Comparable #6:  110 Union Street, Mansfield

This property was rented as of January 2006 as follows: first floor front unit, 2 room studio @ $575 per month, first floor rear unit, 2 room studio @ $575/month; second floor unit, 4 room, 1 bedroom @ $925/month; third floor front unit, 3 room, 1 bedroom @ $585/month and third floor rear unit, 2 room studio @ $575/month. The 3-room unit was used in this analysis as a rental comparable. This rental was adjusted $50/mo for the difference in size and location within the building.  Once the property was adjusted, the indicated market rent for the subject's 1-bedroom apartment is $625 per month.

### *Rental Comparable Analysis*

These rentals indicate the market rents of $1,350 per month for the townhouse style unit, $850 per month for the 2 bedroom unit and $625 per month for the 3 room apartment.  Thus the current estimated market rent for the subject building is $2,825 per month or $33,900 annually.

In estimating a market value via the Gross Rent Multiplier Approach the sales considered in the Sales Comparison Approach were used to extract a Gross Rent Multiplier for the market.  The sales indicated a range in Gross Rent Multipliers from a low of 144.23 to a high of 164.56 utilizing the estimated rents in sale 2.  Sales 3 & 4 were weighed heaviest and a market Gross Rent Multiplier of 146 was extracted from these sales.

Thus 146 x $2,825 = $412,450, Rounded to $412,500.

The indicated value as of January 1, 2006 via the Gross Rent Multiplier Analysis is $412,500.

### *FORECASTED CASH FLOW ANALYSIS OF THE 15-YEAR HOLDING PERIOD FROM 2001 TO 2016*

In this analysis I began with the rents stated in the June 2001 appraisal of $900, $650 and $525. I believe that these stated rents were below market for the two smaller units.  I forecasted the rents in 2001 to have been $1000, $800 and $600 based on actual rental comparables from the town.  In 2001 the Gross Income of the property would have been $28,800.

29

# EXHIBIT A
# (continued)

PETER D. TETREAULT & ASSOCIATES

## GROSS RENT MULTIPLIER APPROACH (Cont.)

In 2002 the Mansfield rental market was increasing for the smaller units and I estimated the rents to be $1,100, $850 and $625 to produce an annual Gross Income of $30,900.

Since 2002 the rental market has been stable for smaller units because there are a lesser number of tenants within the marketplace. Many former renters are now property owners of small garden style condominium units due to the low interest rates and good supply of units. Thus the two smaller units have remained at $625 for the 1-bedroom unit and $850 for the 2-bedroom unit. It appears that the market rent for the 3-bedroom unit continued to increase based on rental comparables.

In 2003 my analysis indicated that the 3-bedroom unit would have rented for $1250 while the other two units remained stable. In 2003 the Gross Income of the property would have been $32,700 based on these market extracted rents.

In 2004 the townhouse (3-bedroom) unit would have rented for $1300 while the other two units remained stable in rent. In 2004 the Gross Income of the property would have been $33,300 based on these market extracted rents.

In 2005 the townhouse style unit had a market rent of $1350 per month and the two smaller units remained at $625 and $850 based on rental comparables from the town that were highlighted in the prior analysis. Based on these rental comparables the forecasted Gross Income for 2005 would be $33,900.

For the rents throughout 2006, it appears that the rental market is generally stable for all units and the current market rents will remain at the present levels through the end of 2006 with a Gross Income of $33,900.

In estimating the potential rental income of the property in the future, I utilized the market research completed for the above 5 year period and my analysis indicated that over the 5-year period there were periods of stability as well as increases in rent. The overall appreciation in

## GROSS RENT MULTIPLIER APPROACH (Cont.)

market rents was 17.7% over this 5-year period or 3.5% on an annual basis. I also analyzed the change in the Consumer Price Index over this period and this rose 31.5 points or 6.3%. For the future income stream I estimated a 5% annual increase in rents to account for the more recent higher fuel and energy costs with the understanding that this is an average increase and that in actuality there could be periods of either stable or declining rents.

For the remainder of the holding period I have forecasted increases in rent of 5% every year that were rounded to the nearest appropriate amount. Thus the estimated potential income for the property over the 15-year holding period is as follows:

```
2001: $1,000; $800; $600 or $2,400 per month -  $28,800 annual income
2002: $1,100; $850; $625 or $2,575 per month -  $30,900 annual income.
2003: $1,250; $850; $625 or $2,725 per month -  $32,700 annual income.
2004: $1,300; $850; $625 or $2,775 per month -  $33,300 annual income.
2005: $1,350; $850; $625 or $2,825 per month -  $33,900 annual income.
2006: $1,350; $850; $625 or $2,825 per month -  $33,900 annual income.
2007: $1,415; $890; $655 or $2,960 per month -  $35,520 annual income.
2008: $1,485; $935; $685 or $3,105 per month -  $37,260 annual income.
2009: $1,560; $980; $720 or $3,260 per month -  $39,120 annual income.
2010: $1,635; $1,030; $750 or $3,415 per month - $40,980 annual income.
2011: $1,715; $1,080; $785 or $3,580 per month - $42,960 annual income.
2012: $1,800; $1,135; $825 or $3,760 per month - $45,120 annual income.
2013: $1,890; $1,190; $865 or $3,945 per month - $47,340 annual income.
2014: $1,985; $1,250; $905 or $4,140 per month - $49,680 annual income.
2015: $2,085; $1,310; $950 or $4,345 per month - $52,140 annual income.
2016: $2,190; $1,375; $995 or $4,560 per month - $54,720 annual income.
```

To arrive at an annual cash flow for the subject property in each of the 15 years all expenses including the annual debt service were subtracted. I have included the Cash Flow Analysis chart for the subject property at the end of this section on page 33.

In this analysis I have assumed that my client would have kept his FHA loan through the holding period and his mortgage payments would have remained constant. In the addenda I have included a loan amortization chart for the subject property based on the stated input factors of a

31

## GROSS RENT MULTIPLIER APPROACH (Cont.)

7.25% interest rate, 30 year fixed rate term and a mortgage amount of $295,850 based on a 3% down payment.

The operating expenses of the property were estimated at 25% of Gross Income, typical of the marketplace. Thus as rents increased, our estimate of expenses increased as well to account for higher taxes, insurance premiums and cost of utilities.

As can be seen on the chart in years 1 & 2 of the holding period (2001 & 2002) the property had a negative cash flow. This is typical of owner occupied properties because owners are willing to pay more than market rent for a chance to build equity as a home owner.

Under the market conditions present during the 2003 to 2006 period rents increased further for the townhouse style unit and the property began to have a positive cash flow. Thus the typical owner would only have to pay a market rent for the unit and still receive a positive cash flow in years 3 through 15 of the holding period. Mr. & Mrs. Mendes' cash flow on their invested income (down payment) is $90,259 after their total operating expenses for the property and annual debt service for each year.

## CASH FLOW ANALYSIS
## 1 - 3 CHILSON AVENUE, MANSFIELD

| YEAR | GROSS INCOME | TYPICAL EXPENSES 25% OF GI | ANNUAL DEBT SERVICE | TOTAL EXPENSES | ANNUAL CASH FLOW | MONTHLY CASH FLOW |
|---|---|---|---|---|---|---|
| 2001 | $28,800 | $7,200 | $24,281 | $31,481 | ($2,881) | ($223) |
| 2002 | $30,900 | $7,725 | $24,281 | $32,006 | ($1,106) | ($92) |
| 2003 | $32,700 | $8,175 | $24,281 | $32,456 | $244 | $20 |
| 2004 | $33,300 | $8,325 | $24,281 | $32,606 | $694 | $58 |
| 2005 | $33,900 | $8,475 | $24,281 | $32,756 | $1,144 | $95 |
| 2006 | $33,900 | $8,475 | $24,281 | $32,756 | $1,144 | $95 |
| 2007 | $35,520 | $8,880 | $24,281 | $33,161 | $2,359 | $197 |
| 2008 | $37,260 | $9,315 | $24,281 | $33,596 | $3,664 | $305 |
| 2009 | $39,120 | $9,780 | $24,281 | $34,061 | $5,059 | $422 |
| 2010 | $40,980 | $10,245 | $24,281 | $34,526 | $6,454 | $538 |
| 2011 | $42,960 | $10,740 | $24,281 | $35,021 | $7,939 | $662 |
| 2012 | $45,120 | $11,280 | $24,281 | $35,561 | $9,559 | $797 |
| 2013 | $47,340 | $11,835 | $24,281 | $36,116 | $11,224 | $935 |
| 2014 | $49,680 | $12,420 | $24,281 | $36,701 | $12,979 | $1,082 |
| 2015 | $52,140 | $13,035 | $24,281 | $37,316 | $14,824 | $1,235 |
| 2016 | $54,720 | $13,680 | $24,281 | $37,961 | $16,759 | $1,397 |
| | | | | | $90,259 | |

**CASH FLOW ON INVESTED INCOME OVER THE HOLDING PERIOD:**

| PURCHASE PRICE | $305,000.00 | | $90,259 |
|---|---|---|---|
| SALES PRICE AT REVERSION | $744,000.00 | | |
| LESS MORTGAGE BALANCE | ($212,619.33) | | |
| LESS RETURN OF DOWNPAYMENT | ($9,150.00) | | |
| LESS REAL ESTATE COMMISSION (6%) | ($44,640.00) | | |
| OVERALL RETURN TO HOMEOWNER (NOT INCLUDING CASH FLOWS) | $477,561 | | |

P.D. Tetreault & Associates.

33

2/03/b CASH FLOW.123

## THE SALES COMPARISON APPROACH

The Sales Comparison Approach is a method of estimating market value whereby a subject property is compared with comparable properties that have sold recently. Preferably, all properties are in the same area. One premise of the Sales Comparison Approach is that the market will determine a price for the property being appraised in the same manner that it determines the price of comparable, competitive properties. Essentially, the Sales Comparison Approach is a systematic procedure for carrying out competitive shopping similar to what is done by the typical purchaser. When applied to real estate, the comparisons, on a point-by-point basis, are applied to the different characteristics of the economic good (the subject property) that cause real estate prices to vary from property to property and location to location.

In applying the Sales Comparison Approach, the appraiser employs appraisal principles. The appraiser is guided by the principles to insure that all relevant issues have been considered in solving the appraisal problem.

The principles that are commonly considered by the appraiser when comparing properties on a point by point basis are supply and demand, balance, principle of substitution, externalities, anticipation, change, conformity, contribution, surplus productivity and highest and best use.

The Sales Comparison Approach is applicable to all property types for which there are a sufficient number of recent comparable, reliable transactions to create value patterns in the market. For property types that are bought and sold regularly, the Sales Comparison Approach often provides a more reliable indication of market value. This approach is considered reliable in such situations because it is direct and systematic.

The steps in the Sales Comparison Approach are as follows:

1. Research the market to obtain information about transactions, listings, and other offering of properties similar to the subject property.
2. Verify information by considering whether the
   a) Data obtained are factual and accurate
   b) Transactions reflect arms length make considerations.

## SALES COMPARISON APPROACH (Cont.)

3. Determine relevant units of comparison (e.g., price per square foot, price per acre, price per unit) and develop a comparative analysis for each unit.

4. Compare the subject and comparable sales according to the elements of comparison and adjust the sales price of each comparable as appropriate or eliminate the property if it is not a truly comparable property.

5. Reconcile the multiple value indications that result from the comparables into a single indication of market value.

### General Comments, Discussion, and Analysis

In estimating a future value for the subject property, I first had to estimate a market value for the subject property as of my annualized date of value, January 1, 2006 in order to establish basis for the appreciation of the subject property.

In estimating the market value as of January 1, 2006 I have considered four sales of three family properties that have sold since May 2005 within the town of Mansfield. Each of the sales was adjusted as required for the location differences as well as the physical differences. Once all sales were adjusted, a close correlation in the value range was arrived at. Your attention is invited to the sales adjustment page that follows this narrative section. Each of the sales will be discussed individually in the following paragraphs.

### Sale #1: 80 Court Street, Mansfield

This sale closed on May 1, 2005 and sold for $400,000. This is a sale of a 105 year old three family dwelling located in the same section of town. The dwelling has 2,719 square feet of living area. The dwelling has two, 4 room apartments and a 3-room apartment. All of the units are of a good size and the units are in generally average repair. The site has 13,970 square feet of land area.

This sale was adjusted $30/SF for the difference in above grade living area and $10,000 for the difference in bedrooms and baths. Once the sale was adjusted, the indicated value was $416,200, rounded to $416,000.

PETER D. TETREAULT & ASSOCIATES

## SALES COMPARISON APPROACH (Cont.)

### Sale #2: 36 Cottage Street, Mansfield

This sale closed on August 30, 2005 and sold for $469,000. This is a sale of a 105 year old three family dwelling located in the same section of town. The dwelling has 3,040 square feet of living area. The dwelling has two, 6 room apartments and a 4-room apartment. All of the units are of a good size and the units are in generally good repair. The site has 10,334 square feet of land area.

This sale was adjusted $30/SF for the difference in above grade living area, $30,000 for superior repair, $15,000 for a 2-car garage and $15,000 for the difference in bedrooms and baths. Once the sale was adjusted, the indicated value was $415,600, rounded to $416,000.

### Sale #3: 56 Draper Avenue, Mansfield

This sale closed on September 29, 2005 and sold for $375,000. This is a sale of a 105 year old three family dwelling located off Route 106 further from the downtown district and schools. The dwelling has 2,276 square feet of living area. The dwelling has a 5-room apartment, 1 3 room apartment and a 4-room apartment. All of the units are of a typical size and the units are in generally average repair. The site has 13,500 square feet of land area.

This sale was adjusted $30/SF for the difference in above grade living area, $15,000 for the difference in location, $10,000 for the difference in bedrooms and baths and $2,500 for an enclosed porch. Once the sale was adjusted, the indicated value was $417,000.

### Sale #4: 525-27 Pleasant Street, Mansfield

This sale closed on November 30, 2005 and sold for 430,000. This is a sale of a 94 year old three family dwelling located in the same section of town. The dwelling has 2,938 square feet of living area. The dwelling has two 5-room apartments and a 4-room apartment. All of the units are of a typical size and the units are in generally average repair. The site has 12,380 square feet of land area. There is a 2-car garage.

36

## SALES COMPARISON APPROACH (Cont.)

This sale was adjusted $15,000 for the garage and $5,000 (net) for the difference in bedrooms and baths. Once the sale was adjusted, the indicated value was $420,000.

### *Summary of Sales Comparison Approach*

As mentioned previously this approach was weighed the heaviest in arriving at a market value as of January 1, 2006 for the subject property based on the assumption that the property was similar in overall repair and updating with the exception of the electrical work completed. Most purchasers of three family homes are owner occupants and utilize a similar process in purchasing their properties. Thus most weight has been placed on the sale comparison approach.

Based on the above sales the range in value is from a low of $416,000 (rounded) to a high of $420,000. Most weight was placed on sale 4. I arrived at a value of $420,000.

The indicated value of the subject via the sales comparison approach is:

### *FOUR HUNDRED AND TWENTY THOUSAND DOLLARS*
### *($420,000)*

### *Forecasted Value at the end of the 15-year holding period*

In order to arrive at a value at the end of the holding period, I first arrived at a value of the property as of January 1, 2006 to establish a basis for the appreciation of the subject property for the entire holding period. During the first five years of the holding period the property appreciated $115,000 or 37.7% or an annualized appreciation rate of 7.5%.

This portion of the 15-year holding period includes the time of record low interest rates for the past 35 years and homes appreciated quickly due to the affordability of mortgage payments. At the present time the interest rates are rising and the affordability of homes has lessened. Thus I have forecasted stable market conditions for 2006 and 2007. Beginning in 2008 into 2009 I forecasted moderate increases in value of 5%. In 2010 through the end of the holding period I utilized an appreciation rate of 7% reflective of a blend of the market as well as the CPI for the

37

PETER D. TETREAULT & ASSOCIATES

## SALES COMPARISON APPROACH (Cont.)

Boston-Brockton-Nashua area.

My research of the sales data included a review of the Warren Information services sales records for the town of Mansfield and MLS listing and town sales records for the time period 2001 to 2005.

My analysis of the current market conditions is that while sales activity has lessened, sales prices have remained stable. My forecast for the near future market conditions in the remainder of 2006 into 2007 is one of stability with increased marketing times. If a shorting than typical marketing period is necessary, then those prices would be lower.

In estimating the forecasted annual appreciation rates for the property over the remaining 10 years of the holding period I have also considered the CPI index and the change during the first 5 years of the holding period. The consumer price index rose 4.64 and I have assumed that the real estate market will closely align itself with the CPI. Thus my appreciation for the property was estimated as follows:

|      |                    |           |
|------|--------------------|-----------|
| 2006: | Stable Market:     | $420,000  |
| 2007: | Stable Market:     | $420,000  |
| 2008: | 5% Appreciation:   | $441,000  |
| 2009: | 5% Appreciation:   | $463,000  |
| 2010: | 7% Appreciation:   | $495,000  |
| 2011: | 7% Appreciation:   | $530,000  |
| 2012: | 7% Appreciation:   | $567,000  |
| 2013: | 7% Appreciation:   | $607,000  |
| 2014: | 7% Appreciation:   | $650,000  |
| 2015: | 7% Appreciation:   | $695,000  |
| 2016: | 7% Appreciation:   | $744,000  |

Thus based on this schedule of appreciation the subject property has a forecasted market value of $744,000 in 2016. In 2016 at the end of the 15-year holding period the remaining balance on the mortgage would be $212,619.33. After subtracting the remaining mortgage balance, the broker's commission of 6% as well as the original down payment of $9,150 Mr. & Mrs. Mendes would have received an overall return, excluding the annual cash flow, of $477,591 or an annual return of 30.95% on the initial $9,150 down payment. Please see bottom of chart on page 33 for detail.

38

PETER D. TETREAULT & ASSOCIATES

### SPREAD SHEET AND ADJUSTMENT GRID

PETER D. TETREAULT & ASSOCIATES

## COMPARABLE SALES



**COMPARABLE SALE # 1**

80 Court Street, Mansfield

This property sold in May 2005 for $400,000.



**COMPARABLE SALE # 2**

36 Cottage Street, Mansfield

This property sold in August 2005 for $469,000.



**COMPARABLE SALE # 3**

56 Draper Avenue, Mansfield

This property sold in September 2005 for $375,000.



**COMPARABLE SALE # 4**

25-27 Pleasant Street, Mansfield

This property sold in November 2005 for $430,000.

## SUMMARY AND CONCLUSION

The scope of work relative to this assignment was to analyze the Mansfield market to determine the potential rental income of the property and cash flow over a 15-year holding period beginning with the effective date of value, the date of the purchase and sales agreement in 2001 as well as to estimate a forecasted future value of the property at the end of the 15-year holding period, July 1, 2016.

In order to obtain a point of reference in order to establish the appreciation in rental income and market value I completed an appraisal of the property as of January 1, 2006. Thus I was able to utilize market rental information and sales information in estimating the changes in income and value during the 15-year holding period.

I utilized the rental analysis completed within the Income Approach to arrive at an annual cash flow for the subject property in each of the 15 years all expenses including the annual debt service were subtracted. My analysis indicated that my clients would receive a positive cash flow in years 3 through 15 of the holding period. Mr. & Mrs. Mendes' potential cash flow on their invested income (down payment) is $90,259 after their total operating expenses for the property and annual debt service for each year.

In estimating a future value of the property at the end of the 15-year holding period analyzed the change in the market value of the subject property over the first five years of the holding period to establish an appreciation rate specific to the subject property. I arrived at a market extracted annualized appreciation rate of 7.5%. During this same time period the CPI for the Boston-Brockton-Nashua area rose on an annualized basis 6.3%.

In calculating the appreciation for the property I concluded that the market conditions during 2006 through the end of 2007 will remain stable. I have estimated that the market will then experience a slightly softer appreciation rate of 5% for 2 years and then rise at an annual rate of 7% for the remainder of the holding period. Thus the forecasted value of the subject property as of June 2016 is $744,000.

41

## SUMMARY AND CONCLUSION (Cont.)

In 2001 Mr. & Mrs. Mendes were not allowed to purchase the three-family dwelling located at 1-3 Chilson Avenue within the town of Mansfield and they lost the investment opportunity of a cash flow and the appreciation of the property's value.

In conclusion Mr. & Mrs. Mendes loss is as follows:

*Loss of Potential Cash Flow:*

> *NINETY THOUSAND AND TWO HUNDED FIFTY-NINE THOUSAND DOLLARS*
> *($90,259)*

*Loss of Potential Profit (Appreciation):*

> *FOUR HUNDRED SEVENTY SEVEN THOUSAND FIVE HUNDRED AND NINETY-ONE DOLLARS*
> *($477,591)*

PETER D. TETREAULT & ASSOCIATES

## CERTIFICATE OF APPRAISAL

I certify to the best of my/our knowledge and belief that:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

- I have no bias with respect to any property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- I have made a personal inspection of the properties that are the subject of this report.

- No one provided significant mass appraisal assistance to the person signing this certification.

The legal description is assumed to be correct. I assume no responsibility for matters legal in character nor do I render any opinion as to the title which is assumed to be good. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear and under responsible ownership and competent management unless otherwise specifically stated in the report.

Sketches in this report are included to assist the reader in visualizing the property. I have made no survey of the property and assume no responsibility in connection with such matters.

I believe to be reliable any and all information that was furnished to me by others and have tried to verify that data from as many sources as possible. However, I assume no responsibility for its accuracy.

The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization.

43

PETER D. TETREAULT & ASSOCIATES

---

## CERTIFICATE OF APPRAISAL (Cont.)

I am not required to give testimony or appear in court by reason of this appraisal with reference to the property in question, unless previous arrangements have been made with the appraiser and/or the appraisal firm.

This report is not to be reproduced in part or as a whole without the written consent of the appraiser.

This appraisal is made in accordance with the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board, April 27, 1987 and updated effective January 1, 2005.

My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

Separate valuations for land and/or buildings must not be used in conjunction with any other appraisal and are invalid if so used.

In my opinion, the investment analysis of the property as described herein, as of the effective date of value is:

*Loss of Potential Cash Flow:*

**NINETY THOUSAND AND TWO HUNDED FIFTY-NINE THOUSAND DOLLARS ($90,259)**

*Loss of Potential Profit (Appreciation):*

**FOUR HUNDRED SEVENTY SEVEN THOUSAND FIVE HUNDRED AND NINETY-ONE DOLLARS ($477,591)**

This report is presented with the understanding that the appraiser and a supervisory appraiser, to the best of their ability and knowledge, has complied with and conformed to the minimum standards as outlined in the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. However, if any information has inadvertently been omitted or additional information is deemed relevant and required by the client, the appraiser and/or supervisory appraiser will furnish that information upon request.

The below signed appraiser has personally inspected the subject property. However, the supervisory appraiser did not personally inspect the subject property. I have no present or contemplated interest in the subject property and the fee agreed upon is in no way related to or contingent upon the value reported.

44

PETER D. TETREAULT & ASSOCIATES

## CERTIFICATE OF APPRAISAL (Cont.)

As of the date of this report, I, Peter D. Tetreault, MRA, SRA, SRPA have completed the requirements under the continuing education program of the Massachusetts Board of Real Estate Appraisers and the Appraisal Institute.

Susan L. Mitchell, RA
Real Estate Appraiser
MA Cert. Gen. Lic. #872
Exp. 11/25/08

Peter D. Tetreault, SRPA/MRA
Supervisory Appraiser
MA Cert. Gen. Lic. #311
Exp. 9/05/08

45

PETER D. TETREAULT & ASSOCIATES

## LIMITING CONDITIONS AND ASSUMPTIONS

This report is presented with the understanding that the appraiser/appraisers have to the best of his/her/their knowledge complied with and this appraisal conforms to the Uniform Standards of Professional Appraisal Practice ("USPAP") adopted by the Appraisal Standards Board of the Appraisal Foundation, the Appraisal Institute and the Massachusetts Board of Real Estate Appraisers. Any deviation from the Uniform Standards will be expressly explained in this appraisal report.

However, if any information has inadvertently been omitted or additional information is deemed relevant and required by the client, the appraiser/appraisers will furnish that information upon request.

1. **LIMIT OF LIABILITY:** The liability of P. D. Tetreault, Inc., appraisal consulting firm and employees is limited to the fee collected. There is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The appraiser assumes no responsibility for any costs incurred to discover or correct any deficiencies present in the property.

2. **COPIES, PUBLICATION, DISTRIBUTION, USE OF REPORT:** Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for other than its intended use; the physical report(s) remain the property of the appraiser for the use of the client, the fee being for the analytical services only.

   The Bylaws and Regulations of the American Institute of Real Estate Appraisers of the National Association of Realtors require each Member and Candidate to control the use and distribution of each appraisal report signed by such Member of Candidate; except as hereinafter provided, the client may distribute copies of this appraisal report in its entirety to such third parties as he may select; however, selected portions of this appraisal report shall not be given to third parties without the prior written consent of the signatories of this appraisal report. Neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations, news, sales or other media for public communication without the prior written consent of appraiser.

3. **CONFIDENTIALITY:** This appraisal is to be used only in its entirety and no part is to be used without the whole report. The Appraiser(s) whose signature(s) appear on the appraisal report, unless indicated as "Review Appraiser", prepared all conclusions and opinions concerning the analysis set forth in the report. No change of any item in the report shall be made by anyone other than the Appraiser and/or officer of the firm. The Appraiser and firm shall have no responsibility if any such unauthorized change is made.

46

PETER D. TETREAULT & ASSOCIATES

## LIMITING CONDITIONS AND ASSUMPTIONS (Cont.)

The appraiser may not divulge the material (evaluation) contents of the report, analytical findings or conclusions, or give a copy of the report to anyone other than the client or his designee as specified in writing except as may be required by the American Institute of Real Estate Appraisers as they may request in confidence for ethics enforcement, or by a court of law or body with the power of subpoena.

4. **TRADE SECRETS:** This appraisal was obtained from Tetreault Real Estate Appraisers, Inc. d/b/a P.D. Tetreault, Inc., 13 Dean Street, Attleboro, Massachusetts, or a related company and/or its individuals or related independent contractors, and consists of "trade secrets and commercial or financial information" which is privileged and confidential and exempted from disclosure under 5 U.S.C. 552 (b) (4). Notify the appraiser(s) signing the report or an officer of P.D. Tetreault, Inc. of any request to reproduce this appraisal in whole or part.

5. **INFORMATION USED:** No responsibility is assumed for accuracy of information furnished by or from others, the client, his designee, or public records. We are not liable for such information or the work of possible subcontractors. Be advised that some of the people associated with P.D. Tetreault, Inc., Appraisal Consultants and possibly signing the report are independent contractors. The comparable data relied upon in this report has been confirmed with one or more parties familiar with the transaction or from affidavit or other source thought reasonable; all are considered appropriate for inclusion to the best of our factual judgment and knowledge. An impractical and uneconomic expenditure of time would be required in attempting to furnish unimpeachable verification in all instances, particularly as to engineering and market related information. It is suggested that the client consider independent verification within these categories as a prerequisite to any transaction involving sale, lease, or other significant commitment of subject property, and that such verification be performed by the appropriate specialists.

6. **TESTIMONY, CONSULTATION, COMPLETION OF CONTRACT FOR APPRAISAL SERVICES:** The contract for appraisal, consultation or analytical service, are fulfilled and the total fee payable upon completion of the report. The appraiser(s) or those assisting in preparation of the report will not be asked or required to give testimony in court or hearing because of having made the appraisal, in full or in part, nor engage in post appraisal consultation with client or third parties except under separate and special arrangement and at additional fee. If testimony or deposition is required because of any subpoena, the client shall be responsible for any additional time, fees, and charges regardless of issuing party.

7. **EXHIBITS:** The sketches and maps in this report are included to assist the reader in visualizing the property and are not necessarily to scale. Various photos, if any, are included for the same purpose as of the date of the photos. Site plans are not surveys unless shown from separate surveyor.

47

**LIMITING CONDITIONS AND ASSUMPTIONS** (Cont.)

8. **LEGAL, ENGINEERING, FINANCIAL, STRUCTURAL, OR MECHANICAL NATURE HIDDEN COMPONENTS, SOIL:** No responsibility is assumed for matters legal in character or nature, nor matters of survey, nor of any architectural, structural, mechanical, or engineering nature. No opinion is rendered as to the title, which is presumed to be good and merchantable. The property is appraised as if free and clear, unless otherwise stated in particular parts of the report.

The legal description is assumed to be correct as used in this report as furnished by the client, his designee, or as derived by the appraiser.

Please note that no advice is given regarding mechanical equipment or structural integrity or adequacy, nor soils and potential for settlement, drainage, and such (seek assistance from qualified architect and/or engineer) nor matters concerning liens, title status and legal marketability (seek legal assistance), and such. The lender and owner should inspect the property before any disbursement of funds; further, it is likely that the lender or owner may wish to require mechanical or structural inspections by qualified and licensed contractor, civil or structural engineer, architect, or other expert.

The appraiser has inspected as far as possible, by observation, the land and the improvements; however, it was not possible to personally observe conditions beneath the soil or hidden structurally, or other components. We have not critically inspected mechanical components within the improvements and no representations are made herein as to these matters unless specifically stated and considered in the report. The value estimate considers there being no such conditions that would cause a loss of value. The land or the soil of the area being appraised appears firm; however, subsidence in the area is unknown. The appraiser(s) do not warrant against this condition or occurrence of problems arising from soil conditions.

The appraisal is based on there being no hidden, unapparent, or apparent conditions of the property site, subsoil, or structures or toxic materials that would render it more or less valuable. No responsibility is assumed for any such conditions or for any expertise or engineering to discover them. All mechanical components are assumed to be in operable condition and status standard for properties of the subject type. Conditions of heating, cooling, ventilating, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. No judgment is made as to the adequacy of insulation, type of insulation, or energy efficiency of the improvements or equipment.

If the appraiser has not been supplied with a termite inspection, survey or occupancy permit, no responsibility or representation is assumed or made for any costs associated with obtaining same or for any deficiencies discovered before or after they are obtained. No representation or warranties are made concerning obtaining the above mentioned items.

## LIMITING CONDITIONS AND ASSUMPTIONS (Cont.)

The appraiser assumes no responsibility for any costs or consequences arising due to the need, or the lack of need for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

9. **LEGALITY OF USE:** The appraisal is based on the premise that there is full compliance with all applicable federal, state and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

10. **COMPONENT VALUES:** The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization. The separate valuations for land and building must not be used in conjunction with any other appraisal and are invalid if so used.

11. **AUXILIARY AND RELATED STUDIES:** No environmental or impact studies, special market study or analysis, highest and best use analysis study or feasibility study has been requested or made unless otherwise specified in an agreement for services or in the report. The appraiser reserves the unlimited right to alter, amend, revise or rescind any of the statements, findings, opinions, values, estimates, or conclusions upon any subsequent such study or analysis, or previous study, or factual information as to market or subject, or analysis subsequently becoming known to him.

12. **DOLLAR VALUES, PURCHASING POWER:** The market value estimates, and the costs used, are as of the date of the estimate of value. All dollar amounts are based on the purchasing power and price of the dollar as of the date of the value estimate.

13. **INCLUSION:** Furnishings and equipment or personal property or business operations except as specifically indicated and typically considered as a part of real estate, have been disregarded with only the real estate being considered in the value estimate unless otherwise stated. In some property types, business and real estate interests and values are combined.

14. **PROPOSED IMPROVEMENTS, CONDITIONED VALUE:** Improvements proposed, if any, on or offsite, as well as any repairs required are considered, for purposes of this appraisal to be completed in good and workmanlike manner according to information submitted and/or considered by the appraisers. In cases of proposed construction, the appraisal is subject to change upon inspection of property after construction is completed. This estimate of market value is as of the date shown, as proposed, as if completed and operating at levels shown and projected.

PETER D. TETREAULT & ASSOCIATES

**LIMITING CONDITIONS AND ASSUMPTIONS** (Cont.)

15. **VALUE CHANGE, DYNAMIC MARKET, and INFLUENCES:** The estimated market value is subject to change with market change over time; value is highly related to exposure, time, promotional effort, terms, motivation, and conditions surrounding the offering. The value estimate considers the productivity and relative attractiveness of the property physically and economically in the marketplace.

In cases of appraisals involving the capitalization of income benefits, the estimate of market value or investment value or value in use is a reflection of such benefits and appraiser's interpretation of income and yields and other factors derived from general and specific client and market information. Such estimates are as of the date of the estimate of value; they are thus subject to change as the market and value is naturally dynamic.

The "Estimate of Market Value" in the appraisal report is not based in whole or in part upon the race, color or national origin of the present owners or occupants of the properties in the vicinity of the property appraised.

The appraiser reserves the right to alter the opinion of value on the basis of any information withheld or not discovered in the original normal course of a diligent investigation.

This appraisal report and value estimates are subject to change if physical or legal entity or financing is different than that envisioned in this report.

16. **MANAGEMENT OF THE PROPERTY:** It is assumed that the property that is the subject of this report will be under prudent and competent ownership and management neither inefficient nor super efficient.

17. **CONTINUING EDUCATION CURRENT:** The Society of Real Estate Appraisers conducts a voluntary program of continuing education for recertification of its designated members; I certify that I am in compliance with these standards and attend periodic recertification programs to keep up with the changes and new requirements of the profession.

18. **FEE:** The fee for this appraisal or study is for the service rendered and not for the time spent on the physical report.

19. **AUTHENTIC COPIES:** The authentic copies of this report are signed in blue or black ink. Any copy that does not have an original signature is unauthorized, and may have been altered.

20. **INSULATION AND TOXIC MATERIALS:** Unless otherwise stated in this report, the appraiser(s) signing this report have no knowledge concerning the presence or absence of toxic materials and/or urea formaldehyde foam insulation in existing improvements; if such is present, the value of the property may be adversely affected and reappraisal at additional cost necessary to estimate the effect of such.

50

PETER D. TETREAULT & ASSOCIATES

## QUALIFICATIONS

### OF

## PETER D. TETREAULT, SRPA, SRA, RA, MRA
### Real Estate Appraiser and Consultant

## PROFESSIONAL AFFILIATIONS AND DESIGNATIONS

### DESIGNATIONS – SRPA – SRA – MRA - RA
#### APPRAISAL INSTITUTE
- SRPA - Senior Real Property Appraiser
- SRA - Senior Residential Appraiser
- Currently in Compliance with the Continuing
- Education Program of the Appraisal Institute.

### MASSACHUSETTS BOARD OF REAL ESTATE APPRAISERS
RA - Residential Appraiser
MRA - Senior Real Estate Appraiser

### NATIONAL ASSOCIATION OF REALTORS
CRS - Certified Residential Specialist
GRI - Graduate of the Realtors Institute

## CERTIFIED GENERAL APPRAISER
STATE OF RHODE ISLAND:    #A00203G; Exp. 2/23/2008
COMMONWEALTH OF MASSACHUSETTS:  #311; Exp. 9/05/08

## LICENSED BUILDER  - License Number 010553

## OFFICES HELD
### MASSACHUSETTS BOARD OF REAL ESTATE APPRAISERS
Past President - 1983
Vice President - 1982
Board of Directors – 1978-1985

### SOCIETY OF REAL ESTATE APPRAISERS
Chairman, Candidate's Progress Committee - 1982-1983
Board of Directors - 1982-1985
Vice President - 1984-1985

## AFFILIATIONS
### NATIONAL ASSOCIATION OF REALTORS
### MASSACHUSETTS ASSOCIATION OF REALTORS
### ATTLEBORO BOARD OF REALTORS

PETER D. TETREAULT & ASSOCIATES

## EDUCATIONAL BACKGROUND AND PROFESSIONAL APPRAISAL TRAINING

### FORMAL EDUCATION

Bryant College, Providence, Rhode Island
B.S. in Business Administration - 1966
Saint Raphael Academy, Pawtucket, Rhode Island - 1961

### SPECIAL EDUCATION

**Society of Real Estate Appraisers**
- Course 101 - An Introduction to Appraising Real Property
- Course 201 - Income Property Appraising
- Course 202 - Applied Income Property Valuation
- R-2 - Case Study
- Narrative Report Writing
- Demonstration Report Writing
- Form Appraisals

**Bentley College**
- Appraisal of Residential Real Property
- Appraisal of Income Producing Property
- Appraisal of Income Property, Part 2
- Capitalization Theory and Techniques

**Appraisal Institute**
- Capitalization Courses A & B
- Standards of Professional Practice - 1992

### SEMINARS AND APPRAISAL WORKSHOPS

Appraising Apartments
Residential Condominium Appraising - The Single Unit and the Condo Project
Cash Equivalency and Favorable Financing Adjustments
Marketability and Market Analysis
Investment Analysis
Appraising Commercial and Industrial Properties
Real Estate Investment Analysis - Introduction to Investment Feasibility
Real Estate Investments - An Introduction to Cash Flow and Risk Analysis
Marketability and Market Analysis

### TEACHING EXPERIENCE

Currently an instructor for:
Massachusetts Board of Real Estate Appraisers
Stonehill College

52

PETER D. TETREAULT & ASSOCIATES

**TEACHING EXPERIENCE** (cont.)

Author of:

Course entitled "REAL ESTATE REPORT WRITING"

A case study of the single family dwelling with emphasis on selecting and analyzing market data and submission of written conclusions in various forms in the narrative appraisal format.

I have also taught Real Estate Appraising as a Co-Instructor at Dean Junior College and Bentley College.

**SEMINARS AND WORKSHOPS**

I have written and taught one and two-day seminars on Freddie Mac/Fannie Mae form appraising techniques for residential and multifamily properties.

**COURT TESTIMONY**

Have qualified as an expert witness and testified before:

Tax Appellate Court
United States Bankruptcy Court
United States District Court
Superior Court in Taunton, New Bedford and Fall River
Probate Court - New Bedford
Fourth District Court - Attleboro
Zoning Board of Appeals - City of Attleboro

**WORK EXPERIENCE**

Peter D. Tetreault, Inc. and associates has been involved in all phases of real estate appraising and consulting, a summary of which is as follows:

**RESIDENTIAL APPRAISING**

For all major lending institutions within the Commonwealth and abutting states as well as for private individuals including single family and multifamily dwellings.

**COMMERCIAL APPRAISING**

Of all types including apartment complexes, commercial strip stores, downtown business and apartment blocks, veterinary hospitals, funeral homes, post offices, gas stations, and a variety of other special purpose commercial properties.

**INDUSTRIAL**

All types and phases of industrial land and buildings including mill buildings, corporate headquarters and sophisticated new structures as well as older industrial properties to be converted to other uses.

PETER D. TETREAULT & ASSOCIATES

## RELOCATION COMPANIES

Our firm is currently engaged in appraising for all the major relocation companies.

## CONDEMNATION

Many assignments have been performed for both sides of eminent domain cases including total and partial takings, subsurface and overhead easements, as well as many other court related assignments and testimony.

## SPECIAL ASSIGNMENTS

Include such properties as a resort island in the West Indies, a major well-known horse farm in Kentucky, a mountain in Vermont, U.S. Post Office, and the feasibility of converting commercial and industrial properties to condominiums, apartments and retail use.

Have also conducted feasibility studies and appraisals on vacant raw land for subdivision purposes as well as the feasibility of condominiums and other types of detached and attached single-family dwellings.

## MARKET ANALYSIS AND FEASIBILITY STUDIES

We have conducted many market studies as well as feasibility studies for commercial, residential, condominium and PUD type projects.

## REVIEW APPRAISER

Review appraising for several of the purchasers in the secondary market and for FHLMC and FNMA.

## CLIENTS/REFERENCES
A list of individual clients and references is available upon request.

PETER D. TETREAULT & ASSOCIATES

## QUALIFICATIONS

### SUSAN L. MITCHELL, RA
### APPRAISER

## PROFESSIONAL DESIGNATION

### MASSACHUSETTS BOARD OF REAL ESTATE APPRAISERS

RA - Residential Appraiser

## STATE LICENSING

Commonwealth of Massachusetts; **License No. 872;**
**Expiration 11/25/08**
Certified General Real Estate Appraiser

## EDUCATIONAL BACKGROUND AND TRAINING

### Formal Education

University of Connecticut, Storrs, Connecticut - 1978
B.S. in Real Estate Finance and Urban Economic Studies

Robert E. Fitch Senior High School, Groton, Connecticut - 1974

### Special Education

### MASSACHUSETTS BOARD OF REAL ESTATE APPRAISERS

REA 2.1 - Practical Income Appraising - 1995

Uniform Standards of Professional Practice Update Seminar - 1995

Discounted Cash Flow Analysis Seminar - 1995

Course III - Appraisal of Income Property

Capitalization Theory and Technique - 1979

PETER D. TETREAULT & ASSOCIATES

## APPRAISAL INSTITUTE

1993 -   Feasibility Analysis Highest & Best Use Seminar for Non-Residential properties

1993 -   The New Uniform Residential Appraisal Report Seminar

1992 -   Standards of Professional Practice, Part A & B

1996 -   Present:  45 hours of continuing education

### Society of Real Estate Appraisers

Course 101- An Introduction to Appraising Real Property - 1978
Course 201- Examination - 1978
R-11 Examination - 1979
Narrative Report Seminar - 1979
Form Appraisals Seminar - 1981
Course 102 - Applied Residential Property Valuation - 1988

## PROFESSIONAL EXPERIENCE

**Current:**   Fee Appraiser/Consultant with P. D. Tetreault, Inc.
Appraisers/Consultants of Attleboro, Massachusetts
Peter D. Tetreault, SRPA, SRA, MRA

**1978-1981:**   In-house appraiser for the Attleborough Savings Bank, Attleboro, Massachusetts

## ADDENDA

*Loan Amortization Schedule*

# Loan Amortization

| Inputs | | Key Figures | |
|---|---|---|---|
| Loan Principal Amount | $295,850.00 | Annual Loan Payments | $24,218.64 |
| Annual Interest Rate | 7.25% | Monthly Payments | $2,018.22 |
| Loan Period in Years | 30 | Interest in First Calender Year | $21,355.22 |
| Base Year of Loan | 2001 | Interest Over Term of Loan | $430,709.20 |
| Base Month of Loan | 1 | Sum of All Payments | $726,559.20 |

Payments in First 12 Months

| Year | Month | Balance | Payments | Principal | Interest | Cumulative Principal | Cumulative Interest | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| 2001 | Jan | $295,850.00 | $2,018.22 | $230.79 | $1,787.43 | $230.79 | $1,787.43 | $295,619.21 |
| | Feb | $295,619.21 | $2,018.22 | $232.19 | $1,786.03 | $462.98 | $3,573.46 | $295,387.02 |
| | Mar | $295,387.02 | $2,018.22 | $233.59 | $1,784.63 | $696.57 | $5,358.09 | $295,153.43 |
| | Apr | $295,153.43 | $2,018.22 | $235.00 | $1,783.22 | $931.57 | $7,141.31 | $294,918.43 |
| | May | $284,918.43 | $2,018.22 | $236.42 | $1,781.80 | $1,167.99 | $8,923.11 | $294,682.01 |
| | Jun | $284,682.01 | $2,018.22 | $237.85 | $1,780.37 | $1,405.84 | $10,703.48 | $294,444.16 |
| | Jul | $294,444.16 | $2,018.22 | $239.29 | $1,778.93 | $1,645.13 | $12,482.41 | $294,204.87 |
| | Aug | $294,204.87 | $2,018.22 | $240.73 | $1,777.49 | $1,885.86 | $14,259.90 | $293,964.14 |
| | Sep | $293,964.14 | $2,018.22 | $242.19 | $1,776.03 | $2,128.05 | $16,035.93 | $293,721.95 |
| | Oct | $293,721.95 | $2,018.22 | $243.65 | $1,774.57 | $2,371.70 | $17,810.50 | $293,478.30 |
| | Nov | $293,478.30 | $2,018.22 | $245.12 | $1,773.10 | $2,616.82 | $19,583.60 | $293,233.18 |
| | Dec | $293,233.18 | $2,018.22 | $246.60 | $1,771.62 | $2,863.42 | $21,355.22 | $292,986.58 |

Yearly Schedule of Balances and Payments

| Year | Balance | Payments | Principal | Interest | Cumulative Principal | Cumulative Interest | Ending Balance |
|---|---|---|---|---|---|---|---|
| 2002 | $292,986.58 | $24,218.64 | $3,077.81 | $21,140.83 | $5,941.23 | $42,496.05 | $289,908.77 |
| 2003 | $289,908.77 | $24,218.64 | $3,308.77 | $20,909.87 | $9,250.00 | $63,405.92 | $286,600.00 |
| 2004 | $286,600.00 | $24,218.64 | $3,556.79 | $20,661.85 | $12,806.79 | $84,067.77 | $283,043.21 |
| 2005 | $283,043.21 | $24,218.64 | $3,823.40 | $20,395.24 | $16,630.18 | $104,463.02 | $279,219.82 |
| 2006 | $279,219.82 | $24,218.64 | $4,109.99 | $20,108.65 | $20,740.18 | $124,571.66 | $275,109.82 |
| 2007 | $275,109.82 | $24,218.64 | $4,418.07 | $19,800.57 | $25,158.25 | $144,372.23 | $270,691.75 |
| 2008 | $270,691.75 | $24,218.64 | $4,749.24 | $19,469.40 | $29,907.49 | $163,841.63 | $265,942.51 |
| 2009 | $265,942.51 | $24,218.64 | $5,105.24 | $19,113.40 | $35,012.73 | $182,955.03 | $260,837.27 |
| 2010 | $260,837.27 | $24,218.64 | $5,487.92 | $18,730.72 | $40,500.64 | $201,685.76 | $255,349.36 |
| 2011 | $255,349.36 | $24,218.64 | $5,899.28 | $18,319.36 | $46,399.92 | $220,005.12 | $249,450.08 |
| 2012 | $249,450.08 | $24,218.64 | $6,341.48 | $17,877.16 | $52,741.41 | $237,882.27 | $243,108.59 |
| 2013 | $243,108.59 | $24,218.64 | $6,816.83 | $17,401.81 | $59,558.23 | $255,284.09 | $236,291.77 |
| 2014 | $236,291.77 | $24,218.64 | $7,327.81 | $16,890.83 | $66,886.04 | $272,174.92 | $228,963.96 |
| 2015 | $228,963.96 | $24,218.64 | $7,877.09 | $16,341.55 | $74,763.13 | $288,516.47 | $221,086.87 |
| 2016 | $221,086.87 | $24,218.64 | $8,467.54 | $15,751.10 | $83,230.67 | $304,267.57 | $212,619.33 |
| 2017 | $212,619.33 | $24,218.64 | $9,102.26 | $15,116.39 | $92,332.92 | $319,383.96 | $203,517.08 |
| 2018 | $203,517.08 | $24,218.64 | $9,784.54 | $14,434.10 | $102,117.46 | $333,818.06 | $193,732.54 |
| 2019 | $193,732.54 | $24,218.64 | $10,517.97 | $13,700.67 | $112,635.43 | $347,518.73 | $183,214.57 |
| 2020 | $183,214.57 | $24,218.64 | $11,306.38 | $12,912.26 | $123,941.81 | $360,430.99 | $171,908.19 |
| 2021 | $171,908.19 | $24,218.64 | $12,153.89 | $12,064.75 | $136,095.70 | $372,495.74 | $159,754.30 |
| 2022 | $159,754.30 | $24,218.64 | $13,064.92 | $11,153.72 | $149,160.63 | $383,649.45 | $146,689.37 |
| 2023 | $146,689.37 | $24,218.64 | $14,044.25 | $10,174.39 | $163,204.88 | $393,823.84 | $132,645.12 |
| 2024 | $132,645.12 | $24,218.64 | $15,096.98 | $9,121.66 | $178,301.86 | $402,945.50 | $117,548.14 |
| 2025 | $117,548.14 | $24,218.64 | $16,228.53 | $7,990.01 | $194,530.49 | $410,935.51 | $101,319.51 |
| 2026 | $101,319.51 | $24,218.64 | $17,445.10 | $6,773.54 | $211,975.56 | $417,709.06 | $83,874.42 |
| 2027 | $83,874.42 | $24,218.64 | $18,752.75 | $5,465.89 | $230,728.33 | $423,174.95 | $65,121.67 |
| 2028 | $65,121.67 | $24,218.64 | $20,158.43 | $4,060.21 | $250,886.76 | $427,235.16 | $44,963.24 |
| 2029 | $44,963.24 | $24,218.64 | $21,669.47 | $2,549.17 | $272,556.23 | $429,784.33 | $23,293.77 |
| 2030 | $23,293.77 | $24,218.64 | $23,293.77 | $924.87 | $295,850.00 | $430,709.20 | $0.00 |

# EXHIBIT B

July 28, 2006


Christopher J. Trombetta
310 North Main Street
Mansfield, MA 02048

     Re: <u>Anthony and Doris Mendes v. Cendant Mortgage</u>

Dear Mr. Trombetta:

     Below please find my opinions relevant to the above matter. Please contact me with any questions.

     1. The Approval Letter

     The approval letter issued by Cendant Mortgage on May 3rd itemized conditions which were satisfied based on the documentation provided. There was no condition for monthly rental income or for the monthly rental income to be at a particular level. The condition for the appraisal says receipt and review of a satisfactory appraisal on the property that supports the sales price. That appraisal condition did not communicate the need for rental income or rental income at a particular level. Further the representation by Cendant on May 3 2001 was that the borrower was approved and finalizing the loan was as easy as 1-2-3. All the borrower had to do was to find his dream home and simply call 1-800-236-3268 ext 84853 and Cendant "guaranteed" the closing. There were no expiration dates on the approval.

     Cendant also represented in the approval letter that they would be "with you", the borrower, "all the way from application process right through the closing". (This was not the case, the opposite appears to have been the reality.) They denied the loan (wrongly) for a condition that had not been communicated.

     The next approval letter from Cendant June 12, 2001 for $307,545 reiterated the "guaranteed closing" and that Cendant "would support the borrower through closing". The conditions of that approval included a maximum monthly payment beyond which their PITI pmt could not exceed, a satisfactory appraisal where the terms had previously been presented to the borrower in the May letter of approval and finally verification of personal income and assets. The monthly payment on the home the borrower chose complied with the conditions communicated. On this letter there was no condition in the event the credit changed or deteriorated that it would matter or effect their ability to be financed. There were no expirations dates on the approval. There was no condition for rents to be at a particular level relative to the monthly payment.

If there were any question about rental amounts, it clearly should have been communicated to the consumer with the initial approval. If the borrowers were not aware of this potential issue disrupting their purchase at this point, it would appear that they were being intentionally misled as opposed to irresponsible and/or incomplete communication.

The July 11 appraisal satisfied the communicated conditions of the approval and the representations made to the borrower.

Based on the above Cendant obligated itself to fund a mortgage loan to Mr. and Mrs. Mendes. It communicated that obligation to them. Furthermore, Cendant had a responsibility to communicate the conditions and limiting factors of the approval to the borrower. Mr. and Mrs. Mendes satisfied the conditions stated by Cendant.

### 2. Mr. and Mrs. Mendes Qualified for the FHA Mortgage Loan

The FHA guidelines provide that a comparison must be made as to total rents and PITI. A copy of the guidelines is attached. Such a comparison in the present case required the lender to subtract the total monthly mortgage payment from seventy five percent of the total rent. Because the resulting difference is negative, the amount needs to be listed as negative cash flow and listed with monthly payment obligations on the underwriting sheet.

The borrower, however, is still entitled to use rental income in connection with calculating his/her gross income. Cendant used 75% of the rent that would have been earned on the two units which Mr. and Mrs. Mendes would not have occupied. The rent figure utilized by Cendant was $955.

In calculating gross income, however, Cendant did not include income from Mrs. Mendes second job. That income appears on the application and needed to have been included. Using that income the front ratio would have amounted to approximately 29%.

In addition, I understand that Mr. and Mrs. Mendes had the ability to borrow funds. Had they borrowed $5,250 they could have paid off and closed 13 accounts which represented $449 in other/back debt. Such reductions include:

- lord taylor 30
- filene 50
- household 20
- wfnn 20
- ctib 20
- sear 10
- fnanb 29
- cap one 15
- mgba 19

- wfnnb 6
- hhld 15
- filene 180
- cross 35

Such a reduction would have made the back ratio equal 46% even with the negative excess of pmt over 75% of the rents. (The relevant FHA guideline indicates that you run the ratio carrying the additional payment.) The front and back ratios would have entitled Mr. and Mrs. Mendes to approval as to the FHA loan.

In addition, the borrower may have been able to consolidate and extend two loans he had with the credit union for $10,275 and $2685. I don't know if this consolidation was suggested or considered as an option to reduce the back ratio. This reduction would have made his back ratio even lower.

### 3. Mr. and Mrs. Mendes Could Have Funded the Loan From Other Sources

Also if Mrs. Mendes had liquidated her approximately $7000 401K she would have received $5600 after taxes. In addition Mr. and Mrs. Mendes show $14,100 in other assets on the application. If they did a no points, no closing they would have saved the $6,851 Cendant was charging the borrowers to close. All they then needed was a gift of $4,000 to have a 10% down payment. Numerous lenders would then have approved a loan to Mr. and Mrs. Mendes. There were several lenders who then financed owner occupied three family properties and there were B lenders that also would have approved a loan to Mr. and Mrs. Mendes.

The above is subject to revision based on the receipt of further information.

Sincerely,

Connor Shortsleeve

to continue at least three years.  If the income is not expected to
be received for at least three years, such income may be considered
as a compensating factor.  (Unemployment income must be documented
for two years.  Reasonable assurance of its continuance is also
required.  This requirement may apply to individuals employed on a
seasonal basis, such as farm workers, resort employees, etc.)

M.   Rental Income.  [Prev Hit][Next Hit]Rent received for properties owned by the
borrower is acceptable if the lender can document that the rental
income is stable.  Examples of stability may include a current lease,
an agreement to lease, or a rental history over the previous 24
months that is free of unexplained gaps greater than three months.
(Student, seasonal, or military renters, or property rehabilitation
would provide such an explanation).  A separate schedule of real
estate is not required for rental properties, provided all properties
are shown on the URLA.

If the borrower resides in one or more units of a multiple-unit
property and charges [Prev Hit][Next Hit]rent to tenants of other units, that [Prev Hit]
used for qualifying purposes.  However, projected [Prev Hit][Next Hit]rent of additi
units only and not the owner-occupied unit(s) may be considered gross
income only after deducting the HOC's vacancy and maintenance factor.
They may not be used as a direct offset to the mortgage payments.

Income from roommates in a single-family property to be occupied as
the borrower's primary residence is not acceptable.  Rental income
from boarders is acceptable if the boarders are related by blood,
marriage, or law.  The rental income may be considered effective
income if shown on the borrower's tax returns.  Otherwise, the income
only may be considered a compensating factor and must be documented
adequately by the lender.

The following is required to verify all rental income:

1.   Schedule E of IRS Form 1040.  Depreciation may be added back to
the net income or loss shown on Schedule E.  Positive rental income
is considered gross income for qualifying purposes; negative rental
income must be treated as a recurring liability.  The lender must be
certain that the borrower still owns each property listed, by
comparing the Schedule E with the real estate owned section of the
residential loan application.  (If the borrower in the same general
area owns six or more units, a map disclosing the locations must be
submitted evidencing compliance with FHA's seven-unit limitation.
See paragraph 4-8 for additional information.)

2.   Current Leases  If a property was acquired since the last
income tax filing and is not shown on Schedule E, a current signed
lease or other rental agreement must be provided.  The gross rental
amount must be reduced for vacancies and maintenance by 25 percent
(or the percentage developed by the jurisdictional HOC), before
subtracting [Prev Hit][Next Hit]PITI and any homeowners' association dues, etc., and
applying the remainder to income (or recurring debts, if negative).

N.   Eligible Investment Properties.  If the property to be insured
is an eligible investment property or sold through FHA's REO program,
the following calculations of qualifying ratios apply:

1. Subtract the monthly payment ([Prev Hit][Next Hit]PITI) from the monthly net rent
income of the subject property (gross rents, minus the 25 percent
reduction or HOC's percentage reduction for vacancies and repairs).

If this calculation yields a positive number, add the number to the
borrower's monthly gross income. If the calculation results in a
negative number, consider it a recurring monthly obligation; then
2. Calculate the mortgage payment-to-income ratio (top or front-end
ratio) by dividing the borrower's current housing expense (principal
residence) by the monthly gross income. (The monthly gross income
will include any positive cash flow from the subject investment
property.); and
3.    Calculate the total fixed payment-to-income ratio (bottom or
back-end ratio) by dividing the borrower's total monthly obligations,
including any net loss from the subject investment property, by the
borrower's total monthly gross income.

O.    Automobile Allowances and Expense Account Payments. Only the
amount by which the borrower's automobile allowance or expense
account payments exceed actual expenditures may be considered income.
The borrower must provide IRS Form 2106, Employee Business Expenses,
for the previous two years to establish the amount of income that may
be added to gross income. The borrower also must provide
verification from the employer that these payments will continue.
(If these calculations show a loss, that amount must be treated as a
recurring debt.  If the borrower uses the standard per-mile rate in
calculating automobile expenses, as opposed to the actual cost
method, the portion that the IRS considers depreciation may be added
back to income.) Additionally, the borrower's monthly car payment
must be treated as a recurring debt; it may not be offset by the car
allowance.

P.    Trust Income. Income from trusts may be used if guaranteed,
constant payments will continue for at least the first three years of
the mortgage term. Documentation is required and includes a copy of
the Trust Agreement, or other trustee's statement, confirming amount,
frequency of distribution, and duration of payments. Funds from the
trust account also may be used for the required cash investment with
adequate documentation.

Q.    Non-Taxable Income. If a particular source of regular income
is not subject to federal taxes (e.g., certain types of disability
and public assistance payments, military allowances), the amount of
continuing tax savings attributable to the non-taxable income source
may be added to the borrower's gross income. The percentage of
income that may be added may not exceed the appropriate tax rate for
that income amount, and no additional allowances for dependents are
acceptable. The lender must document and support the adjustments
(the amount the income is "grossed up") made for any non-taxable
income source. Child support income cannot be grossed up.  The
lender should use the tax rate used to calculate last year's income
tax for the borrower. If the borrower is not required to file a
federal income tax return, the tax rate to use is 25 percent.

R.    Projected Income. Projected or hypothetical income is not
acceptable for qualifying purposes. However, exceptions are
permitted to this rule for income from cost-of-living adjustments,
performance raises, bonuses, etc., which are both verified by the
employer in writing and scheduled to begin within 60 days of loan
closing.

If a borrower is about to start a new job and has a guaranteed,
non-revocable contract for employment that will begin within 60 days
of loan closing, the income is acceptable for qualifying purposes.

# CURRICULUM VITAE

I have been originating mortgage loans for 15 years. I worked for 5 years originating mortgages at Fleet Bank, the largest regional bank, I worked an additional 5 years, 4 yr 10 months at Bank of America, the largest national bank in mortgage origination, I worked for 1.75 years at Summit Mortgage, the largest broker in the state originating mortgages, an addition 3 years for Metro Boston Mortgage a small well run correspondent lender and for Mortgage Master the largest publicly held mortgage company in the country. I originate roughly $35,000,000 in mortgages loans annually.

On a daily basis I originate mortgage applications, run credit, run DO approvals and find mortgage programs for prospective borrowers. I run a wide range of programs including conventional loans, government loans, state loans, jumbo loans, simultaneous seconds, stand alone helocs and B credit loans. I also have originated numerous FHA loans.  By industry standard my fall out rate is very low, more than 95% of the loans I originate close. One of the areas I am very careful with is not to over represent a borrower's ability to secure credit and fit within specific programs.

## DOCUMENTS REVIEWED

May 3, 2001 Approval Letter

June 12, 2001 Approval Letter

Mortgage Application

Underwriting Statement (rejection is noted thereon)

August 10, 2001 Final Commitment Letter

# EXHIBIT C



United States
Department of Labor
Boston, MA   02203



**BLS Home | Programs & Surveys | Get Detailed Statistics | Glossary | What's New | Find It! In DOL**

**RELATED LINKS**

General Information: (617) 565-2327
Media Contact: (617) 565-2331
http://www.bls.gov/ro1

# Consumer Price Index Boston-Brockton-Nashua, MA-NH-ME-CT (1982-84 = 100)

**CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS (CPI-U), NOT SEASONALLY ADJUSTED Boston-Brockton-Nashua, MA-NH-ME-CT All Items 1982-84 = 100 (R) = Revised**

| Year | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVG |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 1995 | 158.0 | | 158.4 | | 157.7 | | 157.8 | | 158.6 | | 160.3 | | 158.6 |
| 1996 | 162.2 | | 162.8 | | 161.8 | | 162.0 | | 163.5 | | 166.3 | | 163.3 |
| 1997 | 167.7 | | 168.1 | | 166.7 | | 167.1 | | 167.8 | | 169.4 | | 167.9 |
| 1998 | 171.2 | | 171.3 | | 170.9 | | 170.7 | | 172.1 | | 173.3 | | 171.7 |
| 1999 | 174.1 | | 174.8 | | 174.2 | | 175.3 | | 176.8 | | 179.2 | | 176.0 |
| 2000 | 180.2 | | 182.8 (R) | | 181.7 (R) | | 183.2 | | 184.3 | | 187.4 | | 183.6 |
| 2001 | 189.0 | | 190.9 | | 190.9 | | 192.1 | | 192.7 | | 192.7 | | 191.5 |
| 2002 | 192.9 | | 194.7 | | 194.8 | | 195.7 | | 199.1 | | 200.4 | | 196.5 |
| 2003 | 199.8 | | 202.8 | | 202.3 | | 203.0 | | 206.8 | | 206.5 | | 203.9 |
| 2004 | 208.4 | | 208.7 | | 208.7 | | 208.9 | | 209.8 | | 211.7 | | 209.5 |
| 2005 | 211.3 | | 214.2 | | 214.6 | | 217.2 | | 220.1 | | 218.6 | | 216.4 |
| 2006 | 220.5 | | 221.3 | | 222.9 | | 225.1 | | 224.5 | | | | |

**CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS (CPI-U), NOT SEASONALLY ADJUSTED, Boston-Brockton-Nashua, MA-NH-ME-CT, ALL ITEMS, 1982-84=100, PERCENT CHANGE FROM 12 MONTHS AGO, NOT SEASONALLY ADJUSTED (R ) = Revised**

| year / month | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVG |
|--------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 1996 | 2.7 | | 2.8 | | 2.6 | | 2.7 | | 3.1 | | 3.7 | | 3.0 |
| 1997 | 3.4 | | 3.3 | | 3.0 | | 3.1 | | 2.6 | | 1.9 | | 2.8 |
| 1998 | 2.1 | | 1.9 | | 2.5 | | 2.2 | | 2.6 | | 2.3 | | 2.3 |
| 1999 | 1.7 | | 2.0 | | 1.9 | | 2.7 | | 2.7 | | 3.4 | | 2.5 |
| 2000 | 3.5 | | 4.6 (R) | | 4.3 (R) | | 4.5 | | 4.2 | | 4.6 | | 4.3 |
| 2001 | 4.9 | | 4.4 | | 5.1 | | 4.9 | | 4.6 | | 2.8 | | 4.3 |
| 2002 | 2.1 | | 2.0 | | 2.0 | | 1.9 | | 3.3 | | 4.0 | | 2.6 |
| 2003 | 3.6 | | 4.2 | | 3.9 | | 3.7 | | 3.9 | | 3.0 | | 3.8 |

| 2004 | 4.3 | 2.9 | 3.2 | 2.9 | 1.5 | 2.5 | 2.7 |
| 2005 | 1.4 | 2.6 | 2.8 | 4.0 | 4.9 | 3.3 | 3.3 |
| 2006 | 4.4 | 3.3 | 3.9 | 3.6 | 2.0 | | |

**CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS (CPI-U), NOT SEASONALLY ADJUSTED, Boston-Brockton-Nashua, MA-NH-ME-CT, ALL ITEMS, 1982-84=100, PERCENT CHANGE FROM 2 MONTHS AGO, NOT SEASONALLY ADJUSTED (R ) = Revised**

| year / month | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | 1.2 | | 0.4 | | -0.6 | | 0.1 | | 0.9 | | 1.7 | | |
| 1997 | 0.8 | | 0.2 | | -0.8 | | 0.2 | | 0.4 | | 1.0 | | |
| 1998 | 1.1 | | 0.1 | | -0.2 | | -0.1 | | 0.8 | | 0.7 | | |
| 1999 | 0.5 | | 0.4 | | -0.3 | | 0.6 | | 0.9 | | 1.4 | | |
| 2000 | 0.6 | | 1.4 | | -0.6 | | 0.8 (R) | | 0.6 | | 1.7 | | |
| 2001 | 0.9 | | 1.0 | | 0.0 | | 0.6 | | 0.3 | | 0.0 | | |
| 2002 | 0.1 | | 0.9 | | 0.1 | | 0.5 | | 1.7 | | 0.7 | | |
| 2003 | -0.3 | | 1.5 | | -0.2 | | 0.3 | | 1.9 | | -0.1 | | |
| 2004 | 0.9 | | 0.1 | | 0.0 | | 0.1 | | 0.4 | | 0.9 | | |
| 2005 | -0.2 | | 1.4 | | 0.2 | | 1.2 | | 1.3 | | -0.7 | | |
| 2006 | 0.9 | | 0.4 | | 0.7 | | 1.0 | | -0.3 | | | | |

**CONSUMER PRICE INDEX FOR ALL URBAN WAGE EARNERS AND CLERICAL WORKERS (CPI-W), NOT SEASONALLY ADJUSTED Boston-Brockton-Nashua, MA-NH-ME-CT All Items 1982-84 = 100 (R) = Revised**

| Year/Month | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1995 | 157.0 | | 156.9 | | 156.5 | | 156.6 | | 157.4 | | 159.3 | | 157.4 |
| 1996 | 161.1 | | 161.7 | | 160.8 | | 160.9 | | 162.1 | | 165.4 | | 162.2 |
| 1997 | 166.6 | | 166.8 | | 165.6 | | 165.8 | | 166.2 | | 167.8 | | 166.6 |
| 1998 | 169.3 | | 169.3 | | 168.9 | | 168.8 | | 169.9 | | 171.5 | | 169.7 |
| 1999 | 172.2 | | 172.3 | | 172.6 | | 173.3 | | 175.2 | | 177.8 | | 174.2 |
| 2000 | 178.6 | | 181.1 | | 180.6 (R) | | 182.3 (R) | | 183.2 | | 186.2 | | 182.4 |
| 2001 | 187.4 | | 189.3 | | 190.1 | | 191.3 | | 192.0 | | 191.9 | | 190.5 |
| 2002 | 191.8 | | 193.2 | | 193.3 | | 194.1 | | 197.7 | | 199.2 | | 195.2 |
| 2003 | 199.3 | | 202.3 | | 201.8 | | 202.2 | | 206.2 | | 205.6 | | 203.2 |
| 2004 | 206.3 | | 207.4 | | 207.9 | | 207.9 | | 208.8 | | 211.0 | | 208.4 |
| 2005 | 210.3 | | 213.1 | | 214.0 | | 216.0 | | 220.2 | | 217.7 | | 215.6 |
| 2006 | 219.5 | | 220.5 | | 222.9 | | 223.9 | | 224.3 | | | | |

**CONSUMER PRICE INDEX FOR ALL URBAN WAGE EARNERS AND CLERICAL WORKERS (CPI-W), NOT SEASONALLY ADJUSTED, Boston-Brockton-Nashua, MA-NH-ME-CT, ALL ITEMS, 1982-84=100, PERCENT CHANGE FROM 12 MONTHS AGO, NOT SEASONALLY ADJUSTED (R ) = Revised**

| Year/Month | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | 2.6 | | 3.1 | | 2.7 | | 2.7 | | 3.0 | | 3.8 | | 3.0 |
| 1997 | 3.4 | | 3.2 | | 3.0 | | 3.0 | | 2.5 | | 1.5 | | 2.7 |
| 1998 | 1.6 | | 1.5 | | 2.0 | | 1.8 | | 2.2 | | 2.2 | | 1.9 |
| 1999 | 1.7 | | 1.8 | | 2.2 | | 2.7 | | 3.1 | | 3.7 | | 2.7 |
| 2000 | 3.7 | | 5.1 | | 4.6 | | 5.2 (R) | | 4.6 | | 4.7 | | 4.7 |
| 2001 | 4.9 | | 4.5 | | 5.3 | | 4.9 | | 4.8 | | 3.1 | | 4.4 |
| 2002 | 2.3 | | 2.1 | | 1.7 | | 1.5 | | 3.0 | | 3.8 | | 2.5 |
| 2003 | 3.9 | | 4.7 | | 4.4 | | 4.2 | | 4.3 | | 3.2 | | 4.1 |
| 2004 | 3.8 | | 2.5 | | 3.0 | | 2.8 | | 1.3 | | 2.6 | | 2.6 |
| 2005 | 1.7 | | 2.7 | | 2.9 | | 3.9 | | 5.5 | | 3.2 | | 3.5 |
| 2006 | 4.4 | | 3.5 | | 4.2 | | 3.7 | | 1.9 | | | | |

**CONSUMER PRICE INDEX FOR ALL URBAN WAGE EARNERS AND CLERICAL WORKERS (CPI-W), NOT SEASONALLY ADJUSTED, Boston-Brockton-Nashua, MA-NH-ME-CT, ALL ITEMS, 1982-84=100, PERCENT CHANGE FROM 2 MONTHS AGO, NOT SEASONALLY ADJUSTED (R ) = Revised**

| Year/Month | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | 1.1 | | 0.4 | | -0.6 | | 0.1 | | 0.7 | | 2.0 | | |
| 1997 | 0.7 | | 0.1 | | -0.7 | | 0.1 | | 0.2 | | 1.0 | | |
| 1998 | 0.9 | | 0.0 | | -0.2 | | -0.1 | | 0.7 | | 0.9 | | |
| 1999 | 0.4 | | 0.1 | | 0.2 | | 0.4 | | 1.1 | | 1.5 | | |
| 2000 | 0.4 | | 1.4 | | -0.3 | | 0.9 | | 0.5 | | 1.6 | | |
| 2001 | 0.6 | | 1.0 | | 0.4 | | 0.6 | | 0.4 | | -0.1 | | |
| 2002 | -0.1 | | 0.7 | | 0.1 | | 0.4 | | 1.9 | | 0.8 | | |
| 2003 | 0.1 | | 1.5 | | -0.2 | | 0.2 | | 2.0 | | -0.3 | | |
| 2004 | 0.6 | | 0.3 | | 0.2 | | 0.0 | | 0.4 | | 1.1 | | |
| 2005 | -0.3 | | 1.3 | | 0.4 | | 0.9 | | 1.9 | | -1.1 | | |
| 2006 | 0.8 | | 0.5 | | 1.1 | | 0.4 | | 0.2 | | | | |

**Last Modified Date:** October 20, 2006

(A) **Back to Top**                                                                 **www.dol.gov**

**U.S. Bureau of Labor Statistics**
New England Information Office
JFK Federal Building
Room E-310
Boston, MA 02203

URL: **http://www.bls.gov/ro1/**
Phone: (617) 565-2327
Fax: (617) 565-4182
New England Information questions: **BLSinfoBoston@bls.gov**
Do you have a **Technical (web) question**?
Do you have **Other comments**?

# EXHIBIT D



# U.S. Department of Labor

**Bureau of Labor Statistics**
BLS Glossary

## www.bls.gov



**Advanced Search | A-Z Index**

BLS Home | Programs & Surveys | Get Detailed Statistics | Glossary | What's New | Find It! In DOL

[ **A** | **B** | **C** | **D** | **E** | **F** | **G** | **H** | **I** | **J** | **K** | **L** | **M** | **N** | **O** | **P** | **Q** | **R** | **S** | **T** | **U** | **V** | **W** | **X** | **Y** | **Z** ]

# Glossary

## A [top]

**Absence rate (Current Population Survey)**
The ratio of workers with absences to total full-time wage and salary employment. Absences are defined as instances when persons who usually work 35 or more hours per week worked less than 35 hours during the reference week for one of the following reasons: own illness, injury, or medical problems; childcare problems; other family or personal obligations; civic or military duty; and maternity or paternity leave.

**Accidental death and dismemberment (National Compensation Survey--Benefits)**
A term used to describe a policy that pays additional benefits to the beneficiary if the cause of death is due to a non-work-related accident. Fractional amounts of the policy will be paid out if the covered employee loses a bodily appendage or sight because of an accident.

**All other occupational illnesses**
Illnesses other than skin diseases or disorders, respiratory conditions, or poisoning. Examples include anthrax, brucellosis, infectious hepatitis, malignant and benign tumors, food poisoning, histoplasmosis, coccidioidomycosis.

**Alternative employment arrangements (Current Population Survey)**
BLS has collected data for workers in four types of alternative employment arrangements: 1) independent contractors, 2) on-call workers, 3) temporary help agency workers, and 4) workers provided by contract firms. **More information**

**Average hours per day (American Time Use Survey)**
This term refers to the average number of hours spent in a 24-hour day (between 4 a.m. on the diary day and 4 a.m. on the interview day) doing a specified activity.

**Average hours per day, population (American Time Use Survey)**
The average number of hours per day is computed using all responses from a given population, including respondents who did not do a particular activity on their diary day.

**Average hours per day, persons reporting the activity on the diary day (American Time Use Survey)**
The average number of hours per day is computed using only responses from those who engaged in a particular activity on their diary day.

## B [top]

**Base period**
A point in time used as a reference point for comparison with some later period.

from business establishments; time unit that employers use to pay employees that overlaps the 12th of the month; length of the pay period does not matter, as long as the 12th of the month is included in the pay period: For establishments with a Monday-through-Friday pay period, if the 12th of the month falls on a Saturday, it should be taken as the last day of the requested pay period, and if the 12th of the month falls on a Sunday, it should be taken as the first day of the requested pay period.

## Payroll employment (Current Employment Statistics)

Employment is the total number of persons on establishment payrolls employed full or part time who received pay for any part of the pay period which includes the 12th day of the month. Temporary and intermittent employees are included, as are any workers who are on paid sick leave, on paid holiday, or who work during only part of the specified pay period. A striking worker who only works a small portion of the survey period, and is paid, would be included as employed under the CES definitions. Persons on the payroll of more than one establishment are counted in each establishment. Data exclude proprietors, self-employed, unpaid family or volunteer workers, farm workers, and domestic workers. Persons on layoff the entire pay period, on leave without pay, on strike for the entire period or who have not yet reported for work are not counted as employed. Government employment covers only civilian workers. With the release of NAICS-based estimates in June 2003, the scope and definition of Federal Government employment estimates changed due to a change in source data and estimation methods. The previous series was an end-of-month federal employee count produced by the Office of Personnel Management, and it excluded some workers, mostly employees who work in Department of Defense-owned establishments such as military base commissaries. Beginning in June 2003, the CES national series began to include these workers. Also, Federal Government employment is now estimated from a sample of Federal establishments, is benchmarked annually to counts from unemployment insurance tax records, and reflects employee counts as of the pay period including the 12th of the month, consistent with other CES industry series. The historical time series for Federal Government employment was revised to reflect these changes.

## Percentile wage estimate

Shows what percentage of workers in an occupation earn less than a given wage and what percentage earn more. For example, a 25th percentile wage of $15.00 indicates that 25% of workers (in a given occupation in a given area) earn less than $15.00; therefore 75% of workers earn more than $15.00.

## Permanent job losers (Current Population Survey)

Unemployed persons whose employment ended involuntarily and who began looking for work.

## Primary activity (American Time Use Survey)

A primary activity is the main activity a respondent was doing at a specified time. Most published time use estimates reflect time spent in primary activities only.

## Price Index

A price index is a tool that simplifies the measurement of price movements in a numerical series. Movements are measured with respect to the base period, when the index is set to 100.

## Producer Price Index (PPI)

A family of indexes that measure the average change over time in selling prices received by domestic producers of goods and services. PPIs measure price change from the perspective of the seller. This contrasts with other measures that measure price change from the purchaser's perspective, such as the Consumer Price Index (CPI). Sellers' and purchasers' prices may differ due to government subsidies, sales and excise taxes, and distribution costs.

## Productivity

A measure of economic efficiency that shows how effectively economic inputs are