UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| ANTHONY MENDES | * | |
| AND DORIS MENDES, | * | |
| | * | |
| Plaintiffs, | * | C. A. No.: 05-11765-DPW |
| | * | |
| v. | * | |
| | * | |
| CENDANT MORTGAGE, | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE PLAINTIFFS' EXPERTS FROM TESTIFYING AND TO STRIKE THEIR EXPERT REPORTS

Plaintiffs, Anthony and Doris Mendes, hereby submit their opposition to defendant's motion to preclude plaintiffs' experts from testifying and to strike their expert reports. Briefly stated, the motion should be denied because: (1) plaintiffs' experts are qualified to render their opinions; (2) issues raised as to plaintiffs' experts' opinions should be addressed on cross-examination and; (3) the opinions are relevant to plaintiffs' claims.

## FACTS[1]

Mr. and Mrs. Mendes were unsophisticated buyers in 2001. Mr. Mendes worked as a cook at a nursing home. Deposition of Anthony Mendes ("A. Mendes Dep."), pp. 10-13.[2] Mrs. Mendes worked as an aide at a nursing home and possessed a second job where she worked from 11:00 p.m. until 6:30 a.m. as a medical records clerk. Deposition

---

[1] These facts and supporting exhibits are set forth in Plaintiffs' Opposition to Cendant's Summary Judgment Motion.

[2] Deposition pages of Mr. Mendes' deposition are attached as Exhibit A to Affidavit of Christopher J. Trombetta.

of Doris Mendes ("D. Mendes Dep."), pp. 11-12.[3] She is from Peru and speaks broken English. D. Mendes Dep., pp. 5-6, 9, 13. In 2001, they were seeking to purchase their very first home. A. Mendes Dep., pp. 22-23, 116.

In the spring of 2001, Anthony and Doris Mendes viewed multi-family properties listed for sale. A. Mendes Dep., pp. 22-23. As to three of such properties, Cendant provided letters to Mr. and Mrs. Mendes in March, May and June 2001. In the letters, Cendant agreed to provide to Mr. and Mrs. Mendes a mortgage loan insured by the FHA. Cendant selected this loan and never explained it or any alternatives to Mr. and Mrs. Mendes. A. Mendes Dep., pp. 45, 52-53, 78-79, 195. Mr. and Mrs. Mendes also did not understand the meaning of FHA. Id.

Cendant issued a June 12, 2001 letter applicable to the purchase by Mr. and Mrs. Mendes of the Mansfield, Massachusetts property, 1-3 Chilson Avenue. The letter stated:

| | |
|---|---|
| Sales Price: | $310,00 |
| Loan Amount: | $307,545 |
| Interest Rate: | 7.125% |
| Type/Term of Loan: | FHA, 360 Months |

YOU'RE APPROVED!

```
* * * * * * * * *
*  FHA           *
*  APPROVAL  *
* * * * * * * * *
```

A. Mendes Aff., ¶ 2, Ex. B.

The letter went on to state:

We're pleased to tell you that you've been approved for a mortgage loan in the amount of $307,545.00. From here on, getting the home you want will be an easy as 1-2-3. We'll be with you all the way, from the application process right through closing

---

[3] Deposition pages of Mrs. Mendes' deposition are attached as Exhibit B to Affidavit of Christopher J. Trombetta

Now that your application is already completed and on file with us, all you need to do is find your dream home. As soon as you do, simply call us at 1-800-236-3268, Ext. 84853, to give us the property address, and we'll make sure your loan closes right on time – guaranteed.

Id. (emphasis added).

The letter also noted that Mr. and Mrs. Mendes could house hunt with confidence "[k]nowing that [their] mortgage [had been] approved" and be "confident that the closing process will be smooth and easy." Id. The letter also indicated that because "your financing [is] secured and a closing date is guaranteed, sellers know that your offer is solid." Id. [4]

### Mr. and Mrs. Mendes Satisfied the Lender's Indication That an Appraisal Be Conducted and That Their Incomes Become Verified.

Cendant claims that Mr. and Mrs. Mendes did not satisfy what it claims are two requirements set forth in the June 12, 2002 letter. That letter stated that Cendant would need to obtain an appraisal as to the property, 1-3 Chilson Avenue, and verify the income and assets of Mr. and Mrs. Mendes. Each of these alleged requirements were satisfied.

### The Appraisal Related Only to the Property's Sale Price and Cendant Received an Adequate Appraisal.

Cendant misleadingly contends that the requested appraisal needed to indicate that seventy-five percent of total rents would be greater than the monthly mortgage payment. The appraisal referred to in the letter, however, related only to support for the sales price. That conclusion is made clear in the conditions attached to the May 3, 2001 letter. Those conditions indicate that an appraisal "supporting the sale price needed to be acquired."

---

[4] Cendant contends that Mr. and Mrs. Mendes cannot rely on this letter because they do not possess all of its pages. Mr. and Mrs. Mendes produced all pages that it possessed. A Mendes Dep., p. 64. More important, however, is that Cendant does not even possess a copy of the letter.

Shortsleeve Expert Report, p. 1.[5] The relevant appraisal supported the price of 1-3

Chilson Avenue.  A. Mendes Aff., ¶7, Ex. G.

More important is that rents played no role in calculating the value of 1-3 Chilson

Avenue.  The appraiser based its appraisal on comparisons to other properties.  Indeed, if

Mr. and Mrs. Mendes needed to meet requirements as to rent, that issue should have been

set forth in the June 12, 2001 letter.  Shortsleeve Expert Report, p. 2.  Cendant's failure to

mention in its June 21, 2001 letter any rent condition precluded it from asserting such a

condition in August 2001.  Id.

Mr. and Mrs. Mendes Possessed Adequate Income
and Cendant Never Indicated that a Deficiency Existed.

Cendant's September 10, 2001 Government Underwriting Worksheet verifies that

Mr. and Mrs. Mendes possessed sufficient income.  Trombetta Aff., ¶7, Ex. F.[6]  This

income differs from the amounts set forth in the application because Cendant had

received verification as to income amounts.  Cendant had the ability to obtain this

information based on a release which Mr. and Mrs. Mendes executed income 2001.  A.

Mendes Aff. ¶3, Ex. C.  Cendant also received documents which evidenced Mr. Mendes'

income of $3,500 per month and Mrs. Mendes' income of nearly $3,900 per month as set

forth in the application.  A. Mendes Aff., ¶6, Ex. F.  (attaching several documents

forwarded by Mr. and Mrs. Mendes to Cendant).[7]  Furthermore, tax returns filed by Mr.

---

[5] Mr. Shortsleeve's report is attached as Exhibit H to the Trombetta Affidavit.
[6] This verification also is apparent based on the change in income figures previously indicated on a July 10, 2001 government underwriting worksheet.  Trombetta Aff., ¶6, Ex. E.
[7] Cendant also had received income and asset information from Mr. and Mrs. Mendes before issuing its prior letter in May.  A. Mendes Aff., ¶1, Ex. A.  That conclusion also is evidenced by the reference to earnings figures relating to Mr. and Mrs. Mendes in the May 3, 2001 letter.  Mendes Aff., ¶1, Ex. A. Cendant obtained information from Mr. Mendes by telephone.  A. Mendes Dep., p. 48.  Cendant also had forwarded a list of conditions with the May 3, 2001 letter it had forwarded to Mr. and Mrs. Mendes.  A. Mendes Aff., ¶1, Ex. A.  Mr. and Mrs. Mendes satisfied each of these conditions.  Expert Report of Connor Shortsleeve. p. 2.

4

and Mrs. Mendes indicate that they earned more that the amounts appearing on the worksheet. Id. ¶13, Ex. H.

Cendant also incorrectly understated their income on the September 10, 2001 government underwriting worksheet. Cendant included base and overtime income in calculating Mrs. Mendes' $3,087.84 earnings figure.[8] Cendant, however, failed to include $748 in income earned from Mrs. Mendes' second job. That amount appeared on the application but does not appear on the underwriting worksheet. Mrs. Mendes had provided Cendant evidence that she earned such amounts. Mendes Aff., ¶ 6, Ex. F.

Moreover, the rental income set forth in the September 10, 2001 government underwriting worksheet also qualified Mr. and Mrs. Mendes for an FHA loan. Trombetta Aff., ¶9, Exhibit H. (Shortsleeve Expert Report, pp. 1-2). That conclusion would have been apparent to Cendant had it included Mrs. Mendes' income form her second job on the worksheet. Id. Mr. and Mrs. Mendes also could have obtained a gift from Doris Mendes' mother to fund the down payment and any closing expenses that may have arisen. D. Mendes Aff, ¶¶1-4.

Cendant Never Indicated that Rents Must Exceed
Seventy-Five Percent of the Monthly Mortgage Payment.

Cendant contends that Mr. and Mrs. Mendes did not qualify for an FHA loan because seventy-five percent of the rental amounts to be earned from 1-3 Chilson Avenue did not exceed the monthly mortgage payment. Cendant, however, failed to advise Mr. and Mrs. Mendes of this condition even though it knew when it completed the application that Chilson Avenue was a three unit property. Trombetta Aff., ¶8, Ex. G. Cendant also

---

[8] This conclusion is apparent by adding the base income and overtime figures appearing in the application. Trombetta Aff., ¶8, Ex. G.

never forwarded the application to Mr. and Mrs. Mendes for review or signature. A.
Mendes Aff., ¶10.

The application also indicated that the mortgage payment equals $2,467. The
application also indicates that net rents as to two apartments amount only to $1,575. A
$900 deficiency existed between the rental amount and mortgage amount. Accordingly,
the gross rent from all apartments needed to exceed $3,289 to satisfy the alleged
requirement that seventy-five percent of all net rents to be earned on all three units
exceed the monthly mortgage amount. Thus, the third apartment need to receive rents in
excess of $1,189. The application, however, contained no analysis as to whether seventy-
five percent of gross rents would exceed the mortgage amount. The application also did
not indicate that rent on the third apartment would need to exceed $1,189. Trombetta
Aff., ¶8, Ex. G.

That failure is glaring for at least two reasons. First, the rental amounts listed in
the application indicate that the property would not satisfy that requirement. Second,
Cendant contends that it obtained projected rents from Anthony Mendes, a first time
buyer with no real estate experience. A. Mendes Dep. P. 80. Accordingly, Cendant
could not rely and should not have relied on any estimate provided by him.

Even more significant is that the Cendant representative, who completed the
application, never advised Mr. and Mrs. Mendes in its June 12, 2001 or any prior letter
that such a condition would exist as to their purchase of 1-3 Chilson Avenue. A. Mendes
Aff., ¶¶1-2, Exs. A & B.   This representative had received more than seven months of
training as to qualifications for mortgage loans, including those guaranteed by the FHA.

Deposition of Richard Luongo ("Luongo Dep."), pp. 9-12.[9] In creating the application, this representative also used a computer program that applied all FHA requirements. Luongo Dep., pp. 103-04, 116-17. Despite his training and the use of this program, no indication existed as to a requirement that net rents must exceed the mortgage amount.

Furthermore, this representative also indicated that Cendant did not need to follow the guidelines. The lenders had the ability to deviate. Id. pp. 63-64, 99-102. See also Shortsleeve Expert Report, p. 2. Accordingly, Cendant could have elected and apparently did elect not to apply this requirement in making its decision to make the loan. Id.

### Mr. and Mrs. Mendes Relied on the June 21, 2001 Letter to Their Detriment.

In reliance on Cendant's representation contained in the June 12, 20001 letter, Mr. and Mrs. Mendes did not pursue a loan from any other lender. A. Mendes Aff., ¶8; A. Mendes Dep., p. 177. At Cendant's direction, they went onto sign a purchase and sale agreement as to 1–3 Chilson Avenue based on their understanding that they would receive a mortgage loan from Cendant. A. Mendes Dep., pp. 112-13, 134. They funded a $9,000 deposit as to the property. A. Mendes Dep., pp. 144-45. Mr. and Mrs. Mendes then simply waited more than two months to close. A. Mendes Dep., p. 177.

### Cendant Did Not Forward a Commitment Letter Until August 10, 2001.

On August 10, 2001, nearly two months after it had completed the application and sent the June 12, 2001 letter guaranteeing financing, Cendant forwarded Mr. and Mrs. Mendes what it claims is a commitment letter. A. Mendes Aff., ¶4, Ex. D. Cendant never addressed or discussed the letter with Mr. and Mrs. Mendes. It told them to sign the letter and then return it. A. Mendes Dep., pp. 187. Mr. and Mrs. Mendes also did not

---

[9] Deposition pages of Mr. Luongo's deposition are attached as Exhibit C to Affidavit of Christopher J. Trombetta.

understand that they needed to execute a commitment letter to obtain the loan. A. Mendes Dep. pp. 192-30, 126-27.

Mr. and Mrs. Mendes also understood that the language set forth in the letter indicated only that additional income, which they had earned, would satisfy any deficiencies as to rent. A. Mendes Dep., p. 169. The letter indicated:

> Appraiser to provide the net market rental for all 3 units for the area to evidence that PITI doesn't exceed 75% of the market rental (also to obtain additional income to lower ratios).

Id.[10]

The language in the parenthetical indicated to Mr. and Mrs. Mendes that their income needed to satisfy relevant ratios. A. Mendes Dep., p. 169. They already understood that they possessed sufficient income because Cendant had so indicated in approving them for the loan. Accordingly, this provision did not indicate that net rents needed to exceed the monthly mortgage payment.

Cendant also forwarded this letter after it had received on July 11, 2006 an appraisal listing total rents of $2,075 as to all units and after an analysis had been completed as to whether Mr. and Mrs. Mendes qualified for an FHA loan. Mendes Aff., ¶7, Ex. G. Cendant never indicated any requirement as to total rents in the month preceding the forwarding of the alleged commitment letter.

### Cendant Appointed Lawyers to Close the Loan to Mr. and Mrs. Mendes.

Cendant also continued to represent that it would make the loan. Attorneys, which it had hired, forwarded a letter to Mr. and Mrs. Mendes just prior to the closing date indicating that the closing would occur. Mendes Aff., ¶5, Ex. E. Cendant did not

---

[10] Cendant had never made such a representation during the two month loan process. A. Mendes Aff., ¶9.

refuse to make the loan until just several days before the scheduled day of the closing. A. Mendes Dep., p. 173.

Cendant Failed to Advise of Other Available Loans.

Cendant also failed to offer Mr. and Mrs. Mendes any options as to other loans for which they could qualify. A. Mendes Dep., p. 190. Cendant, however, had indicated that it had the ability to do so. In its June 12, 2001 letter, it stated:

> FLEXIBILITY. Although you've been approved for a specific loan amount, we realize that your loan requirements may change. Simply call us if you need to change your loan amount, or the term or type of loan.

A. Mendes Aff., ¶4, Ex.D.

Mr. and Mrs. Mendes earned sufficient income to qualify for a loan which required them to produce a down payment of ten percent of the price of 1–3 Chilson Avenue. Various firms offered loans which required ten percent down payments and as to which Mr. and Mrs. Mendes qualified. Obtaining such a loan would have permitted Mr. and Mrs. Mendes to purchase 1-3 Chilson Avenue. Expert Report of Connor Shortsleeve, p. 3. If necessary, Mr. and Mrs. Mendes also had the ability to obtain from Mrs. Mendes' mother a gift in an amount necessary to obtain a mortgage to provide a ten percent down payment. Affidavit of Doris Mendes, ¶¶1-4.

Following Cendant's Refusal to Fund a Loan to Mr. and Mrs. Mendes the
Terms of Their Purchase and Sale Agreement Expired and the
Owner Sold the Property to Anther Buyer.

Following Cendant's refusal to make a loan to Mr. and Mrs. Mendes the terms of their purchase and sale agreement expired. They no longer had the right to purchase the property. The owner then sold the home to another buyer within thirty days. A. Mendes

9

Aff., ¶12. Accordingly, Mr. and Mrs. Mendes lost the opportunity to purchase the

Chilson Avenue property. A. Mendes, ¶12.

## ARGUMENT

Federal Rule Evidence 702 has been interpreted liberally in favor of the admission

of expert testimony. Levin v. Dalva Brothers, Inc., 459 F.3d 68, 79 (1st Cir. 2006). See

also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 488, 113 S. Ct. 2786, 125 L. Ed.

2d 469 (1993). As such, expert witnesses need not have overly specialized knowledge to

offer opinions. Levin, 459 F.3d at 79. See also Gaydar v. Sociedad Instituto Gineco-

Quirurgico y Planificacion, 345 F.3d 15, 24-25 (1st Cir 2003).

Liberal policy of admissibility extends to substantive as well as formal

qualification of experts, such that an expert can testify based on a broad range of

knowledge, shells, harming and experience. See In re: Paoli R.R. Yard PCB Litig., 35

F.3d 717, 741 (3d Cir. 1994). Gaps in qualification or knowledge go to weight of

witnesses' testimony, not its admissibility. See F.R.E. 702.

1.    Peter Tetreault's Opinions are Admissible

A.    Peter Tetreault May Testify as to the Appreciation of the Chilson
Avenue Property.

Cendant wrongly contends that a real estate appraiser may not testify as to the

value of real estate in the future. Real estate appraisers are familiar with calculating the

value of real estate. Mr. Tetreault has been an appraiser for more than thirty years. His

background has made him familiar with the appreciation (and depreciation) of real estate

prices over time. In rendering his opinions he has utilized that experience. That

experience permits him to analyze how property will appreciate in the future.

Accordingly, he may testify as to appreciation of the value or the Chilson avenue property.

      B.  Cendant's Contentions as to the Correct Measure of the Consumer Price Index Is an Issue to be Addressed on Cross Examination.

Cendant repeatedly (and incorrectly) states that Mr. Tetreault utilized the wrong measure as to the Consumer Price Index. Simply put, Mr. Tetreault disagrees with Cendant. If Cendant wishes to contend that he used the incorrect measure, it may do so on cross examination. Any disagreement as to the mere substance of the opinion does not render it incompetent or inadmissible. See Micro Financial, Inc. v. Premier Holidays Int'l, Inc., 385 F.3d 72, 81 (1st Cir. 2004).

      C.  Peter Tetreault's Opinion Is Relevant to Calculating Plaintiffs' Damages.

Even if one assumes that damages are to be determined at the time the breach occurs, the Mendes are entitled to two elements of damages. Cendant, however, contends that it owes Mr. and Mrs. Mendes nothing based on its breach of its agreement to provide them with a loan.[11] This contention is wrong.

Mr. and Mrs. Mendes are owed damages relating to: (1) lost appreciation as to the Chilson Avenue property and; (2) loss of rent that they would have received during their period of ownership. Lost appreciation relates to the increase in the property's value during their period of ownership.[12] This value is based only on the fact that the property contains three rental apartments. The appraisal is based only on the availability of such

---

[11] Cendant relies on Anzalone v. Strand, 14 Mass. App. Ct. 45, 47-50 (1982). That case, however, provides that plaintiffs are entitled to recovery of all pecuniary loss, which is what Mr. and Mrs. Mendes claim in this case.

[12] Mr. and Mrs. Mendes would have resided in the home at least for fifteen years. At that time, they hoped to consider retirement.

11

units. It does not depend on whether the owner ever rented the apartments or collected any rent.

Mr. and Mrs. Mendes also lost the opportunity to receive rent on two apartments during the period of their ownership. Mr. Tetreault's report sets forth the rental income to be received on all three apartments and expenses applicable to the property. Those figures are used to calculate the lost rent as to two units and expenses. The total net amount of lost income during that fifteen year period exceeds $300,000.[13] See Shahidi v. Michael, 2005 WL 3294663 (Mass. App. Div. 2005) (claim for future rent); 250 L.L.C. v. Photopoint Corp. (USA), 131 Cal. App. 4th 703, 715-16, 32 Cal. Rptr. 293, 304-05 (2005) (claim for future rent).[14]

## 2. Connor Shortsleeve's Opinions Are Admissible.

### A. Mr. Shortsleeve's Opinions as to the May 3 and June 12, 2001 Letters Are Competent.

Mr. Shortsleeve has offered opinions relating to conditions set forth (and not set forth) in May 3 and June 12, 2001 letters forwarded by Cendant to Mr. and Mrs. Mendes and the meaning of such letters in the industry. He states what conditions should have appeared in the letters and what the absence of various conditions means in the mortgage industry. He also opines that such letters form commitments to loan based on the language used. Accordingly, his testimony relates to standards in the industry.

---

[13] Lost income would include rent as to two apartments. That rent rose from $1,400 to approximately $2,645 in 2016. These figures are determined by multiplying total rent by .58, which is the percentage applicable to the two remaining units. After deducting expenses, the total lost income amounted to approximately $300,000. In calculating expenses, taxes were not included because they would be forwarded with the mortgage payment.

[14] Any contention that Mr. and Mrs. Mendes needed to purchase a second multi-family property after Cendant's breach is misguided. Initially, real estate is considered to be "unique." Thus, Mr. and Mrs. Mendes did not have an obligation to purchases a second property which they did not like. More important, however, is that Cendant told Mr. and Mrs. Mendes that they did not qualify for a loan to purchase a multi-family home. Accordingly, Cendant deprived them of the understanding that they could even pursue such a purchase.

Testimony as to such standards from an expert in the mortgage industry is admissible. See Levin, 459 F.3d at 79; Ford v. Allied Mut. Ins. Co., 72 F.3d 836, 841 (10th Cir. 1996).[15] Moreover, this opinion is not only relevant but needed because former Cendant mortgage personnel will testify that the letter only was a pre-qualification letter which is not binding in the industry.

### B. Mr. Shortsleeve May Testify as to Whether Mr. and Mrs. Mendes Qualified for an FHA Loan Because His Opinion Is Derived From His Experience.

Mr. Shortsleeve has experience as to whether individuals qualify for FHA loans. See Cendant Mem., Ex. 2 (curriculum vitae). Accordingly, in his experience he has reviewed individuals' financial and other qualifications and then determined if they qualified for an FHA loan. Nearly all of the loans he originated closed. Thus, he is knowledgeable as to FHA requirements and can determine whether individuals would qualify for such mortgages.

Cendant's contention that Mr. Shortsleeve did not state the basis for his opinions is ludicrous. Mr. Shortsleeve's statement that Cendant did not consider Mrs. Mendes' second job is evidenced by a Cendant document which demonstrates that very fact. See supra, p. 5. Cendant cannot now make a half-hearted and baseless contention to avoid a fact which has been addressed numerous times by the parties. Indeed, this very fact is addressed in Mr. and Mrs. Mendes' summary judgment opposition.

Cendant's attack on Mr. Shortsleeve's opinions as to qualifying Mr. and Mrs. Mendes based on debt reduction also misses the mark. As a mortgage broker he

---

[15] Mr. Shortsleeve also offers an opinion that the July 11, 2001 appraisal satisfies defendant's request in the June 12, 2001 letter for an appraisal. This opinion shows that Cendant had requested an appraisal as to sale price but not as to rental amounts.

determined if individuals qualified for various loans. He engaged in the very same practice in determining that Mr. and Mrs. Mendes qualified for various loans. Mr. Shortsleeve also relied on information provided to him as a basis for rendering his opinion that Mr. and Mrs. Mendes had this ability. For example, he relied on evidence indicating Mr. and Mrs. Mendes had the ability to obtain a gift in the amount of $5,250. See supra, p. 9.[16] Accordingly, his reliance on that information is appropriate.

Finally, Mr. Shortsleeve's opinion as to consolidation of debt also would be based on evidence offered by Mr. and Mrs. Mendes. If they offer such evidence, Mr. Shortsleeve's opinion has a foundation and is admissible.

C.          Mr. Shortsleeve May Testify That Mr. and Mrs. Mendes
               Qualified for Loans from Other Sources.

Mr. Shortsleeve is a mortgage broker. He is familiar with loans being offered by numerous lenders. His job is to determine if borrowers qualify for programs offered by such lenders. Mr. Shortsleeve engaged in such an analysis in determining that Mr. and Mrs. Mendes would have qualified for a loan in 2001.

Any criticisms of Mr. Shortsleeve's technique is unwarranted. He engages in this very same analysis every day. He review borrowers' finances, determines what he can do to raise a down payment and determines what can be done to reduce debt in order to qualify an individual for a loan. He performed that very analysis in connection with rendering his opinion. Moreover, any contention that his opinion is inadmissible because it is not scientific in value misses the point. Based on his experience, his opinions are admissible even if not scientific in nature. Turf Racing Products, Inc. v. American

---

[16] Mr. Shortsleeve's indication that Mr. and Mrs. Mendes had the ability to borrow should indicate that they had the ability to obtain a gift.

Suzuki Motors Corp., 223 F.3d 585, 591 (7th Cir. 2000). (witness need not put forth

testimony in scientific manner to be considered an expert).

Finally, Mr. Shortsleeve has identified lenders who would fund the loans. He

provided a copy of that list to Cendant shortly after September 19, 2006. The lenders

include American Home Mortgage, Ohio Savings, and Boston Federal Savings and

Nation One, GMAC, NetBank, and Aurora which offered high loan to value financing.

## CONCLUSION

For the reasons set forth above, Cendant's Motion to Preclude Plaintiffs' Experts

from Testifying and to Strike Their Expert Reports should be denied.

ANTHONY AND DORIS MENDES,

By their attorney,
LAW OFFICE OF CHRISTOPHER J. TROMBETTA

\s Christopher J. Trombetta
Christopher J. Trombetta (BBO #556923)
310 North Main Street, Suite 6
Mansfield, MA 02048
(508) 339-5900

December 22, 2006

## CERTIFICATE OF SERVICE

I, Christopher J. Trombetta, do hereby certify that on December 22, 2006 a copy

of the foregoing document has been served via first class mail on opposing counsel in this

action.

\s Christopher J. Trombetta
Christopher J. Trombetta