```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


ANTHONY MENDES and              )
DORIS MENDES,                   )
     Plaintiffs,                )
                                )       CIVIL ACTION NO.
          v.                    )       05-11765-DPW
                                )
CENDANT MORTGAGE,               )
     Defendant.                 )
```

MEMORANDUM AND ORDER
July 12, 2007

Defendant Cendant Mortgage ("Cendant") has moved for summary judgment in this action brought by plaintiffs Anthony and Doris Mendes (collectively "Mendes") for breach of contract and violation of Mass. Gen. Laws ch. 93A. For the reasons discussed more fully below, I will grant Cendant's summary judgment motion.

## I. BACKGROUND

Anthony and Doris Mendes, a married couple, sought financing in 2001 to purchase their first home. A Century 21 real estate broker referred the couple to Cendant Mortgage to get preapproval for a loan. Undisputed testimony from Richard Luongo, a senior loan consultant at Cendant at the time, indicates that Cendant's standard process was to offer customers tentative preapproval based on credit reports and self-reported income, often before a specific property had been located. After locating a property, the customer would pay the mortgage application fee, an underwriter would be assigned, and a mortgage application loan package would be generated and sent out for signatures. The loan

package generally contained contingencies which had to be satisfied for the loan to be completed.

In this case, three preapproval letters were sent, on March 21st, May 3rd, and June 12th of 2001, for loan amounts ranging from $272,832.00 to $337,335.25. The Mendes were preapproved for an FHA-insured loan, which allowed them to put only three percent down as a deposit. On June 12, 2001, the Mendes looked at a three-family house for sale at 1-3 Chilson Avenue, Mansfield, Massachusetts, and submitted an offer to buy the house the same day. The offer contained a mortgage contingency clause, which allowed the Mendes to terminate the offer if a suitable loan could not be obtained by August 17, 2001. On June 14, 2001, Mr. Mendes talked to Mr. Luongo on the telephone, and submitted an application for mortgage financing. This application included unverified information about the Mendes' employment income, their debts, and other related information. Mrs. Mendes also paid a $350 deposit to Cendant on a Visa card on June 14, 2001. Mr. and Mrs. Mendes and the seller signed a purchase and sale agreement on July 6, 2001, which contained a separate mortgage contingency clause, this one with a commitment date of July 31, 2001 for an FHA loan in the amount of $297,000.00. A closing was scheduled for August 31, 2001.

On or about August 10, 2001, Cendant sent a Final Commitment Letter to the Mendes. That letter stated it included the "final terms" of the loan and specified conditions that had to be

satisfied for financing to be finalized.  These included showing the source of the $9,000 deposit, obtaining an escrow letter from an attorney, and providing evidence from an appraiser to confirm that the ratio of market rent to PITI (Principal, Interest, Taxes, and Insurance) was acceptable.  Both Mr. and Mrs. Mendes acknowledge signing the Final Commitment Letter on August 14, 2001, although it is unclear whether they concede either reading or understanding it.  The Mendes also acknowledge they did not comply with the stated conditions.

When the Mendes did not comply with the conditions in the Final Commitment Letter, Cendant refused to provide the FHA loan for which it had preapproved the Mendes.  Closing was postponed until September 13, 2001 but the Mendes never provided the necessary information, and Cendant did not authorize financing.  The Mendes eventually bought a different property, a one-family house, using a different mortgage company.  Both the $9,000 deposit on the 1-3 Chilson Avenue property and the $350 Cendant loan fee were promptly refunded to the Mendes.

Nearly four years later, the Mendes brought this suit in Massachusetts state court and Cendant removed the case to this court on diversity grounds.  In their complaint, the Mendes allege damages of over $360,000, for lost rent and appreciation.  Cendant maintains it had no obligation to provide financing, once Mr. and Mrs. Mendes failed to satisfy the express conditions of the agreement.

## II. DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995), *cert. denied*, 515 U.S. 1103 (1995).  Once the moving party makes such a showing, the non-moving party must point to specific facts demonstrating that there is, indeed, a trialworthy issue.  *Id.*

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party."  *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir. 1996)).  "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

B.   **Breach of Contract Claims**

The parties disagree over the legal significance of various pieces of correspondence, including the June 12, 2001 preapproval letter, and the August 10, 2001 Final Commitment Letter. However, the underlying facts are largely undisputed, and the Mendes acknowledge receiving both the June 12, 2001 letter and the Final Commitment Letter.  They both also acknowledge signing the Final Commitment Letter, and do not allege that they were under duress or legal incapacity when the letter was signed.

1.   June 12, 2001 Preapproval Letter

The Mendes have alleged that Cendant "agreed, or at least promised, to provide a mortgage loan" in the June 12, 2001 letter.  As Mr. Luongo explained in his deposition testimony, the June 12, 2001 letter is a general preapproval letter, not sent in response to any particular property.  In any case, by its own terms, the June 12, 2001 letter is conditional.  It clearly states that the potential borrower must call Cendant once a specific home has been selected for purchase, so Cendant can "arrange and receive a satisfactory appraisal on the home you intend to buy, and [] verify your income and assets" before finalizing the loan.  Previous versions of the preapproval letter sent to Mr. and Mrs. Mendes also included a two page checklist of necessary steps to be taken and information to be provided before the loan could close.  The record is unclear on whether these

additional pages were sent along with the June 12, 2001 letter. Accordingly, viewing the evidence in the light most favorable to Mr. and Mrs. Mendes, I must assume the additional checklist was not included with the June 12, 2001 letter. However, the fact that Mr. and Mrs. Mendes had previously received such a checklist indicates they were advised that as a general proposition additional steps had to be taken to secure their mortgage loan. Given the conditional language of the June 12, 2001 letter, and the fact that the Mendes had been put on notice that additional action was required on their part to complete the loan, it was unreasonable for the Mendes to assume, as apparently they contend they did, that an unconditional promise had been made by Cendant to provide a mortgage for more than $300,000 on a property which had not yet been identified, irrespective of whether Mr. and Mrs. Mendes verified their income and assets, or a satisfactory appraisal could be obtained.

    2.   Final Commitment Letter

Even assuming Mr. and Mrs. Mendes had the mistaken impression that an unconditional promise had been made in the June 12, 2001 letter, the Final Commitment Letter, received no later than August 14th, sixteen days before the scheduled closing date, definitively clarified matters. This letter, entitled "FINAL COMMITMENT," began "Cendant Mortgage Corporation is pleased to issue a mortgage loan commitment to you which reflects the final terms of your loan." The wording of the document made

clear that it was an offer from Cendant, which could be accepted by Mr. and Mrs. Mendes ("P. <u>Acceptance</u>: To accept this commitment, you must sign below and return this letter to us within 15 days from the date of this letter.  This agreement cannot be changed orally.").  In accepting the terms of the Final Commitment Letter, the Mendes necessarily agreed to modify any preexisting contract.  As a consequence, Cendant's only potential liability is for breach of the terms of the Final Commitment Letter.

The first section, "<u>A. Your Approved Loan terms</u>," included information on the loan amount, interest rate, and other related items.  Important pieces of information, including the loan amount and interest rate, were different than the June 12, 2001 letter.[1]  Part C, "<u>Conditions to commitment</u>," states: "*Please read the conditions listed below carefully*.  They are a part of this commitment and are needed to meet your August 31st, 2001 closing date."  The listed conditions included showing the source of the $9,000 deposit, obtaining an escrow letter from an attorney, and providing evidence from an appraiser to confirm that the ratio of market rent to PITI (Principal, Interest, Taxes, and Insurance) was acceptable. Part G, "<u>Expiration of Commitment</u>," set a commitment expiration date of August 31, 2001,

---

[1] For example, the interest rate in the June 12, 2001 letter was 7.125; in the Final Commitment Letter it was 7.250.  The total loan amount was $307,545.00 in the June 12, 2001 letter and $302,231.00 in the Final Commitment Letter.

and unequivocally stated that "We may cancel this commitment if something occurs which we feel may effect the security or your ability to repay this loan."

Mr. and Mrs. Mendes signed pages two and three of the Final Commitment Letter.  Above the signature block on the second page was the following statement: "ACCEPTANCE OF OFFER: The terms and conditions offered by the Final Commitment letter and Attachments are accepted by the undersigned."  The only writing on the third page, other than the signature block, was the Addendum to Part C, which contained "<u>Conditions to commitment, continued</u>."  Having signed the Final Commitment Letter, whose terms varied materially from the June 12, 2001 preapproval letter, the Mendes were bound by its terms, which superseded any prior related contracts.  The Final Commitment Letter clearly stated specific conditions that had to be satisfied for the loan to close on time.  There could be no question that if the Mendes failed to satisfy the stated conditions, Cendant had no legal obligation to close the loan.

It is undisputed that the Mendes failed to satisfy several of the conditions in the Final Commitment Letter, including showing the origin of the $9,000 deposit, providing an escrow letter from an attorney, and ensuring that the appraised value of the net market rental was high enough that PITI did not exceed 75% of the market rental.  Mr. Mendes testified in a deposition that he did not satisfy any of these conditions, and there is no evidence to the contrary.  He also testified that he did not

attempt to discuss any problems with Cendant, even after the closing date was pushed back to September 13, 2001.

In short, Cendant is entitled to summary judgment on Count I, breach of written contract, because the Mendes failed to satisfy necessary conditions laid out in the final contract between the parties.  Cendant did not breach the contract when it refused to close the mortgage loan.

Cendant is also entitled to summary judgment on Count II, breach of implied contract, because Mr. Mendes testified that no one at Cendant made any promises to him, outside of the documents already discussed, and there is no evidence of any additional promises.  Massachusetts case law does not support a claim for breach of an implied contract where an explicit contract governs the parties' relationship.  *Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 85 (1956) ("The law will not imply a contract where there is an existing express contract covering the same subject matter.") (citations omitted).  See also, *Okmyansky v. Herbalife Int'l of Am.*, 415 F.3d 154, 162 (1st Cir. 2005); *Ruiz v. Bally Total Fitness Holding Co.*, 447 F.Supp.2d 23, 29 (D. Mass. 2006); *Micromuse, Inc. v. Micromuse, PLC*, 304 F.Supp.2d 202, 209 (D. Mass. 2004); *Boswell v. Zephyr Lines*, *Inc.* 414 Mass. 241, 250 (1993).

    **C.    93A Claim**

Mass. Gen. Laws ch. 93A, Section 2(a) provides that "Unfair

methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  The Mendes' complaint alleged that Cendant violated this provision by its "refusal to provide financing to Mr. and Mrs. Mendes and its misrepresentation that it offered to provide conventional financing to them."  However, neither aspect of the Mendes' complaint alleges a circumstance that descends to the level of a 93A violation.

Case law makes clear that a standard breach of contract does not constitute a 93A violation.  *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985) ("it has been held that mere breaches of contract, without more, do not violate chapter 93A"), *citing Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100-01 (1979).  As I determined above, Cendant's "refusal to provide financing" was not even a breach of contract.  Consequently, standing alone, Cendant's refusal to provide financing is not a violation of Ch. 93A.  Reliance upon a plain contract is not an "unfair or deceptive act" under Ch. 93A.  The Mendes do not allege that Cendant engaged in any additional improper conduct.  Consequently, summary judgment is appropriate on this allegation.

The alleged "misrepresentation" to which the Mendes' complaint refers appears to be based on Cendant's conduct at some unspecified point after the mortgage was denied.  Mr. Mendes

10

acknowledged in his deposition testimony regarding the 93A claim that he never asked Cendant about conventional financing ("Q: Did you ever ask Cendant Mortgage if you could apply for conventional financing?  A: No.").  Mr. and Mrs. Mendes have both acknowledged that Mr. Mendes handled all discussions with Cendant.  Consequently, if Mr. Mendes did not discuss conventional financing with Cendant, there is no basis to find that Mrs. Mendes did so.  The Mendes' opposition to summary judgment does not illuminate the basis of the misrepresentation claim, and, in fact, fails to mention this allegation at all.  Because the plaintiff has testified that no misrepresentation was made to him regarding conventional financing, and the issue is not pressed in plaintiffs' opposition brief, I find summary judgment appropriate on this allegation, as well.  Consequently, I will grant summary judgment on the Chapter 93A claim.

    **D.    Motions to Strike**

The defendants have filed two motions to strike, one to preclude plaintiffs' experts Susan L. Mitchell, Peter D. Tetreault, and Connor Shortsleeve from testifying and to strike Mr. Shortsleeve's expert report in opposition to summary judgment, and the other to strike Mrs. Mendes' affidavit on hearsay grounds.  The proposed expert testimony of Ms. Mitchell and Mr. Tetreault are essentially directed to the issue of damages, which are no longer viable given my disposition of the

summary judgment motion. Consequently, the motion to preclude these experts from testifying at trial appears moot.

However, to the extent that Mr. Shortsleeve's expert report could be considered relevant to the summary judgment motion, I find defendant's motion to strike well founded. Mr. Shortsleeve holds himself out to be a mortgage broker. But that hardly makes him qualified to offer a legal opinion on whether Cendant and the Mendes had a binding contract, or whether various conditions were satisfied, as he does in Part One of his report. These are questions to be answered by the court, not a quondam expert, even if the proposed expert has legal training, something Mr. Shortsleeve does not. Parts Two and Three of Mr. Shortsleeve's report have no bearing on the question I have found determinative in this case -- whether Cendant had an obligation to lend money to the Mendes if the conditions in the Final Commitment Letter were not satisfied. Consequently, I have disregarded these as well. Similarly, Mrs. Mendes' affidavit, based on hearsay, is irrelevant to the determinative question, and I have not considered it.

### III. CONCLUSION

For the reasons discussed more fully above, I GRANT Cendant's motion for summary judgment on all counts.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK

```
                                        UNITED STATES DISTRICT JUDGE
```